**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x

MORTON LIPETZ and EVELYN JEAN
LIPETZ, Individually and On Behalf of All
Others Similarly Situated,

                        Plaintiffs,

    vs.

WACHOVIA CORPORATION, G.
KENNEDY THOMPSON and THOMAS J.
WURTZ,

                        Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 08-6171

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

## INTRODUCTION

1.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Wachovia Corporation ("Wachovia" or the "Company") between May 8, 2006 and June 6, 2008 (the "Class Period"), against Wachovia and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.     Wachovia is registered as a financial holding company and a bank holding company, and provides commercial and retail banking and trust services through full-service banking offices.

3.     During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results and concealed the Company's extremely aggressive residential mortgage lending practices, its failure to write down impaired securities containing subprime debt, its poor internal controls and its improper practices with respect to auction rate securities.  As a result of defendants' false statements, Wachovia stock traded at artificially inflated prices during the Class Period, reaching a high of $58.80 per share in February 2007.

4.     In mid-July 2007, it became apparent to the market that banks, including Wachovia, would be adversely affected by the mortgage meltdown.  As it relates to Wachovia, investors would have known this information at the beginning of the Class Period had defendants disclosed Wachovia's risky practices with respect to mortgage lending and taken appropriate reserves for the large amount of securities linked to subprime mortgages in its portfolio.  While Wachovia's stock declined during July, it continued to be artificially inflated due to defendants' concealment of Wachovia's enormous problems with mortgage-related assets.

5.     On November 8, 2007, Wachovia announced that the Company was setting aside $600 million in the fourth quarter and that the value of securities it owned linked to subprime mortgages dropped by $1.1 billion in October 2007.  This followed write-downs of $1.3 billion in the third quarter.  Even with the write-downs, Wachovia's stock continued to be artificially inflated

as defendants represented that future residential mortgage-backed securities losses, net of hedges, would be immaterial.  The press release stated:

> **October Market Events**  Following our October 2007 announcement of third quarter 2007 results of operations and our financial outlook for the remainder of 2007, certain financial markets experienced further deterioration, particularly the markets for subprime residential mortgage-backed securities ("RMBS") and for collateralized debt obligations ("CDOs") collateralized by RMBS ("ABS CDOs"). In October, rising defaults and delinquencies in subprime residential mortgages and rating agencies' downgrades of a large number of subprime residential mortgage-related securities led to unprecedented declines in the ABX subprime indices, that contributed to a rapid decline in the valuations of subprime RMBS and ABS CDOs.

> *          *          *

> The value of CDOs we have in our portfolio depends on the value of the underlying collateral. ABS CDOs experienced declines in value correlated to the declines in value of subprime RMBS in October. Our third quarter 2007 market disruption-related losses totaling $1.3 billion pre-tax included $347 million of subprime-related valuation losses, net of hedges, on ABS CDOs. Due to the October market deterioration, these ABS CDOs experienced further declines in value in the month of October 2007 by an amount we currently estimate to be approximately $1.1 billion pre-tax. ***At October 31, 2007, we had remaining exposure to ABS CDOs of $676 million***, including on-balance sheet positions and the notional amount of off-balance sheet positions, compared to $1.8 billion at September 30, 2007.

> We have exposure to subprime RMBS in other positions totaling $2.1 billion at both October 31, 2007, and September 30, 2007. Estimated aggregate valuation ***losses of these other positions during the month of October 2007 are immaterial net of hedges***.

> *          *          *

> ***Of the remaining asset classes where we recorded market disruption-related losses in the third quarter of 2007, the aggregate net market value changes in October in these investments have not been significant. These asset classes include commercial mortgage, leveraged finance, consumer mortgage, and other structured credit products not collateralized by subprime RMBS. Some of the markets for these asset classes continue to demonstrate poor liquidity and higher than typical volatility while others have displayed moderate stability in October.***

6.      As a result of this news entering the market, Wachovia's stock dropped to close at $40.65 per share on November 9, 2007, a decline of 11% from October 31, 2007, and a decline of 19% from October 15, 2007.

7.    However, even these disclosures failed to inform investors of the extent of Wachovia's problems.

8.    On December 12, 2007, Wachovia disclosed that it would set aside $1 billion in excess of charge-offs, an increase from the previous estimate of $500 million to $600 million.

9.    On January 22, 2008, Wachovia issued its fourth quarter and full year 2007 financial results, in a release which stated in part:

> Wachovia Corp. today reported net income of $51 million, or 3 cents per share, in the fourth quarter of 2007 compared with $2.30 billion, or $1.20 per share, in the fourth quarter of 2006.
>
> *        *        *
>
> "The continued turmoil in the capital markets and the dramatic change in the credit environment diminished our fourth quarter results substantially," said Ken Thompson, Wachovia chairman and chief executive officer. "We took active and prudent steps in the second half of the year to deal with the market disruption and credit deterioration, and we believe this allows us to move forward from a position of strength despite the uncertain economic environment. . . . . Our management team and dedicated employees are focused intently on the strategic priorities that prepared us well for this more difficult economic environment: controlling expenses, managing risk appropriately, creating revenue synergies between our businesses, and continuing to provide industry-leading customer service. We're excited about the future with our new partners from A.G. Edwards and with our newest banking markets in some of the nation's fastest growing and affluent regions."

10.    On February 5, 2008, *The New York Times* reported that Wachovia was accused in a lawsuit of allowing fraudulent telemarketers to use its accounts to steal millions from victims. Also on February 5, 2008, Wachovia had to offer the highest coupon the bank had ever paid on bonds in order to raise capital.

11.    On February 28, 2008, Wachovia disclosed it expected even higher losses on mortgage defaults, as the Company raised its expected losses from lending to more than triple the prior year's levels because of rising mortgage defaults. The Company's stock dropped to $32.36 per share on the news, but continued to be artificially inflated as defendant G. Kennedy Thompson, the

Company's CEO and President, assured investors: "We have every confidence we'll navigate the headwinds of the current cycle."

12.    On March 3, 2008, Wachovia was sued by hedge fund VCG Special Opportunities Master Fund Ltd. for improperly requiring it to pay out more from insurance derivatives contracts as the value of mortgage-backed bonds declined.

13.    On April 14, 2008, Wachovia reported its first quarter 2008 financial results, which included a provision for credit losses of $2.8 billion, and reduced the dividend, in a release which stated in part:

> Wachovia today announced a series of actions to further enhance its capital base and operational flexibility, and updated its credit reserve modeling to reflect greater emphasis on forecasted changes in customer behavior assuming continued house price depreciation. These actions include:
>
> - Plans to raise capital through a public offering of common stock and perpetual convertible preferred stock;
>
> - Lowering the quarterly common stock dividend, which preserves $2.1 billion of capital annually, to build capital ratios and provide more operational flexibility. The board of directors declared a quarterly common stock dividend of $0.375 cents per common share, payable on June 16, 2008, to stockholders of record on May 30, 2008. This dividend level is consistent with Wachovia's capital needs and growth opportunities for each of its business segments, and with an anticipated 40 percent to 50 percent cash payout ratio over the intermediate horizon; and
>
> - The update in the credit reserve modeling in response to the current and forecasted market environment and its effect on consumer behavior, particularly in stressed markets, resulting in a significant increase in the first quarter 2008 provision for credit losses. In addition, the scope of credit disclosures was increased to provide enhanced insight into the payment option consumer real estate portfolio.
>
> In addition, Wachovia reported a first quarter 2008 net loss of $350 million before preferred dividends, or a net loss available to common stockholders of $393 million, (20 cents per common share). These results, which reflect higher credit costs and the continued disruption in the capital markets, compared with earnings of $2.30 billion, or $1.20 per share, in the first quarter of 2007.

*    *    *

Other key trends in the first quarter of 2008 compared with the first quarter of 2007 included:

*    *    *

- Provision for credit losses of $2.8 billion, which exceeded net charge-offs by $2.1 billion. The provision largely reflected more severe deterioration in the residential housing market, particularly in specific markets in California and Florida, as well as the result of the refinements made to the credit reserve model for the payment option product. These refinements incorporate multiple and more granular factors regarding unprecedented consumer behavior, housing price deterioration and increased foreclosures. Net charge-offs were $765 million, or an annualized 0.66 percent of average net loans. Total nonperforming assets including loans held for sale were $8.4 billion, or 1.70 percent of loans, foreclosed properties and loans held for sale, largely reflecting increases in consumer real estate-related nonperforming assets due to the effects of the weakened housing industry.

**Lines of Business**

The following discussion covers the results for Wachovia's four core business segments and is on a segment earnings basis, which excludes net merger-related and restructuring expenses, other intangible amortization and discontinued operations. Segment earnings are the basis on which Wachovia manages and allocates capital to its business segments. In accordance with Wachovia's business segment methodology, provision expense in excess of charge-offs, which amounted to $2.1 billion in the first quarter of 2008, is not allocated to business segments.

14.     On this news, Wachovia's stock declined to $25.55 per share, on volume of 191 million shares, a decline of 56% from the Class Period high of $58.80 per share in February 2007.

15.     On April 15, 2008, Oppenheimer cut Wachovia's fiscal 2008 earnings estimate to $1.70 a share from $2.70 a share, citing the Company's share sale to replenish capital, which diluted existing stock by about 15%, and credit losses linked to the U.S. subprime slump.  As *Bloomberg* reported:

Richard Bove, an analyst at Punk Ziegel & Co. LP, questioned the company's credibility, saying the bank cut its dividend after previously suggesting it wouldn't trim the payout.  Bove called for the removal of Lanty Smith, the Wachovia director

- 5 -

who said in a Wall Street Journal article that it was "disingenuous" for investors to be surprised by Wachovia's dividend reduction.

'Outrageous Statement'

"This is not acceptable," said Bove in a note to investors. "It is the most outrageous statement I can ever remember made by a board member directly insulting shareholders."

16.    By late May 2008, Wachovia disclosed it had received subpoenas and/or inquiries

from the SEC and regulators from several states, related to auction rate securities.

17.    On June 2, 2008, Wachovia announced an immediate change in the Company's

management, in a release which stated in part:

> Wachovia announced today that its current Chairman, Lanty Smith, has been appointed interim Chief Executive Officer, succeeding Ken Thompson, who is retiring at the request of the Board. Ben Jenkins, currently Vice Chairman and President of the General Bank, will serve as interim Chief Operating Officer.
>
> All of the company's staff functions will report to Smith, with the company's four lines of business – General Bank, Wealth Management, the Corporate and Investment Bank and Capital Management – reporting to Jenkins. The Board of Directors has formed a special committee to conduct a search for a permanent Chief Executive Officer.
>
> "Wachovia is a strong institution and well positioned even in the face of the unprecedented conditions in the financial services industry," said Smith. "The Board is confident that we are putting in place the right interim leadership to move the company forward, and no other senior management changes are currently contemplated."
>
> Smith continued, "No single precipitating event caused the Board to reach this decision, but a series of previously disclosed disappointments and setbacks cumulatively have negatively impacted the company and its performance. The Board believes new leadership will help to revitalize and reenergize Wachovia and enable it to realize its potential. We will move Wachovia steadily ahead as a strong, independent company by continuing to focus first on the needs of our customers. Our recent successful capital raising actions provide us the solid foundation and flexibility we need in an environment which remains extremely challenging for Wachovia and the entire banking industry. Despite continued hurdles, we have confidence in our strong liquidity, good capital position and solid business model."

18.    Wachovia was then placed on creditwatch negative by Standard & Poor's.

- 6 -

19.     After this news, Wachovia's stock dropped to $23.40 per share on June 2, 2008, on volume of 66 million shares.  The stock continued to decline on June 3, 2008.

20.     Then, on June 9, 2008, a *BusinessWeek* article came online about Wachovia, entitled "Wachovia:  Golden West Wasn't Golden."  The article stated in part:

> When Wachovia (WB) Chief Executive Officer Ken Thompson sealed a $24 billion deal to buy Golden West Financial in May, 2006, he bragged that he had bagged "a crown jewel" of the mortgage business. Two years later it's painfully clear that Thompson bought the nation's second-largest S&L at the peak of the housing bubble, a misstep that led to his ouster on June 2.

> *              *              *

> Analysts figure Wachovia could end up incurring losses of as much as $11 billion on Golden's West $122 billion mortgage portfolio. "You'd be hard-pressed to find anything good out of this acquisition," says Terry Maltese, president of Sandler O'Neill Asset Management.

> *              *              *

> In most mergers, it's the acquirers that exert their will. But right after Wachovia bought Golden West, executives from the S&L took control of all mortgage lending. And according to former brokers, they began pushing Wachovia's sales force to steer applicants into its signature "Pick-A-Payment" loans. These give borrowers four choices of how much to pay each month, and cost as much as a full percentage point more than a 30-year, fixed-rate mortgage. "[Management] believed Pick-A-Payment loans were the answer for every customer," says one ex-broker.

> *              *              *

> Despite Thompson's tireless defense of the deal, it was evident by earlier this year that Golden West's approach worked best in rising markets. Analysts note that Golden West focused too much on appraisals and too little on verifying the income and assets of applicants. While this tactic helped ensure that Golden West could recover the full value of homes that went into foreclosure during up cycles, it didn't anticipate that borrowers would simply walk away if a plunge in home prices left them underwater.

> Thompson in January eased out Golden West's top executive and soon after required Golden West's mortgage officers to start using credit scores and better verify employment and assets from applicants. But those moves were too late to salvage his job.

21.     On this news, Wachovia's stock dropped to $18.89 per share on June 9, 2008, on volume of more than 80 million shares.

22.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     Defendants' portfolio of collateralized debt obligations ("CDOs") contained billions of dollars worth of impaired and risky securities, many of which were backed by subprime mortgage loans.

(b)     Defendants failed to properly account for highly leveraged loans such as mortgage-backed securities.

(c)     Wachovia had inadequate controls to prevent employees and others from using customer account numbers to steal millions of dollars.

(d)     The Company had inadequate controls to prevent management from understating loan loss allowances by billions of dollars causing Wachovia's financial statements to be materially misstated.

(e)     Internally at Wachovia it was understood that the acquisition of Golden West Financial in 2006 for $24 billion had been a colossal mistake and would lead to large losses.

(f)     Wachovia had become heavily involved in the underwriting, sale and subsequent auctions of auction rate securities, which were much riskier than represented to investors in the securities and the municipalities which issued them.[1]  Once these auctions began failing, Wachovia would be subject to investigations and loss of reputation.

---

[1]     An auction rate security ("ARS") typically refers to a debt instrument (such as municipal bonds) with a long-term nominal maturity for which the interest rate is reset through a dutch auction.

(g)    Wachovia had been heavily involved in pay-option adjustable rate mortgages ("pay-option ARMs").  These pay-option ARMs provided that during the initial term of the loan, borrowers could pay only as much as they desired with any underpayment being added to the loan balance.  These loans would become toxic (for both Wachovia and the borrowers) once housing prices stopped increasing at a rapid rate.

23.    As a result of defendants' false statements, Wachovia's stock traded at inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 67% from their price before these disclosures.

## JURISDICTION AND VENUE

24.    Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

25.    Venue is proper here pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.  Wachovia has a substantial presence in New York.  Many of the acts and transactions giving rise to the violations of law complained of occurred here.

26.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

27.    Plaintiffs Morton Lipetz and Evelyn Jean Lipetz purchased Wachovia common stock as described in the attached certification and were damaged thereby.

28.    Defendant Wachovia operates as a bank holding company.  The Company engages in capital management, the general bank, wealth management, and the corporate and investment bank

businesses and provides various commercial and retail banking and trust services through full-service banking offices in the United States. Wachovia has headquarters in Charlotte, North Carolina, and has branch offices throughout the United States, including many in this District, and around the globe.

29.    Defendant G. Kennedy Thompson ("Thompson") was, at relevant times, Chairman of the Board of Wachovia until May 2008, and was CEO and President of the Company until June 2, 2008, when the Board asked him to retire.

30.    Defendant Thomas J. Wurtz ("Wurtz") is, and at all relevant times was, Chief Financial Officer ("CFO") and Executive Vice President of Wachovia.

31.    Defendants Thompson and Wurtz (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Wachovia's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at ¶¶39-48, 51, 53-55, 57, 59, 61-62, 64, 67-68, 70, 72, 74, 76-77 and 80.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

32.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Wachovia. Defendants' fraudulent scheme and course of

business that operated as a fraud or deceit on purchasers of Wachovia common stock was a success, as it: (i) deceived the investing public regarding Wachovia's prospects and business; (ii) artificially inflated the price of Wachovia common stock; and (iii) caused plaintiff and other members of the Class to purchase Wachovia common stock at inflated prices.

33.    Defendants were also motivated by the compensation arrangements of Wachovia. Defendants' compensation was in large part determined by the reported financial performance of the Company:

> The Compensation Committee determines this compensation element at the end of the fiscal year so that all relevant data are available regarding the corporate and individual performance measures, relying upon audited financial results. Wachovia provides the annual cash incentive award opportunities to our executive officers, including the CEO, under the covered officer incentive component of the SIP. The maximum individual award, including cash incentive and restricted stock awards, under the SIP is limited to 0.5% of Wachovia's adjusted net income, which in 2006 is equal to $39.5 million. Funding for the SIP annual cash incentive award component is based on an assessment of Wachovia's actual financial performance relative to the Compensation Committee's pre-established financial performance goals:

> - If actual performance does not reach a certain threshold level of goal performance, the SIP does not fund;
>
> - If actual performance reaches a threshold level, the SIP funds at 50% of target;
>
> - If actual performance reaches the target level, the SIP funds at 100% of target; and
>
> - If actual performance reaches a superior level, the SIP funds at 200% of target.

34.     For 2006, defendants received the following amounts:

### Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Thompson | 2006 | 1,090,000 | 9,064,002 | 8,144,728 | 5,150,000 | 216,178 | 23,846,282 |
| Wurtz | 2006 | 420,833 | 527,162 | 328,606 | 1,750,000 | 37,755 | 3,126,515 |

35.     Defendants Thompson and Wurtz also benefited from the inflation in Wachovia's stock price caused by their false statements, each selling $1.7 million worth of their Wachovia stock during the Class Period.

## BACKGROUND

36.     Wachovia operates as a bank holding company. It engages in capital management, and the general bank, wealth management, and corporate and investment bank businesses.  The Company provides various commercial and retail banking and trust services through full-service banking offices in the United States.  Wachovia offers checking, savings, check card, foreign currency, annuities, life insurance, brokerage account transfers, CAP accounts, individual retirement accounts, credit cards, home equity, mortgage, hazard and flood insurance, escrow, taxes, private mortgage insurance, education loans, online services, online banking, online bill pay, and online brokerage services.  The Company also provides various other financial services, including mortgage banking, investment banking, estate planning, investment advisory, asset management, credit and debit card products, trust services, charitable services, mortgage banking, asset-based lending, leasing, insurance, and international and securities brokerage services.  In addition, Wachovia engages in equity and debt underwriting activities, private equity investment activities, derivative securities activities, investment and wealth management advisory businesses, and brokerage activities.

37.     On October 1, 2006, Wachovia completed the acquisition of Golden West Financial Corporation, the parent company of World Savings Bank. Golden West shareholders received 1,051 shares of Wachovia plus $18.6461 in cash for each Golden West share. The total cost of the acquisition was $24.3 billion.

38.     By this time, the residential real estate market was beginning to show signs of peaking or, at minimum, indications of reduced growth prospects. Wachovia was heavily exposed to this market, yet defendants made efforts to conceal the actual threat to Wachovia from the changing housing market. To conceal their problems, which could devastate the Company, defendants failed to take adequate reserves for mortgage-related assets, and discussed in positive, but false, terms the benefits of the Golden West acquisition.

**DEFENDANTS' FALSE AND MISLEADING
STATEMENTS ISSUED DURING THE CLASS PERIOD**

39.     On May 7, 2006, after the market closed, Wachovia issued a press release entitled "Wachovia to Acquire Golden West Financial, Nation's Most Admired and 2nd Largest Savings Institution; Enhances Retail Banking Network in Attractive Growth Markets and Bolsters National Consumer Lending," which stated in part:

> Wachovia Corporation and Golden West Financial Corporation, parent of World Savings Bank, said today they have signed a definitive agreement to merge, creating a leading retail banking and mortgage lending franchise in many of the nation's most attractive growth markets. This combination strengthens Wachovia's presence in California, Florida and Texas, and extends the banking franchise within reach of 55 percent of the U.S. population.
>
> With the acquisition of Oakland, California-based Golden West, Wachovia will add 285 consumer banking offices with $62 billion in retail deposits in 10 states while entering new markets in California, Arizona, Colorado, Illinois, Kansas and Nevada. The combined company, which will have assets of $669 billion and a market capitalization of $117 billion, will serve banking customers in 21 states and Washington, D.C. Wachovia will gain mortgage lending operations under the World Savings Bank name in 39 states.

"We believe this combination of our two companies, both known for exceptional customer service and pristine credit quality, will generate superior long-term growth in earnings per share," said Ken Thompson, Wachovia chairman and chief executive officer, who noted that Golden West's World Savings Bank is the nation's only standalone savings and loan with a "AA" debt rating. "For four decades, Golden West has taken industry-wide challenges in stride and maintained a singular focus as a risk-averse residential mortgage portfolio lender. The result is an astonishing 25-year track record of 17 percent compound annual growth in earnings per share and virtually no credit losses realized even in the toughest year in its history."

Herbert M. Sandler, Golden West chairman and chief executive officer, commented, "I've been a keen observer of the market and the mortgage and banking industries for nearly 40 years. Wachovia is the company we selected to entrust with our legacy as one of the nation's most admired and trusted financial institutions. We share the same values of operating with integrity, putting customers first and encouraging teamwork."

Added Marion O. Sandler, Golden West chairman and chief executive officer, "Golden West has grown consistently over many years, and now we'd like to provide our loyal customers with the additional banking products they've been asking for. We believe Wachovia is the perfect partner to deliver on customers' needs and further enhance the strong company we have built."

Terms of the agreement call for each Golden West shareholder to receive a package of 1.051 shares of Wachovia common stock and $18.65 in cash. Based on the closing price of Wachovia common stock on May 5, 2006, this represents total consideration of $25.5 billion, or a price of $81.07 per share of Golden West common stock, a 15 percent premium over Golden West's share price on that date. The purchase accounting transaction, which is expected to close in the fourth quarter of 2006, is expected to add to Wachovia's earnings per share excluding merger-related and restructuring expense and intangibles amortization in the second year after closing. It is expected to provide an internal rate of return of 17 percent for Wachovia shareholders.

Wachovia and Golden West will be well-positioned in numerous high-growth markets, with an extensive product offering – the No. 1 retail bank in the Southeast, a Top 5 bank in the western United States, Top 10 mortgage origination and servicing company, Top 10 indirect auto lender, a leading national brokerage and fund manager, and a well-positioned corporate and investment bank. The combined company will have total deposits of $390 billion and loans of $402 billion. The company's 15 million customers will be served by more than 110,000 employees, 3,400 banking branches, 5,300 ATMs, 360 mortgage lending offices and 730 full-service retail brokerage offices.

"We're very excited to partner with such strong management and with an extremely knowledgeable and diligent team of sales leaders," said Ben Jenkins,

- 14 -

Wachovia vice chairman and General Bank president. "Customers will continue to be served by the same dedicated and passionate people who have always met their needs – only over time, they'll have more products and services to choose from. We'll work hard with our new partners to achieve merger efficiencies, but we expect that no employees who deal directly with customers will lose their jobs."

"Both companies are proud of their tradition of outstanding community service," added Marion Sandler of Golden West. "Together, we will strengthen our community leadership, and our shared commitment to the communities we serve will be made more powerful by this merger." Each company currently has been rated "outstanding" for Community Reinvestment Act compliance by federal regulators.

Wachovia expects the merger will generate $53 million after tax in annual expense reductions, phased in over two years. This equals less than 1 percent of the companies' current combined expense base. Wachovia expects to take merger-related one-time charges of $293 million after tax, related to staff training, retention and severance; real estate; systems integration; and other miscellaneous accruals.

The complementary strengths of the two companies are expected to generate significant revenue opportunities; however, revenue assumptions were not included in the financial assumptions for the transaction.

40.    On July 20, 2006, Wachovia issued its second quarter 2006 financial results, in a release which stated in part:

Wachovia Corp. today reported record net income of $1.88 billion, or $1.17 per share, in the second quarter of 2006 compared with $1.65 billion, or $1.04 per share, in the second quarter of 2005.

Excluding after-tax net merger-related expenses of 1 cent per share in the second quarter of 2006 and 3 cents per share in the second quarter of 2005, earnings were $1.90 billion, or $1.18 per share, in the second quarter of 2006 compared with $1.70 billion, or $1.07 per share, in the second quarter of 2005.

"This was a strong quarter for Wachovia. In the face of a challenging yield curve environment, we generated double-digit revenue and earnings growth driven by solid execution. Our team delivered record results in three of our four major businesses, and the first full quarter of results in our new auto lending businesses exceeded our expectations," said Ken Thompson, Wachovia chairman and chief executive officer. "Our fundamentals remain strong with improving overhead efficiency, stellar asset quality and industry-leading customer service. We're excited about our prospects as we work with our merger partners to extend our brand promise to customers nationwide."

*      *      *

Results include the impact of the acquisition of Westcorp on March 1, 2006. Also announced during the quarter was the proposed acquisition of Golden West Financial Corporation, which is expected to close in the fourth quarter of this year.

In the second quarter of 2006 compared with the second quarter of 2005, Wachovia:

- Grew revenue 14 percent, driven by strong balance sheet growth and fee and other income related to solid capital markets results, including higher principal investing gains and strong trading profits.

*      *      *

- Noninterest expense rose 12 percent on higher personnel expense reflecting revenue-based incentives and the effect of the Westcorp acquisition.

- Recorded a provision for credit losses of $59 million. Net charge-offs were $51 million, or an annualized 0.08 percent of average net loans. Total nonperforming assets including loans held for sale were $741 million, declining to 0.25 percent of loans, foreclosed properties and loans held for sale.

*      *      *

**Capital Management**

Capital Management includes retail brokerage services and asset management. The second quarter of 2006 compared with the second quarter of 2005 included:

- Record earnings of $195 million on 12 percent revenue growth, as strength in retail brokerage managed account fees overcame relatively flat brokerage transaction activity. Managed assets grew 35 percent to $121.9 billion.

- 41 percent growth in net interest income largely due to improved deposit spreads.

- 7 percent growth in noninterest expense primarily due to increased production-based commissions, employee stock compensation expense and the impact of two June 1, 2006, acquisitions. The overhead efficiency ratio improved 355 basis points to 78.33 percent due to strong net interest income growth, retail brokerage managed account fee growth and disciplined expense control.

- Total assets under management of $237.3 billion at June 30, 2006, were up 5 percent from June 30, 2005. Equity assets reached $90.6

billion, up 15 percent from June 30, 2005, including $5.5 billion in assets from the Metropolitan West Capital Management acquisition and market appreciation. Total brokerage client assets grew 3 percent from year-end 2005 and 7 percent from June 30, 2005.

41.     On August 4, 2006 , the Company filed its Form 10-Q for the second quarter of 2006, which included the same financial results as previously reported.  The Form 10-Q also included a certification by Thompson, which stated:

I, G. Kennedy Thompson, certify that:

1.     I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2006 of Wachovia Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

42.    Defendant Wurtz signed a nearly identical certification included in the Form 10-Q.

43.    On August 31, 2006, Wachovia issued a press release entitled "Wachovia Corporation and Golden West Financial Corporation Announce Shareholder Merger Approval," which stated in part:

Wachovia Corporation and Golden West Financial Corporation announced today that the shareholders of both companies approved their merger.

"We are delighted that shareholders of both companies support the combination of Golden West and Wachovia. Wachovia is proud to join forces with a stellar company that has an impressive track record, and we are confident the combined company will generate superior growth and long-term value," said Ken Thompson, chairman, president and chief executive officer of Wachovia. "We look forward to delivering outstanding products and services to individuals and businesses from coast to coast."

"We received strong support from our shareholders today and are delighted with their response," said Herbert M. Sandler, Chairman and CEO of Golden West. "We look forward to the successful completion of the merger and to a combined company that serves the best interests of our shareholders, employees, customers and communities."

44.    On October 2, 2006, Wachovia announced the completion of the merger, in a release which stated in part:

> "We are excited about the opportunities presented as we join forces with one of the country's premier financial institutions. The combination of Wachovia and Golden West greatly enhances our market presence, product set and mix of businesses, *enabling us to deliver a stronger value proposition for our customers and shareholders*," said Ken Thompson, Wachovia chairman and chief executive officer. "For the past four months, teams from Wachovia and Golden West have worked together diligently to plan for the integration of our two companies. We are now totally focused on implementing the integration plan and delivering exceptional service and products to our customers. On behalf of all my Wachovia teammates, we welcome the employees of Golden West."

> "Today marks a momentous occasion when two great companies join to form an even greater, new company," said Herbert M. Sandler, Golden West chairman emeritus. "We have tremendous confidence in the combined Wachovia-Golden West team."

*        *        *

> As a result of the merger, Golden West shareholders will receive approximately 1.051 shares of Wachovia common stock and $18.65 in cash for each share of Golden West common stock they own. Shareholders may access additional information at Wachovia's Investor Relations Web site, wachovia.com/investor. The site provides access to the most current news and financial information on Wachovia.

> The merger integration process is scheduled to be completed mid-2008.

45.    On October 16, 2006, Wachovia issued its third quarter 2006 financial results, in a release which stated in part:

> Wachovia Corp. today reported net income of $1.88 billion, or $1.17 per share, in the third quarter of 2006 compared with $1.66 billion, or $1.06 per share, in the third quarter of 2005.

> Excluding after-tax net merger-related expenses of 2 cents per share in the third quarter of 2006 and 3 cents per share in the third quarter of 2005, earnings were $1.90 billion, or $1.19 per share, in the third quarter of 2006 compared with $1.72 billion, or $1.09 per share, in the third quarter of 2005.

> "Wachovia once again delivered double-digit earnings per share growth due to strong fundamentals and focused execution," said Ken Thompson, Wachovia chairman and chief executive officer. "In the face of a challenging yield curve environment, we continued to improve efficiency, while asset quality remained

strong. Our industry-leading customer service helped sales productivity remain stable, and our expanded consumer franchise including auto lending, credit cards and Westcorp retail branches in California generated results ahead of our expectations. With the closing of the Golden West merger on October 1, we're very excited about our prospects as we extend our brand promise to customers nationwide."

*      *      *

Results include the impact of the acquisition of Westcorp on March 1, 2006. The acquisition of Golden West Financial Corporation closed on October 1, 2006, and therefore is not included in Wachovia's September 30, 2006, financial results. In the third quarter of 2006 compared with the third quarter of 2005, Wachovia:

- Grew revenue 5 percent on higher fee income and growth in loans and deposits, including the addition of Westcorp, although the benefit of a larger balance sheet was limited by margin compression.

- Increased net interest income 4 percent, reflecting higher average commercial loans, up 14 percent, and average consumer loans, up 36 percent.

  ° Commercial loan growth was led by middle-market and business banking, commercial real estate and large corporate lending, while consumer loan growth was led by higher real estate-secured loans, which included the impact of year-end 2005 loan transfers from loans held for sale, as well as the addition of Westcorp.

  ° Average core deposits rose 4 percent and average low-cost core deposits were relatively stable. Growth in lower spread loans, a shift in deposit mix and the effects of a more inverted yield curve resulted in 15 basis points of margin compression.

- 6 percent growth in fee and other income was led by 15 percent growth in service charges and 10 percent growth in fiduciary and asset management fees. Growth in insurance commissions was more than offset by lower retail brokerage commissions as customers migrate to retail brokerage managed account relationships. In addition, principal investing and trading results were lower, while securities gains rose from the third quarter of 2005.

- Noninterest expense rose modestly as lower incentives and a favorable resolution of franchise tax matters were offset by the impact of acquisitions. The overhead efficiency ratio improved to 57.44 percent, down 234 basis points.

- 20 -

- The increase in the provision for credit losses to $108 million largely reflected growth in auto lending and other consumer loans as well as lower commercial loan recoveries. Net charge-offs were $116 million, or an annualized 0.16 percent of average net loans. Total nonperforming assets including loans held for sale were $782 million, or 0.26 percent of loans, foreclosed properties and loans held for sale.

46.     On November 3, 2006, the Company filed its Form 10-Q for the third quarter of 2006, which included the same financial results as previously reported. The Form 10-Q also contained virtually identical certifications by Thompson and Wurtz as contained in Wachovia's Form 10-Q for the second quarter of 2006, as cited above.

47.     On December 13, 2006, defendant Thompson appeared at a conference in New York and discussed the benefits of the Golden West acquisition:

> "I think it is fair to say that with Golden West, Wachovia is positioned in the best combination of growth and affluency in the country and [that] these markets are appealing not just to our general bank, not just to the retail side of our business, but also to commercial banking, to our wealth management operation, to our brokerage business and to our capital markets business."

48.     On December 18, 2006, Wachovia issued a press release entitled "2006 Best Year Ever for Customer Service and Customer Loyalty at Wachovia." The press release stated in part:

> Wachovia Corp. today announced that 2006 was the company's best year ever for customer service and customer loyalty.

> "We are pleased to end the year on such a high note in terms of customer service and loyalty," said Ken Thompson, chairman and CEO of Wachovia Corporation. "The results we've seen are a testament to the investment Wachovia has made in becoming a customer service leader in our industry."

49.     On December 28, 2006, *American Banker* reported on the Golden West acquisition:

> Wachovia Corp. had billed its purchase of the thrift company Golden West Financial Corp. as a way to strengthen its branch network and cross-sell products to new customers, but early on in the integration it says it is finding readier opportunities on the mortgage side of the business.

> The $698 billion-asset Charlotte banking company said it remains on target to introduce retail banking products such as credit cards and checking accounts to

customers of the Oakland, Calif., thrift it bought in October; some products are set to appear before next year's fourth quarter, it said.

Meanwhile, however, it has already launched a mortgage product that draws on both Wachovia's and Golden West's product styles.

"We're finding opportunities that we didn't even think of when we agreed to do the deal. . . . There's more upside surprises," Robert McGee, who is coordinating the integration for Wachovia, said in a recent interview.

Wachovia has introduced a fixed-rate mortgage that offers payment options similar to those available in Golden West's adjustable-rate mortgages. The company is also replacing generalists in its East Coast branches with mortgage specialists, many of whom are coming from Golden West.

In the interview in Charlotte, Mr. McGee, who is also the chief operating officer of Wachovia's general bank, discussed how the integration is going, addressed persistent investor concern about Golden West's focus on option ARMs, and talked about his plan to relocate to Oakland to make sure things go smoothly.

The quick introduction of mortgage products makes it likely Wachovia will generate revenue faster than first projected, he said. In announcing the deal last May, Wachovia projected that it would produce $230 million of new annual revenue by 2009.

"We should make enough progress so that 2008 will be measurably better than what we had originally planned . . . , and I'm confident that we'll do better in 2009 than we told folks," he said. He declined to update the revenue-expectation number.

\*       \*       \*

Analysts "are really overreacting" to negative amortization, Mr. McGee said. "The credit and the risk isn't any different than when people draw from a home equity line," he said. Most of the deferred interest is tied to homes with loan-to-value ratios of less than 80%. "So there is still a huge amount of equity in these properties."

50.    Due to these statements, by the end of December 2006, Wachovia stock was above $56 per share, up from $54 at the beginning of December 2006.

51.    On January 23, 2007, Wachovia issued financial results for the full year 2006, which included results for the fourth quarter of 2006, in a release which stated in part:

- 22 -

**4th QUARTER 2006 COMPARED WITH 4th QUARTER 2005**

- Double-digit growth in face of difficult interest rate environment. Results include acquisitions and divestitures.

- Strong momentum and record results in market-related businesses of the Corporate and Investment Bank and Capital Management.

- Overhead efficiency ratio at record low while investment for the future continues.

- Continued strength in credit quality; increased provision reflects growth in auto, commercial lending and credit card.

- Average loans up 74 percent, including acquisitions, with strength in commercial lending and consumer real estate-secured. Expanded consumer franchise including auto lending and credit cards generates results ahead of expectations.

- Customer loyalty scores reach high of 51.8%; organic customer acquisition grew 13.2% annualized.

\*    \*    \*

Wachovia Corp. today reported net income of $2.30 billion, or $1.20 per share, in the fourth quarter of 2006 compared with $1.71 billion, or $1.09 per share, in the fourth quarter of 2005.

Excluding after-tax net merger-related expenses of 1 cent per share in the fourth quarter of 2006 and 2 cents per share in the fourth quarter of 2005, earnings were $2.33 billion, or $1.21 per share, in the fourth quarter of 2006 compared with $1.74 billion, or $1.11 per share, in the fourth quarter of 2005.

Full year 2006 net income was $7.79 billion, up 17 percent from 2005, and earnings per share were up 11 percent from 2005 to a record $4.63. Excluding after-tax net merger-related expenses of 7 cents in 2006 and 11 cents in 2005, earnings in 2006 were $7.91 billion, or $4.70 per share, compared with $6.81 billion, or $4.30 per share, in 2005.

\*    \*    \*

In the fourth quarter of 2006 compared with the fourth quarter of 2005, Wachovia:

- Grew revenue 31 percent on higher loans and deposits primarily due to the addition of Golden West and Westcorp, with equally strong fee income growth.

- 23 -

- Increased net interest income 29 percent, reflecting higher average commercial loans, up 12 percent, and average consumer loans, up 161 percent, including the impact of the acquisitions.

*     *     *

- Generated across-the-board growth in fee and other income, up 33 percent, led by record investment banking fees, strength in service charges and higher securitization income. Asset management fees reached a new high, reflecting continued growth in retail brokerage managed account relationships, while commissions reflected renewed retail brokerage customer activity. Both trading results and securities gains turned around from losses in the fourth quarter of 2005.

- Noninterest expense rose 18 percent largely reflecting the acquisition impact, and also included higher incentives on revenue growth in the Corporate and Investment Bank and in Capital Management.

- Recorded a provision for credit losses of $206 million largely reflecting growth in auto, credit cards and commercial loan portfolios and a refinement of our reserving methodology on a portion of the business banking loan portfolio. Net charge-offs were $140 million, or an annualized 0.14 percent of average net loans. Total nonperforming assets including loans held for sale were $1.4 billion, or 0.32 percent of loans, foreclosed properties and loans held for sale and included $700 million related to the Golden West acquisition.

52.     Following these announcements, while Wachovia's stock was trading at around $57 per share, defendants Thompson and Wurtz each sold approximately 30,000 shares of their Wachovia stock for proceeds of $1,703,092 and $1,741,129, respectively.

53.     On February 28, 2007, the Company filed its Form 10-K for the full year 2006, which included the results for the fourth quarter of 2006, as previously reported.  The Form 10-K also contained virtually identical certifications by Thompson and Wurtz as contained in Wachovia's Form 10-Q for the second quarter 2006, as cited above.

54.     On April 16, 2007, Wachovia issued its results for the first quarter of 2007, in a press release which stated in part:

- 24 -

Wachovia Corp. today reported net income of $2.30 billion, or $1.20 per share, in the first quarter of 2007 compared with $1.73 billion, or $1.09 per share, in the first quarter of 2006.

After-tax net merger-related expenses did not affect earnings per share in the first quarter of 2007 and amounted to 3 cents per share in the first quarter of 2006. Excluding these expenses, earnings were $2.31 billion, or $1.20 per share, in the first quarter of 2007 and $1.77 billion, or $1.12 per share, in the first quarter of 2006. Results also included a lower effective tax rate of 30.99 percent compared with 35.06 percent in the first quarter of 2006.

"Once again our team delivered double-digit earnings growth," said Ken Thompson, Wachovia chairman and chief executive officer. "***Our focus on cost control and risk management continues to provide flexibility in the face of the challenging interest rate environment. Most of all, our team's dedication to serving our customers has a direct impact on our results as we provide industry-leading customer service and grow our base of loyal customers***. In addition, we're seeing very promising results as our cross-business partnerships serve customer needs and generate incremental revenues. The integration of Golden West is on track, and we're pleased with the cross-sell potential of our expanded mortgage platform, as well as our initial success in cross-selling existing World Savings banking customers."

Results in the first quarter of 2007 included the full quarter impact of the purchase accounting acquisitions of Golden West on October 1, 2006, and Westcorp on March 1, 2006. Results in the first quarter of 2006 included one month of results related to Westcorp and a $100 million termination payment received in relation to the Bank of America/MBNA merger.

\*      \*      \*

In the first quarter of 2007 compared with the first quarter of 2006, Wachovia:

- Grew revenue 17 percent on higher loans and deposits primarily due to the addition of Golden West and Westcorp, while higher fee and other income largely reflected strong brokerage managed account fees, growth in fiduciary and asset management fees related to acquisitions and organic growth, and strength in advisory and underwriting fees.

- Increased net interest income 27 percent, reflecting higher average commercial loans, up 10 percent, and increased average consumer loans, largely reflecting the impact of acquisitions.

\*      \*      \*

- Generated 6 percent growth in fee and other income, reflecting continued growth in retail brokerage managed account fees, strong retail brokerage transaction activity and collaboration between Capital Management and the Corporate and Investment Bank to originate and distribute new investment products. Service charges also contributed to solid growth.

- Increased noninterest expense 8 percent largely reflecting the acquisition impact, and included higher commissions on revenue growth in Capital Management.

- Recorded a provision for credit losses of $177 million largely reflecting growth in auto lending, commercial and credit cards. Net charge-offs were $155 million, or an annualized 0.15 percent of average net loans. Total nonperforming assets including loans held for sale were $1.8 billion, or 0.40 percent of loans, foreclosed properties and loans held for sale.

55.     On May 4, 2007, the Company filed its Form 10-Q for the first quarter of 2007, which included the same financial results as previously reported.  The Form 10-Q also contained virtually identical certifications by Thompson and Wurtz as contained in Wachovia's Form 10-Q for the second quarter of 2006, as cited above.

56.     On May 18, 2007, Wachovia's stock continued to trade above $56 per share, as defendants concealed the Company's extensive exposure to mortgage-related asset impairments.

57.     On July 20, 2007, Wachovia issued its financial results for the second quarter of 2007, in a press release which stated in part:

Wachovia Corp. today reported net income of $2.34 billion, or $1.22 per share, in the second quarter of 2007 compared with $1.88 billion, or $1.17 per share, in the second quarter of 2006.

After-tax net merger-related expenses amounted to 1 cent per common share in the second quarters of both 2007 and 2006. Excluding these expenses, earnings were $2.36 billion, or $1.23 per share, in the second quarter of 2007 and $1.90 billion, or $1.18 per share, in the second quarter of 2006.

"Our second quarter performance reflects our continued focus on execution in both the traditional banking and markets-related businesses," said Ken Thompson, Wachovia chairman and chief executive officer. "All four of our major businesses delivered double-digit earnings growth, fueled by new markets, revenue growth

initiatives and an expanded product set. Especially gratifying is our employees' continuing dedication to providing industry-leading customer service — which generated record loyalty and satisfaction scores this quarter. The integration of Golden West is proceeding as planned, and we're excited by the cross-sell potential of our expanded platform. Additionally, our focus on efficiency and risk management continues to provide flexibility for investment for future growth."

Results in the second quarter of 2007 included the full quarter impact of the October 1, 2006, acquisition of Golden West.

*        *        *

In the second quarter of 2007 compared with the second quarter of 2006, Wachovia:

- Grew revenue 20 percent on higher loans and deposits, driven by the addition of Golden West and organic growth, while higher fee and other income largely reflected growth in both our traditional banking and securities businesses.

- Increased net interest income 21 percent on higher average consumer loans, largely reflecting the impact of acquisitions, and higher average commercial loans, up 13 percent.

  ° Commercial loan growth was led by middle-market commercial and international lending. Increased consumer loans were led by higher real estate loans primarily due to the addition of Golden West, as well as growth in auto lending and in credit card.

  ° Average core deposits rose 30 percent and average low-cost core deposits were up 6 percent. Growth in lower spread loans, a shift in deposit mix, acquisition impact and the effects of the inverted yield curve resulted in 26 basis points of margin compression.

- Generated 18 percent growth in fee and other income, reflecting solid retail brokerage transaction activity and continued strength in retail brokerage managed account fees; record originations in key investment banking products and robust principal investing results; and higher traditional banking fees.

- Experienced a 14 percent increase in noninterest expense largely reflecting the impact of acquisitions, higher revenue-based incentives and commissions, and growth initiatives.

- Recorded a provision for credit losses of $179 million largely reflecting growth in auto, commercial, and consumer real estate lending. Net charge-offs were $150 million, or an annualized 0.14 percent of average net loans. Total nonperforming assets including loans held for sale were $2.1 billion, or 0.47 percent of loans, foreclosed properties and loans held for sale.

- In addition, in the second quarter of 2007, Wachovia announced an agreement to acquire A.G. Edwards, Inc., a retail brokerage firm headquartered in St. Louis, Missouri. The transaction, which is subject to applicable regulatory approvals and approval of A.G. Edwards shareholders, is expected to close in the fourth quarter of this year.

*    *    *

**Capital Management**

Capital Management includes retail brokerage services and asset management. The second quarter of 2007 compared with the second quarter of 2006 included:

- 30 percent earnings growth to $291 million on record revenue, driven by solid retail brokerage transaction activity and strength in managed account fees as managed assets grew 24 percent to $151.3 billion.

- Growth in fee income, which also reflected the effect of acquisitions including European Credit Management Ltd. (ECM), a London-based fixed income investment management firm, which closed on January 31, 2007.

- 16 percent growth in noninterest expense primarily due to higher commissions and the impact of acquisitions.

- A decrease in assets under management from the first quarter of 2007, reflecting a change in investment discretion responsibility from Capital Management to Wealth Management.

Total assets under management of $281.5 billion at June 30, 2007, were up from December 31, 2006, including $26.2 billion from the ECM acquisition, $4.9 billion in net inflows and approximately $6.0 billion in market appreciation, offset by a $34.5 billion change in investment discretion responsibility on previously co-managed, nonproprietary assets now solely managed by Wealth Management. Total brokerage client assets grew 5 percent from year-end 2006 to $795.8 billion.

58.    In late July 2007, Wachovia stock declined due to these disclosures and due to announcements by other banks about the credit crunch, which exposed the poor underlying fundamentals of the banks' mortgage risk management, including at Wachovia.

59.    On July 30, 2007, the Company filed its Form 10-Q for the second quarter of 2007, which included the same financial results as previously reported.  The Form 10-Q also contained virtually identical certifications by Thompson and Wurtz as contained in Wachovia's Form 10-Q for the second quarter of 2006, as cited above.

60.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    Defendants' portfolio of CDOs contained billions of dollars worth of impaired and risky securities, many of which were backed by subprime mortgage loans.

(b)    Defendants failed to properly account for highly leveraged loans such as mortgage-backed securities.

(c)    Wachovia had inadequate controls to prevent employees and others from using customer account numbers to steal millions of dollars.

(d)    The Company had inadequate controls to prevent management from understating loan loss allowances by billions of dollars causing Wachovia's financial statements to be materially misstated.

(e)    Wachovia had become heavily involved in the underwriting, sale and subsequent auctions of auction rate securities, which were much riskier than represented to investors in the securities and the municipalities which issued them.  Once these auctions began failing, Wachovia would be subject to investigations and loss of reputation.

(f)    Wachovia had been heavily involved in pay-option ARMs.  These pay-option ARMs provided that during the initial term of the loan, borrowers could pay only as much as they desired with any underpayment being added to the loan balance.  These loans would become toxic (for both Wachovia and the borrowers) once housing prices stopped increasing at a rapid rate.

61.    On October 19, 2007, Wachovia issued financial results for the third quarter of 2007, in a release which stated in part:

- Lower earnings reflecting disruption in the capital markets resulting in valuation losses of $1.3 billion before tax and reduced origination and distribution revenues in the Corporate and Investment Bank.

- Revenue growth led by a 28 percent increase in net interest income, including Golden West, coupled with disciplined expense control partially offset lower fee income.

- Average loans up 53 percent, driven by higher consumer real estate loans related to the Golden West acquisition, and strong organic growth in commercial, international and auto lending.

- Average core deposits up 30 percent, including Golden West. Sales productivity solid in expanded markets.

- Net charge-offs rose 3 basis points to an annualized 0.19 percent of average net loans. Increased provision for credit losses reflects modest deterioration in credit quality, a more uncertain credit environment and loan growth. Higher nonperforming assets largely related to Golden West consumer real estate NPAs and to higher commercial real estate NPAs largely related to downgrades of residential developers.

- Customer loyalty scores at near record 53.1 percent; organic customer acquisition grew 14.8 percent annualized.

*        *        *

Wachovia Corp. today reported net income of $1.69 billion, or 89 cents per share, in the third quarter of 2007 compared with $1.88 billion, or $1.17 per share, in the third quarter of 2006.

After-tax net merger-related expenses amounted to 1 cent per common share in the third quarter of 2007 and 2 cents per common share in the third quarter of 2006. Excluding these expenses, earnings were $1.71 billion, or 90 cents per share, in

the third quarter of 2007 and $1.90 billion, or $1.19 per share, in the third quarter of 2006.

"I'm very proud of our ability to provide capital, liquidity and advice to our customers and peers in the face of the disruption in the fixed income markets in the third quarter. *These conditions clearly had a disappointing impact on the results of market-oriented businesses, but the strength in our core banking and brokerage businesses continued to serve us very well*," said Ken Thompson, Wachovia chairman and chief executive officer. "Our loan and deposit trends were solid, and our retail brokerage performance was strong – and poised for even more growth as our A.G. Edwards colleagues join our team. Additionally, the first of our World Savings branch and deposit conversions was completed successfully last weekend, and going forward, attention in our expanded platform returns fully to sales production. While the impact of the market disruption was significant, it's worth noting that the majority of the lower market valuations in the third quarter largely arose from a repricing of risk in the marketplace and do not reflect deterioration in the underlying credit quality of the assets in our leveraged finance and commercial real estate securitization businesses. Looking ahead, we're taking the appropriate steps to ensure that as markets remain unsettled, we focus intently on actively managing our exposures and controlling costs. Longer term, we believe the *challenges of the third quarter will be an advantage to companies like Wachovia with strong capital and liquidity positions and a clear understanding of the needs of customers and investors*."

Results in the third quarter of 2007 included the full quarter impact of the October 1, 2006, acquisition of Golden West. Results do not include the impact of the acquisition of A.G. Edwards, Inc., a retail brokerage firm headquartered in St. Louis, Missouri, which closed on October 1 of this year.

*    *    *

In the third quarter of 2007 compared with the third quarter of 2006, Wachovia:

- Grew revenue 4 percent on higher loans and deposits, driven by the addition of Golden West and organic growth, while fee and other income declined reflecting disruption in the capital markets in fixed income and other market-related fees, including net valuation losses of:

  ° 1.3 billion in the Corporate and Investment Bank on structured products and leveraged finance warehouse loans and commitments; and

  ° $40 million in Capital Management on asset-backed commercial paper investments.

- 31 -

- Increased net interest income 28 percent reflecting growth in average commercial loans, up 16 percent, and higher average consumer loans, including the impact of acquisitions.

- Generated strong commercial loan growth led by strength in middle-market commercial, large corporate and international lending. Increased consumer loans were led by higher real estate loans primarily due to the addition of Golden West, as well as growth in auto lending.

- Also generated 30 percent growth in average core deposits while average low-cost core deposits were up 7 percent.

- Generated continued strong performance in retail brokerage managed account fees and solid retail brokerage transaction activity. Strong principal investing results and higher traditional banking fees also contributed to growth.

- Held noninterest expense growth, including the effect of acquisitions, to 8 percent largely reflecting lower revenue-based compensation in light of the market disruption.

- Recorded a provision for credit losses of $408 million reflecting modest deterioration in credit quality, a more uncertain credit environment and loan growth. Net charge-offs were $206 million, or an annualized 0.19 percent of average net loans. Total nonperforming assets including loans held for sale were $3.0 billion, or 0.63 percent of loans, foreclosed properties and loans held for sale.

Earnings in the third quarter of 2007 included a $249 million after-tax benefit related to correction of errors primarily in earlier periods in 2007. This related primarily to incorrect application of hedge accounting to certain variable rate demand deposits in the second quarter of 2007. Wachovia's management believes that this impact is not material to current or prior period financial statements, and the Audit Committee of Wachovia's Board of Directors, based on information reviewed by management with the Committee, concurred with management's conclusion.

62.    On this news, the stock dropped to $46.40 per share.  However, if Wachovia had taken appropriate reserves for impaired assets, as required by Generally Accepted Accounting Principles ("GAAP"), its stock would have declined much more than it did.  The stock continued to drift lower after this announcement on suspicions the Company would announce larger write-downs. These fears were confirmed on November 8, 2007, when Wachovia announced the Company was

setting aside $600 million in the fourth quarter and said the value of securities it owned linked to subprime mortgages dropped by $1.1 billion in October 2007. This followed write-downs of $1.3 billion in the third quarter. Wachovia stated:

> Wachovia Corporation today is providing information on the impact of market volatility on its financial results for the month of October and is providing further information on its expectation for credit costs for the fourth quarter of 2007 and certain additional information. Wachovia is providing this information in advance of a presentation by a senior executive on November 9, 2007 to investors and analysts. This same information will be included in Wachovia's Third Quarter Report on Form 10-Q that will be filed on November 9, 2007:

> **October Market Events** Following our October 2007 announcement of third quarter 2007 results of operations and our financial outlook for the remainder of 2007, certain financial markets experienced further deterioration, particularly the markets for subprime residential mortgage-backed securities ("RMBS") and for collateralized debt obligations ("CDOs") collateralized by RMBS ("ABS CDOs"). In October, rising defaults and delinquencies in subprime residential mortgages and rating agencies' downgrades of a large number of subprime residential mortgage-related securities led to unprecedented declines in the ABX subprime indices, that contributed to a rapid decline in the valuations of subprime RMBS and ABS CDOs.

> *     *     *

> The value of CDOs we have in our portfolio depends on the value of the underlying collateral. ABS CDOs experienced declines in value correlated to the declines in value of subprime RMBS in October. Our third quarter 2007 market disruption-related losses totaling $1.3 billion pre-tax included $347 million of subprime-related valuation losses, net of hedges, on ABS CDOs. Due to the October market deterioration, these ABS CDOs experienced further declines in value in the month of October 2007 by an amount we currently estimate to be approximately $1.1 billion pre-tax. At October 31, 2007, we had remaining exposure to ABS CDOs of $676 million, including on-balance sheet positions and the notional amount of off-balance sheet positions, compared to $1.8 billion at September 30, 2007.

> We have exposure to subprime RMBS in other positions totaling $2.1 billion at both October 31, 2007, and September 30, 2007. Estimated aggregate valuation losses of these other positions during the month of October 2007 are immaterial net of hedges.

> *     *     *

> Of the remaining asset classes where we recorded market disruption-related losses in the third quarter of 2007, the aggregate net market value changes in October in these investments have not been significant. These asset classes include

- 33 -

commercial mortgage, leveraged finance, consumer mortgage, and other structured credit products not collateralized by subprime RMBS. Some of the markets for these asset classes continue to demonstrate poor liquidity and higher than typical volatility while others have displayed moderate stability in October.

The fair values of all of our assets that are subject to market valuation adjustments, including subprime RMBS and ABS CDOs, depend on market conditions and assumptions that may change over time. Accordingly, the fair values of these investments in future periods, including at the end of the fourth quarter, and their effect on our financial results, will depend on future market developments and assumptions and may be materially greater or less than the changes in values during October discussed above. For example, markets for all asset classes discussed above have remained extraordinarily volatile in the first week of November, with additional rating agencies' downgrades on subprime RMBS and ABS CDOs, and credit spread widening and illiquidity.

Wachovia has historically been a major participant in structuring and underwriting CDOs. As measured by lead underwriter league table rankings, Wachovia ranked 3rd for both the first nine months of 2007 and the full year 2006, with issuance volumes of $19.6 billion and $23.4 billion, respectively. The primary focus of Wachovia's CDO business has been, and continues to be, transactions backed by commercial loans and commercial real estate loans. Our issuance of ABS CDOs has been limited. We originated three ABS CDOs in the first nine months of 2007 and six in full year 2006, accounting for approximately 16 percent and 23 percent, respectively, of the total issuance volume of our CDO business during these periods.

Additionally, due to anticipated loan growth and the impact of continuing credit deterioration in our loan portfolio, we expect to increase our allowance for loan losses in the fourth quarter of 2007. The expected credit deterioration will likely be focused in certain geographic areas that have recently experienced dramatic declines in housing values. We expect that these declines will correlate to increases in loan losses for loans originated within the last two years within these geographic areas. Accordingly, Wachovia now expects to record a loan loss provision in the fourth quarter of 2007 by an amount estimated to be between $500 million and $600 million in excess of charge-offs for the quarter. The actual provision will be determined in accordance with our policies and procedures, will depend on credit conditions and assumptions at quarter-end and may be materially greater or less than the range discussed in the preceding sentence.

63.     As the *Associated Press* reported on November 9, 2007, after Wachovia's

announcement:

Wachovia Corp. said Friday the value of securities it owns that are backed by loans sank by about $1.1 billion in October, making it the latest major financial institution to warn of continuing losses in the credit markets.

- 34 -

The nation's fourth largest banking company also said it plans to boost its allowance for loan losses in the fourth quarter due to expected credit deterioration in the housing market in certain regions. The provision is pegged at $500 million to $600 million in excess of charge-offs in the quarter.

Wachovia shares dropped $1.43, or 3.6 percent, to $38.87 in morning trading Friday after falling to a new 52-week low of $38.05.

The news heightened fears that the fallout from the subprime turmoil is spreading deeper into credit markets. It also raised questions about the bank's October 2006 acquisition of adjustable-rate mortgage lender Golden West Financial Corp. of Oakland, Calif.

"We believe the company is trying to get ahead of likely higher future mortgage losses in California," Deutsche Bank Securities analyst Mike Mayo wrote in a client note. "Per Golden West, it now becomes even more obvious that Wachovia purchased the thrift at the wrong time of the cycle."

The weakening markets – which Wachovia estimates could get worse over the last two months of the quarter – cut the value of the bank's so-called collateralized debt obligations by more than 60 percent.

As of Sept. 30, Wachovia had $1.8 billion in CDO exposure; after the latest writedowns, the exposure is now $676 million.

CDOs are complex instruments that combine slices of different kind of risk. CDOs are often backed, in part, by subprime mortgages – loans given to customers with poor credit history. As those mortgages have increasingly defaulted, the value of the CDOs has plummeted.

Wachovia has an additional $2.1 billion of exposure to more traditional subprime mortgage-backed bonds. The value of those holdings remained steady in October as hedging strategies offset losses.

In a regulatory filing with the Securities and Exchange Commission, the financial services provider said the market in November so far remains "extraordinarily volatile."

Analysts polled by Thomson Financial, on average, were forecasting earnings of $1.08 per share for Wachovia before the writedown announcement.

Friedman Billings Ramsey analyst Gary B. Townsend predicted Friday that Wachovia's shares "will remain under pressure until real estate markets and nonperforming assets levels stabilize."

64.    On November 9, 2007, Wachovia filed its Form 10-Q for the third quarter of 2007, which included the same financial results as previously reported.  The Form 10-Q also contained

virtually identical certifications by Thompson and Wurtz as contained in Wachovia's Form 10-Q for the second quarter of 2006, as cited above.

65.    By the time this news was in the market, Wachovia's stock had collapsed to close at $40.65 per share on November 9, 2007, a decline of 11% from October 31, 2007, and a decline of 19% from October 15, 2007.  However, even this decline failed to inform investors of the extent of Wachovia's problems.

66.    On December 12, 2007, Wachovia disclosed that it would set aside $1 billion in excess of charge-offs, an increase from the previous estimate of $500 million to $600 million.

67.    On January 22, 2008, Wachovia issued its fourth quarter and full year 2007 financial results, in a release which stated in part:

> Wachovia Corp. today reported net income of $51 million, or 3 cents per share, in the fourth quarter of 2007 compared with $2.30 billion, or $1.20 per share, in the fourth quarter of 2006.
>
> Excluding after-tax net merger-related expenses of 5 cents per share in the fourth quarter of 2007 and 1 cent per share in the fourth quarter of 2006, earnings were $160 million, or 8 cents per share, in the fourth quarter of 2007 compared with $2.33 billion, or $1.21 per share, in the fourth quarter of 2006.
>
> Full year 2007 net income was $6.31 billion, down 19 percent from $7.79 billion in 2006, and earnings per share were down 30 percent from 2006 to $3.26. Excluding after-tax net merger-related expenses of 8 cents in 2007 and 7 cents in 2006, earnings in 2007 were $6.47 billion, or $3.34 per share, compared with $7.91 billion, or $4.70 per share, in 2006.
>
> "The continued turmoil in the capital markets and the dramatic change in the credit environment diminished our fourth quarter results substantially," said Ken Thompson, Wachovia chairman and chief executive officer. "We took active and prudent steps in the second half of the year to deal with the market disruption and credit deterioration, and we believe this allows us to move forward from a position of strength despite the uncertain economic environment. For the full year, we earned $6.3 billion, paid $4.6 billion in dividends, and maintained a well-capitalized balance sheet even as we had $3.1 billion in net market-related valuation losses and increased our allowance for credit losses by $1.2 billion. Our management team and dedicated employees are focused intently on the strategic priorities that prepared us well for this more difficult economic environment: controlling expenses, managing risk appropriately, creating revenue synergies between our businesses, and continuing to

provide industry-leading customer service. We're excited about the future with our new partners from A.G. Edwards and with our newest banking markets in some of the nation's fastest growing and affluent regions."

Results in 2007 included the impact of the acquisition of A.G. Edwards, Inc., a retail brokerage firm headquartered in St. Louis, Missouri. This transaction was consummated on October 1, 2007, and the retail brokerage business was consolidated into Wachovia Securities LLC on January 1, 2008. Integration activity will continue through 2009.

\*      \*      \*

In the fourth quarter of 2007 compared with the fourth quarter of 2006, Wachovia:

\*      \*      \*

- Recorded a 17 percent increase in noninterest expense largely reflecting the acquisition impact.

- Recorded a provision for credit losses of $1.5 billion, which exceeded net charge-offs by $1.0 billion. The provision largely reflected the recent significant deterioration in the residential housing market and the related portions of the commercial real estate portfolio, including higher expected loss factors for the consumer real estate and auto loan portfolios, and for the commercial portfolios following an extensive review of a large portion of the real estate financial services portfolio in light of this deterioration. Net charge-offs were $461 million, or an annualized 0.41 percent of average net loans. Total nonperforming assets including loans held for sale were $5.2 billion, or 1.08 percent of loans, foreclosed properties and loans held for sale, largely reflecting increases in consumer due to the effects of the weakened housing industry.

68. On February 4, 2008, Wachovia issued a statement, clarifying its exposure to BluePoint Re, a Wachovia subsidiary:

On February 1, 2008, Moody's Investors Service announced that it has placed BluePoint Re, a Wachovia Corporation subsidiary, on review for possible downgrade.

Wachovia's 2007 financial results include valuation losses on BluePoint Re assets that resulted in a write-down of substantially all of Wachovia's $300 million investment in BluePoint Re. Consequently, Wachovia believes BluePoint Re should have no further negative impact on Wachovia's financial results.

As background, BluePoint Re is a financial guaranty re-insurer licensed in Bermuda. It is a distinct company with stand-alone operations and governance. BluePoint Re is separately capitalized and separately rated by the rating agencies. Financial guaranty re-insurers like BluePoint Re have been affected by the current dislocation in the credit markets, and Moody's review is a result of the market disruption.

69.     On February 5, 2008, *The New York Times* reported that Wachovia was accused in a lawsuit of allowing fraudulent telemarketers to use its accounts to steal millions from victims. Also on February 5, 2008, Wachovia had to offer the highest coupon the bank had ever paid on bonds in order to raise capital.

70.     On February 28, 2008, Wachovia filed its Form 10-K for the full year 2007, which included results for the fourth quarter of 2007, as previously reported on January 22, 2008. The Form 10-K also contained virtually identical certifications by Thompson and Wurtz as contained in Wachovia's Form 10-Q for the second quarter of 2006, as cited above.

71.     On February 28, 2008, *Associated Press* reported the following:

Wachovia Corp., the nation's fourth-largest bank, spent nearly $1.4 million in 2007 to lobby the federal government on lending reform laws and other issues.

The company lobbied on legislation dealing with mortgage lending reform and government-sponsored entities, patent reform, student lending and more, according to the form posted online Feb. 13 by the Senate's public records office. Charlotte, N.C.-based Wachovia spent $760,000 in the second half of 2007 to lobby on those issues.

The bank took write-downs of more than $3 billion in the second half of last year as the housing slump and credit market turmoil sunk the value of certain mortgage-backed investments.

Elsewhere, Wachovia on Thursday said the Justice Department is investigating two of its employees for possible misconduct related to competitive bids in municipal derivative markets. The bank added that it expects to set aside more money in the first half of this year to cover troubled mortgage loans.

Besides Congress, Wachovia lobbied the Treasury Department, Federal Deposit Insurance Corp., Federal Reserve System, Office of the Comptroller of the Currency and the Office of Thrift Supervision.

Lobbyists are required to disclose activities that could influence members of the executive and legislative branches, under a federal law enacted in 1995.

72.    On February 28, 2008, Wachovia disclosed it expected even higher losses on mortgage defaults, as the Company raised its expected losses from lending to more than triple the prior year's levels because of rising mortgage defaults. The Company's stock dropped to $32.36 per share on the news, but continued to be artificially inflated as defendant Thompson assured investors: "We have every confidence we'll navigate the headwinds of the current cycle."

73.    On March 3, 2008, Wachovia was sued by hedge fund VCG Special Opportunities Master Fund Ltd. for improperly requiring it to pay out more from insurance derivatives contracts as the value of mortgage-backed bonds declined.

74.    On April 14, 2008, Wachovia reported its first quarter 2008 financial results, which included a provision for credit losses of $2.8 billion, and reduced the dividend, in a release which stated in part:

> Wachovia today announced a series of actions to further enhance its capital base and operational flexibility, and updated its credit reserve modeling to reflect greater emphasis on forecasted changes in customer behavior assuming continued house price depreciation. These actions include:
>
> - Plans to raise capital through a public offering of common stock and perpetual convertible preferred stock;
>
> - Lowering the quarterly common stock dividend, which preserves $2.1 billion of capital annually, to build capital ratios and provide more operational flexibility. The board of directors declared a quarterly common stock dividend of $0.375 cents per common share, payable on June 16, 2008, to stockholders of record on May 30, 2008. This dividend level is consistent with Wachovia's capital needs and growth opportunities for each of its business segments, and with an anticipated 40 percent to 50 percent cash payout ratio over the intermediate horizon; and
>
> - The update in the credit reserve modeling in response to the current and forecasted market environment and its effect on consumer behavior, particularly in stressed markets, resulting in a significant increase in the first quarter 2008 provision for credit losses. In

addition, the scope of credit disclosures was increased to provide enhanced insight into the payment option consumer real estate portfolio.

In addition, Wachovia reported a first quarter 2008 net loss of $350 million before preferred dividends, or a net loss available to common stockholders of $393 million, (20 cents per common share). These results, which reflect higher credit costs and the continued disruption in the capital markets, compared with earnings of $2.30 billion, or $1.20 per share, in the first quarter of 2007.

\* \* \*

Other key trends in the first quarter of 2008 compared with the first quarter of 2007 included:

\* \* \*

- Provision for credit losses of $2.8 billion, which exceeded net charge-offs by $2.1 billion. The provision largely reflected more severe deterioration in the residential housing market, particularly in specific markets in California and Florida, as well as the result of the refinements made to the credit reserve model for the payment option product. These refinements incorporate multiple and more granular factors regarding unprecedented consumer behavior, housing price deterioration and increased foreclosures. Net charge-offs were $765 million, or an annualized 0.66 percent of average net loans. Total nonperforming assets including loans held for sale were $8.4 billion, or 1.70 percent of loans, foreclosed properties and loans held for sale, largely reflecting increases in consumer real estate-related nonperforming assets due to the effects of the weakened housing industry.

**Lines of Business**

The following discussion covers the results for Wachovia's four core business segments and is on a segment earnings basis, which excludes net merger-related and restructuring expenses, other intangible amortization and discontinued operations. Segment earnings are the basis on which Wachovia manages and allocates capital to its business segments. In accordance with Wachovia's business segment methodology, provision expense in excess of charge-offs, which amounted to $2.1 billion in the first quarter of 2008, is not allocated to business segments.

75.    On this news, Wachovia's stock declined to $25.55 per share, on volume of 191 million shares, a decline of 56% from the Class Period high of $58.80 per share in February 2007.

76.     On April 15, 2008, Oppenheimer cut Wachovia's fiscal 2008 earnings estimate to
$1.70 a share from $2.70 a share, citing the Company's share sale, which diluted existing stock by
about 15%, and credit losses linked to the U.S. subprime slump.  As *Bloomberg* reported:

> Richard Bove, an analyst at Punk Ziegel & Co. LP, questioned the company's
> credibility, saying the bank cut its dividend after previously suggesting it wouldn't
> trim the payout.  Bove called for the removal of Lanty Smith, the Wachovia director
> who said in a Wall Street Journal article that it was "disingenuous" for investors to
> be surprised by Wachovia's dividend reduction.

> 'Outrageous Statement'

> "This is not acceptable," said Bove in a note to investors.  "It is the most
> outrageous statement I can ever remember made by a board member directly
> insulting shareholders."

77.     Wachovia continued to disclose adverse information.  On April 30, 2008, Wachovia
issued a press release entitled "Wachovia Responds to Tax Ruling in Leveraged Lease Transactions;
Wachovia May Take Charge of Up to $1 Billion," which stated in part:

> Wachovia Corporation today announced that, as a result of its analysis of a ruling in
> *BB&T Corporation v. the United States* on April 29, 2008, it expects to record an
> after-tax non-cash charge of between $800 million and $1 billion in the second
> quarter of 2008. Wachovia expects to provide additional information when it files its
> 2008 First Quarter Report on Form 10-Q.

> Wachovia entered into various leasing transactions between 1999 and 2003
> involving lease-to-service contracts and leases of qualified technological equipment,
> which are widely known as sale-in, lease-out or "SILO" transactions. Wachovia
> stopped originating these transactions in 2003.

> In 2006, the FASB issued guidance on the accounting treatment of leveraged
> leasing transactions. Previously, changes in the timing of tax cash flows did not
> require any change in the amount of income recognized under a leveraged lease.
> With the issuance of FASB Staff Position FAS 13-2, "Accounting for a Change or
> Projected Change in the Timing of Cash Flows Relating to Income Taxes Generated
> by a Leveraged Lease Transaction" (FSP 13-2), and FASB Interpretation No. 48,
> "Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement
> No. 109" (FIN 48), changes affecting the timing of income tax cash flows but not the
> total net income under a leveraged lease trigger a recalculation of the net investment
> in the lease. Where tax cash flows are reduced or delayed, this recalculation results in
> a one-time non-cash charge to earnings.

On April 29, 2008, the U.S. Court of Appeals for the Fourth Circuit issued an opinion in the *BB&T* case that disallowed tax benefits associated with certain of BB&T's lease-in, lease-out ("LILO") transactions. Although the *BB&T* decision involved LILOs, Wachovia believes some portions of the decision may also apply to SILO transactions. There has not yet been any judicial decision that directly involves SILOs, so the tax law as applied to SILOs remains unsettled. However, applicable accounting standards require Wachovia to update the assessment of its SILO transactions in light of the *BB&T* decision. The decision has no impact on Wachovia's LILO transactions, which were settled in their entirety in 2004.

Although Wachovia continues to believe its SILO transactions comply with applicable laws, in light of the *BB&T* decision, under the principles established by FSP 13-2 and FIN 48, the non-cash charge to earnings is currently estimated to be in the range of $800 million to $1 billion and this approximate amount would be recognized as income over the remaining terms of the affected leases, generally 35 to 40 years.

78.    As *The Wall Street Journal* reported on May 1, 2008:

Wachovia Corp. said it expects to take an after-tax charge of $800 million to $1 billion in its second quarter for past leasing transactions.

The Charlotte, N.C., bank said the charge is needed because of an accounting ruling issued Tuesday by the U.S. Court of Appeals for the Fourth Circuit in a case involving BB&T Corp. The ruling provides guidance on accounting standards for recording the timing of cash flows on leveraged leases.

Wachovia said it completed the transactions affected by the ruling in 1999 through 2003. The company said it stopped originating those transactions, which involved lease-to-service contracts and leases of technological equipment, in 2003. The charges eventually will be recognized as income over the remaining terms of the leases, typically 35 to 40 years.

"We believe we have material information that we wanted to provide to our investors," said Christy Phillips-Brown, a Wachovia spokeswoman.

The news is the latest blow to the bank, which in April reported a first-quarter loss of $393 million and announced a 41% cut to its dividend. Last week, Wachovia said it will pay $144 million to settle federal allegations that it had failed to stop telemarketers who took advantage of thousands of elderly consumers.

Federal prosecutors are also investigating the bank for alleged laundering of drug proceeds by Colombian and Mexican money-transfer companies. Ms. Phillips-Brown said Wachovia "is committed to maintaining a strong anti-money-laundering program."

Carl Tobias, a law professor at Virginia's University of Richmond, said Wachovia's response shows it is being cautious because its own lease agreements

differ slightly from those of BB&T and are still legal. "Wachovia is being conservative, and they are right about it," he said. "It's a way to alert investors to this possibility."

79.      By late May 2008, Wachovia would disclose it had received subpoenas and/or

inquiries from the SEC and regulators from several states due to its involvement with auction rate

securities.

80.      On June 2, 2008, Wachovia announced an immediate change in the Company's

management, in a release which stated in part:

> Wachovia announced today that its current Chairman, Lanty Smith, has been appointed interim Chief Executive Officer, succeeding Ken Thompson, who is retiring at the request of the Board.  Ben Jenkins, currently Vice Chairman and President of the General Bank, will serve as interim Chief Operating Officer.
>
> All of the company's staff functions will report to Smith, with the company's four lines of business – General Bank, Wealth Management, the Corporate and Investment Bank and Capital Management – reporting to Jenkins.  The Board of Directors has formed a special committee to conduct a search for a permanent Chief Executive Officer.
>
> "Wachovia is a strong institution and well positioned even in the face of the unprecedented conditions in the financial services industry," said Smith.  "The Board is confident that we are putting in place the right interim leadership to move the company forward, and no other senior management changes are currently contemplated."
>
> Smith continued, "No single precipitating event caused the Board to reach this decision, but a series of previously disclosed disappointments and setbacks cumulatively have negatively impacted the company and its performance.  The Board believes new leadership will help to revitalize and reenergize Wachovia and enable it to realize its potential.  We will move Wachovia steadily ahead as a strong, independent company by continuing to focus first on the needs of our customers. Our recent successful capital raising actions provide us the solid foundation and flexibility we need in an environment which remains extremely challenging for Wachovia and the entire banking industry.  Despite continued hurdles, we have confidence in our strong liquidity, good capital position and solid business model."

81.      Wachovia was then placed on creditwatch negative by Standard & Poor's.

82.      After this news, Wachovia's stock dropped to $23.40 per share on June 2, 2008, on

volume of 66 million shares.  The stock continued to decline on June 3, 2008.

83.    Then, on June 9, 2008, a *BusinessWeek* article came online about Wachovia, entitled "Wachovia:  Golden West Wasn't Golden."  The article stated in part:

> When Wachovia (WB) Chief Executive Officer Ken Thompson sealed a $24 billion deal to buy Golden West Financial in May, 2006, he bragged that he had bagged "a crown jewel" of the mortgage business. Two years later it's painfully clear that Thompson bought the nation's second-largest S&L at the peak of the housing bubble, a misstep that led to his ouster on June 2.

> \*        \*        \*

> Analysts figure Wachovia could end up incurring losses of as much as $11 billion on Golden's West $122 billion mortgage portfolio. "You'd be hard-pressed to find anything good out of this acquisition," says Terry Maltese, president of Sandler O'Neill Asset Management.

> \*        \*        \*

> In most mergers, it's the acquirers that exert their will. But right after Wachovia bought Golden West, executives from the S&L took control of all mortgage lending. And according to former brokers, they began pushing Wachovia's sales force to steer applicants into its signature "Pick-A-Payment" loans. These give borrowers four choices of how much to pay each month, and cost as much as a full percentage point more than a 30-year, fixed-rate mortgage. "[Management] believed Pick-A-Payment loans were the answer for every customer," says one ex-broker.

> \*        \*        \*

> Despite Thompson's tireless defense of the deal, it was evident by earlier this year that Golden West's approach worked best in rising markets. Analysts note that Golden West focused too much on appraisals and too little on verifying the income and assets of applicants. While this tactic helped ensure that Golden West could recover the full value of homes that went into foreclosure during up cycles, it didn't anticipate that borrowers would simply walk away if a plunge in home prices left them underwater.

84.    On this news, Wachovia's stock dropped to $18.89 per share on June 9, 2008, on volume of more than 80 million shares.

85.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    Defendants' portfolio of CDOs contained billions of dollars worth of impaired and risky securities, many of which were backed by subprime mortgage loans.

(b)    Defendants failed to properly account for highly leveraged loans such as mortgage-backed securities.

(c)    Wachovia had inadequate controls to prevent employees and others from using customer account numbers to steal millions of dollars.

(d)    The Company had inadequate controls to prevent management from understating loan loss allowances by billions of dollars causing Wachovia's financial statements to be materially misstated.

(e)    Internally at Wachovia it was understood that the acquisition of Golden West Financial in 2006 for $24 billion had been a colossal mistake and would lead to large losses.

(f)    Wachovia had become heavily involved in the underwriting, sale and subsequent auctions of auction rate securities, which were much riskier than represented to investors in the securities and the municipalities which issued them.  Once these auctions began failing, Wachovia would be subject to investigations and loss of reputation.

(g)    Wachovia had been heavily involved in pay-option ARMs.  These pay-option ARMs provided that during the initial term of the loan, borrowers could pay only as much as they desired with any underpayment being added to the loan balance.  These loans would become toxic (for both Wachovia and the borrowers) once housing prices stopped increasing at a rapid rate.

86.    As a result of defendants' false statements, Wachovia's stock price traded at inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 67% from their price before these disclosures.

## WACHOVIA'S FALSE FINANCIAL REPORTING

87.    In order to inflate the price of Wachovia stock, defendants caused the Company to falsely report its results for at least fiscal 2006 through the third quarter fiscal 2007 through its failure to timely record adequate reserves for credit impairment for its exposure to mortgage-related assets, which inflated the Company's assets and net income.  The Company also improperly accounted for leveraged leasing transactions between 1999 and 2003, which ultimately led to more than $1 billion in pre-tax charges in the second quarter of 2008.

88.    The results issued during the Class Period were included in a Form 10-K and Forms 10-Q filed with the SEC.  The results were also included in press releases disseminated to the public.

89.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

90.    In its 2006 Form 10-K, Wachovia represented the following with respect to its allowances for loan losses:

> The allowance for loan losses and reserve for unfunded lending commitments are maintained at levels that are adequate to absorb probably losses inherent in the loan portfolio and in unfunded commercial lending commitments, respectively, as of the date of the consolidated financial statements.  The Company has developed policies and procedures for assessing the adequacy of the allowance for unfunded lending commitments that reflect the assessment of credit risk considering all available information.

91.     A fundamental precept of GAAP is that impairment of financial securities that is deemed to be other than temporary should be recorded as a charge against earnings.  This impairment includes credit risk, where borrowers are not expected to pay.  FASB Statement of Financial Standards No. 115, *Accounting for Certain Investments in Debt and Equity Securities*, ¶16, states in part:

> For individual securities classified as either available-for-sale or held-to-maturity, an enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary. . . .  For example, if it is probable that the investor will be unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition, an other-than-temporary impairment shall be considered to have occurred.  If the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value as a new cost basis and the amount of the write-down shall be included in earnings (that is, accounted for as a realized loss).

(Footnote omitted.)

92.     Wachovia has acknowledged that it has now recorded billions of dollars in provisions for credit problems.  Wachovia's failure to properly accrue and report reserves for impaired assets caused its financial statements to be materially misstated.  Due to Wachovia's growing exposure to the mortgage crisis at the time the sector was becoming increasingly risky, Wachovia was required to, but did not, record adequate and timely write-downs for these assets during fiscal 2006 and early fiscal 2007.  Wachovia also recorded more than $1 billion in charges due to its improper accounting for leveraged lease transactions it had previously entered into.

93.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

94.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### DEFENDANTS' FAILURE TO ENSURE WACHOVIA HAD ADEQUATE INTERNAL CONTROLS

95.     Defendants were able to scheme Wachovia shareholders and inflate Wachovia's stock price through accounting improprieties which resulted in materially misstated financial statements by means of circumventing and failing to establish and maintain adequate internal accounting controls, which permitted and caused Wachovia's reserves for mortgage-related asset impairment to be inadequate.

96.     Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting company must:

(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

*       *       *

 (ii) transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP].

15 U.S.C. §78m(b)(2)(A)-(B).

97. These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets. *SEC v. World-Wide Coin Inv*., 567 F. Supp. 724, 746 (N.D. Ga. 1983).

98. Defendants caused Wachovia to violate §13(b)(2)(A) of the 1934 Act by failing to maintain accurate records concerning its accounting for impaired mortgage-related assets among other accounting improprieties. Wachovia's inaccurate and false records were not isolated or unique instances because they were improperly maintained for multiple reporting periods. Accordingly, defendants caused Wachovia to violate §13(b)(2)(A) of the 1934 Act.

99. In addition, defendants caused Wachovia to violate §13(b)(2)(B) of the 1934 Act by failing to implement procedures reasonably designed to prevent accounting irregularities. Wachovia failed to ensure that proper review and checks were in place to ensure that it was recording and properly reporting accounting for loan losses. In fact, despite knowing the true state of the Company's dismal lack of adequate controls, defendants regularly issued quarterly financial statements throughout the Class Period without ever disclosing the deficiencies in Wachovia's internal accounting controls and falsely asserted that its financial statements complied with GAAP.

100. Financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly to the information in the financial statements. *See* FASB Statement of Concepts No. 1, ¶7. For this reason, in addition to Wachovia's failure to make the required disclosures in its financial statements and in its SEC filings, Wachovia

also shirked its duty to make such disclosures in its conference calls, its press releases and its Annual Report.

101.    As defendants allowed and were responsible for initiating a gross lack of internal controls over financial reporting, defendants were enabled to scheme Wachovia shareholders and inflate the Company's stock price through accounting improprieties which resulted in materially misstated publicly filed financial statements.

## LOSS CAUSATION/ECONOMIC LOSS

102.    By misrepresenting Wachovia's financial statements, the defendants presented a misleading picture of the Company's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that Wachovia's business was not as healthy as represented, Wachovia falsely concealed the extent of its exposure to mortgage-related problems.

103.    These claims of profitability caused and maintained the artificial inflation in Wachovia's stock price throughout the Class Period and until the truth about its future earnings was revealed to the market.

104.    Defendants' false and misleading statements had the intended effect and caused Wachovia stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $58.80 per share.

105.    In July 2007, the market became aware of the problems that banks (including Wachovia) were having with subprime debt.  By November 2007, Wachovia had announced it would have to write down billions of dollars of its debt securities.

106.    As a direct result of defendants' admissions and the public revelations regarding the truth about Wachovia's profitability and its actual business prospects going forward, Wachovia's stock price plummeted 16%, falling from $48.14 per share on October 18, 2007 to $40.65 per share on November 9, 2007, a decline of $7.49 per share.  In mid-December 2007, Wachovia disclosed

ever increasing write-offs, causing its stock to drop to below $40 per share. In February 2008, additional disclosures about Wachovia's other improprieties drove the stock to below $30 per share.

107.    On April 14, 2008, Wachovia's stock price plummeted another 8.1% , falling from $27.81 per share on April 11, 2008 to $25.55 per share on April 14, 2008, a decline of $2.26 per share.

108.    After news of defendant Thompson's ousting on June 2, 2008, Wachovia's stock declined to $23.40 per share on June 2, 2008, and to $21.92 per share on June 3, 2008, and after *BusinessWeek*'s article on Golden West Financial, Wachovia's stock dropped below $20 per share. These drops removed the inflation from Wachovia's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

109.    Plaintiffs incorporate ¶¶1-108 by reference.

110.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 52 -

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Wachovia common stock during the Class Period.

112.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Wachovia common stock.  Plaintiff and the Class would not have purchased Wachovia common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

### COUNT II

#### For Violation of §20(a) of the 1934 Act
#### Against All Defendants

113.     Plaintiffs incorporate ¶¶1-112 by reference.

114.     The Individual Defendants acted as controlling persons of Wachovia within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Wachovia stock, the Individual Defendants had the power and authority to cause Wachovia to engage in the wrongful conduct complained of herein.  Wachovia controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### CLASS ACTION ALLEGATIONS

115.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Wachovia common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

116.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court.  Wachovia has nearly 2 billion shares of common stock outstanding, owned by hundreds if not thousands of persons.

117.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    whether the price of Wachovia common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

118.    Plaintiffs' claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

119.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

120.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding plaintiffs and the members of the Class damages, including interest;

C.      Awarding plaintiffs' reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: July 7, 2008                              **BRODSKY & SMITH, LLC**

                                                 By: */s/ Evan J. Smith (ES3254)*
                                                 Evan J. Smith, Esquire (ES3254)
                                                 240 Mineola Boulevard
                                                 Mineola, NY 11501
                                                 (516) 741-4977
                                                 (516) 741-0626 (facsimile)