KIRBY McINERNEY LLP
Roger W. Kirby
Ira M. Press
825 Third Avenue, 16th Floor
New York, NY  10022
Telephone:  (212) 371-6600
Fax: (212) 751-2540
Email: ipress@kmllp.com

*Attorneys for Movant, New York City Pension Funds*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MORTON LIPETZ and EVELYN JEAN LIPETZ, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> WACHOVIA CORPORATION, G. KENNEDY THOMPSON and THOMAS J.WURTZ, <br><br> Defendants. | Civil Action No. 1:08-6171-RJS <br><br> CLASS ACTION |

**AFFIDAVIT OF IRA M. PRESS
IN SUPPORT OF MOTION OF THE NEW YORK CITY PENSION FUNDS
FOR APPOINTMENT AS LEAD PLAINTIFF AND
APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL**

STATE OF NEW YORK    )
                     )    ss.:
COUNTY OF NEW YORK  )

IRA M. PRESS, being duly sworn, deposes and says:

1.    I am a member of the law firm of Kirby McInerney LLP, counsel for the New York

City Pension Funds (the "NYC Funds" or "Movants").[1]  As such, I have knowledge of the matters set forth herein.

2.      The NYC Funds seek appointment as Lead Plaintiff pursuant to Section 21D of the Securities Exchange Act of 1934 in the above-captioned action.

3.      I submit this Affidavit, together with the attached exhibits, in support of the NYC Funds' motion to appoint the NYC Funds to serve as Lead Plaintiff on behalf of the class in the Action and to approve the NYC Funds' choice of Kirby McInerney LLP as Lead Counsel.

4.      Attached hereto as the exhibits indicated are true and correct copies of the following:

Exhibit A:    Press release published on June 9, 2008, on *PrimeNewswire*, a widely-circulated, national, business-oriented wire service, announcing pendency of the first-filed securities class action suit on behalf of Wachovia investors.

Exhibit B:    Sworn PSLRA certifications of the NYC Funds.

Exhibit C:    Tables reflecting the calculated losses incurred by the NYC Funds as a result of their class period transactions in Wachovia Corporation securities.

Exhibit D:    Declaration of Ilyse Sisolak, Assistant Corporation Counsel at the New York City Law Department, in Support of the New York City Pension Funds' Motion For Appointment as Lead Plaintiff and Approval of Selection of Lead

---

[1]      Specifically: the New York City Board of Education Retirement System ("NYC BERS"); the New York City Employees' Retirement System ("NYCERS"); the New York City Police Pension Fund ("NYC Police"); the New York City Police Officers' Variable Supplements Fund ("POVSF"); the New York City Police Superior Officers' Variable Supplements Fund ("PSOVSF"); the New York City Fire Department Pension Fund ("NYC Fire"); the New York City Firefighters' Variable Supplements Fund ("FFVSF"); the New York City Fire Officers' Variable Supplements Fund ("FOVSF"); the New York City Teachers' Retirement System ("NYC TRS"); and the New York City Teachers' Retirement System Variable Annuity Program ("Teachers Variable A").

Counsel.

Exhibit E:    Firm resumé of the law firm of Kirby McInerney LLP.

Exhibit F:    The June 9, 2008 complaint filed in the United States District Court for the

Northern District of California in *Bristol County Retirement System v.*

*Wachovia Corp. et al.*, Civ. No. 3:08-cv-02844-SC (the "California Action").

Exhibit G:    Press release published on July 8, 2008, on *Marketwire,* a widely-circulated,

national, business-oriented wire service, announcing pendency of this action.

Exhibit H:    Notice and order of voluntary dismissal of the California Action.

Exhibit I:    Court order in *Pappas v. Countrywide Financial Corp.*, No. 07-cv-5295

(C.D. Cal. Nov. 28, 2007).

_____
IRA M. PRESS

Subscribed and sworn before me this
8TH   day of August, 2008

_____
Notary Public

ILEANA RAMIREZ
Notary Public, State of New York
No. 01RA4740575
Appointed in Bronx County
My Commission expires  8/31/2009

3

## CERTIFICATE OF SERVICE

I, Ira M. Press, hereby certify that, on August 8, 2008, I caused a true and correct copy

of the attached:

1.  **NOTICE OF MOTION OF THE NEW YORK CITY PENSION FUNDS FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL**

2.  **MEMORANDUM OF LAW IN SUPPORT OF MOTION OF THE NEW YORK CITY PENSION FUNDS  FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL**

3.  **AFFIDAVIT OF IRA M. PRESS IN SUPPORT OF MOTION OF THE NEW YORK CITY PENSION FUNDS FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL**

to be served: (i) electronically on all counsel registered for electronic service for this case; and (ii)

by first-class mail to any additional counsel.

                              /s/ Ira M. Press
                              Ira M. Press

## SERVICE LIST

**Electronically to all ECF-Registered Entities**
**By U.S. Mail To All Known Non-ECF Registered Entities**

*Attorneys for Defendants:*

Robert L. Dell Angelo
Marc T.G. Dworsky
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9540
Facsimile: (213) 683-4040

*Attorneys for Plaintiffs:*

Evan J. Smith
BRODSKY & SMITH, LLC
240 Mineola Boulevard
Mineola, NY 11501
Telephone: (516) 741-4977
Facsimile: (516) 741-0626

*Counsel for Plaintiffs Morton Lipetz and*
*Evelyn Jean Lipetz*

Nicole Lavallee
Joseph J. Tabacco, Jr.
Julie J. Bai
BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO
425 California Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6282

*Local Counsel for California Action Plaintiff*
*Bristol County Retirement System*

Andrei V. Rado
Christopher J. Keller
Alan I. Ellman
LABATON SUCHAROW LLP
140 Broadway New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for California Action Plaintiff*
*Bristol County Retirement System*

# EXHIBIT A

PZM          Labaton Sucharow LLP Announces Filing of Securities Class Action
             Jun 9 2008  15:35:47


*T
        Labaton Sucharow LLP Announces Filing of Securities Class
             Action Lawsuit Against Wachovia Corp. -- WB
*T
NEW YORK, June 9, 2008 (PRIME NEWSWIRE) -- Labaton Sucharow LLP filed a
class action lawsuit on June 6, 2008 in the United States District
Court for the Northern District of California, on behalf of persons who
purchased the securities of Wachovia Corp. (NYSE:WB) ("Wachovia" or the
"Company") between May 8, 2006 and April 11, 2008, inclusive (the
"Class Period"). The complaint names Wachovia, G. Kennedy Thomson
(former CEO), Thomas J. Wurtz (CFO) and Donald K. Truslow (Chief Risk
Officer) as defendants (collectively, "Defendants"). The complaint
alleges that during the Class Period Defendants violated Sections 10(b)
and 20(a) of the Securities Exchange Act of 1934 by issuing various
materially false and misleading statements about Wachovia's financial
results and business operations, which had the effect of artificially
inflating the market price of the Company's securities.

You can view a copy of the complaint online at
http://www.labaton.com/en/cases/Newly-Filed-Cases.cfm or obtain it from
the Court. The case number is C-08-02844 SC, and the Judge presiding
over the case is the Honorable Samuel Conti.

In summary, the complaint alleges that Defendants misled investors by
falsely representing that Wachovia had strict and selective
underwriting and loan origination practices and a conservative lending
approach that set it apart from other lenders. Such reassurances were
repeated by defendants throughout the Class Period in order to
artificially support Wachovia's stock price in the midst of a weakening
mortgage market. In response to increased market concern with the
mortgage lending industry, and Wachovia's option ARMs in particular,
Wachovia falsely represented that its loan underwriting practices were
much better than at other banks and that this would allow it to prosper
while lenders with less exacting standards and procedures would fare
much worse. In reality, Wachovia's actual lending practices differed
materially from the description of those practices in statements made
to investors. The Company's ability to weather the deterioration in the
real estate and credit markets was grossly exaggerated by Defendants,
at precisely the worst time, when analysts began to ask tough
questions. The Company, moreover, had inadequate loan loss reserves and
falsely represented that its capital position was sufficient to fund
its dividend.

.Shortly after last assuring the market of its liquidity, the strength
of its underwriting practices, and the adequacy of its reserves,
Wachovia reported a surprise quarterly loss, undertook emergency
measures to increase capital, and cut its dividend. On April 14, 2008,
before the open of ordinary trading, Wachovia reported a loss of $350
million, or $0.20 per share, for the first quarter of 2008. The Company
attributed the results to: (1) a $2.8 billion increase credit loss
reserves, including $1.1 billion specifically for "Pick-A-Pay" reserve
build, the lending program highly touted by the Company during the
Class Period. The need to increase Pick-A-Pay reserves was attributed

Copyright (c) 2008

PZM        Labaton Sucharow LLP Announces Filing of Securities Class Action
           Jun 9 2008  15:35:47
to Wachovia's adoption of a "refined reserve modeling" that resulted in
"higher than expected loss factors on Pick-a-Pay"; and (2) $2 billion
in mark-to-market losses for mortgage backed securities, including a
"$729 million loss on unfunded leveraged finance commitments." In order
to shore-up its capital, Wachovia announced the following steps: (1)
reduce the dividend 41% to $0.375; and (2) plan to raise capital by
$7-8 billion through public offerings.

In reaction to the news, shares fell from $27.81 to $25.55 (8.13%) on
abnormally high volume.

Plaintiff is represented by the law firm of Labaton Sucharow LLP, which
has been representing plaintiffs in securities class actions for over
40 years.

If you bought Wachovia securities between May 8, 2006 and April 11,
2008, inclusive, you may qualify to serve as Lead Plaintiff. Lead
Plaintiff papers must be filed with the court no later than August 8,
2008. If you would like to consider serving as lead plaintiff or have
any questions about the lawsuit, please contact one of our
representatives or Andrei V. Rado, Esq. of Labaton Sucharow, at
800-321-0476. A lead plaintiff is a court-appointed representative
party that acts on behalf of absent class members. You do not need to
be a lead plaintiff in order to share in any recovery that may result
from this litigation. You can share in a recovery as an absent class
member by filing out claim forms that will be made available at the
appropriate time.

More information on this and other class actions can be found on the
Class Action Newsline at www.primenewswire.com/ca

*T
-0-
CONTACT: Labaton Sucharow LLP
         Andrei V. Rado, Esq.
         800-321-0476
*T

Provider ID: 00144330
-0- Jun/09/2008 19:35 GMT

Copyright (c) 2008

# EXHIBIT B

# CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Teachers' Retirement System ("NYC TRS"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of NYC TRS.  I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    NYC TRS did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    NYC TRS understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary.  NYC TRS maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    NYC TRS' transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    NYC TRS has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)

6.    Beyond its pro rata share of any recovery, NYC TRS will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this __7th__ day
of August, 2008.

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

**Exhibit A**
**NYC TRS Transactions in Wachovia Corp. common stock**
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|---|
| 337478 | 1,167,077 shares | 5/19/2006 | Buy | 6,022 | 53.14 |
| | | 10/4/2006** | Buy | 198,523 | 56.72 |
| | | 11/17/2006 | Buy | 1,850 | 55.01 |
| | | 11/17/2006 | Buy | 1,587 | 55.01 |
| | | 12/1/2006 | Buy | 5,685 | 54.10 |
| | | 1/29/2007 | Buy | 4,115 | 56.03 |
| | | 2/5/2007 | Buy | 766 | 57.06 |
| | | 2/9/2007 | Buy | 3,799 | 57.12 |
| | | 2/15/2007 | Buy | 1,262 | 57.89 |
| | | 2/28/2007 | Buy | 4,110 | 55.37 |
| | | 3/1/2007 | Buy | 592 | 55.38 |
| | | 3/19/2007 | Buy | 4,588 | 55.70 |
| | | 3/19/2007 | Buy | 63 | 55.70 |
| | | 3/28/2007 | Buy | 3,087 | 55.08 |
| | | 3/28/2007 | Buy | 2,435 | 55.08 |
| | | 4/20/2007 | Buy | 7,709 | 55.85 |
| | | 5/31/2007 | Buy | 3,995 | 54.19 |
| | | 6/7/2007 | Buy | 11,290 | 52.85 |
| | | 6/22/2007 | Sell | 25,202 | 51.87 |
| | | 6/22/2007 | Sell | 12,202 | 51.84 |
| | | 6/27/2007 | Sell | 13,932 | 52.06 |
| | | 6/27/2007 | Sell | 27 | 52.06 |
| | | 8/31/2007 | Buy | 1,558 | 48.79 |
| | | 8/31/2007 | Buy | 3,858 | 48.98 |
| | | 9/24/2007 | Buy | 4,344 | 50.39 |
| | | 9/26/2007 | Buy | 3,648 | 50.64 |
| | | 10/3/2007** | Buy | 56,254 | 51.37 |
| | | 10/9/2007 | Buy | 3,974 | 51.42 |
| | | 10/24/2007 | Buy | 369 | 45.40 |
| | | 10/24/2007 | Buy | 7,283 | 45.40 |
| | | 10/26/2007 | Buy | 3,295 | 46.54 |
| | | 10/30/2007 | Sell | 10,172 | 45.97 |
| | | 12/12/2007 | Buy | 2,766 | 40.54 |
| | | 12/19/2007 | Buy | 3,569 | 38.99 |
| | | 1/31/2008 | Buy | 2,421 | 35.47 |
| | | 2/5/2008 | Buy | 29,755 | 34.03 |
| | | 2/26/2008 | Sell | 7,091 | 34.81 |
| | | 2/26/2008 | Sell | 3,963 | 34.80 |
| | | 3/27/2008 | Buy | 1,071 | 27.07 |
| | | 3/31/2008 | Buy | 4,360 | 27.00 |
| | | 3/31/2008 | Buy | 711 | 27.00 |
| | | 4/30/2008 | Buy | 129,495 | 29.14 |
| | | 4/30/2008 | Buy | 340 | 29.15 |
| 337479 | 392,399 shares | 5/15/2006 | Buy | 2,500 | 54.71 |
| | | 6/8/2006 | Buy | 1,750 | 54.44 |
| | | 6/30/2006 | Sell | 1,400 | 54.08 |

|  |  | Date | Type | Shares | Price |
|---|---|---|---|---|---|
|  |  | 6/30/2006 | Sell | 3,570 | 54.08 |
|  |  | 10/4/2006** | Buy | 67,403 | 56.72 |
|  |  | 10/26/2006 | Buy | 1,200 | 55.62 |
|  |  | 10/31/2006 | Buy | 3,100 | 55.50 |
|  |  | 11/27/2006 | Buy | 3,510 | 53.91 |
|  |  | 12/27/2006 | Sell | 3,740 | 57.46 |
|  |  | 2/1/2007 | Buy | 2,480 | 56.50 |
|  |  | 2/28/2007 | Buy | 1,900 | 55.37 |
|  |  | 3/21/2007 | Buy | 2,155 | 55.74 |
|  |  | 5/15/2007 | Buy | 2,542 | 56.58 |
|  |  | 5/25/2007 | Sell | 7,200 | 55.08 |
|  |  | 6/7/2007 | Buy | 4,560 | 53.16 |
|  |  | 6/22/2007 | Sell | 6,700 | 51.84 |
|  |  | 6/27/2007 | Sell | 3,360 | 51.74 |
|  |  | 8/30/2007 | Buy | 3,431 | 47.94 |
|  |  | 10/2/2007 | Buy | 2,000 | 50.83 |
|  |  | 10/3/2007** | Buy | 18,631 | 51.37 |
|  |  | 10/12/2007 | Buy | 2,640 | 51.00 |
|  |  | 10/30/2007 | Sell | 5,648 | 45.97 |
|  |  | 11/15/2007 | Buy | 3,231 | 41.20 |
|  |  | 12/14/2007 | Buy | 2,900 | 39.03 |
|  |  | 2/26/2008 | Buy | 3,588 | 34.46 |
|  |  | 4/30/2008 | Buy | 33,265 | 29.15 |
|  |  | 5/5/2008 | Buy | 13,901 | 29.60 |
| 337480 | 60,612 shares | 10/4/2006** | Buy | 10,405 | 56.72 |
|  |  | 10/4/2006 | Buy | 39,100 | 56.38 |
|  |  | 11/7/2006 | Sell | 7,400 | 55.68 |
|  |  | 12/5/2006 | Sell | 27,700 | 54.98 |
|  |  | 1/9/2007 | Buy | 200 | 56.51 |
|  |  | 2/13/2007 | Buy | 300 | 57.70 |
|  |  | 3/20/2007 | Buy | 14,700 | 55.97 |
|  |  | 6/12/2007 | Buy | 4,200 | 53.59 |
|  |  | 7/10/2007 | Buy | 24,100 | 50.42 |
|  |  | 8/9/2007 | Sell | 18,400 | 47.46 |
|  |  | 10/9/2007 | Buy | 13,600 | 51.21 |
|  |  | 10/25/2007 | Buy | 500 | 45.85 |
|  |  | 4/24/2008 | Sell | 19,300 | 27.44 |
| 337481 | 49,500 shares | 8/3/2006 | Buy | 15,900 | 54.20 |
|  |  | 10/4/2006** | Buy | 9,669 | 56.72 |
|  |  | 11/3/2006 | Sell | 4,500 | 54.39 |
|  |  | 1/4/2007 | Sell | 24,000 | 57.17 |
|  |  | 8/3/2007 | Sell | 29,600 | 46.28 |
|  |  | 4/3/2008 | Sell | 16,969 | 28.23 |
| 337485 | 0 shares | 10/1/2007 | Sell | 22,247 | 50.38 |
|  |  | 10/3/2007** | Buy | 22,247 | 51.37 |
| 363220 | 0 shares | 11/20/2007 | Buy | 710 | 38.11 |
| 363221 | 0 shares | 11/20/2007 | Buy | 116 | 38.34 |

|        |          | 3/14/2008  | Sell | 116 | 26.63 |
|--------|----------|------------|------|-----|-------|
| 363242 | 0 shares | 11/26/2007 | Buy  | 500 | 40.24 |
|        |          | 3/4/2008   | Sell | 100 | 28.92 |
|        |          | 3/25/2008  | Sell | 100 | 29.95 |
|        |          | 5/28/2008  | Sell | 100 | 23.46 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 and A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Marc Katz, Deputy Director of Investment Administration for the Teachers' Retirement System of the City of New York, provide the following certification on behalf of the New York City Teachers' Retirement System Variable Annuity Program ("Teachers' Variable A"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of Teachers' Variable A.  I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    Teachers' Variable A did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    Teachers' Variable A understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. Teachers' Variable A maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    Teachers' Variable A's transactions in the securities of Wachovia, as prepared by the NYC Teachers' Retirement System accounting staff, are reflected in Exhibit A, attached hereto.

5.    Teachers' Variable A has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)

6.    Beyond its pro rata share of any recovery, Teachers' Variable A will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of

such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury on this ___7___ day of August, 2008 that the foregoing

is true and correct to the best of my knowledge.

MARC KATZ
Deputy Director of Investment Administration
for the Teachers' Retirement System of the City of
New York

2

**Exhibit A**
NYC Teachers' Variable A Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|---|
| Enhanced | 109,933 shares | 05/12/06 | Sell | 6601 | 54.94 |
| | | 07/17/06 | Sell | 1803 | 53.01 |
| | | 09/05/06 | Buy | 6900 | 55.27 |
| | | 10/2/2006 | Buy | 11036 | 55.80 |
| | | 11/17/06 | Sell | 2999 | 55.01 |
| | | 11/30/06 | Buy | 9500 | 53.71 |
| | | 02/12/07 | Sell | 15201 | 57.48 |
| | | 02/13/07 | Sell | 1298 | 57.49 |
| | | 05/01/07 | Sell | 11199 | 55.20 |
| | | 05/16/07 | Sell | 1199 | 56.11 |
| | | 08/22/07 | Sell | 10100 | 49.50 |
| | | 11/07/07 | Buy | 4900 | 41.37 |
| | | 12/14/07 | Sell | 1803 | 40.19 |
| | | 01/22/08 | Buy | 8800 | 30.38 |
| | | 01/30/08 | Sell | 18198 | 37.51 |
| | | 02/14/08 | Sell | 1500 | 33.66 |
| | | 03/05/08 | Buy | 15000 | 30.00 |
| | | 04/17/08 | Buy | 14100 | 25.70 |
| Wellington | 0 shares | 10/02/06 | Buy | 20390 | 55.80 |
| | | 01/23/07 | Sell | 900 | 56.38 |
| | | 01/24/07 | Sell | 700 | 56.47 |
| | | 01/26/07 | Sell | 900 | 56.05 |
| | | 03/02/07 | Sell | 5400 | 55.01 |
| | | 03/14/07 | Sell | 900 | 53.92 |
| | | 03/16/07 | Sell | 1100 | 55.02 |
| | | 04/05/07 | Sell | 1100 | 54.49 |
| | | 04/10/07 | Sell | 2800 | 54.13 |
| | | 04/11/07 | Sell | 900 | 53.70 |
| | | 04/12/07 | Sell | 1200 | 53.58 |
| | | 04/16/07 | Sell | 1300 | 55.13 |
| | | 05/29/07 | Sell | 3190 | 54.57 |
| MCM | 0 shares | 11/13/06 | Buy | 401164 | 55.49 |
| | | 11/17/06 | Sell | 9400 | 55.01 |
| | | 12/18/06 | Sell | 3800 | 57.49 |
| | | 12/19/06 | Buy | 474430 | 57.30 |
| | | 01/19/07 | Sell | 4650 | 56.70 |
| | | 02/13/07 | Sell | 7410 | 57.48 |
| | | 06/18/07 | Sell | 7700 | 54.05 |
| | | 06/22/07 | Sell | 11700 | 51.84 |
| | | 06/27/07 | Sell | 4030 | 51.74 |
| | | 09/17/07 | Sell | 3400 | 49.91 |
| | | 10/01/07 | Buy | 32374 | 49.42 |
| | | 10/18/07 | Sell | 1 | 48.91 |
| | | 02/15/08 | Sell | 6201 | 33.66 |
| | | 04/30/08 | Buy | 54759 | 29.15 |

|          |          | 05/05/08 | Buy  | 22845  | 29.60 |
|          |          | 05/16/08 | Sell | 6700   | 27.60 |
| Goldman  | 0 shares | 06/13/07 | Buy  | 39700  | 53.16 |
|          |          | 09/24/07 | Buy  | 55400  | 50.68 |
|          |          | 10/09/07 | Buy  | 5100   | 51.17 |
|          |          | 12/03/07 | Sell | 100200 | 42.47 |
|          |          | 02/25/08 | Buy  | 6700   | 34.15 |
|          |          | 03/05/08 | Buy  | 14595  | 29.28 |
|          |          | 03/07/08 | Buy  | 305    | 27.48 |
|          |          | 03/13/08 | Buy  | 12800  | 26.98 |
|          |          | 03/24/08 | Buy  | 100400 | 31.35 |
|          |          | 04/01/08 | Buy  | 36200  | 28.66 |
|          |          | 04/18/08 | Sell | 131700 | 27.27 |
|          |          | 04/23/08 | Sell | 39300  | 26.14 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 and A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Employees' Retirement System ("NYCERS"), and hereby certify as follows:

1.  I am fully authorized to enter into and execute this Certification on behalf of NYCERS. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.  NYCERS did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.  NYCERS understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. NYCERS maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.  NYCERS's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.  NYCERS has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*Vogel v. Jobs*, No. C-06-05208-JF (N.D. Cal.) (*Appointed*)
*In re Take-Two Interactive Securities Litig.*, No. 1:06-cv-00803-SWK (S.D.N.Y.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)

6.  Beyond its pro rata share of any recovery, NYCERS will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this _7th_ day

of August, 2008.


LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYCERS Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|---|
| 337545 | 20,117 shares | 5/24/2006 | Buy | 3,300 | 53.36 |
| | | 5/25/2006 | Buy | 2,500 | 53.41 |
| | | 8/18/2006 | Buy | 2,290 | 55.58 |
| | | 10/4/2006** | Buy | 630 | 56.72 |
| | | 12/26/2006 | Buy | 100 | 57.18 |
| | | 3/27/2007 | Sell | 1,200 | 55.83 |
| | | 4/5/2007 | Sell | 4,553 | 54.24 |
| | | 5/3/2007 | Buy | 200 | 55.61 |
| | | 5/16/2007 | Sell | 1,500 | 56.63 |
| | | 6/25/2007 | Buy | 300 | 52.25 |
| | | 9/24/2007 | Sell | 1,930 | 50.86 |
| | | 9/24/2007 | Sell | 2,800 | 50.86 |
| | | 10/3/2007** | Buy | 98 | 51.37 |
| | | 10/22/2007 | Sell | 2,340 | 46.2 |
| | | 10/23/2007 | Sell | 1,595 | 45.84 |
| | | 11/26/2007 | Sell | 12,317 | 39.98 |
| | | 11/27/2007 | Sell | 200 | 39.67 |
| | | 12/27/2007 | Sell | 100 | 38.48 |
| | | 3/4/2008 | Sell | 200 | 28.92 |
| | | 3/25/2008 | Sell | 300 | 29.95 |
| | | 5/28/2008 | Sell | 200 | 23.46 |
| 337548 | 882,333 shares | 5/19/2006 | Buy | 3,911 | 53.14 |
| | | 6/27/2006 | Sell | 7,009 | 52.84 |
| | | 6/30/2006 | Sell | 3,434 | 54.08 |
| | | 6/30/2006 | Sell | 8,457 | 54.08 |
| | | 8/29/2006 | Buy | 1,256 | 55.23 |
| | | 9/25/2006 | Sell | 19,755 | 55.5 |
| | | 10/4/2006** | Buy | 150,804 | 56.72 |
| | | 10/31/2006 | Buy | 167 | 55.5 |
| | | 10/31/2006 | Buy | 407 | 55.5 |
| | | 12/1/2006 | Buy | 3,342 | 54.1 |
| | | 12/27/2006 | Sell | 97 | 57.46 |
| | | 12/27/2006 | Sell | 6,000 | 57.46 |
| | | 2/15/2007 | Buy | 566 | 57.89 |
| | | 2/28/2007 | Buy | 2,899 | 55.37 |
| | | 2/28/2007 | Buy | 417 | 55.38 |
| | | 3/19/2007 | Buy | 49 | 55.7 |
| | | 3/19/2007 | Buy | 3,591 | 55.7 |
| | | 3/28/2007 | Buy | 1,650 | 55.08 |
| | | 3/28/2007 | Buy | 1,301 | 55.08 |
| | | 4/20/2007 | Buy | 3,984 | 55.85 |
| | | 4/30/2007 | Buy | 5,945 | 55.54 |
| | | 4/30/2007 | Buy | 427 | 55.54 |
| | | 6/27/2007 | Sell | 38,493 | 52.06 |
| | | 6/27/2007 | Sell | 74 | 52.05 |
| | | 7/12/2007 | Sell | 2,908 | 52.28 |

|  |  | Date | Type | Shares | Price |
|---|---|---|---|---|---|
|  |  | 9/24/2007 | Buy | 4,756 | 50.39 |
|  |  | 10/3/2007** | Buy | 38,142 | 51.37 |
|  |  | 10/9/2007 | Buy | 3,976 | 51.42 |
|  |  | 10/24/2007 | Buy | 263 | 45.4 |
|  |  | 10/24/2007 | Buy | 5,187 | 45.4 |
|  |  | 11/27/2007 | Sell | 7,604 | 40.12 |
|  |  | 11/27/2007 | Sell | 10,920 | 40.12 |
|  |  | 12/19/2007 | Buy | 2,910 | 38.99 |
|  |  | 12/26/2007 | Sell | 4,937 | 39.07 |
|  |  | 2/8/2008 | Buy | 5,043 | 34.04 |
|  |  | 2/26/2008 | Sell | 1,913 | 34.8 |
|  |  | 2/26/2008 | Sell | 1,070 | 34.8 |
|  |  | 3/7/2008 | Buy | 1,858 | 27.22 |
|  |  | 3/27/2008 | Buy | 2,704 | 27.07 |
|  |  | 3/31/2008 | Buy | 2,341 | 27 |
|  |  | 3/31/2008 | Buy | 382 | 27 |
|  |  | 4/25/2008 | Sell | 6,495 | 28.81 |
|  |  | 4/25/2008 | Sell | 2,366 | 28.81 |
|  |  | 4/30/2008 | Buy | 219 | 29.15 |
|  |  | 4/30/2008 | Buy | 83,392 | 29.14 |
| 337549 | 894,871 shares | 6/7/2006 | Buy | 22,300 | 54.76 |
|  |  | 6/7/2006 | Buy | 3,600 | 54.47 |
|  |  | 6/16/2006 | Buy | 1,500 | 52.82 |
|  |  | 6/21/2006 | Buy | 4,400 | 53.33 |
|  |  | 6/22/2006 | Buy | 7,500 | 53.08 |
|  |  | 6/30/2006 | Sell | 31,200 | 54.15 |
|  |  | 6/30/2006 | Sell | 6,400 | 54.08 |
|  |  | 7/25/2006 | Sell | 10,000 | 53.46 |
|  |  | 8/3/2006 | Buy | 4,000 | 54.2 |
|  |  | 9/6/2006 | Buy | 1,100 | 55.44 |
|  |  | 9/6/2006 | Buy | 300 | 55.19 |
|  |  | 9/26/2006 | Sell | 26,300 | 55.5 |
|  |  | 9/26/2006 | Sell | 14,800 | 55.14 |
|  |  | 9/26/2006 | Sell | 400 | 55.5 |
|  |  | 10/2/2006 | Buy | 900 | 55.67 |
|  |  | 10/4/2006** | Buy | 140,315 | 56.72 |
|  |  | 10/4/2006** | Buy | 6,831 | 56.72 |
|  |  | 10/4/2006** | Buy | 2,312 | 56.72 |
|  |  | 10/13/2006 | Sell | 15,400 | 56.49 |
|  |  | 10/13/2006 | Sell | 76 | 56.49 |
|  |  | 10/13/2006 | Buy | 23,900 | 56.45 |
|  |  | 11/3/2006 | Buy | 3,600 | 54.62 |
|  |  | 1/25/2007 | Sell | 1,000 | 55.76 |
|  |  | 4/12/2007 | Buy | 10,100 | 53.34 |
|  |  | 5/31/2007 | Buy | 7,500 | 54.22 |
|  |  | 6/22/2007 | Sell | 45,300 | 51.86 |
|  |  | 6/22/2007 | Sell | 3,900 | 51.84 |
|  |  | 6/26/2007 | Sell | 11,700 | 51.98 |
|  |  | 9/12/2007 | Buy | 44,900 | 48.84 |
|  |  | 9/26/2007 | Sell | 15,100 | 50.64 |
|  |  | 10/3/2007** | Buy | 38,293 | 51.37 |

| | | | | | |
|---|---|---|---|---|---|
| | | 10/18/2007 | Buy | 2,400 | 47.81 |
| | | 11/26/2007 | Sell | 31,900 | 40.25 |
| | | 12/6/2007 | Buy | 5,300 | 43.18 |
| | | 12/21/2007 | Sell | 8,900 | 38.65 |
| | | 1/9/2008 | Buy | 14,700 | 35.07 |
| | | 2/25/2008 | Sell | 13,100 | 33.62 |
| | | 3/6/2008 | Buy | 14,400 | 28.35 |
| | | 3/31/2008 | Buy | 7,500 | 27 |
| | | 4/30/2008 | Buy | 89,200 | 29.15 |
| | | 5/27/2008 | Sell | 22,600 | 24.61 |
| 337568 | 0 shares | 10/1/2007 | Sell | 5,020 | 50.38 |
| | | 10/3/2007** | Buy | 5,020 | 51.37 |
| 337570 | 0 shares | 10/3/2007** | Buy | 3,839 | 51.37 |
| | | 10/11/2007 | Sell | 300 | 51.14 |
| | | 10/22/2007 | Sell | 3,539 | 46.26 |
| 337816 | 34,800 shares | 11/30/07 | Sell | 34,800 | 43.26 |
| 337818 | 14,090 shares | 5/8/2006 | Buy | 2,480 | 55.43 |
| | | 12/1/2006 | Sell | 5,250 | 53.95 |
| | | 6/26/2007 | Sell | 11,320 | 51.86 |
| 349445 | 0 shares | 11/20/2007 | Buy | 990 | 38.11 |
| 349446 | 0 shares | 11/20/2007 | Buy | 161 | 38.34 |
| | | 3/14/2008 | Sell | 161 | 26.63 |
| 349466 | 0 shares | 11/30/2007 | Buy | 14,526 | 43 |
| | | 11/30/2007 | Sell | 14,526 | 43.27 |
| 337551 | 196,619 shares | 6/15/2006 | Buy | 100 | 52.39 |
| | | 6/16/2006 | Sell | 900 | 52.76 |
| | | 6/27/2006 | Buy | 100 | 52.79 |
| | | 6/28/2006 | Buy | 80 | 53 |
| | | 6/29/2006 | Buy | 105 | 53.86 |
| | | 6/30/2006 | Buy | 53 | 54.44 |
| | | 7/5/2006 | Buy | 137 | 53.56 |
| | | 7/6/2006 | Buy | 25 | 53.77 |
| | | 8/23/2006 | Buy | 75 | 55.85 |
| | | 8/24/2006 | Buy | 45 | 56.32 |
| | | 8/25/2006 | Buy | 81 | 56.22 |
| | | 8/29/2006 | Buy | 49 | 55.08 |
| | | 8/31/2006 | Buy | 50 | 54.67 |
| | | 9/15/2006 | Sell | 1,200 | 55.12 |
| | | 9/22/2006 | Buy | 63 | 54.68 |
| | | 9/25/2006 | Buy | 414 | 55.17 |
| | | 9/29/2006 | Buy | 5,900 | 55.78 |
| | | 10/4/2006** | Buy | 34,431 | 56.72 |
| | | 12/18/2006 | Buy | 43 | 57.32 |
| | | 12/19/2006 | Buy | 31 | 57.49 |

| 12/20/2006 | Buy | 25 | 57.2 |
|---|---|---|---|
| 12/21/2006 | Buy | 33 | 57.21 |
| 12/22/2006 | Buy | 68 | 57.03 |
| 2/1/2007 | Buy | 20 | 56.45 |
| 2/2/2007 | Buy | 45 | 56.42 |
| 2/6/2007 | Buy | 135 | 57.26 |
| 2/12/2007 | Buy | 245 | 57.52 |
| 2/13/2007 | Buy | 91 | 57.7 |
| 2/14/2007 | Buy | 72 | 57.94 |
| 2/15/2007 | Buy | 73 | 57.97 |
| 2/16/2007 | Buy | 87 | 58.24 |
| 2/20/2007 | Buy | 26 | 58.07 |
| 2/22/2007 | Buy | 31 | 58.69 |
| 2/23/2007 | Sell | 17,800 | 57.74 |
| 3/16/2007 | Buy | 900 | 55.14 |
| 4/5/2007 | Buy | 150 | 54.28 |
| 4/9/2007 | Buy | 22 | 54.03 |
| 4/11/2007 | Buy | 128 | 53.68 |
| 4/19/2007 | Buy | 200 | 55.34 |
| 4/26/2007 | Buy | 50 | 55.66 |
| 4/27/2007 | Buy | 50 | 55.65 |
| 5/4/2007 | Buy | 20 | 55.91 |
| 5/8/2007 | Buy | 80 | 56.37 |
| 5/25/2007 | Sell | 7,100 | 55.08 |
| 6/11/2007 | Buy | 120 | 53.65 |
| 6/13/2007 | Buy | 211 | 53.12 |
| 6/15/2007 | Buy | 2,500 | 54.04 |
| 7/10/2007 | Buy | 100 | 50.74 |
| 8/28/2007 | Buy | 125 | 49.16 |
| 8/30/2007 | Buy | 243 | 47.76 |
| 8/31/2007 | Buy | 79 | 48.95 |
| 9/4/2007 | Buy | 53 | 49.16 |
| 9/11/2007 | Buy | 50 | 48.14 |
| 9/12/2007 | Buy | 36 | 48.89 |
| 9/13/2007 | Buy | 14 | 49.98 |
| 9/21/2007 | Buy | 100 | 51.36 |
| 10/2/2007 | Buy | 60 | 51.28 |
| 10/3/2007 | Buy | 125 | 51.36 |
| 10/4/2007 | Buy | 129 | 51.45 |
| 10/8/2007 | Buy | 86 | 51.49 |
| 10/10/2007 | Buy | 210 | 50.88 |
| 10/11/2007 | Buy | 320 | 50.98 |
| 10/16/2007 | Buy | 80 | 49.25 |
| 11/5/2007 | Buy | 132 | 41.93 |
| 11/7/2007 | Buy | 174 | 41.81 |
| 11/8/2007 | Buy | 94 | 39.5 |
| 12/5/2007 | Buy | 50 | 42.47 |
| 12/6/2007 | Buy | 90 | 44.1 |
| 12/7/2007 | Buy | 138 | 43.63 |
| 12/10/2007 | Buy | 122 | 44.45 |
| 12/11/2007 | Buy | 100 | 44.47 |
| 12/21/2007 | Buy | 9,700 | 39.5 |

| | | | |
|---|---|---|---|
| 1/7/2008 | Buy | 66 | 35.27 |
| 1/8/2008 | Buy | 76 | 35.1 |
| 1/9/2008 | Buy | 46 | 33.52 |
| 1/10/2008 | Buy | 12 | 34.7 |
| 1/16/2008 | Buy | 200 | 34.85 |
| 1/23/2008 | Buy | 55 | 33.85 |
| 1/24/2008 | Buy | 45 | 35.97 |
| 1/29/2008 | Buy | 224 | 37.53 |
| 1/30/2008 | Buy | 76 | 37.47 |
| 3/11/2008 | Buy | 120 | 28.89 |
| 3/12/2008 | Buy | 54 | 28.66 |
| 3/13/2008 | Buy | 63 | 26.55 |
| 3/14/2008 | Buy | 63 | 26.93 |
| 3/20/2008 | Buy | 2,300 | 30.72 |
| 4/2/2008 | Buy | 120 | 29.14 |
| 4/3/2008 | Buy | 92 | 28.02 |
| 4/7/2008 | Buy | 75 | 27.71 |
| 4/8/2008 | Buy | 11 | 27.59 |
| 4/9/2008 | Buy | 55 | 26.88 |
| 4/10/2008 | Buy | 23 | 26.68 |
| 4/11/2008 | Buy | 114 | 27.81 |
| 4/14/2008 | Buy | 17,100 | 25.54 |
| 4/14/2008 | Buy | 43 | 24.96 |
| 5/6/2008 | Buy | 66 | 29.75 |
| 5/7/2008 | Buy | 120 | 29.56 |
| 5/8/2008 | Buy | 14 | 27.85 |
| 5/13/2008 | Sell | 200 | 27.79 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Police Pension Fund ("NYC Police"), and hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of NYC Police. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.     NYC Police did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.     NYC Police understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. NYC Police maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.     NYC Police's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.     NYC Police has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Take-Two Interactive Securities Litig.*, No. 1:06-cv-00803-SWK (S.D.N.Y.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919
(W.D. Wash.) (*Motion withdrawn*)

6.     Beyond its pro rata share of any recovery, NYC Police will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such

reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this 7ᵗʰ day of August, 2008.


_____
LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYC Police Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---------|------------------|------------|-------|----------|-------|
| 337627 | 15,400 shares | 1/8/2007 | Sell | 15,400 | 56.34 |
| 337629 | 334,040 shares | 6/7/2006 | Buy | 15,100 | 54.74 |
| | | 6/7/2006 | Buy | 2,400 | 54.47 |
| | | 6/30/2006 | Sell | 8,800 | 54.15 |
| | | 6/30/2006 | Sell | 1,800 | 54.08 |
| | | 10/4/2006** | Buy | 58,438 | 56.72 |
| | | 12/11/2006 | Buy | 2,300 | 56.28 |
| | | 1/25/2007 | Buy | 800 | 55.76 |
| | | 4/12/2007 | Buy | 4,900 | 53.33 |
| | | 5/31/2007 | Buy | 15,500 | 54.23 |
| | | 6/22/2007 | Sell | 1,700 | 51.84 |
| | | 6/22/2007 | Sell | 18,600 | 51.86 |
| | | 6/26/2007 | Sell | 11,600 | 51.98 |
| | | 9/12/2007 | Buy | 18,200 | 48.84 |
| | | 10/3/2007** | Buy | 16,845 | 51.37 |
| | | 12/6/2007 | Sell | 3,200 | 43.17 |
| | | 3/12/2008 | Buy | 300 | 29.69 |
| | | 3/31/2008 | Buy | 7,000 | 27 |
| | | 4/30/2008 | Buy | 37,300 | 29.15 |
| 337635 | 0 shares | 10/1/2007 | Sell | 23,527 | 50.38 |
| | | 10/3/2007** | Buy | 23,527 | 51.37 |
| 337642 | 71,500 shares | 4/22/2008 | Sell | 26,900 | 26.14 |
| | | 4/23/2008 | Sell | 24,400 | 26.15 |
| | | 4/24/2008 | Sell | 20,200 | 27.06 |
| 337643 | 0 shares | 8/29/2007 | Buy | 1,670 | 48.1 |
| | | 8/29/2007 | Buy | 76,090 | 48.15 |
| | | 8/31/2007 | Buy | 12,610 | 48.45 |
| | | 9/7/2007 | Buy | 6,330 | 48.12 |
| | | 9/12/2007 | Buy | 30,360 | 48.95 |
| | | 9/19/2007 | Buy | 12,240 | 52.64 |
| | | 9/26/2007 | Sell | 36,920 | 50.51 |
| | | 10/1/2007 | Sell | 15,920 | 50.88 |
| | | 10/18/2007 | Sell | 42,990 | 48 |
| | | 10/18/2007 | Sell | 43,470 | 47.96 |
| | | 2/1/2008 | Buy | 76,160 | 38.48 |
| | | 2/25/2008 | Buy | 9,920 | 33.91 |
| | | 3/3/2008 | Sell | 86,080 | 29.99 |
| 337821 | 323,519 shares | 5/31/2006 | Buy | 12,500 | 53.41 |
| | | 7/3/2006 | Buy | 4,900 | 54.14 |
| | | 8/4/2006 | Buy | 5,500 | 55.82 |
| | | 10/4/2006** | Buy | 56,546 | 56.72 |
| | | 5/16/2007 | Buy | 3,100 | 56.64 |
| | | 6/7/2007 | Buy | 15,400 | 53.09 |

| | | | | | |
|---|---|---|---|---|---|
| | | 6/22/2007 | Sell | 30,000 | 51.87 |
| | | 8/23/2007 | Buy | 13,100 | 49.56 |
| | | 10/3/2007** | Buy | 15,763 | 51.37 |
| | | 4/30/2008 | Buy | 41,600 | 29.15 |
| 363057 | 0 shares | 11/20/2007 | Buy | 630 | 38.11 |
| 363058 | 0 shares | 11/20/2007 | Buy | 103 | 38.34 |
| | | 3/14/2008 | Sell | 103 | 26.63 |
| 363081 | 0 shares | 11/26/2007 | Buy | 200 | 40.24 |
| | | 3/4/2008 | Sell | 50 | 28.92 |
| | | 3/25/2008 | Sell | 50 | 29.95 |
| | | 5/28/2008 | Sell | 50 | 23.46 |
| 337644 | 0 shares | 6/9/2006 | Buy | 7,900 | 54.47 |
| | | 10/10/2006 | Buy | 100 | 55.87 |
| | | 11/6/2006 | Sell | 8,000 | 54.49 |
| | | 1/9/2007 | Buy | 800 | 56.12 |
| | | 1/9/2007 | Buy | 2,100 | 55.98 |
| | | 3/21/2007 | Buy | 2,200 | 57.1 |
| | | 3/21/2007 | Buy | 1,300 | 57.21 |
| | | 3/22/2007 | Buy | 3,000 | 57.02 |
| | | 3/23/2007 | Buy | 1,000 | 56.92 |
| | | 3/23/2007 | Buy | 1,100 | 56.74 |
| | | 3/23/2007 | Buy | 500 | 56.92 |
| | | 3/27/2007 | Buy | 10,100 | 55.88 |
| | | 3/27/2007 | Buy | 10,200 | 55.8 |
| | | 5/23/2007 | Sell | 32,300 | 56.08 |
| | | 11/21/2007 | Buy | 9,200 | 37.99 |
| | | 12/12/2007 | Sell | 9,200 | 40.87 |
| | | 1/9/2008 | Buy | 52,200 | 33.58 |
| | | 1/16/2008 | Buy | 13,000 | 35.48 |
| | | 1/22/2008 | Buy | 5,700 | 30.21 |
| | | 1/25/2008 | Sell | 8,400 | 37.9 |
| | | 1/25/2008 | Sell | 3,100 | 36.56 |
| | | 1/25/2008 | Sell | 59,400 | 37.87 |
| | | 2/11/2008 | Buy | 12,300 | 33.69 |
| | | 2/14/2008 | Buy | 52,100 | 33.64 |
| | | 3/3/2008 | Buy | 1,600 | 30.04 |
| | | 3/27/2008 | Buy | 6,400 | 27.85 |
| | | 3/27/2008 | Buy | 14,800 | 27.56 |
| | | 3/27/2008 | Buy | 2,700 | 27.94 |
| | | 4/10/2008 | Sell | 5,900 | 27.46 |
| | | 4/14/2008 | Buy | 118,500 | 24 |
| | | 4/18/2008 | Sell | 9,600 | 27.31 |
| | | 4/30/2008 | Sell | 17,500 | 29.38 |
| | | 6/2/2008 | Buy | 15,400 | 23.39 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07.  The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Fire Department Pension Fund ("NYC Fire"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of NYC Fire. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    NYC Fire did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    NYC Fire understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. NYC Fire maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    NYC Fire's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    NYC Fire has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Take-Two Interactive Securities Litig.*, No. 1:06-cv-00803-SWK (S.D.N.Y.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919
(W.D. Wash.) (*Motion withdrawn*)

6.    Beyond its pro rata share of any recovery, NYC Fire will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this _7th_ day of August, 2008.

_Lewis Finkel_

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

**Exhibit A**
**NYC Fire Transactions in Wachovia Corp. common stock**
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---------|------------------|------------|-------|----------|-------|
| 337665 | 5,600 shares | 1/8/2007 | Sell | 5,600 | 56.34 |
| 337673 | 83,090 shares | 6/7/2006 | Buy | 2,000 | 54.47 |
| | | 6/7/2006 | Buy | 2,300 | 54.72 |
| | | 6/30/2006 | Sell | 2,200 | 54.15 |
| | | 6/30/2006 | Sell | 400 | 54.08 |
| | | 8/17/2006 | Buy | 300 | 55.67 |
| | | 10/4/2006** | Buy | 14,504 | 56.72 |
| | | 11/3/2006 | Buy | 2,400 | 54.62 |
| | | 5/31/2007 | Buy | 1,900 | 54.25 |
| | | 6/22/2007 | Sell | 300 | 51.84 |
| | | 6/22/2007 | Sell | 3,500 | 51.86 |
| | | 6/26/2007 | Sell | 2,900 | 51.99 |
| | | 9/12/2007 | Buy | 4,500 | 48.84 |
| | | 10/3/2007** | Buy | 4,619 | 51.37 |
| | | 11/21/2007 | Sell | 200 | 38.22 |
| | | 12/6/2007 | Sell | 900 | 43.17 |
| | | 2/8/2008 | Buy | 1,800 | 34.03 |
| | | 2/29/2008 | Buy | 2,200 | 30.62 |
| | | 3/31/2008 | Buy | 900 | 27 |
| | | 4/30/2008 | Buy | 9,600 | 29.15 |
| 337675 | 26,400 shares | 8/3/2006 | Buy | 6,200 | 54.2 |
| | | 9/6/2006 | Buy | 1,700 | 55.44 |
| | | 9/6/2006 | Buy | 800 | 55.19 |
| | | 10/4/2006** | Buy | 4,414 | 56.72 |
| | | 1/4/2007 | Sell | 13,700 | 57.17 |
| | | 5/4/2007 | Sell | 25,814 | 55.9 |
| | | 2/5/2008 | Buy | 20,000 | 34.43 |
| 337678 | 0 shares | 10/1/2007 | Sell | 5,512 | 50.38 |
| | | 10/3/2007** | Buy | 5,512 | 51.37 |
| 337681 | 0 shares | 10/3/2007** | Buy | 4,331 | 51.37 |
| | | 10/11/2007 | Sell | 400 | 51.14 |
| | | 10/22/2007 | Sell | 3,931 | 46.26 |
| 337687 | 9,100 shares | 5/8/2006 | Buy | 1,700 | 56.21 |
| | | 10/16/2006 | Buy | 1,200 | 54.82 |
| | | 11/13/2007 | Sell | 12,000 | 43.42 |
| 337688 | 0 shares | 8/29/2007 | Buy | 620 | 48.1 |
| | | 8/29/2007 | Buy | 28,110 | 48.15 |
| | | 8/31/2007 | Buy | 4,660 | 48.45 |
| | | 9/7/2007 | Buy | 2,340 | 48.12 |
| | | 9/12/2007 | Buy | 11,220 | 48.95 |
| | | 9/19/2007 | Buy | 4,520 | 52.64 |

|        |               | 9/26/2007  | Sell | 13,635 | 50.51 |
|--------|---------------|------------|------|--------|-------|
|        |               | 10/1/2007  | Sell | 5,880  | 50.88 |
|        |               | 10/18/2007 | Sell | 16,065 | 47.96 |
|        |               | 10/18/2007 | Sell | 15,890 | 48    |
|        |               | 2/1/2008   | Buy  | 28,140 | 38.48 |
|        |               | 2/25/2008  | Buy  | 3,680  | 33.91 |
|        |               | 3/3/2008   | Sell | 31,820 | 29.99 |
| 337690 | 0 shares      | 6/9/2006   | Buy  | 1,900  | 54.47 |
|        |               | 11/6/2006  | Sell | 1,900  | 54.49 |
|        |               | 1/9/2007   | Buy  | 200    | 56.12 |
|        |               | 1/9/2007   | Buy  | 500    | 55.98 |
|        |               | 3/21/2007  | Buy  | 500    | 57.1  |
|        |               | 3/21/2007  | Buy  | 300    | 57.21 |
|        |               | 3/22/2007  | Buy  | 800    | 57.02 |
|        |               | 3/23/2007  | Buy  | 200    | 56.92 |
|        |               | 3/23/2007  | Buy  | 300    | 56.74 |
|        |               | 3/23/2007  | Buy  | 100    | 56.92 |
|        |               | 3/27/2007  | Buy  | 2,500  | 55.88 |
|        |               | 3/27/2007  | Buy  | 2,400  | 55.8  |
|        |               | 5/23/2007  | Sell | 7,800  | 56.08 |
|        |               | 11/21/2007 | Buy  | 2,200  | 37.99 |
|        |               | 12/12/2007 | Sell | 2,200  | 40.87 |
|        |               | 1/9/2008   | Buy  | 12,700 | 33.58 |
|        |               | 1/16/2008  | Buy  | 3,100  | 35.48 |
|        |               | 1/22/2008  | Buy  | 1,400  | 30.21 |
|        |               | 1/25/2008  | Sell | 2,000  | 37.9  |
|        |               | 1/25/2008  | Sell | 800    | 36.56 |
|        |               | 1/25/2008  | Sell | 14,400 | 37.87 |
|        |               | 2/11/2008  | Buy  | 3,000  | 33.69 |
|        |               | 2/14/2008  | Buy  | 12,600 | 33.64 |
|        |               | 3/3/2008   | Buy  | 400    | 30.04 |
|        |               | 3/27/2008  | Buy  | 1,600  | 27.85 |
|        |               | 3/27/2008  | Buy  | 3,600  | 27.56 |
|        |               | 3/27/2008  | Buy  | 600    | 27.94 |
|        |               | 4/10/2008  | Sell | 1,400  | 27.46 |
|        |               | 4/14/2008  | Buy  | 28,700 | 24    |
|        |               | 4/18/2008  | Sell | 2,400  | 27.31 |
|        |               | 4/30/2008  | Sell | 4,200  | 29.38 |
|        |               | 6/2/2008   | Buy  | 3,700  | 23.39 |
| 337806 | 6,200 shares  | 11/30/2007 | Sell | 6,200  | 44.49 |
| 337807 | 2,520 shares  | 5/8/2006   | Buy  | 440    | 55.43 |
|        |               | 12/1/2006  | Sell | 940    | 53.95 |
|        |               | 6/26/2007  | Sell | 2,020  | 51.86 |
| 337849 | 84,781 shares | 5/31/2006  | Buy  | 1,000  | 53.5  |
|        |               | 6/30/2006  | Sell | 3,500  | 54.12 |
|        |               | 10/4/2006**| Buy  | 13,663 | 56.72 |
|        |               | 10/17/2006 | Buy  | 4,200  | 55.02 |
|        |               | 2/7/2007   | Buy  | 900    | 57.36 |

| | | | | | |
|---|---|---|---|---|---|
| | | 3/2/2007 | Buy | 900 | 54.99 |
| | | 5/31/2007 | Buy | 1,400 | 54.18 |
| | | 6/22/2007 | Sell | 2,700 | 51.87 |
| | | 6/27/2007 | Sell | 3,400 | 52.06 |
| | | 10/1/2007 | Buy | 3,700 | 50.98 |
| | | 10/3/2007** | Buy | 3,833 | 51.37 |
| | | 1/7/2008 | Buy | 3,200 | 35.84 |
| | | 2/26/2008 | Sell | 5,200 | 34.8 |
| | | 4/4/2008 | Buy | 1,900 | 27.88 |
| | | 4/30/2008 | Buy | 8,200 | 29.15 |
| 348872 | 0 shares | 11/20/2007 | Buy | 510 | 38.11 |
| 348873 | 0 shares | 11/20/2007 | Buy | 84 | 38.34 |
| | | 3/14/2008 | Sell | 84 | 26.63 |
| 362868 | 0 shares | 11/30/2007 | Buy | 1,614 | 43.27 |
| | | 11/30/2007 | Sell | 1,614 | 43.27 |
| 337689 | 19,800 shares | 4/22/2008 | Sell | 7,500 | 26.14 |
| | | 4/23/2008 | Sell | 6,700 | 26.15 |
| | | 4/24/2008 | Sell | 5,600 | 27.06 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Board of Education Retirement System ("NYC BERS"), and hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of NYC BERS. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.      NYC BERS did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.      NYC BERS understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. NYC BERS maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.      NYC BERS' transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.      NYC BERS has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)

6.      Beyond its pro rata share of any recovery, NYC BERS will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such

reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this **7th** day of August, 2008.

_Lewis F_

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYC BERS Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---------|------------------|------------|-------|----------|-------|
| 337500 | 2,300 shares | 1/8/2007 | Sell | 2,300 | 56.34 |
| 337504 | 78,222 shares | 6/7/2006 | Buy | 2,100 | 54.72 |
| | | 6/7/2006 | Buy | 2,000 | 54.47 |
| | | 6/30/2006 | Sell | 1,900 | 54.15 |
| | | 6/30/2006 | Sell | 600 | 54.08 |
| | | 10/4/2006** | Buy | 13,663 | 56.72 |
| | | 12/11/2006 | Buy | 600 | 56.28 |
| | | 1/25/2007 | Buy | 100 | 55.76 |
| | | 4/12/2007 | Buy | 3,000 | 53.35 |
| | | 5/31/2007 | Buy | 700 | 54.29 |
| | | 6/22/2007 | Sell | 300 | 51.84 |
| | | 6/22/2007 | Sell | 3,300 | 51.86 |
| | | 9/12/2007 | Buy | 2,300 | 48.84 |
| | | 10/3/2007** | Buy | 4,102 | 51.37 |
| | | 10/18/2007 | Buy | 900 | 47.81 |
| | | 12/27/2007 | Buy | 600 | 38.52 |
| | | 2/29/2008 | Buy | 900 | 30.62 |
| | | 3/31/2008 | Buy | 900 | 27 |
| | | 4/30/2008 | Buy | 9,000 | 29.15 |
| 337801 | 8,800 shares | 11/30/2007 | Sell | 8,800 | 44.54 |
| 337802 | 3,600 shares | 5/8/2006 | Buy | 630 | 55.43 |
| | | 12/1/2006 | Sell | 1,340 | 53.95 |
| | | 6/26/2007 | Sell | 2,890 | 51.86 |
| 348618 | 30,700 shares | 9/6/2006 | Sell | 900 | 55.14 |
| | | 9/6/2006 | Sell | 8,700 | 55.21 |
| | | 4/22/2008 | Sell | 7,900 | 26.14 |
| | | 4/23/2008 | Sell | 7,200 | 26.15 |
| | | 4/24/2008 | Sell | 6,000 | 27.06 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial
on 10/4/06 or A.G. Edwards on 10/3/07.  The share price shown is the closing price on the
day of the acquisition.

# CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Firefighters' Variable Supplements Fund ("FFVSF"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of FFVSF. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    FFVSF did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    FFVSF understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. FFVSF maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    FFVSF's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    FFVSF has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919 (W.D. Wash.) (*Motion withdrawn*)

6.    Beyond its pro rata share of any recovery, FFVSF will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs

and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this 7th day of August, 2008.

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

**Exhibit A**
**NYC FFVSF Transactions in Wachovia Corp. common stock**
Class Period: 5/8/06 to 6/6/08

| Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|
| 29,682 shares | 5/31/2006 | Buy | 1,100 | 53.5 |
| | 6/30/2006 | Sell | 1,100 | 54.12 |
| | 8/24/2006 | Buy | 200 | 56.63 |
| | 10/4/2006** | Buy | 5,360 | 56.72 |
| | 11/13/2006 | Buy | 400 | 55.65 |
| | 11/21/2006 | Buy | 600 | 54.67 |
| | 2/7/2007 | Buy | 400 | 57.23 |
| | 6/22/2007 | Sell | 500 | 51.87 |
| | 8/10/2007 | Buy | 600 | 46.79 |
| | 10/3/2007** | Buy | 1,328 | 51.37 |
| | 10/3/2007 | Buy | 1,800 | 51.26 |
| | 12/11/2007 | Sell | 4,000 | 41.95 |
| | 12/12/2007 | Sell | 100 | 40.81 |
| | 4/2/2008 | Buy | 900 | 28.82 |
| | 4/30/2008 | Buy | 2,800 | 29.15 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Fire Officers' Variable Supplements Fund ("FOVSF"), and hereby certify as follows:

1.  I am fully authorized to enter into and execute this Certification on behalf of FOVSF. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.  FOVSF did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.  FOVSF understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. FOVSF maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.  FOVSF's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.  FOVSF has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919 (W.D. Wash.) (*Motion withdrawn*)

6.  Beyond its pro rata share of any recovery, FOVSF will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this _7th_ day of August, 2008.

_Lewis F_____

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

**Exhibit A**
**NYC FOVSF Transactions in Wachovia Corp. common stock**
Class Period: 5/8/06 to 6/6/08

| Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|
| 21,414 shares | 9/15/2006 | Buy | 200 | 55.1 |
| | 9/29/2006 | Buy | 459 | 55.78 |
| | 10/4/2006** | Buy | 3,542 | 56.72 |
| | 10/6/2006 | Buy | 500 | 56.43 |
| | 10/6/2006 | Buy | 500 | 56.54 |
| | 10/6/2006 | Sell | 500 | 56.34 |
| | 1/26/2007 | Sell | 100 | 56.26 |
| | 6/15/2007 | Buy | 500 | 54.04 |
| | 12/21/2007 | Buy | 1,300 | 39.5 |
| | 1/28/2008 | Sell | 2,700 | 37.6 |
| | 3/20/2008 | Buy | 800 | 30.72 |
| | 4/14/2008 | Buy | 100 | 25.01 |
| | 4/14/2008 | Buy | 1,300 | 25.54 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

# CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Police Officers' Variable Supplements Fund ("POVSF"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of POVSF. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    POVSF did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    POVSF understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. POVSF maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    POVSF's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    POVSF has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919
(W.D. Wash.) (*Motion withdrawn*)

6.    Beyond its pro rata share of any recovery, POVSF will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this 7th day

of August, 2008.

_____

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

**Exhibit A**
**NYC POVSF Transactions in Wachovia Corp. common stock**
Class Period: 5/8/06 to 6/6/08

| Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|
| 54,734 shares | 6/7/2006 | Buy | 1,600 | 54.47 |
| | 6/30/2006 | Sell | 2,100 | 54.15 |
| | 6/30/2006 | Sell | 400 | 54.08 |
| | 9/26/2006 | Buy | 200 | 55.5 |
| | 10/20/2006 | Buy | 9,354 | 55.11 |
| | 12/11/2006 | Sell | 300 | 56.28 |
| | 5/31/2007 | Buy | 2,600 | 54.23 |
| | 6/22/2007 | Sell | 2,800 | 51.86 |
| | 6/22/2007 | Sell | 300 | 51.84 |
| | 9/12/2007 | Buy | 1,800 | 48.9 |
| | 10/3/2007** | Buy | 2,461 | 51.37 |
| | 10/5/2007 | Buy | 300 | 51.94 |
| | 10/18/2007 | Buy | 400 | 47.81 |
| | 11/6/2007 | Buy | 400 | 42.68 |
| | 12/10/2007 | Sell | 7,600 | 44.46 |
| | 12/27/2007 | Buy | 300 | 38.52 |
| | 1/15/2008 | Buy | 200 | 35.03 |
| | 1/31/2008 | Buy | 100 | 38.93 |
| | 2/29/2008 | Buy | 700 | 30.62 |
| | 3/31/2008 | Buy | 600 | 27 |
| | 4/30/2008 | Buy | 5,400 | 29.15 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Police Superior Officers' Variable Supplements Fund ("PSOVSF"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of PSOVSF. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    PSOVSF did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    PSOVSF understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. PSOVSF maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    PSOVSF's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    PSOVSF has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919
(W.D. Wash.) (*Motion withdrawn*)

6.    Beyond its pro rata share of any recovery, PSOVSF will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

    I declare under penalty of perjury that the foregoing is true and correct this _7th_ day

of August, 2008.

                               _Lewis F_____

                               LEWIS FINKELMAN
                               Deputy Comptroller for Legal Affairs and General
                               Counsel for the Office of the New York City
                               Comptroller

**Exhibit A**
**NYC PSOVSF Transactions in Wachovia Corp. common stock**
Class Period: 5/8/06 to 6/6/08

| Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|
| 56,177 shares | 6/7/2006 | Buy | 1,500 | 54.47 |
| | 6/30/2006 | Sell | 2,100 | 54.15 |
| | 6/30/2006 | Sell | 400 | 54.08 |
| | 9/26/2006 | Buy | 200 | 55.5 |
| | 10/4/2006** | Buy | 9,564 | 56.72 |
| | 11/3/2006 | Buy | 1,800 | 54.62 |
| | 12/11/2006 | Sell | 700 | 56.11 |
| | 12/11/2006 | Sell | 2,600 | 56.28 |
| | 1/25/2007 | Buy | 100 | 55.76 |
| | 5/31/2007 | Buy | 3,300 | 54.23 |
| | 6/22/2007 | Sell | 300 | 51.84 |
| | 6/22/2007 | Sell | 2,900 | 51.86 |
| | 9/12/2007 | Buy | 2,900 | 48.84 |
| | 10/3/2007** | Buy | 2,534 | 51.37 |
| | 12/10/2007 | Sell | 10,900 | 44.46 |
| | 12/27/2007 | Buy | 400 | 38.52 |
| | 1/15/2008 | Buy | 100 | 35.03 |
| | 1/31/2008 | Buy | 200 | 38.93 |
| | 2/29/2008 | Buy | 700 | 30.62 |
| | 3/31/2008 | Buy | 500 | 27 |
| | 4/30/2008 | Buy | 5,200 | 29.15 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

# EXHIBIT C

**NYC Funds Damages Summary -- Wachovia Corp. Securities Litigation -- Class Period: May 8, 2006 to June 6, 2008 -- LIFO**

| Fund | Manager | Acct. # | Shares Purchased, Class Period | Expenditure | Shares Sold, Class Period | Proceeds | LIFO Recognized Sales** | LIFO Recognized Proceeds** | Shares Retained (LIFO)** | Valuation | (Damages) / Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **NYC Board of Education Retirement System** | | | **41,495** | **$ 1,974,536** | **52,130** | **$ 2,152,824** | **6,730** | **$ 356,012** | **34,765** | **$ 548,154** | **$ (1,070,370)** |
| | Fidelity Management - LCG | 337500 | 0 | $ - | 6,100 | $ 322,023 | 6,100 | $ 322,023 | 0 | $ - | $ - |
| | Blackrock Russell 3000 | 337504 | 40,865 | $ 1,939,615 | 2,300 | $ 129,582 | 0 | $ - | 34,765 | $ 548,154 | $ (1,069,438) |
| | PIM Denali | 337801 | 0 | $ - | 8,800 | $ 391,952 | 0 | $ - | 0 | $ - | $ - |
| | PIM Piedmont | 337802 | 630 | $ 34,921 | 4,230 | $ 222,168 | 630 | $ 33,989 | 0 | $ - | $ (932) |
| | Aronson Johnson | 348618 | 0 | $ - | 30,700 | $ 1,087,099 | 0 | $ - | 0 | $ - | $ - |
| **NYC Employees' Retirement System** | | | **905,983** | **$ 42,754,434** | **510,962** | **$ 23,763,880** | **363,165** | **$ 16,141,798** | **542,818** | **$ 8,558,829** | **$ (18,053,808)** |
| | PIM Affinity | 337816 | 0 | $ - | 34,800 | $ 1,505,448 | 0 | $ - | 0 | $ - | $ - |
| | Blackrock Russell 3000 | 337549 | 456,851 | $ 21,672,169 | 258,077 | $ 12,346,495 | 213,676 | $ 9,035,059 | 243,175 | $ 3,834,237 | $ (8,802,873) |
| | FIS - Transition | 337545 | 9,418 | $ 510,174 | 29,235 | $ 523,677 | 29,235 | $ 508,551 | 0 | $ - | $ (1,623) |
| | BGI Russell 3000 | 337548 | 331,890 | $ 15,576,057 | 121,533 | $ 5,915,167 | 88,045 | $ 3,925,810 | 243,846 | $ 3,844,817 | $ (7,805,945) |
| | Amalgated Bank | 337551 | 80,807 | $ 3,734,424 | 27,200 | $ 1,538,026 | 26,000 | $ 1,473,790 | 54,807 | $ 864,164 | $ (1,396,470) |
| | Chicago Equity | 337568 | 5,020 | $ 257,900 | 5,020 | $ 252,908 | 5,020 | $ 252,908 | 990 | $ 15,610 | $ (4,992) |
| | CP Twin | 337620 | 990 | $ 37,729 | 161 | $ - | - | $ - | 990 | $ - | $ (22,119) |
| | CP Ten | 349445 | 161 | $ 6,173 | 161 | $ 4,287 | 161 | $ 4,287 | - | $ - | $ 3,922 |
| | Attucks Transition | 349446 | 14,526 | $ 624,618 | 14,526 | $ 628,540 | 14,526 | $ 628,540 | 0 | $ - | $ (1,885) |
| | Franklin Port | 349466 | 3,839 | $ 197,209 | 3,839 | $ 179,056 | 3,839 | $ 179,056 | 0 | $ - | $ (18,153) |
| | PIM-Piedmont | 337818 | 2,480 | $ 137,466 | 16,570 | $ 870,293 | 2,480 | $ 133,796 | 0 | $ - | $ (3,670) |
| **NYC Fire Dept Pension Fund** | | | **305,015** | **$ 12,817,515** | **243,206** | **$ 10,775,460** | **171,086** | **$ 7,522,668** | **133,929** | **$ 2,111,712** | **$ (3,183,135)** |
| | Northern Trust | 337849 | 42,896 | $ 2,028,734 | 14,800 | $ 687,433 | 12,300 | $ 552,133 | 30,596 | $ 482,419 | $ (994,182) |
| | PIM Affinity | 337665 | 0 | $ - | 5,600 | $ 315,504 | 0 | $ - | 0 | $ - | $ (11,395) |
| | PIM Atlanta Life | 348872 | 510 | $ 19,436 | 0 | $ - | 0 | $ - | 510 | $ 8,041 | $ (651) |
| | Blackrock Russell 3000 | 337807 | 440 | $ 24,389 | 2,960 | $ 155,470 | 440 | $ 23,738 | 0 | $ - | $ - |
| | Lord Abbett | 337673 | 47,023 | $ 2,198,143 | 10,400 | $ 535,092 | 10,400 | $ 535,092 | 0 | $ - | $ (1,085,602) |
| | Westpeak | 337659 | 83,300 | $ 2,676,913 | 37,100 | $ 1,508,629 | 37,100 | $ 1,508,629 | 0 | $ - | $ (439,830) |
| | | 337675 | 33,114 | $ 1,413,402 | 39,514 | $ 2,226,232 | 13,114 | $ 749,727 | 36,623 | $ 577,449 | $ (348,327) |
| | | 337678 | 5,513 | $ 283,151 | 5,513 | $ 277,695 | 5,513 | $ 277,695 | 0 | $ - | $ (5,456) |
| | | 337681 | 4,331 | $ 222,483 | 4,331 | $ 202,304 | 4,331 | $ 202,304 | 0 | $ 728,454 | $ (20,179) |
| | | 337687 | 2,900 | $ 161,341 | 12,000 | $ 521,040 | 2,900 | $ 125,918 | 46,200 | $ 315,348 | $ (35,423) |
| | Iridian Asset Mgmt | 348873 | 84 | $ 3,221 | 84 | $ 2,237 | 84 | $ 2,237 | 0 | $ - | $ (984) |
| | Aronson Johnson | 363868 | 1,614 | $ 69,838 | 1,614 | $ 69,838 | 1,614 | $ 69,838 | 0 | $ - | $ - |
| | | 337688 | 83,290 | $ 3,716,464 | 83,290 | $ 3,475,357 | 83,290 | $ 3,475,357 | 20,000 | $ - | $ (241,107) |
| | PIM Rasara Strategies | 337609 | 0 | $ - | 19,800 | $ 522,791 | 0 | $ - | 0 | $ - | $ - |
| | | 337806 | 0 | $ - | 6,200 | $ 275,838 | 0 | $ - | 0 | $ - | $ - |
| **NYC Police Pension Fund** | | | **941,532** | **$ 39,068,357** | **565,160** | **$ 23,518,965** | **478,260** | **$ 20,763,491** | **463,272** | **$ 7,304,595** | **$ (11,000,271)** |
| | Northern Trust | 337821 | 168,409 | $ 8,112,001 | 30,000 | $ 1,556,100 | 30,000 | $ 1,556,100 | 138,409 | $ 2,182,350 | $ (4,373,551) |
| | | 337627 | 0 | $ - | 15,400 | $ 867,636 | 0 | $ - | 0 | $ - | $ - |
| | Blackrock Russell 3000 | 337629 | 179,083 | $ 8,587,257 | 45,700 | $ 2,367,700 | 45,700 | $ 2,367,700 | 133,383 | $ 2,103,103 | $ (4,116,454) |
| | Aronson Johnson | 337635 | 23,527 | $ 1,208,582 | 23,527 | $ 1,185,290 | 23,527 | $ 1,185,290 | 0 | $ - | $ (23,292) |
| | | 337642 | 0 | $ - | 71,500 | $ 1,887,838 | 0 | $ - | 0 | $ - | $ - |

**NYC Funds Damages Summary -- Wachovia Corp. Securities Litigation -- Class Period: May 8, 2006 to June 6, 2008 -- LIFO**

| Fund / Manager | Account | Shares | $ | Shares | $ | Shares | $ | Shares | $ | $ Damages |
|---|---|---|---|---|---|---|---|---|---|---|
| Lord Abbett | 363644 | 344,200 | $ 11,067,437 | 153,400 | $ 6,242,822 | 153,400 | $ 6,242,822 | 190,800 | $ 3,008,420 | $ (1,816,195) |
| Indian Asset Mgmt | 363643 | 225,380 | $ 10,057,074 | 225,380 | $ 9,404,719 | 225,380 | $ 9,404,719 | 0 | $ - | $ (652,355) |
| ING (fmnly AELTUS) | 363081 | 200 | $ 8,048 | 150 | $ 4,117 | 150 | $ 4,117 | 50 | $ 788 | $ (3,143) |
| Mellon Russell 3000 | 363058 | 103 | $ 3,949 | 103 | $ 2,743 | 103 | $ 2,743 | 0 | $ - | $ (1,206) |
| BGI | 363057 | 630 | $ 24,009 | 0 | $ - | 0 | $ - | 630 | $ 9,933 | $ (14,076) |
| **NYC Teachers Retirement System** | | **853,483** | **$ 41,024,998** | **274,739** | **$ 13,115,627** | **224,519** | **$ 11,060,201** | **628,964** | **$ 9,911,127** | **$ (20,047,670)** |
| Westpeak | 337481 | 25,569 | $ 1,410,206 | 75,069 | $ 3,465,758 | 25,569 | $ 1,449,270 | 0 | $ - | 39,064 |
| | 363242 | 500 | $ 20,120 | 300 | $ 8,233 | 300 | $ 8,233 | 200 | $ 3,153 | $ (8,734) |
| | 363221 | 116 | $ 4,447 | 116 | $ 3,089 | 116 | $ 3,089 | 0 | $ - | $ (1,358) |
| | 363220 | 710 | $ 27,058 | 0 | $ - | 0 | $ - | 710 | $ 11,195 | $ (15,863) |
| | 337485 | 22,247 | $ 1,142,828 | 22,247 | $ 1,120,804 | 22,247 | $ 1,120,804 | 0 | $ - | $ (22,024) |
| | 337480 | 107,105 | $ 5,805,582 | 72,800 | $ 3,337,834 | 72,800 | $ 3,337,834 | 34,305 | $ 540,901 | $ (1,926,847) |
| | 337479 | 176,667 | $ 8,343,788 | 31,618 | $ 1,661,067 | 30,898 | $ 1,622,129 | 145,789 | $ 2,298,713 | $ (4,422,946) |
| | 337478 | 520,549 | $ 24,270,969 | 72,589 | $ 3,518,842 | 72,589 | $ 3,518,842 | 447,960 | $ 7,063,165 | $ (13,688,962) |
| **NYC TRS Variable Annuity** | | **1,347,398** | **$ 67,619,390** | **428,483** | **$ 16,773,260** | **397,718** | **$ 15,280,960** | **949,680** | **$ 14,973,984** | **$ (37,364,456)** |
| Enhanced VAR A | | 70,236 | $ 2,789,844 | 71,901 | $ 3,562,557 | 41,136 | $ 2,070,247 | 29,100 | $ 458,831 | $ (260,766) |
| Goldman | | 271,200 | $ 10,373,995 | 271,200 | $ 8,874,255 | 271,200 | $ 8,874,255 | 0 | $ - | $ (1,499,740) |
| Wellington | | 20,390 | $ 1,137,762 | 20,390 | $ 1,116,696 | 20,390 | $ 1,116,696 | 0 | $ - | $ (21,066) |
| MCM | | 985,572 | $ 53,317,789 | 64,992 | $ 3,219,752 | 64,992 | $ 3,219,752 | 920,580 | $ 14,515,153 | $ (35,582,884) |
| NYC FGVSF (Northern Trust) | 337852 | 9,201 | $ 432,662 | 3,300 | $ 135,316 | 3,300 | $ 135,316 | 5,901 | $ 93,043 | $ (204,303) |
| NYC FFVSF (Northern Trust) | 337846 | 15,488 | $ 748,269 | 5,700 | $ 257,348 | 5,700 | $ 257,348 | 9,788 | $ 164,331 | $ (336,590) |
| NYC POVSF (Blackrock Russell 3000) | 337860 | 26,415 | $ 1,238,487 | 13,500 | $ 650,887 | 12,600 | $ 602,180 | 13,815 | $ 217,827 | $ (418,480) |
| NYC PSOVSF (Blackrock Russell 3000) | 337835 | 28,998 | $ 1,403,145 | 19,900 | $ 971,512 | 18,900 | $ 917,390 | 10,098 | $ 169,219 | $ (326,536) |
| **TOTAL NYC FUNDS** | | **4,475,008** | **$ 209,081,793** | **2,117,080** | **$ 92,115,079** | **1,681,978** | **$ 73,037,354** | **2,793,030** | **$ 44,038,821** | **$ (92,005,618)** |

Pursuant to the PSLRA, shares held at the end of the Class Period were valued at their average closing price during the 90 days following the close of the class period. As 90 days have not yet passed, the shares were valued at the average closing price between 6/7/08 and 8/1/08 -- $15.7674

## NYC Funds Damages Summary -- Wachovia Corp. Securities Litigation -- Class Period: May 8, 2006 to June 6, 2008 -- FIFO

| Fund | Manager | Acct. # | Shares Purchased, Class Period | Expenditure | Shares Sold, Class Period | Proceeds | FIFO Recognized Sales** | FIFO Recognized Proceeds** | Shares Retained (FIFO)** | Valuation | (Damages) / Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **NYC Board of Education Retirement System** | | | 41,495 | $ 1,974,536 | 52,130 | $ 2,152,824 | 630 | $ 32,672 | 40,865 | $ 644,335 | $ (1,297,529) |
| | Fidelity Management - LCG | 337500 | 0 | | 2,300 | 129,582 | 0 | | 0 | | |
| | Blackrock Russell 3000 | 337504 | 40,865 | 1,939,615 | 6,100 | 322,023 | 0 | | 40,865 | 644,335 | (1,295,280) |
| | PIM Denali | 337801 | 630 | 34,921 | 8,800 | 391,952 | 630 | 32,672 | 0 | | (2,249) |
| | PIM Piedmont | 337802 | 0 | | 4,230 | 222,168 | 0 | | 0 | | |
| | Aronson Johnson | 348618 | 0 | | 30,700 | 1,087,099 | 0 | | 0 | | |
| **NYC Employees' Retirement System** | | | 905,983 | $ 42,754,434 | 510,962 | $ 23,763,880 | 35,146 | $ 1,549,256 | 870,837 | $ 13,730,835 | $ (27,474,343) |
| | PIM Affinity | 337816 | 0 | | 34,800 | 1,505,448 | 0 | | 0 | | |
| | Blackrock Russell 3000 | 337549 | 456,851 | 21,672,169 | 258,077 | 12,346,495 | 0 | | 456,851 | 7,203,352 | (14,468,817) |
| | FIS - Transition | 337545 | 9,418 | 510,174 | 29,235 | 523,677 | 9,119 | 355,851 | 299 | 4,714 | (149,609) |
| | BGI Russell 3000 | 337548 | 331,890 | 15,576,572 | 121,533 | 5,915,150 | 0 | | 331,890 | 5,233,042 | (10,343,530) |
| | Amalgated Bank | 337551 | 80,807 | 3,734,424 | 27,200 | 1,538,026 | 0 | | 80,807 | 1,274,116 | (2,460,308) |
| | Chicago Equity | 337568 | 5,020 | 257,900 | 5,020 | 252,908 | 5,020 | 252,908 | 0 | | (4,992) |
| | CP Twin | 349445 | 990 | 37,729 | 0 | | 0 | | 990 | 15,610 | (22,119) |
| | CP Ten | 349446 | 161 | 6,173 | 161 | 4,287 | 161 | 4,287 | 0 | | (1,886) |
| | Attucks Transition | 349466 | 14,526 | 624,618 | 14,526 | 628,540 | 14,526 | 628,540 | 0 | | 3,922 |
| | Franklin Port | 337570 | 3,839 | 197,209 | 3,839 | 179,056 | 3,839 | 179,056 | 0 | | (18,153) |
| | PIM-Piedmont | 337818 | 2,480 | 137,466 | 16,570 | 870,293 | 2,480 | 128,613 | 0 | | (8,853) |
| **NYC Fire Dept'l Pension Fund** | | | 305,015 | $ 12,817,515 | 243,206 | $ 10,775,460 | 148,386 | $ 6,417,869 | 156,629 | $ 2,469,632 | $ (3,930,014) |
| | Northern Trust | 337849 | 42,896 | 2,028,734 | 14,800 | 687,433 | 0 | | 42,896 | 676,358 | (1,352,376) |
| | | 337665 | 0 | | 5,600 | 315,504 | 0 | | 0 | | |
| | | 348872 | 510 | 19,436 | 0 | | 0 | | 510 | 8,041 | (11,395) |
| | PIM Affinity | 337807 | 440 | 24,389 | 2,960 | 155,470 | 440 | 22,818 | 0 | | (1,571) |
| | PIM Atlanta Life | 337673 | 47,023 | 2,198,143 | 10,400 | 535,092 | 0 | | 47,023 | 741,430 | (1,456,713) |
| | Blackrock Russell 3000 | 337690 | 83,300 | 2,676,913 | 37,100 | 1,508,629 | 37,100 | 1,508,629 | 46,200 | 728,454 | (439,830) |
| | Lord Abbett | 337675 | 33,114 | 1,413,402 | 39,514 | 2,226,232 | 13,114 | 733,073 | 20,000 | 315,348 | (364,981) |
| | Westpeak | 337678 | 5,513 | 283,151 | 5,513 | 277,695 | 5,513 | 277,695 | 0 | | (5,456) |
| | | 337681 | 4,331 | 222,483 | 4,331 | 202,304 | 4,331 | 202,304 | 0 | | (20,179) |
| | | 337687 | 2,900 | 161,341 | 12,000 | 521,040 | 2,900 | 125,918 | 0 | | (35,423) |
| | | 348873 | 84 | 3,221 | 84 | 2,237 | 84 | 2,237 | 0 | | (984) |
| | Iridian Asset Mgmt | 363868 | 1,614 | 69,838 | 1,614 | 69,838 | 1,614 | 69,838 | 0 | | |
| | Aronson Johnson | 337688 | 83,290 | 3,716,464 | 83,290 | 3,475,357 | 83,290 | 3,475,357 | 0 | | (241,107) |
| | PIM Rasara Strategies | 337806 | 0 | | 19,800 | 522,791 | 0 | | 0 | | |
| | | | 0 | | 6,200 | 275,838 | 0 | | 0 | | |
| **NYC Police Pension Fund** | | | 941,532 | $ 39,068,357 | 565,160 | $ 23,518,965 | 402,560 | $ 16,839,691 | 538,972 | $ 8,498,187 | $ (13,730,479) |
| | Northern Trust | 337821 | 168,409 | 8,112,001 | 30,000 | 1,556,100 | 0 | | 168,409 | 2,655,372 | (5,456,629) |
| | | 337627 | 0 | | 15,400 | 867,636 | 0 | | 0 | | |
| | Blackrock Russell 3000 | 337629 | 179,083 | 8,587,257 | 45,700 | 2,367,700 | 0 | | 179,083 | 2,823,673 | (5,763,584) |
| | | 337635 | 23,527 | 1,208,582 | 23,527 | 1,185,290 | 23,527 | 1,185,290 | 0 | | (23,292) |

## NYC Funds Damages Summary -- Wachovia Corp. Securities Litigation -- Class Period: May 8, 2006 to June 6, 2008 -- FIFO

| Fund | Acct | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| Aronson Johnson | 337642 | 0 | $ - | 71,500 | $ 1,887,838 | 0 | $ - | 0 | $ - | $ - |
| | 363057 | 630 | $ 24,009 | 0 | $ - | 0 | $ - | 630 | $ 9,933 | $ (14,076) |
| | 363058 | 103 | $ 3,949 | 103 | $ 2,743 | 103 | $ 2,743 | 103 | $ - | $ (1,206) |
| | 363081 | 200 | $ 8,048 | 150 | $ 4,117 | 150 | $ 4,117 | 50 | $ 788 | $ (3,143) |
| Indian Asset Mgmt | 337643 | 225,380 | $ 10,057,074 | 225,380 | $ 9,404,719 | 225,380 | $ 9,404,719 | 0 | $ - | $ (652,355) |
| Lord Abbett | 337644 | 344,200 | $ 11,067,437 | 153,400 | $ 6,242,822 | 153,400 | $ 6,242,822 | 190,800 | $ 3,008,420 | $ (1,816,195) |
| **NYC Teachers Retirement System** | | 853,483 | $ 41,024,998 | 274,739 | $ 13,115,627 | 60,420 | $ 2,343,608 | 793,063 | $ 12,504,542 | $ (26,176,848) |
| BGI | 337478 | 520,549 | $ 24,270,969 | 72,589 | $ 3,518,842 | 0 | $ - | 520,549 | $ 8,207,704 | $ (16,063,265) |
| Mellon Russell 3000 | 337479 | 176,687 | $ 8,343,788 | 31,618 | $ 1,661,067 | 0 | $ - | 176,687 | $ 2,785,895 | $ (5,557,893) |
| ING (fmrly AEL/IUS) | 337480 | 107,105 | $ 5,805,582 | 72,800 | $ 3,337,834 | 12,188 | $ 334,439 | 94,917 | $ 1,496,594 | $ (3,974,549) |
| | 337485 | 22,247 | $ 1,142,828 | 22,247 | $ 1,120,804 | 22,247 | $ 1,120,804 | 0 | $ - | $ (22,024) |
| | 363220 | 710 | $ 27,058 | 0 | $ - | 0 | $ - | 710 | $ 11,195 | $ (15,863) |
| | 363221 | 116 | $ 4,447 | 116 | $ 3,089 | 116 | $ 3,089 | 0 | $ - | $ (1,358) |
| | 363242 | 500 | $ 20,120 | 300 | $ 8,233 | 300 | $ 8,233 | 200 | $ 3,153 | $ (8,734) |
| Westpeak | 337481 | 25,569 | $ 1,410,206 | 75,069 | $ 3,465,758 | 25,569 | $ 877,043 | 0 | $ - | $ (533,163) |
| **NYC TRS Variable Annuity** | | 1,347,398 | $ 67,619,390 | 428,483 | $ 16,773,260 | 356,582 | $ 13,210,703 | 990,816 | $ 15,622,592 | $ (38,786,095) |
| Enhanced VAR A | | 70,236 | $ 2,789,844 | 71,901 | $ 3,562,557 | 0 | $ - | 70,236 | $ 1,107,439 | $ (1,682,405) |
| Goldman | | 271,200 | $ 10,373,995 | 271,200 | $ 8,874,255 | 271,200 | $ 8,874,255 | 0 | $ - | $ (1,499,740) |
| Wellington | | 20,390 | $ 1,137,762 | 20,390 | $ 1,116,696 | 20,390 | $ 1,116,696 | 0 | $ - | $ (21,066) |
| MCM | | 985,572 | $ 53,317,789 | 64,992 | $ 3,219,752 | 64,992 | $ 3,219,752 | 920,580 | $ 14,515,153 | $ (35,582,884) |
| NYC FGVSF (Northern Trust) | 337852 | 9,201 | $ 432,662 | 3,300 | $ 135,316 | 0 | $ - | 9,201 | $ 145,076 | $ (287,586) |
| NYC FFVSF (Northern Trust) | 337846 | 15,488 | $ 748,269 | 5,700 | $ 257,348 | 0 | $ - | 15,488 | $ 244,205 | $ (504,064) |
| NYC POVSF (Blackrock Russell 3000) | 337860 | 26,415 | $ 1,238,487 | 13,500 | $ 650,887 | 0 | $ - | 26,415 | $ 416,496 | $ (821,991) |
| NYC PSOVSF (Blackrock Russell 3000) | 337835 | 28,998 | $ 1,403,145 | 19,900 | $ 971,512 | 0 | $ - | 28,998 | $ 457,223 | $ (945,922) |
| **TOTAL NYC FUNDS** | | 4,475,008 | $ 209,081,793 | 2,117,080 | $ 92,115,079 | 1,003,724 | $ 40,393,799 | 3,471,284 | $ 54,733,123 | $ (113,954,871) |

Pursuant to the PSLRA, shares held at the end of the Class Period were valued at their average closing price during the 90 days following the close of the class period. As 90 days have not yet passed, the shares were valued at the average closing price between 6/7/08 and 8/1/08 -- $15.7674

Pursuant to FIFO methodology, proceeds from class period sales of shares that were purchased pre-class period are disregarded in the calculation.

Only when all pre-class period positions have been closed by subsequent sales do we begin to match sales against class period purchases,

and offset the proceeds of the sales against the class period expenditures.

# EXHIBIT D

**DECLARATION OF ILYSE SISOLAK IN SUPPORT OF THE NEW YORK CITY
PENSION FUNDS FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF
SELECTION OF LEAD COUNSEL**

ILYSE SISOLAK hereby declares, pursuant to 28 U.S.C. § 1746:

1.     I am an Assistant Corporation Counsel at the New York City Law Department ("Law Department").

2.     I submit this declaration in support of the application made by certain New York City Pension Funds described below (collectively, the "NYC Pension Funds") for appointment as Lead Plaintiff and approval of their selection of Lead Counsel in this action.

3.     The NYC Pension Funds consist of the actuarial pension systems of the New York City Employees' Retirement System ("NYCERS"), the New York City Police and Fire Department Pension Funds ("NYC Police" and "NYC Fire"), the New York City Teachers' Retirement System ("NYC TRS"), the New York City Board of Education Retirement System ("NYC BERS"), and certain other funds and programs, including the New York City Police Officers' Variable Supplements Fund ("POVSF"), New York City Police Superior Officers' Variable Supplements Fund ("PSOVSF"), New York City Firefighters' Variable Supplements Fund ("FFVSF"), New York City Fire Officers' Variable Supplements Fund ("FOVSF"), and the New York City Teachers' Variable Annuity Program ("Teachers' Variable A"). The NYC Funds had over $106 billion in assets as of March 31, 2008.

4.     NYCERS, established under Section 13-102 of the Administrative Code of the City of New York, provides pension benefits to all New York City employees who join the Pension Plan and are not eligible to participate in separate NYC Fire, NYC Police, NYC TRS, or NYC BERS pension funds. NYCERS holds over $39 billion in assets with over 200,000 active members and approximately 125,000 retirees and beneficiaries.

5.    NYC Police, created pursuant to New York Local Law 2 of 1940, provides pension benefits for full-time uniformed employees of the New York City Police Department. NYC Police holds over $21 billion in assets with more than 36,000 active members and 42,000 retired members.

6.    NYC Fire, established pursuant to Section 13-301 of the Administrative Code of the City of New York, provides pension benefits for full-time uniformed employees of the New York City Fire Department.  NYC Fire holds approximately $6.9 billion in assets, and has approximately 12,000 active members and 18,000 retired members.

7.    NYC TRS maintains two separate retirement programs, the Qualified Pension Plan ("QPP") and the Tax-Deferred Annuity ("TDA").[1]  The QPP, established pursuant to Section 13-502 of the Administrative Code of the City of New York, provides pension benefits to those with regular appointments to the pedagogical staff of the Department of Education. The TDA, established pursuant to Internal Revenue Code Section 403(b), provides a means of deferring income tax payments on voluntary tax-deferred contributions.  NYC TRS has approximately $36 billion in assets, and approximately 65,000 retirees and over 109,000 active members, and Teachers' Variable A has a further $12 billion in assets.

8.    NYC BERS provides pension benefits to, among others, non-pedagogical employees of the Department of Education.  NYC BERS has approximately $2.4 billion in assets and approximately 12,000 retirees and 38,000 active members.

9.    POVSF, PSOVSF, FFVSF and FOVSF were enacted, pursuant to enabling

---

[1]    The Teachers' Variable A program is included in NYC TRS Tax-Deferred Annuity program.

State legislation, to provide certain retirees of the New York City Police Department and the New York City Fire Department with fixed supplement benefits from variable supplement funds. As of March 31, 2008, POVSF had over $1 billion in assets, PSOVSF had over $998 million in assets, FFVSF had approximately $546 million in assets, and FOVSF had approximately $317 million in assets.

10.    For all of the NYC Funds (other than TRS' Variable A), the New York City Comptroller serves as Chief Investment Advisor, pursuant to resolutions by the Funds, and also serves as Custodian of Assets, pursuant to Statute.

11.    In general, the NYC Pension Funds have invested in domestic equities, international equities, and U.S. fixed income investments.

12.    The Law Department is the legal arm of the City of New York. Pursuant to the powers and duties granted to it under Section 394 of the New York City Charter, the Law Department represents all City agencies and the NYC Pension Funds, as well as the offices of elected officials such as the Comptroller and the Public Advocate. In the matters in which outside counsel is retained to represent New York City, its agencies and its pension funds, the Law Department has the sole authority and responsibility to select which firms to retain and to negotiate the terms of retention.

13.    The Law Department has over 650 attorneys with exceptional depth in all areas of litigation, including class action litigation, at both the trial and appellate levels. The Law Department's expertise extends to the areas of bankruptcy, financial transactions and other related fields. Since 1992, the Law Department has been involved in a number of cases involving securities laws, both securities fraud class action litigation and cases involving the issue of whether companies

3

were required to include NYC Pension Funds' shareholder proposals in their proxy materials (*see*, *e.g.*, *The NYC Funds v. Brunswick Corp.*, 789 F.Supp. 144 (S.D.N.Y. 1992).

14.    The Law Department serves as counsel to the NYC Pension Funds, and is thus able to provide direction and monitoring of this litigation on behalf of the NYC Pension Funds. The Law Department has both the experience and resources to perform this function. In this regard, the Law Department appointed outside counsel for the NYC Pension Funds, and monitored the activity of said counsel, in *In re Cendant Corp. Litigation*, 264 F.3d 201 (3d Cir. 2001) and in *In re Orbital Sciences Corporation Securities Litigation*, 188 F.R.D. 237 (E.D. Va. 1999), securities class actions in which the NYC Pension Funds were designated as lead plaintiffs, as well as in significant non-class securities litigation. *See In re WorldCom, Inc. Securities Litigation*, 2004 WL 254682 (S.D.N.Y. Nov. 10, 2004). The Law Department also retained outside counsel for certain of the NYC Pension Funds in *In re Take-Two Securities Litigation*, Civil Action No. 1:06-cv-00803-SWK (S.D.N.Y.); *In re Juniper Networks, Inc. Securities Litigation*, Civil Action No. 3:06-cv-4327-MJJ (N.D. Cal.); *Vogel v. Jobs*, Civil Action No. C-06-05208-JF (N.D. Cal.); and *In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.), in which those NYC Pension Funds have been appointed lead plaintiff.

15.    The NYC Pension Funds represent an ideal plaintiff to lead this litigation. The NYC Pension Funds have proven themselves to be precisely the type of institutional investor Congress was trying to attract to securities litigation when it enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA").

16.    The PSLRA sought to "empower investors so that they, not their lawyers, control private securities litigation..." Conference Report on Securities Litigation Reform, H.R. Rep.

No. 369, 104th Cong., 1st Sess. 31, reprinted in 1955 U.S.C.C.A.N. 679, 730-34 ("Conf. Rep."). *In re Cendant Corporation Litigation,* 98-1664 (WNW) (D.N.J.), a case in which NYC Pension Funds served as Co-Lead Plaintiff, is one of the best examples of client driven rather than lawyer driven securities class actions.

17.    The NYC Pension Funds have been highly selective in choosing cases they feel are appropriate for public pension fund involvement.

18.    As a result of this selectivity in choosing cases, the NYC Pension Funds are in full compliance with 15 U.S.C. § 78u-4 limiting service as a lead plaintiff to 5 securities class actions during any 3-year period.

19.    The NYC Pension Funds have decided to seek to Lead Plaintiff appointment in this litigation because of the important public policy considerations at stake and the obvious need for a strong independent entity to vigorously prosecute all claims and to conscientiously monitor the actions of Lead Counsel. As evidenced by its prior history as Lead Plaintiff in *Cendant* and *Orbital,* the NYC Pension Funds are qualified to represent this class and to ensure that the interests of the class are never overshadowed by the concerns of class counsel.

20.    The NYC Pension Funds have selected the firm of Kirby McInerney LLP to serve as the NYC Pension Funds' selection as Lead Counsel. The Law Department will receive, review, and approve all significant pleadings (*e.g.,* consolidated complaint, motion for class certification and significant discovery motions) *before* they are filed with the Court.

21.    The Law Department will be apprised of court appearances, settlement discussions, and other important meetings and will attend such meetings at their discretion.

22.    The Law Department will also participate in periodic meetings and conference

calls with Kirby McInerney in order to discuss developments and strategies in the prosecution of the case, including but not limited to settlement discussions.

23.     The Law Department will also receive and review, on a periodic basis, time and expense reports of Kirby McInerney.

24.     The NYC Pension Funds and Kirby McInerney have negotiated a schedule for the payment of attorneys' fees which provides for contingent fee payments that are significantly less than fees typically awarded in securities fraud class action litigation.  Kirby McInerney has agreed that they will not submit any fee application to the Court without the prior approval of the NYC Pension Funds. (Any fee application will, of course, be subject to final approval of the Court).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 7TH day of August, 2008.

_____
ILYSE SISOLAK

# EXHIBIT E



**KIRBY McINERNEY LLP**
WWW.KMLLP.COM

**At Kirby McInerney LLP,** we bring experience, intelligence, creativity and dedication to bear in defending our clients' interests against losses in cases of corporate malfeasance. Unfortunately, on the heels of the exposure of colossal corporate frauds – Enron, Worldcom and others – public and private investors, consumers, payors and employees today participate in an uncertain marketplace, and they need protection. We utilize cutting-edge strategies that bring high – and have even brought unprecedented – recoveries for our clients: governmental entities, Taft-Hartley funds, hedge funds, and other aggrieved institutions and individuals. We have achieved and are pursuing landmark results in the fields of securities fraud, corporate governance, consumer, antitrust, health care and ERISA litigation, representing our clients in class actions or, if appropriate, individual litigation.

We make our clients' interests our own, and are constantly looking for ways in which to help them manage the now amplified risks associated with their participation in the marketplace. As part of our focus on risk management, our *Institutional Monitoring Program* monitors our clients' investment history in order to ensure crucial, immediate awareness of possible fraud. When evidence of fraud surfaces, we partner with our clients to identify and execute a legal strategy that best defends their interests in light of their losses. Our *Institutional Monitoring Program* is cost and commitment free.

We offer our litigation services on a contingency basis, and are paid only if successful in recovering losses in the event of a fraud. This policy allows our clients to access legal rights and remedies that might otherwise be uneconomical. We carefully review the merits of all litigation proceedings, weighing our clients' losses against their chance for recovery, before moving forward with litigation.

We pride ourselves on our proven ability to protect our clients using the entire range of tools for recourse offered by the legal system, whether it be through settlement or, if needed, trial. Throughout the history of our firm we have recovered billions of dollars for our clients, and the average recoveries that we procure in each individual case are among the very best in the field:

> **In 2007, Institutional Shareholder Services, a top industry publication, lauded KM for procuring, on average, the third largest recoveries for shareholders of all plaintiffs' firms in the United States.**

**KIRBY McINERNEY LLP**

# CURRICULA VITAE

**Roger W. Kirby** is managing partner of the firm. He has written several articles on litigation, the Federal Rules of Civil Procedure and Federal Rules of Evidence that have been published by various reporters and journals, and has been on the board of editors of Class Action Reports. He has also lectured on aspects of securities litigation to various professional organizations in the United States and abroad.

Mr. Kirby has enjoyed considerable success as a trial attorney, and cases for which he has had primary responsibility have produced landmark decisions in the fields of securities law, corporate governance, and deceptive advertising.

Recent activities include:

- Representation of an objector to the settlement in *Reynolds v. Beneficial National Bank* in the United States Northern District Court for the District of Illinois. Mr. Kirby and KM successfully persuaded the U.S. Court of Appeals for the Seventh Circuit and ultimately the district court to overturn the settlement in question, and were then appointed co-lead counsel to the class. Mr. Kirby and KM were lauded by the presiding judge for their "intelligence and hard work," and for obtaining "an excellent result for the class."

- Representation, as lead counsel, of a class of investors in *Gerber v. Computer Associates International, Inc.*, a securities class action that resulted in a multimillion dollar recovery jury verdict that was upheld on appeal; and

- Representation, as lead counsel, of a certified class of purchasers of PRIDES securities in connection with the Cendant Corporation accounting fraud in *In re Cendant Corporation PRIDES Litigation*. Mr. Kirby was instrumental in securing an approximate $350 million settlement for the certified class – an unprecedented 100 percent recovery.

Mr. Kirby is admitted to the New York State Bar, the United States District Courts for the Southern, Northern and Eastern Districts of New York, the United States Courts of Appeals for the Second, Third, Fifth, Seventh, Eighth, Ninth, and Eleventh Circuits and the United States Supreme Court. He attended Stanford University & Columbia College (B.A., 1969) and Columbia University School of Law (J.D., 1972) where he was an International Fellow. He also attended The Hague Academy of International Law (Cert. D'Att.). Thereafter, he was law clerk to the late Honorable Hugh H. Bownes, United States District Court for New Hampshire, and the United States Court of Appeals for the First Circuit.



**Alice McInerney** is a partner in our New York office focusing on antitrust and consumer matters, and who also handles securities class actions. Ms. McInerney joined the firm in 1995 and has over 30 years of experience as an attorney.

Prior to joining KM, Ms. McInerney was Chief of the Investor Protection Bureau and Deputy Chief of the Antitrust Bureau of the New York Attorney General's office. While there, she chaired the Enforcement Section of the North American Securities Administrators Association and also chaired the Multi-State Task Force on Investigations for the National Association of Attorneys General.

Some of Ms. McInerney's relevant work includes:

- Representation, as lead and co-lead counsel, of consumer classes in antitrust cases against Microsoft. These litigations resulted in settlements totaling nearly a billion dollars for consumers in Florida, New York, Tennessee, West Virginia and Minnesota;

- Representation of a class of retailers in *In re Visa Check/Master Money Antitrust Litigation*, an antitrust case which resulted in a settlement of over $3 billion for the class;

- Representation of public entities in connection with ongoing Medicaid fraud and false claims act litigations arising from health expenditures of these state and local governmental entities; and

- Representation of California homeowners in litigation arising from mortgage repayment irregularities. Litigation resulted in settlements that afforded millions of California homeowners clear title to their property. The cases resulted in the notable decision *Bartold v. Glendale Federal Bank*.

Ms. McInerney is admitted to the New York State Bar, all United States District Courts for the State of New York, the United States Court of Appeals for the Second Circuit and the United States Supreme Court. She graduated from Smith College (B.A. 1970) and Hofstra School of Law (J.D. 1976).



**Randall K. Berger** is a partner in our New York office focusing on antitrust, whistleblower and unclaimed property litigation. Mr. Berger joined the firm in 1994 and leads the firm's whistleblower practice. In whistleblower cases, fraud against Federal and State governments is exposed by persons having unique knowledge of the circumstances surrounding the fraud. These cases are generally litigated under seal.

Mr. Berger is a certified arbitrator for the National Association of Securities Dealers. The arbitration panels where Mr. Berger serves are used to resolve disputes between NASD member firms and customers, and to resolve intra-industry conflicts.

Some of Mr. Berger's relevant work includes:

- Representation, as co-lead counsel, of investors in Ponzi scheme instruments issued by the now-bankrupt Bennett Funding Group in a class action which resulted in a recovery of $169.5 million for the class;

- Representation of State Treasurers in litigation against the Federal government to recover unclaimed U.S. savings bond proceeds;

- Representation of companies that offered IPO securities in antitrust litigation against the 27 largest investment banks in the United States. Plaintiffs allege that the banks conspired to price fix underwriting fees in the mid-sized IPO market.

Mr. Berger is admitted to the New York State Bar, the United States District Courts for the Southern, Eastern and Northern Districts of New York and the District of Colorado. He has been a member of the New York City Bar Association since 1995. He graduated from Iowa State University (B.S., 1985) and from the University of Chicago (J.D., 1992).

Prior to attending law school and joining KM, Mr. Berger utilized his undergraduate (engineering) degree working for four years with the management information consulting division of Arthur Anderson & Co.



**Joanne Cicala** is a partner in our Texas office who specializes in health care fraud and consumer litigation.  Ms. Cicala has been with the firm since 1997 and serves as Special Assistant Attorney General to the States of Michigan and Iowa, and counsel to the City of New York and forty two New York County governments in connection with ongoing Medicaid fraud litigations and other matters arising out of the health expenditures of these state and local governmental entities.  Ms. Cicala also represents and advises numerous public employee health benefit funds and Taft Hartley funds on an array of issues related to their health care expenditures and relationships with Pharmacy Benefit Managers.

Ms. Cicala is a member of the National Association of Public Pension Fund Attorneys and the County Attorneys Association of the State of New York.

Some of Ms. Cicala's recent, relevant experience includes:

- Representation of the City of New York in federal antitrust proceedings against GlaxoSmithKline for defrauding the U.S. Patent and Trademark Office in order to unlawfully extend patents for certain drugs;

- Representation of an objector to the settlement in *Reynolds v. Beneficial National Bank* in the U.S. Northern District Court for the District of Illinois. Ms. Cicala and KM successfully persuaded the U.S. Court of Appeals for the Seventh Circuit and ultimately the district court to overturn the settlement in question, and were then appointed co-lead counsel to the class. Ms. Cicala and KM were lauded by the presiding judge for their "intelligence and hard work," and for obtaining "an excellent result for the class."

- Representation, as lead and co-lead counsel, of consumer classes in connection with antitrust proceedings against Microsoft. These litigations resulted in settlements totaling nearly a billion dollars for consumers in Florida, Tennessee, West Virginia and Minnesota; and

- Representation, as lead counsel, of a class of investors in *Gerber v. Computer Associates International, Inc.*, a securities class action which succeeded in trial and resulted in a multimillion dollar recovery for the class.

Ms. Cicala is admitted to practice in the states of New York, New Jersey and Texas.  She is also admitted to the all U.S. District Courts in New York, the Western District of Texas and the United States Court of Appeals for the Second, Seventh and Eighth Circuits.  She graduated from Georgetown University (B.S.F.S., 1987) and Fordham University Law School (J.D., 1994).

Prior to joining KM, Ms. Cicala was a litigator with Lane & Mittendorf LLP (now Windels Marx Lane & Mittendorf, LLP).  Prior to attending law school, she worked for a US-AID funded organization in Washington, DC on legislative development projects in Central America. Ms Cicala also has extensive experience managing municipal welfare reform activities.

**Daniel Hume** is a partner in our New York office focusing on antitrust and securities litigation. Mr. Hume joined the firm in 1995 and currently leads our antitrust litigation practice. He has advised clients in connection with significant antitrust litigation and has helped to recover billions of dollars for corporate consumers, individual consumers, and institutional investors throughout the course of his career.

Mr. Hume has rendered compliance advice to broker-dealers and has contributed to The Compliance Reporter's securities question and answer column. He has also authored articles on securities and class action matters.

Some of Mr. Hume's relevant work includes:

- Representation, as a lead counsel, of consumer classes in connection with antitrust proceedings against Microsoft. These litigations resulted in settlements totaling nearly a billion dollars for consumers in Florida, New York, Tennessee, West Virginia and Minnesota, where the litigation proceeded to trial;

- Representation, as lead counsel, of a class of consumers in connection with *In re Reformulated Gasoline (RFG) Antitrust and Patent Litigation and Related Actions*. This case involves Unocal's manipulation of the standard-setting process for low-emissions reformulated gasoline in California, which increased retail prices of reformulated gasoline. This litigation is ongoing;

- Representation, as one of the firms with primary responsibility for the case, of a class of purchasers of computers containing Intel's microprocessor chips in *Coordination Proceedings Special Title, Intel x86 Microprocessor Cases*. This litigation is ongoing;

- Representation, as lead counsel, of the investor class in *In re AT&T Wireless Tracking Stock Securities Litigation*, a securities class action which resulted in a recovery of $150 million for the class; and

- Representation, as one of the firms with primary responsibility for the case, of a class of retailers in *In re Visa Check/MasterMoney Antitrust Litigation*, an antitrust case which resulted in a settlement of over $3 billion for the class.

Mr. Hume is admitted to the New York State Bar, the United States District Courts for the Southern and Eastern Districts of New York, the United States Court of Appeals for the Second Circuit and the United States Supreme Court. He graduated from the State University of New York at Albany *magna cum laude* (B.A., 1988) and from Columbia Law School, where he served as Notes Editor for the Columbia Journal of Environmental Law (J.D., 1991).

Prior to joining KM, Mr. Hume practiced at Tenzer Greenblatt (now Blank Rome Tenzer Greenblatt) and Herzog Calimari & Gleason where he focused on securities and securities regulatory litigation.



**Peter S. Linden** is a partner in our New York office focusing on securities and commercial fraud litigation. Mr. Linden joined the firm in 1990 and focuses on providing advisory services to government pension funds and other institutional investors as well as to corporate and individual consumers. He has been appointed a Special Assistant Attorney General for the State of Michigan and is a member of the National Association of Public Pension Plan Attorneys.

Mr. Linden has obtained numerous outstanding recoveries for investors and consumers during his career. His advocacy has also resulted in many notable decisions, including *In re Matsushita Securities Litigation*, which granted partial summary judgment under § 14(d)(7) of the Securities Exchange Act and, more recently, *In re Ebay Inc. Shareholder's Litigation*, which found that corporate insiders' acceptance of IPO allocations through "spinning" states a claim for breach of a fiduciary duty and that investment banking advisors could be held liable for aiding and abetting such a breach. Mr. Linden has been quoted or featured in articles in *The New York Times* and *The American Lawyer*.

Some of Mr. Linden's relevant experience includes:

- Representation, as lead counsel, of two major insurance companies and a class of bondholders in *In re Laidlaw Bondholder Litigation*, a securities class action which resulted in a $42.275 million recovery for the class;

- Representation, as co-lead counsel, of an investor class and an institutional plaintiff in *In re BISYS Securities Litigation*, a class action arising out of alleged accounting improprieties and which resulted in a $65 million recovery for the class;

- Serving as Chairman of the Plaintiffs' Steering Committee in *In re MCI Non-Subscriber Litigation*, a consumer class action which resulted in an approximately $90 million recovery for the class;

- Representation of an objector to the settlement in *Reynolds v. Beneficial National Bank* in the United States Northern District Court for the District of Illinois. Mr. Linden and KM successfully persuaded the U.S. Court of Appeals for the Seventh Circuit and ultimately the district court to overturn the settlement in question, and were then appointed co-lead counsel to the class. Mr. Linden and KM were lauded by the presiding judge for their "intelligence and hard work," and for obtaining "an excellent result for the class."

- Current representation in class actions on behalf of investors includes *Dot Hill Systems Corporation* and, on behalf of retirement plan participants, in *In re JPMorgan Cash Balance Litigation*.

Mr. Linden is admitted to the New York State Bar, the United States Courts of Appeals for the Third, Sixth, Eighth, and Eleventh Circuits, and the United States District Courts for the Eastern and Southern Districts of New York, the Eastern District of Michigan and the District of Colorado. He graduated from the State University of New York at Stony Brook (B.A., 1980) and from Boston University School of Law (J.D., 1984). Prior to joining KM, Mr. Linden worked as an assistant district attorney in the Kings County District Attorney's Office from 1984 through October, 1990 where he served as a supervising attorney of the Office's Economic Crimes Bureau.

 **Ira M. Press** is a partner in our New York office focusing in securities and consumer litigation. Mr. Press joined the firm in 1993, and currently leads the firm's *Institutional Monitoring Program*. In this capacity, he has provided advisory services to numerous government pension funds and other institutional investors. He has authored articles on securities law topics and has lectured to audiences of attorneys, experts and institutional investor fiduciaries.

Mr. Press' advocacy has resulted in several landmark appellate decisions including, *Rothman v. Gregor,* the first ever appellate reversal of a lower court's dismissal of a securities class action suit pursuant to the 1995 private securities litigation reform act, and more recently, *Pinker v. Roche Holdings.*

Some of Mr. Press' relevant experience includes:

- Representation of the NY State Common Retirement Fund as lead plaintiff in *Robert Casey, et al. v. National City Corporation*, et al, a securities class action arising from National City's issue of alleged materially false and misleading statements regarding the Company's business, including the extent of its exposure to subprime mortgage related losses. During the class period, the company's stock fell from approximately $30 to less than $16.

- Representation of a union pension fund as lead plaintiff in *Nach v. Huber* in securities class action arising from Moody's misrepresentation about and in the course of its rating of mortgage-related securities. Classwide losses are estimated to be in the billions;

- Representation of a public pension fund as lead plaintiff in *Stanley Kurzweil et al. vs. Medtronic, Inc. et al.*, a securities class action in which classwide losses are estimated to be approximately $2 billion;

- Representation, as lead counsel, of the investor class in *In re AT&T Wireless Tracking Stock Securities Litigation*, a securities class action which resulted in recovery of $150 million for the class;

- Representation of numerous institutional investors who have opted out of securities class actions to pursue individual claims.

Mr. Press is admitted to the New York State Bar, the United States Court of Appeals for the Second, Third and Eleventh Circuits, and the United States District Courts for the Eastern, Northern and Southern Districts of New York. He graduated from Yeshiva University *magna cum laude* (B.A., 1986) and from New York University Law School (J.D., 1989).

Prior to joining KM, Mr. Press practiced at Warshaw Burstein Cohen Schlesinger & Kuh, LLP, where he focused on commercial litigation.



**Mark Strauss** is a partner in our New York office focusing in securities class actions and class action cases involving defrauded investors and consumers.  Mr. Strauss joined the firm in 1999.  He has broad experience litigating auditor liability and Ponzi scheme cases.  He also litigates claims on behalf of shareholders in mergers and acquisitions.

Some of Mr. Strauss' relevant work includes significant roles in the following litigations:

- Representation, as co-lead counsel, of a multinational bank as lead plaintiff in *In re: Adelphia Communications Corp. Securities & Deriv. Litig.*, a securities class action which resulted in a total recovery of $455 million for the class;

- Representation, as co-lead counsel, of a class of hedge fund investors in *Cromer Finance v. Berger, et al.*, a securities class action which resulted in a total recovery of US$65 million, and one of the largest ever recoveries against a non-auditor third party service provider;

- Representation, as lead counsel, of brokerage customers of Refco Capital Markets in *In re:  Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, an action alleging a  Ponzi scheme. This litigation is ongoing;

- Representation, as lead counsel, of a class of investors in a hedge fund, Lipper Convertibles, L.P., which fraudulently overstated its investment performance, in *In re: Serino v. Lipper, et al.* This litigation is ongoing; and

- Representation, as lead counsel, of a class of bond investors in Amazon.com in *Argent Classic Convertible Arbitrage Fund v. Amazon.com*, a securities class action which resulted in a total recovery of $20 million for the class;

Mr. Strauss is admitted to the New York State Bar, the United States District Courts for the Eastern and Southern Districts of New York, the State of California and the Northern, Southern and Central Districts of California.  He graduated from Cornell University (B.A., 1987) and from Fordham University School of Law, where he was Associate Editor of the Law Review (J.D., 1993).

Prior to joining KM, Mr. Strauss practiced at Christy & Viener, LLP and Cahill Gordon & Reindel LLP where he focused on commercial litigation and class action defense.

**Publications:**
**Are Class Actions Against Broker/Dealers Dead?**
*Securities Regulation and Law Report*,  Vol. 36, No. 2, 01/12/2004, pp. 68-72.

Note, **Public Employees Freedom of Association—Should Connick's Free-Speech Based Public-Concern Rule Apply?**
*61 Fordham L. Rev. 473* (1992)



**David Bishop** is of counsel to the firm and practices out of our New York office. Mr. Bishop joined the firm in 2006 following a distinguished career in local government. Mr. Bishop was elected to the Suffolk County Legislature in 1993 while still attending Fordham Law School. There he served in several leadership capacities, including Democratic Party Leader, Chairman of Public Safety and Chairman of Environment. His legislative record earned him recognition from the Nature Conservancy, the Child Care Council and the Long Island Federation of Labor.

As an attorney in private practice, Mr. Bishop has litigated numerous NASD arbitrations on behalf of claimants. In addition to his work in connection with securities matters, Mr. Bishop helps to coordinate the firm's client relations activities.

Recent cases in which Mr. Bishop has been involved include:

- Representation of a union pension fund as lead plaintiff in *Nach v. Huber* in securities class action arising from Moody's misrepresentation about and in the course of its rating of mortgage-related securities. Classwide losses are estimated to be in the billions;

- Representation, as co-lead counsel, of an investor class led by an individual investor in *Lapin v. Goldman Sachs*, a securities class action against Goldman Sachs; and

- Representation, as lead counsel, of a class of investors led by a hedge fund against Herley Industries in *In re Herley Industries Inc. Securities Litigation.*

Mr. Bishop is admitted to the New York State Bar and the United States District Court for the Eastern District of New York. He is a member of the Public Investors Arbitration Bar Association and of the New York City Bar Association. He graduated from American University (B.A., 1987) and from Fordham University (J.D., 1993).Fiske Stone Scholar and Editor of the Columbia Law Review.



**Richard L. Stone** is of counsel to the firm and focuses on securities and consumer fraud litigation. Mr. Stone joined the firm in 1997. In addition to his robust legal practice, Mr. Stone currently teaches as an Adjunct Professor of Financial Services Law at Florida State University.

Some of Mr. Stone's relevant experience includes:

•   Representation, as co-lead counsel, of investors in Ponzi scheme instruments issued by the now-bankrupt Bennett Funding Group in a class action which resulted in a recovery of $169.5 million for the class;

•   Representation, as co-lead counsel, of a multinational bank as lead plaintiff in *In re Adelphia Communications Corp. Securities & Deriv. Litig.*, a securities class action which resulted in a total recovery of $455 million for the class;

•   Representation, as lead counsel, of a class of investors in Amazon.com in *Argent Classic Convertible Arbitrage Fund v. Amazon.com*, a securities class action which resulted in a total recovery of $20 million for the class;

•   Representation, as lead counsel, of two major insurance companies and a class of bondholders in *In re Laidlaw Bondholder Litigation*, a securities class action which resulted in a $42.275 million recovery for the class; and

•   Representation, as co-lead counsel, of a class of institutional investors in Manhattan Investment Fund (a Bermuda hedge fund) in *Cromer Finance v. Berger et al.*, a securities class action which resulted in a total recovery of US$65 million for the class. The case involved complex jurisdictional and choice-of-law issues because of the offshore nature of the fund, and represents one of the largest ever recoveries against a non-auditor third party service provider in a securities class action.


Mr. Stone is admitted to the New York State Bar as well as United States District Courts for the Eastern and Southern Districts of New York. He graduated from Colgate University *magna cum laude* and Phi Beta Kappa (B.A., 1981), and from Columbia University School of Law (J.D., 1983), where he was a Harlan Fiske Stone Scholar and Editor of the Columbia Law Review.

Prior to joining KM, Mr. Stone was a Partner at Cadwalader, Wickersham & Taft in their Market Regulation and Financial Institutions Practice Groups. Immediately after law school, Mr. Stone clerked for the Honorable Charles P. Sifton, United States District Judge in the Eastern District of New York.



**Henry Telias** is of-counsel to the firm and practices out of our New York office, focusing in accountants' liability and securities litigation. Mr. Telias joined the firm in 1997.

In addition to his legal work, Mr. Telias is also the firm's chief forensic accountant. He received his CPA license from New York State in 1982. Prior to practicing as an attorney, he practiced exclusively as a certified public accountant from 1982 to 1989, including 3 years in the audit and tax departments of Deloitte Haskins & Sells' New York office.

Mr. Telias is a member of the American Institute of Certified Public Accountants, the Association of Certified Fraud Examiners, and the American Finance Association.

Some of Mr. Telias' relevant experience includes:

- Representation, as co-lead counsel, of a multinational bank as lead plaintiff in *In re Adelphia Communications Corp. Securities & Deriv. Litig.*, a securities class action which resulted in a total recovery of $455 million for the class;

- Representation, as lead counsel, of a certified class of purchasers of PRIDES securities in connection with the Cendant Corporation accounting fraud in *In re Cendant Corporation PRIDES Litigation*. This litigation resulted in an approximate $350 million settlement for the certified class – an unprecedented 100 percent recovery.

- Representation, as co-lead counsel, of a class of investors in *In re Waste Management, Inc. Securities Litigation,* a securities class action which resulted in a recovery of $220 million for the class;

- Representation, as co-lead counsel, of an investor class and an institutional plaintiff in I*n re BISYS Securities Litigation*, a class action arising out of alleged accounting improprieties and which resulted in a $65 million recovery for the class; and

- Representation, as co-lead counsel, of an international bond fund as lead plaintiff in *Muzinich & Co., Inc. v. Raytheon Corp.*, a securities class action which resulted in a recovery of $39 million for the class;

Mr. Telias is admitted to the New York State Bar and the United States District Court for the Southern District of New York. He graduated from Brooklyn College cum laude (B.S., 1980) and from Hofstra University School of Law (J.D., 1989).



**Kenneth G. Walsh** is of counsel to the firm and practices out of our New York office. Mr. Walsh joined the firm in 2007 and concentrates primarily on antitrust litigation, representing direct purchasers of medical devices and pharmaceuticals in federal courts. In addition, he has significant involvement in a number of state law antitrust and consumer protection actions.  Mr. Walsh is currently serving as counsel to direct purchasers of urological catheters in a federal antitrust case pending in the Eastern District of Missouri.

Prior to joining KM, Mr. Walsh served as national counsel in significant federal and state antitrust actions while with Boies, Schiller, Flexner, LLP and Straus & Boies, LLP.

During his time at Boies, Schiller & Flexner, LLP, Mr. Walsh served as co-lead national counsel for approximately 3,700 independent retail pharmacies who are plaintiffs in a federal antitrust case pending against major drug manufacturers. He also defended AT&T/Southwestern Bell Telephone against monopolization claims brought in Texas state courts and in federal court in Oklahoma. Mr. Walsh also had significant involvement in a trademark infringement action that the firm brought and successfully settled on behalf of a prominent fashion designer.  During his time at Straus & Boies, LLP, Mr. Walsh represented nationwide classes of indirect purchasers of computer chips and Vitamin C.

Mr. Walsh is admitted to the New York State Bar and the United States District Courts for the Eastern and Southern Districts of New York.  He graduated from Catholic University (B.A., 1987) and from New York Law School (J.D., 1992).



**James P. Carroll, Jr.** is an associate based in our Texas office focusing on antitrust, securities and consumer fraud litigation. Mr. Carroll joined the firm in 1995.

Recent cases in which Mr. Carroll has been involved include:

- Representation, as lead counsel, of the States of Michigan and Iowa as well as the City of New York and 42 New York counties in connection with individual Medicaid fraud actions in federal court. This litigation is ongoing;

- Representation as co-lead counsel of a class of consumers in connection with *Gordon v. Microsoft Inc.*, a Minnesota State civil antitrust case which settled for $175 million after nearly two months of trial; and

- Representation, as one of the firms with primary responsibility for the case, of a class of retailers in *In re Visa Check/MasterMoney Antitrust Litigation*, an antitrust case which resulted in a settlement of over $3 billion for the class.

Mr. Carroll is admitted to the New York State Bar, the Texas State Bar, the Colorado State Bar, the United States District Court for Colorado, the United States District Courts for the Eastern and Southern Districts of New York, the United States Tax Court and the United States Courts of Appeals for the Ninth and Tenth Circuits. He graduated from Duke University (B.A., 1988) and University of Denver (J.D.,1994).

Prior to joining KM, Mr. Carroll served as General Counsel & Director of U.S. Operations for Emerging Technologies, ET AB, a venture capital firm based in Stockholm, Sweden, and for Twobyfour Software AB, an application management software company where he served as General Counsel, Head of Business Development & Director of U.S. Operations.

 **Aaron Hovan** is an associate in our New York office who specializes in health care fraud litigation.  Mr. Hovan joined the firm in 2003 and serves as Special Assistant Attorney General to the States of Michigan and Iowa, and counsel to the City of New York and  forty two New York County governments in connection with ongoing Medicaid fraud and false claims act litigations and other matters arising out of the health related expenditures of these state and local governmental entities.

Mr. Hovan also represents and advises numerous public employee health benefit funds and Taft Hartley funds on an array of issues related to their health care expenditures and relationships with Pharmacy Benefit Managers.

Recent cases in which Mr. Hovan has been involved include:

- Representation, as lead counsel, of the States of Michigan and Iowa as well as the City of New York and 42 New York counties in connection with individual Medicaid fraud actions in federal court. This litigation is ongoing; and

- Advising County Health Benefit Plans and Taft Hartley Funds on the services rendered by those with whom they contract for health care services, including pharmacy benefit managers.

Mr. Hovan is admitted to the New York State Bar and the United States District Courts for the Southern, Eastern, Western and Northern Districts of New York. He graduated from Colgate University *cum laude* (B.A., 1996) and Columbia University School of Law (J.D., 2002).

Before attending law school, Mr. Hovan worked for the Petroleum Finance Company as an upstream oil & gas industry analyst.  Prior to joining KM, Mr. Hovan practiced at Baker Botts, LLP.



**David E. Kovel** is an associate based in our New York office focusing on antitrust, commodities and various corporate governance matters. Mr. Kovel joined the firm in 2004.

Recent cases in which Mr. Kovel has been involved include:

- Representation, as lead counsel, of the States of Michigan and Iowa as well as the City of New York and 42 New York counties in connection with individual Medicaid fraud actions in federal court. This litigation is ongoing;

- Representation, as lead counsel, of a class of consumers in connection with *In re Reformulated Gasoline (RFG) Antirust and Patent Litigation and Related Actions*. This case involves Unocal's manipulation of the standard-setting process for low-emissions reformulated gasoline in California, which increased retail prices of reformulated gasoline.

- Representation of consumers of propane who were harmed by BP America's manipulation of the propane market; and

- Representation of whistleblowers who claim that their companies have defrauded the United States Government.

Mr. Kovel is admitted to the New York State Bar, the United States District Courts for the Southern, Eastern, Western and Northern Districts of New York, the First Circuit and the Connecticut State Bar. He graduated from Yale University (B.A., 1993), Columbia University School of Law (J.D., 2002) and Columbia University School of Business Administration (M.B.A., 2003).

Mr. Kovel traded commodities for several years before attending law school. Prior to joining KM, Mr. Kovel practiced at Simpson Thacher & Bartlett, LLP.



**Sarah G. Lopez** is an associate in our New York office focusing on securities litigation. Ms. Lopez joined the firm in 2006.

Recent cases in which Ms. Lopez has been involved include:

- Representation, as lead counsel, in the securities class action *In Re Herley Industries Inc. Securities Litigation* on behalf of investors. This litigation is ongoing;

- Representation of institutional investors who have opted out of a securities class action filed against Tenet Healthcare Corp. and KPMG LLP to pursue their individual claims. This litigation is ongoing;

- Representation, as lead counsel, of a class of limited partners of hedge fund Lipper Convertibles, L.P. in *In re Serino v. Lipper et al.*, a securities class action filed against Lipper, certain of its officers and PriceWaterhouseCoopers, its auditor, in connection with alleged accounting fraud. This litigation is ongoing;

- Representation, as lead counsel, of brokerage customers of Refco Capital Markets in *In re: Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, an action pertaining to an alleged ponzi scheme executed by Refco which resulted in billions in brokerage customer losses. This litigation is ongoing.

Prior to joining KM, Ms. Lopez practiced at Wilson, Elser, Moskowitz, Edelman & Dicker, LLP where her practice primarily focused on professional liability defense with a specialty in defending accountants and experience in defending directors and officers in shareholder derivative suits. Ms. Lopez's specialty in accountants liability encompassed defending accounting firms against claims of negligence and fraud in connection with audit services provided to both profit and not-for profit entities as well as consulting services and tax preparations services provided to individuals and commercial entities.

During her time at Wilson Elser, Ms. Lopez also advised clients in connection with responding to subpoena requests issued in various investigations by government agencies such as the U.S. Attorney, SEC and NYS Attorney General. Ms. Lopez also has experience with ERISA matters and has experience representing Plaintiffs asserting commercial claims for breach of contract and various business torts. Finally, Ms. Lopez has extensive experience litigating matters at every phase of an action from commencement through the appellate process, in both New York State and Federal Court as well as before various arbitration tribunals.

Ms. Lopez is admitted to the New York State Bar, the United States District Courts for the Southern and Eastern Districts of New York, and the New Jersey State Bar. She graduated from Colgate University (B.A., 1998) and from St. John's University (J.D., 2003).

**Karina Shostakovsky** is an associate based in our New York office focusing on antitrust litigation. Ms. Shostakovsky joined the firm in 2005.

Recent cases in which Ms. Shostakovsky has been involved include:

- Representation, as a lead counsel, of direct purchasers of urological catheters in a federal antitrust case pending in the Eastern District of Missouri. The case alleges that C.R. Bard and co-conspirators devised anticompetitive schemes to eliminate or lessen competition in order to acquire and maintain monopoly;

- Representation, as lead counsel, of a class of consumers in connection with *In re Reformulated Gasoline (RFG) Antirust and Patent Litigation and Related Actions*. This case involves Unocal's manipulation of the standard-setting process for low-emissions reformulated gasoline in California, which increased retail prices of reformulated gasoline. This litigation is ongoing;

- Representation, as one of the firms with primary responsibility for the case, of a class of purchasers of computers containing Intel's microprocessor chips in *Coordination Proceedings Special Title, Intel x86 Microprocessor Cases*. This litigation is ongoing;

- Representation, as a lead counsel, of consumer classes in connection with antitrust proceedings against Microsoft. These litigations resulted in settlements totaling nearly a billion dollars for consumers in Florida, New York, Tennessee, West Virginia and Minnesota, where the litigation proceeded to trial.

Ms. Shostakovsky is admitted to the New York State Bar and the New Jersey State Bar. She graduated from Boston University (B.A., 2000) and from New York Law School (J.D., 2007).



**Christopher S. Studebaker** is an associate in the New York office focusing on antitrust and securities litigation.  Mr. Studebaker joined the firm in 2007.

Prior to joining KM, Mr. Studebaker worked at Straus & Boies, LLP, primarily litigating private antitrust cases involving the medical device, food supplements, electronics, and semiconductor industries.  Some of his notable antitrust experience includes the representation of a hospital against a pulse oximetry manufacturer, a distributor against a hypodermic syringe manufacturer, and consumers against manufacturers of Vitamin C.

Mr. Studebaker's previous experience also includes his work at the U.S. Department of Commerce, where he advised senior administration officials, multinational companies and trade associations on international trade policy and agreements; litigation of disputes before the World Trade Organization (WTO); and Customs matters.  He also represented the United States in a WTO dispute settlement proceeding and in trade agreement negotiations.  Before his legal career, Mr. Studebaker spent several years working and studying in Japan.  He is fluent in Japanese.

Mr. Studebaker is admitted to the New York State Bar and the Washington State Bar.  He graduated from Georgetown University *cum laude* (B.S.F.S., 1997), Waseda University (M.A., 2001), and University of Kansas (J.D., 2004), where he was the Managing Editor of the Kansas Journal of Law and Public Policy. He is an active member of the Asian American Bar Association of New York.



**Beverly Tse** is an associate based in our New York office focusing on antitrust and securities litigation. Ms. Tse joined the firm in 2004.

Recent cases in which Ms. Tse has been involved include:

- Representation, as lead counsel, of a class of consumers in connection with *In re Reformulated Gasoline (RFG) Antitrust and Patent Litigation and Related Actions*. This case involves Unocal's manipulation of the standard-setting process for low-emissions reformulated gasoline in California, which increased retail prices of reformulated gasoline. This litigation is ongoing;

- Representation, as one of the firms with primary responsibility for the case, of a class of purchasers of computers containing Intel's microprocessor chips in *Coordination Proceedings Special Title, Intel x86 Microprocessor Cases*. This litigation is ongoing;

- Representation, as lead counsel, of the investor class in *In re AT&T Wireless Tracking Stock Securities Litigation*, a securities class action which resulted in a recovery of $150 million for the class;

- Representation of an objector to the settlement in *Reynolds v. Beneficial National Bank* in the United States Northern District Court for the District of Illinois. Ms. Tse and KM were lauded by the presiding judge for their "intelligence and hard work," and for obtaining "an excellent result for the class."

Ms. Tse is admitted to the California State Bar and the United States District Courts for the Northern and Central Districts of California. She graduated from California State University of Los Angeles *magna cum laude* (B.S., 2000) and from California Western School of Law (J.D., 2004).



**Edward M. Varga, III** is an associate based in our New York office. focusing on securities and antitrust litigation.  Mr. Varga joined the firm in 2006.

Recent cases in which Mr. Varga has been involved include:

- Representation, as lead counsel, in the securities class action *In Re Herley Industries Inc. Securities Litigation* on behalf of investors.  This litigation is ongoing;

- Representation of companies that offered IPO securities in antitrust litigation against the 27 largest investment banks in the United States.  Plaintiffs allege that the banks conspired to price fix underwriting fees in the mid-sized IPO market.

- Representation of the NY State Common Retirement Fund as lead plaintiff in *Robert Casey, et al. v. National City Corporation*, et al, a securities class action arising from National City's issue of alleged materially false and misleading statements regarding the Company's business, including the extent of its exposure to subprime mortgage related losses.  During the class period, the company's stock fell from approximately $30 to less than $16.

Mr. Varga is admitted to the New York State bar.  He graduated from Cornell University  (B.S., 2000) and from New York University Law School (J.D., 2006).

## Client & Adversary Recognition

*"The case has been in front of the Supreme Court of the United States once, and in front of the Ninth Circuit no fewer than three times. Throughout, [KM] has . . . brought a considerable degree of success . . . and thwarted attempts by other counsel who sought to settle . . . and destroy a potential billion dollars of class rights."*

**Plaintiff / client, Epstein v. MCA, Inc.**

*"[The KM firm] proved to be a highly able and articulate advocate. Single-handedly, [KM] was able to demonstrate not only that [KM's] client had a good case but that many of the suspicions and objections held by the Nigerian Government were ill-founded."*

**English adversary in The Nigerian Cement Scandal**

*"[KM] represented us diligently and successfully. Throughout [KM's] representation of our firm, [KM's] commitment and attention to client concerns were unimpeachable."*

**European institutional defendant /client**
**involved in a multi-million dollar NASD arbitration**

*"Against long odds, [KM] was able to obtain a jury verdict against one of the larger, more prestigious New York law firms."*

**Plaintiff / client,**
**Vladimir v. U.S. Banknote Corporation**

*"[KM] represented our investors with probity, skill, and diligence. There is too much money involved in these situations to leave selection of class counsel to strangers or even to other institutions whose interests may not coincide."*

**Plaintiff / institutional client,**
**In re Cendant Corporation PRIDES Litigation**

## Notables

The firm has repeatedly demonstrated its expertise in the field of class litigation and its expertise has been repeatedly recognized.  For example:

• *In re Bisys Securities Litigation,* C.A. No. 04-CV-3840 (S.D.N.Y. 2007).  Co-lead counsel, $66 million settlement.

• *In re AT&T Corp. Securities Litigation*, C.A. No. 00-CV-8754 (S.D.N.Y. 2006).  Sole counsel, $150 million settlement.

> "Nonetheless, in this Court's experience, relatively few cases have involved as high level of risk, as extensive discovery, and, most importantly, as positive a final result for the class members as that obtained in this case."

• *In re Adelphia Communications, Inc. Securities Litigation*, No. 04 CV 05759 (S.D.N.Y. 2006). Co-lead counsel,  $455 million settlement.

> "[T]hat the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work."

• *Carnegie v. Household International Inc., et al.,* 98 C 2178 (EEB)(N.D.Ill. 2006).  Co-lead counsel, $39 million settlement:

> "Since counsel took over the representation of this case . . ., they have pursued this case, conducting discovery, hiring experts, preparing for trial, filing motions where necessary, opposing many motions, and representing the class with intelligence and hard work. They have obtained an excellent result for the class."

• *Argent Convertible Classic Arbitrage Fund, L.P. v. Amazon.com, Inc. et al.,* CV No. 01-0640L (W.D. Wash. Oct. 20, 2005).  Lead counsel for class of convertible euro-demoninated bond purchase.  $20 million settlement.

• *Muzinich & Co., Inc. et al. v. Raytheon Company et al. ,* No. C-01-0284-S-BLW  (D. Idaho 2005).   Co lead counsel.  $39 million settlement.

**KIRBY McINERNEY LLP - 24**

- *Gordon v. Microsoft Corporation*, Civil No. 00-5994 (Minn. Dist. Ct., Henn. Co. 2004).  Co-lead counsel; $175 million settlement following two months of trial.

- *In re Visa Check/MasterMoney Antitrust Litigation*, 96-CV-5238 (E.D.N.Y. 2003)  $3 billion monetary settlement; injunctive relief.

- *In re Florida Microsoft Antitrust Litig.*, Case No. 99-27340 CA 11 (Fl. Cir. Ct. 11th Cir., Miami/ Dade Co. 2003). Co-lead counsel.  $200 million settlement of antitrust claims.

- *In re Churchill Securities, Inc.* (SIPA Proceeding), Case No. 99 B 5346A (Bankr.  S.D.N.Y. 2003: Sole Counsel; recovered over $9 million for 500+ victims of pyramid scheme perpetrated by defunct brokerage firm.

- *In re Laidlaw Bondholder Securities Litigation,* 00 cv 2518-17 (D. S.C. 2002).  Lead counsel; $42.8 million settlement.

- *Cromer Finance v. Berger et al.* (*In re Manhattan Fund Securities Litigatio*n), 00 cv 2284 (S.D.N.Y. 2002).  Co-lead counsel; $32 million settlement.

- *In re Boeing Securities Litigation,* 97 cv 715 (W.D. Wash. 2001).  $92.5 million settlement.

- *In re MCI Non-Subscriber Telephone Rates Litigation,* MDL No. 1275 (S.D. Ill. 2001).  Chairman of steering committee; $88 million settlement.

- *In re General Instrument Corp. Securities Litigation*, 01 cv 1351 (E.D. Pa. 2001). Co- lead counsel; $48 million settlement.

- *In re Bergen Brunswig/Bergen Capital Trust Securities Litigation,* 99 cv 1305 and  99 cv 1462 (C.D. Cal. 2001).  Co-lead counsel; $42 million settlement.

- *Steiner v. Aurora Foods,* 00 cv 602 (N.D. Cal. 2000).  Co-lead counsel; $36 million settlement.

- *Gerber v. Computer Associates International, Inc.*, No. 91 C 3610 (E.D.N.Y. 2000).  Multi-million dollar jury verdict in securities class action.

- *Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000). Principal counsel of record in appeal that resulted in first ever appellate reversal of the dismissal of a securities fraud class action under the Securities Reform Act of 1995.

- *Bartold v. Glendale Federal Bank,* (2000) 81 Cal.App.4th 816. Ruling on behalf of hundreds of thousands of California homeowners establishing banks' duties regarding title reconveyance; substantial damages still to be calculated in this and related cases against other banks for failures to have discharged these duties.

- *In re Cendant Corporation PRIDES Litigation,* 51 F. Supp. 2d 537, 542 (D. N.J. 1999). Lead counsel, $340 million settlement.  The court said:

    "[R]esolution of this matter was greatly accelerated by the creative dynamism of counsel."  * * *   "We have seen the gifted execution of responsibilities by a lead counsel."

- *In re Waste Management, Inc. Securities Litigation*, No. 97C 7709 (N.D. Ill. 1999). Co-lead counsel, $220 million settlement.

    "...[Y]ou have acted the way lawyers at their best ought to act.  And I have had a lot of cases... in 15 years now as a judge and I cannot recall a significant case where I felt people were better represented than they are here... I would say this has been the best representation that I have seen."

- *In re Bennett Funding Group Securities Litigation*, No. 96 Civ. 2583 (1999). Co-lead counsel; $140 million in settlements to date ($125 million recovered from Generali U.S. Branch, insurer of Ponzi scheme instruments issued by Bennett Funding Group; $14 million settlement with Mahoney Cohen, Bennett's auditor).  Case continuing against other defendants.

- *In re MedPartners Securities Litigation*, CV-98-06364 (Ala. June 1999). Co-lead counsel; $56 million settlement.

- *In re MTC Electronic Technologies Shareholder Litigation,*  No. CV-93-0876 (E.D.N.Y. October 20, 1998). Co-lead counsel; settlement in excess of $70 million.

- *Skouras v. Creditanstalt International Advisers, Inc., et al.,* NASD Arb., No. 96-05847 (1998).  Following an approximately one month hearing, successfully defeated multi-million dollar claim against major European institution.

- *In re Woolworth Corp. Securities Class Action Litigation,* 94 Civ. 2217 (RO) (S.D.N.Y. Sept. 29, 1997). Co-lead counsel; $20 million settlement.

- *In re Archer Daniels Midland Inc. Securities Litigation,* C.A. No. 95-2877 (C. D. Ill. April 11, 1997). Co-lead counsel; $30 million settlement.

- *Vladimir v. U.S. Banknote Corp.,* No. 94 Civ. 0255 (S.D.N.Y. 1997). Multi-million dollar jury verdict in § 10(b) action.

- *In re Archer Daniels Midland Inc. Securities Litigation,* C.A. No. 95-2877 (C. D. Ill. April 11, 1997). Co-lead counsel; $30 million settlement.

- *Vladimir v. U.S. Banknote Corp.,* No. 94 Civ. 0255 (S.D.N.Y. 1997). Multi-million dollar jury verdict in § 10(b) action.

- *Epstein et al. v. MCA, Inc., et al.,* No. 92-55675, 50 F.3d 644 (9th Cir. 1995) *rev'd and remanded on other grounds, Matsushita Electric Industrial Co., Ltd. et al. v. Epstein et al.,* No. 94-1809, 116 S. Ct. 873 (February 27, 1996). Sole counsel. Appeal resulted in landmark decision concerning liability of tender offeror under section 14(d)(7) of the Williams Act, SEC rule 14d-10 and preclusive effect of a release in a state court proceeding. In its decision granting partial summary judgment to plaintiffs, the court of appeals for the Ninth Circuit stated:

    "The record shows that the performance of the Epstein plaintiffs and their counsel in pursuing this litigation has been exemplary."

- *In re Abbott Laboratories Shareholder Litigation,* No. 92-C-3869 MEA, Fed. Sec. L. Rep. ¶ 98,973 (N.D. Ill. 1995). Co-lead counsel; $32.5 million settlement:

    "The record here amply demonstrates the superior quality of plaintiffs' counsel's preparation, work product, and general ability before the court."

- *In re Morrison Knudsen Securities Litigation,* No. CV 94-334-S-EJL (D. Id. 1995). Co-lead counsel; approximately $68 million settlement.

- *In re T2 Medical Inc. Securities Litigation,* No. 1:94-CV-744-RLV (N.D. Ga. 1995). Co-lead counsel; approximately $50 million settlement.

- *Gelb v. AT&T*, 90 Civ. 7212 (LMM) (S.D.N.Y. 1994). Landmark decision regarding filed rate doctrine leading to injunctive relief.

- *In re International Technology Corporation Securities Litigation*, CV 88-40-WPG, (C.D. Cal. 1993). Co-lead counsel; $13 million settlement.

**KIRBY MᴄINERNEY LLP - 27**

- *Colaprico v. Sun Microsystems,* No. C-90-20710 (SW) (N.D. Cal. 1993). Co-lead counsel; $5 million settlement.

- *Steinfink v. Pitney Bowes, Inc.*, No. B90-340 (JAC) (D. Conn. 1993). Lead counsel; $4 million settlement.

- *In re Jackpot Securities Enterprises, Inc. Securities Litigation*, CV-S-89-05-LDG (RJJ) (D. Nev. 1993). Lead counsel; $3 million settlement.

- *In re Nordstrom Inc. Securities Litigation,* No. C90-295C (W.D. Wa. 1991). Co-lead counsel; $7.5 million settlement.

- *United Artists Litigation*, No. CA 980 (Sup. Ct., L.A., Cal.). Trial counsel; $35 million settlement.

- *In re A.L. Williams Corp. Shareholders Litigation*, Consolidated, C.A. No. 10881 (Delaware. Ch. 1990). Lead counsel; benefits in excess of $11 million.

- *In re Triangle Inds., Inc., Shareholders' Litigation*, C.A. No. 10466 (Delaware. Ch. 1990). Co-lead counsel; recovery in excess of $70 million.

- *Schneider v. Lazard Freres*, (N.Y. Sup. 1990). Co-lead counsel. Landmark decision concerning liability of investment bankers in corporate buyouts; $55 million settlement.

- *Rothenberg v. A.L. Williams,* C.A. No. 10060 (Delaware. Ch. 1989). Sole counsel; benefits of at least $25 million to the class.

- *Kantor v. Zondervan Corporation*, C.A. No. 88 C5425 (W.D. Mich. S.D. 1989). Sole counsel; recovery of $3.75 million.

- *King v. Advanced Systems, Inc.*, C.A. No. 84 C10917 (N.D. Ill. E.D. 1988). Lead counsel; recovery of $3.9 million (representing 90% of damages).

- *Straetz v. Cordis*, 85-343 Civ. (SMA) (S.D. Fla. 1988). Lead counsel:

  "I want to commend counsel and each one of you for the diligence with which you've pursued the case and for the results that have been produced on both sides. I think that you have displayed the absolute optimum in the method and manner by which you have represented your respective clients, and you are indeed a credit to the legal profession, and I'm very proud to have had the opportunity to have you appear before the Court in this matter."

**KIRBY McINERNEY LLP - 28**

- *In re Flexi-Van Corporation, Inc. Shareholders Litigation,* C.A. No. 9672 (Delaware. Ch. 1988). Co-lead counsel; $18.4 million settlement.

- *Entezed, Inc. v. Republic of Nigeria,* I.C.C. Arb. (London 1987).  Multi-million dollar award for client.

- *In re Carnation Company Securities Litigation,* No. CV84-6913 (FW) (C.D. Cal. 1987). Co-lead counsel; $13 million settlement.

- *In re Data Switch Securities Litigation,* B84 585 (RCZ) (D. Conn. 1985). Co-lead counsel; $7.5 million settlement.

- *Stern v. Steans,* 80 Civ 3903 (GLG). The court characterized the result for the class obtained during trial to jury as "unusually successful" and "incredible" (Jun 1, 1984).

- *In re Datapoint Securities Litigation,* SA 82 CA 338 (W.D. Tex.). Lead Counsel for a Sub-Class; $22.5 million aggregate settlement.

- *Malchman, et al. v. Davis, et al.*, 77 Civ 5151 (S.D.N.Y., June 8, 1984) (TPG):

  "It is difficult to overstate the far-reaching results of this litigation and the settlement.  Few class actions have ever succeeded in altering commercial relationships of such magnitude.  Few class action settlements have even approached the results achieved herein....  In the present case, the attorneys representing the class have acted with outstanding vigor and dedication . . . Although the lawyers in this litigation have appeared considerably more in the state courts than in the federal court, they have appeared in the federal court sufficiently for me to attest as to the high professional character of their work. Every issue which has come to this court has been presented by both sides with a thoroughness and zeal which is outstanding ....  In sum, plaintiffs and their attorneys undertook a very large and difficult litigation in both the state and federal courts, where the stakes were enormous. This litigation was hard fought over a period of four years.  Plaintiffs achieved a settlement which altered commercial relationships involving literally hundreds of millions of dollars."

* * *

# EXHIBIT F

COPY

E filing

1  Joseph J. Tabacco, Jr. (75484)
   jtabacco@bermanesq.com
2  Nicole Lavallee (165755)
   nlavallee@bermanesq.com
3  Julie J. Bai (227047)
   jbai@bermanesq.com
4  BERMAN DEVALERIO PEASE TABACCO
   BURT & PUCILLO
5  425 California Street, Suite 2100
   San Francisco, CA 94010
6  Telephone: (415) 433-3200
   Facsimile: (415) 433-6282
7
   **Local Counsel for Plaintiff Bristol County Retirement System**
8
   [Additional Counsel Appear on Signature Page]
9

ORIGINAL
FILED
JUN - 6 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ADR

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12  
    BRISTOL COUNTY RETIREMENT          )   Case No. **C08-02844**
13  SYSTEM, Individually and on Behalf of all )
    Others Similarly Situated,            )   **CLASS ACTION COMPLAINT FOR**
14                          Plaintiff,    )   **VIOLATIONS OF FEDERAL**
                                          )   **SECURITIES LAWS**
15          vs.                           )
                                          )   **JURY TRIAL DEMANDED**
16  WACHOVIA CORPORATION, G.              )
    KENNEDY THOMPSON, THOMAS J.           )
17  WURTZ, and DONALD K. TRUSLOW,         )
                                          )
18                          Defendants.   )
    _____)

19

20          Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which

21  included a review of United States Securities and Exchange Commission ("SEC") filings by

22  Wachovia Corporation ("Wachovia" or the "Company"), as well as regulatory filings and reports,

23  securities analysts' reports and advisories about the Company, press releases and other public

24  statements issued by the Company, and media reports about the Company, and plaintiff believes that

25  substantial additional evidentiary support will exist for the allegations set forth herein after a

26  reasonable opportunity for discovery.

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                              - 1 -

1          ## NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS

2          1.      This is a federal securities class action on behalf of purchasers of the securities of

3     Wachovia between May 8, 2006 and April 11, 2008, inclusive (the "Class Period"), seeking to

4     pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

5          2.      Wachovia is one of the nation's largest financial services providers, servicing retail,

6     brokerage, and corporate customers. Over the past few years, Wachovia enjoyed strong growth that

7     was reflected in its stock price, which peaked at $58.77 per share during the Class Period, giving

8     Wachovia a market capitalization of $115.8 billion.

9          3.      This action alleges that defendants misled investors by falsely representing that

10    Wachovia had strict and selective underwriting and loan origination practices and a conservative

11    lending approach that set it apart from other lenders. Such reassurances were repeated by defendants

12    throughout the Class Period in order to artificially support Wachovia's stock price in the midst of a

13    weakening mortgage market.

14         4.      In 2006, Wachovia acquired Golden West Financial Corp. ("Golden West"), a

15    Oakland, California-based mortgage lender, for more than $24 billion. Golden West's main product

16    was called "Pick-A-Payment," which was a loan program that allowed customers to choose from

17    multiple payment options each month.

18         5.      Pick-A-Payment loans come with four monthly payment options: (1) full interest and

19    principal payment that pays off the loan in 30 years; (2) a higher payment that would pay off the loan

20    in 15 years; (3) an interest-only payment; or (4) a minimum payment that does not cover all the

21    necessary interest, with the unpaid interest added to the loan balance.

22         6.      After the acquisition, Golden West's Pick-A-Payment programs contributed

23    substantially to Wachovia's overall results. As of December 31, 2007, Pick-A-Payment loans

24    represented 46 percent of the Company's consumer loans and 25 percent of the Company's total

25    loans. Properties securing the Company's Pick-a-Payment loans are concentrated primarily in

26    California (59 percent) and Florida (10 percent). No other state concentration is more than 5 percent

27    of total Pick-a-Payment loans.

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                      - 2 -

7.    The mortgage loans, variously called "pick-a-pay", payment-option mortgages, or option adjustable-rate mortgages ("option ARMs"), are very risky because the loan balance and the monthly payments on some loans can grow among those who chose options (3) or (4) in ¶ 5 above, as home prices fall across the country.

8.    Borrowers who make the minimum payment on a regular basis under option (4) in ¶ 5 above can see their loan balance grow and their monthly payment more than double when they begin making payments of principal and full interest. This typically happens after five years, but can occur earlier if the amount owed reaches a predetermined level – typically 110% to 125% of the original loan balance. With home prices dropping, a growing number of borrowers with these loans owe more than their homes are worth.

9.    In prior years, the Company had been able to make such loans in large part because real estate prices were rising, which meant that the risk that borrowers would be unable to meet payments was mitigated by increasing home prices, which would allow the borrower to refinance or sell the property and enjoy a profit even after satisfying the debt.

10.    By the beginning of the Class Period, however, many securities analysts and economic commentators expressed growing concern with the direction of real estate prices, growing interest rates and the negative impact that these factors could have on lenders, such as Wachovia, who profited from selling risky loans.

11.    In response to increased market concern with the mortgage lending industry, and Wachovia's option ARMs in particular, Wachovia falsely represented that its loan underwriting practices were much better than at other banks and that this would allow it to prosper while lenders with less exacting standards and procedures would fare much worse. In reality, Wachovia's actual lending practices differed materially from the description of those practices in statements made to investors. The Company's ability to weather the deterioration in the real estate and credit markets was grossly exaggerated by defendants, at precisely the worst time, when analysts began to ask tough questions. The Company, moreover, improperly inflated its reported income by understating its loan loss reserves in SEC filings.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                      - 3 -

1       12.    In fact, despite assurances of its "conservative underwriting standards," Wachovia

2    eventually admitted that, during the Class Period, it **did not require a minimum credit score from**

3    **potential borrowers or verify borrowers' assets and employment before making a mortgage**

4    **loan** it planned to keep on its books.

5       13.    Wachovia also misled the market about its exposure to subprime loans, which are

6    loans made to borrowers who have poor credit histories and would not qualify for traditional loans.

7       14.    The representations contained in Wachovia's press releases, SEC filings, conference

8    calls, and presentations during the Class Period, as set out below, were materially false and

9    misleading when made because they failed to disclose the following facts:

10       (a)    the Company did not follow strict underwriting and loan-origination practices,

11    including in its Pick-A-Payment mortgage portfolio;

12       (b)    a material portion of the Company's loans were made on a "low

13    documentation" basis, such that it had no way of confirming the credit-worthiness of many loan

14    applicants, thereby rendering the Company's reassurances about its loan-origination and

15    underwriting practices lacking in any reasonable basis;

16       (c)    the Company placed intense pressure on its loan officers to persuade

17    borrowers to use Pick-A-Payment loans;

18       (d)    the Company's loan loss provisions were understated and did not properly

19    reflect the risk facing the Company, thereby inflating Wachovia's reported income;

20       (e)    Wachovia's representation that it was amply capitalized, and its assurance that

21    it would therefore not need to cut its dividend, were lacking in any reasonable basis when made;

22       (f)    the certifications signed by defendants Thompson and Wurtz, which attested

23    to the accuracy of the reported financial statements in the quarterly and annual SEC filings, were

24    themselves misleading because of the above misstatements and omissions included in the reports,

25    and provided false comfort to the market;  and

26       (g)    the Company's growth was not due to Wachovia's prudent risk management,

27    as represented by defendants; to the contrary, Wachovia's results were founded on the aggressive

28

1 │ origination of risky loans without regard to its stated origination policies, even in the face of
2 │ worsening market conditions.

3 │     15.    Contrary to its Class Period assurances, on April 14, 2008, before the open of
4 │ ordinary trading, Wachovia announced a surprise increase in its provision against credit losses to
5 │ $2.83 billion and an approximate $2 billion writedown in assets. This caused it to report a first
6 │ quarter 2008 loss of $393 million, or $0.20 per share, significantly worse than analysts expected. In
7 │ addition, Wachovia was in financial trouble. It announced that it would need to raise $7 billion by
8 │ selling common and preferred stock and it cut its dividend by 41%, to $0.375. In reaction to the
9 │ news, shares fell 8.13%, from $27.81 to $25.55 on abnormally high volume.

10 │     16.    The Company's belatedly disclosed troubles severely harmed the credibility of its
11 │ leadership. On June 2, 2008, Wachovia announced that its board of directors had asked Chief
12 │ Executive Officer ("CEO") Thompson to resign.

13 │ **JURISDICTION AND VENUE**

14 │     17.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the
15 │ Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC
16 │ [17 C.F.R. § 240.10b-5].

17 │     18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.
18 │ § 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

19 │     19.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28
20 │ U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part
21 │ in this District, and legacy Golden West was headquartered in this District. The Western Region
22 │ headquarters for Wachovia's General Bank are also located in this District.

23 │     20.    In connection with the acts alleged in this complaint, Defendants, directly or
24 │ indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,
25 │ the mails, interstate telephone communications and the facilities of the national securities markets.

26
27
28

**PARTIES**

21.     Plaintiff, Bristol County Retirement System, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Wachovia at artificially inflated prices during the Class Period.

22.     Defendant Wachovia is a North Carolina corporation, headquartered at One Wachovia Center, Charlotte, North Carolina 28288.

23.     Defendant G. Kennedy Thompson ("Thompson") served as Wachovia's CEO and President throughout the Class Period.

24.     Defendant Thomas J. Wurtz ("Wurtz") served as Chief Financial Officer ("CFO") and Senior Executive Vice President throughout the Class Period.

25.     Defendant Donald K. Truslow ("Truslow") served as Chief Risk Officer throughout the Class Period

26.     Defendants Thompson, Wurtz, and Truslow are collectively referred to herein as the "Individual Defendants."

27.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements and markets via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

28.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Wachovia, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business,

1    operations, growth, financial statements, and financial condition, as alleged herein. Said defendants
2    were involved in drafting, producing, reviewing and/or disseminating the false and misleading
3    statements and information alleged herein, were aware, or disregarded with deliberate recklessness,
4    that the false and misleading statements were being issued regarding the Company, and approved or
5    ratified these statements, in violation of the federal securities laws.

6          29.    As officers and controlling persons of a publicly-held company whose common stock
7    was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the
8    New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws,
9    the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information
10   with respect to the Company's financial condition and performance, growth, operations, financial
11   statements, business, markets, management and earnings, and to correct any previously issued
12   statements that had become materially misleading or untrue, so that the market price of the
13   Company's publicly-traded common stock would be based upon truthful and accurate information.
14   The Individual Defendants' misrepresentations and omissions during the Class Period violated these
15   specific requirements and obligations.

16         30.    The Individual Defendants participated in the drafting, preparation, and/or approval
17   of the various public and shareholder and investor reports and other communications complained of
18   herein and were aware of, or disregarded with deliberate recklessness, the misstatements contained
19   therein and omissions therefrom, and were aware of their materially false and misleading nature.
20   Because of their Board membership and/or executive and managerial positions with Wachovia, each
21   of the Individual Defendants had access to the adverse undisclosed information about Wachovia's
22   financial condition and performance as particularized herein and knew (or recklessly disregarded)
23   that these adverse facts rendered the positive representations made by or about Wachovia and its
24   business issued or adopted by the Company materially false and misleading.

25         31.    The Individual Defendants, because of their positions of control and authority as
26   officers and/or directors of the Company, were able to and did control the content of the various SEC
27   filings, press releases and other public statements pertaining to the Company during the Class
28   Period. Each Individual Defendant was provided with copies of the documents alleged herein to be

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                        - 7 -

1  misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent

2  their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is

3  responsible for the accuracy of the public reports and releases detailed herein and is therefore

4  primarily liable for the representations contained therein.

5      32.    Each of the defendants is liable as a participant in a fraudulent scheme and course of

6  business that operated as a fraud or deceit on purchasers of Wachovia common stock by

7  disseminating materially false and misleading statements and/or concealing material adverse facts.

8  The scheme:  (i) deceived the investing public regarding Wachovia's business, operations,

9  management and the intrinsic value of Wachovia common stock; and (ii) caused plaintiff and other

10 members of the Class to purchase Wachovia's common stock at artificially inflated prices.

11                    **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

12     33.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

13 Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

14 acquired the common stock of Wachovia between May 8, 2006 and April 11, 2008 inclusive ("the

15 Class") and who were damaged thereby.  Excluded from the Class are defendants, the officers and

16 directors of the Company, members of their immediate families and their legal representatives, heirs,

17 successors or assigns and any entity in which defendants have or had a controlling interest.

18     34.    The members of the Class are so numerous that joinder of all members is

19 impracticable.  Throughout the Class Period, Wachovia had more than 1.9 billion shares of common

20 stock outstanding that traded on the NYSE.  While the exact number of Class members is unknown

21 to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes

22 that there are hundreds or thousands of members in the proposed Class.  Record owners and other

23 members of the Class may be identified from records maintained by Wachovia or its transfer agent

24 and may be notified of the pendency of this action by mail, using the form of notice similar to that

25 customarily used in securities class actions.

26     35.    Plaintiff's claims are typical of the claims of the members of the Class as all members

27 of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

28 complained of herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                          - 8 -

1    36.    Plaintiff will fairly and adequately protect the interests of the members of the Class

2  and has retained counsel competent and experienced in class and securities litigation.

3    37.    Common questions of law and fact exist as to all members of the Class and

4  predominate over any questions solely affecting individual members of the Class.  Among the

5  questions of law and fact common to the Class are:

6        (a)    whether the federal securities laws were violated by defendants' acts as

7  alleged herein;

8        (b)    whether statements made by defendants to the investing public during the

9  Class Period misrepresented material facts about the business, operations and management of

10  Wachovia; and

11        (c)    to what extent the members of the Class have sustained damages and the

12  proper measure of damages.

13    38.    A class action is superior to all other available methods for the fair and efficient

14  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

15  damages suffered by individual Class members may be relatively small, the expense and burden of

16  individual litigation make it impossible for members of the Class to individually redress the wrongs

17  done to them.  There will be no difficulty in the management of this action as a class action.

18    **SUBSTANTIVE ALLEGATIONS**

19  **The Company's False Statements Regarding**
   **Underwriting Standards and 2006 Results**

20

21    39.    The Class Period begins on May 8, 2006, when Wachovia held a conference call to

22  discuss its planned acquisition of Golden West, an Oakland, California-based mortgage originator,

23  for total consideration of $24.3 billion.  The acquisition was completed on October 1, 2006.

24    40.    On the May 8, 2006 conference call announcing the Golden West acquisition,

25  Wachovia's CEO, defendant Thompson, was effusive about Golden West's underwriting standards,

26  saying "They are obsessed with conservative underwriting..."  Thompson added: "They have a

27  simpleminded focus as Herb [Sandler, co-CEO of Golden West] described and an elegantly simple

28  option ARM product that is low risk because of, number one, the product features of their option

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                    - 9 -

1   ARM and two, because of their rigorous underwriting process." Thompson also stated, "They have

2   no subprime origination at Golden West, so a very conservative portfolio."

3       41.     On May 12, 2006, Wachovia held an informational conference call on the Golden

4   West merger. The Company's CFO, defendant Wurtz, discussed caps on Pick-A-Payment loans

5   when the borrower chooses to make a minimum payment that does not cover all the necessary

6   interest, with the unpaid interest added to the loan balance. He said that on a loan with a loan-to-

7   value ("LTV") of less than 85%, the amount of negative amortization (or "deferred interest") could

8   only grow until it represents 125% of the original loan amount; thereafter the loan is recapped such

9   that it is adjusted to a payment that would pay off over the remaining term of the loan. For loans

10  with a LTV greater than 85%, that recast occurs when the loan amount reaches 110% of the original

11  loan amount. In response to an analyst's question, Wurtz said that the average borrower who

12  chooses the negative amortization option takes "a long time" to reach the aforementioned caps,

13  probably in "six or seven years":

14          **Gerard Cassidy, RBC -- *Analyst***                                      75

15          "Very good. Going on getting back to the deferred interest comments that
            you made earlier. Can you share with us on the deferred interest how long
16          does it take a typical person who takes out one of these mortgages these
            option ARMs if they were to choose the minimum payment from day one?
17          How long does it take them to get to those caps of 110 and 125%?"

18          **Tom Wurtz, Wachovia – CFO**                                             76

19          "It takes a long time. Probably about at least four or five years, probably in
            the average environment six or seven years, something like that."

20

21      42.     On a May 16, 2006, at a UBS Global Financial Services Conference, Thompson

22  commented on the conservative nature of the Pick-A-Payment loans it planned to originate after the

23  Golden West merger: "And Wachovia can originate Golden West's conservative option ARM

24  products on the East Coast."

25      43.     Responding to a question about his lack of concern over the growing amount of

26  negative amortization in the Golden West portfolio, Thompson dispelled investor worries: "I'm

27  really not concerned. And I'm not concerned because of the conservative underwriting standards that

28  the company has."

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                      - 10 -

44.    On November 3, 2006, Wachovia filed its quarterly report on Form 10-Q for the third fiscal quarter of 2006, ending September 30, 2006 ("3Q06 report"). The report was signed by defendant Wurtz. The Company reported revenues for the quarter of $7.04 billion, an increase of five percent from the third quarter of 2005. Diluted earnings per share for the quarter was $1.17.

45.    The Company described its management of credit risk in the following terms: "We continue to mitigate risk and volatility on our balance sheet by actively monitoring and reducing potential problem loans, including their sale when prudent."

46.    The Company reported that the allowance for loan losses increased $280 million from year-end 2005 to $3.0 billion at September 30, 2006. This amount is subtracted from revenues and lowers net income.

47.    Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included a certification signed by defendants Thompson and Wurtz:

1.    I have reviewed this Quarterly Report on Form 10-Q for the quarter ended September 30, 2006 of Wachovia Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                      - 11 -

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

48.    In an earnings conference call on January 23, 2007 reporting fourth quarter 2006 earnings results, Thompson stated that "we feel really good about credit quality."

49.    On February 28, 2007, Wachovia filed its annual report on Form 10-K for the 2006 fiscal year, ending December 31, 2006 ("FY06 report"). The report was signed by defendants Thompson and Wurtz. The Company reported revenues for the year of $29.95 billion, compared with revenues of $26.11 billion for fiscal year 2005. Diluted earnings per share for the year were $4.63, an 11% increase over diluted earnings per share for the previous year.

50.    The Company described its outlook for credit quality: "We are optimistic about our outlook for credit quality as we enter 2007 given the highly collateralized nature of our loan portfolio. While we expect modest increases in credit costs, we believe overall credit quality will remain strong."

51.    The Company reported allowance for loan losses of $3.36 billion at the end of fiscal year 2006, compared to loan loss reserves of $2.72 billion at the end of fiscal year 2005. This amount is subtracted from revenues and lowers nets income.

52.    Further assuring investors of the veracity of the information contained in the Form 10-K, the report included a certification signed by defendants Thompson and Wurtz:

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                                 - 12 -

1.    I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2006 of Wachovia Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                    - 13 -

1               b)      any fraud, whether or not material, that involves management
              or other employees who have a significant role in the registrant's internal
2               control over financial reporting.

3        53.      The representations contained in Wachovia's press releases and SEC filings,

4 conference calls and presentations regarding its underwriting standards and 2006 financial results, as

5 set out above, were materially false and misleading when made because they failed to disclose the

6 following facts:

7               (a)      the Company did not follow strict underwriting and loan-origination practices,

8 including in its Pick-A-Payment mortgage portfolio;

9               (b)      a material portion of the Company's loans were made on a "low

10 documentation" basis, such that it had no way of confirming the credit-worthiness of many loan

11 applicants, thereby rendering the Company's reassurances about its loan-origination and

12 underwriting practices lacking in any reasonable basis;

13               (c)      the Company placed intense pressure on its loan officers to persuade

14 borrowers to use Pick-A-Payment loans;

15               (d)      the Company's loan loss provisions were understated and did not properly

16 reflect the risk facing the Company, thereby inflating Wachovia's reported income;

17               (e)      the certifications signed by defendants Thompson and Wurtz, which attested

18 to the accuracy of the reported financial statements in the quarterly and annual SEC filings, were

19 themselves misleading because of the above misstatements and omissions included in the reports,

20 and provided false comfort to the market; and

21               (f)      the Company's growth was not due to Wachovia's prudent risk management,

22 as represented by defendants; to the contrary, Wachovia's results were founded on the aggressive

23 origination of risky loans without regard to its stated origination policies, even in the face of

24 worsening market conditions.

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                   - 14 -

1  **The Company's False Statements Regarding**
   **Its Underwriting Standards and 2007 Results**
2

3      54.    In an earnings conference call for the fist quarter of 2007, on April 16, 2007, CEO

4  Kennedy Thompson said:

5              [L]ooking forward with the integration of Golden West on track, we feel
               confident about the **superior credit quality of our mortgage portfolio**, the
6              prospects for cross-selling our product set in Golden West markets, and
               originating pick-a-pay mortgages through traditional Wachovia channels.[1]
7

8      55.    On the same call, CFO Thomas Wurtz said, "One thing I can tell you is we will not

9  stretch for earnings by altering the Golden West origination system or weakening their proven credit

10 practices."

11     56.    Chief Risk Officer Don Truslow stated:

12             As we've talked about before, the Golden West loans are **very conservatively
               underwritten** at low loan to values with particular attention paid to the
13             quality of the appraisals. Most appraisals are completed by in-house
               appraisers, and the appraisal process, I can tell you it's very robust. Over the
14             last several months as our teams have worked more closely with one another
               through integration, **our view regarding the quality of the Golden West
15             underwriting practices has just continued to grow stronger.**

16     57.    By early 2007, the media and politicians began to question the wide availability of

17 unusual mortgage loans that many had identified as responsible for what was being referred to as the

18 real estate bubble that had begun to deflate. Interest groups and lawmakers suggested that tighter

19 mortgage-industry regulations were necessary.  In response to a question about the legislative

20 atmosphere around "exotic instruments" in the mortgage industry and if Wachovia expected to get

21 "caught up" in it, Thompson stated:

22             [W]e don't fear it because the guidance that we've seen would impact most
               people in the -- in the option arm and -- and fixed pick-a-pay kind of
23             business. **But it does not affect us. And I think that goes to the very
               conservative underwriting standards** and servicing standards that the
24             Sandlers implemented at Golden West. And we are changing none of that.
               So, if anything, we think that any changes might, in fact, benefit us relative to
25             our competition.

26

27  ─────────────────

28  [1] All emphasis is added unless otherwise noted.

    CLASS ACTION COMPLAINT FOR VIOLATIONS
    OF THE FEDERAL SECURITIES LAWS                                            - 15 -

58.    Contrasting Wachovia to its competitors, Thompson stated:

I also think that many competitors were underwriting to the introductory or teaser rate. And Golden West has never done that. We've always underwritten to a fully indexed rate, which we will continue. **I think if you look at the credit history and right up to the current moment, it would be hard for me to imagine how anybody could look at our underwriting of these loans and draw any conclusion under -- other than we are very responsible underwriters and servicers of these -- of these clients.**

59.    In response to a question of whether there were any loans in Golden West's portfolio that would be considered equivalent to an Alt-A type of loan,[2] Truslow stated:

Well, a very good bit of it would be, as well as the rest of our consumer book. But the difference is those are on balance sheet loans. **And we've got the other underwriting criteria.** So, for instance, in our credit card business, our auto business or -- and our equity line business, it's -- it is very common where you know the customer, have a relationship, not to provide tax returns, and all those kinds of things that you tend to associate with a conforming mortgage loan.. . .

60.    On May 4, 2007, Wachovia filed its quarterly report on Form 10-Q for the first fiscal quarter of 2007, ending March 31, 2007 ("1Q07 report"). The Company reported revenues for the quarter of $8.24 billion, an increase of 17% from the same quarter in 2006. Diluted earnings per share for the first quarter were $1.20, a 10% increase from the same quarter in 2006.

61.    Commenting on its management of credit risk, the Company stated:

The low level of net charge-offs reflects a continuing solid credit environment, the highly collateralized nature of our loan portfolio and our **careful management of the inherent credit risk in our loan portfolio.** The Golden West portfolio has a long record of extremely low net charge-offs, including virtually none for the past eight years, reflecting **strong underwriting and credit risk management.**

62.    The Company reported allowance for loan losses of $3.38 billion at the end of the first quarter 2007, increasing its provision for credit losses by $175 million.

63.    Further assuring investors of the veracity of the information contained in the Form 10-K, the report included a certification signed by defendants Thompson and Wurtz:

---

[2] Alt-A is a classification of mortgages where the risk profile falls between prime and subprime. The borrowers behind these mortgages will typically have clean credit histories, but the mortgage itself will generally have some issues that increase its risk profile. These issues include higher loan-to-value and debt-to-income ratios or inadequate documentation of the borrower's income.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                      - 16 -

1     1.     I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 of Wachovia Corporation;

2

3     2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

4

5

6     3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

7

8     4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

9

10

11     a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

12

13

14

15     b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

16

17

18     c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

19

20     d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

21

22

23     5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

24

25

26     a)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                           - 17 -

1            b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal

2    control over financial reporting.

3    64.    On the Company's July 20, 2007 earnings conference call, defendant Truslow

4    commented on Wachovia's exposure to the credit crunch in the financial markets:

5        I thought I would just make a couple of comments switching gears about the turbulence in the capital markets and the impact on Wachovia. Overall, I feel

6    like we are in very good shape... Probably not appropriate to get too specific around the numbers at Wachovia, but acknowledging there would be a high

7    level of interest in that but for competitive reasons I want to be a little careful of how specific we get but **we view the risk to Wachovia [sic] what's**

8    **currently happening is very modest.**

9    65.    Discussing Wachovia's exposure to subprime mortgages, Truslow said:

10       As for subprime in our Capital Markets businesses, and in our origination businesses, we shied away from diving into this business over the last few

11   years as that market took off really for two reasons. One is given the firm's prior experience in the subprime market in the late '90s and also, importantly,

12   the view of our Capital Markets group that the risk in this arena has been underpriced for quite some time, so we just haven't felt that it has been a

13   business that's made good sense for us and, therefore, **we've actively managed our business to minimize our exposure to the subprime market.**

14   **So as a result there's been little impact to our businesses with the turbulence in the subprime markets and we don't anticipate any**

15   **meaningful potential impact to earnings from subprime going forward.**

16   66.    Adding further commentary on the Company's subprime exposure, Steve Cummings,

17   Wachovia's head of corporate and investment banking, said:

18       But very quickly on a couple key markets, the subprime and CDO businesses, which Don touched on. As he said, we have avoided the origination side of

19   subprime for some time. We don't have that origination platform plus **when we have brought platforms in that did have subprime activities over the**

20   **last 18 to 24 months we have purposely exited that portion of the business.**

21

22   67.    Truslow discussed Wachovia's Pick-A-Payment product:

23       I do want to remind everybody that our pick a pay product, which is our option payment ARM is structured with caps that limit the amount

24   customer's payment may increase in any given year to no more than 7.5% of the payment. So on a $1,000 mortgage payment that would be a $75 increase

25   from one year to the next and therefore, **I just want to point out that payment shock in our option ARMs is just not an issue here at all. It's**

26   **really not an issue with the product.** Given the environment, again, we're not surprised to see the residential non-performs trend up as we noted last

27   quarter, it's what we've been expecting and I would anticipate that we'll continue to see some trend up over the next few quarters as well. **But**

28   **because the way these loans are underwritten, we're not seeing any meaningful increases in losses in the portfolio and we don't expect to see**

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

- 18 -

1                     **any rises and losses as we look forward over the next few quarters and so**
                       **the underwriting process and how these things are booked and what**

2                     **we're ultimately relying upon holding up very well as expected.**

3        68.     Cummings stated that Wachovia is "one of the larger players in the CDO business,

4 and in that market **we've managed that exposure also extremely well,** some indicators of that

5 would include the recent rating agency actions that have been taken."

6        69.     On July 30, 2007, Wachovia filed its quarterly report on Form 10-Q for the second

7 fiscal quarter of 2007, ending June 30, 2007 ("2Q07 report"). The Company reported revenues for

8 the quarter of $8.69 billion, compared with revenues of $7.26 billion for the same period in 2006.

9 Diluted earnings per share for the second quarter were $1.22, an increase of 4% over diluted

10 earnings per share for the second quarter of 2006.

11        70.     The Company commented on its management of credit risk:

12                     Consumer net charge-offs were $249 million, up from $112 million in the
                      first six months of 2006.... The low level of net charge-offs reflects the

13                     highly collateralized nature of our loan portfolio and our **careful**
                     **management of inherent credit risk.** Our consumer real estate portfolio has

14                     a long record of relatively low net charge-offs, **reflecting strong**
                     **underwriting and credit risk management.**

15

16        71.     Wachovia reported allowance of loan losses of $3.39 billion at the end of the second

17 quarter of 2007, having increased its provision for credit losses by $168 million during the quarter.

18        72.     Further assuring investors of the veracity of the information contained in the Form

19 10-Q, the report included a certification signed by defendants Thompson and Wurtz:

20                  1.     I have reviewed this Quarterly Report on Form 10-Q for the quarter
                     ended June 30, 2007 of Wachovia Corporation;

21

22                  2.     Based on my knowledge, this report does not contain any untrue
                     statement of a material fact or omit to state a material fact necessary to make
                     the statements made, in light of the circumstances under which such

23                     statements were made, not misleading with respect to the period covered by
                     this report;

24

25                  3.     Based on my knowledge, the financial statements, and other financial
                     information included in this report, fairly present in all material respects the
                     financial condition, results of operations and cash flows of the registrant as

26                     of, and for, the periods presented in this report;

27                  4.     The registrant's other certifying officers and I are responsible for
                     establishing and maintaining disclosure controls and procedures (as defined

28                     in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                         - 19 -

financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

73.    The statements in ¶¶ 65 and 66 were materially false and misleading because Wachovia in fact did have extensive exposure to subprime mortgages. On an October 19, 2007 earnings conference call, CEO Thompson admitted the Company's subprime exposure:

   I would say that as we looked at results, I think the biggest disappointment for me is that of those $1.3 billion in marks, **we had about $300 million, roughly $300 million in losses on AAA subprime paper that was in trading desks or in inventory**. And the thing that disappoints me about that is we have an institutional bias here against subprime. We avoided it in our origination efforts and we avoided it in, for the most part, in our securitization efforts.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                              - 20 -

1          So, frankly, I think we had a little bit of a break down in having AAA

2          subprime in some of our portfolios that we took losses on. I do think it is really quite amazing that we could take $300 million of losses on AAA

3          paper. We didn't expect that that paper could degenerate that fast, with that kind of swiftness.

4      74.    Upon the Company's first disclosure of its exposure to subprime mortgages, the stock

5 price fell 3.61% on October 19, 2008.

6      75.    Notwithstanding his previous assurances to investors, Chief Risk Officer Truslow

7 admitted at a BancAnalysts Association of Boston Conference on November 9, 2007, that the

8 Company failed to minimize its exposure to subprime mortgages:

9          **Clearly we could have done a better job around subprime** on -- for the

10          company that has had such a negative bias towards subprime. We didn't leap into the origination side. We stayed away from a lot of the businesses that

11          evolved and grew beginning just a couple of years ago yet we found ourselves in this downdraft with pockets of subprime exposure that,

12          essentially, there were investments or positions taken in various places across the platform. Mostly in the form of what we believe to the very high-quality

13          assets, AAA, Super Senior AAA, and adjunct to that is that **where those decisions were made, they probably didn't involve the expertise and**

14          **talent of the part of the platform that really had the most experience around residential mortgages and subprime,** probably too reliant on the

15          ratings and taking too much comfort in historical performance around securities with those ratings.

16      76.    On the same day, Wachovia filed its quarterly report on Form 10-Q for the third fiscal

17 quarter of 2007, ending September 30, 2007 ("3Q07 report"). The Company detailed its exposure to

18 subprime residential mortgage-backed securities ("RMBS"). The Company had total subprime

19 RMBS exposure of $2.05 billion as of October 31, 2007 and September 30, 2007. The Company

20 reported revenues for the quarter of $7.35 billion, compared with revenues of $7.04 billion for the

21 same period in 2006. Diluted earnings per share for the third quarter were $0.85, a 27% decrease

22 over diluted earnings per share for the same period in 2006.

23      77.    Despite its losses on subprime mortgages, the Company remained positive on its

24 management of credit risk:

25          While our outlook indicates a rise in the overall level of charge-offs at this point in the credit cycle, we believe the well collateralized nature of our real

26          estate-secured portfolio, our careful management of inherent credit risk and strong underwriting will position us relatively well in a more uncertain credit

27          environment.

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                               - 21 -

1    78.    The Company reported allowance for loan losses of $3.51 billion at the end of the

2    third quarter of 2007.

3    79.    Further assuring investors of the veracity of the information contained in the Form

4    10-Q, the report included a certification signed by defendants Thompson and Wurtz:

5            1.    I have reviewed this Quarterly Report on Form 10-Q for the quarter
             ended September 30, 2007 of Wachovia Corporation;

6

7            2.    Based on my knowledge, this report does not contain any untrue
             statement of a material fact or omit to state a material fact necessary to make
             the statements made, in light of the circumstances under which such
8            statements were made, not misleading with respect to the period covered by
             this report;

9

10           3.    Based on my knowledge, the financial statements, and other financial
             information included in this report, fairly present in all material respects the
             financial condition, results of operations and cash flows of the registrant as
11           of, and for, the periods presented in this report;

12           4.    The registrant's other certifying officers and I are responsible for
             establishing and maintaining disclosure controls and procedures (as defined
13           in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over
             financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-
14           15(f)) for the registrant and have:

15               a)    Designed such disclosure controls and procedures, or caused
             such disclosure controls and procedures to be designed under our
16           supervision, to ensure that material information relating to the registrant,
             including its consolidated subsidiaries, is made known to us by others within
17           those entities, particularly during the period in which this annual report is
             being prepared;

18

19               b)    Designed such internal control over financial reporting, or
             caused such internal control over financial reporting to be designed under our
             supervision, to provide reasonable assurance regarding the reliability of
20           financial reporting and the preparation of financial statements for external
             purposes in accordance with generally accepted accounting principles;

21

22               c)    Evaluated the effectiveness of the registrant's disclosure
             controls and procedures and presented in this report our conclusions about
             the effectiveness of the disclosure controls and procedures, as of the end of
23           the period covered by this report based on such evaluation; and

24               d)    Disclosed in this report any change in the registrant's internal
             control over financial reporting that occurred during the registrant's most
25           recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an
             annual report) that has materially affected, or is reasonably likely to
26           materially affect, the registrant's internal control over financial reporting; and

27           5.    The registrant's other certifying officer(s) and I have disclosed, based
             on our most recent evaluation of internal control over financial reporting, to
28           the registrant's auditors and the audit committee of the registrant's board of
             directors (or persons performing the equivalent functions):

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                              - 22 -

1

2          a)      all significant deficiencies and material weaknesses in the
design or operation of internal control over financial reporting which are
3      reasonably likely to adversely affect the registrant's ability to record, process,
summarize and report financial information; and

4          b)      any fraud, whether or not material, that involves management
or other employees who have a significant role in the registrant's internal
5      control over financial reporting.

6      80.     The Company held a conference call to discuss its full-year 2007 results on January

7    22, 2008. Thompson, responding to a number of anxious investors' questions, stated:

8          Nevertheless, based on recent action in our stock price, I'm certain that
investors are anxious about several questions on Wachovia which I want to
9          address now . . . does Wachovia have enough capital? After our December
preferred offering, Wachovia's capital levels were higher at year end than at
10          the end of the third quarter, in spite of the marks, and in spite of the reserve
build that we did in the fourth quarter. And we're confident that those capital
11          levels will increase as we go through 2008. And the third question, will
Wachovia cut its dividend? And the answer to that question is **we have no**
12          **plans to cut the dividend, because we do not need to cut the dividend.**
We're confident in our ability to meet our 2008 business plan, and that plan
13          as we have said before, will generate cash earnings that will cover our
dividend payments, continue to build necessary credit reserves, improve our
14          capital ratios, and support growth in our business lines.

15      81.     On February 28, 2008, the Company filed its annual report on Form 10-K for the

16    fiscal year 2007, ending December 31, 2007 ("FY07 report"). The report was signed by defendants

17    Thompson and Wurtz. The Company reported revenues for the year of $31.58 billion, compared

18    with revenues of $30.07 billion for fiscal year 2006. Diluted earnings per share for the year were

19    $3.26, compared with diluted earnings per share of $4.63 for fiscal year 2006.

20      82.     Discussing its credit risk management in the FY07 report, the Company stated:

21    "While our outlook indicates a rise in the level of charge-offs at this point in the credit cycle, we

22    believe the well-collateralized nature of our real estate-secured portfolio, our **careful management**

23    **of credit risk** and **strong underwriting position** us relatively well in this credit environment."

24      83.     In the FY07 report, the Company reported allowance for loan losses of $4.51 billion

25    at the end of fiscal year 2007, compared with allowance for loan losses of $3.36 billion at the end of

26    fiscal year 2006. Wachovia disclosed that the loan loss "provision expense in the first half of 2008 is

27    likely to **exceed** 75 basis points of average net loans on an annualized basis."  This is compared to

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                    - 23 -

1  sentiment in mid-January when the Company believed "provision expense in the first half of 2008 is

2  expected to remain **below** 75 basis points of average net loans on an annualized basis."

3      84.    On this news, Wachovia's stock fell 10.2% over the next two days, from a close of

4  $34.10 per share on February 27, 2008 to a close of $30.62 per share on February 29, 2008.  The

5  truth about Wachovia's underwriting practices and its weakening financial condition, however,

6  remained undisclosed.

7      85.    Further assuring investors of the veracity of the information contained in the Form

8  10-K, the report included a certification signed by defendants Thompson and Wurtz:

9          1.    I have reviewed this Annual Report on Form 10-K for the year ended
   December 31, 2007 of Wachovia Corporation;

10

11         2.    Based on my knowledge, this report does not contain any untrue
   statement of a material fact or omit to state a material fact necessary to make
   the statements made, in light of the circumstances under which such
12  statements were made, not misleading with respect to the period covered by
   this report;

13

14         3.    Based on my knowledge, the financial statements, and other financial
   information included in this report, fairly present in all material respects the
   financial condition, results of operations and cash flows of the registrant as
15  of, and for, the periods presented in this report;

16         4.    The registrant's other certifying officers and I are responsible for
   establishing and maintaining disclosure controls and procedures (as defined
17  in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over
   financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-
18  15(f)) for the registrant and have:

19             a)    Designed such disclosure controls and procedures, or caused
   such disclosure controls and procedures to be designed under our
20  supervision, to ensure that material information relating to the registrant,
   including its consolidated subsidiaries, is made known to us by others within
21  those entities, particularly during the period in which this annual report is
   being prepared;

22

23             b)    Designed such internal control over financial reporting, or
   caused such internal control over financial reporting to be designed under our
   supervision, to provide reasonable assurance regarding the reliability of
24  financial reporting and the preparation of financial statements for external
   purposes in accordance with generally accepted accounting principles;

25

26             c)    Evaluated the effectiveness of the registrant's disclosure
   controls and procedures and presented in this report our conclusions about
   the effectiveness of the disclosure controls and procedures, as of the end of
27  the period covered by this report based on such evaluation; and

28             d)    Disclosed in this report any change in the registrant's internal
   control over financial reporting that occurred during the registrant's most
   CLASS ACTION COMPLAINT FOR VIOLATIONS
   OF THE FEDERAL SECURITIES LAWS                                    - 24 -

1    recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an
     annual report) that has materially affected, or is reasonably likely to
2    materially affect, the registrant's internal control over financial reporting; and

3    5.    The registrant's other certifying officer(s) and I have disclosed, based
     on our most recent evaluation of internal control over financial reporting, to
4    the registrant's auditors and the audit committee of the registrant's board of
     directors (or persons performing the equivalent functions):
5        a)    all significant deficiencies and material weaknesses in the
     design or operation of internal control over financial reporting which are
6    reasonably likely to adversely affect the registrant's ability to record, process,
     summarize and report financial information; and
7
8        b)    any fraud, whether or not material, that involves management
     or other employees who have a significant role in the registrant's internal
     control over financial reporting.
9

10   86.    Defendant Truslow, speaking on a Deutsche Bank conference call on March 12, 2008,

11   continued to tout Wachovia's Pick-A-Payment loan portfolio:

12       The Pick-A-Pay non-accrual loan levels are up, but compared with some
         recently reported results by some other option ARM lenders in the industry,
13       **we believe our levels sit at relatively attractive levels,** or levels pretty
         significantly below what we have seen some others report. I think that is
14       probably due very heavily to the way Pick-A-Pay product is designed, and
         **we are somewhat insulated from the recast pressure that some other**
15       **option ARMs lenders are facing right now.**

16   87.    The representations contained in Wachovia's press releases and SEC filings,

17   conference calls and presentations regarding its underwriting standards and 2007 financial results, as

18   set out above in ¶¶ 54-86, were materially false and misleading when made because they failed to

19   disclose the following facts:

20       (a)    the Company did not follow strict underwriting and loan-origination practices,

21   including in its Pick-A-Payment mortgage portfolio;

22       (b)    a material portion of the Company's loans were made on a "low

23   documentation" basis, such that it had no way of confirming the credit-worthiness of many loan

24   applicants, thereby rendering the Company's reassurances about its loan-origination and

25   underwriting practices lacking in any reasonable basis;

26       (c)    the Company placed intense pressure on its loan officers to persuade

27   borrowers to use Pick-A-Payment loans;

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                              - 25 -

1        (d)    the Company's loan loss provisions were understated and did not properly

2  reflect the risk facing the Company, thereby inflating Wachovia's reported income;

3        (e)    Wachovia's representation that it was amply capitalized, and its assurance that

4  it would therefore not need to cut its dividend, were lacking in any reasonable basis when made;

5        (f)    the certifications signed by defendants Thompson and Wurtz, which attested

6  to the accuracy of the reported financial statements in the quarterly and annual SEC filings, were

7  themselves misleading because of the above misstatements and omissions included in the reports,

8  and provided false comfort to the market; and

9        (g)    the Company's growth was not due to Wachovia's prudent risk management,

10  as represented by defendants; to the contrary, Wachovia's results were founded on the aggressive

11  origination of risky loans without regard to its stated origination policies, even in the face of

12  worsening market conditions.

13                   **THE TRUTH IS DISCLOSED**

14      88.    Three months after assuring the market of its liquidity, the strength of its underwriting

15  practices, and the adequacy of its reserves, Wachovia reported a surprise loss and undertook

16  emergency measures to increase capital.

17      89.    On April 14, 2008, before the open of ordinary trading, Wachovia shocked the market

18  when it reported a loss of $350 million, or $0.20 per share, for the first quarter of 2008.  The

19  Company attributed the results to: (1) a $2.8 billion increase credit loss reserves, including $1.1

20  billion specifically for "Pick-A-Pay" reserve build, the lending program highly touted by the

21  Company during the Class Period. The need to increase Pick-A-Pay reserves was attributed to

22  Wachovia's adoption of a "refined reserve modeling" that resulted in "higher than expected loss

23  factors on Pick-a-Pay"; and (2) $2 billion in mark-to-market losses for mortgage backed securities,

24  including a "$729 million loss on **unfunded** leveraged finance commitments." The Company said

25  that it expects to experience additional net charge-offs and reserve building in its Pick-A-Payment

26  portfolio of $3.2-$3.8 billion in 2008 and $2.4-$2.8 billion in 2009.

27      90.    In order to shore-up its capital, Wachovia announced the following steps: (1) **reduce**

28  **the dividend 41%** to $0.375; and (2) plan to raise capital by $7-8 billion through public offerings.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                - 26 -

1      91.    Commenting on the financial results, an analyst from RBC Capital Markets said:

2    "[I]nvestors will be skeptical of what they hear from management after the optimism expressed

3    about the Pick-A-Pay losses and quarterly dividend in the last 60-90 days. We believe management

4    should have been more aggressive in attacking its problems."

5      92.    These terrible results and emergency capital raising measures conflicted dramatically

6    with the Company's assurances during the Class Period. In reaction to the news, shares fell from

7    $27.81 to $25.55 on abnormally high volume. The one-day stock drop of 8.13% that resulted from

8    this disclosure erased over $6 billion of Wachovia's market capitalization.

9                      **Post-Class Period Developments**

10     93.    On June 2, 2008, Wachovia's board of directors forced Thompson to retire from the

11    Company. He was replaced as CEO by director Lanty L. Smith.

12                    **ADDITIONAL SCIENTER ALLEGATIONS**

13     94.    As alleged herein, defendants acted with scienter in that defendants knew that the

14    public documents and statements issued or disseminated in the name of the Company were

15    materially false and misleading; knew that such statements or documents would be issued or

16    disseminated to the investing public; and knowingly and substantially participated or acquiesced in

17    the issuance or dissemination of such statements or documents as primary violations of the federal

18    securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of

19    information reflecting the true facts regarding Wachovia, their control over, and/or receipt and/or

20    modification of Wachovia's allegedly materially misleading misstatements and/or their associations

21    with the Company which made them privy to confidential proprietary information concerning

22    Wachovia, participated in the fraudulent scheme alleged herein.

23     95.    Because of their position with the Company, defendants at all times had the

24    opportunity to, and did, commit the wrongdoing alleged herein.

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                 - 27 -

1
### Applicability Of Presumption Of Reliance:
### Fraud On The Market Doctrine

2

3    96.    At all relevant times, the market for Wachovia's common stock was an efficient

4    market for the following reasons, among others:

5        (a)    Wachovia's stock met the requirements for listing, and was listed and

6    actively traded on the NYSE, a highly efficient and automated market;

7        (b)    As a regulated issuer, Wachovia filed periodic public reports with the SEC

8    and the NYSE;

9        (c)    Wachovia regularly communicated with public investors via established

10    market communication mechanisms, including through regular disseminations of press releases

11    on the national circuits of major newswire services and through other wide-ranging public

12    disclosures, such as communications with the financial press and other similar reporting services;

13    and

14        (d)    Wachovia was followed by several securities analysts employed by major

15    brokerage firms who wrote reports which were distributed to the sales force and certain

16    customers of their respective brokerage firms. Each of these reports was publicly available and

17    entered the public marketplace.

18    97.    As a result of the foregoing, the market for Wachovia's common stock promptly

19    digested current information regarding Wachovia from all publicly available sources and reflected

20    such information in Wachovia's stock price. Under these circumstances, all purchasers of

21    Wachovia's common stock during the Class Period suffered similar injury through their purchase of

22    Wachovia's common stock at artificially inflated prices and a presumption of reliance applies.

23    ### NO SAFE HARBOR

24    98.    The statutory safe harbor provided for forward-looking statements under certain

25    circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

26    Many of the specific statements pleaded herein were not identified as "forward-looking statements"

27    when made. To the extent there were any forward-looking statements, there were no meaningful

28    cautionary statements identifying important factors that could cause actual results to differ materially

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                - 28 -

1    from those in the purportedly forward-looking statements. Alternatively, to the extent that the

2    statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

3    liable for those false forward-looking statements because at the time each of those forward-looking

4    statements was made, the particular speaker knew that the particular forward-looking statement was

5    false, and/or the forward-looking statement was authorized and/or approved by an executive officer

6    of Wachovia who knew that those statements were false when made.

7                              **LOSS CAUSATION/ECONOMIC LOSS**

8          99.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the

9    damages suffered by plaintiff and the Class.

10         100.   During the Class Period, plaintiff and the Class purchased securities of Wachovia at

11   artificially inflated prices. The price of Wachovia common stock declined when the

12   misrepresentations made to the market, and/or the information alleged herein to have been concealed

13   from the market, and/or the effects thereof, were revealed, causing investors' losses, as alleged

14   above.

15                              **Violation Of Section 10(b) Of**
                          **The Exchange Act Against And Rule 10b-5**
16                        **Promulgated Thereunder Against All Defendants**

17         101.   Plaintiff repeats and realleges each and every allegation contained above as if fully set

18   forth herein.

19         102.   During the Class Period, defendants carried out a plan, scheme and course of conduct

20   which was intended to and, throughout the Class Period, did: (i) deceive the investing public

21   regarding Wachovia's business, operations, management and the intrinsic value of Wachovia

22   common stock; and (ii) cause plaintiff and other members of the Class to purchase Wachovia's

23   common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course

24   of conduct, defendants, and each of them, took the actions set forth herein.

25         103.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue

26   statements of material fact and/or omitted to state material facts necessary to make the statements not

27   misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud

28   and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                          - 29 -

1  high market prices for Wachovia's common stock in violation of Section 10(b) of the Exchange Act

2  and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal

3  conduct charged herein or as controlling persons as alleged below.

4    104.  Defendants, individually and in concert, directly and indirectly, by the use, means or

5  instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

6  continuous course of conduct to conceal adverse material information about the business and

7  operations of Wachovia as specified herein.

8    105.  These defendants employed devices, schemes and artifices to defraud, while in

9  possession of material adverse non-public information, and engaged in acts, practices, and a course

10  of conduct as alleged herein in an effort to assure investors of Wachovia's value and performance

11  and continued substantial growth, which included the making of, or the participation in the making

12  of, untrue statements of material facts and omitting to state material facts necessary in order to make

13  the statements made about Wachovia and its business operations in the light of the circumstances

14  under which they were made, not misleading, as set forth more particularly herein, and engaged in

15  transactions, practices and a course of business which operated as a fraud and deceit upon the

16  purchasers of Wachovia common stock during the Class Period.

17    106.  Each of the Individual Defendants' primary liability, and controlling person liability,

18  arises from the following facts: (i) the Individual Defendants were high-level executives and/or

19  directors at the Company during the Class Period and members of the Company's management team

20  or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as

21  a senior officer and/or director of the Company was privy to and participated in the creation,

22  development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii)

23  each of these defendants enjoyed significant personal contact and familiarity with the other

24  defendants and was advised of and had access to other members of the Company's management

25  team, internal reports and other data and information about the Company's finances, operations, and

26  sales at all relevant times; and (iv) each of these defendants was aware of the Company's

27  dissemination of information to the investing public which they knew or recklessly disregarded was

28  materially false and misleading.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                              - 30 -

1    107.    The defendants had actual knowledge of the misrepresentations and omissions of

2  material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

3  ascertain and to disclose such facts, even though such facts were available to them.    Such

4  defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for

5  the purpose and effect of concealing Wachovia's operating condition from the investing public and

6  supporting the artificially inflated price of its common stock.    As demonstrated by defendants'

7  overstatements and misstatements of the Company's business, operations and earnings throughout

8  the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and

9  omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from

10  taking those steps necessary to discover whether those statements were false or misleading.

11    108.    As a result of the dissemination of the materially false and misleading information

12  and failure to disclose material facts, as set forth above, the market price of Wachovia's common

13  stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of

14  Wachovia's publicly-traded common stock were artificially inflated, and relying directly or

15  indirectly on the false and misleading statements made by defendants, or upon the integrity of the

16  market in which the common stock trades, and/or on the absence of material adverse information

17  that was known to or recklessly disregarded by defendants but not disclosed in public statements by

18  defendants during the Class Period, plaintiff and the other members of the Class acquired Wachovia

19  common stock during the Class Period at artificially high prices and were damaged thereby.

20    109.    At the time of said misrepresentations and omissions, plaintiff and other members of

21  the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other

22  members of the Class and the marketplace known the truth regarding Wachovia's financial results,

23  which were not disclosed by defendants, plaintiff and other members of the Class would not have

24  purchased or otherwise acquired their Wachovia common stock, or, if they had acquired such

25  common stock during the Class Period, they would not have done so at the artificially inflated prices

26  which they paid.

27    110.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange

28  Act, and Rule 10b-5 promulgated thereunder.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                    - 31 -

1    111.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the

2    other members of the Class suffered damages in connection with their respective purchases and sales

3    of the Company's common stock during the Class Period.

4                        **Violation Of Section 20(a) Of**
                 **The Exchange Act Against the Individual Defendants**
5

6    112.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

7    forth herein.

8    113.    The Individual Defendants acted as controlling persons of Wachovia within the

9    meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

10   positions, and their ownership and contractual rights, participation in and/or awareness of the

11   Company's operations and/or intimate knowledge of the false financial statements filed by the

12   Company with the SEC and disseminated to the investing public, the Individual Defendants had the

13   power to influence and control and did influence and control, directly or indirectly, the decision-

14   making of the Company, including the content and dissemination of the various statements which

15   plaintiff contends are false and misleading.  The Individual Defendants were provided with or had

16   unlimited access to copies of the Company's reports, press releases, public filings and other

17   statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were

18   issued and had the ability to prevent the issuance of the statements or cause the statements to be

19   corrected.

20   114.    In particular, each of these defendants had direct and supervisory involvement in the

21   day-to-day operations of the Company and, therefore, is presumed to have had the power to control

22   or influence the particular transactions giving rise to the securities violations as alleged herein, and

23   exercised the same.

24   115.    As set forth above, Wachovia and the Individual Defendants each violated Section

25   10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

26   positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the

27   Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                              - 32 -

1  members of the Class suffered damages in connection with their purchases of the Company's

2  common stock during the Class Period.

3      **WHEREFORE**, plaintiff prays for relief and judgment, as follows:

4      (a)    Determining that this action is a proper class action, designating plaintiff as

5  Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of

6  Civil Procedure and Labaton Sucharow LLP as Lead Counsel;

7      (b)    Awarding compensatory damages in favor of plaintiff and the other Class

8  members against all defendants, jointly and severally, for all damages sustained as a result of

9  defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

10     (c)    Awarding plaintiff and the Class their reasonable costs and expenses incurred

11  in this action, including counsel fees and expert fees; and

12     (d)    Such other and further relief as the Court may deem just and proper.

13                    **JURY TRIAL DEMANDED**

14     Plaintiff hereby demands a trial by jury.

15  DATED: June 6, 2008                **BERMAN DEVALERIO PEASE TABACCO**
                                       **BURT & PUCILLO**

16

17                                     By: _____
                                              Nicole Lavallee

18

19                                     Joseph J. Tabacco, Jr.
                                       Nicole Lavallee

20                                     Julie J. Bai
                                       425 California Street, Suite 2100

21                                     San Francisco, CA 94104
                                       Telephone: (415) 433-3200

22                                     Facsimile: (415) 433-6282

23                                     **Local Counsel for Plaintiff Bristol County**
                                       **Retirement System**

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                          - 33 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LABATON SUCHAROW LLP**
Christopher J. Keller
ckeller@labaton.com
Andrei V. Rado
arado@labaton.com
Alan I. Ellman
aellman@labaton.com
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

**Counsel for Plaintiff Bristol County
Retirement System**

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

# EXHIBIT G

MWR        Law Offices of Brodsky & Smith, LLC Announces Expanded Class
           Jul 8 2008  10:37:21

Law Offices of Brodsky & Smith, LLC Announces Expanded Class Period
in Class Action Lawsuit Against Wachovia Corp.

BALA CYNWYD, PA -- (MARKET WIRE) -- 07/08/08 -- Law offices of
Brodsky & Smith, LLC announces that a class action lawsuit alleging
an expanded class period has been filed on behalf of all persons who
purchased the common stock of Wachovia Corp. ("Wachovia" or the
"Company") (NYSE: WB) between May 8, 2006 and June 6, 2008.  The
class action lawsuit was filed in the United States District Court
for the Southern District of New York.

The Complaint alleges that defendants violated federal securities
laws by issuing a series of material misrepresentations to the
market, thereby artificially inflating the price of Wachovia.

No class has yet been certified in the above action.  Until a class
is certified, you are not represented by counsel unless you retain
one.  If you are a Wachovia shareholder you have certain rights.  To
be a member of the class you need not take any action at this time,
and you may retain counsel of your choice.  If you want to discuss
your legal rights, you may e-mail or call the law office of Brodsky &
Smith, LLC who will, without obligation or cost to you, attempt to
answer your questions.  You may contact Evan J. Smith, Esquire or
Marc L. Ackerman, Esquire at Brodsky & Smith, LLC, Two Bala Plaza,
Suite 602, Bala Cynwyd, PA 19004, by e-mail at
clients@brodsky-smith.com, or by calling toll free 877-LEGAL-90.


Contact:
Evan J. Smith, Esquire
Marc L. Ackerman, Esquire
Brodsky & Smith, LLC
Email Contact
877-LEGAL-90
-0- Jul/08/2008 14:37 GMT

Copyright (c) 2008

# EXHIBIT H

1   Joseph J. Tabacco, Jr. (75484)
    jtabacco@bermanesq.com
2   Nicole Lavallee (165755)
    nlavallee@bermanesq.com
3   Julie J. Bai (227047)
    jbai@bermanesq.com
4   **BERMAN DEVALERIO PEASE TABACCO
    BURT & PUCILLO**
5   425 California Street, Suite 2100
    San Francisco, CA 94010
6   Telephone: (415) 433-3200
    Facsimile: (415) 433-6382
7
    **Local Counsel for Plaintiff Bristol County Retirement System**
8
9                   **UNITED STATES DISTRICT COURT**
10                **NORTHERN DISTRICT OF CALIFORNIA**
11                                        )
12   BRISTOL COUNTY RETIREMENT SYSTEM,    )   Civil Action No. C-08-02844-SC
     Individually and on Behalf of all Others Similarly )
13   Situated,                            )
                                          )
14                   Plaintiff,           )   **NOTICE OF VOLUNTARY
                                          )   DISMISSAL**
15          vs.                           )
                                          )
16                                        )
     WACHOVIA CORP., G. KENNEDY           )
17   THOMPSON, THOMAS J. WURTZ, and       )
     DONALD K. TRUSLOW,                   )
18                                        )
                                          )
19                   Defendants.          )
                                          )
20
21
22
23
24
25
26
27
28
     [C-08-02844-SC] NOTICE OF VOLUNTARY DISMISSAL

1    Pursuant to Federal Rules of Civil Procedure 41(a)(1)(A)(i), the Plaintiff Bristol County

2    Retirement System and their counsel hereby give notice that the above-captioned action is

3    voluntarily dismissed, without prejudice against the defendants Wachovia Corp., G. Kennedy

4    Thompson, Thomas J. Wurtz, and Donald K. Truslow. An action substantially similar to this

5    action, captioned *Lipetz v. Wachovia Corp.*, 08 Civ. 6171 (S.D.N.Y. filed July 7, 2008), is

6    pending in the Southern District of New York.  Defendants have not answered the complaint or

7    filed a motion for summary judgment in this action.

8

9    Date:  August 6, 2008                          **LABATON SUCHAROW LLP**

10

11                                                  By:  ___/s/ Andrei V. Rado_____
                                                           Andrei V. Rado

12                                                  Christopher J. Keller (admitted pro hac vice)
                                                    ckeller@labaton.com
13                                                  Andrei V. Rado (admitted pro hac vice)
                                                    arado@labaton.com
14                                                  Alan I. Ellman (admitted pro hac vice)
                                                    aellman@labaton.com
15                                                  140 Broadway
                                                    New York, NY  10005
16                                                  Telephone: (212) 907-0700
                                                    Facsimile:  (212) 818-0477
17
                                                    **Counsel for Plaintiff Bristol County**
18                                                  **Retirement System**

19                                                  Nicole Lavallee
                                                    Joseph J. Tabacco, Jr.
20                                                  Julie J. Bai
                                                    **BERMAN DEVALERIO PEASE**
21                                                  **TABACCO BURT & PUCILLO**
                                                    425 California Street, Suite 2100
22                                                  San Francisco, CA  94104
                                                    Telephone: (415) 433-3200
23                                                  Facsimile:  (415) 433-6382

24                                                  **Local Counsel for Plaintiff Bristol County**
                                                    **Retirement System**
25

26

27

28

[C-08-02844-SC] NOTICE OF VOLUNTARY DISMISSAL                                           1

IT IS SO ORDERED
Judge Samuel Conti

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1        I, Nicole Lavallee, am the ECF User whose ID and password are being used to file this

2    Notice of Voluntary Dismissal.  In compliance with General Order 45, X.B., I hereby attest that

3    Andrei V. Rado of Labaton Sucharow LLP has concurred in this filing.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[C-08-02844-SC] NOTICE OF VOLUNTARY DISMISSAL                                        2

# EXHIBIT I

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE PAPPAS, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> COUNTRYWIDE FINANCIAL CORP., ANGELO MOZILO and ERIC P. SIERACKI, <br><br> Defendants. | Case No.: CV-07-05295-MRP (MANx) ✓ <br><br> ORDER CONSOLIDATING CASES AND APPOINTING LEAD PLAINTIFF AND LEAD COUNSEL |
| NORFOLK COUNTY RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> COUNTRYWIDE FINANCIAL CORPORATION, ANGELO R. MOZILO, DAVID SAMBOL, ERIC P. SIERACKI, and STANFORD L. KURLAND, <br><br> Defendants. | Case No.: CV-07-05727-MRP |

*(Additional Captions Follow)*

-1-

1
2
3   JACK MCBRIDE, Individually and On Behalf
4   of All Others Similarly Situated,

                    Plaintiff,

5           v.

6   COUNTRYWIDE FINANCIAL
7   CORPORATION, COUNTRYWIDE HOME
8   LOANS, INC., COUNTRYWIDE CAPITAL
9   V., CITIGROUP GLOBAL MARKETS INC.,
    JP MORGAN SECURITIES INC., MERRILL
10  LYNCH, PIERCE, FENNER & SMITH
11  INCORPORATED, MORGAN STANLEY &
12  CO. INCORPORATED, UBS SECURITIES
13  LLC, WACHOVIA CAPITAL MARKETS
14  LLC, ANGELO R. MOZILO, KATHLEEN
15  BROWN, HENRY G. CISNEROS, JEFFREY
16  M. CUNNINGHAM, ROBERT J. DONATO,
17  MICHAEL E. DOUGHERTY, MARTIN R.
18  MELONE, ROBERT T. PARRY, OSCAR P.
19  ROBERTSON, KEITH P. RUSSELL,
20  HARLEY W. SNYDER, DAVID SAMBOL,
21  ERIC P. SIERACKI, ANDREW GISSENGER,
    III, and CARLOS M. GARCIA.
22
23                  Defendants.
24
25
26
27
28

Case No. CV-07-06083-MRP

-2-

1

2     SARATOGA ADVANTAGE TRUST On          Case No. CV-07-06635-MRP

3     Behalf of Themselves and All Others

4     Similarly Situated,

5

6                          Plaintiff,

7            v.

8     COUNTRYWIDE FINANCIAL

9     CORPORATION, ANGELO R. MOZILO,

10    DAVID SAMBOL, ERIC P. SIERACKI, and

11    STANFORD L. KURLAND,

12                          Defendants.

13

14

15

16    ARGENT CLASSIC CONVERTIBLE          Case No. CV-07-07097-MRP

17    ARBITRAGE FUND L.P., Individually and

18    On Behalf of All Others Similarly Situated,

19                          Plaintiff,

20

21           v.

22    COUNTRYWIDE FINANCIAL

23    CORPORATION, ANGELO R. MOZILO,

24    DAVID SAMBOL, and ERIC P. SIERACKI,

25

26                          Defendants.

27

28

-3-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BARRY BRAHN, Individually and on Behalf
of Himself and All Others Similarly Situated,

                  Plaintiff,

      v.

COUNTRYWIDE CAPITAL V.,

COUNTRYWIDE FINANCIAL

CORPORATION, ANGELO R. MOZILO,

ERIC P. SIERACKI, and STANFORD L.

KURLAND,

                Defendants.

Case No. CV-07-07259-MRP

## I.

### INTRODUCTION

Before the Court are six securities class action cases brought on behalf of investors of Countrywide Financial Corporation ("Countrywide") and asserting claims against Countrywide, its subsidiaries, a variety of current and former officers and directors, and underwriters of public offerings of Countrywide securities. Several Plaintiffs from these cases have moved to consolidate some or all of the claims. Further, multiple parties have filed motions to be appointed as lead plaintiff of either a consolidated case or a case not treated as part of the consolidated case. The Court heard oral argument on the issues of consolidation and appointment of lead plaintiff on November 19, 2007.

## II.

### BACKGROUND

**A.    Defendants in all cases**

Countrywide is a Delaware corporation with its principal place of business in Calabasas, California. With its subsidiaries, Countrywide operates in five business areas: Mortgage Banking, Banking, Capital Markets, Insurance, and Global Operations. The Mortgage Banking component originates and sells residential loans, and the Global Operations component provides ancillary services for those loans. The Banking component operates a federally chartered bank that invests in mortgages and home equity loans that originated in Mortgage Banking. The Capital Markets component underwrites and trades in mortgage-backed securities.

One complaint, *Jack McBride, et al., v. Countrywide Financial Corp., et al.* ("*McBride*"), also includes as defendants Citigroup Global Markets, J.P. Morgan Securities, Merrill Lynch, Morgan Stanley, UBS Securities LLC, Wachovia Capital Markets LLC (collectively the "underwriters") as defendants. These companies served as underwriters of a November 1, 2006 public stock offering.

Finally, several complaints name individual directors and officers of Countrywide or its subsidiaries as defendants. Angelo Mozilo, one of the original founders of Countrywide in 1969, served as CEO and Chairman of the Board of Directors of Countrywide during the period in question. Kathleen Brown, Henry Cisneros, Jeffrey Cunningham, Robert Donato, Michael Dougherty, Martin Malone, Robert Parry, Oscar Robertson, Keith Russell, and Harley Snyder were other members of the Board of Directors in late 2006.

Stanford Kurland is a former COO and President of Countrywide, and David Sambol currently holds those positions, as well as Chairman and CEO of CHL. Eric Sieracki is Countrywide's Executive Managing Director and CFO. Andrew Gissinger, III is Executive Managing Director of Residential Lending, and President and COO of CHL. Carlos Garcia is Executive Managing Director of Banking and Insurance.

**B.    Individual cases**

1.  *Jack McBride, et al., v. Countrywide Financial Corp., et al.*, No. CV-07-06083-MRP and *Barry Brahn v. Countrywide Financial Corp., et al.*, No. CV-07-07259-MRP ("*Brahn*")

1   Plaintiff McBride alleges that Countrywide, its directors and officers, and its underwriters

2   failed to craft a registration statement and prospectus for a Nov. 1, 2006 securities offering

3   (collectively "Prospectus") that fully informed investors of "all material facts and industry

4   trends" affecting Countrywide. Investors purchased Countrywide Capital V preferred stock

5   ("preferred stock") in reliance on the misstatements and omissions in the Prospectus, and

    ultimately lost money when the stock decreased in value in mid-2007.

6       McBride sues on behalf of the class of all purchasers of preferred stock from the

7   November 1, 2006 offering and purchasers traceable thereto. His action arises under § 11 and §

8   15 of the Securities Act of 1933 ("1933 Act"). 15 U.S.C. §§77k-l. Under these sections, where a

9   registration statement or prospectus contains a misstatement of material fact or omission of

10  material fact, any person acquiring the security may sue (1) every person who signed the

11  registration statement, (2) every director and (3) every underwriter of that security, including the

    issuer. *Id.* The heightened pleading requirements of the Private Securities Litigation Reform

12  Act ("PSLRA") do *not* apply to 1933 Act claims unless the complaint "sounds in fraud." *See*

13  *Anderson v. Clow (In re Stac Elecs. Sec. Litig.),* 89 F.3d 1399, 1405 n.3 (9th Cir. 1996); *In re*

14  *Portal Software,* No C-03-5138 VRW, 2006 U.S. Dist. LEXIS 61589, at *7 (N.D. Cal. Aug. 17,

15  2006).

16      The *Brahn* case is similar to McBride in that it asserts § 11 and § 15 of the 1933 Act

17  based on the Prospectus associated with the Nov. 1, 2006 offering of preferred securities. It also

18  asserts a violation of § 12(a)(2) of the 1933 Act, which creates liability for sellers of securities,

19  against Countrywide Capital V.

20

21      2.  *George Pappas v. Countrywide Financial Corp.*, et al., No. CV-07-05295-MRP

22          ("*Pappas*")

23      Plaintiff Pappas alleges that Countrywide and its directors issued false and misleading

    statements during the class period of in violation of § 10(b) and § 20(a) of the Securities and

24  Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5. The complaint references a series of

25  press releases and public statements that contain the alleged misrepresentations and omissions.

26  Pappas highlights the positive and optimistic statements contained in those press releases and

27  characterizes them as misleading in light of the position of the Company. Pappas contends that

28  the defendants should have disclosed some information about the risk of the impairment charge

    and loan loss provision that resulted in a surprise to investors on July 24, 2007.

1    Pappas pleads the reliance requirement of the relevant sections by alleging "fraud on the

2    market" and alleges that the alleged misrepresentations and omissions resulted in purchasers of

3    Countrywide public securities paying artificially inflated prices during the class period of Oct.

     24, 2006 to Aug. 9, 2007.

4

5        3.  *Norfolk County Retirement System, et al.*, v. *Countrywide Financial Corp., et al.*,

6            No. CV-07-05727-MRP ("*Norfolk*") and *Saratoga Advantage Trust, et al., v.*

7            *Countrywide Financial Corp., et al*, No. CV-07-06635-MRP ("*Saratoga*")

8    Plaintiffs in these cases allege that during the class period Countrywide falsely

9    represented that it had strict and selective underwriting and loan origination processes, and ample

10   liquidity that would insulate the company in a market downturn. According to Plaintiffs,

11   Countrywide and its executives repeatedly assured investors and the public that its disciplined

12   and conservative strategy set it apart from other "irrational" mortgages lenders. These

13   assurances came in the form of press releases, conference calls with investors where executives

14   answered questions, SEC filings such as quarterly and annual reports, and presentations to

15   investors. Plaintiffs allege that in fact Countrywide engaged in practices that limited the ability

     of the Company to weather any deterioration of the housing and mortgage markets.

16       As with *Pappas*, the Plaintiffs seek relief under the 1934 Act and SEC Rule 10b-5, and

17   rely on the "fraud on the market" doctrine to show that purchasers of common stock in the period

18   of April 24, 2004 to August 9, 2007 relied on the alleged misrepresentations by paying the

19   inflated prices that resulted from them.

20

21       4.  *Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide, et al.*, No. CV-

22           07-07097-MRP ("*Argent*")

23   Plaintiff Argent Classic Convertible Arbitrage Fund L.P. ("Argent") sues on behalf of

24   itself and the class of qualified institutional buyers who purchased Countrywide Series A and

25   Series B Floating Rate Convertible Senior Debentures due 2037 ("debentures") in a private

26   placement pursuant to SEC Rule 144A during a class period of May 17, 2007 to August 9, 2007.

27   Plaintiff alleges that Defendants made false and misleading statements in press releases, SEC

28   filings, and other public statements that concealed the Company's financial condition. These

     misrepresentations inflated the price of Countrywide common stock, which in turn inflated the

     price of debentures because they are convertible to common stock. As in *Pappas, Norfolk,* and

                                            -7-

*Saratoga,* the *Argent* action alleges violations of § 10(b) and § 20(a) the 1934 Act, and SEC Rule 10b-5. The complaint also alleges violations of several sections of the California Corporations Code.

### III.

#### CONSOLIDATION

**A. Legal Standard**

Under the PSLRA, the court must decide whether to consolidate claims before it appoints a lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(ii). Federal Rule of Civil Procedure 42(a) ("Rule 42") grants the district court broad discretion to consolidate cases involving common issues of law or fact in the interests of judicial economy and convenience. *Huane v. United States*, 743 F.2d 703, 704 (9th Cir. 1984). The court must weigh the saving of time and effort consolidation would produce against any inconvenience, delay, or expense it would cause. *Id.*

Although district courts generally take a favorable view towards consolidation, the mere existence of a common issue should not lead to the conclusion that the district judge must order consolidation – to the contrary, a district judge "always has discretion to deny consolidation." 9 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2383.

In considering whether to consolidate securities class actions, courts have considered whether the actions involved the same "core of defendants," the same law under the various Securities Acts (and Rule 10b-5), and the same factual events. *See, e.g., Garber v. Juniper Networks, Inc.*, No. 06-04327 JW, 2006 U.S. Dist. LEXIS 86721 (N.D. Cal. Nov. 20, 2006); *Averdick v. Hutchinson Tech., Inc.*, No. 05-2095 MJD/SRN, 2006 U.S. Dist. LEXIS 47445 (D. Minn. Feb. 9, 2006); *Meeuwenberg v. Best Buy Co.*, No. 03-6193 ADM/AJB, 2004 U.S. Dist. LEXIS 7686 (D. Minn. Apr. 29, 2004).

Also instructive is *Aronson v. McKesson HBOC, Inc.*, in which a series of 54 securities fraud class actions were brought in the Northern District of California. 79 F. Supp. 2d 1146 (N.D. Cal. 1999). In that case, the court consolidated several cases even though some arose from 10b-5 and others from the Securities Act of 1933, and the cases involved overlapping, but different, sets of defendants and securities. *Id.* The court appointed a single lead plaintiff for all the class actions despite the differences in the cases. *Id.*

Other cases have held that a single lead plaintiff can represent a class of plaintiffs even if that party does not have standing to sue under all claims so long as one named plaintiff does have

standing. *See, e.g., Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 669-70 (C.D. Cal. 2005); *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 458 F. Supp. 2d 455, 462 (E.D. Mich. 2006).

Finally, in *In re Enron Corp. Securities Litigation*, 206 F.R.D. 427, 438 (S.D. Tex. 2002), the district court consolidated a preferred stock claim with a common stock claim, noting that objections to consolidation because of distinct issues surrounding preferred stock can effectively be handled by dividing the class during class certification. *Id.*

## B. Arguments

Plaintiff New York Funds[1] seeks to consolidate all claims primarily because the actions involve numerous common questions of law and fact, and because splintering the litigation could interfere with the ability of a lead plaintiff to run the litigation smoothly. Plaintiff Brahn supports consolidation of the preferred stock claims with the other public securities claims, and supports appointment of New York Funds as lead plaintiff for the consolidated class.

Plaintiff McBride opposes grouping the preferred stock claims with common stock or private placement securities because they are subject to a different pleading standard. In addition, New York Funds has not suggested that it holds any preferred stock, which raises questions about its ability to represent the preferred stock purchasers fairly.

Plaintiff Argent Classic Convertible Fund L.P. ("Argent") opposes grouping the claims involving private debentures with claims involving publicly traded securities primarily because the debentures were offered *only* to "qualified institutional buyers," which by definition cannot include pension funds such as those comprising the New York Funds conglomerate. The private debentures, according to Argent, raise factual and legal distinctions not at issue in any of the other cases and demands separate treatment from those cases.

## C. Analysis

Resolving the question of consolidation requires a close examination at the similarities and differences in the cases before the court, and grouping cases together only when satisfied that the requirements of Rule 42 are met. Some of the cases are so similar that they can be consolidated without further discussion. The *Brahn* case and *McBride* case involve identical

---

[1] "New York Funds" refers to Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems, and as Trustee of the New York State Common Retirement Fund, and of the New York City Pension Funds.

securities (preferred stock) and an identical class (purchasers who can trace their purchase to the Nov. 1, 2006 offering), and both allege violations of nearly identical sections of law (§ 11, § 12(a) and § 15 of the 1933 Act) based on the same statements (the Prospectus). Thus, they are ordered grouped together. Likewise, *Norfolk* and *Saratoga* both allege violations of § 10(b), § 20(a) and SEC Rule 10b-5 and contemplate a class of public stock purchasers dating back to April 24, 2004. Indeed, the complaints in the two cases are identical in parts of their allegations. Therefore, they too are ordered to be grouped together.

### 1. *Pappas* and *Norfolk/Saratoga*

The Court next determines whether to group the *Pappas* claims with *Norfolk/Saratoga*. These three, the broadest complaints, allege violations of the same sections of law, and cite essentially the same public statements made by Countrywide in the period of October 2006 to November 2007 as being materially misleading. The difference is the starting date of the class period (April 2004 in *Norfolk/Saratoga* compared to October 2006 in *Pappas*), and the precise definition of the class (common stock purchasers in *Norfolk* compared to public securities purchasers in Pappas). At least in the period of October 2006 to the end of the class period in August 2007, the Court expects very similar theories and evidence to be presented. The overlap is sufficient to support consolidation to effectuate case management and discovery, and no party opposes this conclusion for these cases. Accordingly, the *Pappas*, *Norfolk*, and *Saratoga* claims are ordered consolidated.

### 2. *McBride/Brahn* and *Pappas/Norfolk/Saratoga*

The parties vigorously contest whether the preferred stock claims from *McBride/Brahn* should be grouped with the common stock claims from the other cases. The Court acknowledges that there are several important differences between the cases. For example, the preferred stock claims in *McBride/Brahn* do not face the heightened pleading requirements of the PSLRA unless they "sound in fraud" and do not require proof of scienter. Moreover, the claims involve a narrower class because they deal solely with purchasers from a particular public offering, and include several underwriters that are not involved in any other case.

However, the similarities between the claims compel the Court to consolidate them, at least at this stage. *See In re Enron Corp. Sec. Litig.*, 206 F.R.D. at 451 (explaining that "consolidation, at least pretrial, serves to promote an orderly progression of this very complex

1   litigation, especially since discovery necessarily involves overlapping Defendants and a common

2   core of facts and legal issues"). From a factual perspective, the claims concern overlapping

3   public statements: the Prospectus is one document that the 1934 Act claimants could very well

4   include in their case. Indeed, the *Pappas* complaint is brought "on behalf of all persons who

5   purchased Countrywide Financial *publicly traded securities* on the open market during the Class

6   Period," a definition which includes both preferred and common stock.[2] Thus, *Pappas* arguably

7   contemplates the Prospectus as one public statement that violates the 1934 Act with respect to

8   preferred stock. Moreover, the class periods in all the public securities cases overlap

9   significantly: their end date of Aug. 9, 2007 is identical, and their start date varies from late 2006

10  to early 2004.

11          The different pleading standards and evidentiary burdens in a 1933 Act claim are not so

12  difficult to manage that multiple lead plaintiffs of distinct classes are necessary at this stage.

13  "Speculations about possible conflicts do not rebut the statutory presumption that one lead

14  plaintiff can vigorously pursue all available causes of action against all possible defendants

15  under all available legal theories." *Aronson v. McKesson HBOC, Inc.,* 79 F. Supp. 2d 1146, 1151

16  (N.D. Cal. 1999). The Court is not persuaded by the speculative arguments made by McBride

17  that combining fraud claims with 1933 Act claims will delay and prejudice the claimants.[3] A

18  single lead plaintiff, with adequate counsel, could very easily manage both types of claims,

19  particularly given the overlap in facts, defendants, and time periods at issue, and because the

20  requirements for each cause of action are well-established.

21          At this time, the Court is satisfied that economy and efficiency would be promoted by

22  having a single lead plaintiff bring all claims involving publicly traded securities, whether they

23  arise under the 1933 Act or 1934 Act, and whether they concern common or preferred stock. For

24  these reasons, the Court consolidates claims involving purchases of public securities under a

25  single lead plaintiff.

---

[2] New York Funds mentions that it intends to amend its complaint to include all securities, public and private. It may further bring claims under § 11 for other securities that it holds. The Court, however, will only decide the issues of consolidation and lead plaintiff with the motions and complaints it has before it at this time.

3. *Argent and the other cases*

The Court has good reason to consolidate *Argent* and to treat it separately with a separate lead plaintiff. As has been well briefed by New York Funds, Plaintiff Argent offers two seemingly inconsistent perspectives on the litigation. On the one hand, Argent's SUPPLEMENTAL STATEMENT REGARDING LEAD PLAINTIFF MOTIONS asserts that the fact that private debentures are involved <u>requires</u> that the case be kept separate because there are <u>no common questions of law or fact</u>. Argent states that the debentures are "fundamentally different" types of securities with "different characteristics", which makes it clear "none of the plaintiffs or movants can adequately represent the *unique* interests of the Debenture class." ARGENT'S SUPPLEMENTAL STATEMENT REGARDING LEAD PLAINTIFF MOTIONS, at 6-8 (emphasis added).

On the other hand, Argent's complaint alleges "fraud on the market" under § 10(b), § 20(a), and Rule 10b-5 and discusses extensively the effect of the misrepresentations on the price of the common stock. *See* Argent's CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND CALIFORNIA STATE LAW ("Argent Complaint"). Factually and legally this is nearly identical to *Pappas*, *Norfolk*, and *Saratoga*, at least during the short *Argent* class period of May 24, 2007 to August 9, 2007. The only additional wrinkle is the contention that the price of the debentures is tied to the common stock due to the convertible nature of the private debentures. In this regard, the Court observes that the *Argent* complaint raises several common questions of *both* law and fact with the other 1934 Act cases, meeting the Rule 42 threshold for consolidation.

Nonetheless, the Court exercises its discretion to separate the *Argent* case under a distinct lead plaintiff because, as has become evident in the briefs and at oral argument, there are important and complex legal and factual issues which are unique to the private placement scenario, and there is reason to believe these issues could be lost in the fray of the public securities litigation. Plaintiff Argent makes an unusual legal argument that "fraud on the market" is available to prove reliance in a SEC Rule 144A private placement case, and in the alternative, that a private placement memorandum issued to qualified institutional investors can support common law reliance. Whether these arguments have merit depends on facts and law not involved in any other case, and concerns only qualified institutional investors who traded in a private market. Class certification for the *Argent* class may hinge on these issues in the private placement case, whereas in the public securities fraud cases, "fraud on the market" is largely straightforward if the securities trade on national exchanges. Moreover, of less importance in the

-12-

1    *Argent* case are the voluminous facts and legal analysis relevant to the class period of 1-3 years

2    asserted by the other cases because the class start date of May 24, 2007 is so very recent.

3        Thus, although there is some overlap in facts and law with the public securities claims,

4    the Court anticipates at the outset that the focus of the private placement claims will be different

5    from the public securities claims, and the difference is sufficient to merit separation for case

6    management purposes. The Court is convinced that in the *Argent* case a lead plaintiff should be

7    appointed who is a qualified institutional investor so that this focus is not lost by a lead plaintiff

8    coordinating claims involving both public and private securities and markets. The coordination

9    of discovery can be managed by later orders of the Court.

10        4.  Conclusion

11        For the foregoing reasons, the Court consolidates the *McBride, Brahn, Pappas, Norfolk,*

12    and *Saratoga* cases ("Public securities cases"), but orders that the *Argent* case remain separate.

13                                    **IV.**

14                    **APPOINTMENT OF LEAD PLAINTIFF**

15    **A.    Legal Standard**

16        The PSLRA provides a three-step process for identifying the lead plaintiff in securities

17    cases. *See In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002). The first step requires that the

18    plaintiff who files the initial action must publish, "in a widely circulated national business-

19    oriented publication or wire service," notice of the pendency of the action and a statement that

20    "any member of the purported class may move the court to serve as lead plaintiff." 15 U.S.C. §

21    78u-4(a)(3)(A). Movants have 60 days from when notice is published to provide their motions to

22    the court. 15 U.S.C. § 78u-4(a)(3)(A)(II).

23        Once notice is established, the district court must select the "presumptively most

24    adequate plaintiff" by identifying the movant that has shown "the largest financial interest in the

25    relief sought by the class" and that it satisfies the adequacy and typicality requirements of Rule

26    23(a) of the Federal Rules of Civil Procedure ("Rule 23"). *In re Cavanaugh*, 306 F.3d at 729-30.

27        In the third step, other plaintiffs have the opportunity to rebut the presumptive lead

28    plaintiff's showing of typicality and adequacy. *Id.* at 730. The Court must examine potential

    lead plaintiffs one at a time, starting with the one with the greatest financial interest, and

                                    -13-

1    continuing in descending order "if and only if the presumptive lead plaintiff is found inadequate

2    or atypical [under Rule 23 standards]." *Id.* at 732.

3        1.  Largest Financial Interest

4        Courts typically look to four factors as being determinative of the "largest financial

5    interest": (1) the numbers of shares of the subject securities purchased; (2) the number of net

6    shares purchased; (3) the total net funds expended by the plaintiffs during the class period; and

7    (4) the approximate losses suffered by the plaintiffs. *Lax v. First Merch. Acceptance Corp.*, No.

8    97 C 2715, 1997 U.S. Dist. LEXIS 11866, at *5 (N.D. Ill. Aug 11, 1997); *In re Cendant*, 264

9    F.3d 201, 262 (3d. Cir. 2001) (citing with approval the Lax court and others that utilized these

10    factors). While these factors are widely recognized by the courts, the Ninth Circuit does not

11    require them; it demands only that district courts select "accounting methods that are both

12    rational and consistently applied." *In re Cavanaugh*, 306 F.3d at 730 n.4.

13        2.  LIFO vs. FIFO

14        The two most common accounting techniques in calculating losses suffered by plaintiffs

15    are FIFO and LIFO.  FIFO stands for "first-in, first-out"; LIFO stands for "last-in, first-out." *See*

16    *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 100 (S.D.N.Y. 2005). They represent different

17    methods for matching specific sales of stock with specific purchases. *See generally Johnson v.*

18    *Dana Corp.*, 236 F.R.D. 349, 352 (N.D. Ohio 2006) (explaining the FIFO and LIFO concepts in

19    the approximate losses context). The choice of which accounting methodology applies is a

20    question of law. *Arenson v. Broadcom Corp.* No. CV-02-301-GLT, 2004 U.S. Dist. LEXIS

21    27522 (C.D. Cal. Dec. 6, 2004) (citing *Crow Tribe v. Racicot*, 87 F.3d 1039, 1045 (9th

22    Cir.1996)).

23        While the New York Funds characterize FIFO as the "predominant" method of matching

24    purchases and sales, it appears that district courts have "generally rejected FIFO as an

25    appropriate means of calculating losses in securities fraud cases." *eSpeed*, 232 F.R.D. at 101

26    (citing *In re Cable & Wireless, PLC Sec. Litig.*, 217 F.R.D. 372, 378-79 (E.D. Va. 2003))

27    (emphasis added). *See also Arenson*, 2004 U.S. Dist. LEXIS, at *5-7. FIFO is disfavored

28    because it "encompasses purchases made outside the class period," *Weisz v. Calpine Corp.*, No.

     C 02-1200 SBA, 2002 U.S. Dist. LEXIS 27831, at *26 (N.D. Cal. Aug. 19, 2002), and thus in

1    some cases "will identify damages where in reality there is none." *In re Clearly Canadian Sec.*

2    *Litig.*, No. C-93-1037-VRW, 1999 U.S. Dist. LEXIS 14273, at *13 (N.D.Cal. Sep. 3, 1999).

3          3.  Rule 23 Requirements

4          As noted above, a movant must also satisfy the requirements of Rule 23 in order to

5    invoke the presumption of being the "most adequate" plaintiff.  In particular, the potential lead

6    plaintiff must make a prima facie showing of the "typicality" and "adequacy" requirements of

7    Rule 23 class certification. *In re Cavanaugh*, 306 F.3d at 730.  "Numerosity" and

8    "commonality" need not be shown because they are class requirements more properly directed

9    towards the class as a whole. *Id.* at 730 n.5 (noting that the absence of this factor "would

10   preclude certifying a class action at all"). The district court has latitude as to what information it

11   will consider in determining typicality and adequacy. *Id.* at 732.  In making these

12   determinations, the Court reviews the plaintiffs' pleadings and declarations, *id.* at 730, and

13   applies established Rule 23 principles. *In re Cendant*, 264 F.3d at 264-265.

14          a.  Typicality

15          The court assesses typicality by determining whether "the circumstances of the movant ...

16   are markedly different or the legal theory upon which the claims [of that movant] are based differ

17   from the theories of the claims of the other class members." *In re Cendant*, 264 F.3d at 265

18   (internal quotations omitted). *See also* (a)(3)(B)(iii)(II)(bb) (allowing statutory presumption to

19   be rebutted where the presumptively most adequate plaintiff is "subject to unique defenses that

20   render such plaintiff incapable of adequarely representing the class").

21          b.  Adequacy

22          In determining adequacy, the court must consider whether the movant has the ability and

23   incentive to represent the claims of the class vigorously, whether it has obtained adequate

24   counsel, and whether there is a conflict between the movant's claims and those asserted on

25   behalf of the class. *In re Cendant*, 264 F.3d at 265.

26

27   **B.    Arguments**

28          Remaining before the Court are several motions for appointment as lead plaintiff.

Plaintiff New York Funds seeks to be appointed as lead plaintiff of the consolidated case.

-15-

1   Saratoga Advantage Trust contends that it should be appointed as co-lead plaintiff with New

2   York Funds, though it concedes that New York Funds' losses "far exceed" their own in this

    matter.

3       Plaintiff McBride seeks appointment as lead plaintiff for claims involving preferred stock

4   purchasers, and Argent seeks appointment as lead plaintiff for claims involving purchasers of the

5   private debentures at issue in that case.

6

7       **C.    Analysis**

8           1.  Notice

9       The movants expend significant energy debating the time-bar effect of the various public

10  notices provided by plaintiffs and others in the several cases. The court declines to rule on these

    issues, except to find that the Aug. 14, 2007 notice published by Scott and Scott LLP in *Prime*

11  *Newswire* and the Sept. 20, 2007 notice published by Wolf Hadenstein Adler Freeman & Herz

12  LLP in *Business Wire* meet the requirements of the PSLRA in announcing the pendency of the

13  public securities cases. The notices were published in widely-distributed news services and

14  properly inform class members of their right to move for appointment as lead plaintiff.

15      Further, the notices that were filed do not explicitly or implicitly cover private placement

16  securities as are at issue in *Argent* and therefore do not bar Argent's later filed motion for

17  appointment as lead plaintiff. Argent's counsel provided notice of the pendency of the *Argent*

18  action pursuant to the PSLRA in *Business Wire* on Oct. 31, 2007. The notice adequately

19  informed debenture purchasers of their right to file motion for appointment as lead plaintiff.

20  Thus, the notice requirement of the PSLRA is met for Argent as well.

21

22          2.  The *Argent* Case

23      Because the time period for movants to file motions for appointment as lead plaintiff has

    not yet expired, the Court declines to appoint a lead plaintiff for the *Argent* case at this time.

24

25          3.  The Public Securities Cases

26      New York Funds, with a LIFO loss of over $40 million and a FIFO loss of over $100

27  million, clearly has the largest financial stake of any movant in the consolidated case under the

28  four factors used by the Third Circuit, and likely under any other rational accounting method.

-16-

1    New York Funds also has made a prima facie showing of typicality and adequacy.

2    Typical of plaintiffs in all the cases, New York Funds purchased public securities in

3    Countrywide at prices it alleges were inflated by false and misleading statements by defendants,
     and damages were incurred by alleged violations of federal securities laws.

4    The party meets the adequacy requirement as well. As a group of large institutional

5    investors who have conducted numerous large securities actions, New York Funds has

6    considerable experience in such cases, and has retained competent counsel also with the

7    necessary experience. The Court accepts the party's statement that it intends to vigorously

8    protect the interests of all plaintiffs. Accordingly, New York Funds is the presumptive lead

9    plaintiff of the consolidated case.

10   As discussed in Section III, McBride challenges the typicality and adequacy of New York

11   Funds as a lead plaintiff of the preferred stock claims because New York Funds does not purport

12   to hold preferred stock. Here, the preferred stock claims under the 1933 Act are sufficiently

13   similar to the allegations in other cases to convince the Court that New York Funds allegations

14   *are* typical of the cases. The typicality requirement is satisfied when the plaintiff's claim arises

15   from the same event or course of conduct that gives rise to the claims of other members and is

16   based on the same legal theory, *In re Enron Corp., Securities Litigation*, 206 F.R.D. at 445

17   (internal citations omitted), and the striking similarity in allegations is evident here despite the

18   different causes of action and securities involved. *See, e.g.*, DECLARATION OF RUSSEL N.

19   JACOBSON IN SUPPORT OF NEW YORK FUNDS' REPLY MEMORANDUM OF POINTS AND

20   AUTHORITIES, Ex. H (chart comparing the similarity of the *Norfolk* and *McBride* complaints,
     including the use of identical language to describe how Countrywide misled investors).

21   Moreover, McBride's argument that the common stockholders "*cannot* be adequate

22   plaintiffs because they have no financial interest in the relief sought by the class" is without

23   merit. That New York Funds has not purchased preferred stock does not bar consolidation nor

24   does it bar their appointment as lead plaintiff for all claims involving public securities. *See*

25   *Tanne v. Autobytel*, 226 F.R.D. 659, 669 (C.D. Cal. 2005). It is inevitable that, in some cases,

26   the lead plaintiff will not have standing to sue on every claim. *Id.* The Court is persuaded that a

27   single, large, institutional investor in public Countrywide securities can quite fairly handle claims
     under the different causes of action that may be asserted by the various plaintiffs such as

28   McBride and Brahn.

-17-

1    Saratoga Advantage Trust has submitted a brief arguing that it should be appointed co-

2    lead plaintiff with New York Funds because the New York Funds is a "single aggregation of

3    politically influenced parties" and Saratoga would serve as a balance in the leadership and a

4    "check" of the litigation process.  Under the case law, there is no question that the Court has the

5    authority to appoint co-lead plaintiffs where such appointment "will enhance, rather than reduce,

6    the efficiency of the litigation."  *In re. Amer. Bus. Fin. Serv. Cit.*, No. 04-0265, 2004 U.S. Dist.

7    LEXIS 10200 (E.D. Pa Jun. 3, 2004).  In the situation here, there is also no question that New

8    York Funds is a grouping of <u>public</u> pension funds.  However, Saratoga Advantage Trust is

9    merely speculating and has not shown that these vague "political" considerations will have any

10   impact whatsoever on New York Funds ability to represent the Plaintiffs as lead on its own.  In

11   fact, New York Funds has done so in prior cases with considerable success.  Absent a more fact-

12   based or specific attack on New York Funds ability to represent the class as a sole lead plaintiff,

     the motion to appoint Saratoga Advantage Trust as co-lead plaintiff is denied.

13

14                                             **V.**

15                            **APPOINTMENT OF LEAD COUNSEL**

16        Once chosen, the lead plaintiff is responsible for choosing the lead counsel in the case.

17   *See* 15 U.S.C. §78u-4(a)(3)(B)(v) ("The most adequate plaintiff shall, subject to the approval of

18   the court, select and retain counsel to represent the class.").  The lead plaintiff's discretion is not

19   absolute, because the court retains the power and the duty to supervise this process.  *In re*

20   *Cendant,* 264 F.3d at 273.  However, the court's role is confined to deciding whether to approve

     the choice of the lead plaintiff.  *Id.*

21        Here, the Court approves New York Funds' choice of Labaton Sucharow LLP as counsel.

22   The firm has extensive experience in large securities fraud cases and in particular, in managing

23   class actions involving public securities purchasers.  At this time, the Court is confident that

     counsel will be able to properly represent the plaintiffs in the consolidated case.

24

25                                            **VI.**

26                                      **CONCLUSION**

27        In accordance with this Order, New York Funds and its counsel of Labaton Sucharow

28   LLP is appointed lead plaintiff and lead counsel, respectively, for a consolidated case comprising

                                             -18-

1   the claims in *Pappas*, *Norfolk*, *Saratoga*, *McBride*, and *Brahn*. All subsequent filings in any of

2   these five cases should reflect the case number CV-07-05295-MRP.

3

4            IT IS SO ORDERED.

5   DATED: November 28, 2007

6                                          _____

7                                          Hon. Mariana R. Pfaelzer

8                                          United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-19-