UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MORTON LIPETZ and EVELYN JEAN LIPETZ, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> WACHOVIA CORPORATION, G. KENNEDY THOMPSON, THOMAS J. WURTZ, DONALD K. TRUSLOW, WACHOVIA CAPITAL MARKETS, LLC (d/b/a/ WACHOVIA SECURITIES), CITIGROUP GLOBAL MARKETS, INC., UBS SECURITIES LLC, UTENDAHL CAPITAL GROUP LLC, GOLDMAN SACHS & CO., CREDIT SUISSE SECURITIES (USA) LLC, AND SAMUEL A. RAMIREZ & COMPANY, INC., <br><br> Defendants. | Civil Action No. 08-6171 (RJS) <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

Page No.

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Lead Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
          1.    Wachovia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
          2.    Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    C.    Underwriter Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONFIDENTIAL WITNESSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.      FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.    Wachovia's Acquisition of Golden West . . . . . . . . . . . . . . . . . . . . . . . . . 19
    B.    Subprime Lending . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    C.    The Bubble Bursts in Early 2006 and Housing Prices Fall . . . . . . . . . . . . . 23

II.     DEFENDANTS' INTENTIONAL WEAKENING OF GOLDEN WEST'S
       ALREADY FLAWED UNDERWRITING STANDARDS AND OTHER
       CONDUCT INCREASING THE PICK-A-PAY LOANS' RISK OF DEFAULT . . . . . 30

    A.    Wachovia Abandons Customary Lending and Business Practices
         in Favor of Much Riskier Loan Products . . . . . . . . . . . . . . . . . . . . . . . . . 30
    B.    Defendants Were Aware of Fundamental Risks Embedded in the
         Pick-A-Pay Mortgage Product, But Publicly Misrepresented, Denied
         and Concealed Those Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    C.    Wachovia's Risky, Nontraditional Loan Products . . . . . . . . . . . . . . . . . . . . 36
    D.    Wachovia's Practices Exacerbated the Risks Inherent in Its
         Nontraditional Loan Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    E.    Wachovia Aggressively Pushed Risky Loans on Borrowers
         for Defendants' Gain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    F.    Appraisals Relating to Wachovia's Loans Were Improperly Inflated . . . . . . . 45
    G.    Wachovia's Underwriting Standards Were Weakened Under Defendants'
         Direction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
          1.    Underwriting Standards for Wachovia Pick-A-Pay Loans
              Were Deficient . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
          2.    Wachovia Implemented Dangerously Permissive Underwriting
              Practices for Its Subprime Lending . . . . . . . . . . . . . . . . . . . . . . 48
    H.    Wachovia's Wholesale Channel Was Infested With Deficiently
         Underwritten Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

      I.      Defendants Concealed Wachovia's Billions of Dollars of Exposure
to Subprime CDOs, and Overstated the Value of Those CDOs  . . . . . . . . . . . . 53

III.     DEFENDANTS' MATERIALLY MISLEADING STATEMENTS  . . . . . . . . . . . . . . . 54

      A.     May 8, 2006 Conference Call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
      B.     May 12, 2006 Conference Call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
      C.     May 16, 2006 Conference Call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
      D.     December 28, 2006 *American Banker* Article . . . . . . . . . . . . . . . . . . . . . . . . 58
      E.     January 23, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
      F.     Wachovia's 2006 Form 10-K . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
      G.    April 16, 2007 Conference Call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
      H.    Wachovia's First Quarter 2007 Form-Q  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
      I.     July 20, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
      J.     Wachovia's Second Quarter 2007 Form 10-Q . . . . . . . . . . . . . . . . . . . . . . . . 71
      K.    October 19, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
      L.     Wachovia's Third Quarter 2007 Form 10-Q  . . . . . . . . . . . . . . . . . . . . . . . . . 73
      M.    November 9, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
      N.    November 14, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
      O.    January 22, 2008 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
      P.     January 30, 2008 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
      Q.    February 13, 2008 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
      R.     Wachovia's 2007 Form 10-K . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
      S.     March 12, 2008 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
      T.     April 14, 2008 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
      U.    July 22, 2008 and September 9, 2008 Conference Calls  . . . . . . . . . . . . . . . . 100

IV.    WACHOVIA'S COLLATERALIZED DEBT OBLIGATIONS  . . . . . . . . . . . . . . . . . 101

      A.     What CDOs Are  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
      B.     That CDO Tranches Suffered Severe Impairment Beginning in
February 2007 Was Evident: That Wachovia Held Any Such
Instruments Was Concealed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111
      C.     Wachovia's CDO Exposures, and Wachovia's False and Misleading
Statements Concerning Those Exposures  . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

V.     DEFENDANTS' VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING
PRINCIPLES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

      A.     Overview of the GAAP Violations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133
      B.     Omission of Required Disclosures regarding Significant Concentrations
of Credit Risk, Current Vulnerability due to Certain Concentrations
and Certain Significant Estimates  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

C. Overstatement of the Loan Portfolio, and related Understatement of the Provision and Allowance for Credit Losses ...................... 144
D. Overstatement of the Value of Certain Investments ..................... 150
E. Failure to Consolidate and Properly Disclose Certain Off-Balance Sheet Entities ........................................... 153
F. Lack of Timely Impairment of Goodwill ............................... 158
G. Ineffective Disclosure Controls and Procedures and Internal Control over Financial Reporting .......................................... 161

VI. ADDITIONAL SCIENTER ALLEGATIONS CONFIRMING THE INDIVIDUAL DEFENDANTS' SCIENTER ................................ 163

A. Defendants Received Reports Detailing Significant and Widespread Problems with Wachovia's Lending .................................. 163
B. Defendants Knew of or Recklessly Disregarded Wachovia's Lax Underwriting Guidelines .............................................. 165
C. Insider Stock Sales By Thompson and Other Officer Defendants During the Class Period Were Highly Unusual and Suspicious ................... 167
D. Defendants Used Wachovia's Inflated Stock As Currency For Acquisitions During The Class Period ........................................... 169

VII. LOSS CAUSATION ...................................................... 169

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ........................................ 180

NO SAFE HARBOR ....................................................... 181

LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS ........................... 182

COUNT I
Violation of § 10(b) of the Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against All Defendants ........................... 184

COUNT II
Violation of § 20(a) of the Exchange Act Against the Individual Defendants ........................................ 187

CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT ..................... 188

A. Securities Act Defendants ......................................... 191
B. The June 2006 Offering Documents Contained Materially False or Misleading Statements ..................................... 191

C.   The June 2007 Offering Documents Contained Materially
     False or Misleading Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
D.   The April 2008 Offering Documents Contained Materially
     False or Misleading Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

COUNT III
     Violations of Section 11 of the Securities Act In Connection With The
     Offerings On Behalf of the Subclass Against the Securities Act Defendants . . . . . . . . 200

COUNT IV
     Violation of Section 15 of the Securities Act of 1933
     Against the Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

COUNT V
     Violations of Section 20A of the Exchange Act on Behalf of Lead Plaintiffs,
     Asserted Against Defendants Thompson, Truslow, and Wurtz . . . . . . . . . . . . . . . . . . 203

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

JURY TRIAL DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

iv

1.      Lead Plaintiff brings this securities class action on its behalf and on behalf of all other persons or entities who purchased or acquired the securities of Wachovia Corporation ("Wachovia" or "the Company") during the period May 8, 2006 through and including September 29, 2008, inclusive (the "Class Period"), for violations of Federal Securities Laws.

2.      Allegations concerning plaintiffs' own transactions are based on plaintiffs' personal knowledge.  All other allegations are based upon the investigation of Lead Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Wachovia, as well as regulatory filings and reports, securities analysts' reports, press releases and other public statements made or issued by Wachovia, media reports about the Company and interviews with numerous former employees of Wachovia.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein following a reasonable opportunity for discovery.

3.      This action alleges that Defendants misled investors by falsely representing that Wachovia had strict and selective underwriting and loan origination practices and a conservative lending approach that set it apart from other lenders.  Such reassurances were repeated by Defendants throughout the Class Period in order to artificially support Wachovia's  stock price in the midst of a weakening mortgage market.

4.      Wachovia is one of the nation's largest financial services providers, servicing retail, brokerage and corporate customers.  Over the past few years, Wachovia enjoyed strong growth that was reflected in its stock price, which peaked at $58.77 per share during the Class Period, giving Wachovia a market capitalization of $112 billion.

5.      In 2006, Wachovia acquired Golden West Financial Corp. ("Golden West"),[1] an Oakland, California-based mortgage lender, for more than $24 billion.   Golden West's main mortgage product, the Pick-A-Payment ("Pick-A-Pay") mortgage, allowed borrowers to choose from multiple payment options each month.   The options were: (1) full payment of interest and principal sufficient to pay down the loan in a traditional 30 year term; (2) a higher payment that would pay off the loan in 15 years; (3) an interest-only payment; or (4) a minimum payment that did  not cover all the necessary interest, with the unpaid interest added to the loan balance.

6.      The difference between the Pick-A-Pay payment options is one of amortization: under the first option, the loan amortizes at traditional thirty-year speed; under the second, it amortizes more quickly still.   Under the third option, the mortgage does not amortize at all: only the interest is paid, while the principal is not paid down but remains outstanding.   Under the fourth option, the mortgage experiences "negative amortization:" with each "minimum" payment made, the outstanding loan balance actually grows.   These payment options were of substantial consequence for the default risks posed by these mortgages and for the severity of Wachovia's loan loss upon borrower default, as detailed herein.

7.      Wachovia did not merely seek to integrate Golden West operations into its business. Instead, as noted by *Business Week*, and as confirmed by several former employees whom plaintiffs have interviewed, "right after Wachovia bought Golden West, executives from [Golden West] took control of all mortgage lending at Wachovia."   Wachovia's mortgage portfolio was dominated by Pick-A-Pay mortgages: by the end of 2007, Wachovia held $120 billion of Pick-A-Pay mortgages

---

[1] Golden West, the parent of World Savings Bank, FSB, had a retail branch presence primarily in the Western United States and mortgage lending operations in 39 states.

2

and $50 billion of "traditional mortgages" (Wachovia's own phrasing).  58% of the $120 billion Pick-A-Pay mortgage portfolio consisted of loans used to purchase properties in California; a further 10% were loans used to purchase properties in Florida.

8.      When Wachovia announced its purchase of Golden West in mid-2006, the housing bubble had already burst and housing prices, which had been appreciating materially for several years, had begun to decline.   The decline was experienced first, and most sharply, in California and Florida.  This decline was well underway by October 2006, when Wachovia's Golden West acquisition closed.  By late 2006, the nationwide mortgage crisis had begun with a growing number of defaults by borrowers with subprime mortgages.

9.      As a result of the foregoing, investors were understandably concerned with the potential exposure of any residential lender – especially nonprime lenders.

10.      In an attempt to reassure the investing public about the stability and profitability of this huge investment in Golden West and of Wachovia's large mortgage loan portfolio, Wachovia's then-Chief Executive Officer ("CEO") G.  Kennedy Thompson ("Ken Thompson" or "Thompson") and other Wachovia officers and representatives repeatedly issued reassuring but inaccurate statements about the safety and stability of Golden West's portfolio and of the Pick-A-Pay loans.

11.      Throughout the Class Period, Defendants touted Golden West's "conservative underwriting standards" and the "superior credit quality of its mortgage portfolio."  Wachovia claimed to have implemented policies that "mak[e] certain that the borrower can pay the contractual interest rate of the loan" and made specific representations about the income levels of the Pick-A-Pay borrowers.  As subprime loan defaults accelerated in early 2007, Defendants claimed that Wachovia "actively managed [its] business to minimize its exposure to the subprime loan market" to the point

3

where Wachovia did not "anticipate any meaningful potential impact to earnings with the subprime going forward."

12.     In fact, Golden West's Pick-A-Pay loan product, which following Wachovia's Golden West acquisition became Wachovia's company-wide mortgage product of choice, was extremely risky and particularly susceptible to default and loss in a declining real property environment.

13.     A borrower's ability to pay a mortgage is, obviously, the most important factor as to the risk that the mortgage will default.  Borrowers "qualify" for mortgages based on their ability to pay those mortgages, primarily measured by the amount of the borrower's income that the mortgage payments will consume (the "debt to income" ratio).   At high debt-to-income ratios, the payment burden becomes intolerable and the mortgage is highly likely to default.

14.     Far from employing conservative underwriting standards that minimized the Company's exposure to mortgage defaults, Wachovia made very little effort to ascertain, let alone verify borrower income and thus borrower ability to uphold the mortgage payment burden.  Former employees have confirmed that approximately 90% of the Pick-A-Pay loans were offered to borrowers on a "stated income" basis, under which borrower income was merely "stated" by the borrower rather than objectively documented or verified by the lender.

15.     Stated income loans are commonly known in the industry as "liar loans" due to the ease with which borrower income levels can be fabricated and overstated.  A study by the Mortgage Asset Research Institute in Reston, Virginia found that 90% of stated income loans – when checked against tax documents – revealed overstatement of income by at least 5%, and nearly 60% of the stated amounts were exaggerated by more than 50%.

16.     Stated income lending is one of the primary hallmarks of the loans now known as "subprime." Wachovia, therefore, was holding mortgages originated under subprime methods and was exposed to the heightened risks those methods presented, while simultaneously – and falsely – claiming that Wachovia would be untouched by subprime.

17.     Wachovia turned a knowing blind eye to the risks posed by "stated income." Income "stated" by the borrower is still susceptible, however, to being checked by the lender. Wachovia could have required borrowers to sign Internal Revenue Service ("IRS") 4506T forms[2] that would enable Wachovia to check the borrowers' tax returns – one quick and easy way to determine the accuracy of the "stated" income (and, indeed, the method behind the above-mentioned Mortgage Asset Research study). Stunningly, it was Wachovia's practice *not* to require signature of this form and Wachovia routinely failed to verify 4506T data with the IRS.

18.     According to former Wachovia employees, Wachovia did not merely turn a blind eye to borrowers who fraudulently overstated their income or assets. Rather, Wachovia loan officers were instructed by their supervisors to actively and knowingly encourage such fraud if a higher stated income level was needed in order to qualify a borrower for a particular loan program. Following the end the of the Class Period, on November 19, 2008, federal prosecutors and the SEC announced an investigation into fraudulent lending practices at Golden West. According to reports by *Bloomberg*, prosecutors are examining, *inter alia*, whether Golden West employees "falsif[ied] confidential information so [that borrowers] could qualify" for "more expensive loans."

---

[2] IRS Form 4506T is an authorization by a tax payer for the dissemination of tax information to third-parties.

19.     Golden West's and Wachovia's Pick-A-Pay mortgages, unmoored to any objective verification of borrowers' ability to bear their payment burdens, were thus at a materially increased risk of default.  Golden West and Wachovia deemed this undisclosed risk acceptable because the Pick-A-Pay mortgages were originated with relatively low Loan-to-Value ("LTV") ratios.  The LTV ratio compares the amount lent to purchase the property (*e.g.*, $70,000) to the value of the property (*e.g.*, $100,000 – which would yield an LTV of 70%).  LTV ratios are one of the primary factors in mortgages' risks of default and in the loss severity to lenders upon default:

(a)     As to the risk of default: a borrower with substantial equity invested in a property (*i.e.*, a low LTV) is less likely to default.  Conversely, a borrower with little or no equity (*i.e.*, an LTV approaching 100%) is more likely to default.  The default likelihood is further magnified when a borrower has *negative* equity in the property (*i.e.*, an LTV exceeding 100%).  In such situations, a borrower's economic motivation to continue making payments all but disappears.

(b)     As to the loss severity to the lender upon default, low-LTV mortgages protect lenders from loss upon default, while high-LTV mortgages leave lenders unprotected against loss.  Should a mortgage default, the lender can foreclose upon the property and seek to recoup the amount lent through foreclosure sale.  Foreclosure costs, however, are substantial.  Therefore, a lender that has originated a low LTV loan (*e.g.*, a $70,000 loan to purchase a $100,000 property) is more likely than a lender that originated a high LTV loan (*e.g.*, a $95,000 loan to purchase the same $100,000 property) to recoup, after foreclosure costs, the amount originally lent.  In short, high LTV loans expose lenders to sharper loss severity upon default.

20.     The low-LTV Pick-A-Pay mortgages, at increased risk of default due to the absence of any meaningful verification of borrower income, literally "bet the house" on their low-at-

6

origination LTV ratios.  The heightened (but undisclosed) default risks were ostensibly defused by the low LTVs, which purportedly functioned to minimize or eliminate any loss to the lender upon default.

21.    However, as property prices declined throughout the Class Period, LTV ratios rose materially.  Simultaneously, as most Pick-A-Pay borrowers chose to the "minimum amount" payment option, their loan balances were *growing* rather then shrinking with each payment – meaning, again, that LTV ratios were rising.  Pick-A-Pay LTV ratios were being 'squeezed' upward at both the "L" end (through increasing loan balances) and the "V" end (through decreasing property values) – and with them, both the risks of default and the loss severity upon default.  The Pick-A-Pay mortgages had lost their only bulwark against default and loss.  As detailed herein, Defendants publicly misrepresented, concealed and falsely denied this reality.

22.    In addition to misrepresenting the manner in which Pick-A-Pay loans were underwritten, and the risks of their default and loss, Defendants also misrepresented the extent of those defaults.  Specifically, Defendants represented at all times prior to late January 2008 that consumer real estate secured loans were charged off when they became 180 days past due.  This policy, even if adhered to, was problematic because its effect was to keep investors in the dark about inevitable but to-date unrecognized charge-offs for loans that were as much as five months delinquent.  However, Wachovia did not even follow the aforementioned policy.  As Defendants first admitted on January 22, 2008, at all times prior to the fourth quarter of 2007, Defendants did not recognize losses on their delinquent Pick-A-Pay loans until the time of an actual property sale, which is usually many months after default and even many months after the 180 day threshold.  This undisclosed policy kept many already-defaulted loans from being recorded on Wachovia's books as

7

being in default, causing an apparently sudden spike in recognized defaults in the fourth quarter of 2007, when Wachovia first began charging off Pick-A-Pay loans when they became 180 days past due, as it previously represented it was doing all along.

23.     Wachovia financial statements were further distorted not just by subprime mortgages, but also by subprime mortgage-backed securities, such as collateralized debt obligations ("CDOs"). During the Class Period, Wachovia masked the extent of its CDO exposures and losses by concealing those exposures and by failing to mark down the value of its CDO holdings.

24.     These undisclosed risks began to materialize publicly in late 2007 as Wachovia began to announce huge charge-offs for losses for its previously-concealed holdings of subprime CDOs, together with growing Pick-A-Pay loan losses and material increases in loan loss reserves.  As 2008 progressed, the market began to recognize that Golden West and the Pick-A-Pay loans were far riskier than Defendants had represented.  With these incremental, partial (and often still misleading) disclosures came successive material declines in Wachovia's stock price.  By June 2, 2008, CEO Thompson was forced to resign.  Most analysts and press reports cited the Golden West debacle and Wachovia's ensuing exposure to $120 billion of Pick-A-Pay mortgages as the chief cause.

25.     On June 4, 2008, *Business Week* published an article titled *Wachovia:  Golden West Wasn't Golden* which reported that losses at Golden West "led to [Thompson's] ouster." *Business Week* added that Golden West's "vaunted underwriting proved inadequate when housing prices began to plummet," because Golden West did not focus adequately on "verifying the income and assets of its [loan] applicants."  By July 2008, Wachovia Chairman and new CEO Lanty Smith admitted to investors that "there has been a complete recognition at the Board level that Golden West was a mistake and that we have to deal with the consequences of it."  Wachovia stock price, which

8

stood above $51 per share through mid-July 2007, fell to approximately $9 per share within days of Smith's admission.  By late September 2008, Wachovia's share price fell below $1 per share – a market capitalization loss of approximately $109.8 billion from early 2007 – when Wachovia announced a proposed sale of its banking assets to Citigroup which valued those assets – due to Pick-A-Pay losses – at only $1 per share.  Subsequent court filings by Wachovia CEO Robert Steel (in a litigation initiated by Citigroup after Wachovia sought to abandon the Citigroup transaction in favor of an acquisition by Wells Fargo) reveal just how precarious the situation at Wachovia had become.  In court papers, Steel said that the Company believed that unless a definitive merger agreement was signed within days, the Federal Deposit Insurance Company ("FDIC") was prepared to place Wachovia's banking subsidiaries into receivership.

26.    While Wachovia's share price has responded slightly since the Wells Fargo acquisition was announced (thereby calming shareholders' fears of insolvency), the current stock price of $5.29 per share as of the close of trading December 12, 2008, still represents a market capitalization loss exceeding $100 billion from early-2007 levels.  Wachovia's current market capitalization of $11.4 billion is, amazingly, one-tenth of what it had been in early 2007.  More shockingly, the entire corporation's market capitalization is now less than half of what Wachovia had paid in late 2006 to acquire Golden West.

## JURISDICTION AND VENUE

27.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a),and Rule 10b-5 promulgated thereunder by the SEC, 17C.F.R. § 240.10b-5; and Sections 11 and 15 of the Securities Act of 1933,15 U.S.C. §§ 77k and § 77o.

9

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

29.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as many of the false and misleading statements and omissions were made in or issued from this District.  Wachovia has a substantial presence in New York.  Many of the acts and transactions giving rise to the violations of law complained of occurred here.

30.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### A.     LEAD PLAINTIFF

31.     Lead Plaintiff, the New York City Board of Education Retirement System, the New York City Employees' Retirement System, the New York City Police Pension Fund, the New York City Police Officers' Variable Supplements Fund, the New York City Police Superior Officers' Variable Supplements Fund, the New York City Fire Department Pension Fund, the New York City Firefighters' Variable Supplements Fund, the New York City Fire Officers' Variable Supplements Fund, the New York City Teachers' Retirement System, and the New York City Teachers' Retirement System Variable Annuity Program (the "New York City Pension Funds" or "NYCPF"), are all public pension funds of the City of New York and related public employers, and their associated supplement funds.  The NYCPF collectively acquired the common stock of Wachovia during the Class Period, including in connection with Wachovia's April 14, 2008 secondary offering,

as well as in connection with Wachovia's acquisitions of Golden West and A.G. Edwards,[3] at artificially inflated prices during the Class Period, as set forth in documents filed previously with this Court, and have suffered significant losses.

32.     On October 9, 2008, this Court appointed the New York City Pension Funds as Lead Plaintiff.

### B.     DEFENDANTS

#### 1.     Wachovia

33.     Defendant Wachovia Corporation ("Wachovia") is a diversified financial services company, which operates as a bank holding company.   The North Carolina corporation is headquartered at One Wachovia Center, Charlotte, North Carolina, but has retail banking offices in 21 states, including New York, and retail brokerage operations under the Wachovia Securities name in 47 states.   The Company offers retail banking and brokerage, asset and wealth management, and corporate and investment banking products and services.

#### 2.     Individual Defendants

34.     Defendant Thompson served as Wachovia's CEO and President throughout the Class Period.   During the Class Period, Defendant Thompson signed the Company's Forms 10-K[4] and 10-Q[5] pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, was quoted in Company press releases and participated in conference calls with securities and market analysts.   Defendant

---

[3]  In June 2007, Wachovia acquired A.G. Edwards in exchange for approximately 72 million  shares of Wachovia common stock.

[4]  SEC Form 10-K contains, *inter alia*, a company's annual report.

[5] SEC Form 10-Q contains a company's quarterly report, which includes the company's financial statements and management's discussions of results and operations.

Thompson also signed the Registration Statements for the merger with Golden West and for the merger with A.G. Edwards.  Thompson also signed the Registration Statement for Wachovia's April 14, 2008 common stock offering.  Defendant Thompson is responsible for the materially false and misleading statements complained of herein.  As an executive officer of the Company, Defendant Thompson was responsible for the day-to-day operations of the Company.  On June 2, 2008, Wachovia's Board of Directors forced Thompson to retire from the Company.

35.    Defendant Thomas J. Wurtz ("Wurtz") served as Chief Financial Officer ("CFO") and Senior Executive Vice President throughout the Class Period.  During the Class Period, Defendant Wurtz signed the Company's SEC filings, including, but not limited to, Wachovia Forms 10-K, 10-Q and 8-K,[6] and participated in conference calls with securities and market analysts. Defendant Wurtz also certified Wachovia's Forms 10-K and 10-Q during the Class Period pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  Defendant Wurtz also signed the Registration Statements for the mergers with Golden West and A.G. Edwards, and the Registration Statement for Wachovia's April 2008 common stock offering.  Defendant Wurtz is responsible for the materially false and misleading statements complained of herein.  As a senior executive officer of the Company, Wurtz was responsible for day-to-day operations of the Company and his behavior is central to Wachovia's misconduct.

36.    Defendant Donald K. Truslow ("Truslow") served as Chief Risk Officer  ("CRO") throughout the Class Period. As CRO, Truslow reported to CEO Thompson, and was responsible for the oversight of Wachovia's operational, credit, interest rate, balance sheet and market risk.

---

[6] SEC Form 8-K contains material company events, news, developments and disclosures as they occur during interim periods between the company's quarterly and annual filings.

Defendant Truslow is responsible for many of the materially false and misleading statements complained of herein. On or about August 1, 2008, Truslow announced that he would resign from Wachovia once a replacement could be found.

37.     Because of the Individual Defendants' positions with the Company, they had access to adverse undisclosed information about the Company's business, operations, operational trends, financial statements and markets, via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

38.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of Wachovia, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or disregarded with deliberate recklessness, that the false and misleading statements were being issued regarding the Company and approved or ratified these statements in violation of the federal securities laws.

13

39.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management and earnings, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

40.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports, and other communications complained of herein and were aware of, or disregarded with deliberate recklessness, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Wachovia, each of the Individual Defendants had access to the adverse undisclosed information about Wachovia's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Wachovia and its business issued or adopted by the Company materially false and misleading.

41.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.

14

Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is, therefore, primarily liable for the representations contained therein.

42.   Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchases of Wachovia common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Wachovia's business, operations, management and the intrinsic value of Wachovia common stock; and (ii) caused Lead Plaintiff and other members of the Class to purchase Wachovia's common stock at artificially inflated prices.

### C.   Underwriter Defendants

43.   Wachovia Securities is an investment bank and a subsidiary of Wachovia Corporation.  Wachovia Securities acted as Joint Bookrunning Manager for the April 2008 Stock Offering.  Pursuant to the Offering Documents, Wachovia Capital Markets, LLC, which conducted business under the name "Wachovia Securities," sold and distributed 75,468,750 shares of Wachovia's common stock.  Wachovia Securities was paid at least $45,281,250 for its underwriting services in connection with the Offering.  Wachovia Securities' headquarters is located at 1 N. Jefferson, Bldg. E7, St Louis, Mo. 63103.

44.   Citigroup Global Markets, Inc. ("Citi") is an investment bank that acted as underwriter and Co-Manager for the April 2008 Offering.  Pursuant to the Offering Documents, Citi sold and distributed 8,385,417 shares of Wachovia's common stock. Citi was paid at least

$5,031,250 for its underwriting services in connection with the Offering.  Citi's headquarters is located at 388 Greenwich St., New York, New York 10013.

45.     UBS Securities LLC ("UBS") is an investment bank that acted as underwriter and Co-Manager for the April 2008 Offering.  Pursuant to the Offering Documents, UBS sold and distributed 8,385,417 shares of Wachovia's common stock. UBS was paid at least $5,031,250 for its underwriting services in connection with the Offering.  UBS's headquarters is located at 677 Washington Boulevard, Stamford, Connecticut 06901.

46.     Utendahl Capital Group LLC ("Utendahl") is an investment bank that acted as underwriter and Co-Manager for the April 2008 Offering.  Pursuant to the Offering Documents, Utendahl sold and distributed 1,677,083 shares of the common stock.  Utendahl was paid at least $1,006,250 for its underwriting services in connection with the Offering.  Utendahl's headquarters is located at 30 Broad Street, 21st Floor, New York, New York 10004.

47.     Goldman, Sachs & Co. ("Goldman Sachs") is an investment bank that acted as underwriter and Joint Bookrunning Manager for the April 2008 Offering.  Pursuant to the Offering Documents, Goldman Sachs sold and distributed 63,729,167 shares of Wachovia's common stock.  Goldman Sachs was paid at least $38,237,500 for its underwriting services in connection with the Offering.  Goldman Sachs' headquarters is located at 85 Broad Street, New York, New York 10004.

48.     Credit Suisse Securities (USA) LLC is an investment bank that acted as underwriter and Co-Manager for the April 2008 Offering.  Pursuant to the Offering Documents, Credit Suisse sold and distributed 8,385,417 of Wachovia's common stock. Credit Suisse was paid at least $5,031,250 for its underwriting services in connection with the Offering.   Credit Suisse's headquarters is located at 11 Madison Avenue, Lobby 1, New York, New York 10010.

49.     Samuel A. Ramirez & Company, Inc. ("Ramirez") is an investment bank that acted as underwriter and Co-Manager for the April 2008 Offering.  Pursuant to the Offering Documents, Ramirez sold and distributed 1,677,083 of Wachovia's common stock.  Ramirez was paid at least $1,006,250 for its underwriting services in connection with the Offering.  Ramirez's headquarters is located at 61 Broadway, Room 2924, New York, New York 10006.

50.     The defendants identified in ¶¶ 43-49 are collectively referred to herein as the "Underwriter Defendants."

**CONFIDENTIAL WITNESSES**

51.     CW 1 was a sales strategist and Mortgage Banking Executive for Wachovia Mortgage from 2007 to October 2008.  CW 1's responsibilities included overseeing loan origination and underwriting on the Pick-A-Pay loan program at three branch offices in North Carolina, one branch office in South Carolina, three branch offices in Ohio and one branch in Tennessee.  These branches exclusively sold Pick-A-Pay loans through a "wholesale" channel, meaning their customers were third party mortgage brokers who dealt directly with borrowers.  CW1 reported to Senior Mortgage Banking Executive Frank Fitzpatrick who, in turn, reported to Kim Kurkowski, the General Manager of the east coast.

52.     CW 2  was a workout specialist in Loss Mitigation from 2000 through 2004, and a loan servicing specialist from November 2004 through October 2007 for HomEq Servicing Corporation ("HomEq") in North Highlands, California.  HomEq serviced portfolio loans, specifically subprime loans, which Wachovia aggressively sold to customers.  CW 2 reported that Wachovia received quarterly reports from HomEq on losses and costs associated with the company's collection efforts.

17

53.     CW 3 was a loan officer and sales manager from 2004 through 2008 for Wachovia and sold many Pick-A-Pay loans after the merger with Golden West, and its mortgage subsidiary World Savings Bank ("World Savings").  As a Sales Manager at Wachovia CW 3 reported to Angela Marsano, a Wachovia Mortgage Director located in Charlotte, North Carolina.  In that capacity, CW 3 supervised ten to eleven Loan Officers.

54.     CW 4  was an employee of World Savings and Wachovia Mortgage holding a variety of regional loan operations management positions for the two companies from 1996 through October 2008.  CW 4's responsibilities included training new loan officers on how to sell loans to customers. As a Regional Manager of Retail Loan Operations, CW 4 oversaw 15 branch offices in New York and New Jersey.  In that position, CW 4 was primarily responsible for training loan officers.

55.     CW 5 was a senior underwriter at World Savings in 2005 and continued with Wachovia after the merger until October 2008.  CW 5 was based in the southeast region and reported to Erin Schanuel, an underwriting manager in Boynton Beach, Florida.  Schanuel reported to the district underwriting manager, Anna Buonaiut.  CW 5 underwrote or approved Pick-A-Pay loans with a debt-to-income ratio guideline of 33% to 40%.

56.     CW 6  worked for Wachovia Mortgage as a mortgage counselor in the Equity Group from 2004 to 2007.  CW 6's responsibilities included selling loans to consumers.  CW 6 reported Sales Manager Tommy Hornick.

57.     CW 7 was Vice President ("VP") and Accounting Merger Integration Leader for Golden West from 1988 to 2007.  CW 7 was responsible for handling the roll-up of World's financial results into Golden West's financials and would provide the consolidated results to Wachovia.

18

58.     CW 8 was employed as the customer services section manager and senior district manager of portfolio retention for World Savings/Wachovia in San Antonio, Texas.  From 2006 through September 2007, CW 8 worked as a manager and senior district manager of underwriting and processing.  CW 8 reported to people within World Savings, who reported to Herbert and Marion Sandler (co-founders of World Savings/Golden West), who then reported to management at Wachovia.

59.     CW 9 was an underwriter, loan processor and exception specialist for World Savings in California until October 2007.  As an underwriter, CW 9 reported to Rachelle Sels, who reported to Mark Peters, a First VP at World Savings and a Senior VP at Wachovia Mortgage FSB, who reported to Marcia Wasserman, a Senior VP at World Savings and Wachovia, who reported to Jim Judd, Chief Operating Officer ("COO") for World Savings and President and COO of Wachovia's mortgage business division.

## I.     FACTUAL BACKGROUND

### A.     Wachovia's Acquisition of Golden West

60.     Wachovia operates as a bank holding company.  It engages in capital management, and the general bank, wealth management, and corporate and investment bank businesses.  The Company provides various commercial and retail banking and trust services through full-service banking offices in the United States.  Wachovia offers checking, savings, check card, foreign currency, annuities, life insurance, brokerage account transfers, individual retirement accounts, credit cards, home equity, mortgage, hazard and flood insurance, escrow, taxes, private mortgage insurance, education loans, online services, online banking, online bill pay and online brokerage services.  The Company also provides various other financial services, including mortgage banking,

19

investment banking, estate planning, investment advisory, asset management, credit and debit card products, trust services, charitable services, mortgage banking, asset-based lending, leasing, insurance and international and securities brokerage services.  In addition, Wachovia engages in equity and debt underwriting activities, private equity investment activities, derivative securities activities, investment and wealth management advisory business, and brokerage activities.

61.     On October 1, 2006, Wachovia completed the acquisition of Golden West Financial Corporation, the parent company of World Savings Bank.  Golden West shareholders received 1.051 shares of Wachovia plus $18.6461 in cash for each Golden West share.  The total cost of the acquisition was $24.3 billion. On several occasions in fact, including immediately after the merger and throughout the Class Period, Wachovia made repeated public representations about the strict underwriting standards with which Golden West had underwritten its loans, and about the fact that Wachovia and Golden West had little or no exposure to subprime instruments.

62.     By time of the completion of Wachovia's acquisition of Golden West, the residential real estate market was beginning to show signs of peaking or, at minimum, indications of reduced growth prospects, particularly in California.  Wachovia and Golden West were heavily exposed to this market, yet Defendants made efforts to conceal the actual threat to Wachovia from the changing housing market.  To conceal their problems, which could devastate the Company, Defendants failed to take adequate reserves for mortgage-related assets, and discussed in positive but false terms the benefits of the Golden West acquisition and the Pick-A-Pay mortgages.

**B.     Subprime Lending**

63.     The term "subprime" does not have a singular meaning in the mortgage and lending industry, and  has been used variously to describe borrowers with certain credit characteristics or

20

loans with certain underwriting standards.[7]  Regardless of its particular usage, the term's utility is

that it denotes a quantum of risk exceeding that associated with conforming prime loans.[8]

64.     In describing a *borrower* as "prime" or "subprime," the mortgage and lending

industry typically relies on the borrower's Fair Isaac Credit Organization ("FICO") credit score.

FICO describes the FICO score, which ranges from 300 to 850, as "the standard measure of US

consumer credit risk" and "the recognized industry standard in consumer credit risk assessment."

Generally, a borrower is considered "subprime" if his FICO score is below 660.  *See* Board of

Governors of the Federal Reserve, *et al.*, *Expanded Guidance for Subprime Lending Programs*, at

3 (Jan. 31, 2001), *available at* http://www.fdic.gov/news/news/press/2001/pr0901a.html. "Subprime

borrowers typically have weakened credit histories that include payment delinquencies, and possibly

more severe problems such as charge-offs, judgments, and bankruptcies." *Id.* at 2.  A loan made to

a subprime borrower is considered a subprime loan, regardless of the loan's underwriting standards,

because of the risk arising from the borrower's individual creditworthiness.

65.     However, the term "subprime" as used to describe a *mortgage* also refers to

mortgages sharing one or more underwriting characteristics that render such loans riskier than a

conforming prime loan, irrespective of the creditworthiness of the borrower.  The hallmarks of

subprime loans include: (1) high loan-to-value ratios; (2) no or minimal down payment; (3) initial

---

[7]  *See* Yuliya Demyanyk & Otto Van Hemert, *Understanding the Subprime Mortgage Crisis*, at 6 (Feb. 4, 2008), *available at* http://www.fdic.gov/bank/analytical/cfr/2008/mar/CFR_SS_2008_ DemyanykHemert.pdf (hereinafter "*Understanding the Subprime Mortgage Crisis*");  Proposed Rules for  Nationally Recognized Statistical Rating Organizations, 73 Fed. Reg. 36212, 36212 n.1 (Sec. Exch. Comm'n June 25, 2008)

[8]  Conforming mortgages are ones originated in accord with the strict underwriting standards of Government Sponsored Entities ("GSEs") – such as Fannie Mae and Freddie Mac – making such mortgages not only extremely creditworthy but also eligible for purchase by the GSEs.  Producing GSE-eligible mortgages thus effectively guarantees an originating lender the ability to sell such mortgages profitably.

teaser adjustable rates; and, most importantly; (4) no documentation or verification of borrower income (a.k.a. "stated income" loans).[9]  *See, e.g.*, *Understanding the Subprime Mortgage Crisis*, at 6;  Proposed Rules for Nationally Recognized Statistical Rating Organizations, 73 Fed. Reg. at 36212 n.1.

66.    Generally, a loan made to a subprime borrower will bear one or more of the characteristics of a subprime loan described above, as the borrower, due to a hampered credit history or ability to repay, does not qualify for the conforming, prime loans reserved for more creditworthy borrowers.  However, subprime loans include loans with subprime characteristics, even if made to borrowers with FICO scores above the 660 threshold.[10]  This accounts for the fact that a subprime loan's permissive origination standards render the loan inherently risky, notwithstanding the purported creditworthiness of a particular borrower.  Moreover, because many subprime loans are stated income or no documentation loans, and therefore provide an incentive for a borrower inflate

---

[9]  "Stated income" lending, known more colorfully as "liar loans" and NINJA loans (an acronym for No Income, No Job or Assets), was a hallmark of subprime lending, and lies for obvious reasons at the generative heart of what is now known as the subprime crisis.  "Stated income" lending was born as a "niche" product originally extended only to a relative handful of prime borrowers that had relatively high but difficult to document income (*e.g.*, certain self-employed persons).  However, when stated income loans were extended to wage earners whose income was regular and documentable, it became, very clearly, a way for people to qualify for a mortgage  when their actual incomes would not qualify them. Loans originated on the basis of stated income were more likely to default than those originated on the basis of objectively documented income.

[10]  For example, in 2007,  Merrill Lynch defined subprime mortgages as follows:

> We view sub-prime mortgages as single-family residential mortgages displaying more than one high risk characteristic, such as: (i) the borrower has a low FICO score (generally below 660); (ii) *a high loan-to-value ("LTV") ratio* (LTV greater than   80% without borrower paid mortgage insurance); (iii) the borrower has a high debt-to-income ratio (greater than 45%) or (iv) *stated/limited income documentation*.

Merrill Lynch & Co., Annual Report on Form 10-K for the fiscal year ended Dec. 31, 2007, at 34 (Feb. 25, 2008) (emphasis added).

his income and assets, it is unsurprising that a material portion of subprime loans were made to borrowers whose FICO scores technically exceeded the threshold for qualifying as a "prime" borrower, albeit on an illusory basis.

67.    During the Class Period, Defendants acknowledged that the FICO score was hardly the end-all and be-all of Wachovia/Golden West's assessment of loan risk. As defendant Wurtz said, at the May 12, 2008 conference call discussing the Golden West acquisition:

> "I don't think Fair Isaac is going to ask the Sandlers [of Golden West] to do many commercials for them because they view the FICO score as just a very, very small component of their credit decisioning …[T]hat isn't a big driver of their credit decisions."

**C.    The Bubble Bursts in Early 2006 and Housing Prices Fall**

68.    By mid-2005, housing prices throughout the United States had enjoyed such dramatic price appreciation that *The Economist* (among many others) identified it as the "biggest financial bubble in history."

69.    Housing price growth peaked in the final quarter of 2005. Nobel Prize-winning economist Paul Krugman greeted 2006 by concluding, in a January 2, 2006 column published in the *New York Times*, that "at this point the overall market value of housing has lost touch with economic reality. And there's a nasty correction ahead." Paul Krugman, *No Bubble Trouble?*, N.Y. Times, Jan. 2, 2006.

70.    On May 5, 2006, *Fortune* reported that certain of the higher-flying bubble markets had become "dead zones" – where sales were plunging and inventory rising.

> *Welcome to the Dead Zone*

Real estate survival guide: The great housing bubble has finally started to deflate, and the fall will be harder in some markets than others . . . .

The message is clear. Five years of superheated price gains rescued America from stock market collapse, put billions in consumers' pockets, and ignited a building boom that bolstered the nation's economy. But it's over. The great housing bubble has finally started to deflate.

\*\*\*\*\*

**And what's happening in these areas is a sign of what may be coming in the rest of the bubble zone -- the two dozen or so mainly coastal cities and their suburbs that have seen prices soar in recent years and account for 60 percent of the nation's residential real estate value.**

**The problem is as basic as beams and trusses: The triple threat of soaring prices, higher mortgage rates and relentlessly rising property taxes has drastically increased the cost of ownership and put many homes out of reach for a huge number of potential buyers**.

\*\*\*\*\*

With houses hovering beyond the reach of most potential purchasers, formerly frantic markets grow eerily calm. People who rush to list their homes, hoping to grab a fat gain just before prices break, take them off the market.

Sales shrink as buyers float low-ball offers, and sellers refuse them. Realtors and mortgage brokers find other jobs. **The bubble areas turn into Dead Zones.**

**There's no mystery about what it will take to close the affordability gap and bring the markets back to life: Prices will have to come down** . . . .

\*\*\*\*\*

**The real losers will be those who bought recently at inflated prices and are forced to sell, usually because they're taking a job**

> **in another city or can't make the payments when their adjustable
> mortgage rate jumps**. And speculators who bought overpriced
> condos in hope of a quick killing are going to get hosed.

Shawn Tully, *Welcome to the Dead Zone*, Fortune, May 5, 2006.[11]

71.     Particularly hard hit was California, where Golden West did the vast majority of its

business.  Of Wachovia's $120 billion Pick-A-Pay mortgage portfolio, more than $70 billion were

California mortgages (*i.e.*, 58% of the entire portfolio).  In May 2006, the California Association of

Realtors lowered their expectations for California home sales from a 2% decline (2006 sales vs. 2005

sales) to a 16.8% decline.  This dramatic decline led the Association's chief economist to abandon

continued usage of the term "soft landing" to describe the market decline because it no longer

matched the reality it purported to describe:

> *Realtors: 'Soft Landing' Falls Short*
>
> Leslie Appleton-Young is at a loss for words.
>
> **The chief economist of the California Assn. of Realtors has
> stopped using the term "soft landing" to describe the state's real
> estate market, saying she no longer feels comfortable with that
> mild label**.
>
> "Maybe we need something new. That's all I'm prepared to say,"
> Appleton-Young said Thursday.
>
> *****
>
> For real estate optimists, the phrase "soft landing" conveyed the
> soothing notion that the run-up in values over the last few years
> would be permanent. It wasn't a bubble, it was a new plateau.
>
> **The Realtors association last month lowered its 2006 sales
> prediction from a 2% slip to a 16.8% drop. That was when**

---

[11]  All emphasis in this Complaint is added unless otherwise noted.

> **Appleton-Young first told the San Diego Union-Tribune that she didn't feel comfortable any longer using "soft landing."**

David Streitfeld, *Realtors: 'Soft Landing' Falls Short*, L.A. Times, July 21, 2006.

72.     In August 2006, after recent data demonstrated dramatically slowing sales, the highest inventory of unsold homes in decades, and stagnant home prices the chief economist for the National Association of Realtors (the "NAR") joined his California Association of Realtors counterpart in admitting that "hard landings" in certain markets were probable, especially in California and Florida (Golden West's second largest market – $12 billion of Wachovia's $120 billion Pick-A-Pay Portfolio were Florida mortgages):

> *Existing-home sales plunge to a two-year low; Inventories of unsold homes rise to 13-year high*
>
> **July was dry for the U.S. real estate market, as sales of existing homes plunged 4.1% to a two-year low, prices stagnated and the number of homes on the market soared to a 13-year high, according to a report from the National Association of Realtors released Wednesday.**
>
> **The report shows a continued implosion in the housing market, with inventories up sharply while prices are softening. Sales are down 11.4% in the past year** . . . .

Rex Nutting, *Existing-home sales plunge to a two-year low; Inventories of unsold homes rise to 13-year high,* Market Watch, Aug. 23, 2006.

> *Existing home sales drop 4.1% in July, median prices drop in most regions*
>
> **Existing home sales posted an unexpectedly sharp drop last month to the lowest level since January 2004 and home prices fell in all regions of the country but the South, the National Association of Realtors said Wednesday.**

*****

> "I was disappointed, it was a lot lower than I anticipated," said David Lereah, NAR's chief economist. "What is clear to me is sellers are more stubborn than I expected them to be. We definitely need a correction in prices in order for buyers to come back into the market."
>
> **He said he expects home prices to come down 5% nationally, more in some markets, less in others. And a few cities in Florida and California, where home prices soared to nose-bleed heights, could have "hard landings," he said.**

Noelle Knox, *Existing home sales drop 4.1% in July, median prices drop in most regions*, USA Today, Aug. 24, 2006.

73.     Others looking at the same NAR data were even less sanguine.  Economist Nouriel Roubini observed, "every housing indicator is in free fall, including now housing prices," and concluded that the ongoing housing collapse would push the U.S. into a "much nastier, deeper and more protracted" recession than any in recent memory:

> *Recession will be nasty and deep, economist says*
> *Housing is in free fall, pulling the economy down with it, Roubini argues*
>
> **"This is the biggest housing slump in the last four or five decades: every housing indicator is in free fall, including now housing prices," Roubini said. The decline in investment in the housing sector will exceed the drop in investment when the Nasdaq collapsed in 2000 and 2001, he said.**

Rex Nutting, *Recession will be nasty and deep, economist says:  Housing is in free fall, pulling the economy down with it, Roubini argues*, MarketWatch, Aug. 23, 2006.

74.     A more detailed analysis, provided on the same day and provoked by the same data, led *Barron's* Lon Witter to exactly the same conclusions:

> *The No- Money Down Disaster*

**A housing crisis approaches: According to the Commerce Department's estimates, the national median price of new homes has dropped almost 3% since January. New-home inventories hit a record in April and are only slightly off those all-time highs. Existing-home inventories are 39% higher than they were just one year ago. Meanwhile, sales are down more than 10%.**

*****

**By any traditional valuation, housing prices at the end of 2005 were 30% to 50% too high. Others have pointed this out, but few have had the nerve to state the obvious: Even if wages and GDP grow, the national median price of housing will probably fall by close to 30% in the next three years. That's simple reversion to the mean . . . .**

-- 15.2% of 2005 buyers owe at least 10% more than their home is worth

**-- 10% of all home owners with mortgages have no equity in their homes**

-- $2.7 trillion dollars in loans will adjust to higher rates in 2006 and 2007.

**These numbers sound preposterous, but the reasoning behind them is worse . . . .**

*****

**Negative amortization and other short-term loans on long-term assets don't work because eventually too many borrowers are unable to pay the loans down -- or unwilling to keep paying for an asset that has declined in value relative to their outstanding balance. Even a relatively brief period of rising mortgage payments, rising debt and falling home values will collapse the system. And when the housing-finance system goes, the rest of the economy will go with it.**

**By the release of the August housing numbers, it should become clear that the housing market is beginning a significant decline. When this realization hits home, investors will finally have to confront the fact that they are gambling on people who took out no-money-down, interest-only, adjustable-rate mortgages at the top of the market and the financial institutions that made those loans. The stock market should then begin a 25%-30% decline.**

28

> **If the market ignores the warning signs until fall, the decline
> could occur in a single week**.

Lon Witter, *The No- Money Down Disaster*, Barron's, Aug. 21, 2006.

75.     By October 4, 2006 Federal Reserve Chairman Ben S. Bernanke conceded that "[t]here is currently a substantial correction going on in the housing market."

76.     The same day, *Moody's* released a 195 page report titled *Housing at the Tipping Point*, predicting imminent double-digit housing price declines in bubble markets and the first "calendar year" nationwide home price decline since the Great Depression.

77.     Monthly housing statistics provided by the National Association of Realtors showed that by August 2006, year-over-year home prices had in fact declined – for the first time in 11 years:

> [E]ach passing week shows the nation's housing statistics heading
> down . . . .  **According to the National Association of Realtors,
> sales of existing homes were down 12.6% in August from a year
> earlier, and the median price of homes sold dropped 1.7% over
> that period -- the first year-to-year price decline in 11 years**. Sales
> of new homes were down 17.4% in August from a year ago,
> according to the Census Bureau . . . . A report by Moody's
> Economy.com said house prices could keep falling until 2008 or 2009
> in some areas . . . .

Ruth Simon and Michael Hudson, *Whistling Past Housing's Graveyard? --- Builders' Shares Have Been Hot, Sparking Debate Among Investors On Whether Sector Has Hit Bottom*, Wall St. J., Oct. 9, 2006.

78.     Thus, housing prices were already in decline by May 2006 when Wachovia announced that it had agreed to pay $24 billion to buy Golden West, and the decline was in full-swing by October 2006 when the acquisition closed.   These declines were experienced both first and most sharply in California and Florida; these two states alone accounted for 68% of Wachovia's

Class Period Pick-A-Pay mortgage portfolio. Unbeknownst to investors, these declines were to spell disaster for Wachovia because, contrary to Defendants' public representations, Golden West, both before and after the acquisition, did little to verify buyers' ability to repay loans, choosing instead to bet the house (literally) on the underlying collateral (*i.e.*, the house) maintaining its value.

## II.  DEFENDANTS' INTENTIONAL WEAKENING OF GOLDEN WEST'S ALREADY FLAWED UNDERWRITING STANDARDS AND OTHER CONDUCT INCREASING THE PICK-A-PAY LOANS' RISK OF DEFAULT

### A.  Wachovia Abandons Customary Lending and Business Practices in Favor of Much Riskier Loan Products

79.     Prior to the Company's acquisition of Golden West Financial, a large majority of the loans funded by Wachovia were traditional fixed-rate mortgages.

80.     After Golden West was acquired, it was not integrated into Wachovia's residential mortgage unit. Instead, the reverse effectively happened: According to CW 4, Wachovia's residential mortgage operations were folded into the former Golden West. This is confirmed by a June 4, 2008 *Business Week* article, which noted that "right after Wachovia bought Golden West, executives from [Golden West] took control of all mortgage lending." CW 4's responsibilities included training new loan officers on how to sell loans to customers. After the merger, CW 4 observed that Wachovia's loan officers solely relied upon a computerized underwriting program to determine whether to approve or reject a loan application and did not have actual underwriters on staff. For this reason, if a Wachovia loan officer was asked to look at a loan application and assess whether the loan should be approved or not, the person would not have any idea how to go about making the assessment. CW 4 has direct knowledge that the priority at Wachovia became selling Pick-A-Pay loans and abandoning more conservative Wachovia loans.

81.     CW 6, who worked for Wachovia mortgage as a counselor from 2004 to 2007 and was responsible for selling loans to customers, noted that after the merger the underwriting of Pick-A-Pay loans continued to be performed solely by legacy Golden West employees, at their former offices in San Antonio, Texas.

82.     CW 7, VP and accounting merger integration leader for Golden West from 1988 through 2007, handled the roll-up of World's financial results into Golden West's financials.  CW 7 added that after the acquisition, Golden West continued to operate as a separate subsidiary of Wachovia.  CW 7 provided consolidated results to management at Wachovia.

83.     Thus, as discussed more fully below, at a time when the residential real estate bubble had already burst, Wachovia made the decision to abandon its more traditional loan products, and to focus almost exclusively on originating Pick-A-Pay loans, the overwhelming majority of which were stated-income Option ARMs, with the potential for negative amortization.   Against this backdrop, Wachovia's repeated Class Period representations regarding its conservative underwriting could not be further from the truth.

**B.      Defendants Were Aware of Fundamental Risks Embedded in the Pick-A-Pay Mortgage Product, But Publicly Misrepresented, Denied and Concealed Those Risks**

84.     During the Class Period, in conference call after conference call, Defendants maintained that their Option ARM product – the Pick-A-Pay mortgage – was entirely distinguished from and superior to other Option ARMs, Alt-A mortgages[12] and subprime mortgages due to: (1)

---

[12]    Alt-A is a classification of mortgages where the risk profile falls between prime and subprime. The borrowers behind these mortgages will typically have clean credit histories, but the mortgage itself will generally have characteristics of a subprime mortgage, such as no income verification, low "teaser" interest rates subject to reset, or high LTV ratio.

Wachovia's purportedly strict underwriting guidelines, including underwriting the mortgages at relatively low initial LTVs of approximately 70%; and (2) two structural features of Pick-A-Pays, namely (a) the 7.5% annual payment increase cap built into the Pick-A-Pay structure, which limited immediate "payment shock" from adjustable-rate resets, and (b) the 10-year delay before Pick-A-Pay mortgages "recast" to fully-amortizing rates.   Defendants represented that these features of Wachovia's Pick-A-Pay mortgages rendered those mortgages – and Wachovia – immune to the sort of devastation then being experienced by other Option ARMs, Alt-A mortgages and subprime mortgages.   In conference call after conference call, Defendants maintained in the face of analyst questioning that Wachovia's Pick-A-Pay mortgages were performing much better than subprime mortgages, Alt-A mortgages, and other Option ARMs due to these design features of the Pick-A-Pay mortgages, and that such superior performance justified Wachovia's low level of loss reserves relative to peer lending institutions.

85.     These representations were materially false and misleading.

86.     The first of the purportedly-distinguishing features of Pick-A-Pay mortgages was their purported low LTV ratios.   Mortgages with low LTVs experience both lower risk of default and lower (or no) loss to lenders upon default.   This is because a borrower with substantial equity invested in a home is less likely to default; conversely, a borrower with little or no equity in the property has less to lose upon default and thus is more likely to default.   In the extreme case, borrowers with "negative equity" in their homes – *i.e.*, borrowers who are paying down a loan each month whose amount is greater than the property's current value – have little economic motivation to continue making such payments, and are much more likely to default.   As to loss severity upon default, a low LTV mortgage increases the likelihood that the lender can recoup, through foreclosure

sale and after foreclosure costs, the full amount originally lent.  Where a lender lends $70,000 for purchase of a $100,000 property (rather than $90,000 for the same property), sale of that property is more likely to provide the lender with $70,000 back (and less likely, after foreclosure costs, to provide the lender with $90,000 back).

87.    Defendants consistently touted the low **initial** LTV of Wachovia's Pick-A-Pay loans – approximately 71% – as a primary reason why Pick-A-Pay loans were experiencing lower rates of default and loss than other Option ARMs, Alt-A mortgages and subprime mortgages, and as justification for Wachovia's low loss reserves.  These statements were materially false and misleading, for two reasons.

(a)    First, the LTV ratios of Wachovia's Pick-A-Pay loans were rising dramatically from both the "L" end (the loan amount) and the "V" end (the property value), so that they bore little resemblance to the initial LTV ratios touted by Defendants.  As the substantial majority of Pick-A-Pay borrowers were picking the minimum payment option, their loan amounts were actually rising (as, each month, the amount of unpaid interest was added back to the loan's principal amount). Simultaneously, as property values declined, and declined most sharply in the very markets where 68% of Wachovia's Pick-A-Pay loans had been originated (California and Florida), LTV ratios were rising (because the "V" element of LTV, property value, was falling).  Defendants were aware *ab initio* that LTV ratios were thus being squeezed upwards from both ends.  As LTV ratios increased, the risks of default substantially increased and the degree of loss severity sharply increased.  It was apparent to Defendants early on that even solvent borrowers were increasingly likely to default, and that upon default Wachovia would suffer severe losses.

(b)    Second, Defendants concealed and misrepresented this rising LTV reality (and thus the reality of rising default risks and sharp loss severities) by representing Pick-A-Pay LTV ratios as lower than they in fact were.  In so doing, Defendants relied on the initial low LTVs (71%) and on purported "updates" of those LTVs which represented that the LTV ratios had not materially changed since loan origination.  But these updates themselves were outdated; in truth LTVs were dramatically higher than adverted, and were only climbing higher as property values contined to decline and as borrowers continued to pick the minimum payment options.  In conference call after conference call, Defendants provided misleading assurances supported by outdated data, and therefore failed to disclose current realities as to Pick-A-Payment default and loss risks.

88.    In April 2008, Defendants made a fundamental change to their loss reserve model to take this long-understood LTV dynamic into account.  The result: massive loss reserve increases, acknowledgement of a capital crisis that Defendants had denied only months earlier, and the necessity to reduce Wachovia's dividend (a necessity that Defendants had likewise denied only months earlier).  Defendants revealed for the first time that 14% of Wachovia's entire $120 billion Pick-A-Pay loan portfolio – the same portfolio that Defendants had consistently described as an extremely low-LTV portfolio – had LTV ratios that exceeded 100%.  Only in late 2008 did Defendants reveal that, as a result of sharp property price declines in California and Florida (which declines were already sharp two years earlier, in late 2006), and as a result of most Pick-A-Pay borrowers picking to pay minimum payments (which they had been doing all along), the average LTV ratio across Wachovia's $120 billion Pick-A-Pay portfolio had risen from 71% to a stunning 95%.  The default risks and degree of loss severity at 95% LTV are altogether different – and far,

far higher – than the default risks and loss seveity at 71% LTV ratios.  The difference is one of night and day, and of many billions of dollars.

89.    Defendants also consistently touted the product design of Wachovia's Pick-A-Pay loans – and especially the 7.5% annual cap on payment increases – as a primary reason why Pick-A-Pay loans were experiencing lower rates of default and loss than other Option ARMs, Alt-A mortgages and subprime mortgages, and as justification for Wachovia's low loss reserves.

90.    These statements were materially false and misleading.  **Defendants knew that the 7.5% annual payment increase cap did not obviate or eliminate the "payment shock" risk of these mortgages, but merely delayed it.**  Subprime and Alt-A ARMs were experiencing skyrocketing delinquencies because their rates adjusted quickly to fully-indexed rates: 80% of subprime ARMs had such rate resets occur after two or three years.  The wave of subprime defaults that spiked in early 2007 was the result of the wave of rate resets that was then beginning.  Other Option ARMs, which did not feature the Pick-A-Pay 7.5% cap, likewise were experiencing higher delinquencies as their rates reset and/or recasted sharply upwards.  Defendants wilfully ignored that Wachovia's Pick-A-Pay mortgages would produce exactly the same levels of payment shock as these other mortgages, with exactly the same results, **with the only difference being that they would do so in slow motion.**  The 7.5% annual payment cap did not make Wachovia's Pick-A-Pay mortgages any  superior to these other mortgages, as Defendants represented, and did not justify Wachovia's low loss reserves, as Defendants claimed.  Rather, it  merely meant that Wachovia's $120 billion of Pick-A-Pay mortgages would only later arrive at the levels of payment shock-inspired defaults that other subprime, Alt-A and Option ARM mortgages were currently experiencing.

91.     This reality was masked throughout by Defendants but acknowledged by their successors.  On October 22, 2008, Wachovia's new management: (1) revealed Wachovia's largest-ever quarterly loss reserve provisioning expense, $4.8 billion, 66% of which was dedicated to the Pick-A-Pay portfolio; (2) admitted that cumulative Pick-A-Pay losses would amount to 22% of the entire $120 billion portfolio (or $26.4 billion) – nearly twice the 12% cumulative loss figure that Defendants had represented; and (3) acknowledged with a further $18.8 billion writedown what Defendants had long explicitly denied: the substantial devaluation of Wachovia's Pick-A-Pay franchise.  In October 2007, Wachovia's erstwhile acquirer, Wells Fargo, after reviewing Wachovia's $498 billion of loan portfolios, disclosed that it expected those portfolios to generate losses of **$74 billion**.  Wachovia's $120 billion Pick-A-Pay portfolio, according to Wells Fargo, would generate cumulative losses of 26%, or $37.2 billion.  Thus, though the Pick-A-Pay portfolio amounted to only 20% of Wachovia's total loans, they represented 50% of the total losses.

## C.     Wachovia's Risky, Nontraditional Loan Products

92.     Prior to the Class Period, Wachovia offered both traditional and nontraditional exotic loan products.  After the merger, however, Wachovia almost exclusively offered Golden West's signature product, the Pick-A-Pay loan, and, according to CW 3, began to heavily market and sell Pick-a-Pay loans directly to customers. CW 4 stated that during this period, almost 100 % of the loans funded by Wachovia were Pick-A-Pay loans.

93.     As previously discussed, the Pick-A-Pay loans provided borrowers with four payment options.  The "minimum amount" option was particularly nefarious.  The minimum amount was calculated pursuant to a low, fixed monthly rate operative for one year.  This rate (typically, 1.5%-2.5%) was substantially lower than the actual operative interest rate that applied to the mortgage

(which was 6% or higher).  If a borrower selected this option and continued to make minimum payments, the amount of the unpaid interest would be "deferred" and added, each month, to the loan's principal balance.  This result was known as "negative amortization."  The payment rate reset annually, and any increase in payment over the prior year was capped at 7.5%.  However, over and above these annual rate resets, the Pick-A-Pay mortgages were also subject to "recast."  Wachovia "recast" Pick-a-Pay loans after either (1) 10 years, or (2) when negative amortization reaches 110% or 125% of the loan's original balance.  Upon either of these events, the Pick-A-Pay mortgage recasts to become fully amortizing – meaning, concretely, that the monthly payment recasts to whatever level necessary to pay off the mortgage in full during the remainder of its 30-year term.

94.     During the Class Period, Wachovia falsely represented that it was managing the risk associated with its Pick-A-Pay products by ensuring compliance with appropriate underwriting standards, appropriately monitoring loan performance and conducting risk modeling procedures, when in fact it was not doing so.  CW 3 explained that after the merger, the underwriting process at Wachovia was nothing short of fraud.  Vitally important to underwriting is the ability of borrowers to service their debt obligations in light of their sources of income.  The vast majority of Wachovia's Pick-A-Pay loans were "stated income" loans, or in Wachovia's official parlance "Quick Qualifier" loans.  To qualify for this sort of loan, a borrower's Debt-to-Income ("DTI") ratio must be less than 50%.  CW 3 explained that many of the Pick-A-Pay loans had a DTI of more than 50%.

95.     To get the loans approved, CW 3 and other loan officers and sales managers were instructed to falsify the amount of stated income on the loan application.  CW 3 recalled witnessing an incident where another loan officer was instructed to "bump up" an applicant's Social Security income so that the borrower "qualified" for the loan under debt-to-income ratio tests.  Indeed,

CW 2 confirmed that while attempting to help borrowers avoid foreclosure, it became clear that many of the documents that supported the original loan application were nonexistent or were falsified by the borrower at the behest of the loan officer.

96.     Additionally, while any credit score below 660 is considered "subprime," CW 8, who worked as a manager and senior district manager of underwriting and processing, reported that between 2005 and 2007, Wachovia in fact routinely issued Pick-A-Pay loans to borrowers with credit scores in the low 600's, and, at times, even lower than 600. This exposed Wachovia to the very subprime risks and "impacts" that Defendants represented Wachovia had avoided.

97.     Wachovia also offered a substantial majority of its Pick-A-Pay loans on the basis of stated income. CW 1, the northeast sales strategist and mortgage banking executive for Wachovia mortgage who was responsible for overseeing loan origination and underwriting on Pick-A-Pay loans at several branch offices, stated that at least 90% of the Pick-A-Pay loans that Wachovia funded were stated income or no documentation loans, meaning there was no verification of the borrower's income by examining their pay stubs, W-2s, bank statements, tax documents or other records. CW 3 confirmed the percentage of these types of loans. According to CW 1, for "Quick Qualifier" loans Wachovia would simply ask the borrower for his or her income and take any such representation at face value. Due to the lack of verification, stated income loans are particularly risky and are often referred to in the industry as "liar loans." In fact, a study by the Mortgage Assert Research Institute in Reston, Virginia found that 90% of stated income loans when checked against tax documents revealed overstatement of income by at least 5%, and nearly 60% of the stated amounts are exaggerated by more than 50%.

**D.     Wachovia's Practices Exacerbated the Risks Inherent in Its Nontraditional Loan Products**

98.     Although Wachovia and the Individual Defendants claimed that Wachovia had "careful[ly] manage[d] . . . the inherent credit risking of [its] portfolio," as can be seen throughout this Complaint, it actively took undisclosed, unlawful and unsafe measures to increase its volume of Pick-A-Pay loans.

99.     The risk inherent in Wachovia's widespread use of stated income "liar loans" was exacerbated by its systematic failure to take routine measures to compare (1) the buyers' actual reported incomes to the IRS with (2) the inflated incomes borrowers routinely stated in their applications.  Wachovia's failure to verify prospective mortgage borrowers' actual incomes led to abusive overstatements of income.

100.     As reported in the April 6, 2008 article in the *New York Times* called, *A Road Not Taken by Lenders*, at least 90% of borrowers, including stated income borrowers, were supposed to be required to provide IRS Form 4506T with their applications, thereby authorizing the lender to verify income information with the IRS.  This was an important cross-check to be utilized in connection with due diligence to prevent overstatement of borrower income.

101.     In October 2006, at the time the Golden West acquisition closed, the IRS implemented a system to "give mortgage lenders faster access to borrowers' tax returns to verify their incomes, vendors and lenders say."  *Lenders Like Most of What They See in New IRS Service*, American Bankers, Sept. 22, 2006.  In this article, Lisa Faulk, an executive vice president of operations of Wachovia Corp.'s AmNet Mortgage, Inc., noted that the double-checking of IRS returns with respect to stated income loans was an important tool and further noted that:

39

"nine dollars does seem to be relatively steep, but in the scheme of things, with fraud on the rise," it is not enough to discourage Amnet from using the tool, she said.  Rising concerns about fraud, especially involving stated-income loans, will probably mean "you're going to see more and more companies using it."

102.   Despite the acknowledged importance of utilizing Form 4506T to verify incomes, Wachovia routinely failed to double-check incomes in connection with its stated income mortgage originations.  Wachovia's equity submission form for its Eastern Wholesale Operations, dated March 7, 2007, failed to require signed Form 4506Ts as a general matter.  Similarly, Wachovia's rate sheets routinely limited the utilizations of 4506T forms with the qualifying language "if necessary" and "if applicable."  *See, e.g.*, Wachovia California Wholesale Region Rate Sheet, Oct. 12, 2006.

103.   Wachovia's complete disregard of the 4506T verification process is consistent with Wachovia's objective of increasing loan production growth with a corresponding drop in underwriting quality.  Indeed, as the *New York Times* reported, income with the IRS was verified on approximately only 3-5% of all loans funded in 2006.  Wachovia clearly turned a blind eye to stated incomes despite its ability to determine easily whether that information was accurate.  The sheer recklessness in failing to verify stated incomes contributed to Wachovia's increased acceptance of true "liar loans," eventually leading to the Company's alarming default rate and increased loss severity that caused massive losses in Wachovia's Pick-A-Pay portfolio.

104.   Additionally, in connection with its mortgage production, Wachovia's wholesale division distributed lending matrices to mortgage and real estate professionals.  These lending matrices provided guidelines for the types of loans Wachovia would underwrite, along with interest rate information and product highlights.  The matrices, however, were not intended for public dissemination.  For example, an October 12, 2006 Wachovia California Wholesale Region Matrix

("California Matrix") provided that "information contained herein is confidential and is for the sole use of Wachovia Mortgage Corp. approved mortgage brokers.  Distribution to consumers is prohibited."

105.   Wachovia's lack of commitment to thorough underwriting is revealed by its California Matrix's underwriting turn-times.  The matrix provides for conventional jumbo loans: "Complete Files received by 3:30 pm today can expect U/W response by End of Day."  Certainly, conservative underwriting practices would require more than a couple of hours of due diligence.

106.   Similarly, the California Matrix notes that certain borrowers "may qualify for substantially reduced documentation with 'Mortgages Made Easy'!!!"  Numerous matrices highlighted new program features that made it ever easier for consumer access to obtain mortgages and exponentially increased Wachovia's risk.  For instance, the California Matrix sets forth the following alarming information:

> JUMBO & CONFORMING/JUMBO NICHE PRODUCT HIGHLIGHTS
> ***New Jumbo Fixed Enhancements & Guidelines***
> *Loan amounts to $3.5 million are now eligible
> *100% CLTV to $650,000
> *Enhanced LTVs/CLTVs
> *Increased Cash out limits
> *Cash out now permitted on Stated Income loans

107.   In addition, a September 24, 2007 in-house matrix for Wachovia-World Savings states that there was no required FICO score for certain loans between $40k and $750K in value, and features a circle encapsulating the word "FICO" with a line struck through it, reminiscent of "no smoking" signs.

108.   The highlights of the foregoing program reveal the extent to which Wachovia was loosening its lending criteria to attract mortgage volume.  An examination of Wachovia's matrices

reveals numerous program changes that increased the availability of riskier loans to riskier customers throughout 2006. Only in 2007, after the subprime market began to collapse, did Wachovia begin to restrict and tighten its lending criteria. By then, it was too late, as Wachovia's balance sheet was already burdened with tens of billions of recklessly underwritten loans that began to experience dramatically increasing default rates and loss severity.

### E.    Wachovia Aggressively Pushed Risky Loans on Borrowers for Defendants' Gain

109.    Wachovia, at the direction of the Individual Defendants, established a system of financial rewards for originating higher risk loans, and corresponding negative consequences for those who did not toe the Company line. Wachovia loan production personnel were compensated based on loan volume without any regard to loan quality, and were paid even more for originating riskier Pick-A-Pay loans. As a result, many of these loans were made to people that had no realistic ability to meet the obligations inherent in the loans they were sold.

110.    CW 3 stated that commissions earned by Wachovia's employees who sold Pick-A-Pay loans were substantially higher than those resulting from the sale of more traditional products. The commission on a Pick-A-Pay loan was three basis points. This meant that a $100,000 Pick-A-Pay loan would yield a commission of $3,000. By contrast, the commission on $100,000 conventional fixed-rate loan would yield a commission of only $90. CW 3 stated that several loan officers and sales managers were motivated by these higher commissions. According to CW 3, in addition to loan officer commissions, sales managers received monthly bonuses that were based on the dollar volume of the Pick-A-Pay loans produced. The amount of these bonuses varied depending on the percentage of the monthly Pick-A-Pay sales goals that were met by the sales manager's team.

111.   CW 3 stated that those employees that did not meet their monthly Pick-A-Pay sales goals were sure to be reprimanded and ultimately fired if they did not increase such sales.  Similarly, CW 4 states that "at Wachovia, it was all about the numbers" and that if a loan officer underperformed, "that's it, you're gone."  In fact, CW 3  believes that he was terminated because he was unable to meet his sales goals.  CW 3 had previously refused to lie about the amount of a customer's income so as to artificially increase his volume of Pick-A-Pay loan originations.

112.   CW 3 also recalled that the riskier Pick-A-Pay loans offered Wachovia a larger margin than the more conventional loans.  Prior to the acquisition of Golden West and the adoption of the Pick-A-Pay loan program, Wachovia's loan closing costs were typically around $600, but once it started to sell the Pick-A-Pay loans, those same closing costs were around $4,800.  These closing costs are almost 7-1/2 times larger than those associated with traditional mortgages.  Knowing this, it becomes clear why the more conventional, less risky mortgage loans were all but abandoned.  This expanded margin had an immediate impact on Wachovia's bottom-line.  Without accounting for the extraordinarily higher added risk of fault by properly adjusting allowances for loan losses, to the investing public Wachovia appeared to be enjoying significant, although artificial, growth.

113.   Indeed, as confirmed in a recent *MSNBC* article based on an interview with former Wachovia mortgage consultant Sharren McGarry, Wachovia used both sticks and carrots to entice and prod its employees to maximize Pick-A-Pay loan originations, and artifice to dupe naive borrowers:

> Sometime after Sharren McGarry went to work as a mortgage consultant at Wachovia's Stuart Fla., branch in July 2007, she and her colleagues were directed to market a mortgage called the "Pick A Pay" loan.  Sales commissions on the product were double the

43

rates for conventional mortgages, and she was required to make sure nearly half the loans she sold were "Pick A Pay," she said . . .

Her job description included a requirement that she meet a monthly quota of Pick A Pay mortgages . . .

In June 2008, her manager wrote a "Corrective Action and Counseling" warning, saying she wasn't meeting the banks "expectation of production" . . . .

McGarry says she was encouraged to promote the idea that with Pick A Pay loan the borrower could pay less than the full monthly payment and set aside the difference for savings or investment. The pitch includes sales literature comparing two brothers. One took the Pick A Pay loan, made the minimum payment and put the payment in the bank. The second brother got a conforming loan. Five years later, both brothers needed to pay their children's college tuition.

"(The brother with the conforming loan) didn't have the money in the bank," said McGarry. "And the brother that had the pay-option ARM could go to the bank and withdraw the money and didn't have to refinance his mortgage. That's how they sold it."

McGarry said the sales pitch downplayed the impact of negative amortization. When the loan principal swells to a set threshold . . . the mortgage automatically "recasts" to a higher, set monthly payment that many borrowers would have a hard time keeping up with.

John W. Schoen, *"Pay Option" Loans Could Swell Defaults*, MSNBC.com, Dec. 10, 2008.

114.    Wachovia's push to maximize its output of Pick-A-Pay loans at all costs marked a significant departure from Golden West's prior practice. CW 4 explained that, prior to the merger, Golden West had cultivated relationships with several lenders that, unlike Golden West, offered conventional fixed rate mortgages, and would refer potential clients to such lenders when the Pick-A-Pay product was not the "best fit." CW 4 added that Wachovia quickly dispensed with this philosophy and, for the reasons discussed above, focused solely on the numbers, *i.e.*, the numbers

of Pick-A-Pay loans it could foist upon nearly all customers who walked through its doors regardless of "fit."

**F.      Appraisals Relating to Wachovia's Loans Were Improperly Inflated**

115.    The use of reliable home appraisals is fundamental to the home mortgage industry. Without credible appraisals, the extent to which the home loans at issue are adequately collateralized is virtually unknown.  Furthermore, accurate appraisals are needed to assess the likelihood of default by the borrower.  Integral to assessing these risks are Loan-to-Value ("LTV") ratios.  It is generally accepted within the home lending industry that LTV ratios greater than 80% expose lending institutions and by necessity, their investors, to greater risks than those loans with lower LTV ratios.

116.    The LTV ratio is directly dependent on appraisal value, and any error or fraud related to an appraisal will necessarily affect the LTV.  Without credible appraisals, the LTV ratios for home loans issued by lenders would be subject to manipulation, and borrowers could be issued larger mortgages than they could realistically repay.   It naturally follows that artificially increased appraisals lead to artificially decreased LTV ratios, which makes a company's loan portfolio look less risky than it is in reality.

117.    After Wachovia's merger with Golden West, CW 2 served as a Loan Servicing Specialist until October 2007.  CW 2's responsibilities included working with borrowers that were experiencing long term financial problems, to resolve delinquencies and regain current standing on accounts.  As part of CW 2 's employment responsibilities, CW 2 would review borrowers' financial and credit reports, including bank statements, tax returns and credit reports.

118.    CW 2 explained that the portfolio of loans serviced by HomEq were all subprime loans that Wachovia aggressively sold to its customers.  CW 2  further stated during her tenure in

the Loss Mitigation Department, CW 2 reviewed many loans that "should not been issued in the first place" and that it was "common to see loans for properties that had been over-appraised at origination."

119.    Additionally, CW 4 explained that after Wachovia's acquisition of Golden West, Wachovia discontinued Golden West's policy of exclusively employing in-house appraisers with respect to Pick-A-Pay loans.  Instead, Wachovia utilized outside, third-party appraisers to value the property, and the in-house appraisers were relegated to merely reviewing the reports of the outside appraisers.  CW 4 noted that this change rendered appraisals less accurate because the outside appraisers had a reputation for assigning less conservative appraisals as compared to Golden West's in-house appraisers.

120.    Lead Plaintiff believes that additional discovery will uncover further evidence of Wachovia misrepresenting the value of the underlying loan collateral, thus exposing Wachovia shareholders to a substantial undisclosed risk of loss inherent in Wachovia's real-estate secured loan portfolio.

## G.    Wachovia's Underwriting Standards Were Weakened Under Defendants' Direction

121.    Unbeknownst to the members of the Class, the Individual Defendants caused Wachovia's underwriting standards to deteriorate significantly during the Class Period.  In fact, the Individual Defendants created a false and misleading appearance of conservative, quality-focused underwriting at Wachovia through their many wilfully untrue public statements.

122.    Underwriting is a critical component to every loan because it acts as a form of quality control by which the loan originator is able to enforce its policies for approving or disapproving

loans pursuant to its guidelines.  Throughout the Class Period, Wachovia failed to disclose the specifics of its underwriting practices to the investing public.

123.    Nevertheless, Wachovia regularly and untruthfully discussed its "conservative" underwriting standards in public filings, earnings calls, and investor conferences.

(a)    For example, the Company described its risk management in the following terms in each of its reports on Form 10-Q 2006 and 2007: "[w]e continue to mitigate risk and volatility on our balance sheet by actively monitoring and reducing potential problem loans, including their sale when prudent."  The Company further stated in its First Quarter and Second Quarter 2007 10-Q reports: "[t]he low level of charge-offs reflects a continuing solid credit environment, the highly collateralized nature of our loan portfolio and **careful management of the inherent credit risking of our loan portfolio**."

(b)    Likewise, during each of Wachovia's conference calls and investor conferences during the class period, the Individual Defendants touted Wachovia's purportedly conservative standards and the purportedly low-risk mortgages produced by those standards.  These statements are alleged in detail in Section III, *infra*.  Some examples:  Referencing the conservative nature and quality of its underwriting process, CRO Don Truslow explained during a July 20, 2007 conference call that "because [of] the way [Pick-A-Pay] loans are underwritten, we're not seeing any meaningful increases in losses in the portfolio and we don't expect to see any rises and losses as we look forward over the next few quarters and so the underwriting process and how these things are booked is what we're ultimately relying on holding up very well as expected."  On an April 16, 2007 conference call, Individual Defendant Thomas Wurtz, while talking about the integration of Golden West, said "[o]ne thing I can tell you is we will not stretch for earnings by altering the Golden West

origination system or weakening their proven credit practices."  As is explained throughout this Complaint, Wachovia's underwriting standards were anything but conservative and certainly were not risk adverse.

### 1.   Underwriting Standards for Wachovia Pick-A-Pay Loans Were Deficient

124.   Wachovia's Pick-A-Pay loan program was inherently risky because of the potential for negative amortization and payment shock upon recasting.  These features were made all the more dangerous by sales and underwriting practices at Wachovia that did not fully appraise borrowers of the loan's complex nature.

125.   Because Wachovia's Pick-A-Pay loans were of particular concern to investors who wanted to make sure the Company was not underwriting high-risk loans with potentially high profit margins at the expense of massive future credit losses, Defendants regularly and falsely reassured investors of the strength of the Company's underwriting for Pick-A-Pay loans.  During a May 16, 2006 UBS Global Financial Services Conference, Individual Defendant Thompson explained that Wachovia planned to originate Golden West's "conservative option ARM products on the East Coast" after the merger.  He later dispelled investor's worries about the growing negative amortization in the Golden West portfolio by saying "I'm really not concerned.  And I am not concerned because of the conservative underwriting standards that the company has."

### 2.   Wachovia Implemented Dangerously Permissive Underwriting Practices for Its Subprime Lending

126.   Realizing that the Pick-A-Pay loan program boosted Wachovia's profit margins, Defendants actively took further steps to increase the sales volume of these toxic loans by

implementing questionable procedures and encouraging Wachovia employees to engage in less than scrupulous behavior.

127.     Wachovia aggressively pushed Pick-A-Pay loans to customers, regardless of whether the customers were particularly well-suited for such a loan.  According to CW 3, loan officers were instructed **not** to fully educate borrowers about the Pick-A-Pay loans.  They were taught to aggressively sell the program and to emphasize to prospective borrowers the financial flexibility that accompanied the minimum amount option, but to omit information about the downsides of selecting this option, namely, the negative amortization.  Prospective borrowers were encouraged to use the extra money for their kids' college savings, to pay down credit cards, or for the purchase of a car or boat.

128.     CW 3 explained that after the merger, the underwriting process at Wachovia was nothing short of fraud.  As previously noted, the vast majority of Pick-A-Pay loans were stated income ("Quick Qualifier") loans.  Even where the loan is stated-income, it is vitally important that a borrower's debt-to-income ratio indicates that he or she has the wherewithal to service the loan in light of his or her outstanding debt obligations.  To qualify for Wachovia's Pick-A-Pay Quick Qualifier loan, a borrower's debt-to-income ratio had to be less than 50%.  CW 3 explained that many of the Pick-A-Pay Quick Qualifier loans had a debt-to-income ratio of more than 50%.

129.     To get the loans approved, CW 3 and other loan officers and sales managers were instructed to falsify the amount of stated income on the loan application. According to CW 3, it was not uncommon for the following deceptive selling technique to take place:

> Loan Officer: "Mr. X, you need to make $300,000 a year to qualify
> for this loan. Do you make $300,000 a year?"  Borrower: "No, I make
> $200,000 a year."  Loan Officer: "I want to make sure you understand

49

this, you have to make $300,000 a year, so do you make $300,000 a year?"  Loan Officers were to continue this sort of exchange until the prospective borrower acquiesced that they did in fact make the necessary sum of money.

130.    Indeed, CW 2 confirmed that while attempting to help borrowers avoid foreclosure, it became clear that many of the documents that supported the original loan application were nonexistent or were falsified by the borrower at the behest of the loan officer.

131.    These loans were already remarkably risky at origination because the "stated" information was not verified.   These loans were then made worse by the income falsification.

132.    Both the SEC and the United States Justice Department have now launched investigations into Golden West's lending practices. The government's investigation centers on whether Golden West engaged in predatory lending practices.[13]  Specifically, the government is investigating whether Golden West committed fraud by luring clients into mortgages they could not afford or else by falsifying borrowers' financial information to allow them to "qualify" for loans.[14] The government is also investigating whether Golden West misrepresented the quality of these loans when it was acquired by Wachovia.[15]

---

[13]   Sara Lepro, *Justice Department probing Golden West Financial*, AP, Nov. 20, 2008, *available at* http://www.forbes.com/ feeds/ap/2008/11/20/ap5723055.html (last visited on Dec. 2, 2008).

[14]  J. Gediminus, *Golden West Financial Investigated by SEC & US Justice Dept.*, Nov. 21, 2008, *available at* http://www.hotstocked.com/article/0959/golen-west-financial-investigated-by-sec-amp-usjustice-dept.html (last visited on Dec. 2, 2008).

[15]  *U.S. Probing Golden West Lending, Sale: Prosecutor*, Reuters, Nov. 19, 2008, *available at* http://www.newsdaily.com/ stories/tre4aj0kl-us-wachovia-probe/ (last visited on Dec. 2, 2008).

### H.    Wachovia's Wholesale Channel Was Infested With Deficiently-Underwritten Loans

133.    Wachovia's repeated assertions of "very conservative underwriting" are further belied by the deficient loans purchased through Wachovia's wholesale channels.  Wachovia, in order to expand its operations in and profits from the residential mortgage-backed securities ("RMBS") and collateralized debt obligation ("CDO") markets, increased its profile in the wholesale mortgage banking business.  As reflected below, a substantial portion of these loans were defective and were left on Wachovia's balance sheets to rot.

134.    In December of 2005, Wachovia announced the acquisition of American Mortgage Network ("AmNet"), a wholesale mortgage banker.  AmNet was expected to fund approximately $14-$15 billion of loans in 2005.  AmNet served about 7,000 mortgage brokers and had about $1.9 billion in warehouse facilities.  AmNet's mortgage volume was concentrated in Alt-A loans, option ARM loans, and interest-only loans.  Wachovia touted the acquisition as "an important enhancement to our market-leading structured products capabilities."

135.    In September 2006, Wachovia announced that it was creating a new wholesale lending division by combining AmNet and Wachovia's Third-Party Lending businesses.  The new unit was called Wachovia Securities Wholesale Mortgage and became a part of Wachovia's Corporate and Investment Banking Group.  In a September 27, 2006 press release, Curtis Arledge, head of Wachovia's Fixed Income Division, noted that "[o]ur vertically integrated mortgage model leverages our capabilities in the secondary market and will help drive profitability as we meet continued global demand for mortgage-backed securities."

136.    Besides relying upon direct/retail mortgage production, Wachovia utilized the

wholesale and correspondent channels for a substantial portion of its mortgage production, specifically with respect to Wachovia's Vertice subsidiary.  During the first quarter of 2007, all of Vertice's entire loan production – $3.9 billion – was originated through the wholesale/broker channel.  Similarly, Golden West relied on brokers and wholesale for a substantial portion of its mortgage production.  In the first quarter of 2007, $5.7 billion of World Savings' $9.3 billion total loan portfolio was generated through the wholesale/broker channel.  *See* Wachovia Corp. Mortgage Update Presentation, dated June 12, 2007.

137.    Contrary to Wachovia's purported "conservative underwriting practices," litigation involving Wachovia and its correspondent lenders reveals massive problems with respect to a significant number of defective loans.  Wachovia was frequently unable to sell these defective loans into RMBS and was stuck with these loans on its balance sheet.  For instance, in litigation Wachovia filed against Ameriquest Mortgage Company in the County of Mecklenburg, North Carolina, Wachovia complained of at least 135 mortgages that contained misrepresentations that breached warranties from Ameriquest.  Although Wachovia demanded repurchase of these loans as early as November 2006, Ameriquest failed to comply.

138.    Similarly, litigation between Wachovia and Just Mortgage, Inc.,[16] a Pomona, California mortgage lender, reveals major underwriting problems, including early payment defaults. In June and July of 2007, Wachovia purchased approximately $11.95 million of Home Equity Line of Credit ("HELOC") first and second loan mortgages from Just Mortgage.  By September 2007, Wachovia notified Just Mortgage that numerous loans had early payment defaults and requested that

---

[16]  Just Mortgage, Inc. is also the subject of litigation by Indymac relating to similar repurchase demands for early payment defaults.

Just Mortgage repurchase these early payment default ("EPD") loans. Wachovia failed to commence litigation against Just Mortgage until June of 2008, approximately nine months after Wachovia experienced the rash of EPDs.

139.    The foregoing litigations are merely illustrative of the substantial underwriting problems that Wachovia was experiencing in its wholesale correspondent channel. On July 22, 2008, Wachovia announced that it was exiting the wholesale mortgage origination channel immediately.

**I.      Defendants Concealed Wachovia's Billions of Dollars of Exposure to Subprime CDOs, and Overstated the Value of Those CDOs**

140.    During 2006 and 2007, Wachovia created, structured and underwrote approximately $10.11 billion of CDOs backed, as detailed below, by pools of subprime mortgages. At all times until November 9, 2007, Wachovia concealed that it had retained in excess of $2.1 billion of those very subprime CDO securities. Wachovia furthered its concealment, at all times until October 19, 2007,[17] by carrying these (undisclosed) CDO holdings at par value, despite the fact that their value had been materially and evidently impaired no later than February 2007.

141.    Wachovia continued to overstate the value of its CDOs at all times until July 22, 2008. Directly observable indicators of those CDOs' value – most directly, indexes tracking the market prices of CDOs and of the assets collateralizing the CDOs – had long indicated, essentially, that there was none. Wachovia turned a blind eye to those indicators and only acknowledged in July 2008 the truth that such directly observable indicators had long stated. Wachovia's series of

---

[17]   Wachovia first revealed the existence of these CDOs simultaneously with their writedown on October 19, 2007. Wachovia's October 19, 2007 disclosures of writedowns indicated that Wachovia held some amount of these instruments, but Wachovia did not then disclose what that amount actually was.

writedowns between October 19, 2007 and July 22, 2008 belatedly conceded: (1) what had been evident by February 2007 – that the value of these instruments was materially impaired; and (2) what was evident by October 2007 – that the value of these instruments had almost entirely disappeared. By July 2008, Wachovia had written down the value of this $2.1 billion of retained CDOs by $1.69 billion, or 79.7%. But that degree of value deterioration had in fact existed since October 2007, and much of it had existed since February 2007.

142.     The risks of such subprime CDOs had been well and widely understood no later than February 2007. That their value was materially impaired was likewise recognized by the market no later than February 2007, and the degree of impairment only became more severe thereafter. By October 2007, the impairment was near-total, and subsequent declines in value were minor as most of the value had already evaporated. The only matter that was *not* known was that Wachovia had any exposure to such decreasingly valuable instruments.

## III.   DEFENDANTS' MATERIALLY MISLEADING STATEMENTS

143.     In light of the foregoing, many of Defendants' Class Period statements concerning Wachovia's and Golden West's standards and practices were false and/or misleading. Throughout the Class Period, Defendants touted Golden West's "conservative" underwriting standards, and how Golden West avoided subprime loans and took steps to ensure that the borrowers had the wherewithal to repay the loans in question. These representations were particularly important to investors as the Class Period progressed and the nationwide decline in housing pricing – which had already begun at the time the Golden West acquisition was announced in mid-2006 – worsened. As a result of this decline, lenders were forced increasingly to look to the borrowers themselves rather than to the underlying properties to satisfy payment deficiencies.

A.     **May 8, 2006 Conference Call**

144.    The Class Period begins on May 8, 2006, when Wachovia held a conference call to discuss its planned acquisition of Golden West for total consideration of $24.3 billion.  The acquisition was completed on October 1, 2006.  At the time of the acquisition, real estate prices had already started to decline nationwide.  By late 2006 when the Golden West deal closed, the decline had worsened.

145.    On the May 8, 2006 conference call announcing the Golden West acquisition, Wachovia's CEO, defendant Thompson, was effusive about Golden West's underwriting standards, saying "They are obsessed with conservative underwriting . . . ."  Thompson added: "They have a simpleminded focus as Herb [Sandler, co-CEO of Golden West] described an elegantly simple option ARM product that is low risk because of, number one, the product features of their option ARM and two, because of their rigorous underwriting process."  Thompson also stated, "They have no subprime origination at Golden West, so a very conservative portfolio."

146.    The May 8, 2006 conference call statements are false and misleading because the Pick-A-Pay loan program is inherently risky because of the potential for negative amortization.  In addition, many of the confidential witnesses confirm that the underwriting process was not "rigorous" and the portfolio was not "conservative."  Contrary to Defendants' representations, many of the loans were subprime.   Indeed, as noted elsewhere in this complaint, multiple percipient witnesses state that 90% of Pick-A-Pay loans were stated income/no documentation, and many were the product of fraudulently inflated borrower income and asset figures.  Further, CW 9 stated that 100% of the Pick-A-Pay loans that he and his co-workers reviewed fell below World Savings' stated standards and were openly considered subprime within the company.

55

### B.     May 12, 2006 Conference Call

147.    On May 12, 2006, Wachovia held an informational conference call on the Golden West merger.  CFO Wurtz discussed the caps that were in place on the Pick-A-Pay loans' minimum payment option.  Under that option, the borrower's payment does not cover all the necessary interest, resulting in the unpaid interest being added to the loan's balance.  Wurtz said that on a loan with an LTV of less than 85%, the amount of negative amortization (or "deferred interest") could only grow until it represented 125% of the original loan amount; thereafter the loan would be recapped such that it is adjusted to a payment that would pay off over the remaining term of the loan.  For loans with an LTV greater than 85%, that recast would occur when the loan amount reached 100% of the original loan amount.  In response to an analyst's question, Wurtz said that the average borrower who chose the negative amortization option would take a "long time" to reach the aforementioned caps, probably in "six or seven years:"

> **Gerard Cassidy, RBC-** *Analyst*
>
> "Very good. Going on getting back to the deferred interest comments that you made earlier.  Can you share with us on the deferred interest how long does it take a typical person who takes out one of these mortgages these option ARMs if they were to choose the minimum payment from day one? How long does it take them to get those caps of 110 and 125%."
>
> **Tom Wurtz, Wachovia- CFO**
>
> "It takes a long time.  Probably about at least four or five years, probably in the average environment six or seven years, something like that."

148.    On the issue of credit quality of Golden West customers, defendant Wurtz said that he:

> "would attribute [Golden West's] success to . . . making certain that
> the borrower can pay at the contractual interest rate for the loan . . .
> . [T]hey don't anticipate when they make the loan that the borrower
> will be unable to repay the loan should they choose to make the full
> amortizing payment."

149.    The May 12, 2006 conference call statement is false because Wurtz failed to disclose

that anyone who had selected the Pick-A-Pay option with the negative amortization option would

not be able to pay back the loan if the prices of housing continued to decline as they had by mid-

2006.  In addition, as the confidential witnesses confirmed, the Defendants made mostly stated

income loans, and, rather than "making certain" that the borrower had the ability to repay,

Defendants often turned a blind eye to, or even encouraged, borrower fraud.

### C.    May 16, 2006 Conference Call

150.    On May 16, 2006, at a UBS Global Financial Services Conference, Thompson

commented on the conservative nature of the Pick-A-Pay loans it planned to originate after the

Golden West merger: "And Wachovia can originate Golden West's conservative option ARM

products on the East Coast."

151.    Responding to a question about his lack of concern over the growing amount of

negative amortization in the Golden West portfolio, Thompson dispelled investor worries: "I'm

really not concerned.  And I'm not concerned because of the conservative underwriting standards

that the company has."

152.    The May 16, 2006 statements are false because there was nothing conservative about

the Pick-A-Pay loans.  According to CW 1, at least 90% and probably more of the Pick-A-Pay loans

were stated income/no documentation loans with FICO scores in the low 600s.  CW 3 stated that the

stated income/no documentation loans were known at World Savings/Wachovia as "Quick Qualifier"

loans.  CW 3 said that if the Company had required documentation or other verification of income

on the "Quick Qualifier" Pick-A-Pay loans, "there was no way they would have been approved."

Underwriting standards were not subject to internal controls and oversight by Wachovia management

because the loans were never integrated into Wachovia's mortgage business.  According to CW 7,

all of the underwriting was performed in San Antonio by former Golden West employees.  Finally,

CW 9 reported that 100% of the Pick-A-Pay loans that he and his co-workers were responsible for

reviewing fell below industry standards and were considered subprime loans.

### D.    December 28, 2006 *American Banker* Article

153.    On December 28, 2006, *American Banker* reported on the Golden West acquisition,

incorporating multiple statements from the company:

> Wachovia Corp. had billed its purchase of the thrift company Golden
> West Financial Corp. as a way to strengthen its branch network and
> cross-sell products to new customers, but early on in the integration
> it says it is finding readier opportunities on the mortgage side of the
> business.
>
> ***
>
> Meanwhile, however, it has already launched a mortgage product that
> draws on both Wachovia's and Golden West's product styles.
>
> "We're finding opportunities that we didn't even think of when we
> agreed to do the deal . . . . There's more upside surprises," Robert
> McGee, who is coordinating the integration for Wachovia, said in a
> recent interview.
>
> **Wachovia has introduced a fixed-rate mortgage that offers
> payment options similar to those available in Golden West's
> adjustable-rate mortgages. The company is also replacing
> generalists in its East Coast branches with mortgage specialists,
> many of whom are coming from Golden West.**
>
> In the interview in Charlotte, Mr. McGee, who is also the chief
> operating officer of Wachovia's general bank, discussed how the

58

integration is going, addressed persistent investor concern about Golden West's focus on option ARMs, and talked about his plan to relocate to Oakland to make sure things go smoothly.

The quick introduction of mortgage products makes it likely Wachovia will generate revenue faster than first projected, he said. In announcing the deal last May, Wachovia projected that it would produce $230 million of new annual revenue by 2009.

"We should make enough progress so that 2008 will be measurably better than what we had originally planned . . . **and I'm confident that we'll do better in 2009 than we told folks,**" he said. He declined to update the revenue-expectation number.

* * *

**Analysts "are really overreacting" to negative amortization, Mr. McGee said. "The credit and the risk isn't any different than when people draw from a home equity line," he said. Most of the deferred interest is tied to homes with loan-to-value ratios of less than 80%. "So there is still a huge amount of equity in these properties."**

154.    The December 28, 2006 *American Banker* comments are false and misleading because even before the Golden West acquisition property prices and therefore homeowner equity had begun declining, particularly in California where Golden West made the lion's share of its loans, and the only way the Pick-A-Pay loans were successful was when housing prices were increasing. Thus, "negative amortization" was, in fact, an issue.

E.    **January 23, 2007 Conference Call**

155.    In an earnings conference call on January 23, 2007 reporting fourth quarter 2006 earnings results, Truslow stated:

> **The allowance for credit losses, as has been mentioned, wound out up [this] year at 3.5 billion dollars when you take in the reserve for unfunded commitments or 84 basis points. We recognize that on the surface when you stack this up against peers it looks low**, but as we've been saying for a couple of quarters, the addition of Golden West will have a dilutive impact on that reserve to loan ratio and that we have brought over a very large portfolio of loans that have had no losses for many years and the outlook for 2007 is for a track record that will continue with very de

59

minimus losses and so the impact when you bring such a low loss content portfolio into the overall mix will just naturally dilute that ratio. As a matter of fact, after you bring over Golden West and look at our 420 billion dollar resulting portfolio, something like 45% of the total portfolio is now in the form of first lien residential consumer mortgage loans which by their very nature have a very, very low loss content. So I just encourage you as you look at that ratio and compare across peers you have really got to take our loan mix into consideration and the loan mix at Wachovia is probably pretty unique relative to a lot of peers.

156.   The January 23, 2007 conference call statement was false because Wachovia's loss reserves, which Truslow admitted were low by industry standards, were not explained by the purported "unique" qualities of Wachovia's loan mix.  At this time, Defendants were well aware that the housing market had cooled significantly in California and Florida, where the vast majority of Golden West's loans had been originated, and that dropping property values were resulting in increased defaults.  Because the success of the Pick-A-Pay loan program depended in large part on ever increasing property values – as especially was the case for those borrowers who selected the minimum payment option – Wachovia was well aware of, or recklessly indifferent to, the fact that their loan reserves were significantly understated in light of the deteriorating real estate market.

### F.   Wachovia's 2006 Form 10-K

157.   On February 28, 2007, Wachovia filed its annual report on Form 10-K for 2006, ended December 31, 2006 (the "2006 10-K").  The 2006 10-K was signed by Defendants Thompson and Wurtz, and included Wachovia's financial statements for 2006.  The Company reported revenues for the year of $29.95 billion, compared with venues of $26.11 billion for fiscal year 2005.  Diluted earnings per share for the year were $4.63, an 11% increase over diluted earnings per share for the previous year.  The 2006 10-K was the first annual or quarterly report by Wachovia following the October 2006 acquisition of Golden West.

60

158.   In discussing the Company's standards and methodologies for determining when to charge off delinquent loans, the 2006 10-K stated the following:

> The accrual of interest is generally discontinued on commercial loans and leases that become 90 days past due as to principal or interest, or where reasonable doubt exists as to collection, unless well secured and in the process of collection.  Certain consumer loans that become 120 days past due are placed on nonaccrual status.  Consumer real estate secured loans that become 180 days past due are placed on nonaccrual status, with the exception of certain non-traditional loans which are placed on non accrual status at 90 days past due. Generally, consumer loans that become 180 days past due are charged off.  When borrowers demonstrate over an extended period the ability to repay a loan in accordance with the contractual terms of a loan classified as nonaccrual, the loan is returned to accrual status.

159.   The foregoing statement was materially false and misleading, and misstated Wachovia's actual practice for charging off delinquent loans.  In fact, Defendants had not been charging off delinquent Golden West Pick-A-Pay loans after 180 days of non-payment.  Instead, as Defendants would first admit on January 22, 2008, Wachovia had, at all times prior to the fourth quarter of 2007,  "recogniz[ed] the losses at the time of an actual property sale."  Thus, the loan charge-offs recorded in the 2006 10-K were materially understated because Wachovia had, in fact, been applying a charge- off policy with respect to the Golden West loans that were far more liberal than the policy stated in the 2006 10-K.

160.   In addition, Wachovia's financial statements in its 2006 10-K materially misstated and did not fairly present Wachovia's financial performance and condition, and were not presented in accordance with GAAP and applicable SEC rules and regulations.  The Company's results of operations, including its provision for loan losses, net income and earnings per share ("EPS"), were materially false and misleading, because those amounts disclosed were not derived in conformity with Generally Accepted Accounting Principles ("GAAP").  In particular, Wachovia's 2006 financial statements:

61

a.  overstated Wachovia's loan portfolio (*i.e.*, avoided direct write-offs) and understated the allowance for credit losses, and thus these financial statements materially understated the amounts reported as the provision for credit losses, and thereby materially overstated net income;

b.  omitted the disclosures required by Statement of Financial Accounting Standards ("FAS") 107 and FSP 94-6-1 regarding concentrations of credit risk created by its loan portfolio;

c.  omitted disclosure of "information that is adequate to inform users of the general nature of the risk associated with the concentration" for concentrations in volume of business with particular customers, concentrations in revenue from certain products, and concentrations in certain markets or geographic areas;

d.  omitted the disclosures required by FAS 107 and FSP 94-6-1 regarding significant concentrations of credit risk created by its investment portfolio which, in significant parts, was comprised of subprime-related asset-backed securities ("ABS"), CDOs and RMBS, commercial mortgage-backed securities ("CMBS") and consumer mortgages, leveraged finance distribution exposures, monoline-related exposures, and subprime-related CDS;

e.  materially misstated the value and or valuation of, generally, the Company's financial position, and more specifically, but not exclusively, the investments discussed in (d) above, as those values were not derived in conformity with GAAP; and

f.  Omitted the disclosures required by American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 94-6 for significant

estimates in violation of GAAP and SEC rules; and failed to properly present variable interest entities ("VIEs"), for which the Company was the primary beneficiary, as consolidated, and thereby, materially misstated the Company's financial position and results of operations, in violation of GAAP.

161.    In the 2006 10-K, the Company described its outlook for credit quality: "We are optimistic about our outlook for credit quality as we enter 2007 given the highly collateralized nature of our loan portfolio.  While we expect modest increases in credit costs, we believe overall credit quality will remain strong."

162.    The Company reported allowance for loan losses of $3.36 billion at the end of the fiscal year 2006, compared to loan loss reserves of $2.72 billion at the end of fiscal year 2005.

163.    Further assuring investors of the veracity of the information contained in the Form 10-K, the report included a certification signed by Defendants Thompson and Wurtz:

***

2.    Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statement, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financing reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to

us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financing reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in according with generally accepted accounting principles;

164. The 2006 10-K report was also false and misleading because Defendants failed to disclose the following facts:

a. The Company did not follow strict underwriting and loan-origination practices, including in its Pick-A-Pay mortgage portfolio;

b. A material portion of the Company's loans were not "highly collateralized." Declining property values and increasing obligations by Pick-A-Pay customers who were making minimal monthly payments resulted in material and dangerous increases to the collateral's LTV ratio. Furthermore, because most of the loans were made on a stated income basis and Defendants therefore had no way of confirming the credit-worthiness of many loan applicants, the Company's reassurances about its conservative loan-origination and underwriting practices lacked a reasonable basis;

c. The Company's loan loss provisions were understated and did not properly reflect the risk facing the Company, thereby inflating Wachovia's reported income; and

d. the certifications signed by Defendants Thompson and Wurtz, which attested to the accuracy of the reported financial statements in the quarterly and annual SEC filings, were themselves misleading because the above

misstatements and omissions included in the reports and provided false comfort to the market.

**G.    April 16, 2007 Conference Call**

165.    In a conference call relating to the release of earnings figures for the first quarter of 2007, on April 16, 2007, CEO Thompson said:

> [L]ooking forward with the integration of Golden West on track, we feel confident about the **superior credit quality of our mortgage portfolio**, the prospects for cross-selling our product set in Golden West markets, and originating pick-a-pay mortgages through traditional Wachovia channels.

166.    On the same call, CFO Wurtz said, "One thing I can tell you is we will not stretch for earnings by altering the Golden West origination system or weakening their proven credit practices."

167.    CRO Truslow stated:

> As we've talked about before, the Golden West loans are **very conservatively underwritten** at low loan to values with particular attention paid to the quality of the appraisals.  Most appraisals are completed by in-house appraisers, and the appraisal process, I can tell you it's very robust.  Over the last several months as our teams have worked more closely with one another through integration, **our view regarding the quality of the Golden West underwriting practices has just continued to grow stronger.**

168.    By early 2007, the media and politicians began to question the wide availability of the unusual mortgage loans that had contributed to the now-deflating real estate bubble.  Interest groups and lawmakers suggested that tighter mortgage-industry regulations were necessary.  In response to a question about the legislative atmosphere around "exotic instruments" in the mortgage industry and if Wachovia expected to get "caught up" in it, Thompson stated:

> [W]e don't fear it because the guidance that we've seen would impact most people in the – in the option ARM and – and fixed pick-a-pay kind of business.  **But it does not affect us.  And I think that goes to the very conservative underwriting standards** and servicing standards that the Sandlers implemented at Golden West.  And we are changing none of that.  So, if anything, we think that any changes might, in fact, benefit us relative to our competition.

65

169.    Contrasting Wachovia to its competitors, Thompson stated:

> I also think that many competitors were underwriting to the introductory or teaser rate.  And Golden West has never done that.  We've always underwritten to a fully indexed rate, which we will continue.  **I think if you look at the credit history and right up to the current moment, it would be had for me to imagine how anybody could look at our underwriting of these loans and draw any conclusion under—other than we are very responsible underwriters and servicers of these – of these clients.**

170.    In response to a question of whether there were any loans in Golden West's portfolio that would be considered equivalent to an Alt-A type of loan, Truslow stated:

> Well, a very good bit of it would be, as well as the rest of our consumer book.  But the difference is those are on balance sheet loans.  **And we've got the other underwriting criteria**.  So, for instance, in our credit card business, our auto business or – and our equity line business, it's—it is very common where you know the customer, have a relationship, not to provide tax returns, and all those kinds of things that you tend to associate with a conforming mortgage loan . . . .

171.    The April 16, 2007 statements are false and misleading because Wachovia's credit quality was not superior and it did not rely on "conservative underwriting standards."  Several CWs (CW 9, CW 1 and CW 3) support the fact that Pick-A-Pay loans were sold to subprime borrowers with FICO scores well below 660 and that the loans themselves had subprime characteristics, such as being stated income or no documentation.  Subprime lending is inherently risky, and to make such loans almost entirely without employment or income verification exacerbates those risks.  Wachovia was in fact stretching for earnings and weakening the portfolio's credit quality.  As explained by CW 3, in order to maximize the number of Pick-A-Pay loans that it was underwriting, Wachovia embarked upon a scheme to falsify prospective borrower's income in order to qualify the borrower.  According to CW 4, the priority at Wachovia was to sell as many Pick-A-Pay loans as possible, despite the availability of more traditional mortgages.  These policies are inconsistent with conservative or responsible underwriting.  Wachovia was indeed affected, like others, by the rapidly

66

declining housing market.  However, it took steps to conceal the extent to which its credit quality was actually suffering, and would continue to suffer.

172.    Also during the April 16 2007 conference call, Truslow addressed Golden West's purportedly rigorous appraisal process – stating "[a]s we've talked about before, the Golden West loans are very conservatively underwritten at low loan-to-values with particular attention paid to appraisals."  Linking Golden West's past practices to those employed by Wachovia, Truslow added "[m]ost appraisals are conducted by in-house-appraisers and the appraisal process, I can tell you it's very robust."  At the same time, Tom Wurtz assured investors "We're sticking to the Golden West model and are not going to struggle for higher originations at the expense of damaging the business model we purchased . . . ."

173.    Indeed, during the Class Period, Wachovia repeatedly stressed that it, like Golden West, utilized in-house appraisers to value properties for Pick-A-Pay loans.  For example, Wachovia's June 12, 2007 Mortgage Update Presentation identifies "appraisal standards – in house appraisers produce real values" as one of the "customer protections" of its "Pick-a-Payment loan" product.  In a September 10, 2007 presentation given by Thompson at a Lehman Brothers Financial Services Conference, Thompson contrasted Wachovia's in-house appraisal process for its Pick-A-Pay loans with the "outsourced to market appraiser" approach of Wachovia's competitors.  This same boast was repeated by Truslow at a November 9, 2007 presentation before the BancAnalysts Association of Boston Conference.  And again, during Wachovia's January 22, 2008 Q4 2007 earnings conference call, Truslow stressed that "Golden West's underwriting practices focused on rigorous appraisal process," and that Wachovia use of its "own appraisers embedded in the market" was a competitive "advantage."  Furthermore, even at the May 12, 2006 Informational Conference Call regarding Wachovia's acquisition of Golden West, Tom Wurtz stated "I would attribute [Golden West's] success to having exceptional appraisals," and that, in reference to the in-house

67

appraisers, "it can't be overrated in terms of . . . the consequences to the overall value of what they create."  Indeed, Wurtz cemented both the importance of the in-house appraisals to the Pick-A-Pay loans' past and future success when he stated "I don't think we want to do anything to change the way [Golden West] operates in terms of underwriting [sic] the dedications they have to the integrity of the appraisal process."

174.    These statements were false and misleading.  As recounted by CW 4, after the acquisition, Wachovia did not follow Golden West's tradition of utilizing in-house appraisers to value properties for Pick-A-Pay loans, but instead used outside, third-party appraisers.  In fact, according to CW 4, after the acquisition, Wachovia's in house appraiser's were relegated to merely reviewing the work done by the outside appraisers.  CW 4 added that the outsourcing of appraisals made them less reliable because the outside appraisers had a reputation for assigning higher value to homes as compared to Golden West's appraisers.  That third-party appraisers may have divergent interests from in-house appraisers – and therefore arrive at divergent appraisal values – was noted by Deutsche Bank in its January 22, 2008 4Q07 Wachovia earnings review: "Per the company, mitigants to a potential spike in loss rates to a multiple above historical levels are Golden West's (now Wachovia's) in-house appraisal process (**not outsourced to third-parties who don't get paid if the loan is not closed**) . . . ."

175.    Wachovia's misstatements regarding its use of in-house appraisers were particularly material to investors because, as stated above, Wachovia repeatedly touted Golden West's rigorous in-house appraisal process as one of the cornerstones of the Pick-A-Pay loan's historical success.

**H.    Wachovia's First Quarter 2007 Form 10-Q**

176.    Commenting on its management of credit risk, the Company stated in the First Quarter 2007 10-Q, which was filed with the SEC on May 4, 2007:

> The low level of net charge-offs reflects a continuing solid credit environment, the highly collateralized nature of our loan portfolio and

> our **careful management of the inherent credit risk in our loan portfolio.**  The Golden West portfolio has a long record of extremely low net charge-offs, including, virtually none for the past eight years, reflecting **strong underwriting and credit risk management.**

**I.      July 20, 2007 Conference Call**

177.    On the Company's July 20, 2007 earnings conference call, defendant Truslow commented on Wachovia's exposure to the credit crunch in the financial markets:

> I thought I would just make a couple of comments switching gears about the turbulence in the capital markets and the impact on Wachovia.  Overall, I feel like we are in very good shape… Probably not appropriate to get too specific around the numbers at Wachovia, but acknowledging there would be a high level of interest in that but for competitive reasons I want to be a little careful of how specific we get bu**t we view the risk to Wachovia [sic] what's currently happening is very modest.**

> 178.    Discussing Wachovia's exposure to subprime mortgages, Truslow said:

> As for subprime in our Capital Markets businesses, and in our origination businesses, we shied away from diving into this business over the last few years as the market took off really for two reasons.  One is given the firm's prior experience in the subprime market in the late '90s and also, importantly, the view of our Capital Markets group that the risk in this area has been underpriced for quite some time, so we just haven't felt that it has been a business that's made good sense for us and, therefore, **we've actively managed our business to minimize our exposure to the subprime market.  So as a result there's been little impact to our businesses with the turbulence in the subprime markets and we don't anticipate any meaningful potential impact to earnings from subprime going forward.**

179.    Adding further commentary on the Company's subprime exposure, Steve Cummings, Wachovia's head of corporate and investment banking, said:

> But very quickly on a couple key markets, the subprime and CDO businesses, which Don touched on.  As he said, **we have avoided the origination side of subprime for some time.**  We don't have that origination platform plus when **we have brought platforms in that did have subprime activities over the last 18 to 24 months we have purposely exited that portion of the business.**

180.    Truslow discussed Wachovia's Pick-A-Pay product:

I do want to remind everybody that our pick a pay product, which is our option payment.  ARM is structured with caps that limit the amount customer's payment may increase in any given year to no more than 7.5% of the payment.  So on a $1,000 mortgage payment that would be a $75 increase from one year to the next and therefore, **I just want to point out that payment shock in our option ARMs is just not an issue here at all.  It's really not an issue with the product.**  Given the environment, again, we're not surprised to see the residential non-performs trend up as we noted last quarter, it's what we've been expecting and I would anticipate that we'll continue to see some trend up over the next few quarters as well.  **But because the way these loans are underwritten, we're not seeing any meaningful increases in losses in the portfolio and we don't expect to see any rises and losses we look forward over the next few quarters and so the underwriting process and how these things are booked and what we're ultimately relying upon holding up very well as expected.**

181.    Cummings stated that Wachovia is "one of the larger players in the CDO business and in that market **we've managed that exposure also extremely well**, some indicators of that would include that the recent rating agency actions that have been taken."

182.    The First Quarter 10-Q and the July 20, 2007 conference call statements were false and misleading.  Truslow was in a position to know the true financial condition of the company and that the risk to the Company in the turbulent credit market was far more severe than "moderate." For reasons discussed above, Wachovia had engaged heavily in subprime lending in contravention of Truslow's claim that the Company "actively managed [its] business to minimize its exposure to the subprime market."  Wachovia's disregard of borrower asset or income verification, not to mention its active encouragement of fraud, belied the 10-Q's claims of "careful management of risk" and "strong underwriting and credit risk management."   According to CW 5, Wachovia originated Pick-A-Pay loans for borrowers with FICO scores even lower than 600 – far lower than the Federal Reserve's Guideline setting the FICO score cut-off for a subprime borrower at 660 or below – if they provided certain minimal documentation.  As reported in the *Sacramento Business Journal*, Wachovia later tightened this permissive lending practice to require "a minimum FICO score from

potential borrowers." *Wachovia adjusts mortgage underwriting guidelines*, Sacramento Business Journal, Apr. 11, 2008.

183.    Moreover, according to CW 1 Wachovia had embraced subprime originations for borrowers with FICO scores in the mid-600's on a stated-income basis.  CW 1 added that for many stated-income loans, FICO scores were not required at all if the loan fell below a certain LTV threshold.    According to CW 9 and CW 3, lending to subprime borrowers almost exclusively without documentation and verification of income or assets created the perfect storm of increased risk.  As stated by CW 4, when coupled with its "sell Pick-A-Pay at any cost" philosophy, the already high risk of credit loss was made much worse.  Ultimately, this practice too was tightened in mid-2008, when Wachovia began requiring underwriters to "verify income and employment history before making loans it that it intends to keep in its portfolio."  *Wachovia adjusts mortgage underwriting guidelines*, Sacramento Business Journal, Apr. 11, 2008.  Under these conditions, Truslow could not have reasonably believed that Wachovia's portfolio would hold up well in a turbulent market.

**J.    Wachovia's Second Quarter 2007 Form 10-Q**

184.    In the Second Quarter 2007 10-Q, filed with the SEC on July 30, 2007, the Company again falsely described its management of credit risk:

> Consumer net charge-offs were $249 million, up from $112 million in the first six months of 2006… The low level of net charge-offs reflects the highly collateralized nature of our loan portfolio and our **careful management of inherent credit risk**.  Our consumer real estate portfolio has a long record of relatively low net charge-offs, **reflecting strong underwriting and credit risk management.**

185.    These representations, which were identical to statements made in the prior quarters' 10-Q filings, were materially inaccurate for the same reasons.

K.    **October 19, 2007 Conference Call**

186.    On an October 19, 2007 earnings conference call, CEO Thompson made a partial, but materially false and misleading, disclosure about the Company's subprime exposure:

> I would say that as we looked at results, I think the biggest disappointment for me is that of those $1.3 billion in marks, we had about $300 million, roughly $300 million in losses on AAA subprime paper that was, in trading desks or in inventory.  **And the thing that disappoints me about that is we have an institutional bias here against subprime.  We avoided it in our origination efforts and we avoided it in, for the most part, in our securitization efforts.  So, frankly, I think we had a little bit of a break down in having AAA subprime in some of our portfolios that we took losses on.**  I do think it is really quite amazing that we could take $300 million of losses on AAA paper.  We didn't expect that that paper could degenerate that fast, with that kind of swiftness.

187.    Upon the Company's first partial, incomplete and misleading disclosure of its exposure to subprime mortgage backed securities, and of valuation losses of $1.3 billion, causing it to miss its estimated third quarter earning by 14 cents, the stock price declined $1.74 (or 3.61%), falling to $46.40 on October 19, 2007.  However, Wachovia did not allow for an increased provision for credit losses and a deterioration in credit quality, playing into concerns that the third quarter might not have been the worst for the financial sector.  *See Stock Market Update*, Reuters, Oct. 19, 2007.  Had Wachovia taken the appropriate reserves for impaired assets, as required by GAAP, its stock would have declined much more than it did.

188.    The October 19, 2007 conference call statement is false because Wachovia was not, as a matter of Company policy, against subprime lending whether in origination or securitization.  Wachovia purchased Golden West knowing that it specialized in non-traditional, subprime lending.  After the acquisition, Wachovia continued to aggressively originate Pick-A-Pay loans to subprime borrowers.  Despite having more traditional loans available, its priority was to sell Pick-A-Pay at any cost, including to those borrowers that had no realistic ability to repay the loan.

**L.      Wachovia's Third Quarter 2007 Form 10-Q**

189.    In the Third Quarter 2007 10-Q, filed with the SEC on November 9, 2007, Wachovia reported that the Company was setting aside $600 million in the fourth quarter and said the value of securities it owned linked to subprime mortgages dropped by $1.1 billion in October 2007.  This followed write-downs of $1.3 billion in the third quarter.  In the Third Quarter 2007 10-Q the Company detailed its exposure to subprime RMBS.  Despite this partial disclosure about its losses on subprime mortgage–backed securities, the Company continued to make positive representations about its management of credit risk in the Third Quarter 2007 10-Q:

> While our outlook indicates a rise in the overall level of change-offs at this point in the credit cycle, we believe the well collateralized nature of our real estate-secured portfolio, **our careful management of inherent credit risk and strong underwriting** will position us relatively well in a more uncertain credit environment.

**M.      November 9, 2007 Conference Call**

190.    On November 9, 2007, Defendant Truslow gave a presentation on Wachovia at a BancAnalysts Association of Boston Conference.  By that time, the risks of and losses from Option ARMs (of which Wachovia's Pick-A-Pay was one variant) were a prominent focus of market concern.  Noting that Wachovia's "Pick a Pay product gets a lot of attention" and that Wachovia's Pick-A-Pay mortgages "are often compared with other option ARMs available in the marketplace," Defendant Truslow sought to defuse market concerns by insisting, falsely, that "there really are very significant differences in the product" that made Wachovia's Pick-A-Pay mortgage immune from the risks and losses then apparent in other subprime and Option ARM mortgages.

191.    First, Defendant Truslow represented that Wachovia originated its Pick-A-Pay mortgages for its own portfolio, rather than to be securitized and sold off, so Wachovia was motivated to produce safer, less risky mortgages:

> First of all, this is a portfolio product for us. We are a portfolio lender and that is important because everybody in the chain of these loans

> basically treats this with -- these loans with a cradle to grave mentality. So the appraisers, the underwriters, the relationship managers to their management team, this is not an originate and dump into the capital market and be done with it sort of product. This is a product where people are measured and their performance rewarded or penalized, based upon the long-term quality and value of these loans that are being created.

192.    This statement was materially misleading.  As already detailed, Wachovia underwrote its Pick-A-Pay mortgages on the debased basis of "stated" income, the very standard then reigning in the mortgage securitization markets.  Wachovia's Pick-A-Pay mortgages were thus not distinguished from mortgages originated for securitization, but in truth shared exactly the same debased origination standards and heightened default risks.  Further, as already detailed, Wachovia's compensation structure and origination practices were not based on "the long-term quality and value of these loans that are being created", but rather on Defendants' drive to increase Pick-A-Pay origination volume and short term profits while ignoring the debasement of underwriting standards and the consequent heightening of long-term risk.

193.    Defendants made exactly the same misrepresentations, which were false and misleading for exactly the same reasons, in later earnings conference calls and in later investor conference presentations of November 14, 2007 and February 13, 2008.

194.    Second, Defendant Truslow emphasized the quality and rigor of Wachovia's "in-house appraisers."  These representations, as explained above (Section III.G, *supra*) were materially false and misleading.   As also alleged above, Defendants continued to make similar misrepresentations throughout 2007 and much of 2008.

195.    Third, Defendant Truslow represented that the Pick-A-Pay product design, and particularly the 7.5% annual rate reset cap, distinguished Wachovia's Pick-A-Pay mortgages from other subprime adjustable rate loans then experiencing high rates of default due to rate resets that

produced "payment shock" and spiking defaults.  Defendant Truslow asserted that, for Pick-A-Pay

mortgages, "**resets here just really aren't an issue**:"

> It is also a consumer friendly product from a resets standpoint.
> Obviously resets from the 2/28 and the 3/27[18] that are on the market
> are of significant concern, particularly in the subprime sector. Our
> product basically has a 7.5% payment cap on the minimum payment
> which protects consumers. So payment resets here just really aren't an
> issue . . . .

196.    Defendant Truslow's representations were materially false and misleading.  The 7.5%

payment cap on Pick-A-Pay mortgages did not obviate or eliminate the risk of adjustable payment

rates resetting (or recasting) to levels that would induce "payment shock" and default, but merely

deferred that risk into the future.  Subprime mortgage default rates were then spiking, over and above

their debased basis on borrowers' "stated" income, because they were then undergoing their

uncapped rate resets, resulting in immediate payment shock and default.   During 2007, 35% of

subprime mortgages experiencing rate resets either defaulted or became delinquent within six

months of the rate reset.  Wachovia's Pick-A-Pay mortgages would, in fact, adjust to exactly the

same increased rates, produce exactly the same payment shock, and result in exactly the same spike

in defaults.  The only difference was that, due to the 7.5% annual rate reset cap, this would occur in

slow motion for Wachovia.  The spike in defaults and losses then evident in subprime had not been

avoided by Wachovia, but merely deferred.  Where subprime defaults now were was where

Wachovia's Pick-A-Pay mortgages would later arrive.

197.    Defendants were aware of this reality, but misrepresented it, concealed it, and denied

it in their public statements such as Defendant Truslow's November 9, 2007 representations.

Defendants made exactly the same false and misleading misrepresentations on numerous occasions

---

[18]  The "2/28" and "3/27" subprime mortgages referred to by Defendant Truslow were hybrid
adjustable rate mortgages ("hybrid ARMs") that: (1) offered a low, fixed "teaser" rate for either 2
or 3 years, after which (2) they reset to sharply higher adjustable rates, generally exceeding 11%, for
the remaining life of the mortgage (either 28 years or 27 years).  Such mortgages accounted for in
excess of 80% of all subprime mortgages originated during 2005 and 2006.

during the following months, including during earnings conference calls and presentations on November 14, 2007, January 22, 2008, January 30, 2008, February 13, 2008, March 12, 2008, and April 14, 2008.  By these representations, Defendants falsely assured investors that Wachovia was immune to default and loss risks that in fact were imminent.

198.     Fourth, Defendant Truslow falsely distinguished Wachovia's Pick-A-Pay mortgages by representing that their low LTV ratios functioned to protect Wachovia from loss even upon mortgage default:

> So very different than some other products and then, of course, conservative loan to value is on top of the more conservative appraisal process that we have. Very few loans made above 80% and where we have lent above 80% we have required mortgage insurance. So on most properties at the outset we've acquired 20 to 30% real cash equity on the front end.

199.     Defendant Truslow's representations concerning the safety provided by the purportedly low and conservative LTV ratios of Pick-A-Pay mortgages was materially false and misleading.  Though the *initial* LTV ratio at origination may have been relatively low, the current LTV ratios were already substantially higher and were only continuing to climb.  The majority of Pick-A-Pay borrowers were picking the "minimum amount" payment option: therefore, with each monthly payment, their loan balance was in fact increasing.  As the loan balance increased, so did the LTV (the "L" being the loan balance).  Simultaneously, as property prices were then and had long been declining – and had declined both first and most sharply in California and Florida, where 68% of Wachovia's Pick-A-Pay loans had been used – the property values were experiencing double-digit declines.  As property values declines, LTV increased (the "V" being the property value).  In short, Wachovia's mortgage LTV were being squeezed upwards on both the "L" end and the "V" end.

200.     Defendants publicly misrepresented, concealed and denied the reality of these high and ever-higher LTV ratios, as per Defendant Truslow's above representations, until mid-2008. Defendants made exactly the same false and misleading misrepresentations on numerous occasions

during the following months, including during earnings conference calls and presentations on November 14, 2007, January 22, 2008, January 30, 2008, February 13, 2008, March 12, 2008, and April 14, 2008.  By these representations, Defendants falsely assured investors that Wachovia was protected from losses when, in truth, Wachovia was exposed to substantial and severe losses.

201.    The high and ever higher LTV ratios of Wachovia's Pick-A-Pay mortgages substantially increased their risks of default and severely increased the loss severity to Wachovia upon default.  High-LTV mortgages are at increased risk of default because borrowers with less equity in their home are more likely to default, and borrowers with *negative* equity in their home – *i.e.*, LTV ratios above 100% –  no longer have economic motivation to continue paying their mortgages, making them far more likely to default.  High-LTV mortgages produce sharp loss severity because, upon default and after foreclosure and foreclosure costs, the proceeds from foreclosure sale do not suffice to repay the balance of the loan.  To illustrate: a lender that provides a mortgage for purchase of a $100,000 property is more likely to recoup, through sale of that property, an initial loan of $70,000 as opposed to an initial loan of $95,000.  The situation at Wachovia: (1) though Wachovia's initial loan may have been $70,000 for purchase of $100,000 property; (2) due to minimum payments, that loan balance was actually climbing above $70,000; while (3) due to sharp property price declines in California and Florida, the property value was falling from $100,000 to $80,000 or lower.  Should such mortgages default, Wachovia was therefore not protected by much or any borrower equity from severe loss severity upon default.

202.    Finally, notwithstanding his previous assurances to investors, Truslow made a partial, but still false and misleading disclosure, at a BancAnalysts Association of Boston Conference, similar to Thompson's false statements on October 19, 2007:

> **Clearly we could have done a better job around subprime** on—for the company that has had such a negative bias towards subprime.  **We didn't leap into the origination side.  We stayed away from a lot of the businesses that evolved and grew beginning just a couple**

77

**of years ago yet we found ourselves in this downdraft with pockets of subprime exposure that essentially, there were investments or positions taken in various places across the platform.** Mostly in the form of what we believe to the very high-quality assets, AA, Super Senior AAA, and adjunct to that is that **where those decisions were made, they probably didn't involve the expertise and talent of the part of the platform that really had the most experience around residential mortgages and subprime**, probably too reliant on the ratings and taking too much comfort in historical performance around securities with those ratings.

203.    Defendant Truslow's November 9, 2007 statements about Wachovia's "negative bias toward subprime" and that Wachovia "didn't leap into the origination" of subprime loans are false and misleading because Wachovia was not, as a matter of Company policy, against subprime lending whether in origination or securitization, and in fact originated such loans.  Wachovia purchased Golden West knowing that it specialized in non-traditional, subprime lending.  After the acquisition, Wachovia continued to aggressively originate Pick-A-Pay loans to subprime borrowers.  Despite having more traditional loans available, its priority was to sell Pick-A-Pay at any cost, including to those borrowers that had no realistic ability to repay the loan.

### N.    November 14, 2007 Conference Call

204.    On November 14, 2007, the President of Wachovia's General Bank division, Ben Jenkins, provided a presentation on Wachovia at Merrill Lynch's Banking and Financial Services investor conference.

205.    Mr Jenkins repeated Defendant Truslow's above-detailed misrepresentations of November 9, 2007 as to purported distinguishing features of Wachovia's Pick-A-Pay loans that purportedly rendered them safer than other subprime and option ARM mortgages and/or immune to the risks of default and loss then evident with respect to those other mortgages:

> First of all, it operates as a portfolio product. . . . So, the performance of all of these Wachovia personnel is tied to the performance of the loan. What I'm trying to say is we own that loan to a far greater degree than if it was just originated and quickly shipped into the capital markets.

78

\*\*\*\*\*

The appraisal process is, again, done by somebody on staff, a Wachovia appraisal, who knows the market, knows the submarket, and the only pressure that appraiser feels is the pressure to get it exactly right from a value standpoint . . . . And we have protections built in for the borrower in terms of how much movement that can be in the payment rate. The payment rate can only move up 7.5% year to year. So if rates move up dramatically, the borrower's payment rate only goes up 7.5% . . . .

\*\*\*\*\*

Now, the fourth fundamental for good performance is superb risk management, and that has, I think, long been the hallmark of our company . . . . And with the addition of Golden West, our real estate portfolio has a loan to value at origination of 71% . . . .

206.    These representations – as to the "portfolio" quality of Wachovia's originations and loans, Wachovia's "in house" appraisals, Wachovia's insulation from rate-reset-induced payment shock, and Wachovia's low LTV ratios – were false and misleading for the reasons already alleged above.

207.    Mr Jenkins further sought to distinguish Wachovia's mortgages from other mortgages bearing high risks of default by asserting that:

The underwriting we do on this product is to the fully-indexed rate, not to a teaser rate.

208.    This representation was materially misleading. A mortgage underwritten on the basis of the borrower's ability to pay the low, initial "teaser" rate has a high risk of default, because the borrower's ability to bear the "payment shock" upon rate reset is in doubt. Mr Jenkins represented that Wachovia was immune to this risk, because Wachovia purportedly underwrote mortgages on the basis of borrowers' ability to pay the high rate (the fully-indexed rate) to which the mortgage would reset. This was false. In truth, Wachovia was underwriting its Pick-A-Pay mortgages on the basis of borrower income merely "stated" by the borrower rather than verified by the lender. Underwriting mortgages on a "stated income" basis rendered underwriting at the "fully indexed rate"

79

an empty fiction.   The borrower's ability to pay that fully indexed rate had not in fact been determined or verified.   Thus, Wachovia was exposed to the very default risks that it represented it had avoided.

**O.     January 22, 2008 Conference Call**

209.   On January 22, 2008, Wachovia held a conference call to discuss its full-year 2007 results Defendant Thompson began the call with a set of misrepresentations which capture the essence of plaintiffs' claims here:

> **Nevertheless, based on recent action in our stock price, I'm certain that investors are anxious about several questions on Wachovia which I want to address now.   The first question is: "What is the level of losses in your Pick-A-Pay mortgage portfolio?"** . . .   **[O]ur Pick-A-Pay portfolio will generate very meaningful bottom-line profits in 2008, and I do not believe that investors grasp that fact today**.

> **The second question: "Does Wachovia have enough capital?"** After our December preferred offering, Wachovia's capital levels were higher at year end than at the end of the third quarter, in spite of the marks, and in spite of the reserve build that we did in the fourth quarter.   And we're confident that those capital levels will increase as we go through 2008.

> **And the third question: "Will Wachovia cut its dividend?" And the answer to that question is we have no plans to cut the dividend, because we do not need to cut the dividend**.   We're confident in our ability to meet our 2008 business plan, and that plan as we have said before, will generate cash earnings that will cover our dividend payments, continue to build necessary credit reserves, improve our capital ratios and support growth in our business lines.

210.   Defendant Thompson's statements were correct in the limited sense that (1) these were the most prominent questions facing Wachovia (2) the answers to these questions were inter-related; and (3) investor concerns as to these matters, as Defendant Thompson conceded, had already depressed Wachovia's share price.

211.    However, defendant Thompson's "answers" to these three inter-related questions were materially false and misleading, and worked to sustain Wachovia's share prices at artificially-inflated levels.

212.    In truth, the level of losses in Wachovia's $120 billion Pick-A-Pay portfolio was far, far greater than defendants had publicly acknowledged.  Underneath defendants' above-mentioned misrepresentations as to the high quality of the Pick-A-Pay loans and their immunity to the sorts of default and loss levels then being experienced by other mortgages, were a number of concealed and misrepresented realities, including: (1) the stated income basis of most of those loans, which exposed Wachovia to just the sort of default risks it claimed to have avoided; (2) the high and ever-higher LTV of most of those loans, which exposed Wachovia to default risks it claimed to have avoided and to losses from which it claimed immunity; and (3) the fact that Wachovia's Pick-A-Pay product design, and especially its 7.5% annual rate reset cap, had not allowed Wachovia to escape the crisis of mortgage payment shock and spiking defaults, but merely to defer that crisis to a later date than much of the rest of the mortgage industry.

213.    These concealed, publicly-misrepresented and publicly-denied realities pertaining to Wachovia's Pick-A-Pay portfolio meant: (1) that enormous loan losses were then inherent in the Pick-A-Pay portfolio, apparent to defendants though concealed by defendants to the public; (2) that such losses would cut deeply into Wachovia's capital levels, which would diminish rather than increase; and (3) that such Pick-A-Pay losses and such capital erosion would require Wachovia to eliminate dividend payouts, so as to conserve capital and funds with which to provision loan loss reserves.

214.    During the January 22, 2008 earnings conference call, defendants presented a highly misleading impression of the health of Wachovia's Pick-A-Pay portfolio, and thus of Wachovia's fundamental financial condition.  Defendants Wurtz and Truslow, supporting Defendant Thompson's

misrepresentations concerning Wachovia' Pick-A-Pay portfolio, Wachovia's capitalization, and Wachovia's ability to continue to pay dividends, made reference to a series of charts they had prepared which purportedly demonstrated that Wachovia's Pick-A-Pay mortgages were performing like prime mortgages, rather than like troubled Alt-A and subprime loans, and were thus at little risk of default and loss:

> WURTZ: [T]**here is clear evidence that our Pick-A-Pay portfolio is, to date, performing very similar to that of the average prime portfolio** in the industry, in terms of 60 day delinquency, as an example. . . .
>
> \*\*\*\*\*
>
> TRUSLOW: Given the stressed mortgage markets, and the fact that the underwriting for Wachovia's Pick-A-Pay product is different from what is a typical option payment ARM, and therefore admittedly a little difficult to categorize against other more common products, **we've included the next two slides to provide some help in better understanding how this portfolio is performing in this market, against traditional prime, Alt-A, and subprime loans**.
>
> So if you'll slip over to slide 18, this charts the Wachovia Pick-A-Pay 90 day past due ratios, in the green diamond line, and the Wachovia overall mortgage portfolio loans inclusive of Pick-A-Pay is in the darker blue small square line, against prime, Alt-A, and subprime industry results, and **you can see that the Wachovia results are performing well measured against Alt-A, and just modestly worse than prime. And of course subprime performance has been rather dismal** . . . . **We provided this to the extent that it would be helpful** . . . . **But we think that slide 18, in aggregate tells a story that is maybe not well understood in the market**.

215.    The above statements, and the analysis underlying them, were materially false and misleading because defendants' comparisons were "apples to oranges."  A primary reason why subprime and Alt-A default rates were spiking was that those mortgages were experiencing "payment shock" following *uncapped* rate resets, which often increased borrower payment burdens by 30% or more *immediately*.  Wachovia's Pick-A-Pay mortgages were not becoming delinquent or defaulting at the same rate as these other subprime and Alt-A mortgages because the rate resets on

Wachovia's mortgages were capped at 7.5% per year.  Because of this annual rate reset cap, Wachovia's mortgages had not yet adjusted to "payment shock" levels.  But that did not mean that Pick-A-Pay mortgages would not adjust to such payment shock levels.  Rather, it meant only that they had *yet* to adjust to such high payment levels.  Wachovia's Pick-A-Pay mortgages would ultimately reset to exactly the same high payment levels and then produce exactly the same high rates of default – the only difference being that they would do so in slow motion and later than the other mortgages that were performing badly now.

216.    Therefore, the only truth in Defendants' January 22, 2008 comparisons of Pick-A-Pay mortgages versus other subprime and Alt-A mortgages was that the current poor performance of the latter indicated exactly what would soon happen to the former.

217.    Defendants concealed this truth and, through the analysis they publicly presented on and after January 22, 2008, turned this reality on its head.  According to defendants' public and highly misleading misrepresentations, the seeming better performance of the Pick-A-Pay mortgages was proof of (1) the quality of Wachovia's underwriting standards and (2) Wachovia's immunity to the sorts of defaults and losses then being suffered by other mortgages and other lenders.  The concealed truth, however, was the opposite: (1) Wachovia's underwriting standards shared the same sorts of debasement, particularly with regard to "stated" income, as did wider subprime and Alt-A lending as a whole, and thus exposed Wachovia to exactly the same increased risks of default; and (2) the high and ever-higher LTV of Wachovia's Pick-A-Pay portfolio was exposing Wachovia to substantial risks of default and sharp loss severity upon default.

218.    Thus, and apparent to defendants, the seemingly superior performance of Pick-A-Pay mortgages was a mirage.  Underneath this mirage was the concealed reality of impending defaults and losses.  Defendants hid this reality from the public, and insisted publicly that the mirage was real.  But the mirage was just an epiphenomenon of the simple fact that Wachovia's Pick-A-Pay

83

mortgages with their capped annual rate resets had yet to reach payment shock levels, in contrast to other mortgages with uncapped rate resets which already were reaching those levels.

219.   To return to apples and oranges.   The "apple" in defendants' "analysis" was subprime/Alt-A mortgages which had already hit payment shock, thus producing high rates of payment delinquency and default.   The "orange" was Pick-A-Pay mortgages.   Due to their annual rate reset caps, the degree of adjustment in their "adjustable rate" feature was as yet minor, the current rates were still relatively low, the mortgages had yet to rise to payment shock levels, and thus they were currently performing like prime mortgages.   The "apples to oranges" comparison, therefore, was of mortgages currently experiencing payment shock to mortgages that had yet to reset to payment shock levels, but soon would.

220.   Defendants made exactly the same false and misleading misrepresentations on numerous occasions during the following  months, including during earnings conference calls and presentations on January 30, 2008, February 13, 2008, and April 14, 2008.  By these representations, Defendants falsely assured investors that Wachovia was protected from losses when, in truth, Wachovia was exposed to substantial and severe losses

221.   In addition, defendants continued on January 22, 2008 to misrepresent and conceal the reality of the high and ever higher Pick-A-Pay LTV ratios.

222.   For example, defendant Truslow represented that the initial LTV of the Pick-A-Pay mortgages was 71%, and that the current LTV ratio essentially unchanged at 72%:

> For the pick-a-pay product, the portfolio has an original loan-to-value of about 71%, and an original FICO score of about 673, and as a reminder, the Golden West underwriting practices focused on a rigorous appraisal process, and the borrower's ability to fund 20% to 30% of the purchase price up front. Using estimated current valuation updates that we ran in November, **the average current loan-to-value across the portfolio, is basically unchanged from origination, coming in around 72%**.

223.   This representation was materially false and misleading, and was reiterated by Defendants on January 30, 2008, February 13, 2008, and March 12, 2008.  In truth, LTV values across Wachovia's Pick-A-Pay portfolio were already far higher (as defendants would later admit in drips and drabs between April 2008 and October 2008), and thus the risks of default of loss were far higher than adverted by defendants.

224.   Although defendants conceded the general proposition that declining property prices in California and elsewhere were exerting upward pressure on LTV ratios, defendants further represented – falsely – that such pressure was the exception with respect to Wachovia's Pick-A-Pay portfolio rather than the rule.  For example, defendant Truslow represented that Wachovia had identified and reserved for a $8 billion subset of the $120 billion Pick-A-Pay mortgage portfolio – *i.e.*, a mere 6.67% of the Pick-A-Pay portfolio – where Pick-A-Pay LTV ratios were expected to rise above 95%:

> We've begun experiencing higher loss rates where we have loans in markets, that experienced rapid price depreciation since 1999, and are now seeing rapidly declining trends in housing values. Most of the build in the allowance for the Pick-A-Pay product is for the loans in those markets where the current loan-to-values have risen, or are expected to rise above 95%, were originated over the last three years, and are exhibiting a higher likelihood of default. So when you carve out this pool of loans, it constitutes about $8 billion of the $120 billion Pick-A-Pay portfolio.

225.   Defendants repeated this misrepresentation on February 13, 2008 and March 12, 2008.

226.   Similarly, defendant Truslow represented that less than $1 billion of Wachovia's entire mortgage portfolio (including both Pick-A-Pays and traditional mortgages) had LTV ratios of 90% or more.

227.   Such representations were materially false and misleading, and turned reality on its head.  The reality was that Pick-A-Pay LTVs were already and very widely approaching such

extreme levels of 90% or more, due to (1) sharp property price declines in California and Florida that had reached double digits by mid-2006 and had only deepened since, (2) the fact that 68% of Wachovia's Pick-A-Pay portfolio consisted of loans used to purchase California and Florida properties; and (3) the fact that most Pick-A-Pay borrowers' were making minimum payments and thus seeing their loan balances grow.  Defendant Truslow's "data" was outdated and outright false.

228.    Indeed, when concerned analysts inquired on January 22, 2008 as to what percentage of Pick-A-Pay borrowers were making the minimum payments, defendants declined to provide the answer.

229.    Likewise, Defendant Truslow mentioned that Wachovia had experiencing loss severities nearing 25% on mortgages that defaulted – an extraordinarily high figure given the purported low LTV ratios of those mortgages.  As Defendant Truslow himself explained, such high loss severity could only result from the fact that underlying LTV ratios had substantially increased. Again, however, Defendant Truslow represented falsely that such loss severities were the exception, rather than the norm.  Defendant Truslow represented that these loss severities were the worst-case scenarios, and had become so severe in part because of Wachovia's purported discipline in "moving" foreclosed properties quickly:

> In December severities, I believe, got to just under 25%, so again **you have to take that in light of where most of these sales have been, so the most severely impacted properties. And we have been helped by the fact that we had 20%, 30% real equity on the front-end** . . . .
>
> *****
>
> That would be the loss against the value of the loan. So if you think about some markets in California that have given up 25%, 30% from their peak, that could entirely take away the equity that the borrower put in on the front end, and maybe a little more, and then you take into account the foreclosure costs, cost of fixing up the property, going through foreclosure, the commissions that we're willing to pay to get the house moved, **we've been willing to take some possibly**

**higher severities in some markets, to get the properties moved** .
. . .

230.    Defendant Truslow's "spin" on the facts was materially false and misleading.  As
defendant Truslow himself recognized, the reality was that the sharp property price declines in
California and Florida "could entirely take away the equity that the borrower put in on the front end,
and maybe a little more."  Put in LTV-speak, this meant that those price declines could – or rather,
in fact were – transforming initial LTV ratios of 70% into LTV ratios of 100% ("entirely take away
the equity that the borrower put in on the front end") or even into negative equity LTV ratios
exceeding 100% ("and maybe a little more").  Defendant Truslow falsely represented that such cases
were the exception, and that Wachovia's mortgages' LTVs were essentially unchanged from their
original values (71% at origination, 72% now).  But such cases were the rule, and Wachovia's
mortgages' LTV ratios were materially higher than their original values.

231.    Furthermore: a primary metric used to assess the adequacy of a company's loan loss
reserves is the ratio between comparing the amount of the loan loss reserve to the amount of non-
performing loans.  During Wachovia's January 22, 2008 conference call, Sandler O'Neill analyst
Kevin Fitzsimmons pointed out that this ratio at Wachovia was substantially lower than at peer
lending institutions, and asked why – in light of that fact – investors should not conclude that
Wachovia was substantially under-reserved:

> KEVIN FITZSIMMONS, ANALYST, SANDLER O' NEIL:  I was
> wondering on credit, I know you've given a lot of detail today, but if
> you can **help us reconcile how and why we shouldn't come away
> thinking the allowance is very low, and specifically the ratio I'm
> looking at primarily is the allowance to NPA [non-performing
> asset] ratio being at only 88%, and which I'm sure is well below
> peer level** . . . .

232.    Defendants' answer to Mr Fitzsimmons – that Wachovia's loan portfolio was of
higher quality than the portfolios of its peers, and that Wachovia's loan portfolio was well-secured
by the underlying collateral – was false and misleading.  This answer was repeated by defendants on

February 13, 2008, and March 12, 2008.  In truth, Wachovia's loan portfolio suffered from the same

debased standards, such as "stated income" origination, as its peers' subprime and Alt-A mortgages,

and exposed Wachovia to the same risks of default.  Those default risks were merely muted for

Wachovia in the short-term because of the 7.5% annual cap on rate resets.  Similarly, due to

declining property prices and increasing loan balances, Wachovia's loan portfolio was now *de facto*

a portfolio of high LTV loans.  Therefore, it was no different than peer portfolios of "no money

down" loans and other loans originated with high LTVs, and was exposed to exactly the same

increased risks of default and sharpened loss severity inherent in high LTV loans.

233.    To be clear: defendants' liability here does not arise for making loans at low LTVs

that later became high LTV loans due to declining property prices, but from concealing,

misrepresenting and flat-out denying that high LTV reality before, during and long after it had

become a reality.

234.    Finally, Defendant Thompson closed the January 22, 2008 conference call with the

following materially false and misleading wrap-up:

> And I think, in addition to that, if you look at the provision expense
> in the fourth quarter, and if you look at what we're planning going
> forward, I think **we're being very conservative from a credit
> standpoint moving forward. So I think we are being very
> conservative, and I think we are optimistic about the future given
> the conservatism that we've already taken, and that's why we feel
> comfortable giving the kind of guidance that we've given you, as
> far as covering the dividend, growing capital ratios**, growing our
> business, and we're optimistic about Wachovia. Frankly, **it's just
> hard for me to understand the impact that our stock price has
> taken over the last three months**, because I look at how we compare
> to others, and I feel very good about where Wachovia is.

235.    This statement was materially false and misleading, for all the reasons alleged

immediately above.  Wachovia was sitting on the world's largest portfolio of option ARMs, $120

billion of Pick-A-Pay loans.  Those mortgages had been originated on a stated income basis, which

increased the risk of their default. To mitigate against that risk, Wachovia purportedly originated the loans at low LTVs that would insulate Wachovia from loss upon default. But those mortgages now had high LTVs, thus exposing Wachovia to increased risks of default and sharp loss severity upon default. And the worst was yet to come, given that the 7.5% annual rate reset caps on Wachovia's mortgages had heretofore – but only temporarily – insulated Wachovia from the higher rates of default then being experience by other subprime and Alt-A mortgages. At the same time, Wachovia was under-reserved for its loan losses, both relative to its peers and in an absolute sense. Given all this: (1) Wachovia was not being "very conservative" from a credit point of view; (2) imminent and risking mortgage defaults and loss severities would erode Wachovia's capital and extinguish its ability to fund a dividend payout; and (3) contrary to defendant Thompson's protestations, the only reason Wachovia's share price had not sunk even lower was that defendants were still publicly concealing and misrepresenting the true nature of Wachovia's mortgage exposures.

236. Also during the January 22, 2008 conference call, the Company admitted that, with respect to Golden West's delinquent loans, it had to play "catch-up" and increase loss reserves by $63 million due to a "methodology change" in recognizing loan losses. Specifically, contrary to its stated policy to charge off loans that were more than 180 past due, the Company, at all time prior to the Fourth Quarter 2007, had not charged off Golden West's loans until the property had been sold after foreclosure proceedings. As a result of Wachovia's deviation from its internal policy, it had materially understated reserves while concomitantly overstating earnings.

### P.    January 30, 2008 Conference Call

237. On January 30, 2008, Defendants Thompson and Truslow provided a presentation on Wachovia at Citigroup's Financial Services investor conference.

238.    Defendant Thompson reiterated, in highly false and misleading fashion, the "apples to oranges" analysis of Wachovia's Pick-A-Pay mortgages to other subprime and Alt-A mortgages, as well as the false claim that Wachovia's Pick-A-Pay mortgages were low-LTV mortgages of 71%-72%:

> **So I know that potential credit losses are of concern for investors, and I want to talk directly with you about that. Wachovia, as we see on this slide, has historically been a conservative underwriter, and I can assure you that that's not changed** . . . . Here, we underwrote, as did Golden West before us, with a substantial cash up front. We were at 70%, 71% loan-to-value on our mortgage portfolio, and we are confident--in fact, we are very confident--that **the loss content on these NPAs will not approach levels of loss content in other asset classes that you look at. This slide further illustrates that. It shows why we've got confidence in the statement I just made**.
>
> Now, **mortgage portfolio loss rate will be manageable because, as this slide shows [] the dark green line shows 90-day past-due performance for Wachovia's Pick-a-Pay mortgage portfolio. You can see on this slide that it tracks most closely to the blue line, which is the entire mortgage industry prime performance. It's way below the red line, which is subprime, and it's tracking well below Alt-A, which is the gray line. So that gives us confidence that our loss rate in the Pick-a-Pay portfolio is going to be good**.
>
> **I think you should take further comfort by focusing on this slide. This slide shows delinquency rates for Wachovia portfolios, versus industry averages for the same portfolios. In every category--mortgage--whether it be Pick-a-Pay or traditional mortgages, home equity, and in auto finance--Wachovia is demonstrably superior to the industry**.

239.    These statements were highly false and misleading, for the reasons alleged in detail above with respect to Wachovia's January 22, 2008 conference call.  Their effect is illustrated by the following comment that followed them, from an attendee at the conference: "Thank you for those additional slides.  I think they're starting to get the point across."

240.    During the January 30, 2008 question and answer session, one attendee pointed out that another large originator of Option ARMs had recently reported: (1) that 20% of their Option

ARM portfolio had recently hit their negative amortization limit of 110% of original loan value, and were recasting to fully-amortizing rates; and (2) that 30% of such recasting loans were becoming delinquent.  The attendee asked:

> Does that concern you, considering you guys have such a large option ARM book?

241.    Defendant Thompson's highly false and misleading reply:

> KEN THOMPSON: Well, **our option ARMs were totally different than other option ARMs in the market, and we've gone over this time and time again. We've got a cap on payment rates going up by more than 7.5%. We underwrote to the fully indexed rate, not to the teaser rates. Our average going on LTV was somewhere in the 70% to 72% range. So we've got a cushion**, and we're being hurt in California, where we've seen great price depreciation, and in some other places. But overall, I stand by what I've said about the NPAs are rising, but **our loss content in our NPA portfolio will not be anything close to other asset classes**.

242.    Defendant Thompson's representation was materially false and misleading because: (1) Wachovia's option ARMs (the Pick-A-Pays) were not fundamentally different from other option ARMs, but exposed Wachovia to exactly the same risks on a delayed basis due to the 7.5% annual rate reset cap; (2) the risks purportedly avoided by underwriting to the fully-indexed rate had not in fact been avoided, because Wachovia had not verified the "stated" income that served as the purported "basis" of borrowers' ability to pay those fully-indexed rates; (3) the average LTV of Wachovia's mortgage portfolio was far, far higher than 70%-72%; and (4) Wachovia had in no way immunized itself from the losses then experienced by other mortgage lenders, but had merely deferred those losses and publicly concealed that fact.

**Q.    February 13, 2008 Conference Call**

243.    On February 13, 2008, Wachovia held its annual Fixed Income Update conference, at which defendants Wurtz and Truslow provided presentations on Wachovia.  Defendant Truslow reiterated certain material misrepresentations made on January 22, 2008, including: (1) that only a

minor portion of the $120 billion Pick-A-Pay portfolio (specifically, $8 billion or 6.67% of the total) was at heightened risk of default and loss severity due to rising LTV values; (2) that the current LTV ratios of Wachovia's mortgages were essentially unchanged from those ratios at origination (*i.e.*, 71%); (3) that Wachovia's seemingly-low ratio of loan reserves to nonperforming loans only "seemed" low but in fact was not; and (4) the "apples to oranges" comparison of delinquency rates between Wachovia's Pick-A-Pay mortgages (which due to their 7.5% annual rate reset cap had not produced payment shock yet) and other subprime and Alt-A mortgages (which, with uncapped rate resets, were now experiencing the payment shock that Wachovia's mortgages would soon arrive at).

244.    Defendant Truslow also recycled misrepresentations from October 19, 2007, including: (1) that Wachovia originated its Pick-A-Pay mortgages for its own portfolio, rather than to be securitized and sold off, so Wachovia was motivated to produce safer, less risky mortgages; (2) that Wachovia's "in house" appraisals made Pick-A-Pay mortgages safer still; and (3) that the Pick-A-Pay mortgages were distinguished from other Option ARMs, and safer, due to their 7.5% annual rate reset cap.

245.    Defendant Truslow added to this last misrepresentation a new misleading analysis comparing other lenders' Option ARMs to Wachovia's Pick-A-Pay mortgages. Defendant Truslow pointed out that other lenders' Option ARMs "recast" after five years to fully-amortizing rates, producing upon recast an immediate 77% increase in borrowers' monthly payments (*i.e.*, payment shock). Wachovia's Pick-A-Pays, by contrast, "recast" to fully amortizing rates after ten years rather than five. Defendant Truslow represented that this made Pick-A-Pays safer. This was false and misleading. In truth, the Pick-A-Pay mortgages would produce exactly the same level of payment shock, with exactly the same result (default), but would do so in slow motion: not all at once in year five, but rather in series of yearly 7.5% increases starting in year 2 and ending in year 10. The only real difference was the one, essentially, between quick death and slow death.

246.     One attendee directly questioned Defendant Truslow on this very reality, noting that where other Option ARMs were already recasting now after hitting their 110% negative amortization limit (and causing spikes in delinquencies), Wachovia's would do so as well, only later, due to Wachovia's 125% negative amortization limit (which delayed recast):

> UNIDENTIFIED PARTICIPANT: Then secondly, **the characteristics of your product versus a lot of the other industry players, the 125% cap on negative amortization has -- it seems to me that that's helped your portfolio delinquencies in that we're hearing from some of the other players that recast event is actually causing the delinquency**. So I'm just wondering if you could just discuss, sort of merits of that or the quality of those loans, I guess, **one comment could potentially be that you're just delaying the inevitable by delaying the recast event to a later time period** but maybe you could just discuss the pros and cons of that.

247.     Defendant Truslow flatly – and falsely – denied this reality in his answer. Defendant Truslow stated that no Wachovia loans would hit that 125% negative amortization limit and thus trigger recast, and that those Wachovia loans experiencing negative amortization had extremely low LTVs of 68.5%. Defendant Truslow's conclusion:

> So it really hasn't -- it's a-- it gets a lot of attention and **we get a lot of questions about it but it just hasn't been a factor from an asset quality standpoint or a delinquency standpoint** and again, we believe that **it's actually very favorable from the consumer's vantage point in that it avoids some of the traps that are now popping up in some other products**.

248.     Defendant Truslow's assertions were materially false and misleading. The structural features of the Pick-A-Pays did not "avoid" the "traps that are now popping up in some other products", but just deferred them. For that very reason, the Pick-A-Pays had **yet** to experience the high rates of delinquency that other Option ARMs were now experiencing – and that Pick-A-Pays would assuredly later match.

R.      **Wachovia's 2007 Form 10-K**

249.    Discussing its credit risk management in the 2007 10-K report, filed with the SEC on February 28, 2008, the Company stated: "While our outlook indicates a rise in the level of charge-offs at this point in the credit cycle, we believe the well-collateralized nature of our real estate-secured portfolio, our **careful management of credit risk** and **strong underwriting** position us relatively well in this credit environment."

250.    On that same day, Thompson admitted to "poor" timing in Wachovia's $24 billion purchase of Golden West in October 2006:

> With the benefit of hindsight, it is clear that the timing was poor for this expansion in the mortgage business, Thompson said in a letter to shareholders. Yet we have reconfirmed our opinion of the quality of the Golden West franchise, its underwriting and service model, and the quality of its people.
>
> We expect to recognize further credit losses and to earn less than we'd anticipated in our mortgage business over the next year or two…

*Wachovia CEO says timing of Golden West deal "poor,"* Reuters, Feb. 28, 2008.

251.    The February 28, 2008 statement served as a partial corrective disclosure but was still materially false and misleading, because although Thompson admitted that the timing of the acquisition of Golden West was wrong, he still led the public to believe that Golden West and its underwriting standards were high quality. According to CW 9, an underwriter and a loan processor specialist for World Savings in California until October 2007, **100% of the Pick-A-Pay loans** that he and his co-workers reviewed were considered subprime. Additionally, CW 3 stated that he was repeatedly instructed by managing directors to sell prospective borrowers on Pick-A-Pay loans by getting borrowers to overstate his or her actual income. CW 3 estimates that 90% or more of approved Pick-A-Pay loans were done as stated income or no documentation loans. And, if the

94

Company had required documentation or other verification of income, "there was no way they would have been approved."

**S.     March 12, 2008 Conference Call**

252.    On March 12, 2008, Defendant Truslow provided a presentation on Wachovia on an investor conference call hosted by Deutsche Bank.  Again, Defendant Truslow reiterated his prior misrepresentations concerning the structural effects of the Pick-A-Pay mortgages:

> We get a lot of questions about the Pick-A-Pay product and its features and how the product works, and it doesn't appear that the features themselves are creating any significant issue for us.

253.    This representation was false.  The structural features of the Pick-A-Pays were creating an enormous issue for Wachovia, which defendants, as detailed above, publicly misrepresented, concealed and falsely denied.

254.    Additionally, Defendant Truslow reiterated further prior misrepresentations, including: (1) that current Pick-A-Pay LTV ratios had not materially changed since origination, and stood at 72%; (2) that only a very small portion of Pick-A-Pay mortgages (6.67% of the portfolio) was at heightened risk of default and loss due to high LTV ratios.

**T.     April 14, 2008 Conference Call**

255.     On April 14, 2008, in announcing Wachovia's results for the first quarter of 2008, defendants returned to three questions with which they had begun their prior quarterly earnings conference call on January 22, 2008: (1) what was level of losses in Wachovia's Pick-A-Pay portfolio?; (2) did Wachovia need to raise capital?; and (3) could Wachovia continue to fund its dividend payout.  Defendants' April 14, 2008 answers to these questions were opposite to the false and misleading answers they had provided on January 22, 2008.  Defendants admitted on April 14, 2008 what they had previously concealed, misrepresented and denied: namely, that due to Pick-A-Pay mortgage losses, Wachovia's fundamental financial condition had materially weakened,

Wachovia would need to raise billions in new capital, and Wachovia could not afford to continue its dividend payout.

256.    As defendants made clear, their new answers as to Wachovia's capitalization and dividend arose from a new view of the losses inherent in Wachovia' Pick-A-Pay portfolio.  But as analysts made clear, one after another, there had been no new mortgage-related developments during the prior three months indicating that matters were worse now than they had been in January:

> JASON GOLDBERG, ANALYST, LEHMAN BROTHERS: Ken, **you've been I guess consistent in saying, at least up and through your 10-K in late February that you felt comfortable with your capital and dividend position. Obviously something's changed dramatically. We obviously went through February knowing the housing market was stressed**. Can you just kind of update us with your thoughts over the subsequent six weeks, and the end of February?

> *****

> KEVIN FITZSIMMONS, ANALYST, SANDLER O'NEILL: Could you give a little more detail on – **you cited dramatic change in customer behavior or consumer behavior and that led to the decision to cut the dividend, increase capital** and so just wondering if you could be particular by – I'm assuming it's California . . . .

> *****

> JONATHAN ADAMS, ANALYST, OPPENHEIMER CAPITAL: I guess I had a similar question to the past individual and if I look on page 19 of your presentation, **it strikes me that there's nothing in the 90 day past due trends that would justify the kind of change that you have made in your outlook. You can pick a different – a number of different metrics, whether it's the dividend in suggesting that over a broad range of scenarios it wouldn't need to be cut and then five or six weeks later coming to a different conclusion, or it's some other metrics as well. But it just strikes me as difficult to understand how management's view of the environment has changed so dramatically**.

257.    In truth, as the analysts pointed out, no underlying mortgage fundamentals had changed.  The only change, as defendants admitted, was their adoption of a new model for determining mortgage losses.

258.   Defendants' new model, however, did little more than capture, for the first time, mortgage risks that: (1) were, in principle, axiomatic *ab initio*; and (2) were, in fact, evident nearly two years ago.  The principle: that borrowers with little, no, or negative equity (*i.e.*, borrowers in loans with LTV ratios nearing, at or over 100%) were more likely to default.  This was especially true for borrowers with negative equity (*i.e.*, LTV ratios above 100%), at which point all economic motivation to continue making payments each month (for more than the property was worth) disappeared.  The facts: that double-digit housing price declines in California and Florida, operative since mid-2006 and only increasing since, were functioning to erode and eradicate borrower equity, to increase borrowers' LTV to levels approaching and often exceeding 100%, and thus to sharply increase both the risk of default and the loss severity to Wachovia upon default.

259.   In short, though the model was new, the risks and realities it captured were old:

> THOMPSON:  Over the past year, we have witnessed a consistent pattern of deterioration in credit statistics in our mortgage portfolio in stressed areas of the country and particularly in California and Florida . . . .  The **basis for our revised projections is a new model which permits us to model home prices at the MSA level in conjunction with a behavioral model that captures changes in borrower's repayment behavior when their equity dissipates** . . . .

> ＊＊＊＊＊

> WURTZ:  As Ken mentioned, **we have changed considerably the modeling of our Pick A Pay portfolio with far greater emphasis on forecasting future changes in housing markets and customer behaviors. Particularly in the stressed markets** and Don will describe that in great detail going forward. But **the results of that is we expect further robust provisioning in both 2008 and 2009**.

> ＊＊＊＊＊

> TRUSLOW:  **Ken and Tom mentioned for the Pick A Pay in its portfolio we have implemented a new modeling tool which will help us better estimate the outlook for credit costs for this portfolio**. And we have chosen to use the OFHEO Index at the MSA level weighted for our loan balances in order to calibrate the correlations of **what we were observing in borrower propensity to**

97

**default to housing price declines**, therefore using this as a backdrop for forecasting credit costs . . . .

**[A]s housing prices decline and borrowers lose their equity in their homes relative to their first mortgage balances, we are seeing borrowers default at a faster rate** than historical trends and other quality measures such as FICO would suggest and we believe that this new approach, **this new model better captures these linkages and home price trends and this new analysis and what we've been experiencing in the housing market in the first quarter led us to build the allowance by about $1.1 billion for the Pick A Pay mortgage portfolio** . . . . [W]e've used the models output to help dimension for investors credit costs we are currently estimating for the Pick A Pay loan through the end of 2009. We're currently expecting charge-offs including first quarter results for all of 2008 at about $1.3 billion to $1.7 billion rising to somewhere in the $2.5 billion range in 2009. In terms of reserves, we expect to continue adding another $800 million to $1 billion in addition to the $1.1 billion, that was added in the first quarter across 2008 and this is in anticipation of the estimated charge-offs in 2009 so the reserve has a forward look to it. As you can see, these actions substantially build the loan loss reserves for this product.

*****

KEN THOMPSON:  I'll let Don talk specifically but **I would just say that what we are seeing is that when equity in the home approaches zero, behavior changes. And that's what the model tries to do is to then take that behavior along with house price depreciation and factor that into future losses**. Don?

DON TRUSLOW:  Ken, **that's exactly right. And Kevin, it's just this pattern almost that somewhere -- I don't know where the tipping point is, but somewhere when a borrower crosses the 100% loan to value, somewhere north of that and they presumably run into some sort of cash flow bump, whether it's reduced income or kind of normal things in life that have created past dues before, their propensity to just default and stop paying their mortgage rises dramatically and I mean really accelerates up and it's almost regardless of how they scored, say, on FICO or other kinds of character, credit characteristics**.

**[T]hat behavior is going on. We're seeing in our portfolio the most significant declines and defaults activity in California and of course it's the largest concentration for us in the Pick A Pay portfolio by far**.

98

260.    Another new disclosure of an old reality: defendants disclosed for the first time, on April 14, 2008, that 14% of the entire $120 billion Pick-A-Pay portfolio – *i.e.*, $17 billion of mortgages – had LTV ratios above 100%.  Of the 100%+ LTV mortgages, 75% were from California and 10% from Florida.

> BETSY GRASECK, ANALYST, MORGAN STANLEY:  On page 21, **you've got the percentage of the Pick A Pay portfolio that has got an LTV above 100%, 14%. Is this the first time you're giving that data?**
>
> DON TRUSLOW: **It is. We wanted to provide that just to, number one, that's the most stressed stratification in the portfolio. And also just exhibit that we recognize there's been severe deterioration in several of our markets where we have the Pick A Pay loans**.

261.    Although defendants' April 14, 2008 statements detailed above constituted corrective disclosures, such corrections were still only partial.

262.    Defendants still represented falsely on April 14, 2008: (1) that the current average LTV ratio of Wachovia's Pick-A-Pay mortgages had risen only slightly from the LTV ratio at origination – to 78% from 71%; (2) that cumulative losses on the entire $120 billion portfolio, even under defendants' new loss model, would not exceed 7.5%; and thus (3) that Wachovia still had sufficient capital levels to fund a reduced dividend payout of approximately 60% of the amount of Wachovia's prior dividend.

263.    These April 14, 2008 representations were materially false and misleading.  The purportedly "current" LTV of 78% was neither accurate nor current, but rather false, understated and based on outdated data.  In truth, the LTV ratios were far higher.  Cumulative losses on the $120 billion Pick-A-Pay portfolio were likewise, and connectedly, far higher than the 7.5% level that defendants publicly revealed on April 14, 2008.  Three months later, on July 22, 2008, defendants (under Wachovia's new CEO, who by then had replaced defendant Thompson), admitted: (1) that current LTV ratios were materially higher than previously stated; (2) connectedly, that cumulative

Pick-A-Pay losses would be almost twice as high as stated on April 14, 2008; and (3) that consequently, Wachovia could not continue to fund even its already-reduced dividend.  Defendants also announced that Wachovia would no longer originate Pick-A-Pay mortgages.  Three months after that, on October 22, 2008, Wachovia, then under new management (with defendants Thompson, Wurtz and Truslow gone), admitted that Pick-A-Pay losses would be **triple** the 7.5% level represented by defendants on April 14, 2008 – a stunning 22% of the entire $120 billion portfolio.

### U.    July 22, 2008 and September 9, 2008 Conference Calls

264.    On July 22, 2008, Wachovia (under its new CEO Robert Steel), admitted that Pick-A-Pay LTVs were substantially higher than earlier adverted, that Pick-A-Pay losses would be nearly twice as high as defendants had stated only three months ago (*i.e.*, 12% of the $120 billion portfolio, rather than 7.5%), and that consequently Wachovia would need to effectively eliminate its dividend payout in order to conserve funds in light of those losses.

265.    These statements, though partial corrective disclosures, continued to be false and misleading, continued to understate current LTV ratios, and continued to understate the true level of Pick-A-Pay losses.

266.    During a September 9, 2008 presentation at the Lehman Brothers Global Financial Services Conference, Wachovia's new CEO Robert Steel was confronted directly with the falsity of those representations as to Pick-A-Pay losses:

> JEFFREY TALBERT, ANALYST: **I believe that the last time you offered projections with respect to the Pick-A-Pay portfolio, the bank was looking at about a 12% estimated cumulative loss rate. When I apply the same estimated projections that come out of both Lehman and other firms fixed income research groups by vintage, I come up with a number much closer to something close to 20%.** You've now been at the bank longer than the initial call, has your view on estimated cum losses on a Pick-A-Pay changed, or are you still looking at around 12% or perhaps something higher than that?

267.    Mr Steel and other (unidentified) Wachovia executives replied that their lower loss calculations (12% as opposed to 20%) were correct, that nothing had changed since their announcement on July 22, 2008, and that the 20% loss figure cited by Mr Talbert did not apply to Wachovia's mortgages because it was an "apples to oranges" comparison.

268.    These representations were false and misleading (except for the representation that there had been no material change in underlying mortgage fundamentals since July 22, 2008).  One month later, on October 22, 2008, with nothing having changed in the underlying mortgage fundamentals, Wachovia's new management nearly doubled their Pick-A-Pay loss calculations from 12% of the $120 billion portfolio to a stunning 22%.  Thus an additional $10 billion of losses was revealed, in the absence of any change in underlying mortgage fundamentals, that had previously been concealed, misrepresented and denied by defendants.

## IV.    WACHOVIA'S COLLATERALIZED DEBT OBLIGATIONS

269.    During 2006 and 2007, Wachovia created, structured and underwrote approximately $10.11 billion of CDOs backed, as detailed below, by pools of subprime mortgages.  At all times until November 9, 2007, Wachovia concealed that it had retained in excess of $2.1 billion of those very subprime CDO securities: *i.e.*, in excess of 20% of the subprime CDOs it had underwritten. Wachovia furthered its concealment, at all times until October 19, 2007, by carrying these (undisclosed) CDO holdings at par value, despite the fact that their value had been materially and evidently impaired no later than February 2007.  Wachovia first revealed the existence of these CDOs simultaneously with their writedown on October 19, 2007.  Wachovia's October 19, 2007 disclosures of writedowns indicated that Wachovia held some amount of these instruments, but Wachovia did not disclose what that amount actually was.

270.    Wachovia's CDO-related disclosures were still misleading on October 19, 2007 and continued to be so through July 21, 2008, because, throughout, Wachovia continued to overstate the

value of its CDOs.  Directly observable indicators of those CDOs' value – most directly, indexes tracking the market prices of CDOs and of the assets collateralizing the CDOs – had long indicated, essentially, that there was none.  Wachovia turned a blind eye to those indicators and only acknowledged in July 2008 the truth that such directly observable indicators had long stated. Wachovia's series of writedowns between October 19, 2007 and July 22, 2008 belatedly conceded: (1) what had been evident by February 2007 – that the value of these instruments was materially impaired; and (2) what was evident by October 2007 – that the value of these instruments had almost entirely disappeared.  By July 2008, Wachovia had written down the value of this $2.1 billion of retained CDOs by $1.69 billion, or 79.7%.  But that degree of value deterioration had in fact existed since October 2007, and much of it had existed since February 2007.

271.    The risks of such subprime CDOs had been well and widely understood no later than February 2007.  That their value was materially impaired was likewise recognized by the market no later than February 2007, and the degree of impairment only became more severe thereafter.  By October 2007, the impairment was near-total, and subsequent declines in value were minor as most of the value had already evaporated.  The only matter that was *not* known was that Wachovia had any exposure to such decreasingly valuable instruments.

272.    Lastly, as Wachovia first revealed on January 22, 2008, it had in fact retained a *further* $4.2 billion of the $10.1 billion of subprime CDOs it had underwritten.  With respect to this further $4.2 billion of CDO exposures, Wachovia represented that it had entered into hedging agreements that transferred the risks of these exposures to Wachovia's counterparties.  These counterparties were: (1) monoline insurers (the "Monolines"),[19] and specifically Ambac Financial

---

[19]   Monoline insurers (the "Monolines") guarantee the timely repayment of bond principal and interest when an issuer defaults. They are so named because they provide services to only one industry.

102

Group, Inc. ("Ambac") and MBIA, Inc. ("MBIA"), in the amount of $2.2 billion; (2) AIG, in the amount of $1.1 billion; and (3) a "large European bank" in the amount of $945 million.

273.    Wachovia's representations that $2.2 billion of CDO exposure risks had been hedged and transferred to the Monolines were materially false, and further concealed and misled as to Wachovia's true exposure to its own CDOs.  It had long been known that the Monolines did not have the resources to make good on their "guarantees," because they themselves were swamped by CDO exposures far greater than Wachovia's.  *See, e.g.*, Pershing Square Capital, *Who's Holding the Bag?*, May 2007.  Indeed, Wachovia itself was well aware that the Monolines were failing and were inadequately capitalized: one of the Monolines that was first to capsize under the weight of CDO guarantees was Wachovia's own subsidiary BluePoint Re Ltd. ("BluePoint"), which Wachovia had created and initially capitalized with $300 million.  During the third and fourth quarters of 2007, Wachovia wrote down the entirety of its investment in BluePoint, and thereafter refused to provide any further funding to enable BluePoint to make good on its guarantees, leading to BluePoint's collapse into bankruptcy.

274.    Therefore, Wachovia's hedging with the Monolines created only the *appearance* that $2.2 billion of CDO exposure risks had been hedged/transferred, when in substance they had not.  Wachovia, belatedly, so recognized, and during 2008 recognized $411 million in further losses from its CDO exposures purportedly hedged with the Monolines.

A.    **What CDOs Are**

275.    CDOs are a class of asset-backed securities.  Essentially, a CDO invests in a group of assets and then issues securities "collateralized" by those assets.  Here, the assets backing the CDO securities were yet another class of asset-backed securities: subprime residential mortgage-backed securities (subprime RMBS).

276.     The securities issued in CDO and subprime RMBS securitizations are a set of several *unequal* classes ("tranches") representing differently-prioritized rights to the underlying assets. This tranching is the key to understanding what CDOs are and what their risks are, and is explained below.   Because subprime CDOs invest in already-tranched securities (subprime RMBS), the explanation begins with subprime RMBS.

277.     In a subprime RMBS securitization, the securitizer/underwriter assembles a pool of assets – namely, subprime mortgages – that will serve to collateralize the securities to be issued.  The typical subprime RMBS was based on 3,000-4,000 mortgages having an aggregate value of approximately $1 billion.  The underwriter then evaluates those mortgage assets to calculate their "expected loss."  Based on this expected loss, the underwriter then structures the securitization into a set of discrete tranches, each of which bears a discrete degree of remove from that expected loss sufficient to merit a given credit rating.  The farther removed from loss, the higher the credit rating; the more proximate to loss, the lower the credit rating.

278.     The cash flow generated by the entire underlying asset pool (*i.e.*, the monthly mortgage payments on all the mortgages, and any prepayments of principal) flows like a waterfall (the actual metaphor used in the industry) over this tranching structure, starting at the top and working its way down.  The entire cash flow first goes to paying off the interest on the triple-A tranche, then the double A tranches, then the single-A tranches, etc.  As mortgages become delinquent and/or default, they stop making payments.  The shortfall is first felt by the most junior tranche, even as the more senior tranches continue to receive full payment.

279.     As the underlying mortgages default and suffer principal losses, those losses result in principal writedowns that accrue to the lowest tranches, starting with the unrated "equity" tranche.  As losses mount, they continue to rise to each rated tranche in turn.

280.    The real world results of this structuring process, for 2006 subprime RMBS securitizations and for 2006 Alt-A RMBS securitizations, are displayed graphically on the pages that follow. The charts show, in scale, the average tranching structure for subprime and Alt-A mortgage securitizations during 2006:

# Subprime RMBS:
# Average Structure and Tranche Sizes



**AS UNDERLYING MORTGAGE POOL LOSSES MOUNT, THEY CLIMB UP THE TRANCHES**

1   The lowest tranches -- equity and BB -- amount to 4.5% of the entire securitization.
    Principal losses experienced by the underlying mortgages will accrue here first.
    The BB/Equity tranches are written down by the amount of those losses.

2   If principal losses exceed the size of the equity/BB tranches (4.5%), then losses begin
    to accrue against the more senior tranches above.

3   Next above equity are a series of thin BBB tranches (BBB+, BBB and BBB-).  Each is
    about 1% to 1.5% of the entire securitization; in total, 4.3% of the entire securization.
    Each is successively written down as underlying mortgage losses mount.  If losses
    rise above 8.8% (the 4.5% of equity/BB tranches and the 4.3% of BBB tranches), all
    of the BBB tranches are worthless.

4   The process continues, except, at each successive level, the tranches are "thicker".
    The A tranches account for 5.4% of the securitization.
    The AA tranches account for 6.6% of the securitization.
    The AAA tranches account for 79% of the securitization.

# Alt-A RMBS:
# Average Structure and Tranche Sizes



Pool of Assets
Serving as
Collateral

Tranche Structure
Of RMBS
Securities Issued

**4,000
Alt-A
Mortgages**

Alt-A Mortgage 4,000
Alt-A Mortgage 3,999
...
...
...

**AAA Tranche**

Large AAA Tranche
93% of total securitization

| | | Size of Tranches |
|---|---|---|
| 7.2% | AA Tranches | 3 AA Tranches (AA+, AA, AA-) 2.50% |
| 4.7% | A Tranches | 3 A Tranches (A+, A, A-) 1.70% |
| 3% | BBB Tranches | 3 BBB Tranches (BBB+, BBB, BBB-) 1.20% |
| 1.8% | BB/Equity Tranches | BB and Equity Tranches 1.80% |

## AS UNDERLYING MORTGAGE POOL LOSSES MOUNT, THEY CLIMB UP THE TRANCHES

**Because Alt-A
mortgages have
less risk than
subprime
mortgages, there
is less
subordination
and the
subordinate
tranches are
thinner**

1   The lowest tranches -- equity and BB -- amount to 1.8% of the entire securitization.
Principal losses experienced by the underlying mortgages will accrue here first.
The BB/Equity tranches are written down by the amount of those losses.

2   If principal losses exceed the size of the equity/BB tranches (1.8%), then losses begin
to accrue against the more senior tranches above.

3   Next above equity are a series of thin BBB tranches (BBB+, BBB and BBB-).  Each is
about 0.4% of the entire securitization; the three total 1.2% of the entire securization.
Each is successively written down as underlying mortgage losses mount.  If losses
rise above 3% (the 1.8% of equity/BB tranches and the 1.2% of BBB tranches), all
of the BBB tranches are worthless.

4   The process continues, except, at each successive level, the tranches are "thicker".
The A tranches account for 1.7% of the securitization.
The AA tranches account for 2.5% of the securitization.
The AAA tranches account for 93% of the securitization.

281.    The charts demonstrate two consequential matters: (1) the relative lack of protection, especially for the BBB tranches, from loss; and (2) the dramatic "thin-ness" of the more junior tranches, especially at the BBB and single-A levels. These were consequential because it was exactly these tranches that constituted the lion's share of the assets collateralizing the CDOs that Wachovia retained. As the charts demonstrate, underlying asset losses (*i.e.*, nonprime mortgage losses) did not have to rise very much at all in order to render these RMBS tranches worthless. Thus, relatively small loss increases at the underlying asset level would cause losses to climb into rated RMBS tranches but leap throughout CDOs, because CDOs were primarily collateralized by these lower, thinner RMBS tranches.

(a)    **Relative Lack of Protection from Underlying Asset Losses**. On average, subprime RMBS securitizations provided the BBB tranches with subordinate tranches totaling only 4.5% of the entire securitization. Should underlying asset losses exceed that 4.5% of "first loss" protection, the BBB tranches would start suffering principal losses – first the BBB-, then the BBB, then the BBB+. And as these tranches were themselves quite thin (as next detailed), they did not provide all that much protection for the more senior tranches above them, especially the single-A rated tranches next in line for losses. Because Alt-A mortgages were purportedly safer than subprime, expected losses from Alt-A mortgages were lesser, and thus less subordination was required in Alt-A securitizations. Alt-A BBB tranches were therefore even closer to the bottom, protected by a "first loss" tranche totaling only 1.8% of the entire securitization. Should underlying asset losses exceed that 1.8% of "first loss" protection, the BBB tranches would start suffering principal losses.

(b)    **Tranche Thin-ness**. As the above charts illustrate, nonprime BBB tranches and single-A tranches represent a very thin, very specific slice of subprime risk: they begin to be liable for aggregate losses suffered by the underlying pool of subprime mortgages when such losses

108

exceed approximately "X"%, and they are rendered worthless if such losses rise to X+1%. The very thinness of these tranches gives them an evident *ab initio* risk/return profile. A thin tranche speedily loses its value: a small deterioration in overall asset performance suffices to swing a thin tranche from 100% return of principal to 100% loss. Experts refer to this risk profile as "cliff risk:" everything is fine for a while, but then value "falls off a cliff." Such thin tranches are, effectively, an "all or nothing" proposition. There is very little chance that they will suffer a partial loss: they will provide a 100% principal return (having been protected by tranches below it) or a 100% principal loss (having been engulfed by poor asset performance). Thus, the risk of these tranches has been termed "digital:" 1 or 0.

282.    Thus, triple-B subprime or Alt-A RMBS tranches – as was clear from the outset – constitute a very precise, very thin, and very close-to-the-bottom slice of nonprime risk. Mortgage performance deterioration that may seem relatively slight when considered in light of the entire mortgage pool (e.g., losses increasing by only 1% or 2%) are sufficient to substantially impair the value of these instruments – or entirely destroy them.

283.    CDOs are in essence little different from the RMBS securitizations described above. Just like RMBS, CDOs: (1) invested in a set of assets, and (2) issued a further round of tranched securities backed by those assets. Although any assets serve to collateralize CDOs, the CDOs at issue here are specifically CDOs collateralized by asset-backed securities (known as "ABS CDOs" or "structured finance CDOs"). ABS CDOs came, prior to and during the Class Period, to be collateralized primarily by the junior tranches of subprime RMBS and Alt-A RMBS. They are thus referred to herein as subprime CDOs.

284.    The subprime CDOs at issue here were of two primary types, Mezzanine CDOs and High Grade CDOs.

285.   **Mezzanine CDOs** invested in "mezzanine"-level assets – meaning, primarily, thin, close-to-loss BBB-rated tranches discussed above (referred to as "mezzanine" because such tranches are neither the most senior nor the most junior). These CDOs' extreme asset concentration in nonprime RMBS BBB tranches meant, *ab initio*, that a relatively small rise in underlying mortgage pool losses – sufficient to wipe out the thin, close-to-the-bottom BBB- and BBB tranches – would simultaneously destroy most of the collateral value of a Mezzanine CDO. All the CDO's junior tranches, including the junior triple-A tranche, would be rendered worthless, and even the top-most tranche, the super senior, materially impaired.

286.   In Wachovia's Mezzanine CDO, junior tranches accounted for 37.8% of the securitization, and the super senior for 62.2%.  Thus, the Mezzanine CDO super senior tranche was protected from the first 38% of underlying asset losses.  Yet the "super senior" tranche of Mezzanine CDO did not connote a "super" remote risk, but rather – and merely – the last 62% of losses to be suffered by the thin, close to the bottom BBB RMBS tranches.

287.   **High Grade CDOs** invested in slightly higher-rated assets than did Mezzanine CDOs: the average credit rating of the assets held by High Grade CDOs was between single-A and double-AA. Typically, High Grade CDO assets included a mix of single-A and double-A RMBS tranches, as well as some more highly-rated and some more low-rated tranches. Additionally and very importantly, High Grade CDOs often included in their asset base some single- A, double-AA and triple-A rated tranches from *other* CDOs.  Because the underlying assets were less risky, the High Grade CDO tranching structure differed materially from that of Mezzanine CDOs.  Where the Mezzanine CDO super senior accounted for 62% of the Mezzanine CDO securitization, and thus had credit protection in the form of junior tranches against the first 38% of losses; the super senior tranches of Wachovia's High Grade CDOs accounted for 86% of the entire securitization, and thus had junior tranche loss protection of only 14%.

110

**B.     That CDO Tranches Suffered Severe Impairment Beginning in February 2007 Was Evident: That Wachovia Held Any Such Instruments Was Concealed**

288.     During February and March 2007, market consensus had already recognized that subprime losses would be substantial enough to materially impair even the super senior tranches of ABS CDOs.  By March 2007 it is incontrovertible that market participants and experts had recognized certain fundamental facts and factors – including: (1) subprime and Alt-A mortgage performance deterioration, (2) the oncoming wave of subprime and Alt-A adjustable rate mortgage resets, (3) the new inability to refinance out of such rate-resetting mortgages, given the severe constriction of subprime and Alt-A lending standards, (4) housing price declines, and (5) a wave of rate-reset-sparked defaults that would intensify mortgage performance deterioration and housing price declines – that, when put together, led market participants and experts to conclude that subprime mortgage pool losses would rise through the BBB RMBS tranches and thus leap into Mezzanine CDOs.  Market participants had concluded that the credit ratings still born by these securities no longer matched evident credit realities, and that the value of these securities was substantially impaired and even, imminently, worthless.

289.     Consequently and evidently, the value and market prices for these securities plunged during the first quarter of 2007, together with indexes tracking the prices of those securities.  Just as the S&P 500 index tracks the value of the U.S.'s largest corporations, two more specialized indices – known as the ABX.HE (the "ABX") and TABX.HE (the "TABX") – tracked the value of (1) the different tranches of subprime RMBS (*i.e.*, triple-A, double-A, single-A, triple-B, and triple-B minus); and (2) the different tranches of Mezzanine CDOs (from super senior down to equity).[20]

---

[20]   The ABX index, developed in January 2006 by a consortium of fifteen banks –  including Wachovia –  was designed to track the value of subprime RMBS tranches at each rating level (AAA, AA, A, BBB and BBB-).  "ABX" stands for "Asset-Backed Securities" and "HE" stands for "Home Equity," a term used to refer to subprime mortgages.  From price quotations for 20 representative BBB tranches, 20 representative AA tranches, etc., an average BBB tranche price was reported, an average AA tranche price, etc. The TABX index was launched in February 2007 by the some consortium (including Wachovia).  "TABX" stands for "Tranched ABX."

290.     The ABX and TABX indices were shared market standards expressing aggregate market sentiment as to the value of representative subprime RMBS and Mezzanine CDO tranches. As such, they were objective, directly observable indicators of the value of these instruments. Wachovia was not only aware of these indices at all times, but in fact was one of their founding sponsors, made a market in them, and provided the very price quotations (along with other bank consortium members) that served as their basis.

291.     These indexes, representing efficient market synthesis of available information, visibly registered this market synthesis and consensus. The ABX BBB and BBB- indices began substantial declines in October 2006, after subprime risks began to materialize via monthly tracking reports showing that 2006 subprime mortgages were experiencing record levels of nonpayment.

292.     By February and March 2007, ABX indexes for BBB and BBB- tranches had both suffered substantial declines, with some BBB- indexes having dropped to approximately 60% of par. By February 2007, market participants were then on the record that the ABX BBB values were "going to zero." Jody Shenn and Shannon D. Harrington, *Subprime Mortgage Derivatives Extend Drop on Moody's Reviews*, Bloomberg, Feb. 22, 2007. Given the direct relationship between subprime RMBS triple-B assets and Mezzanine CDO worth, the TABX indices for Mezzanine CDO tranches plunged as well. The TABX index for super senior Mezzanine CDO tranches, reflecting Mezzanine CDO's near-total dependence on BBB RMBS collateral, had fallen to approximately 85% of par. TABX declines for more junior Mezzanine CDO tranches were far more severe: double-A tranches had fallen below 60%; single-A tranches below 50%; and triple-B tranches below 40%.

293.     Worse, on the basis of declining mortgage performance, declining housing prices, rising unsold home inventories, and an imminent wave of rate resets that would spark a wave of defaults and foreclosures, thus adding to unsold inventory and putting additional pressure on housing

112

prices, many market participants "believe[d] the index will go lower," and some already had

concluded that the BBB tranches of subprime RMBS were heading straight "to zero."  As reported

in real time:

> *Subprime Mortgage Derivatives Extend Drop on Moody's Reviews*
>
> **An index of credit-default swaps linked to 20 securities rated
> BBB-, the lowest investment grade, and sold in the second half of
> 2006 today fell 5.6 percent to 74.2** . . .
>
> \*\*\*\*\*
>
> **The BBB- rated portions of ABX contracts are "going to zero,"
> said Peter Schiff, president of Euro Pacific Capital, a securities
> brokerage in Darien, Connecticut. "It's a self-perpetuating spiral,
> where as subprime companies tighten lending standards they
> create even more defaults" by removing demand from the
> housing market and hurting home prices, he said**.

Jody Shenn and Shannon D. Harrington, *Subprime Mortgage Derivatives Extend Drop on Moody's*

*Reviews*, Bloomberg, Feb. 22, 2007.

> *Subprime Mortgage Bond Risks Rise, Credit Derivatives Show*
>
> **An index of credit default swaps on 20 securities rated BBB-, the
> lowest investment grade, and sold in the second half of 2006
> tumbled 7.7% to 68.5 today**, according to Deutsche Bank AG.  It's
> down 30% since trading started Jan. 18. . .
>
> "**Despite some sporadic buying, sentiment remains mostly
> negative and many believe the index will go lower**" said Peter
> DiMartino, an asset-backed securities strategist at RBS Greenwich
> Capital . . . .

Jody Shenn, *Subprime Mortgage Bond Risks Rise, Credit Derivatives Show*, Bloomberg, Feb. 23,

2007.

294.    February and March 2007 brought further, and largely conclusive, bad news for

nonprime, nonprime RMBS, and CDOs – primarily in the form of a definitive collapse of the ability

of nonprime borrowers to refinance out of their mortgages.  The severe constriction of lending

standards and the collapse of subprime originators marked the end of refinancing hopes for many

of the lax nonprime mortgages originated during 2005 and 2006 because it marked the end of easy

subprime credit.  Regulators were cracking down on it, most originators no longer existed to provide it, and the few originators remaining were no longer willing to extend it.

295.    Also during this time, market consensus emerged that CDOs, and particularly Mezzanine CDOs backed by nonprime RMBS tranches, were in imminent danger of severe writedowns, losses and ratings downgrades.  This consensus was reflected in CDO prices, which plummeted, and in the TABX index tracking the value of Mezzanine CDO tranches, which also plummeted at every Mezzanine CDO tranche level, including the super senior.

296.    During late 2006 and early 2007, economist Joseph R. Mason and Joshua Rosner, a managing director of Graham Fisher & Co. investment bank, set out to research "who is investing in the riskiest portions of these [subprime] MBSs" given that their risks were now becoming imminent. The answer, as Mason and Rosner found out, was CDOs ("We found the answer to the big question: the CDO sector").[21]  On February 15, 2007, Mason and Rosner presented this answer in a report titled *How Resilient Are Mortgage-Backed Securities to Collateralized Debt Obligation Market Disruptions?*[22]  Mason and Rosner concluded that, given the recent events in the subprime mortgage market: (1)  "we now know the defaults are in the [RMBS] mortgage pools;" (2) "it is only a matter of time before they accumulate to levels that will threaten rated mezzanine RMBS;" and (3) that, "[g]iven the high proportion of CDO investments in mezzanine RMBS"  "even investment grade rated CDOs will experience significant losses."[23]  Mason and Rosner added that extant credit ratings of the RMBS and CDO tranches had yet to reflect these facts, were thus invalid, and would

---

[21] Alistair Barr, *Subprime shakeout could hurt CDOs: Complex structures helped fuel mortgage boom, but may suffer losses*, Marketwatch, Mar. 13, 2007.

[22]  The later version of this report published on May 14, 2007 under the title *Where Did the Risk Go? How Misapplied Bond Ratings Cause Mortgage Backed Securities and Collateralized Debt Obligation Market Disruptions*, is mentioned further below, and elaborated the points made initially.

[23]  Mason and Rosner, *How Resilient Are Mortgage-Backed Securities to Collateralized Debt Obligation Market Disruptions?*, Feb. 15, 2007, p. 30.

require downgrading.  Mason and Rosner's study was widely reported, and made the front page of the Business section of the *New York Times* three days later, on February 18, 2007.[24] *See* Gretchen Morgenson, *Will Other Mortgage Dominoes Fall?*, N.Y. Times, Feb. 18, 2007.

297.    Other experts agreed.  For example, Mark Adelson[25] stated in mid-March 2007 that the "scenario where the BBBs all blow up is a reasonably possible scenario" – *i.e.*, that the BBB RMBS tranches underlying Mezzanine CDOs could largely and correlatedly be wiped out, taking most of Mezzanine CDOs' value with them.  *See* Caroline Salas and Darrell Hassler, *CDOs May Bring Subprime-Like Bust for LBOs, Junk Debt (Update3)*, Bloomberg Mar. 13, 2007.

298.    Similarly, structured finance textbook author and consultant Janet Tavakoli warned that CDO credit ratings bore little relation to reality, and that – agreeing with Mr Adelson – the BBB RMBS tranches were on the verge of suffering actual principal losses.  Tom Petruno, *Getting A Handle on CDOs is a Complex Challenge*, L.A. Times, Mar. 18, 2007.

299.    On March 23, 2007, *Moody's* published a report titled *The Impact of Subprime Residential Mortgage-Backed Securities on Moody's-Rated Structured Finance CDOs: A Preliminary Review*.  Noting *inter alia* widespread concern over poor subprime mortgage performance, the constriction and collapse of subprime mortgage lending, and the high concentration

---

[24]  And in numerous other publications in the days, weeks and months that followed.  *See*, e.g., Alistair Barr, *Subprime shakeout could hurt CDOs: Complex structures helped fuel mortgage boom, but may suffer losses*, Marketwatch, Mar.13, 2007.

[25]  Mark Adelson, in the 1990s, headed Moody's mortgage-backed securities ratings.  After clashing with Moody's executive Brian Clarkson, who pushed for more lenient rating methods, Mr. Adelson became managing director and head of structured finance research at Nomura Securities International in New York between 2001 and mid-2007.  After the subprime scandal, Mr. Adelson was recruited by Standard & Poors to become their Chief Credit Officer.

of subprime RMBS as the collateral for CDOs, Moody's performed a set of controlled, simple experiments to demonstrate the potential effects to CDOs of such assets' deterioration.[26]

300.    *Moody's* conclusion: for Mezzanine CDOs with above-average exposure to subprime RMBS, "the potential downgrade impact on the SF CDO Notes[27] was severe – in some cases 10 or more notches."  Moody's Investors Service, *The Impact of Subprime Residential Mortgage-Backed Securities on Moody's-Rated Structured Finance CDOs: A Preliminary Review*, Mar. 23, 2007. A "notch" represents the difference between a plain letter rating (such as BBB) and its modifiers "plus" or "minus" (*i.e.*, BBB versus BBB+).  A ten notch downgrade moves an asset from the highest rating, triple-A, down through the three AA notches, the three A notches, the three BBB notches, and deposits it at the below-investment grade rating of BB+.

301.    Moody's conclusion that "where the concentration levels were higher, the potential downgrade impact on the SF CDO Notes was severe - in some cases 10 or more notches" was correct.  What was incorrect was Moody's statement of average subprime concentration of 45% (based, as explained in the last footnote, on an invalid distinction that Moody's later withdrew between subprime and "midprime" assets).

---

[26]  Moody's analysis made no mention of and did not consider Alt-A mortgage performance deterioration, which was then proceeding in parallel to subprime and which was affecting Alt-A RMBS in like manner.  The results of Moody's March 23, 2007 analysis were substantially understated for this reason.  There are many other reasons as well.  For example, the average subprime concentrations reported by Moody's (40%-45% of Mezzanine CDO assets) are substantially understated.  For example, an August 21, 2006 report by Fitch titled *U. S. Subprime RMBS in Structured Finance CDOs* noted that CDOs that closed in the first half of 2006 averaged a 64% concentration in subprime – *i.e.*, 150% the amount reported by Moodys.  The reason for Moody's March 2007 understatement became clear in September 2007 Congressional hearings examining the credit rating agencies' subprime credit ratings: Moody's had created an artificial distinction between "subprime" RMBS and "midprime" RMBS, which it later abandoned after conceding that "midprime" assets looked and acted no differently than "subprime" assets.

[27]  "SF CDO" refers to "structured finance CDOs," *i.e.*, CDOs whose collateral assets are asset-backed securities such as RMBS.  The terms "structured finance" and "asset-backed" are largely interchangeable.

302.     In fact, almost all 2005 and 2006 ABS CDOs had subprime RMBS concentrations that were at the "higher" levels warned of by Moody's.  As Standard & Poor's reported only one week after Moody's, in an April 5, 2007 report titled *Standard & Poor's Weighs In On The U.S. Subprime Mortgage Market*, the average subprime RMBS concentration in 2005 CDOs was between 52%-64%, and in 2006 CDOs between 70%-76%.

303.     On March 27, 2007, the American Enterprise Institute held a conference titled "Mortgage Credit and Subprime Lending: Implications of a Deflating Bubble," and convened a panel of four experts[28] to provide their views on the topic.  All four experts were in complete agreement as to what was happening in nonprime mortgage markets and what the effects would be on CDOs. The analysis each presented on March 27, 2007 is exactly the same as that presented by plaintiffs here.  Plaintiffs' allegations are not *post-facto* reconstructions with the benefit of hindsight, but rather restate the consensus shared by experts as events were unfolding in March 2007.

(a)     Mr. Lachman spoke first.  His analysis of the situation as of March 27, 2007 is exactly the one presented by plaintiffs now (and for that reason will not be quoted – the point has been made).  Of especial interest were his closing remarks: after explaining that housing prices would suffer a steep decline and that subprime mortgages would suffer increased defaults and losses, the only matter he was not sure of was where the securities backed by such mortgages (namely, CDOs) had ended up, and thus which entities were exposed to these losses.

---

[28]  The experts: (1) Desmond Lachman, previously a Wall Street economic strategist and currently an American Enterprise Institute fellow; (2) Nouriel Roubini, Professor of Economics at the New York University Stern School of Business, who had previously served as the Senior Economist for International Affairs at the White House Council of Economic Advisors among many other assignments; (3) Chris Whalen, Senior Vice President and Managing Director of Institutional Risk Analytics, having worked previously both as an investment banker research analyst and in risk management; and (4) Tom Zimmerman, a Managing Director at UBS in charge of UBS' Mortgage, Credit and Asset Backed Securities research (the UBS team of fixed income analysts had won first place in the latest Institutional Investor analyst survey).

(b)     Mr. Roubini's conclusions and analysis were in full agreement with Mr.

Lachman's (and, as Mr. Roubini noted, with Mason and Rosner's analysis):

> First point . . . **any indicator you have right now from the housing market, whether it is building permits, whether it is the housing starts, whether it's construction, whether it's completions, where is the demand for new homes, it's just heading south. The glut of existing and new homes is becoming worse by any standard - unprecedented. The price pressure is downwards**.
>
> *****
>
> So **if you look at any indicator of the housing market, before we even talk about subprime or mortgages, it's a disaster. This is going to be the worst housing recession we're going to have since 1960**.
>
> Second point . . . **think about the reckless lending practices that were essentially being used for the last four or five years. You have zero down payments, no documentation of assets or income, what people refer to as "liar loans." Interest only mortgages. Teaser rates. Negative amortization. Option ARMs. Was it only subprime? Look at the numbers - it was subprime, it was Alt-A**, was piggyback loans, was home equity, was also a good chunk of the option ARMs. Subprime, near-prime, prime. If you look carefully, the numbers, I would argue that about fifty percent if not more of all original mortgages for the last couple of years would be things I would consider as reckless - as just toxic waste.
>
> *****
>
> Fourth point. **People say, you know, the residential mortgage backed security market is still kind of OK. So, as long as it's OK, then there's going to be financing and all the rest. I think there's already evidence that actually, that there have been massive losses in the CDO market** . . . .
>
> *****
>
> **As long as home prices were going up, you could keep up with this party. Right now home prices are falling**, and home equity withdrawal was at a 700 billion dollar annual rate in 2005, Q4 it is down to 270. **In the meanwhile debt servicing ratio is going up. This year alone you are going to have one trillion of ARMs that are coming to maturity and being reset at much higher interest rates** . . . .

Nouriel Roubini, *AEI Conference Transcript*, Mar. 27, 2007.

118

(c)    Mr. Whalen's comments echoed the closing remarks of Mr Lachman: subprime losses would be severe, *but no one knew where those losses were.*  Although no one knew where the risk was, the perception – as Mr. Whalen's remarks evidence – was that at least the banks had sold it off.  And, in this regard, Mr. Whalen's comments demonstrate the validity of plaintiffs' fundamental claim: everyone was aware of subprime-based risks; everyone thought that securitizing banks such as Wachovia had sold off securitized risk to others; and no one had any inkling that Wachovia had in fact retained a sizeable share of those risks:

> **This is what scares the regulators, it's not that the banks have kept a lot of this risk, it's that they've sold it to somebody else and now the zillion dollar question in Washington is "where is all of this risk?" that has been packaged and sold by the sell side to buy-side investors, whether you're a homeowner, whether you're a hedge fund that owns CDOs you have basically the same problem right now**. It's a shame we can't get them together sufficiently.

Christopher Whalen, *AEI Conference Transcript*, Mar. 27, 2007.

(d)    Mr. Zimmerman's observations, analysis and conclusions with respect to housing prices, subprime mortgages and their risks and performance, and the looming disaster of ARM rate resets coupled with the now-closed door to refinancing, were in full agreement with those of the other three experts speaking on March 27, 2007 and with plaintiffs' claims here.  Based on this analysis, Mr. Zimmerman concluded: (1) that underlying BBB RMBS tranches would fail, and with them CDOs ("The lower rated tranches triple-B minus, those guys, they've got problems - they'll get hit. Some of them will go down, half of them will go down. . . ."), but (2) like Mr. Whalen, *asserted that such CDO exposure had been sold off by banks and spread throughout the world* ("So the guys who are going to get hit with this in the capital markets from losses in here and losses in the CDO market, are all around the world. It's really spread out, and this is back to your question about who's got the risk, it's just all over. . . .").  Mr. Zimmerman's March 27, 2007 remarks, therefore, validate the essence of plaintiffs' claims here.  The subprime/CDO risks were

long known; the only matter not known was that Wachovia had, contrary to all market understanding, retained a sizeable share of those very CDO risks:

> **So we knew it was going to happen. Now . . . and take a look at this subprime number roughly - and this is historical data - at zero to five percent HPA we're looking like, you know, eight percent kind of losses. [slide 6 - bottom rightmost bar]. That's an ugly number to a lot of CDO investors. That's a bad number. That's not good. The old numbers were three and four percent. So if the market slows down, if the housing market slows down - a flat market, forget going negative, then there's a lot of problems. So . . . this is what we've been talking about for the last couple of years**.
>
> *****
>
> **One last comment. In terms of the impact on two other groups of people. The impact on the banks is marginal** . . . .
>
> **So Wall Street is going to take some hits here and there - trading desks will get hit, but it's not going to be a serious systemic problem**.
>
> **Who owns this stuff? The subprime . . . first of all, 75 percent of the subprime securitized product in subprime, 75 percent is triple-A. You're home free, not a problem** . . . .
>
> **The lower rated tranches triple-B minus, those guys, they've got problems - they'll get hit. Some of them will go down, half of them will go down** . . . .
>
> **So the guys who are going to get hit with this in the capital markets from losses in here and losses in the CDO market, are all around the world. It's really spread out, and this is back to your question about who's got the risk, it's just all over, so in a way that's good, not bad, right? It's not concentrated it's all over the place**. So I don't see that as a systemic problem.

Thomas Zimmerman, *AEI Conference Transcript*, Mar. 27, 2007.

304.    Thus, by March 2007, market consensus had recognized that CDOs were the concentrated repository of subprime risk, and  CDO values even at the super senior level were already materially impaired.   The question was no longer whether CDOs were at risk, but rather – and only – who was holding these CDOs and thus who would suffer the already-recognized losses.

305.    What no one understood was that Wachovia had not actually sold a sizeable share of the CDO tranches that it underwrote, and had thus retained the very risks that the market believed to have been dispersed.  The market believed – reasonably – that those already-recognized CDO risks had been dispersed by CDO underwriters into the "great unknown" of worldwide capital markets.  In the case of Wachovia, a sizeable portion of those risks had remained with it – safely hidden from public view.

306.    The above-mentioned statements and conclusions of Mr. Lachman, Mr. Whalen and Mr. Zimmerman vividly evidence the fact and efficacy of Wachovia's concealment.  Each had correctly analyzed the situation and had concluded that CDOs were at great risk of great loss.  The only aspect of the situation that they misunderstood was where these risks had gone.  Each understood CDO underwriters to be safe from the risks of these instruments by virtue of having sold off the resulting CDO securities.

307.    Indeed, markets devoted much of the rest of 2007 to searching for where this risk had gone.  Common conclusions were that it had been purchased by hedge funds, by Asian banks, by insurance companies:

> *Mortgage crisis to hit holders of risky derivatives*
> *Most hedge funds made money, but some lost; Asian investors fingered*
>
> The shakeout in the subprime-mortgage business is inexorably worming its way through the credit markets that fueled the sector's rapid growth.  **As delinquencies and foreclosures rise, losses will likely hit some of the riskiest parts, or tranches, of subprime mortgage-backed securities, or MBS, experts say.  Then collateralized debt obligations, which invested in some of the lowest-rated subprime MBS tranches, will feel the pain.**
>
> **But who holds these securities?**
>
> Hedge funds have become big credit-market players in recent years, and many firms trade the riskiest bits of subprime MBS and CDOs.  But while some funds, such as Saye Capital's Tranquility fund and others managed by Cheyne Capital and Cambridge Place Investment

Management, have suffered, most hedge funds made a lot of money in February betting that the subprime crisis would hit, according to several investors who didn't want to be identified. A credit fund run by Paulson & Co. was up almost 67% in February, while other hedge funds run by Harbinger Capital Partners, MKP Capital Management and Bear Stearns also generated gains from the trend, investors said. **So who ultimately holds the risk?**

**Most experts say it's almost impossible to know. Sales teams at investment banks and other firms that offered CDOs won't talk** and no one else contacted by MarketWatch has kept track.

**Many experts point vaguely to Asian and especially Japanese investors** who have been hungry for any assets yielding more than the almost-nonexistent interest rates offered by the world's second-largest economy in recent years.

**But that's where the trail ends, which is a big problem, according to some.**

**"It's pathetic, but it's almost impossible to find out, which is no good for the system or anyone really," Josh Rosner, a managing director at research firm Graham Fisher & Co., said. "On the CDO side we know even less and regulators know even less**. . . .

***** * * * *

Rosner and Joseph Mason, an associate finance professor at Drexel University's business school, published a study in March highlighting CDOs' big exposure to the subprime mortgage business.

**Despite toiling for months on the project, the two can't give a definitive answer on who holds the risk**. Rosner's theory is that hedge funds hold a lot of the lowest-rated bits of subprime MBS and CDOs, called the equity tranches. **Pension funds and insurers probably hold the less risky, senior tranches because rules restrict them from investing in lower-rated securities, he added. Still, many CDOs bought the lower-rated bits of subprime MBS, so Rosner is concerned that rising losses from mortgage defaults and foreclosures could even eat their way up into the investment-grade tranches of CDOs**. Pension funds and insurers may also have invested in hedge funds that hold the riskier CDO tranches, Rosner and Mason said. "There is a real risk that a lot of these assets are held by unsuspecting end holders like pension plans," Rosner said.

Karen Weaver, a veteran MBS analyst who runs a 300-person research group at Deutsche Bank, thinks foreign investors hold a lot of the riskiest parts of these securities.

> **"We don't know exactly who holds these risks, but, in a way, we all hold this risk," Mason said. "The risk doesn't go away. Somebody has to have it."**

Alistair Barr, *Mortgage crisis to hit holders of risky derivatives: Most hedge funds made money, but some lost; Asian investors fingered*, Marketwatch April 2, 2007.

308.     No one suspected that the great chain of securitization was not in fact a line leading away from securitizers but in fact a circle, depositing with securitizers such as Wachovia billions of dollars of subprime risk commonly understood to be somewhere else.

309.     As 2007 progressed, continuing monthly reports evidencing the deteriorating performance of 2006 vintage of subprime mortgages caused further declines in the ABX and TABX indices.  By June 30, 2007, the ABX BBB indices had fallen to approximately 57%, and the TABX index for Mezzanine super seniors had fallen to approximately 69%.

310.     During July 2007, credit rating agencies downgraded hundreds of triple-B rated subprime RMBS tranches, and a variety of other investment vehicles reported severe losses from investments in RMBS and CDOs.  The ABX triple-B indices fell below 40%.  The TABX indices fell at all levels, and the TABX index for Mezzanine super seniors declined to below 60%.  Additionally,  ABX indexes for higher subprime RMBS tranches also showed substantial declines: single-A ABX indices fell to 50%, and double-A ABX indices fell to 70%.   These levels of impairment were sufficient to erase the entirety of the value of High Grade CDO tranches at all levels below the super senior, as High Grade CDOs were collateralized primarily by such single-A and double-A tranches.  Wachovia continued to remain silent about its exposures and continued to conceal them, and retained its CDO assets at inflated prices that were belied by market prices, such that no sign of Wachovia's exposures and losses publicly emerged.

311.     By September 30, 2007, the ABX triple-B indices had fallen to 30%, and TABX indices for all junior Mezzanine CDO  tranches showed such tranches to be effectively worthless.

123

The TABX index for Mezzanine super seniors had, by this point, fallen to 33%.  In addition, ABX indexes for higher RMBS tranches also showed substantial declines: single-A ABX indices at 50%, double-A ABX indices at 80%.

### C.   Wachovia's CDO Exposures, and Wachovia's False and Misleading Statements Concerning Those Exposures

312.   During 2006 and 2007, Wachovia created, structured and underwrote nine subprime CDOs totaling $10.11 billion.  Wachovia concealed, at all times until November 9, 2007, that it had retained $2.12 billion of those very CDOs (*i.e.*, 20% of all the CDOs it underwrote): specifically $1.39 billion of Mezzanine CDO super senior tranches and $730 million of High Grade and Mezzanine CDO junior tranches.  Directly relevant and directly observable indexes tracking the value of these instruments demonstrated that their value was materially impaired no later than February 2007.  By October 2007, as the indexes demonstrated, Mezzanine super senior tranches had lost two-thirds of their value, and the junior tranches of both Mezzanine and High Grade CDOs were worthless.  That these instruments were risky and that their value had all but disappeared  had long been known.  The only matter that was not known was that Wachovia held $2.12 billion of these instruments.

313.   Wachovia wrote down the value of its CDOs on October 19, 2007 (*i.e.*, before Wachovia disclosed the actual extent of its holdings on November 9, 2007), January 22, 2008,  April 14, 2008, and July 22, 2008.  Wachovia's writedowns and post-writedown valuations of October 19, 2007, January 22, 2008, and April 14, 2008 were themselves materially false and misleading.  They failed, both individually and collectively, to value these securities at the levels to which they had sunk no later than October 2007.  As of October 2007, Mezzanine CDO super senior tranches had lost two-thirds of their value, and junior CDO tranches of both Mezzanine and High Grade CDOs were worthless.  Wachovia continued to value its CDOs at higher – and false – values throughout

the next nine months until finally, on July 22, 2008, Wachovia's writedowns captured the loss of value that had been apparent by (and long before) October 2007.

314.    Additionally, Wachovia concealed at all times until January 22, 2008, that it had retained, at least,  a further $4.18 billion of super senior tranches whose risks had purportedly been "hedged" by transferring those risks to various counterparties, including $2.2 billion to the uncreditworthy Monolines.  Precisely because the Monolines were uncreditworthy counterparties, Wachovia's agreements with the Monolines to "transfer" super senior risks created only the appearance of risk transfer rather than the substance.  The reality was that the Monolines could not make good on their guarantees.  Analysts had so concluded no later than May 2007, and Wachovia had intimate knowledge of the Monolines' failures given that, between July and December 2007, it wrote down the entirety of its $300 million of invested capital in its own Monoline subsidiary Bluepoint, which itself was collapsing under the weight of its own CDO exposures.

315.    Wachovia's representations concerning its "hedged" exposures on and after January 22, 2008 were doubly false.   First, Wachovia insisted that the hedges were good, when in truth they were not.  In drips and drabs throughout 2008, Wachovia admitted that the guarantees provided by the Monolines were not, in reality, guarantees of anything, and recognized $411 million of losses from its purported $2.2 billion of Monoline exposure.  This amounts to a 26% writedown.  However, plaintiffs believe that Wachovia is still overstating the value of such guarantees.

316.    Second, Wachovia materially understated its exposure to the Monolines.  Whereas Wachovia claimed only $2.2 billion of exposure to the Monolines, the two largest Monolines – Ambac and MBIA, Inc. – claim in excess of $7 billion of exposure to Wachovia's CDOs.

317.    Plaintiffs' investigation has allowed precise identification of the nine subprime CDOs that Wachovia created, structured and underwrote during 2006 and 2007.[29]  The table on the next page lists Wachovia's nine CDOs, their dates of issuance, their sizes, and their precise tranching/rating structures:

## Wachovia's Subprime CDOs: 2006-2007

| CDO | Date Issued | Size | Type | Tranching / Rating Structure ($ millions) | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Super Senior | AAA | AA | A | BBB | Equity |
| Longshore CDO Funding 2006-1 | Jan. 1, 2006 | $750 million | HG | 619 | 64 | 30 | 22 | 7 | 9 |
| Duke Funding High Grade IV | Feb. 1, 2006 | $1.5 billion | HG | 1312 | 62 | 42 | 54 | 12 | 18 |
| Longshore CDO Funding 2006-2 | 38882 | $1 billion | HG | 870 | 60 | 42 | 13 | 8 | 8 |
| Duke Funding High Grade V | 38900 | $1.5 billion | HG | 1260 | 108 | 78 | 21 | 15 | 18 |
| Stillwater ABS CDO 2006-1 | 38928 | $650 million | HG | 520 | 98 | 11 | 8 | 5 | 8 |
| Octans II CDO | Dec. 20, 2006 | $1.575 billion | MZ | 945 | 195 | 108 | 110 | 126 | 91 |
| Sagittarius CDO | Mar. 29, 2007 | $985 million | MZ | 630 | 148 | 82 | 45 | 80 | |
| Longshore CDO Funding 2007-3 | 39203 | $1.3 billion | HG | 1131 | 94 | 38 | 18 | 10 | 10 |
| Grand Avenue III CDO | Aug. 2, 2007 | $850 million | HG | 670 | 121 | 29 | 16 | 5 | 9 |
| Total | | $10.11 billion | | 7957 | 950 | 460 | 307 | 268 | 171 |

[29]  Wachovia disclosed on November 9, 2007 that it had underwritten nine subprime CDOs during 2006 and 2007, but nowhere provided any further identification or specificity.  *See* Wachovia's November 9, 2007 Form 10-Q, at p. 6 ("We originated three ABS CDOs in the first nine months of 2007 and six in full year 2006. . . .").

318.   As the above table illustrates, Wachovia created $7.96 billion of super senior subprime CDO tranches and $2.16 billion of more junior subprime CDO tranches.

319.   Undisclosed until November 9, 2007 was that Wachovia was still holding at least (1) $1.39 billion of subprime CDO super senior tranches (all of which related to Mezzanine CDOs); and (2) $730 million of junior subprime CDO tranches.  Wachovia's super senior holdings amount to 17.5% of its total super senior issuance during 2006 and 2007.  Wachovia's junior tranche holdings constituted 33.8% of its total junior tranche issuance during 2006 and 2007.

320.   Based upon plaintiffs' investigation, plaintiffs believe that Wachovia's $1.39 billion of Mezzanine CDO super senior exposure included: (1) the $945 million super senior tranche of the Octans II CDO, and (2) $160 million of the $670 million super senior tranche of the Sagittarius CDO (the risk of the remaining $470 million had been "hedged" with the Monoline MBIA).  Wachovia also may have included in this total approximately $217 million of the $1.13 billion super senior tranche of Longshore CDO Funding 2007-3 (the risk of the remaining $896 million had been hedged with the Monoline MBIA) and/or some fragment of the Grand Avenue III CDO super senior tranche.

321.   Undisclosed until January 22, 2008 was that Wachovia was still holding a further $4.18 billion of subprime CDO super senior tranches ($2.4 billion from High Grade CDOs, $1.78 billion from Mezzanine CDOs), which exposures had been purportedly hedged through agreements which purportedly transferred the risks of those exposures to Wachovia's counterparties.  According to Wachovia, these counterparties were: (1) the Monolines, in the amount of $2.2 billion; (2) AIG, in the amount of $1.1 billion; and (3) a "large European bank" with $945 million.

322.   Wachovia's representations do not square with the Monolines' own disclosures of their guarantees.  Wachovia claims that it "transferred" $2.2 billion of super senior risks to the Monolines and a further $2 billion to more creditworthy counterparties.  But data released by two

largest Monolines alone – AMBAC and MBIA – indicates that Wachovia "transferred" in excess of $7 billion of super senior risks just to those two Monolines:

(a)    AMBAC, for example, has disclosed its liability for $5.7 billion of Wachovia-issued subprime CDO super senior tranches.  *See* Ambac, *CDO of ABS Data Supplement*, Aug. 25, 2008. $3.35 billion of that total relates to Wachovia's 2006-2007 subprime CDO super senior tranches, including: (1) the $1.3 billion super senior tranche of Duke Funding High Grade IV; (2) the $1.26 billion super senior tranche of Duke Funding High Grade V; and (3) the $619 million super senior tranche of Longshore CDO Funding 2006-1.  *See id*.  Additionally, AMBAC disclosed liability for a further $2.35 billion of Wachovia CDO super senior tranches issued prior to 2006, including (4) the $825 million super senior tranche of Tremonia CDO 2005-1 PLC, and (5) the $1.53 billion super senior tranche of Duke Funding High Grade III.  *See id*.

(b)    MBIA has acknowledged liability for $473 million of Wachovia's $630 million Sagittarius CDO super senior tranche,[30] and further sources have identified that MBIA bears liability for at least $900 million of the $1.13 billion super senior tranche of Longshore CDO Funding 2007-3.[31]  Thus, MBIA's liability for Wachovia subprime CDO super seniors is at least $1.37 billion.

---

[30] *See, e.g.*, (1) MBIA's written testimony for the February 14, 2008 U.S. House of Representatives, Committee on Financial Services hearings on "The State of the Bond Insurance Industry," at 23; and (2) the December 3, 2007 interpleader complaint in *Deutsche Bank Trust Company Americas v. Lacrosse Financial Products LLC et al.*, Index No. 07116014 (N.Y. Sup. Ct., County of N.Y.) (an action arising over MBIA's actions with respect to the Sagittarius super senior tranche).

[31] *See, e.g.*, (1) William Ackman, *Letter to Eric Dinallo, New York Superintendent of Insurance re Bond Insurer Transparency: Open Source Research*, Jan. 30, 2008, at 14 (listing MBIA's larger exposures to CDOs, including Longshore CDO Funding 2007-3); and (2) the presentation by T2 Partners LLC, *Why We Are Still in the Early Innings of the Bursting of the Housing and Credit Bubbles – And How to Profit From It*, June 6, 2008, at 117-129 (taking an in-depth look at the Longshore 2007-3 CDO guaranteed by MBIA, the assets collateralizing that CDO, and the likely severe losses that will result).

323.    In short, though Wachovia claimed only a $2.2 billion exposure to the Monolines, the two largest Monolines claim that that exposure is in excess of $7 billion -- more than three times greater than Wachovia indicated.

324.    The first public indication that Wachovia retained any exposure to the subprime CDOs it underwrote came on October 19, 2007, when Wachovia disclosed "CDO/CLO and other structured credit products losses of $438 million largely relating to warehouse positions," including "$347 million loss directly related to subprime mortgage investments." Wachovia, *Wachovia 3Q07 Quarterly Earnings Report*, at 3.  Later disclosures discussed below would clarify that of these $438 million of CDO/CLO losses, $330 million were writedowns of subprime CDOs.  Though Wachovia disclosed on October 19, 2007 the *effects* of its previously-concealed subprime CDO holdings (*i.e.*, the above-mentioned writedowns), Wachovia did not then disclose its holdings.  Wachovia merely stated that "CDO/CLO warehouse exposures [were] down significantly from 2Q07 levels," without disclosing what those second quarter levels had been and what the third quarter levels now were.

325.    Wachovia's October 19, 2007 disclosures with respect to subprime CDOs were false and misleading.  The writedowns did not come close to valuing Wachovia's CDOs at current market prices, which were then – and had long been – far lower than Wachovia's post-writedown valuations. This was not publicly evident, however, because Wachovia had not disclosed its subprime CDO holdings *per se* – which would have revealed the inaccuracy and insufficiency of the October 19, 2007 writedowns.

326.    Wachovia first disclosed the extent and nature of its CDO exposures on November 9, 2007.  Wachovia's November 9, 2007 disclosures made clear that, as of the end of the third quarter of 2007 (September 30, 2007), Wachovia held $1.39 billion of subprime Mezzanine CDO super senior tranches and $730 million of junior subprime CDO tranches.  Wachovia's November 9, 2007 disclosures also clarified Wachovia's October 19, 2007 writedowns: (1) Wachovia wrote

down its $1.39 billion of Mezzanine super seniors by $160 million (or 11.5%, despite the fact that Mezzanine CDO super seniors had by then lost 70% of their value); and (2) Wachovia wrote down its $730 million of junior CDO tranches by $170 million (a 23.3% writedown, despite the fact that junior CDO tranches were then worthless). Wachovia acknowledged on November 9, 2007 that further writedowns were required.

327.    On January 22, 2008, Wachovia disclosed a further round of $970 million of CDO writedowns: (1) a further $617 million writedown of its Mezzanine super seniors (to $613 million); and (2) a further $352 million writedown of its junior CDO tranches (to $208 million). Wachovia's January 22, 2008 writedowns and valuations were still materially false and misleading. Wachovia: (1) valued its super seniors at 44.1% of par, when in fact and no later than October 2007 such instruments were worth only 30% of par; and (2) valued its junior CDO tranches at 28.5% of par, when in fact and no later than October 2007 such instruments were worthless.

328.    On April 14, 2008, Wachovia disclosed a further round of $315 million of CDO writedowns: (1) a $174 million writedown of its Mezzanine super seniors (to $439 million); and (2) a $141 million writedown of its junior CDO tranches (to $67 million). Wachovia's April 14, 2008 writedowns and valuations were still materially false and misleading. Wachovia: (1) valued its super seniors at 31.6% of par, when in fact and no later than October 2007 such instruments were worth only 30% of par (and had subsequently declined further); and (2) valued its junior CDO tranches at 9.2% of par, when in fact and no later than October 2007 such instruments were worthless.

329.    Finally, on July 22, 2008, a further round of writedowns brought Wachovia's valuations in line with market realities that had been evident nine months earlier in October 2007. Wachovia: (1) wrote down its Mezzanine super seniors to $419 million, or 30.1% of par; and (2) wrote down its junior CDO tranches to $12 million, or 1.6% of par.

## V.   DEFENDANTS' VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING PRINCIPLES

330.    Defendants also caused the Company to falsely report its financial position and results of operations during the Class Period by, inter alia, omitting required disclosures, overstating net income and misrepresenting the Company's true financial position.   The Company's financial statements, and related Forms 10-K, for the years ended December 31, 2006 (the "2006 annual financial statements") and December 31, 2007 (the "2007 annual financial statements" and, combined, the "relevant annual financial statements") and interim financial statements, and related Forms 10-Q, for the quarterly periods ended March 31, 2006; June 30, 2006; September 30, 2006; March 31, 2007; June 30, 2007; September 30, 2007 and March 31, 2008 (the "relevant interim financial statements" and, collectively, the "relevant financial statements") did not present fairly the Company's financial position and results of operations, and were not presented in conformity with GAAP and SEC rules, as applicable.

331.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA").   GAAP consists of a hierarchy of authoritative literature.   The highest priority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards ("FAS") followed by FASB Interpretations ("FIN"), FASB Statements of Position ("FSP"), Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), and AICPA Statements of Position ("SOP").  GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

332.    Because the Company is publicly traded, it is required to maintain books and records in sufficient detail to reflect its transactions and is therefore required to prepare financial statements

in accordance with GAAP. Specifically, the Securities and Exchange Act of 1934, 15 U.S.C. § 78m

(b) (2) (the "Securities Exchange Act"), requires public companies to:

    (A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

    (B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that -

        i.    transactions are executed in accordance with management's general or specific authorization;

        ii.    transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and

        iii.    to maintain accountability for assets;

        iv.    access to assets is permitted only in accordance with management's general or specific authorization; and

        v.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

333.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a)).

334.    The responsibility for preparing the financial statements in conformity with GAAP rests with the Company's management, as, for example, set forth in the AICPA Auditing Standards ("AU"), in relevant part:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, authorize, record, process, and report

> transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management . . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

(AU 110.03) (footnote omitted).

## A.    Overview of the GAAP Violations

335.    The Company's relevant financial statements were not presented in conformity with GAAP and SEC rules.  During the Class Period, the Company accumulated exposures to certain significant credit risk and other concentrations, inherently risky loans and investments, and had significant involvement with numerous off-balance sheet variable interest entities ("VIEs").  The Company's relevant financial statements omitted required disclosures regarding the Company's exposure to significant concentrations of credit risk and current vulnerabilities due to certain concentrations created by its loan portfolio and certain investments, as well as, disclosures regarding certain significant estimates.  Additionally, the Company's relevant financial statements materially overstated its loan portfolio, and materially understated the related allowance for credit losses and the related provision for credit losses, as well as, materially overstated the value of certain investments.  Further, the Company's relevant financial statements did not present certain VIEs on a consolidated basis, nor include the required disclosures for certain unconsolidated VIEs.  The Company's relevant financial statements also did not timely recognize the material impairment to the Company's goodwill asset.  As a result of these material misstatements, the Company's relevant financial statements materially overstated net income, or understated net losses as applicable, and materially overstated shareholders' equity.  Thus, the Company's relevant financial statements misrepresented its financial condition and its results of operations in violation of GAAP and SEC rules.

133

336.    Further, the Company's relevant financial statements presented the Company's financial position and results of operations in a manner which, inter alia, violated the following fundamental accounting principles:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASCON 1 ¶ 34);

(b)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASCON 1 ¶ 40);

(c)    The principle that financial reporting should provide information about an enterprise's financial performance during a period. "Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance." (FASCON 1 ¶ 42);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. "To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general." (FASCON 1 ¶ 50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASCON 2 ¶¶ 58-59);

(f)    The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASCON 2 ¶ 79);

(g)    The principle that financial reporting should be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent (FASCON 2 ¶ 81); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2 ¶¶ 95, 97).

337.     Each of the improper accounting practices, misrepresentations and omissions engaged in by the Defendants, and discussed further herein, standing alone, was a material breach of GAAP and SEC rules.

**B.     Omission of Required Disclosures regarding Significant Concentrations of Credit Risk, Current Vulnerability due to Certain Concentrations and Certain Significant Estimates**

338.     The Company's relevant financial statements, in violation of GAAP and SEC rules, omitted required disclosures regarding significant concentrations of credit risk, current vulnerability due to certain concentrations and certain significant estimates.

*GAAP Requires Disclosures regarding Significant Concentrations of Credit Risk*

339.     In addition to the fundamental principles of financial reporting established by the FASCONs above, GAAP requires certain disclosures to prevent financial statements from being false and misleading.  FAS No. 107, *Disclosures about Fair Value of Financial Instruments* ("FAS 107"), requires disclosure of significant concentrations of credit risk arising from all financial instruments.  Credit risk can arise from group concentrations in which "a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions."  For each such significant concentration, FAS 107 requires disclosure of (a) the characteristic that identifies the concentration, (b) the related maximum amount of loss due to credit risk, (c) the Company's related policies regarding collateral, and (d) the Company's related policies regarding master netting arrangements to mitigated credit risk.  (FAS 107 ¶ 15A).

340.     FSP SOP No. 94-6-1, *Terms of Loan Products That May Give Rise to a Concentration of Credit Risk* ("FSP SOP 94-6-1"), indicates loan products with certain features may increase the exposure of the originator, holder, investor, guarantor, or servicer to risk of nonpayment or realization, and thereby, create a concentration of credit risk which requires the FAS 107

disclosures described above by the reporting entity.  Regarding such features, SOP 94-6-1 provides the following, in relevant part:

> Examples of features that may increase credit risk include, **but are not limited to**:
>
> (a)  Terms that permit principal payment deferral **or payments smaller than interest accruals (negative amortization)**;
>
> (b)  A **high loan-to-value ratio**;
>
> (c)  Multiple loans on the same collateral that when combined result in a high loan-to-value ratio;
>
> (d)  **Option adjustable-rate mortgages (option ARMs)** or similar products that may expose the borrower to future increases in repayments in excess of increases that result solely from increases in the market interest rate (for example, once negative amortization results in the loan reaching a maximum principal accrual limit);
>
> (e)  An **initial interest rate** that is below the market interest rate for the initial period of the loan term and **that may increase significantly** when that period ends; and
>
> (f)  **Interest-only loans**.

(FSP SOP 94-6-1 ¶ 2).

341.  Under FAS 107 and FSP SOP 94-6-1, further examples that create group concentrations of credit risk include loans to nonprime (*i.e.,* subprime and Alt-A) borrowers, second mortgages/home equity loans (*i.e.*, multiple loans on the same collateral), loans in second lien positions or not secured by collateral, loans heavily concentrated in certain geographic areas and loans subject to ineffective, and potentially fraudulent, underwriting practices, as well as certain investments dependent upon cash flows from significant group concentrations.

*GAAP Requires Disclosures regarding Current Vulnerabilities due to Certain Concentrations*

342.  Regarding loan products, FSP SOP 94-6-1 also refers to the requirements of SOP No. 94-6, *Disclosure of Certain Significant Risks and Uncertainties* ("SOP 94-6"), which requires disclosure of current vulnerabilities due to certain concentrations.  (FSP SOP 94-6-1 ¶¶ 9-11).  Such certain concentrations are not limited to concentrations of credit risk as the disclosures discussed

above were.   Specifically, FSP SOP 94-6-1 points to the requirement of SOP 94-6 to disclose concentrations when such a concentration (a) exists as of the date the financial statements and (b) makes the enterprise vulnerable to the risk of a near-term severe impact, and there is at least a reasonable possibility that the events that could cause the severe impact will occur in the near term. (SOP 94-6 ¶ 21).  Examples of such concentrations include concentrations in the volume of business transacted with a particular customer, concentrations in revenue from particular products or concentrations in a particular market or geographic area.   (SOP 94-6 ¶ 22).   Disclosure of concentrations meeting such criteria should include "information that is adequate to inform users of the general nature of the risk associated with the concentration."  (SOP 94-6 ¶ 24).

*Required Disclosures regarding the Loan Portfolio were Omitted*

343.   The Company's loan portfolio exposed the Company to significant concentrations of credit risk and current vulnerabilities due to certain concentrations.  As alleged and discussed in greater detail elsewhere herein, during the Class Period, the Company accumulated/held a significant loan portfolio which, in significant parts, was comprised of loans with negative amortization features, option ARMs, variable interest rates, interest-only payment options, high LTV ratios, low documentation/stated income; loans to nonprime (*i.e.*, subprime and Alt-A) borrowers; second mortgages/home equity loans (*i.e.*, multiple loans on the same collateral); loans in second lien positions or not secured by collateral; loans based on inappropriate collateral appraisals; loans heavily concentrated in certain geographic areas; and loans subject to ineffective, and potentially fraudulent underwriting practices.

344.   Prior to the merger with Golden West, the Company's loan portfolio already included loans which exhibited certain of the characteristics discussed above.  For example, as of March 31, 2006 the Company's loan portfolio, with total loans in excess of $290 billion, was comprised of 55 percent commercial loans and 45 percent consumer loans. Of the commercial loans, 23 percent were

137

not secured by collateral.  Of the consumer loans, 26 percent were second lien, 31 percent had an

LTV of greater than 80 percent, 10 percent had an LTV of greater than 90 percent and 46 percent had

variable rates.  The Company's 2006 annual financial statements  were the first financial statements

to include the financial position and results of the operations of Golden West (beginning October

1, 2006).  Those financial statements disclosed the following regarding the nature/terms of loans in

its loan portfolio acquired in the merger of Golden West:

> In connection with the Company's merger with Golden West, the
> Company acquired a portfolio of Option Adjustable Rate Mortgage
> Loans ("Option ARMs"). The majority of the Company's Option
> ARMs have **an interest rate that changes monthly based on
> movements in certain indices**. Interest rate changes and available
> options relating to monthly payments of principal and interest are
> subject to contractual limitations based on the Company's lending
> policies. **Negative amortization occurs, under an available option
> subject to certain limits**, when the payment amount is less than the
> interest due on the loan. Borrowers may repay the deferred interest in
> whole or in part at any time. The amount of deferred interest related
> to all Option ARMs was $1.6 billion at December 31, 2006.
>
> At December 31, 2006, **Option ARMs represented 47 percent of
> the Company's consumer loans and 28 percent of the Company's
> total loans**. Properties securing the Company's Option **ARMs are
> concentrated primarily in California (60 percent) and Florida (8
> percent)**. No other state concentration is more than 5 percent of total
> Option ARMs.

Wachovia Corp. 2006 Annual Report, as incorporated in its 2006 Form 10-K.

345.    Subsequent disclosures have indicated that, by September 30, 2008, at least 85

percent of the Pick-A-Pay (*i.e.*, Option ARM) loan portfolio were originated under a low

documentation/stated income program.  No additional disclosure regarding the nature/terms (relevant

to the allegations herein) of the loans in the Company's loan portfolio was provided in the 2006

annual financial statements.  The 2007 annual financial statements included only a substantially

similar and inadequate disclosure regarding the nature/terms (relevant to the allegations herein) of

the loans in the Company's loan portfolio.  Even worse, the relevant interim financial statements

138

omitted any disclosure whatsoever regarding the nature/terms of the loans in the Company's loan portfolio.

346.    Thus, the Company's relevant financial statements, in violation of GAAP and SEC rules, omitted the disclosures required by FAS 107 and FSP 94-6-1 regarding significant concentrations of credit risk created by its loan portfolio.  The Company's relevant financial statements did disclose that its loan portfolio included loans with negative amortization features, option ARMs, variable interest rates and loans heavily concentrated in certain geographic areas. Such disclosures, however, did not include adequate information for each significant concentration regarding (a) the characteristic that identifies the concentration, (b) the related maximum amount of loss due to credit risk, (c) the Company's related policies regarding collateral, and (d) the Company's related policies regarding master netting arrangements to mitigated credit risk, as required by FAS 107 and FSP SOP 94-6-1.  Additionally, and also in violation of GAAP and SEC rules, the Company's relevant financial statements omitted disclosure of "information that is adequate to inform users of the general nature of the risk associated with the concentration" for concentrations in volume of business with particular customers, concentrations in revenue from certain products, and concentrations in certain markets or geographic areas although the criteria for disclosure under SOP 94-6 was met.

*Concentrations in the Loan Portfolio Incurred Significant Losses*

347.    For 2007, the Company reported a provision for credit losses, of $2.3 billion, an increase of $1.9 billion compared to 2006.  The Company reported a related increase to the allowance for credit losses of $1.2 billion from December 31, 2006.  For the first quarter of 2008, the Company reported a provision  for credit losses of $2.8 billion, an increase of $2.6 billion compared to the first quarter of 2007.  The Company reported a related increase to the allowance for credit losses of $2.1 billion from December 31, 2007, including an increase of $1.1 billion related

to the Pick-A-Pay loan portfolio.  For the second quarter of 2008, the Company eventually reported a provision for credit losses of $5.6 billion, an increase of $5.4 billion compared to the second quarter of 2007.  The Company reported a related increase to the allowance for credit losses of $4.2 billion from March 31, 2008, including an increase of $3.3 billion related to the Pick-A-Pay loan portfolio.  For the third quarter of 2008, the Company eventually reported a provision for credit losses of $6.6 billion, an increase of $6.2 billion compared to the third quarter of 2007.  The Company reported a related increase to the allowance for credit losses of $4.6 billion from June 30, 2008, including an increase of $3.4 billion related to the Pick-A-Pay loan portfolio.

*Required Disclosures regarding Certain Investments were Omitted*

348.     During the Class Period, the Company accumulated/held a substantial investment portfolio which, in significant parts, was comprised of the relevant structured investments.  The relevant structured investments exposed the Company to significant concentrations of credit risk.  The values of such investments are dependent upon the present value of the expected cash flows from the investments.  The expected cash flows of the investments are highly dependent upon the cash flows underlying the investments.  As the underlying cash flows of the relevant structured investments are from "a number of counterparties [which] are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions" (*e.g.*, nonprime borrowers, the residential mortgage market, leveraged borrowers, monoline financial guarantors, and/or the subprime mortgage market), such investments exposed the Company to group concentrations of credit risk.  The complex nature, and related "opaqueness," of certain of the Company's structured investments, further enhanced such credit risk.

349.     Although previously undisclosed, the Company reported in its Form 10-Q for the quarterly period ended September 30, 2007, **but not in its related financial statements**, that, as of

140

September 30, 2007, the Company had $3.84 billion of subprime-related ABS CDO and RMBS exposures. Additionally, the Company reported in its Form 10-K for the annual period ended December 31, 2007 that, as of September 30, 2007 the Company also had $10.5 billion of CMBS, $11.1 billion of leveraged finance exposures, and the subprime-related ABS CDO and RMBS exposures were being offset by $2.2 billion of monoline-related exposures, which, aside from the amount of CMBS held in the Company's available-for-sale investment portfolio reported in the relevant financial statements, were also previously undisclosed.

350.    Thus, the Company's relevant financial statements, in violation of GAAP and SEC rules, omitted the disclosures required by FAS 107 and FSP 94-6-1 regarding significant concentrations of credit risk created by its investment portfolio. The Company's relevant financial statements did disclose limited information regarding the MBS and other ABS held in its trading and available for sale portfolios, including CMBS. Such disclosures, however, did not include adequate information for each significant concentration regarding (a) the characteristic that identifies the concentration, (b) the related maximum amount of loss due to credit risk, (c) the Company's related policies regarding collateral, and (d) the Company's related policies regarding master netting arrangements to mitigated credit risk, as required by FAS 107 and FSP SOP 94-6-1.

*Concentrations in the Investment Portfolio Incurred Significant Losses*

351.    For the second half of 2007, the Company reported losses related to its relevant structured investments, of $2.9 billion. For the first quarter of 2008, the Company reported losses related to its relevant structured investments of $1.5 billion. For the second quarter of 2008, the Company has eventually reported losses related to its relevant structured investments of $600 million. For the third quarter of 2008, the Company has eventually reported additional related losses of $1.0 billion.

*GAAP Requires Disclosures regarding Certain Significant Estimates*

352.    In addition to disclosures of current vulnerability due to certain concentrations discussed above, SOP 94-6 requires disclosures regarding certain significant estimates.  SOP 94-6 ¶¶ 13-14, provides, in relevant part:

> Disclosure regarding an estimate should be made when known information available prior to issuance of the financial statements indicates that both of the following criteria are met:
>
> a.    It is at least **reasonably possible** that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements **will change in the near term due to one or more future confirming events**.
>
> b.    The effect of the change would be **material** to the financial statements.
>
> The disclosure should indicate **the nature of the uncertainty and include an indication that it is at least reasonably possible that a change in the estimate will occur in the near term** . . . . If the estimate involves a loss contingency covered by FASB Statement No. 5, the disclosure also should include an estimate of the possible loss or range of loss, or state that such an estimate cannot be made. Disclosure of the factors that cause the estimate to be sensitive to change is  encouraged but not required.

353.    The term "reasonably possible" is defined as "more than remote but less than likely." (SOP 94-6 ¶ 13).  FAS No. 5, *Accounting for Contingencies* ("FAS 5"), defines a loss contingency as "an existing condition, situation, or set of circumstances involving uncertainty as to possible . . . loss . . .to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur."  (FAS 5 ¶ 1).

*Required Disclosures regarding Certain Significant Estimates were Omitted*

354.    As alleged and discussed in greater detail elsewhere herein, the Company had knowledge of its own conduct (*e.g.*, ineffective, and potentially fraudulent, underwriting practices

142

and inadequate risk management) and the related quality of its loans and investments, as well as the prevailing economic conditions. Accordingly, the Company also knew that a related potential near-term, material adverse impact on its significant estimates was reasonably possible. In particular, it was reasonably possible that the values reported for its provision and allowance for credit losses, and the relevant structured investments would be impacted. The Company's relevant financial statements, however, did not include the disclosures required by SOP 94-6 for such significant estimates in violation of GAAP and SEC rules.

*Certain Significant Estimates were Materially Adversely Impacted in the Near-Term*

355. For 2007, the Company reported a provision for credit losses of $2.3 billion, an increase of $1.9 billion compared to 2006. The Company reported a related increase to the allowance for credit losses of $1.2 billion from December 31, 2006. For the first quarter of 2008, the Company reported a provision for credit losses of $2.8 billion, an increase of $2.6 billion compared to the first quarter of 2007. The Company reported a related increase to the allowance for credit losses of $2.1 billion from December 31, 2007, including an increase of $1.1 billion related to the Pick-A-Pay loan portfolio. For the second quarter of 2008, the Company eventually reported a provision for credit losses of $5.6 billion, an increase of $5.4 billion compared to the second quarter of 2007. The Company reported a related increase to the allowance for credit losses of $4.2 billion from March 31, 2008, including an increase of $3.3 billion related to the Pick-A-Pay loan portfolio. For the third quarter of 2008, the Company eventually reported a provision for credit losses of $6.6 billion, an increase of $6.2 billion compared to the third quarter of 2007. The Company reported a related increase to the allowance for credit losses of $4.6 billion from June 30, 2008, including an increase of $3.4 billion related to the Pick-A-Pay loan portfolio. For the second half of 2007, the Company reported losses related to its relevant structured investments of $2.9 billion. For the first quarter of 2008, the Company reported losses related to its relevant structured

investments of $1.5 billion.  For the second quarter of 2008, the Company eventually reported losses related to its relevant structured investments of $600 million.  For the third quarter of 2008, the Company eventually reported additional related losses of $1.0 billion.

### C.   Overstatement of the Loan Portfolio, and related Understatement of the Provision and Allowance for Credit Losses

356.   The Company's relevant financial statements, in violation of GAAP and SEC rules, overstated the value of the Company's loan portfolio, and understated the related allowance for loan/credit losses and the provision for credit losses.

*Relevant GAAP Requirements*

357.   The Company's loans held-for-investment (*i.e.* not held-for-sale) portfolio (herein the "loan portfolio") was reported as "Loans, net."  Loans, net was, purportedly, reported in the relevant financial statements at the outstanding principal balance adjusted for charge-offs, net of the allowance for loan losses, as required by GAAP, and specifically, SOP No. 01-6, *Accounting by Certain Entities (Including Entities With Trade Receivables) That Lend to or Finance the Activities of Others* ("SOP 01-6").

358.   The Company's allowance for loan losses was purportedly reported in the relevant financial statements as the estimate of all probable credit losses inherent in the loan portfolio, as required by GAAP.  Specifically, FAS 5 provides guidance on accounting and reporting of loss contingencies (as previously defined herein), including credit losses.  FAS 5 states that an estimated loss from a loss contingency, such as the collectibility of receivables, should be accrued (*i.e.*, increase the allowance for loan losses) by a charge to income.  Such accrual should be made when, based on information available prior to the issuance of the financial statements, it is probable (defined as likely to occur) that the loss has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated.  (FAS 5 ¶¶ 3, 4, 8).  Specifically with respect to loss contingencies relating to the collectibility of receivables, FAS 5 states that accrual shall be made

144

in relation to individual receivables or groups of similar types of receivables even though particular receivables that are uncollectible may not be identifiable.  (FAS 5 ¶ 22).

359.    Additionally, FAS 5, as amended by FAS No. 114, *Accounting by Creditors for Impairment of a Loan* ("FAS 114"), provides that an individual loan is impaired when, based on current information and events, it is probable that a creditor will not be able to collect all amounts due according to the contractual terms of the loan agreement.  All amounts due includes both the contractual interest payments and contractual principal payments.  (FAS 114 ¶¶ 8, 21; FAS 5, as amended by FAS 114 ¶ 23).

360.    The AICPA Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies (the "AAG") provides that the quality of the related underwriting and review procedures should be considered in determining when credit losses should be recognized under the FAS 5 criteria.  The AAG states, in relevant part, "if a faulty credit granting decision has been made or loan credit review procedures **are inadequate or overly aggressive** . . . the loss generally should be recognized **at the date of loan origination**."  (AAG ¶ 9.37).

361.    Regarding management's methodology for estimating the amount of credit losses, the AAG provides certain common elements of any effective method.  Those common elements include:

a.    a detailed and regular analysis of the loan portfolio and off-balance-sheet instruments with credit risk.

b.    procedures for timely identification of problem credits.

c.    consistent use.

d.    **consideration of all known relevant internal and external factors that may affect collectibility.**

e.    consideration if all loans (whether on an individual or pool-of-loans basis) and other relevant credit exposure.

f.    **consideration of the particular risks inherent in the different kinds of lending.**

145

    g.     **consideration of the current collateral fair values, where applicable.**

    h.     performance by competent and well-trained personnel.

    i.      current and reliable data are the base.

    j.     good documentation with clear explanations of the supporting analyses and rationale.

(AAG ¶ 9.05).

362.    Regarding the evaluation of loans, the AAG provides the following, in relevant part:

Loan evaluations by management (and tests of such by independent accountants to the extent they are performed as part of the engagement) should avoid the following:

- *Collateral myopia*. This is **the failure to see beyond collateral values to a financial weakness in the borrower. Collateral values and liquidity often tend to decline in periods during which they are most needed to protect against loan losses . . . .**

- *Inadequate collateral appraisals*. This is the failure to critically review appraisals to understand the methods employed, assumptions made, and limitations inherent in the appraisal process, including undue reliance on management appraisals. **Appraisal methods and assumptions may be inappropriate in the current circumstances. Going concern values generally are dramatically different from liquidation values**. For example, real estate appraisals made on the income approach are not usually appropriate for incomplete projects or in circumstances in which operating conditions have changed.

- Outdated or unreliable financial information. This is the reliance on old, incomplete, or inconsistent data to assess operating performance or financial capacity. Financial information should be current and complete, particularly for borrowers sensitive to cyclical fluctuations or who demonstrate significant growth or changes in operating philosophy and markets.

- *Excessive renewals or unrealistic terms*. This is **the reliance on current or performing-as-agreed status if the transaction has been structured to obscure weaknesses.** Excessive renewals, **unrealistic terms, and interest capitalization [***i.e.*** negative amortization]** may be indications of such a structure. The purpose of a loan and performance against the original agreement should be critically reviewed.

***

- *Dependence on management representations*. This is undue reliance on management representations even though there is no supporting evidence. For example, such representations as "the guarantee is not signed but it is still good" or "the future prospects for this troubled borrower are promising" necessitate a critical review.

146

(AAG ¶ 9.17).

363.    In addition to those requirements provided in GAAP, the SEC provides additional guidance for registrants, such as the Company, regarding the management's methodology for the estimating credit losses in SAB 102, *Selected Loan Loss Allowance Methodology and Documentation Issues* ("SAB 102").  Specifically, SAB 102 states that "[i]t is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process" and consider the following factors:

- Levels of and trends in delinquencies and impaired loans;
- Levels of and trends in charge-offs and recoveries;
- **Trends in volume and terms of loans**;
- **Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices**;
- Experience, ability, and depth of lending management and other relevant staff;
- **National and local economic trends and conditions**;
- **Industry conditions**; and
- **Effects of changes in credit concentrations**.

364.    Further regulatory guidance that specifically highlighted issues related to the allowance for loan losses on subprime lending was issued as early as 2001, collectively, by the Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision (the "Agencies").  The Agencies' *Expanded Guidance for Subprime Lending Programs*, which indicates the estimated credit losses should meet the criteria of GAAP and substantively reiterated many of the considerations listed above when estimating credit losses.  Specifically, it provided that, when using historical loss experience to estimate expected credit losses, the historical loss experience "should be adjusted for changes in trends, conditions, and other relevant factors, including business volume, underwriting, risk selection, account management practices, and current economic or business conditions that may alter

such experience."  Further, the guidance stated that "[t]he allowance should represent **a prudent, conservative estimate of losses that allows a reasonable margin for imprecision**."

*Reported Amounts were Materially Misstated*

365.    As alleged and discussed in greater detail elsewhere herein, during the Class Period, the Company accumulated/held a significant loan portfolio which, in significant parts, was comprised of loans with negative amortization features, option ARMs, variable interest rates, interest-only payment options, high LTV ratios, low documentation/stated income; loans to nonprime (*i.e.,* subprime and Alt-A) borrowers; second mortgages/home equity loans (*i.e.*, multiple loans on the same collateral); loans in second lien positions or not secured by collateral; loans based on inappropriate collateral appraisals; loans heavily concentrated in certain geographic areas; and loans subject to ineffective, and potentially fraudulent, underwriting practices.

366.    During the relevant time-frame, the Company significantly expanded its total loan portfolio.  The expansion was, in significant part, in the Company's consumer real estate loan portfolio which included the acquisition of the Golden West loan portfolio.  Table #1 at Exhibit A depicts these trends, as well as the related trends in the Company's allowance for loan losses and net charge-offs.

367.    At the same time, the credit quality of the loan portfolio, as indicated by the relative amount of nonperforming assets, began to deteriorate.  Nonperforming assets were comprised of nonaccrual loans and foreclosed properties. Nonaccrual loans are those loans not accruing interest income, typically due to a past due status or other concerns regarding collectability.  Table #2 at Exhibit A depicts this trend, as well as the related trend in the Company's allowance for loan losses.

368.    As indicated by the facts and conduct alleged elsewhere herein, the Company's inaccurate assertion that its loan portfolio, and related allowance for loan losses, were reported in conformity with GAAP rested on knowingly or recklessly ignoring the prevailing economic

conditions and the risks inherent in its loan portfolio.  The Company did not adequately consider such conditions and risks in its determination of the collectibility of the loan portfolio, including the allowance for loan losses.  As shown in the tables above, even as the risks inherent in the loan portfolio increased, the Company's allowance for loan losses, and net charge-offs, remained minimal – and at times, decreased – relative to the loan portfolio.  Similarly, at times during this period, the allowance for loan losses decreased relative to the amount of nonperforming assets.

369.  The Company acknowledged in the first quarter of 2008 that it was tightening underwriting guidelines and had "refined" its reserve model for the Pick-A-Pay portfolio.  The new model (a) "strongly correlates forward expected losses to changes in the home prices and the resulting change in borrower behavior," (b) is "less reliant on historical delinquency trends," (c) "incorporates approximately 20 loan and/or borrower characteristics," and (d) "connects borrower equity to projected changes in home prices by geographic region."  Those changes, in combination with facts and conduct alleged elsewhere herein, confirm there were material shortfalls in the previous model.  In particular, the model Wachovia used for most of the Class Period relied heavily on inflated collateral values and on the unrealistic assumption that current delinquency and default rates would not rise, even as monthly payments did, and did not sufficiently consider geographic concentrations.  Thus, the relevant financial statements, in violation of GAAP and SEC rules, materially understated the allowance for loan losses, and thereby, materially overstated the value of its loan portfolio, net of the allowance for loan losses.

370.  Direct write-offs (*i.e.*, charge-offs) from the loan portfolio and increases to the allowance for loan losses, which are included in the allowance for credit losses, are reported in the provision for credit losses (*i.e.*, an expense), a component of net income.  Therefore, by overstating its loan portfolio (*i.e.*, avoided direct write-offs) and understating the allowance for credit losses, the

relevant financial statements, in violation of GAAP and SEC rules, materially understated the amounts reported as the provision for credit losses, and thereby materially overstated net income.

371.    Thus, the Company materially misstated its results of operations, including the provision for credit losses, net income and earnings per share or EPS, and its financial position, including the loan portfolio and related allowance for loan and credit losses, because the numbers disclosed were not derived in conformity with GAAP.

*Losses incurred in the Loan Portfolio were eventually Reported*

372.    For 2007, the Company reported a provision for credit losses of $2.3 billion, an increase of $1.9 billion compared to 2006.  The Company reported a related increase to the allowance for credit losses of $1.2 billion from December 31, 2006.  For the first quarter of 2008, the Company has reported a provision for credit losses of $2.8 billion, an increase of $2.6 billion compared to the first quarter of 2007.  The Company reported a related increase to the allowance for credit losses of $2.1 billion from December 31, 2007, including an increase of $1.1 billion related to the Pick-A-Pay loan portfolio.  For the second quarter of 2008, the Company eventually reported a provision of for credit losses of $5.6 billion, an increase of $5.4 billion compared to the second quarter of 2007.  The Company reported a related increase to the allowance for credit losses of $4.2 billion from March 31, 2008, including an increase of $3.3 billion related to the Pick-A-Pay loan portfolio.  For the third quarter of 2008, the Company has eventually reported a provision of for credit losses of $6.6 billion, an increase of $6.2 billion compared to the third quarter of 2007.  The Company reported a related increase to the allowance for credit losses of $4.6 billion from June 30, 2008, including an increase of $3.4 billion related to the Pick-A-Pay loan portfolio.

D.    **Overstatement of the Value of Certain Investments**

373.    The Company's relevant financial statements, in violation of GAAP and SEC rules, overstated the value of the Company's relevant structured investments.

150

*Relevant GAAP Requirements*

374.    The Company falsely reported that it primarily reported its relevant structured investments at fair value as required by GAAP. GAAP, specifically, FAS 157, *Fair Value Measurements* ("FAS ¶ 157"), defines "fair value" as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  (FAS 157 ¶ 5).

375.    FAS 157 indicates that fair value is measured using valuation techniques that are appropriate in the circumstances and for which sufficient data are available, and segregates the inputs, or assumptions, used in the valuation techniques into two categories: observable and unobservable.  (FAS 157 ¶ 18).  Regarding their use in valuation models, FAS 157 provides that observable inputs are prioritized over unobservable inputs.  (FAS 157 ¶¶  22, 24, 28, 30).  Further, FAS 157 provides that certain valuation model inputs may require adjustments to appropriately measure fair value. Regarding certain observable inputs, FAS 157 provides that the adjustments are based on factors specific to the asset and may include factors, such as, the condition of the asset and the volume and level of activity in the markets within which the inputs are observed.  (FAS 157 ¶ 29).  Regarding certain unobservable inputs, FAS ¶ 157 provides that inputs include assumptions about risk and the inputs must be adjusted for risk. (FAS 157 ¶ A25).  Specifically, FAS 157, provides the following, in relevant part:

> Assumptions about risk **include the risk inherent in a particular valuation technique used to measure fair value (such as a pricing model) and/or the risk inherent in the inputs to the valuation technique** .… (FAS 157 ¶ A25).

> A measurement (for example, a "mark-to-model" measurement) that does not include an adjustment for risk **would not represent a fair value measurement if market participants would include one in pricing the related asset** or liability. (FAS 157 Footnote 15).

376.    The Company adopted FAS 157 for its 2008 fiscal year (*i.e.*, for the quarterly and annual periods beginning on or after January 1, 2008).  While GAAP did not require the Company to adopt FAS 157 until that time, a significant amount of the Company's peers/competitors elected to early adopt FAS 157 for 2007.  As such, the Company's 2007 annual and interim financial statements did not include the significantly expanded fair value disclosures required by FAS 157, and thereby, contained significantly less disclosure than many of its peers/competitors.

377.    Prior to 2008 (*i.e.*, for the quarterly annual periods ending on or before December 31, 2007), FAS 107 provided guidance regarding fair value.  FAS 157 did not significantly change the concept of fair value from FAS 107.  FAS 107 indicated quoted market prices were the best indication of fair value.  (FAS 107 ¶ 20).  In the absence of quoted market prices, the reporting entity should develop its best estimate and those estimates were to be reflective of the risks involved.  (FAS 107 ¶¶ 20-29).

*Reported Amounts were Materially Misstated*

378.    As alleged and discussed in greater detail elsewhere herein, during the Class Period, the Company accumulated/held a significant investment portfolio which, in significant part, was comprised of the relevant structured products. As indicated by the facts and conduct alleged elsewhere herein, the Company's knowingly false assertion that such investments were reported in conformity with GAAP rested on willfully ignoring the prevailing economic conditions and the risks inherent in its investment portfolio.  The Company did not adequately consider such conditions and risks in its determination of the fair value of, at a minimum, its relevant structured products.  Thus, the relevant financial statements, in violation of GAAP and SEC rules, materially overstated the fair value of those investments.

379.    Changes in the fair value (*i.e.*, realized and unrealized gains and losses) and other market valuation adjustments of the Company's investments discussed above primarily impact net

income, and thereby shareholders' equity, during the period of the change.  In instances where such investments were categorized as available-for-sale and the unrealized loss was determined by the Company to be temporary, the change in fair value directly impacts shareholders' equity, but not net income.  Therefore, by overstating the value of the Company's relevant structured investments, the relevant financial statements, in violation of GAAP and SEC rules, materially overstated net income and shareholders' equity.

380.    Thus, the Company materially misstated its results of operations, including the losses on its relevant structured investments, net income, and earnings per share or EPS, and its financial position, including the investments discussed above, because the numbers disclosed were not derived in conformity with GAAP.

*Losses incurred in the Investment Portfolio were eventually Reported*

381.    For the second half of 2007, the Company reported losses related to its relevant structured investments, although inadequate as discussed below, of $2.9 billion.  For the first quarter of 2008, the Company reported losses related to its relevant structured investments, although inadequate as discussed below, of $1.5 billion.  For the second quarter of 2008, the Company eventually reported losses related to its relevant structured investments of $600 million.  For the third quarter of 2008, the Company eventually reported additional related losses of $1.0 billion.

**E.    Failure to Consolidate and Properly Disclose Certain Off-Balance Sheet Entities**

382.    The Company's relevant financial statements, in violation of GAAP and SEC rules, did not present certain VIEs on a consolidated basis, nor include the required disclosures for certain unconsolidated VIEs.

*Relevant GAAP Requirements*

383.    GAAP requires enterprises (*i.e.*, the Company) to consolidate other entities when there is a controlling financial interest.  Prior to 2004, ARB 51, *Consolidated Financial Statements*

("ARB 51"), provided that a controlling financial interest was indicated by a majority voting interest; however, in the wake of the Enron accounting scandal which, in part, involved the use of off-balance sheet entities, the FASB issued FIN 46(R), *Consolidation of Variable Interest Entities* ("FIN 46(R)"). FIN 46(R), in general, requires consolidation of an entity by the enterprise that assumes the majority of the risks and rewards of the entity. The enterprise that assumes the majority of the risks and rewards is deemed the "primary beneficiary."

384.    Determining if consolidation is required by the provisions of FIN 46(R) is, generally, a two-step process: (a) determining if the entity in question is a VIE, thereby potentially requiring consolidation, and (b) identifying the primary beneficiary.

*Determining if the Entity is a VIE*

385.    The determination of whether an entity meets the definition of a VIE should be performed when an enterprise initially becomes involved with that entity. (FIN 46(R) ¶ 6). VIEs are often created to structure securitization-type transactions (*e.g.*, collateralized debt obligations ("CDOs"), asset-backed commercial paper ("ABCP") conduits, etc.), and/or could be in form of structured lending vehicles, investment funds or money market funds.

*Identifying the Primary Beneficiary*

386.    If the entity is determined to be a VIE, an enterprise must determine if it is the primary beneficiary, and thereby required to consolidate the VIE. (FIN 46(R) ¶ 15). FIN 46(R) identifies the primary beneficiary as the holder of the "variable interest (or combination of variable interests) that **will absorb a majority of the entity's expected losses**, receive a majority of the entity's expected residual returns, or both . . . ." (FIN 46(R) ¶ 14).

387.    Variable interests are the "investments or other interests that will absorb portions of a variable interest entity's expected losses or receive portions of the entity's expected residual returns." (FIN 46(R) ¶ 6). Variable interests may come in the form of, among others, investments

in equity, investments in debt, retained interests, lines of credit, liquidity facilities, guarantees, and certain derivatives.

388.    GAAP, specifically, FSP FIN 46(R)-5, *Implicit Variable Interests under FASB Interpretation No. 46* (revised December 2003) ("FSP FIN 46(R)-5"), requires that enterprises consider both implicit and explicit variable interests when identifying the primary beneficiary.  (FSP FIN 46(R)-5 ¶ 6).  FSP FIN 46(R)-5, generally, describes an implicit variable interest as an "implied pecuniary interest" that may absorb losses of a VIE although not contractually required to do so. (FSP FIN 46(R)-5 ¶¶ 3-4).

389.    The determination of whether an enterprise is the primary beneficiary, and thereby required to consolidate the VIE, should be performed when the enterprise initially becomes involved with the VIE and subsequently upon certain "reconsideration events," such as, when the enterprise, previously not considered the primary beneficiary, acquires additional variable interests.  (FIN 46(R) ¶ 15).  The expected losses and expected residual returns are, generally, determined by a probability weighted discounted cash flow analysis of the VIE. That analysis should consider both implicit and explicit variable interests. (FSP FIN 46(R)-5 ¶ 6).

*The Company's Failure to Consolidate VIEs*

390.    During the Class Period, the Company had significant involvement, implicit and explicit, in numerous unconsolidated VIEs including commercial paper conduits, CDOs, investment funds, money market funds, and structured lending vehicles.  As early as December 31, 2006 the Company had significant variable interests in unconsolidated VIEs it administered (indicative of an implicit variable interest), including liquidity agreements with multi-seller commercial paper conduits and a structured lending vehicle, as well as, ownership interests in two investment funds that were unconsolidated VIEs.  In January 2007 the Company purchased a majority interest in the investment manager of the investment funds (also indicative of an implicit variable interest).

391.    The Company's liquidity agreements are considered guarantees, and thus, were included in the guarantee footnote disclosure.  The following table depicts a significant discrepancy between the Company's total exposures (*i.e.*, the maximum potential amount of future payments) under such variable interests and the amount of expected losses the Company deemed probable (*i.e.*, the carrying value).

| In millions of dollars at year end | 2005 | 2006 (a) | 2007 |
|---|---|---|---|
| Maximum Risk of Loss | 27,193 | 33,341 | 36,926 |
| Carrying Amount | 8 | 9 | 14 |
| Carrying Amount as a percentage of the Maximum Risk of Loss | 0.03% | 0.03% | 0.04% |
| (a) The Maximum Risk of Loss was initially reported as 27,610 in the 2006 annual financial statements, however, that amount was revised to 33,341 in the 2007 annual financial statements. | | | |

392.    The Company's knowingly false assertion that it was not the primary beneficiary of certain VIEs, and thereby not required to consolidate, rested on willfully ignoring the prevailing economic conditions and the risks inherent in its variable interests (implicit and explicit).  The Company knew, or should have known, that it would ultimately absorb the majority of the VIEs' expected losses, and thus it was their primary beneficiary.  At a minimum, the Company was the primary beneficiary of (a) the structured lending vehicle it administered, as of the fourth quarter of 2006 and (b) an Evergreen fund it managed, by no later than the third quarter of 2007.  Those VIEs' financial positions and results of operations should have been consolidated with the Company's.

393.    Thus, statements made regarding the Company's financial position, including capital ratios, and results of operations were materially false and misleading as the amounts were not derived in conformity with GAAP.

394.    The Company eventually consolidated the structured lending vehicle it administered, as of September 30, 2007.  The Company eventually acknowledged its implicit variable interests in

the Evergreen money market funds when, although "not required by contract," it purchased assets from those funds in the third quarter of 2007 and again in the third quarter of 2008. Those asset purchases ultimately resulted in valuation losses of $57 million in 2007 and $761 million in the first nine months of 2008. Additionally, the Company eventually consolidated an Evergreen fund it provided financing to in June 2008, which subsequently resulted in $172 million in write-downs in the second and quarters of 2008.

*The Company's Failure to Properly Disclose VIEs*

395.    The Company's 2006 annual financial statements and 2007 interim statements, in violation of GAAP and SEC rules, did not include any such disclosure regarding liquidity facilities and derivative exposures to certain unconsolidated VIEs involved in CDO securitization transactions. In addition to consolidation requirements, FIN 46(R) provides that with respect to unconsolidated VIEs with which an enterprise has significant variable interests, the enterprise must disclose: (a) the nature of its involvement with the VIE and when that involvement began, (b) the nature, purpose, size, and activities of the VIE, and (c) the enterprise's maximum exposure to loss as a result of its involvement with the VIE. (FIN 46(R) ¶ 24). Although previously undisclosed, the Company eventually acknowledged in its 2007 financial statements that those variable interests actually had a maximum exposure to losses from unconsolidated VIEs involved in CDO securitization transactions of $9.6 billion as of December 31, 2006 and $7.3 billion as of December 31, 2007. Additionally, and also in violation of GAAP and SEC rules, the Company's relevant financial statements did not disclose the entire nature of its involvement (*e.g.*, its implicit interests were undisclosed) and when the Company became involved with certain unconsolidated VIEs with which it had significant variable interests.

F.      **Lack of Timely Impairment of Goodwill**

396.      The Company's relevant financial statements, in violation of GAAP and SEC rules, did not timely recognize impairment of goodwill, most notably the $14.9 billion of goodwill the Company recorded as a result of the merger with Golden West.

*Relevant GAAP Requirements*

397.      Goodwill is defined in FAS 142, *Goodwill and Other Intangible Assets* ("FAS 142"), as the "excess of the cost of an acquired entity over the net of the amounts assigned to assets acquired and liabilities assumed." (FAS 142 Appendix F).  An acquiring entity would, generally, purchase an entity for excess of the fair value of net assets to be acquired, because of a perceived control premium and/or anticipated synergies to be created in the acquisition. Goodwill is reflected in the reporting entity's balance sheet as an asset.

398.      GAAP provides that the carrying value of goodwill should not be amortized to expense; however, GAAP does require that goodwill be tested at an entity's reporting unit level for impairment at least annually, but also between annual tests when certain conditions exist.  (FAS 142 18, 26).  Specifically, FAS 142 provides that "[g]oodwill of a reporting unit shall be tested for impairment between annual tests **if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount**," including significant adverse changes in legal factors or business climate and when its "more-likely-than-not" that a reporting unit will be sold.  (FAS 142 ¶ 28).

399.      FAS 142 requires a two step process when testing goodwill for impairment.  The first step compares the fair value of the reporting unit to its carrying value, including goodwill, to identify potential impairment.  If the carrying value of the reporting unit is less than its fair value, there is no

158

goodwill impairment and the second step is not required.  However, if its carrying value exceeds the fair value of the reporting unit, the second step is performed to measure, if any, the impairment of the reporting unit's goodwill.  The second step compares the implied fair value of the reporting unit's goodwill to the carrying value of the reporting unit's goodwill, and requires an impairment loss for any amount where that carrying value exceeds that fair value.  The implied fair value of a reporting unit's goodwill is determined by allocating the fair value of the reporting unit, as calculated in the first step, to all of the reporting unit's assets and liabilities.  Any amount of the fair value of the reporting unit in excess of the net fair value of the reporting unit's assets and liabilities is the implied fair value of the reporting unit's goodwill.

*Goodwill Impairment was not Timely Recognized*

400.    Goodwill was a significant component of the Company's reported assets in the relevant financial statements.  As of December 31, 2006 and December 31, 2007 the Company reported goodwill in the amount of $38.4 billion and $43.1 billion, respectively.  During 2006 the Company recorded $14.9 billion of goodwill as a result of the merger with Golden West.  Purportedly, the Company performed goodwill impairment tests as of December 31, 2006; December 31, 2007; March 31, 2008; June 30, 2008; and September 30, 2008.  Regarding determining the fair value of its reporting units, the Company disclosed that prior to 2008 it relied upon earnings multiple (EM) and discounted cash flow (DCF) methods, in 2008 focused on the DCF method, and that as of September 30, 2008 it used the Company's fair value indicated by the terms of the merger with Wells Fargo as a basis.  Further, the Company stated that, purportedly, its DCF models "utilized discount rates" that "adequately reflected the risk and uncertainty in the financial markets generally and specifically in its internally developed earnings projections." (Quarterly Financial Supplement

p. 11, as filed as part of the Q3 2008 Form 10-Q).  The Company did not report any goodwill impairment in the relevant financial statements.  The Company did report, however untimely, goodwill impairment losses of $6.1 billion for the second quarter of 2008, and eventually, $18.8 billion for the third quarter of 2008.

401.    The Company's knowingly false assertion that goodwill was not impaired prior to the second and third quarters of 2008 rested on willfully ignoring the prevailing economic conditions and the risks inherent in its reporting units.  The Company's analysis of goodwill did not adequately consider those conditions and risks in its discount rate, and further, the Company's "internally developed earnings projections" did not appropriately reflect the Company's true financial position and results of operations, specifically for those issues and the related untimely reported losses discussed herein.  An analysis that appropriately reflected such factors would have provided a strong indication that (a) more likely than not, the fair value of the Company's reporting units were reduced below the carrying value of those reporting units requiring the Company to more timely perform goodwill impairment testing and (b) the implied fair value of its reporting units' goodwill exceeded the related carrying values requiring more timely goodwill impairment charges.

402.    Further, had the Company more timely recorded the losses related to the issues discussed herein, as required by GAAP, such would have resulted in a more timely decline in the Company's market capitalization, and ultimately, a more timely realization that the Company had to be rescued by another entity.  When the Company eventually reported the goodwill impairment charges in the second and third quarter of 2008, it acknowledged that the primary drivers of such impairment were in fact the Company's reduced market capitalization and the terms of the Wells

Fargo merger.  Thus, the relevant financial statements materially overstated goodwill, and by avoiding timely impairment charges, overstated net income, in violation of GAAP.

### G.   Ineffective Disclosure Controls and Procedures and Internal Control over Financial Reporting

403.   Throughout the Class Period, the Company falsely represented that it had effective disclosure controls and procedures, and internal control over financial reporting.  The SEC defines "disclosure controls and procedures" as:

> controls and other procedures of an issuer that are designed to ensure that **information required to be disclosed by the issuer in the reports filed or submitted by it under the [Securities] Exchange Act is recorded, processed, summarized and reported, with the time periods specified in the Commission's rules and forms**…

SEC Final Rule Release Nos. 33-8124, 34-46427, IC-25722; File No. S7-21-02.

404.   "Internal control over financial reporting" is defined in Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with An Audit of Financial Statements* ("AS 2"), as a process "to provide reasonable assurance regarding the reliability of financial reporting **and the preparation of financial statements for external purposes in accordance with [GAAP]** . . . ."  (See Securities Exchange Act Rules 13a-15(f) and 15d-15(f).2/) (AS 2 ¶ 7).

405.   Securities Exchange Act Rules 13a-15 and 15d-15 require the Company's principal executive officer and principal financial officer to quarterly and annually certify the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure controls and procedures as of the end of each fiscal quarter-end and fiscal year-end.  Further, the Company is

required to annually report on the effectiveness of its internal control over financial reporting. As 2 states, in relevant part:

> A company subject to the reporting requirements of the Securities Exchange Act of 1934 (an "issuer") is required to include in its annual report a report of management on the company's internal control over financial reporting… The report of management is required to contain management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether the company's internal control over financial reporting is effective . . . .

(AS 2 ¶ 2).

406.    Specific to the allowance for loan losses, the Agencies and the National Credit Union Administration issued the "Interagency Policy on the Allowance for Loan and Lease Losses" on December 13, 2006 which reiterated the responsibility of financial institutions to "ensure controls are in place to consistently determine the [allowance for loan losses] in accordance with GAAP . . . ."

407.    The Company's disclosure controls and procedures, and internal control over financial reporting were not effective throughout the Class Period as the Defendants caused the Company to issue the relevant financial statements, and related Forms 10-K and 10-Q that, for the violations noted above herein, were not in conformity with GAAP and SEC rules.  Further, as alleged and discussed in greater detail elsewhere herein, the Company had ineffective underwriting practices and inadequate risk management.  Certain Defendants, however, falsely represented that the Company's disclosure controls and procedures were effective as of the date of each individual Securities Exchange Act report filed during the Class Period.  Further, the Company falsely represented that it maintained effective internal control over financial reporting as of the date of each

of the relevant annual financial statements.  As such, during the Class Period, the Defendants caused the Company to mislead investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS CONFIRMING THE INDIVIDUAL DEFENDANTS' SCIENTER

408.    As alleged herein, Defendants acted with scienter in that Defendants knew that public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Wachovia, their control over, and/or receipt and/or modification of Wachovia's allegedly misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Wachovia, participated in the fraudulent scheme alleged herein.

409.    Because of their position with the Company, Defendants at all times had the opportunity to, and did, commit the wrongdoing alleged herein.

### A.    Defendants Received Reports Detailing Significant and Widespread Problems with Wachovia's Lending

410.    The Individual Defendants received various reports concerning Wachovia's lending practice and loan performance.   According to CW 2, quarterly reports were complied for management's review, detailing information related to the Company's loan origination, including

standards implemented and underwriting guidelines, was automated and readily available to the Individual Defendants as senior executives of the Company.

411.    CW 2, a workout specialist in the loss mitigation department from 2000 through 2004 and a loan servicing specialist from November 2004 through October 2007 for HomeEq Servicing Corporation in California, stated that HomeEq provided quarterly reports to Wachovia on losses and costs associated with the Company's collection efforts on their loans.  The portfolio loans serviced by HomeEq "were not the best" and those serviced by CW 2 were all subprime loans, which Wachovia aggressively sold to customers.

412.    Moreover, CW 2, while attempting to help borrowers avoid foreclosure, said it was not uncommon for a borrower to tell CW 2 that while the loan application showed the borrower's income as a certain amount, he or she really only made a third or half of that amount.  The borrower would explain to CW 2 that he or she was told to write the higher number on the application in order to get the loan approved.  This was a situation CW 2  ran into "a lot of the time."

413.    CW 2 had direct knowledge of the information provided in the quarterly reports Wachovia received from att  ending quarterly all-employee meetings, which took place in the auditorium at the North Highlands, California location.

414.    CW 3 was repeatedly instructed by managing directors to sell prospective borrowers on the Pick-A-Pay loan program by getting the borrowers to overstate their actual income.  CW 3 has direct knowledge that upon receipt of Pick-A-Pay loan files in the Quick Qualifier program, the underwriters did not verify the income or DTI levels.

164

**B.     Defendants Knew of or Recklessly Disregarded Wachovia's Lax
          Underwriting Guidelines**

415.    Because Wachovia's underwriting guidelines directly affected the value and credit

quality of Wachovia's loans, and therefore were fundamental to Wachovia's overall financial

condition, Wachovia's senior management monitored and managed Wachovia's prime and subprime

home lending underwriting guidelines and operations.

416.    In June 2006, Wachovia reported that the factors contributed to the decision to

approve the merger in their Form S4 were that Golden West's financial condition and asset quality

were very sound. In July 2006, Individual Defendant Thompson and Wachovia's management

reviewed and discussed strategic factors related to the proposed transaction, including Golden West's

consumer banking and mortgage-lending businesses, the timing of integration activities, and the

credit quality and risk management assessment of Golden West.

417.    Shortly after the acquisition, Thompson stated that Wachovia had captured "a crown

jewel" in the mortgage business.  All the while, according to CW 2, Wachovia was receiving

quarterly reports on losses and costs with the Company's collection efforts on their portfolio which

consisted of subprime loans after the acquisition of Golden West.

418.    CW 3 explained that after the merger, the underwriting process at Wachovia was

nothing short of fraud.  As previously discussed, the vast majority of Pick-A-Pay loans were stated

income/no document, or "Quick Qualifier" loans.  To get the loans approved, CW 3 and other loan

officers and sales managers were instructed to falsify the amount of stated income on the loan

application.  CW 3 recalled witnessing an incident where another loan officer was instructed to

"bump up" an applicant's social security income to qualify for the stated loan/no documentation

loan.

419. Moreover, CW 4 stated that at Wachovia "it was all about the numbers." The priority was to sell Pick-A-Pay, even though Wachovia had other more conservative mortgage programs available. Additionally, after Wachovia took over the Pick-A-Pay loan program, Wachovia stopped using World in-house appraisers and instead used outside appraisers to assess the home values for loan applications. CW 4 stated that this practice made the home valuation appraisals on Pick-A-Pay loans less reliable because outside appraisers had a reputation for assigning higher values to homes than World's in-house appraisers did.

420. Further, Wachovia, at the direction of the Individual Defendants, established a system of financial rewards of originating higher risk loans, and corresponding negative consequences for those who did not follow the system. Wachovia loan production personnel were compensated based on loan volume without any regard to loan quality, and were paid even more for originating riskier Pick-A-Pay loans. CW 3 stated that commissions earned by Wachovia's employees who sold Pick-A-Pay loans were substantially higher than those resulting from the sale of more traditional products.

421. Finally, unknown to the members of the Class, the Individual Defendants caused Wachovia's underwriting standards to significantly deteriorate during the Class Period. In fact, the Individual Defendant's created a false and misleading appearance of conservative, quality-focused underwriting at Wachovia through their public statements. According to CW 3, loan officers were instructed *not* to fully educate borrowers about the Pick-A-Pay loans and the negative amortization they could face if they chose the Pick-A-Pay mortgage.

166

**C.** **Insider Stock Sales By Thompson and Other Officer Defendants During the Class Period Were Highly Unusual and Suspicious**

422.     The Class Period sales of Wachovia stock by Defendants Thompson, Wurtz, and Truslow were highly unusual, and therefore suspicious, as measured by (1) the amount and percentage of shares sold, (2) comparison with the Individual Defendants' own prior trading history and that of other insiders, and (3) the timing of the sales.  Such sales therefore provide strong evidence of scienter.

423.     To evaluate the Individual Defendants' selling activity, Lead Counsel used publicly available trading data required to be reported to the SEC.  Lead Counsel analyzed the trading by insiders that occurred during the Class Period and during an approximately equal-length period immediately preceding the Class Period, the ("Control Period").  As demonstrated below, Individual Defendants' Class Period sales were extremely large and highly unusual.

424.     During the Class Period, Wachovia's insiders owned and sold the following Wachovia shares:

| Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Thompson | 02/06/07 | 29,712 | $57.32 | 1,703,118.58 |
| Thompson | 3/30/2007 | 9,521 | $55.05 | 524,131.05 |
| Thompson | 4/18/2007 | 9,604 | $55.87 | 536,575.48 |
| Thompson | 4/19/2007 | 9,606 | $55.52 | 533,325.12 |
| Thompson | 4/20/2007 | 7,129 | $55.85 | 398,154.65 |
| Thompson | 2/20/2008 | 15,074 | $34.08 | 513,721.92 |
| Thompson | 3/31/2008 | 9,521 | $27.00 | 257,067.00 |
| Thompson | 4/18/2008 | 19,210 | $27.24 | 523,280.40 |
| Thompson | 4/22/2008 | 7,129 | $26.20 | 186,779.80 |
| **Total** | | **116,506** | | **5,176,154.00** |

| Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Truslow | 10/18/06 | 16,980 | $55.14 | 936,277.20 |
| Truslow | 3/30/2007 | 1,429 | $55.05 | 78,666.45 |
| Truslow | 4/18/2007 | 1,552 | $55.87 | 86,710.24 |
| Truslow | 4/18/2007 | 37,334 | $55.52 | 2,072,783.68 |
| Truslow | 4/18/2007 | 1,789 | $55.87 | 99,951.43 |

167

|       | Name    | Date      | Shares | Price   | Proceeds     |
|-------|---------|-----------|--------|---------|--------------|
|       | Truslow | 4/19/2007 | 1,682  | $55.52  | 93,384.64    |
|       | Truslow | 4/20/2007 | 1,498  | $55.85  | 83,663.30    |
|       | Truslow | 2/20/2008 | 1,816  | $34.08  | 61,889.28    |
|       | Truslow | 3/31/2008 | 1,092  | $27.00  | 29,484.00    |
|       | Truslow | 4/18/2008 | 2,473  | $27.24  | 67,364.52    |
|       | Truslow | 4/22/2008 | 1,145  | $26.20  | 29,999.00    |
| Total |         |           | 68,790 |         | 3,640,173.74 |

|       | Name  | Date      | Shares | Price   | Proceeds     |
|-------|-------|-----------|--------|---------|--------------|
|       | Wurtz | 10/23/06  | 23,358 | $55.95  | 1,306,880.10 |
|       | Wurtz | 12/16/06  | 6,368  | $57.04  | 363,230.72   |
|       | Wurtz | 2/5/2007  | 422    | $56.46  | 23,824.56    |
|       | Wurtz | 2/5/2007  | 1,984  | $56.50  | 112,090.84   |
|       | Wurtz | 2/5/2007  | 28,014 | $57.30  | 1,605,143.37 |
|       | Wurtz | 3/30/2007 | 1,684  | $55.05  | 92,704.20    |
|       | Wurtz | 4/18/2007 | 582    | $55.87  | 32,516.34    |
|       | Wurtz | 4/19/2007 | 431    | $55.52  | 23,929.12    |
|       | Wurtz | 4/20/2007 | 409    | $55.85  | 22,842.65    |
|       | Wurtz | 2/20/2008 | 2,133  | $34.08  | 72,692.64    |
|       | Wurtz | 3/31/2008 | 1,287  | $27.00  | 34,749.00    |
|       | Wurtz | 4/18/2008 | 775    | $27.24  | 21,111.00    |
|       | Wurtz | 4/22/2008 | 313    | $26.20  | 8,200.60     |
| Total |       |           | 67,760 |         | 3,719,915.14 |

425.    Defendants' insider trading was unusual and suspicious.  Defendant Thompson sold just over 61,000 shares of Wachovia common stock in the 16 months preceding the Class Period, but sold over 116,500 shares in the 14 months between February 2007 and April 2008.  Defendant Wurtz sold just 8,255 shares of Wachovia common stock in the 16 months preceding the Class Period, but sold over 67,700 shares in the 18 months between October 2006 and April 2008.  Defendant Truslow sold just 25,730 shares of Wachovia common stock in the 16 months preceding the Class Period, but sold almost 68,000 shares in the 18 months between October 2006 and April 2008.

**D.      Defendants Used Wachovia's Inflated Stock As Currency For Acquisitions
During The Class Period**

426.     Defendants were also motivated to keep Wachovia's stock price artificially inflated
during the Class Period because that stock was used by Defendants for acquisitions.

427.     Specifically, during the Class Period, Defendants were able to acquire Golden West
by payment of 326 million shares of artificially inflated Wachovia common stock as currency.

428.     Later in the Class Period, on or about October 1, 2007, Defendants once again used
Wachovia's artificially inflated shares as currency for an acquisition.  This time, 72 million shares
of Wachovia's common stock were used as currency for Wachovia's acquisition of AG Edwards.

429.     In addition to the foregoing, the Defendants reaped even more benefits through the
sale of artificially inflated Wachovia stock in the form of an April 14, 2008 public offering of 145.83
million shares, priced at $24 a share.  Although that price was significantly below Wachovia's Class
Period highs, subsequent corrective disclosures reveal that even this offering price was artificially
inflated.

**VII.     LOSS CAUSATION**

430.     Wachovia's stock price declined materially beginning in late 2007 and continuing
through the end of the Class Period and thereafter, owing to numerous incremental public disclosures
by Wachovia and others, which although often misleading in themselves, did cumulatively reveal
the materialization of previously undisclosed risks with respect to Golden West's and Wachovia's
Pick-A-Pay loans, the lapses in Pick-A-Pay underwriting standards, and Wachovia's previously-
concealed subprime CDO exposures and losses.

431.    On July 20, 2007, Wachovia announced its second quarter results, which included a dramatic increase to its loss reserves.  At that time, CEO Thompson admitted – in response to an analyst's question regarding the wisdom of the Golden West acquisition – that the Company was "going through a little pain" as a result of that deal.  In reaction to those statements, Wachovia's stock price dropped over the course of the next three trading days from a closing price of $56.61 on July 19, 2007 to approximately $48.40 per share on July 25, 2007.

432.    On October 19, 2007, Wachovia announced its third quarter results, which included $1.3 billion of writedowns for bad loans on its mortgage backed securities, including subprime CDOs.  Wachovia also announced that, allegedly to guard against rising Pick-A-Pay mortgage defaults and losses, it had more than doubled its loss reserve levels from the prior quarter.  In the wake of this news, the Company's stock price fell over the course of the next three trading days from its October 18, 2007 closing price of $48.14 per share to $45.40 per share.

433.    In the Third Quarter 2007 10-Q, filed on November 9, 2007, the Company made the following partial but false and misleading disclosure about its loan loss reserves:

> **[D]ue to anticipated loan growth and the impact of continuing credit deterioration in our loan portfolio, we expect to increase our allowance for loan losses in the fourth quarter of 2007.** The expected credit deterioration will likely be focused in certain geographic areas that have recently experienced dramatic declines in housing values. We expect that these declines will correlate to increases in loan losses for loans originated within the last two years within these geographic areas. Accordingly, Wachovia now expects to record a loan loss provision in the fourth quarter of 2007 by an amount estimated to be between $500 million and $600 million in excess of charge-offs for the quarter. The actual provision will be determined in accordance with our policies and procedures, will depend on credit conditions and assumptions at quarter-end and may be materially greater or less than the range discussed in the preceding sentence.

170

434.    This partial disclosure about loan loss reserves was false and misleading because borrower credit had never been properly verified at the time of loan origination. According to CW 1, the Company failed to verify income and employment. Moreover, CW 3 stated that Wachovia extended Pick-A-Pay loans to borrowers with artificial or inflated debt-to-income.

435.    Defendants also disclosed on November 9, 2007, for the first time, Wachovia's previously-concealed holdings of $2.12 billion of subprime CDOs, and the necessity to take further writedowns (beyond those taken on October 19, 2007) on those instruments.

436.    On December 10, 2007, Merrill Lynch downgraded the Company's stock on the belief that Wachovia's net credit losses will rise "significantly" in 2008 because of rapidly deteriorating non-conforming mortgage exposure in California. Merrill Lynch was also concerned that "Wachovia [was] under-reserved, given its heavy residential real estate exposure in California and Florida, two states where home values are declining rapidly." As a result, Merrill Lynch stated that it expected that necessary future increases to Wachovia's loan loss reserves would restrain the Company's earnings-per-share growth by 12% in 2008. Based on this news, and on the announcement of increases to Wachovia's loss reserves, over the next two days the price of Wachovia shares fell from their closing price of $44.46 on December 10, 2008, to $40.53 on December 12, 2007.

437.    On January 22, 2008, Wachovia disclosed its financial results for the fourth quarter of 2007, which included a $970 million writedown of its subprime CDOs. Despite the size of the writedown, it was still insufficient for accurate valuation of the CDOs, whose value continued to be materially overstated. Defendants continued, however, to misrepresent the credit quality, performance and loss content of Wachovia's $120 billion Pick-A-Pay mortgage portfolio, and represented falsely that losses would be minor, that losses did not threaten Wachovia's capitalization,

and that losses did not and would not affect Wachovia's ability to fund its current dividend payout. Consequently, Wachovia's share price continued to trade at artificially inflated levels reflecting Defendants' misrepresentations, rather than the realities which Defendants then concealed.

438.    On February 4, 2008, Merrill Lynch again addressed Wachovia, demoting the company to a "sell" rating due to the weakening of the California housing market.  Over the next two trading days, the stock price fell from its February 1, 2004 closing price of $38.76 to $34.18 on February 5, 2008.

439.    On February 28, 2008, Wachovia announced that it had increased its reserves for expected loan losses, primarily from Pick-A-Pay mortgages, by more than three times the amount the company had set aside for reserves in the previous year.  Many of those loans had been originated by Golden West.  Thompson admitted in the annual report that "[w]ith the benefit of hindsight, it is clear that the timing was poor for this expansion into the mortgage business."  Nevertheless, Thompson said that the company had "reconfirmed [its] opinion of the quality of the Golden West franchise, its underwriting and service model" and that the company "will be ready for a market with far fewer irrational participants."

440.    As reported in media accounts of Wachovia's February 28, 2008 announcement:

> **Wachovia's report also provided updates on highly watched aspects of its business, including loan quality** and exposure to distressed assets such as mortgage-based securities . . . .
>
> Wachovia also increased the nonperforming assets in its consumer first-lien mortgage portfolio by 9.7% from a report filed last month, to $3.23 billion at yearend, to reflect "a final review of certain modified loans."
>
> At year end it had about $3.3 billion of nonperforming assets in its entire consumer portfolio.

172

> **Many of Wachovia's issues stem from its October 2006 purchase of Golden West Financial Corp., and Oakland, Calif., thrift company that specialized in option adjustable-rate mortgages. Golden West's $120 billion mortgage portfolio accounted for 15.3% of Wachovia's assets at yearend.**

Paul Davis, *Wachovia Says 2 Workers Targeted In a Federal Investigation*, American Banker, Feb. 29, 2008.

441.    Over the course of the last two days in February, Wachovia's stock dropped from $34.10 to $30.62 per share.

442.    On March 12, 2008, CRO Truslow, announced that the housing market "appears to be worsening," and that the sentiment among business owners had become "much more cautious." In particular, Truslow stated that he was wary of what he called a "very challenging environment," observing that Wachovia saw particular weakness in the housing markets of California and Florida, where approximately 70% of Golden West's loans were made.  Deutsche Bank analyst, Mike Mayo, who hosted the conference call with Truslow, commented that "[h]e now expects Wachovia to charge off 1.1 percent of its Golden West loans as of March 31, up from his previous estimate 0.65 percent, 'which reflects the worst quarterly loss rate for residential mortgages in general over the last 20 years.'"  David Mildenberg, *Wachovia See Outlook for U.S. Housing Deteriorating*, Bloomberg, March 12, 2008.  Wachovia's stock price dropped from $29.78 to $28.05 per share on March 12, 2008, and by March 17, 2008 had deteriorated to $25.60 per share.

443.    On April 14, 2008, Wachovia announced that it had sold $7 billion worth of stock to raise capital, and reduced its dividend, despite prior assurances that it would not do so.  Both developments resulted from substantially increased loss reserve provisioning for Pick-A-Pay mortgages.  There had been no change in those mortgages' performance in recent months that made

these developments suddenly necessary.  Rather, the developments were occasioned by Wachovia's adoption of a newly-modified mortgage loss model that belatedly took into account: (1) mortgage risk principles known *ab initio* (namely, that borrowers with little, no or negative equity were at increased risk of default); and (2)  facts that had been apparent beginning in mid-2006 evidencing the materialization of those risks (namely, sharply declining housing prices, especially in California and Florida, that eroded and erased borrower equity, thus increasing both the risk of default and the loss severity to Wachovia upon default).  Wachovia revealed, for the first time, that as of February 2008, 14% of its Pick-A-Pay loans matched or exceeded the value of the underlying collateral (*i.e.*, that 14% of its $120 billion Pick-A-Pay loan portfolio had LTV ratios of 100% or more).  As a result, Wachovia reported that it had set aside $2.8 billion in reserves to cover problem loans, up from $1.5 billion in fourth quarter 2007, and that it was considering halting the origination of Pick-A-Pay loans in California.  Market analysts concluded that Wachovia "'obviously didn't take a close enough look at Golden West, . . . .  The lender's adjustable-rate mortgages, which let borrowers skip payments and add the unpaid interest on the principal, were 'a formula for disaster by anyone's standard.'"  David Mildenberg, *Wachovia Posts Loss, Plans $7 Billion Capital Raising*, Bloomberg, Apr. 14, 2008.

444.    Though Defendants' April 14, 2008 admissions constituted partial corrective disclosures, Defendants continued to misrepresent and conceal the realities of Wachovia' Pick-A-Pay mortgages, their risks, and their losses.  Defendants still represented falsely on April 14, 2008: (1) that the current average LTV ratio of Wachovia's Pick-A-Pay mortgages had risen only slightly from the LTV ratio at origination – to 78% from 71%; (2) that cumulative losses on the entire $120 billion portfolio, even under Defendants' new loss model, would not exceed 7.5%; and thus (3) that

Wachovia still had sufficient capital levels to fund a reduced dividend payout of approximately 60% of the amount of Wachovia's prior dividend.   These representations were materially false and misleading.  The purportedly "current" LTV of 78% was neither accurate nor current, but rather false, understated and based on outdated data.  Cumulative losses on the $120 billion Pick-A-Pay portfolio were likewise, and connectedly, far higher than the 7.5% level that Defendants publicly revealed on April 14, 2008.  Three months later, on July 22, 2008, Defendants (under Wachovia's new CEO, who by then had replaced defendant Thompson), admitted: (1) that current LTV ratios were materially higher than previously stated; (2) connectedly, that cumulative Pick-A-Pay losses would be almost twice as high as stated on April 14, 2008 (*i.e.*, 12% rather 7.5%); and (3)  that, consequently, Wachovia could not continue to fund even its already-reduced dividend.  Defendants also revealed that Wachovia had abandoned further origination of Pick-A-Pay mortgages.  Three months after that, on October 22, 2008, Wachovia, then under new management (with Defendants Thompson, Wurtz and Truslow gone), admitted that Pick-A-Pay losses would be **triple** the 7.5% level represented by Defendants on April 14, 2008 – a stunning 22% of the entire $120 billion portfolio.

445.    Wachovia also disclosed on April 14, 2008 a further $315 million of subprime CDO writedowns.  Again, despite the size of the writedown, the writedown was insufficient, failed to value accurately the CDOs, and Wachovia thus continued to overstate the value of its CDO assets.

446.    Based on Defendants' April 14, 2008 disclosures, which still continued to be materially false and misleading, Wachovia shares fell from $27.81 to $25.55.

447.    On June 2, 2008, Wachovia announced that its board of directors forced Thompson to retire from the Company.  He was replaced as CEO by director Lanty L. Smith.  Wachovia's

shares declined to from their May 30, 2008 closing price of $23.80 to $23.40 per share on June 2, 2008, and to $21.92 per share on June 3, 2008.

448.   The next day, a June 4, 2008 BusinessWeek article ascribed Thompson's ouster to the Golden West fiasco. *See* Dean Foust, *Wachovia: Golden West Wasn't Golden*, BusinessWeek, June 4, 2008.   The article described not only the devastation wrought by that deal, but also Wachovia's shady (and previously undisclosed) business practices:

> Whoever Wachovia directors pick to succeed Thompson may spend a great deal of time mopping up the mess at Golden West.   **The thrift's vaunted underwriting proved inadequate** when housing prices began to plummet in California and Florida . . . .   Analysts figure Wachovia could end up incurring losses of as much as $11 billion on Golden West and $122 billion mortgage portfolio.   "You would be hard pressed to find anything good out of this acquisition." says Terry Maltese, president of Sandler O'Neil Asset Management . . . .
>
> In most mergers, it's the acquirers that exert their will.   But right after the Wachovia bought Golden West, executives from the S&L took control of all mortgage lending.   **And according to former brokers, they began pushing Wachovia's sales force to steer applicants into its signature "Pick-A-Payment" loans** . . . .
>
> **Former brokers say they were given sales targets for the Pick-A-Payment loans and were told to downplay the fact that making the minimum payment would cause the loan balance to rise – a phenomenon known as "negative amortization."   In one training video reviewed by *Business Week*, brokers were instructed to avoid using terms like "negative amortization" in favor of euphemisms like "deferred interest**." (Wachovia has said it does not set quotas by mortgage type) . . . .
>
> Analysts note that Golden West focused too much on appraisals an too little on verifying the income and assets of applicants . . . .

449.   The next day, on June 5, 2008, Goldman Sachs announced that Wachovia might be required to cut its dividends in light of economic conditions.   Wachovia's stock price dropped from

$21.59 to $20.13 on June 6, 2008, and continued its decline on the next trading day, June 9, 2008, closing at $18.89 per share.

450.    On July 9, 2008, Wachovia "pre-announced" financial results for the recently-ended second quarter of 2008. Wachovia warned of an expected $2.6 - $2.8 billion loss for the quarter "driven by higher provision expense, including $4.2 billion pre-tax to build loan loss reserves, $3.3 billion of which related to Wachovia's former Pick-a-Pay loan product." Wachovia also admitted that it would need to write down the value of impaired goodwill, and that such impairment charge would add to Wachovia's above-mentioned losses. On July 10, 2008, during a call with investors, Wachovia's new chairman and CEO, Lanty Smith, admitted that Wachovia had made a serious mistake when it acquired Golden West: "[t]here has been a complete recognition at the board level that Golden West was a mistake and that we have to deal with the consequences of it . . . . It should be recognized that we have come to grips with this issue." As a result of Wachovia's July 9-10, 2008 disclosures, Wachovia's stock, which had closed trading at $ 14.29 on July 8, 2008, declined materially on each of the next four trading days, falling to $9.08 per share on July 15, 2008.

451.    On July 22, 2008, Wachovia posted a net loss of $8.9 billion for the second quarter of 2008 – compared with net income of $2.3 billion the prior year – and took $6.1 billion of write-downs. Defendants admitted that the average LTV ratios of Wachovia's Pick-A-Pay loans was substantially higher than previously stated, and thus that the loss level of the $120 billion Pick-A-Pay portfolio – now pegged at 12% –  was nearly twice the 7.5% level that Defendants represented on April 14, 2008. As a result of these increased losses, Wachovia slashed its dividend to just five cents a share from 37.5 cents. *See* David Mildenberg, *Wachovia Has Record $8.9 Billion Loss, Cuts Dividend*, Bloomberg News, July 22, 2008. Wachovia also revealed another round of subprime

CDO writedowns that sufficed, finally, to bring Wachovia's valuations in line with market realities extant no later than October 2007.

452.    Nevertheless, Wachovia's July 22, 2008 disclosures continued to materially misrepresent the true state of affairs at Wachovia.  Pick-A-Pay LTV ratios, and thus default risks and loss severities, were still higher than Defendants publicly represented, as was, consequently, the level of losses inherent in the $120 billion Pick-A-Pay portfolio.

453.    Wachovia continued to conceal, misrepresent and deny these truths on September 9, 2008, when it disparaged as inapplicable to Wachovia's Pick-A-Pay loans certain calculations stating that cumulative losses would be 20% (rather than the 12% level that Wachovia claimed).

454.    It was only on September 29, 2008 that the true value of Wachovia was finally revealed.  On September 29, 2008, Citigroup Inc. agreed to acquire Wachovia Corp.'s banking operations for $2.1 billion in stock and the assumption another $53 billion in Wachovia debt.  Federal banking regulators pushed for the deal by agreeing to share a portion of future losses that Wachovia's failing mortgage portfolio could generate.  *See* Dean Foust, Wachovia: *Just the Plum Citigroup Needed*, BusinessWeek, Sept. 29, 2008.  The proposed Citigroup acquisition valued Wachovia's banking operations – the operations being acquired, and the lion's share of Wachovia's operations – at a mere $1 per share.  *See* David Mildenberg, *Citigroup Agrees to Buy Wachovia's Banking Business (Update 7)*, Bloomberg, Sept. 29, 2008.  The low purchase price / valuation was a direct function of Wachovia's $120 billion portfolio of Pick-A-Pay mortgages and the losses those mortgages would suffer.

455.    Following this revelation of Wachovia's real value, Wachovia stock immediately lost nearly all its remaining value, falling from its previous closing price, $10.00 per share on Friday

September 26, 2008, to close on Monday September 29, 2008 at $1.84 per share.  During September

29, 2008 intra-day trading, Wachovia shares fell below $1.00 per share.

456.    Subsequent events and disclosures during October and November 2008 confirmed

in greater factual detail what had been revealed on September 29, 2008:  that Wachovia, under the

weight of the losses inherent in its $120 billion Pick-A-Pay portfolio, was nearly worthless.

457.    For example, the proposed Citigroup transaction was itself subsidized by government

guarantees to backstop Wachovia's mortgage losses should they exceed a certain amount.  Absent

such guarantees to limit acquirer losses, Wachovia's executives stated, no buyer could be found.  On

October 5, 2008, Robert K. Steel, in his affidavit in the matter of *Wachovia Corporation v.*

*Citigroup, Inc.*, No. 08 Civ. 8503 (LAK) (S.D.N.Y.), stated the following:

> Shortly after I spoke with Mr. Kovacevich, Sheila Bair, Chairman of
> the Federal Deposit Insurance Corporation ("FDIC") contacted me by
> telephone.  She advised me that the FDIC believed that no transaction
> with Citigroup or Wells Fargo could be effected without substantial
> government assistance.  Chairman Bair confirmed that in the FDIC's
> view this situation posed by a systemic risk to the banking system,
> and that the FDIC was prepared to exercise its powers under Chapter
> 13 of the Federal Deposit Insurance Act to effect an open bank
> assisted transaction.  Subsequently, Chairman Bair directed Wachovia
> to commence negotiations with Citi.

Robert K. Steel Affidavit, ¶8

458.    On October 22, 2008, Wachovia's new management: (1) revealed Wachovia's largest-

ever quarterly loss reserve provisioning expense, $4.8 billion, 66% of which was dedicated to the

Pick-A-Pay portfolio; (2) admitted that cumulative Pick-A-Pay losses would amount to 22% of the

entire $120 billion portfolio (or $26.4 billion) – nearly twice the 12% cumulative loss figure that

Defendants had represented months earlier; (3)  revealed that, as a result of sharp property price

declines in California and Florida (which declines were already sharp two years earlier, in late 2006), and as a result of most Pick-A-Pay borrowers picking to pay minimum payments (which they had been doing all along), the average LTV ratio across Wachovia's $120 billion Pick-A-Pay portfolio had risen from 71% to a stunning 95%; and (4) acknowledged with a further $18.8 billion writedown what Defendants had long explicitly denied: the substantial devaluation of Wachovia's Pick-A-Pay franchise.  Wachovia's erstwhile acquirer, Wells Fargo, after reviewing Wachovia's $498 billion of loan portfolios, disclosed that it expected those portfolios to generate losses of **$74 billion**. Wachovia's $120 billion Pick-A-Pay portfolio, according to Wells Fargo, would generate cumulative losses of 26%, or $31.2 billion.  Thus, though the Pick-A-Pay portfolio amounted to only 20% of Wachovia's total loans, they represented 42% of the total losses.

459.  On November 19, 2008, federal prosecutors and the Securities and Exchange Commission announced that they had opened an investigation probing whether Wachovia's Golden West division had misled borrowers and investors.  Specifically, investigators stated that they were examining whether Golden West fraudulently lured borrowers into mortgages, such as by switching them into more expensive loans, falsified financial data so that borrowers could qualify for certain loans, or misled investors as to the quality of Golden West's loans.  Wachovia shares lost 13% of their value on that news, having lost 88% of their value year-to-date.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

460.  At all relevant times, the market for Wachovia's common stock was an efficient market for the following reasons, among others:

a.      Wachovia's stock met the requirements for listing, and was listed actively traded on the NYSE, a highly efficient market;

b.      As a regulated issuer, Wachovia filed periodic public reports with the SEC and the NYSE;

c.      Wachovia traded an average of 19.6 million shares per day during the Class Period;

d.      Wachovia regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

e.      Wachovia was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

461.    As a result of the foregoing, the market for Wachovia's common stock promptly digested current information regarding Wachovia from all publicly available sources and reflected such information in Wachovia's stock price.   Under these circumstances, all purchasers of Wachovia's common stock during the Class Period suffered similar injury through their purchase of Wachovia's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

462.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

181

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Wachovia who knew that those statements were false when made.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

463.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of: (1) a class consisting of plaintiffs and all other persons or entities who purchased Wachovia's common stock between May 8, 2006 and September 29, 2008, inclusive, and who were damaged thereby (the "Class"); and (2) a subclass of persons who acquired Wachovia shares through Wachovia's Class Period acquisition of Golden West and/or its Class Period acquisition of A.G. Edwards and/or Wachovia's April 14, 2008 stock offering (the "Offerings Subclass"), *see* ¶¶ 485-86.

464.   Excluded from the Class and Offerings Subclass are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest

465.     The members of the Class and Offerings Subclass are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Wachovia common stock was actively traded on the NYSE under the symbol "WB."  As of January 31, 2008, there were approximately 1,981,983,990 outstanding shares of Wachovia's common stock.  While the exact number of Class members and Offerings Subclass members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in both the proposed Class and the Offerings Subclass.  Record owners and other members of the Class and Offerings Subclass may be identified from records maintained by Wachovia or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

466.     Lead Plaintiff's claims are typical of the claims of the members of the Class and Offerings Subclass as all members of the Class and Offerings Subclass are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

467.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and Offerings Subclass and has retained counsel competent and experienced in class action and securities litigation.

468.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class and Offerings Subclass may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class and Offerings Subclass to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

469.     Common questions of law and fact exist as to all members of the Class and Offerings Subclass and predominate over any questions solely affecting individual members of the Class and Offerings Subclass.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements disseminated by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business and operations of Wachovia;

(c)     whether Defendants acted wilfully or recklessly in omitting and/or misrepresenting material facts;

(d)     whether Defendants' non-disclosures and/or misrepresentations constituted a fraud on the market by artificially inflating the market prices of Wachovia common stock during the Class Period; and

(e)     whether the members of the Class and the Offerings Subclass have sustained damages and, if so, what is the proper measure of such damages.

470.     Questions (a), (b) and (e) are also common the Offerings Subclass members.

## <u>COUNT I</u>

**Violation of § 10(b) of the Exchange Act Against and Rule 10b-5
Promulgated Thereunder Against All Defendants**

471.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

472.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Wachovia's business, operations, management and the intrinsic value of Wachovia common stock; and (ii) cause plaintiff and other members of the class to purchase Wachovia's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

473.     Defendants (a) employ devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Wachovia's common stock in violation of Section 10(b) of the Exchange and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

474.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in continuous course of conduct to conceal adverse material information about the business and operations of Wachovia as specified herein.

475.     The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Wachovia's value and performance and continued substantial growth, which included the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Wachovia

185

and its business operations in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fund and deceit upon the purchasers of Wachovia common stock during the Class Period.

476.    Each of the Individual Defendants' primary liability, are controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's finances, operations and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

477.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Wachovia's operating condition from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants'

overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

478.    As a result of the dissemination of the materially false and misleading information and the failure to disclose material facts, as set forth above, the market price of Wachovia's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Wachovia's publicly-traded common stock were artificially inflated, and relying on the integrity of the efficient market for Wachovia securities and/or directly on the false and misleading statements made by Defendants but not disclosed in public statements by Defendants during the Class Period (which caused Wachovia's shares to trade at artificially inflated prices), plaintiff and the other members of the Class acquired Wachovia common stock during the Class Period at artificially high prices and were damaged thereby.

479.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Wachovia common stock during the Class Period.

## COUNT II

### Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

480.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

481.    The Individual Defendants acted as controlling persons of Wachovia within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Wachovia, and their ownership of Wachovia stock, the Individual Defendants had the power and authority to cause Wachovia to engage in the wrongful conduct complained of herein.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

482.    As set forth above, Wachovia and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

### CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT

483.    In the allegations and claims set forth in this part of the complaint, Plaintiff assert a series of strict liability and negligence claims based on the Securities Act on behalf of the subclasses (as defined in ¶¶ 463-470 above, except that Plaintiffs explicitly disclaim subparts (c) and (d) of ¶ 469 from these Securities Act allegations).  Plaintiffs' Securities act claims are not based on any allegations of knowing or reckless misconduct on behalf of the Defendants named in the Third and Fourth Claims for Relief.  Plaintiffs' Securities Act claims do not allege, and do not "sound in fraud," and Plaintiffs specifically disclaim any reference to or reliance upon allegations of fraud in

these non-fraud claims under the Securities Act.  To avoid (unfounded) argument by Defendants that the claims below somehow "sound in fraud," it is necessary to state or summarize facts also stated above.

484.    This action was brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years after each of the offerings described herein.

485.    Specifically, the Securities Act Defendants (set forth below) conducted securities offerings on behalf of Wachovia during the Class Period (referred to collectively as the "Offerings"), through which the Company (i) completed two acquisitions (of Golden West and A.G. Edwards) using, *inter alia*, common stock at valued at $21.9 billion and (ii) raised an additional $3.5 billion. The Offerings were conducted pursuant to prospectuses and registration statements filed with the SEC on the dates indicated below.

486.    The Securities Act Defendants conducted three (3) securities offerings on behalf of Wachovia during the Class Period (referred to collectively as the "Offerings"), through which the Company acquired Golden West (for $18.2 billion in common stock) and A.G. Edwards (for $3.7 billion in common stock) and raised an additional $3.5 billion, for a total from all offerings of approximately **$25.5 billion**.  The Offerings at issue are as follows:

- **The June 2006 Offering**: On or about June 1, 2006, Wachovia registered about 340,000,000 shares of common stock in connection with the Golden West Financial business combination with a maximum aggregate offering of about **$18.2 billion**. The June 2006 Offering was marketed to Golden West shareholders through the materially false and misleading Registration Statement and Prospectus filed with the

SEC on FORM S-4, and amendments thereto on July 24, 2006 (Form S-4/A) ("the June 2006 Offering Documents").

- **June 2007 Offering**: On or about June 28, 2007, Wachovia filed a Registration Statement and Prospectus with the SEC on FORM S-4 for 82,000,000 of common stock in connection with the A.G. Edwards business combination with a maximum aggregate offering of about **$3.7 billion**. The June 2007 Offering was marketed to A.G. Edwards shareholders through the materially false and misleading Registration Statement and Prospectus filed with the SEC on FORM S-4, and amendments thereto on August 7, 2007 (Form S-4/A), August 22, 2007 (Form S-4/A) and August 28, 2007 (Form S-4/A) ("the June 2007 Offering Documents"). Ultimately, and pursuant to the June 2007 Offering Materials, Wachovia issued 72 million shares of its common stock to complete its acquisition of A.G. Edwards.

- **The April 2008 Offering**: On or about April 14, 2008, Wachovia conducted a public offering of about 146,000,000 shares of common stock with an offering price of about **$3.5 billion**.  The April 2008 Offering was marketed and sold to the public through a materially false and misleading Prospectus Supplement dated April 14, 2008 to a Registration Statement and Prospectus dated April 14, 2008 ("the April 2008 Offering Documents"). From this offering, Wachovia raised approximately $3.5 billion before expenses.

The June 2006 Offering Documents, the June 2007 Offering Documents, and the April 2008 Offering Documents are collectively referred to herein as "the Offering Documents."

190

A.     **Securities Act Defendants**

487.    The Securities Act claims are asserted against the Company, Defendants G. Kennedy Thompson and Thomas J. Wurtz as signatories to the Offering Documents, and the Underwriter Defendants (defined above).  Each of these Defendants is statutorily liable under Sections 11 or 12 of the Securities Act for the materially untrue statements contained in some or all of the Offering Documents, as set forth below, including Wachovia's materially false and misleading financial statements incorporated therein.

B.     **The June 2006 Offering Documents Contained Materially False or Misleading Statements**

488.    Wachovia conducted the June 2006 Offering as part of its acquisition of Golden West. Wachovia filed its Form S-4 Registration Statement for the June Offering on or about June 1, 2006, which it thereafter amended on July 24, 2006 (Form S-4/A).

489.    The June 2006 Offering was conducted pursuant to the June 2006 Offering Documents, which incorporated by express reference several of Wachovia's public filings, including its Form 10-K for the fiscal year ended December 31, 2005 (the "2005 10-K"), and its Form 10-Q for the quarters ended March 31, 2006 (the "First Quarter 2006 10-Q").  The 2005 10-K was signed by Defendants Thompson and Wurtz, and the First Quarter 10-Q was signed by Defendants Thompson and Wurtz.

490.    Wachovia made materially false or misleading statements in the June 2006 Offering Documents regarding its financial results, compliance with GAAP, credit risk management and underwriting practices.   These statements misinformed Golden West shareholders about the

reliability of Wachovia's financial statements, and rendered the June 2006 Offering Documents materially untrue and misleading.

491.    Wachovia's financial statements in its First Quarter 2006 10-Q materially misstated and did not fairly present Wachovia's financial performance and condition, and were not presented in accordance with GAAP and applicable SEC rules and regulations.  In particular, Wachovia's First Quarter 2006 financial statements:

  a.    omitted the disclosures required by FAS 107 and FSP 94-6-1 regarding concentrations of credit risk created by its loan portfolio;

  b.    omitted disclosure of "information that is adequate to inform users of the general nature of the risk associated with the concentration" for concentrations in volume of business with particular customers, concentrations in revenue from certain products, and concentrations in certain markets or geographic areas;

  c.    omitted the disclosures required by FAS 107 and FSP 94-6-1 regarding significant concentrations of credit risk created by its investment portfolio which, in significant parts, was comprised of subprime-related ABS CDOs and RMBS, CMBS and consumer mortgages, leveraged finance distribution exposures, monoline-related exposures, and subprime-related CDS; and

  d.    omitted the disclosures required by SOP 94-6 for significant estimates in violation of GAAP and SEC rules.

492.    In the June 2006 Offering Documents, Wachovia also made materially false or misleading statements, and failed to disclose material information about Golden West, its

192

underwriting practices, and the quality (or lack thereof) of its mortgage portfolio.  In particular Defendants stated in the June 2006 Offering documents that among the factors that "supported the decision to approve the merger: . . . Wachovia's board concluded . . . that Golden West's financial condition and asset quality are very sound and will further strengthen Wachovia's balance sheet." This statement falsely represented that Golden West's asset quality was very strong, when nowhere in the June 2006 Offering Documents did Defendants disclose that:

    a.    Golden West did not follow strict underwriting and loan-origination practices, including in its Pick-A-Pay mortgage portfolio;

    b.    a material portion of Golden West's loans were made on a "low documentation" basis, such that it had no way of confirming the credit-worthiness of many loan applicants, thereby rendering the Company's reassurances about its loan-origination and underwriting practices materially inaccurate;

    c.    Golden West's loan loss provisions were understated and did not properly reflect the risk facing Golden West, thereby inflating the pro forma income for the to be merged companies as presented in the June 2006 Offering Documents.

**C.    The June 2007 Offering Documents Contained Materially False or Misleading Statements**

493.    Wachovia conducted the June 2007 Offering as part of its acquisition of A.G. Edwards.  Wachovia filed its Form S-4 Registration Statement for the June 2007 Offering on or

about June 28, 2007, which it thereafter amended on August 7, 2007 (Form S-4), August 22, 2007 (Form S-4) and August 28, 2007 (Form S-4).

494.    The June 2007 Offering was conducted pursuant to the June 2007 Offering Documents, which incorporated by express reference several of Wachovia's public filings, including its Form 10-K for the fiscal year ended December 31, 2006 (the "2006 10-K"), and its Form 10-Qs for the quarters ended March 31, 2007 (the "First Quarter 2007 10-Q") and June 30, 2007 (the "Second Quarter 2007 10-Q"). The 2006 10-K and the First and Second Quarter 2007 10-Qs were signed by Defendants Thompson and Wurtz.

495.    Wachovia made materially false or misleading statements in the June 2007 Offering Documents regarding its financial results, compliance with GAAP, credit risk management and underwriting practices. These statements misinformed A.G. Edwards shareholders about the reliability of Wachovia's financial statements, and rendered the June 2007 Offering Documents materially untrue and misleading.

496.    Wachovia's financial statements in its 2006 10-K and First Quarter 2007 10-Q materially misstated and did not fairly present Wachovia's financial performance and condition, and were not presented in accordance with GAAP and applicable SEC rules and regulations. The Company's results of operations, and more specifically, but not exclusively, provision for loan losses, net income and earnings per share or EPS, were materially false and misleading as those amounts disclosed were not derived in conformity with GAAP. In particular, Wachovia's 2006 and First Quarter 2007 financial statements:

        (a)    overstated Wachovia's loan portfolio (*i.e.*, avoided direct write-offs) and understated the allowance for credit losses, and thus these financial

statements materially understated the amounts reported as the provision for credit losses, and thereby materially overstated net income;

(b)      omitted the disclosures required by FAS 107 and FSP 94-6-1 regarding concentrations of credit risk created by its loan portfolio;

(c)      omitted disclosure of "information that is adequate to inform users of the general nature of the risk associated with the concentration" for concentrations in volume of business with particular customers, concentrations in revenue from certain products, and concentrations in certain markets or geographic areas;

(d)      omitted the disclosures required by FAS 107 and FSP 94-6-1 regarding significant concentrations of credit risk created by its investment portfolio which, in significant parts, was comprised of subprime-related ABS CDOs and RMBS, CMBS and consumer mortgages, leveraged finance distribution exposures, monoline-related exposures, and subprime-related CDS;

(e)      materially misstated the value and or valuation of, generally, the Company's financial position, and more specifically, but not exclusively, the investments discussed in (d) above, as those values were not derived in conformity with GAAP;

(f)      omitted the disclosures required by SOP 94-6 for significant estimates in violation of GAAP and SEC rules; and

(g)      failed to properly present VIEs, for which the Company was the primary beneficiary, as consolidated, and thereby, materially misstated the Company's

195

financial position and results of operations, in violation of GAAP.

497.   In the June 2007 Offering Documents, Wachovia also failed to disclose material information about its underwriting practices and the quality (or lack thereof) of its mortgage portfolio.  In particular nowhere in the June 2007 Offering Documents did Defendants disclose that:

(a)   the Company did not follow strict underwriting and loan-origination practices, including in its Pick-A-Pay mortgage portfolio;

(b)   a material portion of the Company's loans were made on a "low documentation" basis, such that it had no way of confirming the credit-worthiness of many loan applicants, thereby rendering the Company's reassurances about its loan-origination and underwriting practices materially inaccurate;

(c)   the Company's loan loss provisions were understated and did not properly reflect the risk facing the Company, thereby inflating Wachovia's reported income; and

(d)   the certifications signed by Defendants Thompson and Wurtz, which attested to the accuracy of the reported financial statements in the 2006 10-K and the First Quarter 2006 10-Q, were themselves misleading because of the above misstatements and omissions included in the reports, and provided false comfort to the market.

### D.   The April 2008 Offering Documents Contained Materially False or Misleading Statements

498.   On or about April 15, 2008, Wachovia conducted a public offering of about 146,000,000 shares of common stock with an offering price of about $3.5 billion.  The April 2008 Offering was marketed and sold to the public through the materially false and misleading April 2008 Offering Documents.

499.   The April 2008 Offering was conducted pursuant to the April 2008 Offering Materials, which incorporated by express reference several of Wachovia's public filings, including its Form 10-K for the fiscal year ended December 31, 2007 (the "2007 10-K").  The 2007 10-K was signed by Defendants Thompson and Wurtz.

500.   Wachovia made materially false or misleading statements in the April 2008 Offering Documents regarding its financial results, compliance with GAAP, credit risk management and underwriting practices.  These statements misinformed the public about the reliability of Wachovia's financial statements, and rendered the April 2008 Offering Documents materially untrue and misleading.

501.   Wachovia's financial statements in its 2007 10-K materially misstated and did not fairly present Wachovia's financial performance and condition, and were not presented in accordance with GAAP and applicable SEC rules and regulations.  The Company's results of operations, and more specifically, but not exclusively, provision for loan losses, net income and earnings per share or EPS, were materially false and misleading as those amounts disclosed were not derived in conformity with GAAP.  In particular, Wachovia's 2006 financial statements:

197

(a)  overstated Wachovia's loan portfolio (*i.e.*, avoided direct write-offs) and understated the allowance for credit losses, and thus these financial

statements materially understated the amounts reported as the provision for credit losses, and thereby

materially overstated net income;

(b)  omitted the disclosures required by FAS 107 and FSP 94-6-1 regarding concentrations of credit risk created by its loan portfolio;

(c)  omitted disclosure of "information that is adequate to inform users of the general nature of the risk associated with the concentration" for concentrations in volume of business with particular customers, concentrations in revenue from certain products, and concentrations in certain markets or geographic areas;

(d)  omitted the disclosures required by FAS 107 and FSP 94-6-1 regarding significant concentrations of credit risk created by its investment portfolio which, in significant parts, was comprised of subprime-related ABS CDOs and RMBS, CMBS and consumer mortgages, leveraged finance distribution exposures, monoline-related exposures, and subprime-related CDS;

(e)  materially misstated the value and or valuation of, generally, the Company's financial position, and more specifically, but not exclusively, the investments discussed in (d) above, as those values were not derived in conformity with GAAP;

(f)  omitted the disclosures required by SOP 94-6 for significant estimates in violation of GAAP and SEC rules; and

(g)     failed to properly present VIEs, for which the Company was the primary beneficiary, as consolidated, and thereby, materially misstated the Company's financial position and results of operations, in violation of GAAP.

502.    In the April 2008 Offering Documents, Wachovia also failed to disclose material information about its underwriting practices and the quality (or lack thereof) of its mortgage portfolio.  In particular nowhere in the April 2008 Offering Documents did Defendants disclose that:

(a)     the Company did not follow strict underwriting and loan-origination practices, included in its Pick-A-Pay mortgage portfolio;

(b)     a material portion of the Company's loans were made on a "low documentation" basis, such that it had no way of confirming the credit-worthiness of many loan applicants, thereby rendering the Company's reassurances about its loan-origination and underwriting practices materially inaccurate;

(c)     the Company's loan loss provisions were understated and did not properly reflect the risk facing the Company, thereby inflating Wachovia's reported income; and

(d)     the certifications signed by Defendants Thompson and Wurtz, which attested to the accuracy of the reported financial statements in the 2007 10-K, were themselves misleading because of the above misstatements and omissions included in the reports, and provided false comfort to the market.

199

## COUNT III

**Violations of Section 11 of the Securities Act
In Connection With The Offerings On Behalf of the Subclass Against
the Securities Act Defendants**

503.     Plaintiffs repeat and reallege each and every allegation in ¶¶ 483-502 relating to the Securities Act claims as it fully set forth herein.  Defendants' liability under this Claim for Relief is predicated on the participation of each Defendant in conducting the Offerings pursuant to the Registration Statements, which were false and misleading due to various GAAP violations and Defendants' failure to disclose that Golden West's, and later Wachovia's, Pick-A-Pay loans were highly susceptible to default.  This claim for Relief does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

504.     This Count is brought pursuant to Section 11 of the Securities Act against the Securities Act Defendants, on behalf of members of the Subclass who purchased or otherwise acquired the securities issued pursuant and/or traceable to the Offerings and were damaged by the acts alleged herein.  This Count is based solely in strict liability and negligence.

505.     Defendant Wachovia was the issuer, within the meaning of Section 11 of the Securities Act, pursuant to the Offering Documents (including the Registration Statements) of the registered securities issued in the June 2006, June 2007, and April 2008 Offerings.

506.     As discussed above, in June, Wachovia issued $18.2 billion of its common stock to complete the Golden West acquisition.

507.     As discussed above, in April 2008, Wachovia issued and sold to investors $3.5 billion

200

of its common stock. Defendants Wachovia Securities, Goldman Sachs, Citi, Credit Suisse, Ramirez, Utendahl and UBS were statutory underwriters for the registered securities, as admitted in the April 2008 Offering Documents.

508.     Defendant Thompson signed the Registration Statement for each of the June 2006, June 2007 and April 2008 Offerings, which were then updated and incorporated into the Offering Documents, as a senior officer of Wachovia within the meaning of Section 11 of the Securities Act.

509.     Defendant Wurtz signed the Registration Statement for each of the June 2006, June 2007 and April 2008 Offerings, which were then updated and incorporated into the Offering Documents, as a senior officer of Wachovia within the meaning of Section 11 of the Securities Act.

510.     The Offering Documents, including the Registration Statements, contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

511.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Plaintiffs' Securities Act claims, as set forth above.

512.     In Connection with offering the registered securities to the public and the sale of those securities, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

513.     As the issuer of the registered securities, Wachovia is strictly liable for the untrue statements of material fact and material omissions described herein.

514.     None of the other Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

515.     Class members did not know, nor in the exercise of reasonable diligence could have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

516.     As a direct and proximate result of Defendants' acts and omissions in violation of the Securities act, the Subclass suffered substantial damage in connection with its purchase of the registered securities issued pursuant to the Offering Documents.  By reason of the conduct alleged herein, each Defendant violated Section 11 of the Securities Act.

517.     By reason of the foregoing, the Securities Act Defendants are liable to the members of the Subclass who acquired registered securities pursuant to or traceable to the Offering Documents.

518.     This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the Offering Documents.

## COUNT IV

### Violation of Section 15 of the Securities Act of 1933
### Against the Individual Defendants

519.     Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.

520.    This cause of action is being brought pursuant to section 15 of the Securities Act of 1933, 15 U.S.C. §77o, against the Individual Defendants on behalf of members of the Offerings subclass who purchased or otherwise acquired the securities issued and or traceable to the Offerings and were damaged by the acts alleged herein.  This Count is based solely on strict liability and negligence, and does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

521.    Each of the Individual Defendants was a control person of Wachovia with respect to the filing of the Offering Documents, *see* ¶¶ 486, 489, 494, 499, by virtue of his/her position as a senior executive officer and/or director of Wachovia.

522.    As a result, the Individual Defendants are liable under Section 15 of the Securities Act for National City's primary violations of Section 11 of the Securities Act.

**COUNT V**
**Violations of Section 20A of the Exchange Act on Behalf of Lead Plaintiffs,**
**Asserted Against Defendants Thompson, Truslow, and Wurtz**

523.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

524.    This Count is asserted pursuant to Section 20A of the Exchange Act against Defendants Thompson, Truslow and Wurtz on behalf of Lead Plaintiff and all members of the Class who purchased Wachovia common stock contemporaneously with any of these Defendants' sales of Wachovia stock during the class period.

525.    Each of these Defendants sold substantial numbers of shares of Wachovia common stock during the Class Period while in possession of material, adverse, nonpublic information.  This conduct violated Section 20A of the Exchange Act.

526.    As set forth in the certifications Lead Plaintiff previously filed with the Court, Lead Plaintiffs purchased shares of Wachovia common stock on the same day as or close in time to sales of Wachovia common stock made by the Defendants named in this Count, while these Defendants were in possession of material, adverse, nonpublic information.  The sales and purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

527.    Numerous other class members also purchased Wachovia common stock contemporaneously with these Defendants' sales of stock during the Class Period based on material, adverse, nonpublic information.

528.    Accordingly, under Section 20A of the Exchange Act, the Defendants named in the Count are liable to the Lead Plaintiffs and the Class for all profits gained and losses avoided by them as a result of their stock sales.

529.    The Defendants named in this claim are required to account for all such sales and to disgorge their profits or ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.


Dated: New York, New York
      December 15, 2008

### KIRBY McINERNEY LLP

By: _____
        Ira M. Press
        Roger W. Kirby
        825 Third Avenue, 16th Floor
        New York, NY  10022
        Telephone: (212) 371-6600
        Facsimile: (212) 751-2540
        Email: ipress@kmllp.com

        *Lead Counsel*

**Wachovia Corporation Securities Litigation**
**Allowance Analysis**

EXHIBIT A

**TABLE 1**

| At the period end (dollars in millions) | Q4 2005 | Q1 2006 | Q2 2006 | Q3 2006 | Q4 2006 | Q1 2007 | Q2 2007 | Q3 2007 | Q4 2007 | Q1 2008 | Q2 2008 | Q3 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Loan portfolio: | | | | | | | | | | | | |
|   Total consumer | 111,421 | 129,642 | 128,067 | 130,744 | 256,254 | 252,826 | 252,067 | 257,860 | 261,503 | 266,958 | 269,726 | 261,610 |
|   Loans, net | 259,015 | 280,932 | 282,916 | 290,759 | 420,158 | 421,663 | 429,120 | 449,206 | 461,954 | 480,482 | 488,198 | 482,373 |
| Allowance for loan losses as % of loans, net | 1.05% | 1.08% | 1.07% | 1.03% | 0.80% | 0.80% | 0.79% | 0.78% | 0.98% | 1.37% | 2.20% | 3.18% |
| Net Charge-offs as % of average loans, net (annualized) | | | | | | | | | | | | |
|   Total consumer | 0.16% | 0.14% | 0.23% | 0.32% | 0.19% | 0.20% | 0.19% | 0.27% | 0.46% | 0.79% | 1.26% | 1.97% |
|   Total as a % of average loans, net | 0.09% | 0.09% | 0.08% | 0.16% | 0.14% | 0.15% | 0.14% | 0.19% | 0.41% | 0.66% | 1.10% | 1.57% |

**TABLE 2**

| At the period end | Q4 2005 | Q1 2006 | Q2 2006 | Q3 2006 | Q4 2006 | Q1 2007 | Q2 2007 | Q3 2007 | Q4 2007 | Q1 2008 | Q2 2008 | Q3 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nonperforming assets as a % of loans, net and foreclosed properties | 0.28% | 0.28% | 0.25% | 0.26% | 0.32% | 0.41% | 0.48% | 0.68% | 1.16% | 1.74% | 2.44% | 3.10% |
| Allowance for loan losses % of nonperforming assets | 378% | 389% | 421% | 396% | 246% | 194% | 164% | 115% | 84% | 78% | 90% | 102% |