UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



MORTON LIPETZ and EVELYN JEAN
LIPETZ, Individually and on Behalf of All
Others Similarly Situated,

               Plaintiffs,

vs.

WACHOVIA CORPORATION, G.
KENNEDY THOMPSON, THOMAS J.
WURTZ, DONALD K. TRUSLOW,
WACHOVIA CAPITAL MARKETS, LLC
(d/b/a/ WACHOVIA SECURITIES),
CITIGROUP GLOBAL MARKETS, INC.,
UBS SECURITIES LLC, UTENDAHL
CAPITAL GROUP LLC, GOLDMAN
SACHS & CO., CREDIT SUISSE
SECURITIES (USA) LLC, AND SAMUEL
A. RAMIREZ & COMPANY, INC.,

               Defendants.

Civil Action No. 08-6171 (RJS)

**SECOND AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

Page No.

JURISDICTION AND VENUE ................................................... 9

PARTIES ...................................................................... 10

    A.    LEAD PLAINTIFF ................................................... 10

    B.    DEFENDANTS .................................................... 11

        1.    Wachovia ................................................ 11

        2.    Individual Defendants ..................................... 11

    C.    Underwriter Defendants ............................................ 15

CONFIDENTIAL WITNESSES ................................................ 17

I.    FACTUAL BACKGROUND ............................................ 19

    A.    Wachovia's Acquisition of Golden West ............................ 19

    B.    Subprime Lending ................................................ 20

    C.    The Bubble Bursts in Early 2006 and Housing Prices Fall ................ 23

II.    DEFENDANTS' INTENTIONAL WEAKENING OF GOLDEN WEST'S ALREADY FLAWED UNDERWRITING STANDARDS AND OTHER CONDUCT INCREASING THE PICK-A-PAY LOANS' RISK OF DEFAULT ............................ 30

    A.    Wachovia Abandons Customary Lending and Business Practices in Favor of Much Riskier Loan Products ............................. 30

    B.    After Acquiring Golden West, Wachovia Lowered the Already Lax Standards for Pick-A-Pay Loans ................................... 31

    C.    Defendants Were Aware of Fundamental Risks Embedded in the Pick-A-Pay Mortgage Product, But Publicly Misrepresented, Denied and Concealed Those Risks ........................................... 38

    D.    Wachovia's Risky, Nontraditional Loan Products ...................... 42

    E.    Wachovia's Practices Exacerbated the Risks Inherent in Its Nontraditional Loan Products ....................................... 45

F.  Wachovia Aggressively Pushed Risky Loans on Borrowers
    for Defendants' Gain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

G.  Appraisals Relating to Wachovia's Loans Were Improperly Inflated  . . . . . . . . 52

H.  Wachovia's Underwriting Standards Were Weakened Under Defendants'
    Direction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    1.  Underwriting Standards for Wachovia Pick-A-Pay Loans Were
        Deficient . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    2.  Wachovia Implemented Dangerously Permissive Underwriting
        Practices for Its Subprime Lending  . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

I.  Wachovia's Wholesale Channel Was Infested With Deficiently-
    Underwritten Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

J.  Defendants Concealed Wachovia's Billions of Dollars of Exposure
    to Subprime CDOs, and Overstated the Value of Those CDOs  . . . . . . . . . . . . 61

III.  DEFENDANTS' MATERIALLY MISLEADING STATEMENTS . . . . . . . . . . . . . . . . 62

A.  May 8, 2006 Conference Call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

B.  May 12, 2006 Conference Call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

C.  May 16, 2006 Conference Call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

D.  December 28, 2006 *American Banker* Article . . . . . . . . . . . . . . . . . . . . . . . . . 66

E.  January 23, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

F.  Wachovia's 2006 Form 10-K . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

G.  April 16, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

H.  Wachovia's First Quarter 2007 Form 10-Q and May 17, 2007 Press Release . . 78

I.  July 20, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

J.  Wachovia's Second Quarter 2007 Form 10-Q . . . . . . . . . . . . . . . . . . . . . . . . . . 81

K.  October 19, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

L.     Wachovia's Third Quarter 2007 Form 10-Q . . . . . . . . . . . . . . . . . . . . . . . . . 83

M.    November 9, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

N.    November 14, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

O.    January 22, 2008 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

P.     January 30, 2008 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Q.    February 13, 2008 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

R.     Wachovia's 2007 Form 10-K . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

S.     March 12, 2008 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

T.     April 14, 2008 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

U.     July 22, 2008 and September 9, 2008 Conference Calls . . . . . . . . . . . . . . . . . 113

IV.   WACHOVIA'S COLLATERALIZED DEBT OBLIGATIONS . . . . . . . . . . . . . . . . . 114

A.    What CDOs Are . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

B.    That CDO Tranches Suffered Severe Impairment Beginning in February 2007 Was
       Evident: That Wachovia Held Any Such Instruments Was Concealed . . . . . . . 124

C.    Wachovia's CDO Exposures, and Wachovia's False and Misleading Statements
       Concerning Those Exposures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

V.    DEFENDANTS' VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING
     PRINCIPLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

A.    Overview of the GAAP Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

B.    Omission of Required Disclosures regarding Significant Concentrations
       of Credit Risk, Current Vulnerability due to Certain Concentrations
       and Certain Significant Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

C.    Overstatement of the Loan Portfolio, and related Understatement
       of the Provision and Allowance for Credit Losses . . . . . . . . . . . . . . . . . . . 160

D.    Overstatement of the Value of Certain Investments . . . . . . . . . . . . . . . . . . . 168

E.   Failure to Consolidate and Properly Disclose Certain
     Off-Balance Sheet Entities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

F.   Lack of Timely Impairment of Goodwill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

G.   Ineffective Disclosure Controls and Procedures and Internal Control
     over Financial Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

VI.   ADDITIONAL SCIENTER ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

A.   Defendants Received Reports Detailing Significant and Widespread
     Problems with Wachovia's Lending . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

B.   Defendants Knew of or Recklessly Disregarded Wachovia's Lax
     Underwriting Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

C.   Insider Stock Sales By Thompson and Other Officer Defendants During
     the Class Period Were Highly Unusual and Suspicious . . . . . . . . . . . . . . . . . 185

D.   Defendants Used Wachovia's Inflated Stock As Currency For Acquisitions
     During The Class Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

E.   Morgan Stanley Refused to Merge with Wachovia in September 2008 After
     Determining, Based on Non-Public Information, that Wachovia Had Understated its
     Mortgage Loss Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

F.   Wachovia Had a Robust Risk Management Structure . . . . . . . . . . . . . . . . . . . 189

G.   Wachovia Effectively Admitted That it Never Actually Followed its Stated
     "Conservative" and "Prudent" Lending Practices . . . . . . . . . . . . . . . . . . . . . . 192

VII.   LOSS CAUSATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

NO SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . 206

COUNT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208
     Violation of § 10(b) of the Exchange Act Against and Rule 10b-5
         Promulgated Thereunder Against All Defendants . . . . . . . . . . . . . . . . . . . . 208

COUNT II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211
    Violation of § 20(a) of the Exchange Act
    Against the Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT . . . . . . . . . . . . . . . . . . . . . . 212

    A.    Securities Act Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

    B.    The June 2006 Offering Documents Contained Materially
        False or Misleading Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

    C.    The June 2007 Offering Documents Contained Materially
        False or Misleading Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

    D.    The April 2008 Offering Documents Contained Materially
        False or Misleading Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

COUNT III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223
    Violations of Section 11 of the Securities Act
    In Connection With The Offerings On Behalf of the Subclass Against
    the Securities Act Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

COUNT IV
    Violation of Section 15 of the Securities Act of 1933
    Against the Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

COUNT V
    Violations of Section 20A of the Exchange Act on Behalf of Lead Plaintiffs,
    Asserted Against Defendants Thompson, Truslow, and Wurtz . . . . . . . . . . . . . . . . . . 227

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228

JURY TRIAL DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228

v

1.       Lead Plaintiff brings this securities class action on its behalf and on behalf of all other persons or entities who purchased or acquired the securities of Wachovia Corporation ("Wachovia" or "the Company") during the period May 8, 2006 through and including September 29, 2008, inclusive (the "Class Period"), for violations of Federal Securities Laws.

2.       Allegations concerning plaintiffs' own transactions are based on plaintiffs' personal knowledge. All other allegations are based upon the investigation of Lead Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Wachovia, as well as regulatory filings and reports, securities analysts' reports, press releases and other public statements made or issued by Wachovia, media reports about the Company and interviews with numerous former employees of Wachovia.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein following a reasonable opportunity for discovery.

3.       This action alleges that Defendants misled investors by falsely representing that Wachovia had strict and selective underwriting and loan origination practices and a conservative lending approach that set it apart from other lenders. Such reassurances were repeated by Defendants throughout the Class Period in order to artificially support Wachovia's stock price in the midst of a weakening mortgage market.

4.       Wachovia is one of the nation's largest financial services providers, servicing retail, brokerage and corporate customers. Over the past few years, Wachovia enjoyed strong growth that was reflected in its stock price, which peaked at $58.77 per share during the Class Period, giving Wachovia a market capitalization of $112 billion.

5.      In 2006, Wachovia acquired Golden West Financial Corp. ("Golden West"),[1] an Oakland, California-based mortgage lender, for more than $24 billion. Golden West's main mortgage product, the Pick-A-Payment ("Pick-A-Pay") mortgage, allowed borrowers to choose from multiple payment options each month. The options were: (1) full payment of interest and principal sufficient to pay down the loan in a traditional 30 year term; (2) a higher payment that would pay off the loan in 15 years; (3) an interest-only payment; or (4) a minimum payment that did not cover all the necessary interest, with the unpaid interest added to the loan balance.

6.      The difference between the Pick-A-Pay payment options is one of amortization: under the first option, the loan amortizes at traditional thirty-year speed; under the second, it amortizes more quickly still. Under the third option, the mortgage does not amortize at all: only the interest is paid, while the principal is not paid down but remains outstanding. Under the fourth option, the mortgage experiences "negative amortization:" with each "minimum" payment made, the outstanding loan balance actually grows. These payment options were of substantial consequence for the default risks posed by these mortgages and for the severity of Wachovia's loan loss upon borrower default, as detailed herein.

7.      Wachovia did not merely seek to integrate Golden West operations into its business. Instead, as noted by *Business Week*, and as confirmed by several former employees whom plaintiffs have interviewed, "right after Wachovia bought Golden West, executives from [Golden West] took control of all mortgage lending at Wachovia." Wachovia's mortgage portfolio was dominated by Pick-A-Pay mortgages: by the end of 2007, Wachovia held $120 billion of Pick-A-Pay mortgages

---

[1]      Golden West, the parent of World Savings Bank, FSB, had a retail branch presence primarily in the Western United States and mortgage lending operations in 39 states.

2

and $50 billion of "traditional mortgages" (Wachovia's own phrasing). 58% of the $120 billion Pick-A-Pay mortgage portfolio consisted of loans used to purchase properties in California; a further 10% were loans used to purchase properties in Florida.

8.     When Wachovia announced its purchase of Golden West in mid-2006, the housing bubble had already burst and housing prices, which had been appreciating materially for several years, had begun to decline. The decline was experienced first, and most sharply, in California and Florida. This decline was well underway by October 2006, when Wachovia's Golden West acquisition closed. By late 2006, the nationwide mortgage crisis had begun with a growing number of defaults by borrowers with subprime mortgages.

9.     As a result of the foregoing, investors were understandably concerned with the potential exposure of any residential lender – especially nonprime lenders.

10.     In an attempt to reassure the investing public about the stability and profitability of this huge investment in Golden West and of Wachovia's large mortgage loan portfolio, Wachovia's then-Chief Executive Officer ("CEO") G. Kennedy Thompson ("Ken Thompson" or "Thompson") and other Wachovia officers and representatives repeatedly issued reassuring but inaccurate statements about the safety and stability of Golden West's portfolio and of the Pick-A-Pay loans.

11.     Throughout the Class Period, Defendants touted Golden West's "conservative underwriting standards" and the "superior credit quality of its mortgage portfolio." Wachovia claimed to have implemented policies that "mak[e] certain that the borrower can pay the contractual interest rate of the loan" and made specific representations about the income levels of the Pick-A-Pay borrowers. As subprime loan defaults accelerated in early 2007, Defendants claimed that Wachovia "actively managed [its] business to minimize its exposure to the subprime loan market" to the point

3

where Wachovia did not "anticipate any meaningful potential impact to earnings with the subprime going forward."

12.     In fact, Golden West's Pick-A-Pay loan product, which following Wachovia's Golden West acquisition became Wachovia's company-wide mortgage product of choice, was extremely risky and particularly susceptible to default and loss in a declining real property environment.

13.     A borrower's ability to pay a mortgage is, obviously, the most important factor as to the risk that the mortgage will default.  Borrowers "qualify" for mortgages based on their ability to pay those mortgages, primarily measured by the amount of the borrower's income that the mortgage payments will consume (the "debt to income" ratio).   At high debt-to-income ratios, the payment burden becomes intolerable and the mortgage is highly likely to default.

14.     Far from employing conservative underwriting standards that minimized the Company's exposure to mortgage defaults, Wachovia made very little effort to ascertain, let alone verify borrower income and thus borrower ability to uphold the mortgage payment burden.  Former employees have confirmed that approximately 90% of the Pick-A-Pay loans were offered to borrowers on a "stated income" basis, under which borrower income was merely "stated" by the borrower rather than objectively documented or verified by the lender.

15.     Stated income loans are commonly known in the industry as "liar loans" due to the ease with which borrower income levels can be fabricated and overstated. A study by the Mortgage Asset Research Institute in Reston, Virginia found that 90% of stated income loans – when checked against tax documents -- revealed overstatement of income by at least 5%, and nearly 60% of the stated amounts were exaggerated by more than 50%.

4

16.     Stated income lending is one of the primary hallmarks of the loans now known as "subprime." Wachovia, therefore, was holding mortgages originated under subprime methods and was exposed to the heightened risks those methods presented, while simultaneously – and falsely – claiming that Wachovia would be untouched by subprime.

17.     Wachovia turned a knowing blind eye to the risks posed by "stated income." Income "stated" by the borrower is still susceptible, however, to being checked by the lender.  Wachovia could have required borrowers to sign Internal Revenue Service ("IRS") 4506T forms[2] that would enable Wachovia to check the borrowers' tax returns  – one quick and easy way to determine the accuracy of the "stated" income (and, indeed, the method behind the above-mentioned Mortgage Asset Research study). Stunningly, it was Wachovia's practice *not* to require signatures on this form and Wachovia routinely failed to verify 4506T data with the IRS.

18.     According to former Wachovia employees, Wachovia did not merely turn a blind eye to borrowers who fraudulently overstated their income or assets.  Rather, Wachovia loan officers were instructed by their supervisors to actively and knowingly encourage such fraud if a higher stated income level was needed in order to qualify a borrower for a particular loan program. Following the end of the Class Period, on November 19, 2008, federal prosecutors and the SEC announced an investigation into fraudulent lending practices at Golden West. According to reports by *Bloomberg*, prosecutors are examining, *inter alia*, whether Golden West employees "falsif[ied] confidential information so [that borrowers] could qualify" for "more expensive loans."

---

[2]     IRS Form 4506T is an authorization by a tax payer for the dissemination of tax information to third-parties.

19.     Golden West's and Wachovia's Pick-A-Pay mortgages, unmoored to any objective verification of borrowers' ability to bear their payment burdens, were thus at a materially increased risk of default. Golden West and Wachovia deemed this undisclosed risk acceptable because the Pick-A-Pay mortgages were originated with relatively low Loan-to-Value ("LTV") ratios. The LTV ratio compares the amount lent to purchase the property (*e.g.*, $70,000) to the value of the property (*e.g.*, $100,000 – which would yield an LTV of 70%). LTV ratios are one of the primary factors in mortgages' risks of default and in the loss severity to lenders upon default:

(a)     As to the risk of default: a borrower with substantial equity invested in a property (*i.e.*, a low LTV) is less likely to default. Conversely, a borrower with little or no equity (*i.e.*, an LTV approaching 100%) is more likely to default. The default likelihood is further magnified when a borrower has *negative* equity in the property (*i.e.*, an LTV exceeding 100%). In such situations, a borrower's economic motivation to continue making payments all but disappears.

(b)     As to the loss severity to the lender upon default, low-LTV mortgages protect lenders from loss upon default, while high-LTV mortgages leave lenders unprotected against loss. Should a mortgage default, the lender can foreclose upon the property and seek to recoup the amount lent through foreclosure sale. Foreclosure costs, however, are substantial. Therefore, a lender that has originated a low LTV loan (*e.g.*, a $70,000 loan to purchase a $100,000 property) is more likely than a lender that originated a high LTV loan (*e.g.*, a $95,000 loan to purchase the same $100,000 property) to recoup, after foreclosure costs, the amount originally lent. In short, high LTV loans expose lenders to sharper loss severity upon default.

20.     The low-LTV Pick-A-Pay mortgages, at increased risk of default due to the absence of any meaningful verification of borrower income, literally "bet the house" on their low-at-

6

origination LTV ratios. The heightened (but undisclosed) default risks were ostensibly defused by the low LTVs, which purportedly functioned to minimize or eliminate any loss to the lender upon default.

21.     However, as property prices declined throughout the Class Period, LTV ratios rose materially. Simultaneously, as most Pick-A-Pay borrowers chose to the "minimum amount" payment option, their loan balances were *growing* rather then shrinking with each payment – meaning, again, that LTV ratios were rising. Pick-A-Pay LTV ratios were being 'squeezed' upward at both the "L" end (through increasing loan balances) and the "V" end (through decreasing property values) – and with them, both the risks of default and the loss severity upon default. The Pick-A-Pay mortgages had lost their only bulwark against default and loss. As detailed herein, Defendants publicly misrepresented, concealed and falsely denied this reality.

22.     In addition to misrepresenting the manner in which Pick-A-Pay loans were underwritten, and the risks of their default and loss, Defendants also misrepresented the extent of those defaults. Specifically, Defendants represented at all times prior to late January 2008 that consumer real estate secured loans were charged off when they became 180 days past due. This policy, even if adhered to, was problematic because its effect was to keep investors in the dark about inevitable but to-date unrecognized charge-offs for loans that were as much as five months delinquent. However, Wachovia did not even follow the aforementioned policy. As Defendants first admitted on January 22, 2008, at all times prior to the fourth quarter of 2007, Defendants did not recognize losses on their delinquent Pick-A-Pay loans until the time of an actual property sale, which is usually many months after default and even many months after the 180 day threshold. This undisclosed policy kept many already-defaulted loans from being recorded on Wachovia's books as

7

being in default, causing an apparently sudden spike in recognized defaults in the fourth quarter of 2007, when Wachovia first began charging off Pick-A-Pay loans when they became 180 days past due, as it previously represented it was doing all along.

23. Wachovia financial statements were further distorted not just by subprime mortgages, but also by subprime mortgage-backed securities, such as collateralized debt obligations ("CDOs"). During the Class Period, Wachovia masked the extent of its CDO exposures and losses by concealing those exposures and by failing to mark down the value of its CDO holdings.

24. These undisclosed risks began to materialize publicly in late 2007 as Wachovia began to announce huge charge-offs for losses for its previously-concealed holdings of subprime CDOs, together with growing Pick-A-Pay loan losses and material increases in loan loss reserves. As 2008 progressed, the market began to recognize that Golden West and the Pick-A-Pay loans were far riskier than Defendants had represented. With these incremental, partial (and often still misleading) disclosures came successive material declines in Wachovia's stock price. By June 2, 2008, CEO Thompson was forced to resign. Most analysts and press reports cited the Golden West debacle and Wachovia's ensuing exposure to $120 billion of Pick-A-Pay mortgages as the chief cause.

25. On June 4, 2008, *Business Week* published an article titled *Wachovia: Golden West Wasn't Golden* which reported that losses at Golden West "led to [Thompson's] ouster." *Business Week* added that Golden West's "vaunted underwriting proved inadequate when housing prices began to plummet," because Golden West did not focus adequately on "verifying the income and assets of its [loan] applicants." By July 2008, Wachovia Chairman and new CEO Lanty Smith admitted to investors that "there has been a complete recognition at the Board level that Golden West was a mistake and that we have to deal with the consequences of it." Wachovia stock price, which

8

stood above $51 per share through mid-July 2007, fell to approximately $9 per share within days of Smith's admission. By late September 2008, Wachovia's share price fell below $1 per share – a market capitalization loss of approximately $109.8 billion from early 2007 – when Wachovia announced a proposed sale of its banking assets to Citigroup which valued those assets – due to Pick-A-Pay losses – at only $1 per share. Subsequent court filings by Wachovia CEO Robert Steel (in a litigation initiated by Citigroup after Wachovia sought to abandon the Citigroup transaction in favor of an acquisition by Wells Fargo) reveal just how precarious the situation at Wachovia had become. In court papers, Steel said that the Company believed that unless a definitive merger agreement was signed within days, the Federal Deposit Insurance Company ("FDIC") was prepared to place Wachovia's banking subsidiaries into receivership.

26.     While Wachovia's share price has responded slightly since the Wells Fargo acquisition was announced (thereby calming shareholders' fears of insolvency), the current stock price of $5.29 per share as of the close of trading December 12, 2008, still represents a market capitalization loss exceeding $100 billion from early-2007 levels. Wachovia's current market capitalization of $11.4 billion is, amazingly, one-tenth of what it had been in early 2007. More shockingly, the entire corporation's market capitalization is now less than half of what Wachovia had paid in late 2006 to acquire Golden West.

## JURISDICTION AND VENUE

27.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; and Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and § 77o.

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

29.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as many of the false and misleading statements and omissions were made in or issued from this District. Wachovia has a substantial presence in New York. Many of the acts and transactions giving rise to the violations of law complained of occurred here.

30.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### A.     LEAD PLAINTIFF

31.     Lead Plaintiff, the New York City Board of Education Retirement System, the New York City Employees' Retirement System, the New York City Police Pension Fund, the New York City Police Officers' Variable Supplements Fund, the New York City Police Superior Officers' Variable Supplements Fund, the New York City Fire Department Pension Fund, the New York City Firefighters' Variable Supplements Fund, the New York City Fire Officers' Variable Supplements Fund, the New York City Teachers' Retirement System, and the New York City Teachers' Retirement System Variable Annuity Program (the "New York City Pension Funds" or "NYCPF"), are all public pension funds of the City of New York and related public employers, and their associated supplement funds. The NYCPF collectively acquired the common stock of Wachovia during the Class Period, including in connection with Wachovia's April 14, 2008 secondary offering,

10

as well as in connection with Wachovia's acquisitions of Golden West and A.G. Edwards,[3] at artificially inflated prices during the Class Period, as set forth in documents filed previously with this Court, and have suffered significant losses.

32.    On October 9, 2008, this Court appointed the New York City Pension Funds as Lead Plaintiff.

### B.    DEFENDANTS

#### 1.    Wachovia

33.    Defendant Wachovia Corporation ("Wachovia") is a diversified financial services company, which operates as a bank holding company.  The North Carolina corporation is headquartered at One Wachovia Center, Charlotte, North Carolina, but has retail banking offices in 21 states, including New York, and retail brokerage operations under the Wachovia Securities name in 47 states. The Company offers retail banking and brokerage, asset and wealth management, and corporate and investment banking products and services.

#### 2.    Individual Defendants

34.    Defendant Thompson served as Wachovia's CEO and President throughout the Class Period. During the Class Period, Defendant Thompson signed the Company's Forms 10-K[4] and 10-Q[5] pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, was quoted in Company press releases and participated in conference calls with securities and market analysts.  Defendant

---

[3]    In June 2007, Wachovia acquired A.G. Edwards in exchange for approximately 72 million shares of Wachovia common stock.

[4]    SEC Form 10-K contains, *inter alia*, a company's annual report.

[5]    SEC Form 10-Q contains a company's quarterly report, which includes the company's financial statements and management's discussions of results and operations.

11

Thompson also signed the Registration Statements for the merger with Golden West and for the merger with A.G. Edwards. Thompson also signed the Registration Statement for Wachovia's April 14, 2008 common stock offering. Defendant Thompson is responsible for the materially false and misleading statements complained of herein. As an executive officer of the Company, Defendant Thompson was responsible for the day-to-day operations of the Company. On June 2, 2008, Wachovia's Board of Directors forced Thompson to retire from the Company.

35. Defendant Thomas J. Wurtz ("Wurtz") served as Chief Financial Officer ("CFO") and Senior Executive Vice President throughout the Class Period. During the Class Period, Defendant Wurtz signed the Company's SEC filings, including, but not limited to, Wachovia Forms 10-K, 10-Q and 8-K,[6] and participated in conference calls with securities and market analysts. Defendant Wurtz also certified Wachovia's Forms 10-K and 10-Q during the Class Period pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002. Defendant Wurtz also signed the Registration Statements for the mergers with Golden West and A.G. Edwards, and the Registration Statement for Wachovia's April 2008 common stock offering. Defendant Wurtz is responsible for the materially false and misleading statements complained of herein. As a senior executive officer of the Company, Wurtz was responsible for day-to-day operations of the Company and his behavior is central to Wachovia's misconduct.

36. Defendant Donald K. Truslow ("Truslow") served as Chief Risk Officer ("CRO") throughout the Class Period. As CRO, Truslow reported to CEO Thompson, and was responsible for the oversight of Wachovia's operational, credit, interest rate, balance sheet and market risk.

---

[6]     SEC Form 8-K contains material company events, news, developments and disclosures as they occur during interim periods between the company's quarterly and annual filings.

Defendant Truslow is responsible for many of the materially false and misleading statements complained of herein. On or about August 1, 2008, Truslow announced that he would resign from Wachovia once a replacement could be found.

37.    Because of the Individual Defendants' positions with the Company, they had access to adverse undisclosed information about the Company's business, operations, operational trends, financial statements and markets, via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

38.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of Wachovia, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or disregarded with deliberate recklessness, that the false and misleading statements were being issued regarding the Company and approved or ratified these statements in violation of the federal securities laws.

39.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management and earnings, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

40.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports, and other communications complained of herein and were aware of, or disregarded with deliberate recklessness, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Wachovia, each of the Individual Defendants had access to the adverse undisclosed information about Wachovia's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Wachovia and its business issued or adopted by the Company materially false and misleading.

41.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.

14

42.    Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is, therefore, primarily liable for the representations contained therein.

43.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchases of Wachovia common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Wachovia's business, operations, management and the intrinsic value of Wachovia common stock; and (ii) caused Lead Plaintiff and other members of the Class to purchase Wachovia's common stock at artificially inflated prices.

C.    **Underwriter Defendants**

44.    Wachovia Securities is an investment bank and a subsidiary of Wachovia Corporation. Wachovia Securities acted as Joint Bookrunning Manager for the April 2008 Stock Offering. Pursuant to the Offering Documents, Wachovia Capital Markets, LLC, which conducted business under the name "Wachovia Securities," sold and distributed 75,468,750 shares of Wachovia's common stock. Wachovia Securities was paid at least $45,281,250 for its underwriting services in connection with the Offering. Wachovia Securities' headquarters is located at 1 N. Jefferson, Bldg. E7, St Louis, Mo. 63103.

45.    Citigroup Global Markets, Inc. ("Citi") is an investment bank that acted as underwriter and Co-Manager for the April 2008 Offering. Pursuant to the Offering Documents, Citi sold and distributed 8,385,417 shares of Wachovia's common stock. Citi was paid at least

15

$5,031,250 for its underwriting services in connection with the Offering. Citi's headquarters is located at 388 Greenwich St., New York, New York 10013.

46.    UBS Securities LLC ("UBS") is an investment bank that acted as underwriter and Co-Manager for the April 2008 Offering. Pursuant to the Offering Documents, UBS sold and distributed 8,385,417 shares of Wachovia's common stock. UBS was paid at least $5,031,250 for its underwriting services in connection with the Offering. UBS's headquarters is located at 677 Washington Boulevard, Stamford, Connecticut 06901.

47.    Utendahl Capital Group LLC ("Utendahl") is an investment bank that acted as underwriter and Co-Manager for the April 2008 Offering. Pursuant to the Offering Documents, Utendahl sold and distributed 1,677,083 shares of the common stock. Utendahl was paid at least $1,006,250 for its underwriting services in connection with the Offering. Utendahl's headquarters is located at 30 Broad Street, 21st Floor, New York, New York 10004.

48.    Goldman, Sachs & Co. ("Goldman Sachs") is an investment bank that acted as underwriter and Joint Bookrunning Manager for the April 2008 Offering. Pursuant to the Offering Documents, Goldman Sachs sold and distributed 63,729,167 shares of Wachovia's common stock. Goldman Sachs was paid at least $38,237,500 for its underwriting services in connection with the Offering. Goldman Sachs' headquarters is located at 85 Broad Street, New York, New York 10004.

49.    Credit Suisse Securities (USA) LLC is an investment bank that acted as underwriter and Co-Manager for the April 2008 Offering. Pursuant to the Offering Documents, Credit Suisse sold and distributed 8,385,417 of Wachovia's common stock. Credit Suisse was paid at least $5,031,250 for its underwriting services in connection with the Offering. Credit Suisse's headquarters is located at 11 Madison Avenue, Lobby 1, New York, New York 10010.

50.     Samuel A. Ramirez & Company, Inc. ("Ramirez") is an investment bank that acted as underwriter and Co-Manager for the April 2008 Offering.  Pursuant to the Offering Documents, Ramirez sold and distributed 1,677,083 of Wachovia's common stock.  Ramirez was paid at least $1,006,250 for its underwriting services in connection with the Offering.  Ramirez's headquarters is located at 61 Broadway, Room 2924, New York, New York 10006.

51.     The defendants identified in ¶¶ 43-49 are collectively referred to herein as the "Underwriter Defendants."

## CONFIDENTIAL WITNESSES

52.     CW 1 was a sales strategist and Mortgage Banking Executive for Wachovia Mortgage from 2007 to October 2008.  CW 1's responsibilities included overseeing loan origination and underwriting on the Pick-A-Pay loan program at three branch offices in North Carolina, one branch office in South Carolina, three branch offices in Ohio and one branch in Tennessee.  These branches exclusively sold Pick-A-Pay loans through a "wholesale" channel, meaning their customers were third party mortgage brokers who dealt directly with borrowers.  CW1 reported to Senior Mortgage Banking Executive Frank Fitzpatrick who, in turn, reported to Kim Kurkowski, the General Manager of the east coast.

53.     CW 2  was a workout specialist in Loss Mitigation from 2000 through 2004, and a loan servicing specialist from November 2004 through October 2007 for HomEq Servicing Corporation ("HomeEq") in North Highlands, California.  HomEq serviced portfolio loans, specifically subprime loans, which Wachovia aggressively sold to customers.  CW 2 reported that Wachovia received quarterly reports from HomEq on losses and costs associated with the company's collection efforts.

54.     CW 3 was a loan officer and sales manager from 2004 through 2008 for Wachovia and sold many Pick-A-Pay loans after the merger with Golden West, and its mortgage subsidiary World Savings Bank ("World Savings"). As a Sales Manager at Wachovia CW 3 reported to Angela Marsano, a Wachovia Mortgage Director located in Charlotte, North Carolina. In that capacity, CW 3 supervised ten to eleven Loan Officers.

55.     CW 4 was an employee of World Savings and Wachovia Mortgage holding a variety of regional loan operations management positions for the two companies from 1996 through October 2008. CW 4's responsibilities included training new loan officers on how to sell loans to customers. As a Regional Manager of Retail Loan Operations, CW 4 oversaw 15 branch offices in New York and New Jersey. In that position, CW 4 was primarily responsible for training loan officers.

56.     CW 5 was a senior underwriter at World Savings in 2005 and continued with Wachovia after the merger until October 2008. CW 5 was based in the southeast region and reported to Erin Schanuel, an underwriting manager in Boynton Beach, Florida. Schanuel reported to the district underwriting manager, Anna Buonaiut. CW 5 underwrote or approved Pick-A-Pay loans with a debt-to-income ratio guideline of 33% to 40%.

57.     CW 6 worked for Wachovia Mortgage as a mortgage counselor in the Equity Group from 2004 to 2007. CW 6's responsibilities included selling loans to consumers. CW 6 reported Sales Manager Tommy Hornick.

58.     CW 7 was Vice President ("VP") and Accounting Merger Integration Leader for Golden West from 1988 to 2007. CW 7 was responsible for handling the roll-up of World's financial results into Golden West's financials and would provide the consolidated results to Wachovia.

18

59.     CW 8 was employed as the customer services section manager and senior district manager of portfolio retention for World Savings/Wachovia in San Antonio, Texas.  From 2006 through September 2007, CW 8 worked as a manager and senior district manager of underwriting and processing.  CW 8 reported to people within World Savings, who reported to Herbert and Marion Sandler (co-founders of World Savings/Golden West), who then reported to management at Wachovia.

60.     CW 9 was an underwriter, loan processor and exception specialist for World Savings in California until October 2007.  As an underwriter, CW 9 reported to Rachelle Sels, who reported to Mark Peters, a First VP at World Savings and a Senior VP at Wachovia Mortgage FSB, who reported to Marcia Wasserman, a Senior VP at World Savings and Wachovia, who reported to Jim Judd, Chief Operating Officer ("COO") for World Savings and President and COO of Wachovia's mortgage business division.

## I.     FACTUAL BACKGROUND

### A.     Wachovia's Acquisition of Golden West

61.     Wachovia operates as a bank holding company.  It engages in capital management, and the general bank, wealth management, and corporate and investment bank businesses.  The Company provides various commercial and retail banking and trust services through full-service banking offices in the United States.  Wachovia offers checking, savings, check card, foreign currency, annuities, life insurance, brokerage account transfers, individual retirement accounts, credit cards, home equity, mortgage, hazard and flood insurance, escrow, taxes, private mortgage insurance, education loans, online services, online banking, online bill pay and online brokerage services. The Company also provides various other financial services, including mortgage banking,

19