Part  (2) Pages 20-45

investment banking, estate planning, investment advisory, asset management, credit and debit card products, trust services, charitable services, mortgage banking, asset-based lending, leasing, insurance and international and securities brokerage services. In addition, Wachovia engages in equity and debt underwriting activities, private equity investment activities, derivative securities activities, investment and wealth management advisory business, and brokerage activities.

62.    On October 1, 2006, Wachovia completed the acquisition of Golden West Financial Corporation, the parent company of World Savings Bank. Golden West shareholders received 1.051 shares of Wachovia plus $18.6461 in cash for each Golden West share. The total cost of the acquisition was $24.3 billion. On several occasions in fact, including immediately after the merger and throughout the Class Period, Wachovia made repeated public representations about the strict underwriting standards with which Golden West had underwritten its loans, and about the fact that Wachovia and Golden West had little or no exposure to subprime instruments.

63.    By time of the completion of Wachovia's acquisition of Golden West, the residential real estate market was beginning to show signs of peaking or, at minimum, indications of reduced growth prospects, particularly in California. Wachovia and Golden West were heavily exposed to this market, yet Defendants made efforts to conceal the actual threat to Wachovia from the changing housing market. To conceal their problems, which could devastate the Company, Defendants failed to take adequate reserves for mortgage-related assets, and discussed in positive but false terms the benefits of the Golden West acquisition and the Pick-A-Pay mortgages.

**B.    Subprime Lending**

64.    The term "subprime" does not have a singular meaning in the mortgage and lending industry, and  has been used variously to describe borrowers with certain credit characteristics or

20

loans with certain underwriting standards.[7] Regardless of its particular usage, the term's utility is that it denotes a quantum of risk exceeding that associated with conforming prime loans.[8]

65.     In describing a *borrower* as "prime" or "subprime," the mortgage and lending industry typically relies on the borrower's Fair Isaac Credit Organization ("FICO") credit score. FICO describes the FICO score, which ranges from 300 to 850, as "the standard measure of US consumer credit risk" and "the recognized industry standard in consumer credit risk assessment." Generally, a borrower is considered "subprime" if his FICO score is below 660. *See* Board of Governors of the Federal Reserve, *et al.*, *Expanded Guidance for Subprime Lending Programs*, at 3 (Jan. 31, 2001), *available at* http://www.fdic.gov/news/news/press/2001/pr0901a.html. "Subprime borrowers typically have weakened credit histories that include payment delinquencies, and possibly more severe problems such as charge-offs, judgments, and bankruptcies." *Id.* at 2. A loan made to a subprime borrower is considered a subprime loan, regardless of the loan's underwriting standards, because of the risk arising from the borrower's individual creditworthiness.

66.     However, the term "subprime" as used to describe a *mortgage* also refers to mortgages sharing one or more underwriting characteristics that render such loans riskier than a conforming prime loan, irrespective of the creditworthiness of the borrower. The hallmarks of subprime loans include: (1) high loan-to-value ratios; (2) no or minimal down payment; (3) initial

---

[7]     *See* Yuliya Demyanyk & Otto Van Hemert, *Understanding the Subprime Mortgage Crisis*, at 6 (Feb. 4, 2008), *available at* http://www.fdic.gov/bank/analytical/cfr/2008/mar/CFR_SS_2008_DemyanykHemert.pdf (hereinafter "*Understanding the Subprime Mortgage Crisis*"); Proposed Rules for Nationally Recognized Statistical Rating Organizations, 73 Fed. Reg. 36212, 36212 n.1 (Sec. Exch. Comm'n June 25, 2008)

[8]     Conforming mortgages are ones originated in accord with the strict underwriting standards of Government Sponsored Entities ("GSEs") – such as Fannie Mae and Freddie Mac – making such mortgages not only extremely creditworthy but also eligible for purchase by the GSEs. Producing GSE-eligible mortgages thus effectively guarantees an originating lender the ability to sell such mortgages profitably.

teaser adjustable rates; and, most importantly; (4) no documentation or verification of borrower income (a.k.a. "stated income" loans).[9] *See, e.g., Understanding the Subprime Mortgage Crisis*, at 6; Proposed Rules for Nationally Recognized Statistical Rating Organizations, 73 Fed. Reg. at 36212 n.1.

67.    Generally, a loan made to a subprime borrower will bear one or more of the characteristics of a subprime loan described above, as the borrower, due to a hampered credit history or ability to repay, does not qualify for the conforming, prime loans reserved for more creditworthy borrowers. However, subprime loans include loans with subprime characteristics, even if made to borrowers with FICO scores above the 660 threshold.[10] This accounts for the fact that a subprime loan's permissive origination standards render the loan inherently risky, notwithstanding the purported creditworthiness of a particular borrower. Moreover, because many subprime loans are stated income or no documentation loans, and therefore provide an incentive for a borrower inflate

---

[9]    "Stated income" lending, known more colorfully as "liar loans" and NINJA loans (an acronym for No Income, No Job or Assets), was a hallmark of subprime lending, and lies for obvious reasons at the generative heart of what is now known as the subprime crisis. "Stated income" lending was born as a "niche" product originally extended only to a relative handful of prime borrowers that had relatively high but difficult to document income (*e.g.*, certain self-employed persons). However, when stated income loans were extended to wage earners whose income was regular and documentable, it became, very clearly, a way for people to qualify for a mortgage when their actual incomes would not qualify them. Loans originated on the basis of stated income were more likely to default than those originated on the basis of objectively documented income.

[10]    For example, in 2007, Merrill Lynch defined subprime mortgages as follows:

> We view sub-prime mortgages as single-family residential mortgages displaying more than one high risk characteristic, such as: (i) the borrower has a low FICO score (generally below 660); (ii) *a high loan-to-value ("LTV") ratio* (LTV greater than 80% without borrower paid mortgage insurance); (iii) the borrower has a high debt-to-income ratio (greater than 45%) or (iv) *stated/limited income documentation*.

Merrill Lynch & Co., Annual Report on Form 10-K for the fiscal year ended Dec. 31, 2007, at 34 (Feb. 25, 2008) (emphasis added).

his income and assets, it is unsurprising that a material portion of subprime loans were made to borrowers whose FICO scores technically exceeded the threshold for qualifying as a "prime" borrower, albeit on an illusory basis.

68.     During the Class Period, Defendants acknowledged that the FICO score was hardly the end-all and be-all of Wachovia/Golden West's assessment of loan risk. As defendant Wurtz said, at the May 12, 2008 conference call discussing the Golden West acquisition:

> "I don't think Fair Isaac is going to ask the Sandlers [of Golden West] to do many commercials for them because they view the FICO score as just a very, very small component of their credit decisioning …[T]hat isn't a big driver of their credit decisions."

**C.     The Bubble Bursts in Early 2006 and Housing Prices Fall**

69.     By mid-2005, housing prices throughout the United States had enjoyed such dramatic price appreciation that *The Economist* (among many others) identified it as the "biggest financial bubble in history."

70.     Housing price growth peaked in the final quarter of 2005.  Nobel Prize-winning economist Paul Krugman greeted 2006 by concluding, in a January 2, 2006 column published in the *New York Times*, that "at this point the overall market value of housing has lost touch with economic reality.  And there's a nasty correction ahead."  Paul Krugman, *No Bubble Trouble?*, N.Y. Times, Jan. 2, 2006.

71.     On May 5, 2006, *Fortune* reported that certain of the higher-flying bubble markets had become "dead zones" – where sales were plunging and inventory rising.

> *Welcome to the Dead Zone*

23

Real estate survival guide: The great housing bubble has finally started to deflate, and the fall will be harder in some markets than others . . . .

The message is clear. Five years of superheated price gains rescued America from stock market collapse, put billions in consumers' pockets, and ignited a building boom that bolstered the nation's economy. But it's over. The great housing bubble has finally started to deflate.

*****

**And what's happening in these areas is a sign of what may be coming in the rest of the bubble zone -- the two dozen or so mainly coastal cities and their suburbs that have seen prices soar in recent years and account for 60 percent of the nation's residential real estate value.**

**The problem is as basic as beams and trusses: The triple threat of soaring prices, higher mortgage rates and relentlessly rising property taxes has drastically increased the cost of ownership and put many homes out of reach for a huge number of potential buyers.**

*****

With houses hovering beyond the reach of most potential purchasers, formerly frantic markets grow eerily calm. People who rush to list their homes, hoping to grab a fat gain just before prices break, take them off the market.

Sales shrink as buyers float low-ball offers, and sellers refuse them. Realtors and mortgage brokers find other jobs. **The bubble areas turn into Dead Zones.**

**There's no mystery about what it will take to close the affordability gap and bring the markets back to life: Prices will have to come down . . . .**

*****

**The real losers will be those who bought recently at inflated prices and are forced to sell, usually because they're taking a job**

24

**in another city or can't make the payments when their adjustable mortgage rate jumps.** And speculators who bought overpriced condos in hope of a quick killing are going to get hosed.

Shawn Tully, *Welcome to the Dead Zone*, Fortune, May 5, 2006.[11]

72.     Particularly hard hit was California, where Golden West did the vast majority of its

business. Of Wachovia's $120 billion Pick-A-Pay mortgage portfolio, more than $70 billion were

California mortgages (*i.e.*, 58% of the entire portfolio). In May 2006, the California Association of

Realtors lowered their expectations for California home sales from a 2% decline (2006 sales vs. 2005

sales) to a 16.8% decline. This dramatic decline led the Association's chief economist to abandon

continued usage of the term "soft landing" to describe the market decline because it no longer

matched the reality it purported to describe:

> *Realtors: 'Soft Landing' Falls Short*
>
> Leslie Appleton-Young is at a loss for words.
>
> **The chief economist of the California Assn. of Realtors has stopped using the term "soft landing" to describe the state's real estate market, saying she no longer feels comfortable with that mild label.**
>
> "Maybe we need something new. That's all I'm prepared to say," Appleton-Young said Thursday.
>
> *****
>
> For real estate optimists, the phrase "soft landing" conveyed the soothing notion that the run-up in values over the last few years would be permanent. It wasn't a bubble, it was a new plateau.
>
> **The Realtors association last month lowered its 2006 sales prediction from a 2% slip to a 16.8% drop. That was when**

---

[11]     All emphasis in this Complaint is added unless otherwise noted.

> **Appleton-Young first told the San Diego Union-Tribune that she**
> **didn't feel comfortable any longer using "soft landing."**

> David Streitfeld, *Realtors: 'Soft Landing' Falls Short*, L.A. Times,
> July 21, 2006.

73.     In August 2006, after recent data demonstrated dramatically slowing sales, the highest

inventory of unsold homes in decades, and stagnant home prices the chief economist for the National

Association of Realtors (the "NAR") joined his California Association of Realtors counterpart in

admitting that "hard landings" in certain markets were probable, especially in California and Florida

(Golden West's second largest market – $12 billion of Wachovia's $120 billion Pick-A-Pay Portfolio

were Florida mortgages):

> *Existing-home sales plunge to a two-year low; Inventories of unsold*
> *homes rise to 13-year high*

> **July was dry for the U.S. real estate market, as sales of existing**
> **homes plunged 4.1% to a two-year low, prices stagnated and the**
> **number of homes on the market soared to a 13-year high,**
> **according to a report from the National Association of Realtors**
> **released Wednesday.**

> **The report shows a continued implosion in the housing market,**
> **with inventories up sharply while prices are softening. Sales are**
> **down 11.4% in the past year . . . .**

Rex Nutting, *Existing-home sales plunge to a two-year low; Inventories of unsold homes rise to 13-*

*year high,* Market Watch, Aug. 23, 2006.

> *Existing home sales drop 4.1% in July, median prices drop in most*
> *regions*

> **Existing home sales posted an unexpectedly sharp drop last**
> **month to the lowest level since January 2004 and home prices fell**
> **in all regions of the country but the South, the National**
> **Association of Realtors said Wednesday.**

*****

"I was disappointed, it was a lot lower than I anticipated," said David Lereah, NAR's chief economist. "What is clear to me is sellers are more stubborn than I expected them to be. We definitely need a correction in prices in order for buyers to come back into the market."

**He said he expects home prices to come down 5% nationally, more in some markets, less in others. And a few cities in Florida and California, where home prices soared to nose-bleed heights, could have "hard landings," he said.**

Noelle Knox, *Existing home sales drop 4.1% in July, median prices drop in most regions*, USA Today, Aug. 24, 2006.

74.     Others looking at the same NAR data were even less sanguine. Economist Nouriel Roubini observed, "every housing indicator is in free fall, including now housing prices," and concluded that the ongoing housing collapse would push the U.S. into a "much nastier, deeper and more protracted" recession than any in recent memory:

> *Recession will be nasty and deep, economist says*
> *Housing is in free fall, pulling the economy down with it, Roubini argues*
>
> **"This is the biggest housing slump in the last four or five decades: every housing indicator is in free fall, including now housing prices," Roubini said. The decline in investment in the housing sector will exceed the drop in investment when the Nasdaq collapsed in 2000 and 2001, he said.**

Rex Nutting, *Recession will be nasty and deep, economist says: Housing is in free fall, pulling the economy down with it, Roubini argues*, MarketWatch, Aug. 23, 2006.

75.     A more detailed analysis, provided on the same day and provoked by the same data, led *Barron's* Lon Witter to exactly the same conclusions:

> *The No- Money Down Disaster*

27

A housing crisis approaches: According to the Commerce Department's estimates, the national median price of new homes has dropped almost 3% since January. New-home inventories hit a record in April and are only slightly off those all-time highs. Existing-home inventories are 39% higher than they were just one year ago. Meanwhile, sales are down more than 10%.

*****

By any traditional valuation, housing prices at the end of 2005 were 30% to 50% too high. Others have pointed this out, but few have had the nerve to state the obvious: Even if wages and GDP grow, the national median price of housing will probably fall by close to 30% in the next three years. That's simple reversion to the mean . . . .

-- 15.2% of 2005 buyers owe at least 10% more than their home is worth

-- 10% of all home owners with mortgages have no equity in their homes

-- $2.7 trillion dollars in loans will adjust to higher rates in 2006 and 2007.

These numbers sound preposterous, but the reasoning behind them is worse . . . .

*****

Negative amortization and other short-term loans on long-term assets don't work because eventually too many borrowers are unable to pay the loans down -- or unwilling to keep paying for an asset that has declined in value relative to their outstanding balance. Even a relatively brief period of rising mortgage payments, rising debt and falling home values will collapse the system. And when the housing-finance system goes, the rest of the economy will go with it.

By the release of the August housing numbers, it should become clear that the housing market is beginning a significant decline. When this realization hits home, investors will finally have to confront the fact that they are gambling on people who took out no-money-down, interest-only, adjustable-rate mortgages at the top of the market and the financial institutions that made those loans. The stock market should then begin a 25%-30% decline.

28

> If the market ignores the warning signs until fall, the decline
> could occur in a single week.

Lon Witter, *The No- Money Down Disaster*, Barron's, Aug. 21, 2006.

76.    By October 4, 2006 Federal Reserve Chairman Ben S. Bernanke conceded that

"[t]here is currently a substantial correction going on in the housing market."

77.    The same day, *Moody's* released a 195 page report titled *Housing at the Tipping*

*Point*, predicting imminent double-digit housing price declines in bubble markets and the first

"calendar year" nationwide home price decline since the Great Depression.

78.    Monthly housing statistics provided by the National Association of Realtors showed

that by August 2006, year-over-year home prices had in fact declined -- for the first time in 11 years:

> [E]ach passing week shows the nation's housing statistics heading
> down . . . . According to the National Association of Realtors,
> sales of existing homes were down 12.6% in August from a year
> earlier, and the median price of homes sold dropped 1.7% over
> that period -- the first year-to-year price decline in 11 years. Sales
> of new homes were down 17.4% in August from a year ago,
> according to the Census Bureau . . . . A report by Moody's
> Economy.com said house prices could keep falling until 2008 or 2009
> in some areas . . . .

Ruth Simon and Michael Hudson, *Whistling Past Housing's Graveyard? --- Builders' Shares Have*

*Been Hot, Sparking Debate Among Investors On Whether Sector Has Hit Bottom*, Wall St. J., Oct.

9, 2006.

79.    Thus, housing prices were already in decline by May 2006 when Wachovia

announced that it had agreed to pay $24 billion to buy Golden West, and the decline was in full-

swing by October 2006 when the acquisition closed. These declines were experienced both first and

most sharply in California and Florida; these two states alone accounted for 68% of Wachovia's

29

Class Period Pick-A-Pay mortgage portfolio. Unbeknownst to investors, these declines were to spell disaster for Wachovia because, contrary to Defendants' public representations, Golden West, both before and after the acquisition, did little to verify buyers' ability to repay loans, choosing instead to bet the house (literally) on the underlying collateral (*i.e.*, the house) maintaining its value.

## II. DEFENDANTS' INTENTIONAL WEAKENING OF GOLDEN WEST'S ALREADY FLAWED UNDERWRITING STANDARDS AND OTHER CONDUCT INCREASING THE PICK-A-PAY LOANS' RISK OF DEFAULT

### A. Wachovia Abandons Customary Lending and Business Practices in Favor of Much Riskier Loan Products

80. Prior to the Company's acquisition of Golden West Financial, a large majority of the loans funded by Wachovia were traditional fixed-rate mortgages.

81. After Golden West was acquired, it was not integrated into Wachovia's residential mortgage unit. Instead, the reverse effectively happened: According to CW 4, Wachovia's residential mortgage operations were folded into the former Golden West. This is confirmed by a June 4, 2008 *Business Week* article, which noted that "right after Wachovia bought Golden West, executives from [Golden West] took control of all mortgage lending." CW 4's responsibilities included training new loan officers on how to sell loans to customers. After the merger, CW 4 observed that Wachovia's loan officers solely relied upon a computerized underwriting program to determine whether to approve or reject a loan application and did not have actual underwriters on staff. For this reason, if a Wachovia loan officer was asked to look at a loan application and assess whether the loan should be approved or not, the person would not have any idea how to go about making the assessment. CW 4 has direct knowledge that the priority at Wachovia became selling Pick-A-Pay loans and abandoning more conservative Wachovia loans.

30

82.     CW 6, who worked for Wachovia mortgage as a counselor from 2004 to 2007 and was responsible for selling loans to customers, noted that after the merger the underwriting of Pick-A-Pay loans continued to be performed solely by legacy Golden West employees, at their former offices in San Antonio, Texas.

83.     CW 7, VP and accounting merger integration leader for Golden West from 1988 through 2007, handled the roll-up of World's financial results into Golden West's financials. CW 7 added that after the acquisition, Golden West continued to operate as a separate subsidiary of Wachovia. CW 7 provided consolidated results to management at Wachovia.

84.     Thus, as discussed more fully below, at a time when the residential real estate bubble had already burst, Wachovia made the decision to abandon its more traditional loan products, and to focus almost exclusively on originating Pick-A-Pay loans, the overwhelming majority of which were stated-income Option ARMs, with the potential for negative amortization. Against this backdrop, Wachovia's repeated Class Period representations regarding its conservative underwriting could not be further from the truth.

**B.      After Acquiring Golden West, Wachovia Lowered the Already Lax Standards for Pick-A-Pay Loans and Originated Billions of Dollars in Additional High-Risk, Toxic Loans**

85.     After the Golden West acquisition closed on October 1, 2006, Wachovia substantially expanded the origination of Pick-A-Pay loans. As reported in a December 25, 2008 New York Times article that quoted Russell W. Kettell, a former chief financial officer of Golden West's mortgage subsidiary (World Savings), "the [Wachovia/Golden West] merger created 'pressure' for 'a pretty good-sized increase in loan volume,'" and Wachovia "'wanted volume and wanted growth.'" In 2007, Wachovia extended an additional $33.4 billion in Pick-A-Pay loans – a 34%

31

increase over 2004 and 2005 – despite the fact that the housing market was already sharply contracting.

86.     The pleadings in related actions cite to multiple sources confirming this expansion of the Pick-A-Pay loan program and the degradation of underwriting standards.  Lead Plaintiff hereby relies on and incorporates by reference the allegations pled in the *Consolidated Class Action Complaint* (filed Sept. 4, 2009) in *In re Wachovia Preferred Securities and Bond/Notes Litigation*, Master File No. 09 Civ. 6351 (the *"Bond/Notes Complaint"*), to the extent that it alleges facts that the Bond/Notes plaintiffs learned from confidential witnesses (the "Bond/Notes CWs" or "BNCWS") who were privy to conduct by Wachovia and Golden West executives, were intimately involved in Wachovia's mortgage loan practices and have personal knowledge about Golden West's operations after the merger.

87.     For example, BNCW3 was a mortgage consultant for Golden West (and later Wachovia) in California from 1992 to 2007, and a senior training manager at Wachovia until October 2008. As senior training manager, BNCW3 was tasked with training Wachovia employees about the Pick-A-Pay loans.  BNCW3 reported that Wachovia's "upper management" did not complete the training program and "never cared to learn" about underwriting Pick-A-Pay loans. Likewise, according to BNCW4, a Mortgage Consultant and Territory Manager for Golden West (and later Wachovia) in the Midwest from 2004 to 2007, Wachovia incentivized its employees to sell a higher volume of Pick-A-Pay loans by paying them extra commissions to do so, even though Wachovia's employees "didn't understand the product."

88.     As a result of Wachovia's failure to adequately educate and train its employees and upper management about the risks of the Pick-A-Pay product and the proper loan underwriting

32

procedures to mitigate those risks, Wachovia continued to misrepresent the risk of the Pick-A-Pay loan portfolio and the quality of its underwriting. Moreover, Wachovia originated literally tens of billions of additional Pick-A-Pay loans in the year and half following the Golden West acquisition, nearly half of which were made to patently subprime and high-risk borrowers without verification of income and other key borrower information. Indeed, as alleged below, Wachovia belatedly disclosed on April 14, 2008 that it had originated an additional $16.5 billion of Pick-A-Pay loans to subprime borrowers (with FICO scores below 660) during 2007 and the first quarter of 2008.

89.     Wachovia documents also confirm that the degradation of lending standards at Golden West. For example, a December 2006 presentation prepared by a Wachovia account executive for outside brokers, reflects that newly originated thirty-year fixed rate Pick-A-Pay loans were offered on both a "NINA" and "NINANE" basis – terms that referred, respectively, to "No Income, No Asset" verification, and "No Income, No Asset, No Employment" verification. The presentation trumpeted the fact that such loans required "No Minimum FICO!" and no credit history because "No Credit is Good Credit!" In addition, the document also advised that such loans were available at an LTV ratio of up to 95%. Despite the obvious risks associated with such loans, the document promised "48 Hour Fully-Underwritten Approval."

90.     Thus, Wachovia's sales representatives and mortgage brokers continued the Golden West practice of "packaging the loan" by misstating borrower information on the documents sent to Wachovia underwriters. Similarly, Wachovia's underwriters continued Golden West's practice of failing to routinely and consistently verify critical borrower information. Indeed, numerous former employees cited in the *Bond/Notes Complaint* independently confirmed that Wachovia's sales force and underwriters degraded the already-poor credit quality of the Pick-A-Pay portfolio through

33

these means, as well as by qualifying borrowers only at the initial "teaser" interest rate, rather than the rate that would apply once the "teaser" rate period expired (known as the "fully-indexed rate").

91.    For example, BNCW2 confirmed that the falsification of borrower incomes which occurred at Golden West continued unabated after its acquisition by Wachovia. "Everything we did continued. There were rumors it would go away, but it never did."

92.    Indeed, BNCW5, a mortgage underwriter who worked in Wachovia's operations center in its Charlotte, North Carolina headquarters from September 2005 until November 2008, reported that after an application had been submitted to the underwriting department, loan salespeople routinely increased the borrower income listed on the loan application. Moreover, BNCW5 stated that underwriters were precluded from requesting proof of income even when they discovered that the borrower's income had been revised upward. Further, CW 5 reported that when she rejected an application because the borrower's income was obviously fabricated – such as a janitor claiming to make a $100,000 salary – Wachovia sales managers would override her rejection of the loan and approve it instead. BNCW5 also stated that Wachovia personnel continued to make use of the liberal "Exception to Policy" or ETP protocol, and that approximately 30% of all loans were approved by salespeople or their superiors making exceptions to normal underwriting criteria.

93.    Similarly, BNCW6, who worked for Golden West/Wachovia as wholesale mortgage loan salesperson in Connecticut from April 2005 until April 2008, reported that the Company was always "hyping up" the "flexible" underwriting guidelines and its ability to make rampant exceptions, stating that the motto was, "Our guidelines are set in sand, not stone." BNCW6 reported that approximately 50% of the loans he sold were approved pursuant to an exception. In similar vein, BNCW7, who worked for Golden West/Wachovia primarily as an underwriter in San

34

Diegofrom February 2003 to October 2008, stated that approximately 25% of the loans she underwrote were approved pursuant to an exception. Notably, BNCW7 reported that her decisions to reject loan applications were overruled approximately 70% of the time.

94.     Additional former Wachovia employees have also independently confirmed that Wachovia lowered the Pick-A-Pay loan underwriting standards even further following the acquisition of Golden West. For example, BNCW8 worked at Golden West and Wachovia from 1979 until January 2008, primarily as a Senior Vice President and Senior Underwriting Manager in Golden West's San Antonio underwriting center, which underwrote the highest volume of loans of all of Golden West's underwriting centers. BNCW 8 supervised approximately 450 employees. BNCW8 reported that, after the merger, underwriting managers were instructed to use the ETP program to approve Pick-A-Pay loans that otherwise would have been denied. BNCW8 reported that underwriting managers were instructed that "there's no such thing as a 'no,'" and that they were to "approve anything."

95.     Likewise, BNCW9 worked for Golden West from 1984 to 2007 in Texas and California, including as a Vice President and Director of Finance and Operations. BNCW9 stated that in order to boost loan volume after acquiring Golden West, Wachovia combed Golden West's catalogue of rejected borrowers – who had been denied mortgages even under the aforementioned lax standards – and extended them loans. To do so, Wachovia "lowered their [underwriting] standards" by qualifying borrowers only at the initial "teaser" interest rate, and by lowering the minimum required credit score. Similarly, according to BNCW10, who worked for Golden West and Wachovia from 2005 to 2007 as a loan salesman in California, the loan sales force was given "impossible" sales quotas and was instructed to "make it work"; in other words "[it was] almost like

the loan officers were inadvertently told to lie on applications to pull in more loans." As a result, BNCW10 stated, the loan sales force routinely "play[ed] with the numbers to fit the model of an approved loan." BNCW10 added that a number of loan officers "were very honest and refused to do that – in which case, they didn't last very long."

96.    BNCW11 also confirmed Wachovia's deteriorating underwriting practices. BNCW11worked for Golden West and Wachovia from July 2004 until October 2008 as a Division Sales Manager and Assistant Vice President who supervised sales and operations for five loan offices in Connecticut and New York, which closed 150-200 loans per month and generated $800 million in loans per year.    After the Golden West acquisition, BNCW11 reported that "underwriting loosened up significantly." As BNCW11 reported, after the merger virtually all new Pick-A-Pay loans included stated income, but because the Company failed to verify any income or employment information "there was no way of telling" if such stated income or employment information was correct. Moreover, BNCW11 reported that when a loan application couldn't pass muster under the already lax underwriting standards, exceptions to those standards were regularly made in order to approve the loan – most commonly by waiving "limits" (where applicable) on LTV ratios, minimum credit scores, and maximum loan amount.    BNCW11 was responsible for approving all the underwriting exceptions for loans originated through the branches that BNCW11 oversaw, and stated that approximately 20% of all loans contained such exceptions.

97.    Similarly, according to BNCW12, a loan processor for the Company in California from August 2005 to February 2007 who reviewed loan files and applications for completeness, Wachovia lowered its minimum FICO credit score to the mid-to-high 500s in late 2006 or early 2007. BNCW13, who worked for Golden West and then Wachovia in California from 2000 to 2008

36

primarily as a mortgage underwriting manager, also confirmed that in the fourth quarter of 2006, the Company lowered minimum FICO scores to the mid-500 level – well below the FICO subprime cut-off score of 660 – and allowed borrowers with these low credit scores to obtain loans based on their stated income, without verification. As a result of such lowering of underwriting standards, Wachovia's sales representatives succeeded in originating even more Pick-A-Pay loans, and the Company's underwriters were "getting loans coming out of our ears." BNCW13 further reported that, after the Golden West acquisition, the generous ETP program remained in place, and the number of exceptions to negative underwriting decisions denying the mortgage application increased.

98.    In addition, after the Golden West merger, Wachovia lowered the minimum required payments on newly originated Pick-A-Pay loans, resulting in a situation where borrowers would rapidly begin to owe more principal on their homes and accelerating the build-up of negative amortization (i.e., increasing loan balances) with respect to many of the Company's least creditworthy borrowers. Specifically, as reported by a New York Times article on May 14, 2009: "Wachovia made things worse. [Golden West] had demanded minimum annual payments of 1.95 to 2.85 percent of the loan balance, but that fell to 1.5 percent soon after the merger was announced. After the deal closed, Wachovia cut the minimum payment to 1 percent . . . ."

99.    As a direct result of the underwriting practices described above, during the Offering Period Wachovia originated tens of billions of dollars of additional, acutely high risk Pick-A-Pay mortgages. At the same time, as alleged below, Wachovia repeatedly and falsely assured investors of the company's "very strong" credit quality and "prudent lending practices."

37

C.     **Defendants Were Aware of Fundamental Risks Embedded in the Pick-A-Pay Mortgage Product, But Publicly Misrepresented, Denied and Concealed Those Risks**

100.    During the Class Period, in conference call after conference call, Defendants maintained that their Option ARM product – the Pick-A-Pay mortgage – was entirely distinguished from and superior to other Option ARMs, Alt-A mortgages[12] and subprime mortgages due to: (1) Wachovia's purportedly strict underwriting guidelines, including underwriting the mortgages at relatively low initial LTVs of approximately 70%; and (2) two structural features of Pick-A-Pays, namely (a) the 7.5% annual payment increase cap built into the Pick-A-Pay structure, which limited immediate "payment shock" from adjustable-rate resets, and (b) the 10-year delay before Pick-A-Pay mortgages "recast" to fully-amortizing rates.   Defendants represented that these features of Wachovia's Pick-A-Pay mortgages rendered those mortgages – and Wachovia – immune to the sort of devastation then being experienced by other Option ARMs, Alt-A mortgages and subprime mortgages.  In conference call after conference call, Defendants maintained in the face of analyst questioning that Wachovia's Pick-A-Pay mortgages were performing much better than subprime mortgages, Alt-A mortgages, and other Option ARMs due to these design features of the Pick-A-Pay mortgages, and that such superior performance justified Wachovia's low level of loss reserves relative to peer lending institutions.

101.    These representations were materially false and misleading.

---

[12]    Alt-A is a classification of mortgages where the risk profile falls between prime and subprime. The borrowers behind these mortgages will typically have clean credit histories, but the mortgage itself will generally have characteristics of a subprime mortgage, such as no income verification, low "teaser" interest rates subject to reset, or high LTV ratio.

38

102.    The first of the purportedly-distinguishing features of Pick-A-Pay mortgages was their purported low LTV ratios. Mortgages with low LTVs experience both lower risk of default and lower (or no) loss to lenders upon default. This is because a borrower with substantial equity invested in a home is less likely to default; conversely, a borrower with little or no equity in the property has less to lose upon default and thus is more likely to default. In the extreme case, borrowers with "negative equity" in their homes – *i.e.*, borrowers who are paying down a loan each month whose amount is greater than the property's current value – have little economic motivation to continue making such payments, and are much more likely to default. As to loss severity upon default, a low LTV mortgage increases the likelihood that the lender can recoup, through foreclosure sale and after foreclosure costs, the full amount originally lent. Where a lender lends $70,000 for purchase of a $100,000 property (rather than $90,000 for the same property), sale of that property is more likely to provide the lender with $70,000 back (and less likely, after foreclosure costs, to provide the lender with $90,000 back).

103.    Defendants consistently touted the low **initial** LTV of Wachovia's Pick-A-Pay loans – approximately 71% – as a primary reason why Pick-A-Pay loans were experiencing lower rates of default and loss than other Option ARMs, Alt-A mortgages and subprime mortgages, and as justification for Wachovia's low loss reserves. These statements were materially false and misleading, for two reasons.

(a)    First, the LTV ratios of Wachovia's Pick-A-Pay loans were rising dramatically from both the "L" end (the loan amount) and the "V" end (the property value), so that they bore little resemblance to the initial LTV ratios touted by Defendants. As the substantial majority of Pick-A-Pay borrowers were picking the minimum payment option, their loan amounts were actually rising

39

(as, each month, the amount of unpaid interest was added back to the loan's principal amount). Simultaneously, as property values declined, and declined most sharply in the very markets where 68% of Wachovia's Pick-A-Pay loans had been originated (California and Florida), LTV ratios were rising (because the "V" element of LTV, property value, was falling). Defendants were aware *ab initio* that LTV ratios were thus being squeezed upwards from both ends. As LTV ratios increased, the risks of default substantially increased and the degree of loss severity sharply increased. It was apparent to Defendants early on that even solvent borrowers were increasingly likely to default, and that upon default Wachovia would suffer severe losses.

        (b)     Second, Defendants concealed and misrepresented this rising LTV reality (and thus the reality of rising default risks and sharp loss severities) by representing Pick-A-Pay LTV ratios as lower than they in fact were. In so doing, Defendants relied on the initial low LTVs (71%) and on purported "updates" of those LTVs which represented that the LTV ratios had not materially changed since loan origination. But these updates themselves were outdated; in truth LTVs were dramatically higher than adverted, and were only climbing higher as property values continued to decline and as borrowers continued to pick the minimum payment options. In conference call after conference call, Defendants provided misleading assurances supported by outdated data, and therefore failed to disclose current realities as to Pick-A-Payment default and loss risks.

       104.     In April 2008, Defendants made a fundamental change to their loss reserve model to take this long-understood LTV dynamic into account. The result: massive loss reserve increases, acknowledgment of a capital crisis that Defendants had denied only months earlier, and the necessity to reduce Wachovia's dividend (a necessity that Defendants had likewise denied only months earlier). Defendants revealed for the first time that 14% of Wachovia's entire $120 billion Pick-A-

40

Pay loan portfolio – the same portfolio that Defendants had consistently described as an extremely low-LTV portfolio – had LTV ratios that exceeded 100%. Only in late 2008 did Defendants reveal that, as a result of sharp property price declines in California and Florida (which declines were already sharp two years earlier, in late 2006), and as a result of most Pick-A-Pay borrowers picking to pay minimum payments (which they had been doing all along), the average LTV ratio across Wachovia's $120 billion Pick-A-Pay portfolio had risen from 71% to a stunning 95%. The default risks and degree of loss severity at 95% LTV are altogether different – and far, far higher – than the default risks and loss seventy at 71% LTV ratios. The difference is one of night and day, and of many billions of dollars.

105.    Defendants also consistently touted the product design of Wachovia's Pick-A-Pay loans – and especially the 7.5% annual cap on payment increases – as a primary reason why Pick-A-Pay loans were experiencing lower rates of default and loss than other Option ARMs, Alt-A mortgages and subprime mortgages, and as justification for Wachovia's low loss reserves.

106.    These statements were materially false and misleading. **Defendants knew that the 7.5% annual payment increase cap did not obviate or eliminate the "payment shock" risk of these mortgages, but merely delayed it.** Subprime and Alt-A ARMs were experiencing skyrocketing delinquencies because their rates adjusted quickly to fully-indexed rates: 80% of subprime ARMs had such rate resets occur after two or three years. The wave of subprime defaults that spiked in early 2007 was the result of the wave of rate resets that was then beginning. Other Option ARMs, which did not feature the Pick-A-Pay 7.5% cap, likewise were experiencing higher delinquencies as their rates reset and/or recasted sharply upwards. Defendants wilfully ignored that Wachovia's Pick-A-Pay mortgages would produce exactly the same levels of payment shock as these

41

other mortgages, with exactly the same results, **with the only difference being that they would do so in slow motion.** The 7.5% annual payment cap did not make Wachovia's Pick-A-Pay mortgages any superior to these other mortgages, as Defendants represented, and did not justify Wachovia's low loss reserves, as Defendants claimed. Rather, it merely meant that Wachovia's $120 billion of Pick-A-Pay mortgages would only later arrive at the levels of payment shock-inspired defaults that other subprime, Alt-A and Option ARM mortgages were currently experiencing.

107.    This reality was masked throughout by Defendants but acknowledged by their successors. On October 22, 2008, Wachovia's new management: (1) revealed Wachovia's largest-ever quarterly loss reserve provisioning expense, $4.8 billion, 66% of which was dedicated to the Pick-A-Pay portfolio; (2) admitted that cumulative Pick-A-Pay losses would amount to 22% of the entire $120 billion portfolio (or $26.4 billion) – nearly twice the 12% cumulative loss figure that Defendants had represented; and (3) acknowledged with a further $18.8 billion writedown what Defendants had long explicitly denied: the substantial devaluation of Wachovia's Pick-A-Pay franchise.    In October 2007, Wachovia's erstwhile acquirer, Wells Fargo, after reviewing Wachovia's $498 billion of loan portfolios, disclosed that it expected those portfolios to generate losses of **$74 billion.** Wachovia's $120 billion Pick-A-Pay portfolio, according to Wells Fargo, would generate cumulative losses of 26%, or $37.2 billion. Thus, though the Pick-A-Pay portfolio amounted to only 20% of Wachovia's total loans, they represented 50% of the total losses.

**D.    Wachovia's Risky, Nontraditional Loan Products**

108.    Prior to the Class Period, Wachovia offered both traditional and nontraditional exotic loan products. After the merger, however, Wachovia almost exclusively offered Golden West's signature product, the Pick-A-Pay loan, and, according to CW 3, began to heavily market and sell

42

Pick-a-Pay loans directly to customers. CW 4 stated that during this period, almost 100 % of the loans funded by Wachovia were Pick-A-Pay loans.

109.    As previously discussed, the Pick-A-Pay loans provided borrowers with four payment options.  The "minimum amount" option was particularly nefarious.  The minimum amount was calculated pursuant to a low, fixed monthly rate operative for one year.  This rate (typically, 1.5%-2.5%) was substantially lower than the actual operative interest rate that applied to the mortgage (which was 6% or higher).  If a borrower selected this option and continued to make minimum payments, the amount of the unpaid interest would be "deferred" and added, each month, to the loan's principal balance. This result was known as "negative amortization."  The payment rate reset annually, and any increase in payment over the prior year was capped at 7.5%.  However, over and above these annual rate resets, the Pick-A-Pay mortgages were also subject to "recast."  Wachovia "recast" Pick-a-Pay loans after either (1) 10 years, or (2) when negative amortization reaches 110% or 125% of the loan's original balance. Upon either of these events, the Pick-A-Pay mortgage recasts to become fully amortizing – meaning, concretely, that the monthly payment recasts to whatever level necessary to pay off the mortgage in full during the remainder of its 30-year term.

110.    During the Class Period, Wachovia falsely represented that it was managing the risk associated with its Pick-A-Pay products by ensuring compliance with appropriate underwriting standards, appropriately monitoring loan performance and conducting risk modeling procedures, when in fact it was not doing so. CW 3 explained that after the merger, the underwriting process at Wachovia was nothing short of fraud. Vitally important to underwriting is the ability of borrowers to service their debt obligations in light of their sources of income. The vast majority of Wachovia's Pick-A-Pay loans were "stated income" loans, or in Wachovia's official parlance "Quick Qualifier"

43

loans. To qualify for this sort of loan, a borrower's Debt-to-Income ("DTI") ratio must be less than 50%. CW 3 explained that many of the Pick-A-Pay loans had a DTI of more than 50%.

111.    To get the loans approved, CW 3 and other loan officers and sales managers were instructed to falsify the amount of stated income on the loan application. CW 3 recalled witnessing an incident where another loan officer was instructed to "bump up" an applicant's Social Security income so that the borrower "qualified" for the loan under debt-to-income ratio tests. Indeed, CW 2 confirmed that while attempting to help borrowers avoid foreclosure, it became clear that many of the documents that supported the original loan application were nonexistent or were falsified by the borrower at the behest of the loan officer.

112.    Additionally, while any credit score below 660 is considered "subprime," CW 8, who worked as a manager and senior district manager of underwriting and processing, reported that between 2005 and 2007, Wachovia in fact routinely issued Pick-A-Pay loans to borrowers with credit scores in the low 600's, and, at times, even lower than 600. This exposed Wachovia to the very subprime risks and "impacts" that Defendants represented Wachovia had avoided.

113.    Wachovia also offered a substantial majority of its Pick-A-Pay loans on the basis of stated income. CW 1, the northeast sales strategist and mortgage banking executive for Wachovia mortgage who was responsible for overseeing loan origination and underwriting on Pick-A-Pay loans at several branch offices, stated that at least 90% of the Pick-A-Pay loans that Wachovia funded were stated income or no documentation loans, meaning there was no verification of the borrower's income by examining their pay stubs, W-2s, bank statements, tax documents or other records. CW 3 confirmed the percentage of these types of loans. According to CW 1, for "Quick Qualifier" loans Wachovia would simply ask the borrower for his or her income and take any such representation at

44

face value. Due to the lack of verification, stated income loans are particularly risky and are often referred to in the industry as "liar loans." In fact, a study by the Mortgage Assert Research Institute in Reston, Virginia found that 90% of stated income loans when checked against tax documents revealed overstatement of income by at least 5%, and nearly 60% of the stated amounts are exaggerated by more than 50%.

### E. Wachovia's Practices Exacerbated the Risks Inherent in Its Nontraditional Loan Products

114. Although Wachovia and the Individual Defendants claimed that Wachovia had "careful[ly] manage[d] . . . the inherent credit risking of [its] portfolio," as can be seen throughout this Complaint, it actively took undisclosed, unlawful and unsafe measures to increase its volume of Pick-A-Pay loans.

115. The risk inherent in Wachovia's widespread use of stated income "liar loans" was exacerbated by its systematic failure to take routine measures to compare (1) the buyers' actual reported incomes to the IRS with (2) the inflated incomes borrowers routinely stated in their applications. Wachovia's failure to verify prospective mortgage borrowers' actual incomes led to abusive overstatements of income.

116. As reported in the April 6, 2008 article in the *New York Times* called, *A Road Not Taken by Lenders*, at least 90% of borrowers, including stated income borrowers, were supposed to be required to provide IRS Form 4506T with their applications, thereby authorizing the lender to verify income information with the IRS. This was an important cross-check to be utilized in connection with due diligence to prevent overstatement of borrower income.

45