Part  (3) Pages 46-71

117.    In October 2006, at the time the Golden West acquisition closed, the IRS implemented a system to "give mortgage lenders faster access to borrowers' tax returns to verify their incomes, vendors and lenders say." *Lenders Like Most of What They See in New IRS Service*, American Bankers, Sept. 22, 2006. In this article, Lisa Faulk, an executive vice president of operations of Wachovia Corp.'s AmNet Mortgage, Inc., noted that the double-checking of IRS returns with respect to stated income loans was an important tool and further noted that:

> "nine dollars does seem to be relatively steep, but in the scheme of things, with fraud on the rise," it is not enough to discourage Amnet from using the tool, she said. Rising concerns about fraud, especially involving stated-income loans, will probably mean "you're going to see more and more companies using it."

118.    Despite the acknowledged importance of utilizing Form 4506T to verify incomes, Wachovia routinely failed to double-check incomes in connection with its stated income mortgage originations. Wachovia's equity submission form for its Eastern Wholesale Operations, dated March 7, 2007, failed to require signed Form 4506Ts as a general matter. Similarly, Wachovia's rate sheets routinely limited the utilizations of 4506T forms with the qualifying language "if necessary" and "if applicable." *See, e.g.*, Wachovia California Wholesale Region Rate Sheet, Oct. 12, 2006.

119.    Wachovia's complete disregard of the 4506T verification process is consistent with Wachovia's objective of increasing loan production growth with a corresponding drop in underwriting quality. Indeed, as the *New York Times* reported, income with the IRS was verified on approximately only 3-5% of all loans funded in 2006. Wachovia clearly turned a blind eye to stated incomes despite its ability to determine easily whether that information was accurate. The sheer recklessness in failing to verify stated incomes contributed to Wachovia's increased acceptance of

true "liar loans," eventually leading to the Company's alarming default rate and increased loss severity that caused massive losses in Wachovia's Pick-A-Pay portfolio.

120.   Additionally, in connection with its mortgage production, Wachovia's wholesale division distributed lending matrices to mortgage and real estate professionals.  These lending matrices provided guidelines for the types of loans Wachovia would underwrite, along with interest rate information and product highlights.  The matrices, however, were not intended for public dissemination.  For example, an October 12, 2006 Wachovia California Wholesale Region Matrix ("California Matrix") provided that "information contained herein is confidential and is for the sole use of Wachovia Mortgage Corp. approved mortgage brokers.  Distribution to consumers is prohibited."

121.   Wachovia's lack of commitment to thorough underwriting is revealed by its California Matrix's underwriting turn-times.  The matrix provides for conventional jumbo loans: "Complete Files received by 3:30 p.m. today can expect U/W response by End of Day."  Certainly, conservative underwriting practices would require more than a couple of hours of due diligence.

122.   Similarly, the California Matrix notes that certain borrowers "may qualify for substantially reduced documentation with 'Mortgages Made Easy'!!!"  Numerous matrices highlighted new program features that made it ever easier for consumer access to obtain mortgages and exponentially increased Wachovia's risk.  For instance, the California Matrix sets forth the following alarming information:

> JUMBO & CONFORMING/JUMBO NICHE PRODUCT HIGHLIGHTS
> ***New Jumbo Fixed Enhancements & Guidelines***
> *Loan amounts to $3.5 million are now eligible
> *100% CLTV to $650,000
> *Enhanced LTVs/CLTVs

47

*Increased Cash out limits
*Cash out now permitted on Stated Income loans

123.    In addition, a September 24, 2007 in-house matrix for Wachovia-World Savings states that there was no required FICO score for certain loans between $40k and $750K in value, and features a circle encapsulating the word "FICO" with a line struck through it, reminiscent of "no smoking" signs.

124.    The highlights of the foregoing program reveal the extent to which Wachovia was loosening its lending criteria to attract mortgage volume. An examination of Wachovia's matrices reveals numerous program changes that increased the availability of riskier loans to riskier customers throughout 2006. Only in 2007, after the subprime market began to collapse, did Wachovia begin to restrict and tighten its lending criteria. By then, it was too late, as Wachovia's balance sheet was already burdened with tens of billions of recklessly underwritten loans that began to experience dramatically increasing default rates and loss severity.

**F.      Wachovia Aggressively Pushed Risky Loans on Borrowers
for Defendants' Gain**

125.    Wachovia, at the direction of the Individual Defendants, established a system of financial rewards for originating higher risk loans, and corresponding negative consequences for those who did not toe the Company line. Wachovia loan production personnel were compensated based on loan volume without any regard to loan quality, and were paid even more for originating riskier Pick-A-Pay loans. As a result, many of these loans were made to people that had no realistic ability to meet the obligations inherent in the loans they were sold.

126.    CW 3 stated that commissions earned by Wachovia's employees who sold Pick-A-Pay loans were substantially higher than those resulting from the sale of more traditional products.

48

The commission on a Pick-A-Pay loan was three basis points. This meant that a $100,000 Pick-A-Pay loan would yield a commission of $3,000. By contrast, the commission on $100,000 conventional fixed-rate loan would yield a commission of only $90. CW 3 stated that several loan officers and sales managers were motivated by these higher commissions. According to CW 3, in addition to loan officer commissions, sales managers received monthly bonuses that were based on the dollar volume of the Pick-A-Pay loans produced. The amount of these bonuses varied depending on the percentage of the monthly Pick-A-Pay sales goals that were met by the sales manager's team.

127.    CW 3 stated that those employees that did not meet their monthly Pick-A-Pay sales goals were sure to be reprimanded and ultimately fired if they did not increase such sales. Similarly, CW 4 states that "at Wachovia, it was all about the numbers" and that if a loan officer underperformed, "that's it, you're gone." In fact, CW 3 believes that he was terminated because he was unable to meet his sales goals. CW 3 had previously refused to lie about the amount of a customer's income so as to artificially increase his volume of Pick-A-Pay loan originations.

128.    CW 3 also recalled that the riskier Pick-A-Pay loans offered Wachovia a larger margin than the more conventional loans. Prior to the acquisition of Golden West and the adoption of the Pick-A-Pay loan program, Wachovia's loan closing costs were typically around $600, but once it started to sell the Pick-A-Pay loans, those same closing costs were around $4,800. These closing costs are almost 7-1/2 times larger than those associated with traditional mortgages. Knowing this, it becomes clear why the more conventional, less risky mortgage loans were all but abandoned. This expanded margin had an immediate impact on Wachovia's bottom-line. Without accounting for the extraordinarily higher added risk of fault by properly adjusting allowances for loan losses, to the investing public Wachovia appeared to be enjoying significant, although artificial, growth.

129.   On January 26, 2008, the Charlotte News Observer published a story titled "Wachovia Rewards Risky Loans," reporting that "[a] document obtained by the Observer that was distributed to employees in a mortgage call center this month showed a 'multiple' that awarded sales representative 120 percent of their incentive pay for selling at least four Pick-A-Payment loans in a month."

130.   At the time, Wachovia denied the allegation. According to the article, a Wachovia spokesperson "said that particular document was incorrect and not an official Wachovia Mortgage document. He said the bank's compensation plans are confidential for competitive reasons."

131.   Two months later, on March 31, 2008, the Charlotte Observer again reported: "A former Wachovia mortgage consultant in Texas told the Observer he was supposed to sell two Pick-A-Pay loans per month, a requirement he didn't meet." The consultant, who was terminated for "production reasons," added: "That's all we heard about was Pick-A-Pay . . . If you sold a 30-year fixed (rate mortgage) they'd say, 'Why didn't you sell Pick-a-Pay.'"

132.   Wachovia, however, once again denied the allegation, stating "we have not terminated anyone for not selling enough Pick-A-Pay loans and will not in the future."

133.   Wachovia's denials were false. Indeed, as confirmed in a recent *MSNBC* article based on an interview with former Wachovia mortgage consultant Sharren McGarry, Wachovia used both sticks and carrots to entice and prod its employees to maximize Pick-A-Pay loan originations, and artifice to dupe naive borrowers:

> Sometime after Sharren McGarry went to work as a mortgage consultant at Wachovia's Stuart Fla., branch in July 2007, she and her colleagues were directed to market a mortgage called the "Pick A Pay" loan. Sales commissions on the product were double the rates

50

for conventional mortgages, and she was required to make sure nearly half the loans she sold were "Pick A Pay," she said . . .

Her job description included a requirement that she meet a monthly quota of Pick A Pay mortgages . . .

In June 2008, her manager wrote a "Corrective Action and Counseling" warning, saying she wasn't meeting the banks "expectation of production" . . . .

McGarry says she was encouraged to promote the idea that with Pick A Pay loan the borrower could pay less than the full monthly payment and set aside the difference for savings or investment. The pitch includes sales literature comparing two brothers. One took the Pick A Pay loan, made the minimum payment and put the payment in the bank. The second brother got a conforming loan. Five years later, both brothers needed to pay their children's college tuition.

"(The brother with the conforming loan) didn't have the money in the bank," said McGarry. "And the brother that had the pay-option ARM could go to the bank and withdraw the money and didn't have to refinance his mortgage. That's how they sold it."

McGarry said the sales pitch downplayed the impact of negative amortization. When the loan principal swells to a set threshold . . . the mortgage automatically "recasts" to a higher, set monthly payment that many borrowers would have a hard time keeping up with.

John W. Schoen, *"Pay Option" Loans Could Swell Defaults*, MSNBC.com, Dec. 10, 2008.

134. A June 16, 2008 article in Business Week also reported that, according to former brokers, after the Golden West merger "originators were given sales targets for the Pick-A-Payment loans and were told to downplay the fact that the minimum payment option would cause the loan balance to rise – a phenomenon known as 'negative amortization.'"

135. Other media accounts also reported that Wachovia encouraged employees to downplay to borrowers the risks of negative amortization. A Wachovia consultant was quoted by

51

MSNBC on Dec. 10 , 2008 as stating that the company's Pick-A-Pay "sales pitch downplayed the impact of negative amortization." On June 16, 2008, *Business Week* reported that former Wachovia brokers "say they were . . , told to downplay the fact that the minimum payment option would cause the loan balance to rise."

136.    Contrary to the representations to investors regarding Wachovia's supposed conservative and robust underwriting practices and risk controls, defendants chose to ignore the fact that borrowers' selection of the "minimum payment" option also created risks for Wachovia and its investors. According to analysts cited in a December 22, 2008 article in *The State* "[i]t seems that borrowers who choose a mortgage with the option of lower minimum payments may in fact be indicating to the lender that there is more likelihood that they will not have the resources to cover the (full) payment."

137.    Wachovia's push to maximize its output of Pick-A-Pay loans at all costs marked a significant departure from Golden West's prior practice. CW 4 explained that, prior to the merger, Golden West had cultivated relationships with several lenders that, unlike Golden West, offered conventional fixed rate mortgages, and would refer potential clients to such lenders when the Pick-A-Pay product was not the "best fit." CW 4 added that Wachovia quickly dispensed with this philosophy and, for the reasons discussed above, focused solely on the numbers, *i.e.*, the numbers of Pick-A-Pay loans it could foist upon nearly all customers who walked through its doors regardless of "fit."

G.    **Appraisals Relating to Wachovia's Loans Were Improperly Inflated**

138.    The use of reliable home appraisals is fundamental to the home mortgage industry. Without credible appraisals, the extent to which the home loans at issue are adequately collateralized

52

is virtually unknown. Furthermore, accurate appraisals are needed to assess the likelihood of default by the borrower. Integral to assessing these risks are Loan-to-Value ("LTV") ratios. It is generally accepted within the home lending industry that LTV ratios greater than 80% expose lending institutions and by necessity, their investors, to greater risks than those loans with lower LTV ratios.

139.  The LTV ratio is directly dependent on appraisal value, and any error or fraud related to an appraisal will necessarily affect the LTV. Without credible appraisals, the LTV ratios for home loans issued by lenders would be subject to manipulation, and borrowers could be issued larger mortgages than they could realistically repay. It naturally follows that artificially increased appraisals lead to artificially decreased LTV ratios, which makes a company's loan portfolio look less risky than it is in reality.

140.  After Wachovia's merger with Golden West, CW 2 served as a Loan Servicing Specialist until October 2007. CW 2's responsibilities included working with borrowers that were experiencing long term financial problems, to resolve delinquencies and regain current standing on accounts. As part of CW 2's employment responsibilities, CW 2 would review borrowers' financial and credit reports, including bank statements, tax returns and credit reports.

141.  CW 2 explained that the portfolio of loans serviced by HomEq were all subprime loans that Wachovia aggressively sold to its customers. CW 2 further stated during her tenure in the Loss Mitigation Department, CW 2 reviewed many loans that "should not been issued in the first place" and that it was "common to see loans for properties that had been over-appraised at origination."

142.  Additionally, CW 4 explained that after Wachovia's acquisition of Golden West, Wachovia discontinued Golden West's policy of exclusively employing in-house appraisers with

respect to Pick-A-Pay loans. Instead, Wachovia utilized outside, third-party appraisers to value the property, and the in-house appraisers were relegated to merely reviewing the reports of the outside appraisers. CW 4 noted that this change rendered appraisals less accurate because the outside appraisers (who were compensated only if the loan was approved and the property was sold) had a reputation for assigning less conservative appraisals as compared to Golden West's in-house appraisers.

143.    Indeed, defendants themselves identified the well-known phenomenon of appraisal inflation as the reason why Wachovia purportedly used only in-house appraisers. A January 22, 2008 Deutsche Bank earnings review on Wachovia stated, "per the company, mitigants to a potential spike in loss rates to a multiple above historical levels are Golden West's (now Wachovia's) in-house appraisal process (not outsourced to third-parties who don't get paid if the loan is not closed) . . . ." Similarly a June 16, 2008 article in *Business Week* stated that "Golden West executives boasted that . . . [it] relief on housing valuations made by staff appraisers who were rewarded based on the long-term accuracy of their estimates – and not on how many deals they rubber stamped."

144.    Lead Plaintiff believes that additional discovery will uncover further evidence of Wachovia misrepresenting the value of the underlying loan collateral, thus exposing Wachovia shareholders to a substantial undisclosed risk of loss inherent in Wachovia's real-estate secured loan portfolio.

## H.    Wachovia's Underwriting Standards Were Weakened Under Defendants' Direction

145.    Unbeknownst to the members of the Class, the Individual Defendants caused Wachovia's underwriting standards to deteriorate significantly during the Class Period. In fact, the

54

Individual Defendants created a false and misleading appearance of conservative, quality-focused underwriting at Wachovia through their many wilfully untrue public statements.

146.    Underwriting is a critical component to every loan because it acts as a form of quality control by which the loan originator is able to enforce its policies for approving or disapproving loans pursuant to its guidelines.  Throughout the Class Period, Wachovia failed to disclose the specifics of its underwriting practices to the investing public.

147.    Nevertheless, Wachovia regularly and untruthfully discussed its "conservative" underwriting standards in public filings, earnings calls, and investor conferences.

(a)    For example, the Company described its risk management in the following terms in each of its reports on Form 10-Q 2006 and 2007: "[w]e continue to mitigate risk and volatility on our balance sheet by actively monitoring and reducing potential problem loans, including their sale when prudent."  The Company further stated in its First Quarter and Second Quarter 2007 10-Q reports: "[t]he low level of charge-offs reflects a continuing solid credit environment, the highly collateralized nature of our loan portfolio and **careful management of the inherent credit risking of our loan portfolio.**"

(b)    Likewise, during each of Wachovia's conference calls and investor conferences during the class period, the Individual Defendants touted Wachovia's purportedly conservative standards and the purportedly low-risk mortgages produced by those standards. These statements are alleged in detail in Section III, *infra*. Some examples: Referencing the conservative nature and quality of its underwriting process, CRO Don Truslow explained during a July 20, 2007 conference call that "because [of] the way [Pick-A-Pay] loans are underwritten, we're not seeing any meaningful increases in losses in the portfolio and we don't expect to see any rises and losses as we

55

look forward over the next few quarters and so the underwriting process and how these things are booked is what we're ultimately relying on holding up very well as expected." On an April 16, 2007 conference call, Individual Defendant Thomas Wurtz, while talking about the integration of Golden West, said "[o]ne thing I can tell you is we will not stretch for earnings by altering the Golden West origination system or weakening their proven credit practices." As is explained throughout this Complaint, Wachovia's underwriting standards were anything but conservative and certainly were not risk adverse.

### 1. Underwriting Standards for Wachovia Pick-A-Pay Loans Were Deficient

148.    Wachovia's Pick-A-Pay loan program was inherently risky because of the potential for negative amortization and payment shock upon recasting. These features were made all the more dangerous by sales and underwriting practices at Wachovia that did not fully appraise borrowers of the loan's complex nature.

149.    Because Wachovia's Pick-A-Pay loans were of particular concern to investors who wanted to make sure the Company was not underwriting high-risk loans with potentially high profit margins at the expense of massive future credit losses, Defendants regularly and falsely reassured investors of the strength of the Company's underwriting for Pick-A-Pay loans. During a May 16, 2006 UBS Global Financial Services Conference, Individual Defendant Thompson explained that Wachovia planned to originate Golden West's "conservative option ARM products on the East Coast" after the merger. He later dispelled investor's worries about the growing negative amortization in the Golden West portfolio by saying "I'm really not concerned. And I am not concerned because of the conservative underwriting standards that the company has."

56

2.      **Wachovia Implemented Dangerously Permissive Underwriting Practices for Its Subprime Lending**

150.    Realizing that the Pick-A-Pay loan program boosted Wachovia's profit margins, Defendants actively took further steps to increase the sales volume of these toxic loans by implementing questionable procedures and encouraging Wachovia employees to engage in less than scrupulous behavior.

151.    Wachovia aggressively pushed Pick-A-Pay loans to customers, regardless of whether the customers were particularly well-suited for such a loan. According to CW 3, loan officers were instructed **not** to fully educate borrowers about the Pick-A-Pay loans. They were taught to aggressively sell the program and to emphasize to prospective borrowers the financial flexibility that accompanied the minimum amount option, but to omit information about the downsides of selecting this option, namely, the negative amortization. Prospective borrowers were encouraged to use the extra money for their kids' college savings, to pay down credit cards, or for the purchase of a car or boat.

152.    CW 3 explained that after the merger, the underwriting process at Wachovia was nothing short of fraud. As previously noted, the vast majority of Pick-A-Pay loans were stated income ("Quick Qualifier") loans. Even where the loan is stated-income, it is vitally important that a borrower's debt-to-income ratio indicates that he or she has the wherewithal to service the loan in light of his or her outstanding debt obligations. To qualify for Wachovia's Pick-A-Pay Quick Qualifier loan, a borrower's debt-to-income ratio had to be less than 50%. CW 3 explained that many of the Pick-A-Pay Quick Qualifier loans had a debt-to-income ratio of more than 50%.

153.    To get the loans approved, CW 3 and other loan officers and sales managers were instructed to falsify the amount of stated income on the loan application. According to CW 3, it was not uncommon for the following deceptive selling technique to take place:

> Loan Officer: "Mr. X, you need to make $300,000 a year to qualify for this loan. Do you make $300,000 a year?" Borrower: "No, I make $200,000 a year." Loan Officer: "I want to make sure you understand this, you have to make $300,000 a year, so do you make $300,000 a year?" Loan Officers were to continue this sort of exchange until the prospective borrower acquiesced that they did in fact make the necessary sum of money.

154.    Indeed, CW 2 confirmed that while attempting to help borrowers avoid foreclosure, it became clear that many of the documents that supported the original loan application were nonexistent or were falsified by the borrower at the behest of the loan officer.

155.    These loans were already remarkably risky at origination because the "stated" information was not verified.  These loans were then made worse by the income falsification.

156.    Both the SEC and the United States Justice Department have now launched investigations into Golden West's lending practices. The government's investigation centers on whether Golden West engaged in predatory lending practices.[13]  Specifically, the government is investigating whether Golden West committed fraud by luring clients into mortgages they could not afford or else by falsifying borrowers' financial information to allow them to "qualify" for loans.[14]

---

[13]    Sara Lepro, *Justice Department probing Golden West Financial*, AP, Nov. 20, 2008, *available at* http://www.forbes.com/ feeds/ap/2008/11/20/ap5723055.html (last visited on Dec. 2, 2008).

[14]    J. Gediminus, *Golden West Financial Investigated by SEC & US Justice Dept.*, Nov. 21, 2008, *available at* http://www.hotstocked.com/article/0959/golen-west-financial-investigated-by-sec-amp-usjustice-dept.html (last visited on Dec. 2, 2008).

The government is also investigating whether Golden West misrepresented the quality of these loans when it was acquired by Wachovia.[15]

I.   **Wachovia's Wholesale Channel Was Infested With Deficiently-Underwritten Loans**

157.   Wachovia's repeated assertions of "very conservative underwriting" are further belied by the deficient loans purchased through Wachovia's wholesale channels. Wachovia, in order to expand its operations in and profits from the residential mortgage-backed securities ("RMBS") and collateralized debt obligation ("CDO") markets, increased its profile in the wholesale mortgage banking business. As reflected below, a substantial portion of these loans were defective and were left on Wachovia's balance sheets to rot.

158.   In December of 2005, Wachovia announced the acquisition of American Mortgage Network ("AmNet"), a wholesale mortgage banker. AmNet was expected to fund approximately $14-$15 billion of loans in 2005. AmNet served about 7,000 mortgage brokers and had about $1.9 billion in warehouse facilities. AmNet's mortgage volume was concentrated in Alt-A loans, option ARM loans, and interest-only loans. Wachovia touted the acquisition as "an important enhancement to our market-leading structured products capabilities."

159.   In September 2006, Wachovia announced that it was creating a new wholesale lending division by combining AmNet and Wachovia's Third-Party Lending businesses. The new unit was called Wachovia Securities Wholesale Mortgage and became a part of Wachovia's Corporate and Investment Banking Group. In a September 27, 2006 press release, Curtis Arledge, head of Wachovia's Fixed Income Division, noted that "[o]ur vertically integrated mortgage model

---

[15]   *U.S. Probing Golden West Lending, Sale: Prosecutor*, Reuters, Nov. 19, 2008, *available at* http://www.newsdaily.com/ stories/tre4aj0kl-us-wachovia-probe/ (last visited on Dec. 2, 2008).

leverages our capabilities in the secondary market and will help drive profitability as we meet continued global demand for mortgage-backed securities."

160.    Besides relying upon direct/retail mortgage production, Wachovia utilized the wholesale and correspondent channels for a substantial portion of its mortgage production, specifically with respect to Wachovia's Vertice subsidiary. During the first quarter of 2007, all of Vertice's entire loan production – $3.9 billion – was originated through the wholesale/broker channel. Similarly, Golden West relied on brokers and wholesale for a substantial portion of its mortgage production. In the first quarter of 2007, $5.7 billion of World Savings' $9.3 billion total loan portfolio was generated through the wholesale/broker channel. *See* Wachovia Corp. Mortgage Update Presentation, dated June 12, 2007.

161.    Contrary to Wachovia's purported "conservative underwriting practices," litigation involving Wachovia and its correspondent lenders reveals massive problems with respect to a significant number of defective loans. Wachovia was frequently unable to sell these defective loans into RMBS and was stuck with these loans on its balance sheet. For instance, in litigation Wachovia filed against Ameriquest Mortgage Company in the County of Mecklenburg, North Carolina, Wachovia complained of at least 135 mortgages that contained misrepresentations that breached warranties from Ameriquest. Although Wachovia demanded repurchase of these loans as early as November 2006, Ameriquest failed to comply.

162.    Similarly, litigation between Wachovia and Just Mortgage, Inc.,[16] a Pomona, California mortgage lender, reveals major underwriting problems, including early payment defaults.

---

[16]    Just Mortgage, Inc. is also the subject of litigation by Indymac relating to similar repurchase demands for early payment defaults.

In June and July of 2007, Wachovia purchased approximately $11.95 million of Home Equity Line of Credit ("HELOC") first and second loan mortgages from Just Mortgage. By September 2007, Wachovia notified Just Mortgage that numerous loans had early payment defaults and requested that Just Mortgage repurchase these early payment default ("EPD") loans. Wachovia failed to commence litigation against Just Mortgage until June of 2008, approximately nine months after Wachovia experienced the rash of EPDs.

163.    The foregoing litigations are merely illustrative of the substantial underwriting problems that Wachovia was experiencing in its wholesale correspondent channel. On July 22, 2008, Wachovia announced that it was exiting the wholesale mortgage origination channel immediately.

## J.    Defendants Concealed Wachovia's Billions of Dollars of Exposure to Subprime CDOs, and Overstated the Value of Those CDOs

164.    During 2006 and 2007, Wachovia created, structured and underwrote approximately $10.11 billion of CDOs backed, as detailed below, by pools of subprime mortgages. At all times until November 9, 2007, Wachovia concealed that it had retained in excess of $2.1 billion of those very subprime CDO securities. Wachovia furthered its concealment, at all times until October 19, 2007,[17] by carrying these (undisclosed) CDO holdings at par value, despite the fact that their value had been materially and evidently impaired no later than February 2007.

165.    Wachovia continued to overstate the value of its CDOs at all times until July 22, 2008. Directly observable indicators of those CDOs' value – most directly, indexes tracking the

---

[17]    Wachovia first revealed the existence of these CDOs simultaneously with their writedown on October 19, 2007. Wachovia's October 19, 2007 disclosures of writedowns indicated that Wachovia held some amount of these instruments, but Wachovia did not then disclose what that amount actually was.

market prices of CDOs and of the assets collateralizing the CDOs – had long indicated, essentially, that there was none. Wachovia turned a blind eye to those indicators and only acknowledged in July 2008 the truth that such directly observable indicators had long stated. Wachovia's series of writedowns between October 19, 2007 and July 22, 2008 belatedly conceded: (1) what had been evident by February 2007 – that the value of these instruments was materially impaired; and (2) what was evident by October 2007 – that the value of these instruments had almost entirely disappeared. By July 2008, Wachovia had written down the value of this $2.1 billion of retained CDOs by $1.69 billion, or 79.7%. But that degree of value deterioration had in fact existed since October 2007, and much of it had existed since February 2007.

166.    The risks of such subprime CDOs had been well and widely understood no later than February 2007. That their value was materially impaired was likewise recognized by the market no later than February 2007, and the degree of impairment only became more severe thereafter. By October 2007, the impairment was near-total, and subsequent declines in value were minor as most of the value had already evaporated. The only matter that was *not* known was that Wachovia had any exposure to such decreasingly valuable instruments.

## III.    DEFENDANTS' MATERIALLY MISLEADING STATEMENTS

167.    In light of the foregoing, many of Defendants' Class Period statements concerning Wachovia's and Golden West's standards and practices were false and/or misleading. Throughout the Class Period, Defendants touted Golden West's "conservative" underwriting standards, and how Golden West avoided subprime loans and took steps to ensure that the borrowers had the wherewithal to repay the loans in question. These representations were particularly important to investors as the Class Period progressed and the nationwide decline in housing pricing – which had

62

already begun at the time the Golden West acquisition was announced in mid-2006 – worsened. As a result of this decline, lenders were forced increasingly to look to the borrowers themselves rather than to the underlying properties to satisfy payment deficiencies.

A.   **May 8, 2006 Conference Call**

168.   The Class Period begins on May 8, 2006, when Wachovia held a conference call to discuss its planned acquisition of Golden West for total consideration of $24.3 billion.   The acquisition was completed on October 1, 2006. At the time of the acquisition, real estate prices had already started to decline nationwide. By late 2006 when the Golden West deal closed, the decline had worsened.

169.   On the May 8, 2006 conference call announcing the Golden West acquisition, Wachovia's CEO, defendant Thompson, was effusive about Golden West's underwriting standards, saying "They are obsessed with conservative underwriting . . . ." Thompson added: "They have a simpleminded focus as Herb [Sandler, co-CEO of Golden West] described an elegantly simple option ARM product that is low risk because of, number one, the product features of their option ARM and two, because of their rigorous underwriting process." Thompson also stated, "They have no subprime origination at Golden West, so a very conservative portfolio."

170.   Accepting defendants' statements at face value, on May 8, 2006, Morgan Keegan & Co. Inc. rated Wachovia "Outperform" because Golden West's portfolio supposedly had "no sub-prime component" and thus was "very low risk." Similarly, on May 11, 2006, Bernstein Research rated Wachovia "Outperform" because "GDW's [Golden West's] Option ARM product structure and conservative underwriting practices have and will continue to shield [Wachovia] from

63

the credit cycle experienced by other mortgage lenders," and because the "GDW management also claims that it does not lend to subprime borrowers."

171.    The May 8, 2006 conference call statements are false and misleading because the Pick-A-Pay loan program is inherently risky because of the potential for negative amortization. In addition, many of the confidential witnesses confirm that the underwriting process was not "rigorous" and the portfolio was not "conservative." Contrary to Defendants' representations, many of the loans were subprime.   Indeed, as noted elsewhere in this complaint, multiple percipient witnesses state that 90% of Pick-A-Pay loans were stated income/no documentation, and many were the product of fraudulently inflated borrower income and asset figures. Further, CW 9 stated that 100% of the Pick-A-Pay loans that he and his co-workers reviewed fell below World Savings' stated standards and were openly considered subprime within the company.

**B.    May 12, 2006 Conference Call**

172.    On May 12, 2006, Wachovia held an informational conference call on the Golden West merger. CFO Wurtz discussed the caps that were in place on the Pick-A-Pay loans' minimum payment option. Under that option, the borrower's payment does not cover all the necessary interest, resulting in the unpaid interest being added to the loan's balance. Wurtz said that on a loan with an LTV of less than 85%, the amount of negative amortization (or "deferred interest") could only grow until it represented 125% of the original loan amount; thereafter the loan would be recapped such that it is adjusted to a payment that would pay off over the remaining term of the loan. For loans with an LTV greater than 85%, that recast would occur when the loan amount reached 100% of the original loan amount. In response to an analyst's question, Wurtz said that the average borrower

64

who chose the negative amortization option would take a "long time" to reach the aforementioned

caps, probably in "six or seven years:"

> **Gerard Cassidy, RBC- *Analyst***
>
> "Very good. Going on getting back to the deferred interest comments
> that you made earlier. Can you share with us on the deferred interest
> how long does it take a typical person who takes out one of these
> mortgages these option ARMs if they were to choose the minimum
> payment from day one? How long does it take them to get those caps
> of 110 and 125%."
>
> **Tom Wurtz, Wachovia- CFO**
>
> "It takes a long time.  Probably about at least four or five years,
> probably in the average environment six or seven years, something
> like that."

173.    On the issue of credit quality of Golden West customers, defendant Wurtz said that

he:

> "would attribute [Golden West's] success to . . . making certain that
> the borrower can pay at the contractual interest rate for the loan . . .
> . [T]hey don't anticipate when they make the loan that the borrower
> will be unable to repay the loan should they choose to make the full
> amortizing payment."

174.    The May 12, 2006 conference call statement is false because Wurtz failed to disclose

that anyone who had selected the Pick-A-Pay option with the negative amortization option would

not be able to pay back the loan if the prices of housing continued to decline as they had by mid-

2006. In addition, as the confidential witnesses confirmed, the Defendants made mostly stated

income loans, and, rather than "making certain" that the borrower had the ability to repay,

Defendants often turned a blind eye to, or even encouraged, borrower fraud.

C.    **May 16, 2006 Conference Call**

175.    On May 16, 2006, at a UBS Global Financial Services Conference, Thompson commented on the conservative nature of the Pick-A-Pay loans it planned to originate after the Golden West merger: "And Wachovia can originate Golden West's conservative option ARM products on the East Coast."

176.    Responding to a question about his lack of concern over the growing amount of negative amortization in the Golden West portfolio, Thompson dispelled investor worries: "I'm really not concerned. And I'm not concerned because of the conservative underwriting standards that the company has."

177.    The May 16, 2006 statements are false because there was nothing conservative about the Pick-A-Pay loans. According to CW 1, at least 90% and probably more of the Pick-A-Pay loans were stated income/no documentation loans with FICO scores in the low 600s. CW 3 stated that the stated income/no documentation loans were known at World Savings/Wachovia as "Quick Qualifier" loans. CW 3 said that if the Company had required documentation or other verification of income on the "Quick Qualifier" Pick-A-Pay loans, "there was no way they would have been approved." Underwriting standards were not subject to internal controls and oversight by Wachovia management because the loans were never integrated into Wachovia's mortgage business. According to CW 7, all of the underwriting was performed in San Antonio by former Golden West employees. Finally, CW 9 reported that 100% of the Pick-A-Pay loans that he and his co-workers were responsible for reviewing fell below industry standards and were considered subprime loans.

**D.    December 28, 2006 *American Banker* Article**

178.    On December 28, 2006, *American Banker* reported on the Golden West acquisition, incorporating multiple statements from the company:

66

Wachovia Corp. had billed its purchase of the thrift company Golden West Financial Corp. as a way to strengthen its branch network and cross-sell products to new customers, but early on in the integration it says it is finding readier opportunities on the mortgage side of the business.

***

Meanwhile, however, it has already launched a mortgage product that draws on both Wachovia's and Golden West's product styles.

"We're finding opportunities that we didn't even think of when we agreed to do the deal . . . . There's more upside surprises," Robert McGee, who is coordinating the integration for Wachovia, said in a recent interview.

**Wachovia has introduced a fixed-rate mortgage that offers payment options similar to those available in Golden West's adjustable-rate mortgages. The company is also replacing generalists in its East Coast branches with mortgage specialists, many of whom are coming from Golden West.**

In the interview in Charlotte, Mr. McGee, who is also the chief operating officer of Wachovia's general bank, discussed how the integration is going, addressed persistent investor concern about Golden West's focus on option ARMs, and talked about his plan to relocate to Oakland to make sure things go smoothly.

The quick introduction of mortgage products makes it likely Wachovia will generate revenue faster than first projected, he said. In announcing the deal last May, Wachovia projected that it would produce $230 million of new annual revenue by 2009.

"We should make enough progress so that 2008 will be measurably better than what we had originally planned . . . **and I'm confident that we'll do better in 2009 than we told folks,"** he said. He declined to update the revenue-expectation number.

* * *

**Analysts "are really overreacting" to negative amortization, Mr. McGee said. "The credit and the risk isn't any different than when people draw from a home equity line," he said. Most of the**

67

> **deferred interest is tied to homes with loan-to-value ratios of less than 80%. "So there is still a huge amount of equity in these properties."**

179. The December 28, 2006 *American Banker* comments are false and misleading because even before the Golden West acquisition property prices and therefore homeowner equity had begun declining, particularly in California where Golden West made the lion's share of its loans, and the only way the Pick-A-Pay loans were successful was when housing prices were increasing. Thus, "negative amortization" was, in fact, an issue.

### E. January 23, 2007 Conference Call

180. In an earnings conference call on January 23, 2007 reporting fourth quarter 2006 earnings results, Truslow stated:

> **The allowance for credit losses, as has been mentioned, wound out up [this] year at 3.5 billion dollars when you take in the reserve for unfunded commitments or 84 basis points. We recognize that on the surface when you stack this up against peers it looks low,** but as we've been saying for a couple of quarters, the addition of Golden West will have a dilutive impact on that reserve to loan ratio and that we have brought over a very large portfolio of loans that have had no losses for many years and the outlook for 2007 is for a track record that will continue with very de minimus losses and so the impact when you bring such a low loss content portfolio into the overall mix will just naturally dilute that ratio. As a matter of fact, after you bring over Golden West and look at our 420 billion dollar resulting portfolio, something like 45% of the total portfolio is now in the form of first lien residential consumer mortgage loans which by their very nature have a very, very low loss content. So I just encourage you as you look at that ratio and compare across peers you have really got to take our loan mix into consideration and the loan mix at Wachovia is probably pretty unique relative to a lot of peers.

181. The January 23, 2007 conference call statement was false because Wachovia's loss reserves, which Truslow admitted were low by industry standards, were not explained by the

purported "unique" qualities of Wachovia's loan mix. At this time, Defendants were well aware that

the housing market had cooled significantly in California and Florida, where the vast majority of

Golden West's loans had been originated, and that dropping property values were resulting in

increased defaults. Because the success of the Pick-A-Pay loan program depended in large part on

ever increasing property values – as especially was the case for those borrowers who selected the

minimum payment option – Wachovia was well aware of, or recklessly indifferent to, the fact that

their loan reserves were significantly understated in light of the deteriorating real estate market.

    **F.**    **Wachovia's 2006 Form 10-K**

    182.    On February 28, 2007, Wachovia filed its annual report on Form 10-K for 2006,

ended December 31, 2006 (the "2006 10-K"). The 2006 10-K was signed by Defendants Thompson

and Wurtz, and included Wachovia's financial statements for 2006. The Company reported revenues

for the year of $29.95 billion, compared with venues of $26.11 billion for fiscal year 2005. Diluted

earnings per share for the year were $4.63, an 11% increase over diluted earnings per share for the

previous year. The 2006 10-K was the first annual or quarterly report by Wachovia following the

October 2006 acquisition of Golden West.

    183.    In discussing the Company's standards and methodologies for determining when to

charge off delinquent loans, the 2006 10-K stated the following:

> The accrual of interest is generally discontinued on commercial loans
> and leases that become 90 days past due as to principal or interest, or
> where reasonable doubt exists as to collection, unless well secured
> and in the process of collection. Certain consumer loans that become
> 120 days past due are placed on nonaccrual status. Consumer real
> estate secured loans that become 180 days past due are placed on
> nonaccrual status, with the exception of certain non-traditional loans
> which are placed on non accrual status at 90 days past due.
> Generally, consumer loans that become 180 days past due are charged

69

> off. When borrowers demonstrate over an extended period the ability
> to repay a loan in accordance with the contractual terms of a loan
> classified as nonaccrual, the loan is returned to accrual status.

184.    The foregoing statement was materially false and misleading, and misstated

Wachovia's actual practice for charging off delinquent loans. In fact, Defendants had not been

charging off delinquent Golden West Pick-A-Pay loans after 180 days of non-payment. Instead, as

Defendants would first admit on January 22, 2008, Wachovia had, at all times prior to the fourth

quarter of 2007, "recogniz[ed] the losses at the time of an actual property sale." Thus, the loan

charge-offs recorded in the 2006 10-K were materially understated because Wachovia had, in fact,

been applying a charge- off policy with respect to the Golden West loans that were far more liberal

than the policy stated in the 2006 10-K.

185.    In addition, Wachovia's financial statements in its 2006 10-K materially misstated

and did not fairly present Wachovia's financial performance and condition, and were not presented

in accordance with GAAP and applicable SEC rules and regulations. The Company's results of

operations, including its provision for loan losses, net income and earnings per share ("EPS"), were

materially false and misleading, because those amounts disclosed were not derived in conformity

with Generally Accepted Accounting Principles ("GAAP"). In particular, Wachovia's 2006 financial

statements:

   a.  overstated Wachovia's loan portfolio (*i.e.*, avoided direct write-offs) and

      understated the allowance for credit losses, and thus these financial

      statements materially understated the amounts reported as the provision for

      credit losses, and thereby materially overstated net income;

70

b. omitted the disclosures required by Statement of Financial Accounting Standards ("FAS") 107 and FSP 94-6-1 regarding concentrations of credit risk created by its loan portfolio;

c. omitted disclosure of "information that is adequate to inform users of the general nature of the risk associated with the concentration" for concentrations in volume of business with particular customers, concentrations in revenue from certain products, and concentrations in certain markets or geographic areas;

d. omitted the disclosures required by FAS 107 and FSP 94-6-1 regarding significant concentrations of credit risk created by its investment portfolio which, in significant parts, was comprised of subprime-related asset-backed securities ("ABS"), CDOs and RMBS, commercial mortgage-backed securities ("CMBS") and consumer mortgages, leveraged finance distribution exposures, monoline-related exposures, and subprime-related CDS;

e. materially misstated the value and or valuation of, generally, the Company's financial position, and more specifically, but not exclusively, the investments discussed in (d) above, as those values were not derived in conformity with GAAP; and

f. Omitted the disclosures required by American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 94-6 for significant estimates in violation of GAAP and SEC rules; and failed to properly present variable interest entities ("VIEs"), for which the Company was the primary

71