Part  (4) Pages 72-97

beneficiary, as consolidated, and thereby, materially misstated the Company's

financial position and results of operations, in violation of GAAP.

186.   In the 2006 10-K, the Company described its outlook for credit quality: "We are

optimistic about our outlook for credit quality as we enter 2007 given the highly collateralized nature

of our loan portfolio.  While we expect modest increases in credit costs, we believe overall credit

quality will remain strong."

187.   The Company reported allowance for loan losses of $3.36 billion at the end of the

fiscal year 2006, compared to loan loss reserves of $2.72 billion at the end of fiscal year 2005.

188.   Further assuring investors of the veracity of the information contained in the Form

10-K, the report included a certification signed by Defendants Thompson and Wurtz:

*** 

2.   Based on my knowledge, this report does not contain any
untrue statement of material fact or omit to state a material fact
necessary to make the statements made, in light of the circumstances
under which such statements were made, not misleading with respect
to the period covered by this report;

3.   Based on my knowledge, the financial statement, and other
financial information included in this report, fairly present in all
material respects the financial condition, results of operations and
cash flows of the registrant as of, and for, the periods presented in this
report;

4.   The registrant's other certifying officers and I are responsible
for establishing and maintaining disclosure controls and procedures
(as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and
internal control over financing reporting (as defined in Exchange Act
Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused
such disclosure controls and procedures to be designed under our
supervision, to ensure that material information relating to the
registrant, including its consolidated subsidiaries, is made known to

72

us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financing reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in according with generally accepted accounting principles;

189.   The 2006 10-K report was also false and misleading because Defendants failed to disclose the following facts:

a.     The Company did not follow strict underwriting and loan-origination practices, including in its Pick-A-Pay mortgage portfolio;

b.     A material portion of the Company's loans were not "highly collateralized." Declining property values and increasing obligations by Pick-A-Pay customers who were making minimal monthly payments resulted in material and dangerous increases to the collateral's LTV ratio. Furthermore, because most of the loans were made on a stated income basis and Defendants therefore had no way of confirming the credit-worthiness of many loan applicants, the Company's reassurances about its conservative loan-origination and underwriting practices lacked a reasonable basis;

c.     The Company's loan loss provisions were understated and did not properly reflect the risk facing the Company, thereby inflating Wachovia's reported income; and

d.     the certifications signed by Defendants Thompson and Wurtz, which attested to the accuracy of the reported financial statements in the quarterly and

73

annual SEC filings, were themselves misleading because the above misstatements and omissions included in the reports and provided false comfort to the market.

**G.     April 16, 2007 Conference Call**

190.    In a conference call relating to the release of earnings figures for the first quarter of 2007, on April 16, 2007, CEO Thompson said:

> [L]ooking forward with the integration of Golden West on track, we feel confident about the **superior credit quality of our mortgage portfolio,** the prospects for cross-selling our product set in Golden West markets, and originating pick-a-pay mortgages through traditional Wachovia channels.

191.    On the same call, CFO Wurtz said, "One thing I can tell you is we will not stretch for earnings by altering the Golden West origination system or weakening their proven credit practices."

192.    CRO Truslow stated:

> As we've talked about before, the Golden West loans are **very conservatively underwritten** at low loan to values with particular attention paid to the quality of the appraisals. Most appraisals are completed by in-house appraisers, and the appraisal process, I can tell you it's very robust. Over the last several months as our teams have worked more closely with one another through integration, **our view regarding the quality of the Golden West underwriting practices has just continued to grow stronger.**

193.    By early 2007, the media and politicians began to question the wide availability of the unusual mortgage loans that had contributed to the now-deflating real estate bubble. Interest groups and lawmakers suggested that tighter mortgage-industry regulations were necessary. In response to a question about the legislative atmosphere around "exotic instruments" in the mortgage industry and if Wachovia expected to get "caught up" in it, Thompson stated:

74

[W]e don't fear it because the guidance that we've seen would impact most people in the – in the option ARM and – and fixed pick-a-pay kind of business. **But it does not affect us. And I think that goes to the very conservative underwriting standards** and servicing standards that the Sandlers implemented at Golden West. And we are changing none of that. So, if anything, we think that any changes might, in fact, benefit us relative to our competition.

194.    Contrasting Wachovia to its competitors, Thompson stated:

I also think that many competitors were underwriting to the introductory or teaser rate. And Golden West has never done that. We've always underwritten to a fully indexed rate, which we will continue. **I think if you look at the credit history and right up to the current moment, it would be bad for me to imagine how anybody could look at our underwriting of these loans and draw any conclusion under—other than we are very responsible underwriters and servicers of these – of these clients.**

195.    In response to a question of whether there were any loans in Golden West's portfolio

that would be considered equivalent to an Alt-A type of loan, Truslow stated:

Well, a very good bit of it would be, as well as the rest of our consumer book. But the difference is those are on balance sheet loans. **And we've got the other underwriting criteria.** So, for instance, in our credit card business, our auto business or – and our equity line business, it's—it is very common where you know the customer, have a relationship, not to provide tax returns, and all those kinds of things that you tend to associate with a conforming mortgage loan . . . .

196.    The April 16, 2007 statements are false and misleading because Wachovia's credit

quality was not superior and it did not rely on "conservative underwriting standards." Several CWs

(CW 9, CW 1 and CW 3) support the fact that Pick-A-Pay loans were sold to subprime borrowers

with FICO scores well below 660 and that the loans themselves had subprime characteristics, such

as being stated income or no documentation. Subprime lending is inherently risky, and to make such

75

loans almost entirely without employment or income verification exacerbates those risks. Wachovia was in fact stretching for earnings and weakening the portfolio's credit quality. As explained by CW 3, in order to maximize the number of Pick-A-Pay loans that it was underwriting, Wachovia embarked upon a scheme to falsify prospective borrower's income in order to qualify the borrower. According to CW 4, the priority at Wachovia was to sell as many Pick-A-Pay loans as possible, despite the availability of more traditional mortgages. These policies are inconsistent with conservative or responsible underwriting. Wachovia was indeed affected, like others, by the rapidly declining housing market. However, it took steps to conceal the extent to which its credit quality was actually suffering, and would continue to suffer.

197.  Also during the April 16 2007 conference call, Truslow addressed Golden West's purportedly rigorous appraisal process – stating "[a]s we've talked about before, the Golden West loans are very conservatively underwritten at low loan-to-values with particular attention paid to appraisals." Linking Golden West's past practices to those employed by Wachovia, Truslow added "[m]ost appraisals are conducted by in-house-appraisers and the appraisal process, I can tell you it's very robust." At the same time, Tom Wurtz assured investors "We're sticking to the Golden West model and are not going to struggle for higher originations at the expense of damaging the business model we purchased . . . ."

198.    Indeed, during the Class Period, Wachovia repeatedly stressed that it, like Golden West, utilized in-house appraisers to value properties for Pick-A-Pay loans.  For example, Wachovia's June 12, 2007 Mortgage Update Presentation identifies "appraisal standards – in house appraisers produce real values" as one of the "customer protections" of its "Pick-a-Payment loan" product. In a September 10, 2007 presentation given by Thompson at a Lehman Brothers Financial

Services Conference, Thompson contrasted Wachovia's in-house appraisal process for its Pick-A-Pay loans with the "outsourced to market appraiser" approach of Wachovia's competitors. This same boast was repeated by Truslow at a November 9, 2007 presentation before the BancAnalysts Association of Boston Conference. And again, during Wachovia's January 22, 2008 Q4 2007 earnings conference call, Truslow stressed that "Golden West's underwriting practices focused on rigorous appraisal process," and that Wachovia's use of its "own appraisers embedded in the market" was a competitive "advantage." Furthermore, even at the May 12, 2006 Informational Conference Call regarding Wachovia's acquisition of Golden West, Tom Wurtz stated "I would attribute [Golden West's] success to having exceptional appraisals," and that, in reference to the in-house appraisers, "it can't be overrated in terms of . . . the consequences to the overall value of what they create." Indeed, Wurtz cemented both the importance of the in-house appraisals to the Pick-A-Pay loans' past and future success when he stated "I don't think we want to do anything to change the way [Golden West] operates in terms of underwriting [sic] the dedications they have to the integrity of the appraisal process."

199.   These statements were false and misleading. As recounted by CW 4, after the acquisition, Wachovia did not follow Golden West's tradition of utilizing in-house appraisers to value properties for Pick-A-Pay loans, but instead used outside, third-party appraisers. In fact, according to CW 4, after the acquisition, Wachovia's in house appraiser's were relegated to merely reviewing the work done by the outside appraisers. CW 4 added that the outsourcing of appraisals made them less reliable because the outside appraisers had a reputation for assigning higher value to homes as compared to Golden West's appraisers. That third-party appraisers may have divergent interests from in-house appraisers – and therefore arrive at divergent appraisal values – was noted

by Deutsche Bank in its January 22, 2008 4Q07 Wachovia earnings review: "Per the company,
mitigants to a potential spike in loss rates to a multiple above historical levels are Golden West's
(now Wachovia's) in-house appraisal process (**not outsourced to third-parties who don't get paid
if the loan is not closed) . . . .**"

200.    Wachovia's misstatements regarding its use of in-house appraisers were particularly
material to investors because, as stated above, Wachovia repeatedly touted Golden West's rigorous
in-house appraisal process as one of the cornerstones of the Pick-A-Pay loan's historical success.

**H.    Wachovia's First Quarter 2007 Form 10-Q and May 17, 2007 Press Release**

201.    Commenting on its management of credit risk, the Company stated in the First
Quarter 2007 10-Q, which was filed with the SEC on May 4, 2007:

> The low level of net charge-offs reflects a continuing solid credit
> environment, the highly collateralized nature of our loan portfolio and
> our **careful management of the inherent credit risk in our loan
> portfolio.** The Golden West portfolio has a long record of extremely
> low net charge-offs, including, virtually none for the past eight years,
> reflecting **strong underwriting and credit risk management.**"

202.    Defendants also made materially false and misleading statements in a May 17, 2008
press release. Specifically, Defendant Wurtz made materially false and misleading statements
concerning the expected performance of the Pick-a-Pay loan portfolio:

> The Fixed-Rate Pick-a-Payment loan continues to be an attractive
> product in this environment. Increases in nonperforming assets are
> not unexpected; however, World Savings' *conservative underwriting
> practices* and *low loan-to-collateral values* give us confidence the
> portfolio will continue to perform favorably in this environment.

203.    The statements in the First Quarter 2007 10-Q and May 17, 2007 press release were
materially false and misleading because neither Golden West nor its successor, Wachovia, employed

conservative underwriting practices. Furthermore, Defendants knew that declining home values and

accumulating negative amortization were driving LTV ratios upward, which made the Pick-a-Pay

loan portfolio much riskier and more likely to incur losses than Defendants lead investors to believe.

I.    **July 20, 2007 Conference Call**

204.    On the Company's July 20, 2007 earnings conference call, defendant Truslow

commented on Wachovia's exposure to the credit crunch in the financial markets:

> I thought I would just make a couple of comments switching gears
> about the turbulence in the capital markets and the impact on
> Wachovia. Overall, I feel like we are in very good shape... Probably
> not appropriate to get too specific around the numbers at Wachovia,
> but acknowledging there would be a high level of interest in that but
> for competitive reasons I want to be a little careful of how specific we
> get but **we view the risk to Wachovia [sic] what's currently
> happening is very modest.**

205.    Discussing Wachovia's exposure to subprime mortgages, Truslow said:

> As for subprime in our Capital Markets businesses, and in our
> origination businesses, we shied away from diving into this business
> over the last few years as the market took off really for two reasons.
> One is given the firm's prior experience in the subprime market in the
> late '90s and also, importantly, the view of our Capital Markets group
> that the risk in this area has been underpriced for quite some time, so
> we just haven't felt that it has been a business that's made good sense
> for us and, therefore, **we've actively managed our business to
> minimize our exposure to the subprime market. So as a result
> there's been little impact to our businesses with the turbulence in
> the subprime markets and we don't anticipate any meaningful
> potential impact to earnings from subprime going forward.**

206.    Adding further commentary on the Company's subprime exposure, Steve Cummings,

Wachovia's head of corporate and investment banking, said:

> But very quickly on a couple key markets, the subprime and CDO
> businesses, which Don touched on. As he said, **we have avoided the
> origination side of subprime for some time.** We don't have that

79

origination platform plus when **we have brought platforms in that did have subprime activities over the last 18 to 24 months we have purposely exited that portion of the business.**

207.    Truslow discussed Wachovia's Pick-A-Pay product:

I do want to remind everybody that our pick a pay product, which is our option payment. ARM is structured with caps that limit the amount customer's payment may increase in any given year to no more than 7.5% of the payment. So on a $1,000 mortgage payment that would be a $75 increase from one year to the next and therefore, **I just want to point out that payment shock in our option ARMs is just not an issue here at all. It's really not an issue with the product.** Given the environment, again, we're not surprised to see the residential non-performs trend up as we noted last quarter, it's what we've been expecting and I would anticipate that we'll continue to see some trend up over the next few quarters as well. **But because the way these loans are underwritten, we're not seeing any meaningful increases in losses in the portfolio and we don't expect to see any rises and losses we look forward over the next few quarters and so the underwriting process and how these things are booked and what we're ultimately relying upon holding up very well as expected.**

208.    Cummings stated that Wachovia is "one of the larger players in the CDO business and in that market **we've managed that exposure also extremely well,** some indicators of that would include that the recent rating agency actions that have been taken."

209.    The First Quarter 10-Q and the July 20, 2007 conference call statements were false and misleading. Truslow was in a position to know the true financial condition of the company and that the risk to the Company in the turbulent credit market was far more severe than "moderate." For reasons discussed above, Wachovia had engaged heavily in subprime lending in contravention of Truslow's claim that the Company "actively managed [its] business to minimize its exposure to the subprime market." Wachovia's disregard of borrower asset or income verification, not to mention its active encouragement of fraud, belied the 10-Q's claims of "careful management of risk"

80

and "strong underwriting and credit risk management." According to CW 5, Wachovia originated

Pick-A-Pay loans for borrowers with FICO scores even lower than 600 – far lower than the Federal

Reserve's Guideline setting the FICO score cut-off for a subprime borrower at 660 or below – if they

provided certain minimal documentation. As reported in the *Sacramento Business Journal*,

Wachovia later tightened this permissive lending practice to require "a minimum FICO score from

potential borrowers." *Wachovia adjusts mortgage underwriting guidelines*, Sacramento Business

Journal, Apr. 11, 2008.

210.    Moreover, according to CW 1 Wachovia had embraced subprime originations for

borrowers with FICO scores in the mid-600's on a stated-income basis. CW 1 added that for many

stated-income loans, FICO scores were not required at all if the loan fell below a certain LTV

threshold.    According to CW 9 and CW 3, lending to subprime borrowers almost exclusively

without documentation and verification of income or assets created the perfect storm of increased

risk. As stated by CW 4, when coupled with its "sell Pick-A-Pay at any cost" philosophy, the already

high risk of credit loss was made much worse. Ultimately, this practice too was tightened in mid-

2008, when Wachovia began requiring underwriters to "verify income and employment history

before making loans it that it intends to keep in its portfolio." *Wachovia adjusts mortgage

underwriting guidelines*, Sacramento Business Journal, Apr. 11, 2008. Under these conditions,

Truslow could not have reasonably believed that Wachovia's portfolio would hold up well in a

turbulent market.

**J.    Wachovia's Second Quarter 2007 Form 10-Q**

211.    In the Second Quarter 2007 10-Q, filed with the SEC on July 30, 2007, the Company

again falsely described its management of credit risk:

81

Consumer net charge-offs were $249 million, up from $112 million in the first six months of 2006... The low level of net charge-offs reflects the highly collateralized nature of our loan portfolio and our **careful management of inherent credit risk**. Our consumer real estate portfolio has a long record of relatively low net charge-offs, **reflecting strong underwriting and credit risk management.**

212.    These representations, which were identical to statements made in the prior quarters'

10-Q filings, were materially inaccurate for the same reasons.

**K.    October 19, 2007 Conference Call**

213.    On an October 19, 2007 earnings conference call, CEO Thompson made a partial, but

materially false and misleading, disclosure about the Company's subprime exposure:

> I would say that as we looked at results, I think the biggest disappointment for me is that of those $1.3 billion in marks, we had about $300 million, roughly $300 million in losses on AAA subprime paper that was, in trading desks or in inventory. **And the thing that disappoints me about that is we have an institutional bias here against subprime. We avoided it in our origination efforts and we avoided it in, for the most part, in our securitization efforts. So, frankly, I think we had a little bit of a break down in having AAA subprime in some of our portfolios that we took losses on.** I do think it is really quite amazing that we could take $300 million of losses on AAA paper. We didn't expect that that paper could degenerate that fast, with that kind of swiftness.

214.    Upon the Company's first partial, incomplete and misleading disclosure of its

exposure to subprime mortgage backed securities, and of valuation losses of $1.3 billion, causing

it to miss its estimated third quarter earning by 14 cents, the stock price declined $1.74 (or 3.61%),

falling to $46.40 on October 19, 2007. However, Wachovia did not allow for an increased provision

for credit losses and a deterioration in credit quality, playing into concerns that the third quarter

might not have been the worst for the financial sector. *See Stock Market Update*, Reuters, Oct. 19,

82

2007. Had Wachovia taken the appropriate reserves for impaired assets, as required by GAAP, its stock would have declined much more than it did.

215.    The October 19, 2007 conference call statement is false because Wachovia was not, as a matter of Company policy, against subprime lending whether in origination or securitization. Wachovia purchased Golden West knowing that it specialized in non-traditional, subprime lending. After the acquisition, Wachovia continued to aggressively originate Pick-A-Pay loans to subprime borrowers. Despite having more traditional loans available, its priority was to sell Pick-A-Pay at any cost, including to those borrowers that had no realistic ability to repay the loan.

**L.     Wachovia's Third Quarter 2007 Form 10-Q**

216.    In the Third Quarter 2007 10-Q, filed with the SEC on November 9, 2007, Wachovia reported that the Company was setting aside $600 million in the fourth quarter and said the value of securities it owned linked to subprime mortgages dropped by $1.1 billion in October 2007. This followed write-downs of $1.3 billion in the third quarter. In the Third Quarter 2007 10-Q the Company detailed its exposure to subprime RMBS. Despite this partial disclosure about its losses on subprime mortgage–backed securities, the Company continued to make positive representations about its management of credit risk in the Third Quarter 2007 10-Q:

> While our outlook indicates a rise in the overall level of change-offs at this point in the credit cycle, we believe the well collateralized nature of our real estate-secured portfolio, **our careful management of inherent credit risk and strong underwriting** will position us relatively well in a more uncertain credit environment.

**M.     November 9, 2007 Conference Call**

217.    On November 9, 2007, Defendant Truslow gave a presentation on Wachovia at a BancAnalysts Association of Boston Conference. By that time, the risks of and losses from Option

83

ARMs (of which Wachovia's Pick-A-Pay was one variant) were a prominent focus of market

concern. Noting that Wachovia's "Pick a Pay product gets a lot of attention" and that Wachovia's

Pick-A-Pay mortgages "are often compared with other option ARMs available in the marketplace,"

Defendant Truslow sought to defuse market concerns by insisting, falsely, that "there really are very

significant differences in the product" that made Wachovia's Pick-A-Pay mortgage immune from

the risks and losses then apparent in other subprime and Option ARM mortgages.

218.    First, Defendant Truslow represented that Wachovia originated its Pick-A-Pay

mortgages for its own portfolio, rather than to be securitized and sold off, so Wachovia was

motivated to produce safer, less risky mortgages:

> First of all, this is a portfolio product for us. We are a portfolio lender
> and that is important because everybody in the chain of these loans
> basically treats this with -- these loans with a cradle to grave
> mentality. So the appraisers, the underwriters, the relationship
> managers to their management team, this is not an originate and dump
> into the capital market and be done with it sort of product. This is a
> product where people are measured and their performance rewarded
> or penalized, based upon the long-term quality and value of these
> loans that are being created.

219.    This statement was materially misleading. As already detailed, Wachovia underwrote

its Pick-A-Pay mortgages on the debased basis of "stated" income, the very standard then reigning

in the mortgage securitization markets.    Wachovia's Pick-A-Pay mortgages were thus not

distinguished from mortgages originated for securitization, but in truth shared exactly the same

debased origination standards and heightened default risks. Further, as already detailed, Wachovia's

compensation structure and origination practices were not based on "the long-term quality and value

of these loans that are being created", but rather on Defendants' drive to increase Pick-A-Pay

origination volume and short term profits while ignoring the debasement of underwriting standards and the consequent heightening of long-term risk.

220.    Defendants made exactly the same misrepresentations, which were false and misleading for exactly the same reasons, in later earnings conference calls and in later investor conference presentations of November 14, 2007 and February 13, 2008.

221.    Second, Defendant Truslow emphasized the quality and rigor of Wachovia's "in-house appraisers." These representations, as explained above (Section III.G, *supra*) were materially false and misleading.    As also alleged above, Defendants continued to make similar misrepresentations throughout 2007 and much of 2008.

222.    Third, Defendant Truslow represented that the Pick-A-Pay product design, and particularly the 7.5% annual rate reset cap, distinguished Wachovia's Pick-A-Pay mortgages from other subprime adjustable rate loans then experiencing high rates of default due to rate resets that produced "payment shock" and spiking defaults. Defendant Truslow asserted that, for Pick-A-Pay mortgages, **"resets here just really aren't an issue:"**

> It is also a consumer friendly product from a resets standpoint. Obviously resets from the 2/28 and the 3/27[18] that are on the market are of significant concern, particularly in the subprime sector. Our product basically has a 7.5% payment cap on the minimum payment which protects consumers. So payment resets here just really aren't an issue . . . .

223.    Defendant Truslow's representations were materially false and misleading. The 7.5% payment cap on Pick-A-Pay mortgages did not obviate or eliminate the risk of adjustable payment

---

[18]    The "2/28" and "3/27" subprime mortgages referred to by Defendant Truslow were hybrid adjustable rate mortgages ("hybrid ARMs") that: (1) offered a low, fixed "teaser" rate for either 2 or 3 years, after which (2) they reset to sharply higher adjustable rates, generally exceeding 11%, for the remaining life of the mortgage (either 28 years or 27 years).    Such mortgages accounted for in excess of 80% of all subprime mortgages originated during 2005 and 2006.

rates resetting (or recasting) to levels that would induce "payment shock" and default, but merely deferred that risk into the future. Subprime mortgage default rates were then spiking, over and above their debased basis on borrowers' "stated" income, because they were then undergoing their uncapped rate resets, resulting in immediate payment shock and default.   During 2007, 35% of subprime mortgages experiencing rate resets either defaulted or became delinquent within six months of the rate reset. Wachovia's Pick-A-Pay mortgages would, in fact, adjust to exactly the same increased rates, produce exactly the same payment shock, and result in exactly the same spike in defaults. The only difference was that, due to the 7.5% annual rate reset cap, this would occur in slow motion for Wachovia. The spike in defaults and losses then evident in subprime had not been avoided by Wachovia, but merely deferred.   Where subprime defaults now were was where Wachovia's Pick-A-Pay mortgages would later arrive.

224.   Defendants were aware of this reality, but misrepresented it, concealed it, and denied it in their public statements such as Defendant Truslow's November 9, 2007 representations. Defendants made exactly the same false and misleading misrepresentations on numerous occasions during the following months, including during earnings conference calls and presentations on November 14, 2007, January 22, 2008, January 30, 2008, February 13, 2008, March 12, 2008, and April 14, 2008. By these representations, Defendants falsely assured investors that Wachovia was immune to default and loss risks that in fact were imminent.

225.   Fourth, Defendant Truslow falsely distinguished Wachovia's Pick-A-Pay mortgages by representing that their low LTV ratios functioned to protect Wachovia from loss even upon mortgage default:

So very different than some other products and then, of course, conservative loan to value is on top of the more conservative appraisal process that we have. Very few loans made above 80% and where we have lent above 80% we have required mortgage insurance. So on most properties at the outset we've acquired 20 to 30% real cash equity on the front end.

226.    Defendant Truslow's representations concerning the safety provided by the purportedly low and conservative LTV ratios of Pick-A-Pay mortgages was materially false and misleading. Though the *initial* LTV ratio at origination may have been relatively low, the current LTV ratios were already substantially higher and were only continuing to climb. The majority of Pick-A-Pay borrowers were picking the "minimum amount" payment option: therefore, with each monthly payment, their loan balance was in fact increasing. As the loan balance increased, so did the LTV (the "L" being the loan balance). Simultaneously, as property prices were then and had long been declining – and had declined both first and most sharply in California and Florida, where 68% of Wachovia's Pick-A-Pay loans had been used – the property values were experiencing double-digit declines. As property values declines, LTV increased (the "V" being the property value). In short, Wachovia's mortgage LTV were being squeezed upwards on both the "L" end and the "V" end.

227.    Defendants publicly misrepresented, concealed and denied the reality of these high and ever-higher LTV ratios, as per Defendant Truslow's above representations, until mid-2008. Defendants made exactly the same false and misleading misrepresentations on numerous occasions during the following months, including during earnings conference calls and presentations on November 14, 2007, January 22, 2008, January 30, 2008, February 13, 2008, March 12, 2008, and April 14, 2008. By these representations, Defendants falsely assured investors that Wachovia was protected from losses when, in truth, Wachovia was exposed to substantial and severe losses.

87

228.   The high and ever higher LTV ratios of Wachovia's Pick-A-Pay mortgages substantially increased their risks of default and severely increased the loss severity to Wachovia upon default. High-LTV mortgages are at increased risk of default because borrowers with less equity in their home are more likely to default, and borrowers with *negative* equity in their home – *i.e.*, LTV ratios above 100% – no longer have economic motivation to continue paying their mortgages, making them far more likely to default. High-LTV mortgages produce sharp loss severity because, upon default and after foreclosure and foreclosure costs, the proceeds from foreclosure sale do not suffice to repay the balance of the loan. To illustrate: a lender that provides a mortgage for purchase of a $100,000 property is more likely to recoup, through sale of that property, an initial loan of $70,000 as opposed to an initial loan of $95,000. The situation at Wachovia: (1) though Wachovia's initial loan may have been $70,000 for purchase of $100,000 property; (2) due to minimum payments, that loan balance was actually climbing above $70,000; while (3) due to sharp property price declines in California and Florida, the property value was falling from $100,000 to $80,000 or lower. Should such mortgages default, Wachovia was therefore not protected by much or any borrower equity from severe loss severity upon default.

229.   Finally, notwithstanding his previous assurances to investors, Truslow made a partial, but still false and misleading disclosure, at a BancAnalysts Association of Boston Conference, similar to Thompson's false statements on October 19, 2007:

> **Clearly we could have done a better job around subprime on—for**
> the company that has had such a negative bias towards subprime. **We**
> **didn't leap into the origination side. We stayed away from a lot**
> **of the businesses that evolved and grew beginning just a couple**
> **of years ago yet we found ourselves in this downdraft with**
> **pockets of subprime exposure that essentially, there were**
> **investments or positions taken in various places across the**

> **platform.** Mostly in the form of what we believe to the very high-quality assets, AA, Super Senior AAA, and adjunct to that is that **where those decisions were made, they probably didn't involve the expertise and talent of the part of the platform that really had the most experience around residential mortgages and subprime,** probably too reliant on the ratings and taking too much comfort in historical performance around securities with those ratings.

230.  Defendant Truslow's November 9, 2007 statements about Wachovia's "negative bias toward subprime" and that Wachovia "didn't leap into the origination" of subprime loans are false and misleading because Wachovia was not, as a matter of Company policy, against subprime lending whether in origination or securitization, and in fact originated such loans. Wachovia purchased Golden West knowing that it specialized in non-traditional, subprime lending. After the acquisition, Wachovia continued to aggressively originate Pick-A-Pay loans to subprime borrowers. Despite having more traditional loans available, its priority was to sell Pick-A-Pay at any cost, including to those borrowers that had no realistic ability to repay the loan.

**N.    November 14, 2007 Conference Call**

231.  On November 14, 2007, the President of Wachovia's General Bank division, Ben Jenkins, provided a presentation on Wachovia at Merrill Lynch's Banking and Financial Services investor conference.

232.  Mr Jenkins repeated Defendant Truslow's above-detailed misrepresentations of November 9, 2007 as to purported distinguishing features of Wachovia's Pick-A-Pay loans that purportedly rendered them safer than other subprime and option ARM mortgages and/or immune to the risks of default and loss then evident with respect to those other mortgages:

> First of all, it operates as a portfolio product. . . . So, the performance of all of these Wachovia personnel is tied to the performance of the loan. What I'm trying to say is we own that loan to a far greater

89

degree than if it was just originated and quickly shipped into the capital markets.

\*\*\*\*\*

The appraisal process is, again, done by somebody on staff, a Wachovia appraisal, who knows the market, knows the submarket, and the only pressure that appraiser feels is the pressure to get it exactly right from a value standpoint . . . . And we have protections built in for the borrower in terms of how much movement that can be in the payment rate. The payment rate can only move up 7.5% year to year. So if rates move up dramatically, the borrower's payment rate only goes up 7.5% . . . .

\*\*\*\*\*

Now, the fourth fundamental for good performance is superb risk management, and that has, I think, long been the hallmark of our company . . . . And with the addition of Golden West, our real estate portfolio has a loan to value at origination of 71% . . . .

233.    These representations – as to the "portfolio" quality of Wachovia's originations and loans, Wachovia's "in house" appraisals, Wachovia's insulation from rate-reset-induced payment shock, and Wachovia's low LTV ratios – were false and misleading for the reasons already alleged above.

234.    Mr Jenkins further sought to distinguish Wachovia's mortgages from other mortgages bearing high risks of default by asserting that:

The underwriting we do on this product is to the fully-indexed rate, not to a teaser rate.

235.    This representation was materially misleading. A mortgage underwritten on the basis of the borrower's ability to pay the low, initial "teaser" rate has a high risk of default, because the borrower's ability to bear the "payment shock" upon rate reset is in doubt. Mr Jenkins represented that Wachovia was immune to this risk, because Wachovia purportedly underwrote mortgages on

90

the basis of borrowers' ability to pay the high rate (the fully-indexed rate) to which the mortgage would reset. This was false. In truth, Wachovia was underwriting its Pick-A-Pay mortgages on the basis of borrower income merely "stated" by the borrower rather than verified by the lender. Underwriting mortgages on a "stated income" basis rendered underwriting at the "fully indexed rate" an empty fiction. The borrower's ability to pay that fully indexed rate had not in fact been determined or verified. Thus, Wachovia was exposed to the very default risks that it represented it had avoided.

O.     January 22, 2008 Conference Call

236.    On January 22, 2008, Wachovia held a conference call to discuss its full-year 2007 results Defendant Thompson began the call with a set of misrepresentations which capture the essence of plaintiffs' claims here:

> **Nevertheless, based on recent action in our stock price, I'm certain that investors are anxious about several questions on Wachovia which I want to address now. The first question is: "What is the level of losses in your Pick-A-Pay mortgage portfolio?". . . . [O]ur Pick-A-Pay portfolio will generate very meaningful bottom-line profits in 2008, and I do not believe that investors grasp that fact today.**
>
> **The second question: "Does Wachovia have enough capital?"** After our December preferred offering, Wachovia's capital levels were higher at year end than at the end of the third quarter, in spite of the marks, and in spite of the reserve build that we did in the fourth quarter. And we're confident that those capital levels will increase as we go through 2008.
>
> **And the third question: "Will Wachovia cut its dividend?" And the answer to that question is we have no plans to cut the dividend, because we do not need to cut the dividend.** We're confident in our ability to meet our 2008 business plan, and that plan as we have said before, will generate cash earnings that will cover our

91

dividend payments, continue to build necessary credit reserves, improve our capital ratios and support growth in our business lines.

237.    Defendant Thompson's statements were correct in the limited sense that (1) these were the most prominent questions facing Wachovia (2) the answers to these questions were inter-related; and (3) investor concerns as to these matters, as Defendant Thompson conceded, had already depressed Wachovia's share price.

238.    However, defendant Thompson's "answers" to these three interrelated questions were materially false and misleading, and worked to sustain Wachovia's share prices at artificially-inflated levels.

239.    In truth, the level of losses in Wachovia's $120 billion Pick-A-Pay portfolio was far, far greater than defendants had publicly acknowledged. Underneath defendants' above-mentioned misrepresentations as to the high quality of the Pick-A-Pay loans and their immunity to the sorts of default and loss levels then being experienced by other mortgages, were a number of concealed and misrepresented realities, including: (1) the stated income basis of most of those loans, which exposed Wachovia to just the sort of default risks it claimed to have avoided; (2) the high and ever-higher LTV of most of those loans, which exposed Wachovia to default risks it claimed to have avoided and to losses from which it claimed immunity; and (3) the fact that Wachovia's Pick-A-Pay product design, and especially its 7.5% annual rate reset cap, had not allowed Wachovia to escape the crisis of mortgage payment shock and spiking defaults, but merely to defer that crisis to a later date than much of the rest of the mortgage industry.

240.    These concealed, publicly-misrepresented and publicly-denied realities pertaining to Wachovia's Pick-A-Pay portfolio meant: (1) that enormous loan losses were then inherent in the

92

Pick-A-Pay portfolio, apparent to defendants though concealed by defendants to the public; (2) that such losses would cut deeply into Wachovia's capital levels, which would diminish rather than increase; and (3) that such Pick-A-Pay losses and such capital erosion would require Wachovia to eliminate dividend payouts, so as to conserve capital and funds with which to provision loan loss reserves.

241.    During the January 22, 2008 earnings conference call, defendants presented a highly misleading impression of the health of Wachovia's Pick-A-Pay portfolio, and thus of Wachovia's fundamental financial condition. Defendants Wurtz and Truslow, supporting Defendant Thompson's misrepresentations concerning Wachovia' Pick-A-Pay portfolio, Wachovia's capitalization, and Wachovia's ability to continue to pay dividends, made reference to a series of charts they had prepared which purportedly demonstrated that Wachovia's Pick-A-Pay mortgages were performing like prime mortgages, rather than like troubled Alt-A and subprime loans, and were thus at little risk of default and loss:

> WURTZ: [T]here is clear evidence that our Pick-A-Pay portfolio **is, to date, performing very similar to that of the average prime portfolio** in the industry, in terms of 60 day delinquency, as an example. . . .
>
> \*\*\*\*\*
>
> TRUSLOW: Given the stressed mortgage markets, and the fact that the underwriting for Wachovia's Pick-A-Pay product is different from what is a typical option payment ARM, and therefore admittedly a little difficult to categorize against other more common products, **we've included the next two slides to provide some help in better understanding how this portfolio is performing in this market, against traditional prime, Alt-A, and subprime loans.**
>
> So if you'll slip over to slide 18, this charts the Wachovia Pick-A-Pay 90 day past due ratios, in the green diamond line, and the Wachovia

overall mortgage portfolio loans inclusive of Pick-A-Pay is in the darker blue small square line, against prime, Alt-A, and subprime industry results, and **you can see that the Wachovia results are performing well measured against Alt-A, and just modestly worse than prime. And of course subprime performance has been rather dismal . . . . We provided this to the extent that it would be helpful . . . . But we think that slide 18, in aggregate tells a story that is maybe not well understood in the market.**

242.    The above statements, and the analysis underlying them, were materially false and misleading because defendants' comparisons were "apples to oranges."  A primary reason why subprime and Alt-A default rates were spiking was that those mortgages were experiencing "payment shock" following *uncapped* rate resets, which often increased borrower payment burdens by 30% or more *immediately*.  Wachovia's Pick-A-Pay mortgages were not becoming delinquent or defaulting at the same rate as these other subprime and Alt-A mortgages because the rate resets on Wachovia's mortgages were capped at 7.5% per year.  Because of this annual rate reset cap, Wachovia's mortgages had not yet adjusted to "payment shock" levels.  But that did not mean that Pick-A-Pay mortgages would not adjust to such payment shock levels.  Rather, it meant only that they had *yet* to adjust to such high payment levels.  Wachovia's Pick-A-Pay mortgages would ultimately reset to exactly the same high payment levels and then produce exactly the same high rates of default – the only difference being that they would do so in slow motion and later than the other mortgages that were performing badly now.

243.    Therefore, the only truth in Defendants' January 22, 2008 comparisons of Pick-A-Pay mortgages versus other subprime and Alt-A mortgages was that the current poor performance of the latter indicated exactly what would soon happen to the former.

94

244.   Defendants concealed this truth and, through the analysis they publicly presented on and after January 22, 2008, turned this reality on its head.  According to defendants' public and highly misleading misrepresentations, the seeming better performance of the Pick-A-Pay mortgages was proof of (1) the quality of Wachovia's underwriting standards and (2) Wachovia's immunity to the sorts of defaults and losses then being suffered by other mortgages and other lenders.  The concealed truth, however, was the opposite: (1) Wachovia's underwriting standards shared the same sorts of debasement, particularly with regard to "stated" income, as did wider subprime and Alt-A lending as a whole, and thus exposed Wachovia to exactly the same increased risks of default; and (2) the high and ever-higher LTV of Wachovia's Pick-A-Pay portfolio was exposing Wachovia to substantial risks of default and sharp loss severity upon default.

245.   Thus, and apparent to defendants, the seemingly superior performance of Pick-A-Pay mortgages was a mirage.  Underneath this mirage was the concealed reality of impending defaults and losses.  Defendants hid this reality from the public, and insisted publicly that the mirage was real.  But the mirage was just an epiphenomenon of the simple fact that Wachovia's Pick-A-Pay mortgages with their capped annual rate resets had yet to reach payment shock levels, in contrast to other mortgages with uncapped rate resets which already were reaching those levels.

246.   To return to apples and oranges.  The "apple" in defendants' "analysis" was subprime/Alt-A mortgages which had already hit payment shock, thus producing high rates of payment delinquency and default.  The "orange" was Pick-A-Pay mortgages.  Due to their annual rate reset caps, the degree of adjustment in their "adjustable rate" feature was as yet minor, the current rates were still relatively low, the mortgages had yet to rise to payment shock levels, and thus they were currently performing like prime mortgages.  The "apples to oranges" comparison,

95

therefore, was of mortgages currently experiencing payment shock to mortgages that had yet to reset to payment shock levels, but soon would.

247.    Defendants made exactly the same false and misleading misrepresentations on numerous occasions during the following months, including during earnings conference calls and presentations on January 30, 2008, February 13, 2008, and April 14, 2008. By these representations, Defendants falsely assured investors that Wachovia was protected from losses when, in truth, Wachovia was exposed to substantial and severe losses

248.    In addition, defendants continued on January 22, 2008 to misrepresent and conceal the reality of the high and ever higher Pick-A-Pay LTV ratios.

249.    For example, defendant Truslow represented that the initial LTV of the Pick-A-Pay mortgages was 71%, and that the current LTV ratio essentially unchanged at 72%:

> For the pick-a-pay product, the portfolio has an original loan-to-value of about 71%, and an original FICO score of about 673, and as a reminder, the Golden West underwriting practices focused on a rigorous appraisal process, and the borrower's ability to fund 20% to 30% of the purchase price up front. Using estimated current valuation updates that we ran in November, **the average current loan-to-value across the portfolio, is basically unchanged from origination, coming in around 72%.**

250.    This representation was materially false and misleading, and was reiterated by Defendants on January 30, 2008, February 13, 2008, and March 12, 2008. In truth, LTV values across Wachovia's Pick-A-Pay portfolio were already far higher (as defendants would later admit in drips and drabs between April 2008 and October 2008), and thus the risks of default of loss were far higher than adverted by defendants.

96

251.     Although defendants conceded the general proposition that declining property prices in California and elsewhere were exerting upward pressure on LTV ratios, defendants further represented – falsely – that such pressure was the exception with respect to Wachovia's Pick-A-Pay portfolio rather than the rule.  For example, defendant Truslow represented that Wachovia had identified and reserved for a $8 billion subset of the $120 billion Pick-A-Pay mortgage portfolio – *i.e.*, a mere 6.67% of the Pick-A-Pay portfolio – where Pick-A-Pay LTV ratios were expected to rise above 95%:

> We've begun experiencing higher loss rates where we have loans in markets, that experienced rapid price depreciation since 1999, and are now seeing rapidly declining trends in housing values. Most of the build in the allowance for the Pick-A-Pay product is for the loans in those markets where the current loan-to-values have risen, or are expected to rise above 95%, were originated over the last three years, and are exhibiting a higher likelihood of default. So when you carve out this pool of loans, it constitutes about $8 billion of the $120 billion Pick-A-Pay portfolio.

252.     Defendants repeated this misrepresentation on February 13, 2008 and March 12, 2008.

253.     Similarly, defendant Truslow represented that less than $1 billion of Wachovia's entire mortgage portfolio (including both Pick-A-Pays and traditional mortgages) had LTV ratios of 90% or more.

254.     Such representations were materially false and misleading, and turned reality on its head.  The reality was that Pick-A-Pay LTVs were already and very widely approaching such extreme levels of 90% or more, due to (1) sharp property price declines in California and Florida that had reached double digits by mid-2006 and had only deepened since, (2) the fact that 68% of Wachovia's Pick-A-Pay portfolio consisted of loans used to purchase California and Florida