Part  (5) Pages 98-123

properties; and (3) the fact that most Pick-A-Pay borrowers' were making minimum payments and thus seeing their loan balances grow. Defendant Truslow's "data" was outdated and outright false.

255.    Indeed, when concerned analysts inquired on January 22, 2008 as to what percentage of Pick-A-Pay borrowers were making the minimum payments, defendants declined to provide the answer.

256.    Likewise, Defendant Truslow mentioned that Wachovia had experiencing loss severities nearing 25% on mortgages that defaulted – an extraordinarily high figure given the purported low LTV ratios of those mortgages. As Defendant Truslow himself explained, such high loss severity could only result from the fact that underlying LTV ratios had substantially increased. Again, however, Defendant Truslow represented falsely that such loss severities were the exception, rather than the norm. Defendant Truslow represented that these loss severities were the worst-case scenarios, and had become so severe in part because of Wachovia's purported discipline in "moving" foreclosed properties quickly:

> In December severities, I believe, got to just under 25%, so again **you have to take that in light of where most of these sales have been, so the most severely impacted properties. And we have been helped by the fact that we had 20%, 30% real equity on the front-end . . . .**
>
> \*\*\*\*\*
>
> That would be the loss against the value of the loan. So if you think about some markets in California that have given up 25%, 30% from their peak, that could entirely take away the equity that the borrower put in on the front end, and maybe a little more, and then you take into account the foreclosure costs, cost of fixing up the property, going through foreclosure, the commissions that we're willing to pay to get the house moved, **we've been willing to take some possibly higher severities in some markets, to get the properties moved** . . . .

257.    Defendant Truslow's "spin" on the facts was materially false and misleading. As defendant Truslow himself recognized, the reality was that the sharp property price declines in California and Florida "could entirely take away the equity that the borrower put in on the front end, and maybe a little more." Put in LTV-speak, this meant that those price declines could – or rather, in fact were – transforming initial LTV ratios of 70% into LTV ratios of 100% ("entirely take away the equity that the borrower put in on the front end") or even into negative equity LTV ratios exceeding 100% ("and maybe a little more"). Defendant Truslow falsely represented that such cases were the exception, and that Wachovia's mortgages' LTVs were essentially unchanged from their original values (71% at origination, 72% now). But such cases were the rule, and Wachovia's mortgages' LTV ratios were materially higher than their original values.

258.    Furthermore: a primary metric used to assess the adequacy of a company's loan loss reserves is the ratio between comparing the amount of the loan loss reserve to the amount of non-performing loans. During Wachovia's January 22, 2008 conference call, Sandler O'Neill analyst Kevin Fitzsimmons pointed out that this ratio at Wachovia was substantially lower than at peer lending institutions, and asked why – in light of that fact – investors should not conclude that Wachovia was substantially under-reserved:

> KEVIN FITZSIMMONS, ANALYST, SANDLER O' NEIL: I was wondering on credit, I know you've given a lot of detail today, but if you can **help us reconcile how and why we shouldn't come away thinking the allowance is very low, and specifically the ratio I'm looking at primarily is the allowance to NPA [non-performing asset] ratio being at only 88%, and which I'm sure is well below peer level . . . .**

259.    Defendants' answer to Mr Fitzsimmons – that Wachovia's loan portfolio was of higher quality than the portfolios of its peers, and that Wachovia's loan portfolio was well-secured

99

by the underlying collateral – was false and misleading. This answer was repeated by defendants on

February 13, 2008, and March 12, 2008. In truth, Wachovia's loan portfolio suffered from the same

debased standards, such as "stated income" origination, as its peers' subprime and Alt-A mortgages,

and exposed Wachovia to the same risks of default. Those default risks were merely muted for

Wachovia in the short-term because of the 7.5% annual cap on rate resets. Similarly, due to

declining property prices and increasing loan balances, Wachovia's loan portfolio was now *de facto*

a portfolio of high LTV loans. Therefore, it was no different than peer portfolios of "no money

down" loans and other loans originated with high LTVs, and was exposed to exactly the same

increased risks of default and sharpened loss severity inherent in high LTV loans.

260.    To be clear: defendants' liability here does not arise for making loans at low LTVs

that later became high LTV loans due to declining property prices, but from concealing,

misrepresenting and flat-out denying that high LTV reality before, during and long after it had

become a reality.

261.    Finally, Defendant Thompson closed the January 22, 2008 conference call with the

following materially false and misleading wrap-up:

> And I think, in addition to that, if you look at the provision expense
> in the fourth quarter, and if you look at what we're planning going
> forward, I think **we're being very conservative from a credit
> standpoint moving forward. So I think we are being very
> conservative, and I think we are optimistic about the future given
> the conservatism that we've already taken, and that's why we feel
> comfortable giving the kind of guidance that we've given you, as
> far as covering the dividend, growing capital ratios,** growing our
> business, and we're optimistic about Wachovia. Frankly, **it's just
> hard for me to understand the impact that our stock price has
> taken over the last three months,** because I look at how we compare
> to others, and I feel very good about where Wachovia is.

100

262.   This statement was materially false and misleading, for all the reasons alleged immediately above. Wachovia was sitting on the world's largest portfolio of option ARMs, $120 billion of Pick-A-Pay loans. Those mortgages had been originated on a stated income basis, which increased the risk of their default. To mitigate against that risk, Wachovia purportedly originated the loans at low LTVs that would insulate Wachovia from loss upon default. But those mortgages now had high LTVs, thus exposing Wachovia to increased risks of default and sharp loss severity upon default. And the worst was yet to come, given that the 7.5% annual rate reset caps on Wachovia's mortgages had heretofore – but only temporarily – insulated Wachovia from the higher rates of default then being experience by other subprime and Alt-A mortgages. At the same time, Wachovia was under-reserved for its loan losses, both relative to its peers and in an absolute sense. Given all this: (1) Wachovia was not being "very conservative" from a credit point of view; (2) imminent and risking mortgage defaults and loss severities would erode Wachovia's capital and extinguish its ability to fund a dividend payout; and (3) contrary to defendant Thompson's protestations, the only reason Wachovia's share price had not sunk even lower was that defendants were still publicly concealing and misrepresenting the true nature of Wachovia's mortgage exposures.

263.   Also during the January 22, 2008 conference call, the Company admitted that, with respect to Golden West's delinquent loans, it had to play "catch-up" and increase loss reserves by $63 million due to a "methodology change" in recognizing loan losses. Specifically, contrary to its stated policy to charge off loans that were more than 180 past due, the Company, at all time prior to the Fourth Quarter 2007, had not charged off Golden West's loans until the property had been sold

after foreclosure proceedings. As a result of Wachovia's deviation from its internal policy, it had

materially understated reserves while concomitantly overstating earnings.

     **P.**    **January 30, 2008 Conference Call**

    264.    On January 30, 2008, Defendants Thompson and Truslow provided a presentation

on Wachovia at Citigroup's Financial Services investor conference.

    265.    Defendant Thompson reiterated, in highly false and misleading fashion, the "apples

to oranges" analysis of Wachovia's Pick-A-Pay mortgages to other subprime and Alt-A mortgages,

as well as the false claim that Wachovia's Pick-A-Pay mortgages were low-LTV mortgages of 71%-

72%:

> **So I know that potential credit losses are of concern for investors,
> and I want to talk directly with you about that. Wachovia, as we
> see on this slide, has historically been a conservative underwriter,
> and I can assure you that that's not changed . . . .** Here, we
> underwrote, as did Golden West before us, with a substantial cash up
> front. We were at 70%, 71% loan-to-value on our mortgage portfolio,
> and we are confident--in fact, we are very confident--that **the loss
> content on these NPAs will not approach levels of loss content in
> other asset classes that you look at. This slide further illustrates
> that. It shows why we've got confidence in the statement I just
> made.**
>
> Now, **mortgage portfolio loss rate will be manageable because, as
> this slide shows [] the dark green line shows 90-day past-due
> performance for Wachovia's Pick-a-Pay mortgage portfolio. You
> can see on this slide that it tracks most closely to the blue line,
> which is the entire mortgage industry prime performance. It's
> way below the red line, which is subprime, and it's tracking well
> below Alt-A, which is the gray line. So that gives us confidence
> that our loss rate in the Pick-a-Pay portfolio is going to be good.**
>
> **I think you should take further comfort by focusing on this slide.
> This slide shows delinquency rates for Wachovia portfolios,
> versus industry averages for the same portfolios. In every
> category--mortgage--whether it be Pick-a-Pay or traditional**

**mortgages, home equity, and in auto finance--Wachovia is demonstrably superior to the industry.**

266.   These statements were highly false and misleading, for the reasons alleged in detail above with respect to Wachovia's January 22, 2008 conference call. Their effect is illustrated by the following comment that followed them, from an attendee at the conference: "Thank you for those additional slides. I think they're starting to get the point across."

267.   During the January 30, 2008 question and answer session, one attendee pointed out that another large originator of Option ARMs had recently reported: (1) that 20% of their Option ARM portfolio had recently hit their negative amortization limit of 110% of original loan value, and were recasting to fully-amortizing rates; and (2) that 30% of such recasting loans were becoming delinquent. The attendee asked:

> Does that concern you, considering you guys have such a large option ARM book?

268.   Defendant Thompson's highly false and misleading reply:

> KEN THOMPSON: Well, **our option ARMs were totally different than other option ARMs in the market, and we've gone over this time and time again. We've got a cap on payment rates going up by more than 7.5%. We underwrote to the fully indexed rate, not to the teaser rates. Our average going on LTV was somewhere in the 70% to 72% range. So we've got a cushion,** and we're being hurt in California, where we've seen great price depreciation, and in some other places. But overall, I stand by what I've said about the NPAs are rising, but **our loss content in our NPA portfolio will not be anything close to other asset classes.**

269.   Defendant Thompson's representation was materially false and misleading because:

(1) Wachovia's option ARMs (the Pick-A-Pays) were not fundamentally different from other option ARMs, but exposed Wachovia to exactly the same risks on a delayed basis due to the 7.5% annual

103

rate reset cap; (2) the risks purportedly avoided by underwriting to the fully-indexed rate had not in

fact been avoided, because Wachovia had not verified the "stated" income that served as the

purported "basis" of borrowers' ability to pay those fully-indexed rates; (3) the average LTV of

Wachovia's mortgage portfolio was far, far higher than 70%-72%; and (4) Wachovia had in no way

immunized itself from the losses then experienced by other mortgage lenders, but had merely

deferred those losses and publicly concealed that fact.

Q.    **February 13, 2008 Conference Call**

270.    On February 13, 2008, Wachovia held its annual Fixed Income Update conference,

at which defendants Wurtz and Truslow provided presentations on Wachovia. Defendant Truslow

reiterated certain material misrepresentations made on January 22, 2008, including: (1) that only a

minor portion of the $120 billion Pick-A-Pay portfolio (specifically, $8 billion or 6.67% of the total)

was at heightened risk of default and loss severity due to rising LTV values; (2) that the current LTV

ratios of Wachovia's mortgages were essentially unchanged from those ratios at origination (*i.e.*,

71%); (3) that Wachovia's seemingly-low ratio of loan reserves to nonperforming loans only

"seemed" low but in fact was not; and (4) the "apples to oranges" comparison of delinquency rates

between Wachovia's Pick-A-Pay mortgages (which due to their 7.5% annual rate reset cap had not

produced payment shock yet) and other subprime and Alt-A mortgages (which, with uncapped rate

resets, were now experiencing the payment shock that Wachovia's mortgages would soon arrive at).

271.    Defendant Truslow also recycled misrepresentations from October 19, 2007,

including: (1) that Wachovia originated its Pick-A-Pay mortgages for its own portfolio, rather than

to be securitized and sold off, so Wachovia was motivated to produce safer, less risky mortgages;

(2) that Wachovia's "in house" appraisals made Pick-A-Pay mortgages safer still; and (3) that the

104

Pick-A-Pay mortgages were distinguished from other Option ARMs, and safer, due to their 7.5%
annual rate reset cap.

272.    Defendant Truslow added to this last misrepresentation a new misleading analysis
comparing other lenders' Option ARMs to Wachovia's Pick-A-Pay mortgages. Defendant Truslow
pointed out that other lenders' Option ARMs "recast" after five years to fully-amortizing rates,
producing upon recast an immediate 77% increase in borrowers' monthly payments (*i.e.*, payment
shock). Wachovia's Pick-A-Pays, by contrast, "recast" to fully amortizing rates after ten years rather
than five. Defendant Truslow represented that this made Pick-A-Pays safer. This was false and
misleading. In truth, the Pick-A-Pay mortgages would produce exactly the same level of payment
shock, with exactly the same result (default), but would do so in slow motion: not all at once in year
five, but rather in series of yearly 7.5% increases starting in year 2 and ending in year 10. The only
real difference was the one, essentially, between quick death and slow death.

273.    One attendee directly questioned Defendant Truslow on this very reality, noting that
where other Option ARMs were already recasting now after hitting their 110% negative amortization
limit (and causing spikes in delinquencies), Wachovia's would do so as well, only later, due to
Wachovia's 125% negative amortization limit (which delayed recast):

> UNIDENTIFIED    PARTICIPANT:    Then    secondly,    **the
> characteristics of your product versus a lot of the other industry
> players, the 125% cap on negative amortization has -- it seems to
> me that that's helped your portfolio delinquencies in that we're
> hearing from some of the other players that recast event is
> actually causing the delinquency.** So I'm just wondering if you
> could just discuss, sort of merits of that or the quality of those loans,
> I guess, **one comment could potentially be that you're just
> delaying the inevitable by delaying the recast event to a later time
> period** but maybe you could just discuss the pros and cons of that.

274.   Defendant Truslow flatly – and falsely – denied this reality in his answer. Defendant Truslow stated that no Wachovia loans would hit that 125% negative amortization limit and thus trigger recast, and that those Wachovia loans experiencing negative amortization had extremely low LTVs of 68.5%. Defendant Truslow's conclusion:

> So it really hasn't -- it's a-- it gets a lot of attention and **we get a lot of questions about it but it just hasn't been a factor from an asset quality standpoint or a delinquency standpoint** and again, we believe that **it's actually very favorable from the consumer's vantage point in that it avoids some of the traps that are now popping up in some other products.**

275.   Defendant Truslow's assertions were materially false and misleading. The structural features of the Pick-A-Pays did not "avoid" the "traps that are now popping up in some other products", but just deferred them. For that very reason, the Pick-A-Pays had yet to experience the high rates of delinquency that other Option ARMs were now experiencing – and that Pick-A-Pays would assuredly later match.

R.   **Wachovia's 2007 Form 10-K**

276.   Discussing its credit risk management in the 2007 10-K report, filed with the SEC on February 28, 2008, the Company stated: "While our outlook indicates a rise in the level of charge-offs at this point in the credit cycle, we believe the well-collateralized nature of our real estate-secured portfolio, our **careful management of credit risk** and **strong underwriting** position us relatively well in this credit environment."

277.   On that same day, Thompson admitted to "poor" timing in Wachovia's $24 billion purchase of Golden West in October 2006:

> With the benefit of hindsight, it is clear that the timing was poor for this expansion in the mortgage business, Thompson said in a letter to

106

> shareholders. Yet we have reconfirmed our opinion of the quality of
> the Golden West franchise, its underwriting and service model, and
> the quality of its people.
>
> We expect to recognize further credit losses and to earn less than
> we'd anticipated in our mortgage business over the next year or
> two...

*Wachovia CEO says timing of Golden West deal "poor," Reuters, Feb. 28, 2008.*

278.   The February 28, 2008 statement served as a partial corrective disclosure but was still

materially false and misleading, because although Thompson admitted that the timing of the

acquisition of Golden West was wrong, he still led the public to believe that Golden West and its

underwriting standards were high quality. According to CW 9, an underwriter and a loan processor

specialist for World Savings in California until October 2007, **100% of the Pick-A-Pay loans** that

he and his co-workers reviewed were considered subprime. Additionally, CW 3 stated that he was

repeatedly instructed by managing directors to sell prospective borrowers on Pick-A-Pay loans by

getting borrowers to overstate his or her actual income. CW 3 estimates that 90% or more of

approved Pick-A-Pay loans were done as stated income or no documentation loans. And, if the

Company had required documentation or other verification of income, "there was no way they would

have been approved."

S.     **March 12, 2008 Conference Call**

279.   On March 12, 2008, Defendant Truslow provided a presentation on Wachovia on an

investor conference call hosted by Deutsche Bank. Again, Defendant Truslow reiterated his prior

misrepresentations concerning the structural effects of the Pick-A-Pay mortgages:

> We get a lot of questions about the Pick-A-Pay product and its
> features and how the product works, and it doesn't appear that the
> features themselves are creating any significant issue for us.

107

280.   This representation was false. The structural features of the Pick-A-Pays were creating an enormous issue for Wachovia, which defendants, as detailed above, publicly misrepresented, concealed and falsely denied.

281.   Additionally, Defendant Truslow reiterated further prior misrepresentations, including: (1) that current Pick-A-Pay LTV ratios had not materially changed since origination, and stood at 72%; (2) that only a very small portion of Pick-A-Pay mortgages (6.67% of the portfolio) was at heightened risk of default and loss due to high LTV ratios.

**T.    April 14, 2008 Conference Call**

282.   On April 14, 2008, in announcing Wachovia's results for the first quarter of 2008, defendants returned to three questions with which they had begun their prior quarterly earnings conference call on January 22, 2008: (1) what was level of losses in Wachovia's Pick-A-Pay portfolio?; (2) did Wachovia need to raise capital?; and (3) could Wachovia continue to fund its dividend payout. Defendants' April 14, 2008 answers to these questions were opposite to the false and misleading answers they had provided on January 22, 2008. Defendants admitted on April 14, 2008 what they had previously concealed, misrepresented and denied: namely, that due to Pick-A-Pay mortgage losses, Wachovia's fundamental financial condition had materially weakened, Wachovia would need to raise billions in new capital, and Wachovia could not afford to continue its dividend payout.

283.   As defendants made clear, their new answers as to Wachovia's capitalization and dividend arose from a new view of the losses inherent in Wachovia' Pick-A-Pay portfolio. But as analysts made clear, one after another, there had been no new mortgage-related developments during the prior three months indicating that matters were worse now than they had been in January:

JASON GOLDBERG, ANALYST, LEHMAN BROTHERS: Ken, **you've been I guess consistent in saying, at least up and through your 10-K in late February that you felt comfortable with your capital and dividend position. Obviously something's changed dramatically. We obviously went through February knowing the housing market was stressed.** Can you just kind of update us with your thoughts over the subsequent six weeks, and the end of February?

*****

KEVIN FITZSIMMONS, ANALYST, SANDLER O'NEILL: Could you give a little more detail on – **you cited dramatic change in customer behavior or consumer behavior and that led to the decision to cut the dividend, increase capital** and so just wondering if you could be particular by – I'm assuming it's California . . . .

*****

JONATHAN ADAMS, ANALYST, OPPENHEIMER CAPITAL: I guess I had a similar question to the past individual and if I look on page 19 of your presentation, **it strikes me that there's nothing in the 90 day past due trends that would justify the kind of change that you have made in your outlook. You can pick a different – a number of different metrics, whether it's the dividend in suggesting that over a broad range of scenarios it wouldn't need to be cut and then five or six weeks later coming to a different conclusion, or it's some other metrics as well. But it just strikes me as difficult to understand how management's view of the environment has changed so dramatically.**

284. In truth, as the analysts pointed out, no underlying mortgage fundamentals had changed. The only change, as defendants admitted, was their adoption of a new model for determining mortgage losses.

285. Defendants' new model, however, did little more than capture, for the first time, mortgage risks that: (1) were, in principle, axiomatic *ab initio*; and (2) were, in fact, evident nearly two years ago. The principle: that borrowers with little, no, or negative equity (*i.e.*, borrowers in

109

loans with LTV ratios nearing, at or over 100%) were more likely to default. This was especially true for borrowers with negative equity (*i.e.*, LTV ratios above 100%), at which point all economic motivation to continue making payments each month (for more than the property was worth) disappeared. The facts: that double-digit housing price declines in California and Florida, operative since mid-2006 and only increasing since, were functioning to erode and eradicate borrower equity, to increase borrowers' LTV to levels approaching and often exceeding 100%, and thus to sharply increase both the risk of default and the loss severity to Wachovia upon default.

286.    In short, though the model was new, the risks and realities it captured were old:

> THOMPSON: Over the past year, we have witnessed a consistent pattern of deterioration in credit statistics in our mortgage portfolio in stressed areas of the country and particularly in California and Florida . . . . **The basis for our revised projections is a new model which permits us to model home prices at the MSA level in conjunction with a behavioral model that captures changes in borrower's repayment behavior when their equity dissipates** . . .

*****

> WURTZ: As Ken mentioned, **we have changed considerably the modeling of our Pick A Pay portfolio with far greater emphasis on forecasting future changes in housing markets and customer behaviors. Particularly in the stressed markets** and Don will describe that in great detail going forward. But **the results of that is we expect further robust provisioning in both 2008 and 2009.**

*****

> TRUSLOW: **Ken and Tom mentioned for the Pick A Pay in its portfolio we have implemented a new modeling tool which will help us better estimate the outlook for credit costs for this portfolio.** And we have chosen to use the OFHEO Index at the MSA level weighted for our loan balances in order to calibrate the correlations of **what we were observing in borrower propensity to**

110

**default to housing price declines,** therefore using this as a backdrop for forecasting credit costs . . . .

**[A]s housing prices decline and borrowers lose their equity in their homes relative to their first mortgage balances, we are seeing borrowers default at a faster rate** than historical trends and other quality measures such as FICO would suggest and we believe that this new approach, **this new model better captures these linkages and home price trends and this new analysis and what we've been experiencing in the housing market in the first quarter led us to build the allowance by about $1.1 billion for the Pick A Pay mortgage portfolio** . . . . [W]e've used the models output to help dimension for investors credit costs we are currently estimating for the Pick A Pay loan through the end of 2009. We're currently expecting charge-offs including first quarter results for all of 2008 at about $1.3 billion to $1.7 billion rising to somewhere in the $2.5 billion range in 2009. In terms of reserves, we expect to continue adding another $800 million to $1 billion in addition to the $1.1 billion, that was added in the first quarter across 2008 and this is in anticipation of the estimated charge-offs in 2009 so the reserve has a forward look to it. As you can see, these actions substantially build the loan loss reserves for this product.

*****

KEN THOMPSON: I'll let Don talk specifically but **I would just say that what we are seeing is that when equity in the home approaches zero, behavior changes. And that's what the model tries to do is to then take that behavior along with house price depreciation and factor that into future losses.** Don?

DON TRUSLOW: Ken, **that's exactly right. And Kevin, it's just this pattern almost that somewhere -- I don't know where the tipping point is, but somewhere when a borrower crosses the 100% loan to value, somewhere north of that and they presumably run into some sort of cash flow bump, whether it's reduced income or kind of normal things in life that have created past dues before, their propensity to just default and stop paying their mortgage rises dramatically and I mean really accelerates up and it's almost regardless of how they scored, say, on FICO or other kinds of character, credit characteristics.**

111

> [T]hat behavior is going on. We're seeing in our portfolio the
> most significant declines and defaults activity in California and
> of course it's the largest concentration for us in the Pick A Pay
> portfolio by far.

287.    Another new disclosure of an old reality: defendants disclosed for the first time, on

April 14, 2008, that 14% of the entire $120 billion Pick-A-Pay portfolio – *i.e.*, $17 billion of

mortgages – had LTV ratios above 100%. Of the 100%+ LTV mortgages, 75% were from California

and 10% from Florida.

> BETSY GRASECK, ANALYST, MORGAN STANLEY: On page
> 21, you've got the percentage of the Pick A Pay portfolio that has
> got an LTV above 100%, 14%. Is this the first time you're giving
> that data?
>
> DON TRUSLOW: It is. We wanted to provide that just to,
> number one, that's the most stressed stratification in the
> portfolio. And also just exhibit that we recognize there's been
> severe deterioration in several of our markets where we have the
> Pick A Pay loans.

288.    Although defendants' April 14, 2008 statements detailed above constituted corrective

disclosures, such corrections were still only partial.

289.    Defendants still represented falsely on April 14, 2008: (1) that the current average

LTV ratio of Wachovia's Pick-A-Pay mortgages had risen only slightly from the LTV ratio at

origination – to 78% from 71%; (2) that cumulative losses on the entire $120 billion portfolio, even

under defendants' new loss model, would not exceed 7.5%; and thus (3) that Wachovia still had

sufficient capital levels to fund a reduced dividend payout of approximately 60% of the amount of

Wachovia's prior dividend.

290.    These April 14, 2008 representations were materially false and misleading. The

purportedly "current" LTV of 78% was neither accurate nor current, but rather false, understated and

based on outdated data. In truth, the LTV ratios were far higher. Cumulative losses on the $120 billion Pick-A-Pay portfolio were likewise, and connectedly, far higher than the 7.5% level that defendants publicly revealed on April 14, 2008. Three months later, on July 22, 2008, defendants (under Wachovia's new CEO, who by then had replaced defendant Thompson), admitted: (1) that current LTV ratios were materially higher than previously stated; (2) connectedly, that cumulative Pick-A-Pay losses would be almost twice as high as stated on April 14, 2008; and (3) that consequently, Wachovia could not continue to fund even its already-reduced dividend. Defendants also announced that Wachovia would no longer originate Pick-A-Pay mortgages. Three months after that, on October 22, 2008, Wachovia, then under new management (with defendants Thompson, Wurtz and Truslow gone), admitted that Pick-A-Pay losses would be **triple** the 7.5% level represented by defendants on April 14, 2008 -- a stunning 22% of the entire $120 billion portfolio.

**U.     July 22, 2008 and September 9, 2008 Conference Calls**

291.    On July 22, 2008, Wachovia (under its new CEO Robert Steel), admitted that Pick-A-Pay LTVs were substantially higher than earlier adverted, that Pick-A-Pay losses would be nearly twice as high as defendants had stated only three months ago (*i.e.*, 12% of the $120 billion portfolio, rather than 7.5%), and that consequently Wachovia would need to effectively eliminate its dividend payout in order to conserve funds in light of those losses.

292.    These statements, though partial corrective disclosures, continued to be false and misleading, continued to understate current LTV ratios, and continued to understate the true level of Pick-A-Pay losses.

113

293.     During a September 9, 2008 presentation at the Lehman Brothers Global Financial

Services Conference, Wachovia's new CEO Robert Steel was confronted directly with the falsity of

those representations as to Pick-A-Pay losses:

> JEFFREY TALBERT, ANALYST: **I believe that the last time you
> offered projections with respect to the Pick-A-Pay portfolio, the
> bank was looking at about a 12% estimated cumulative loss rate.
> When I apply the same estimated projections that come out of
> both Lehman and other firms fixed income research groups by
> vintage, I come up with a number much closer to something close
> to 20%.** You've now been at the bank longer than the initial call, has
> your view on estimated cum losses on a Pick-A-Pay changed, or are
> you still looking at around 12% or perhaps something higher than
> that?

294.     Mr Steel and other (unidentified) Wachovia executives replied that their lower loss

calculations (12% as opposed to 20%) were correct, that nothing had changed since their

announcement on July 22, 2008, and that the 20% loss figure cited by Mr Talbert did not apply to

Wachovia's mortgages because it was an "apples to oranges" comparison.

295.     These representations were false and misleading (except for the representation that

there had been no material change in underlying mortgage fundamentals since July 22, 2008). One

month later, on October 22, 2008, with nothing having changed in the underlying mortgage

fundamentals, Wachovia's new management nearly doubled their Pick-A-Pay loss calculations from

12% of the $120 billion portfolio to a stunning 22%. Thus an additional $10 billion of losses was

revealed, in the absence of any change in underlying mortgage fundamentals, that had previously

been concealed, misrepresented and denied by defendants.

IV.     **WACHOVIA'S COLLATERALIZED DEBT OBLIGATIONS**

296.     During 2006 and 2007, Wachovia created, structured and underwrote approximately

$10.11 billion of CDOs backed, as detailed below, by pools of subprime mortgages. At all times

until November 9, 2007, Wachovia concealed that it had retained in excess of $2.1 billion of those

very subprime CDO securities: *i.e.*, in excess of 20% of the subprime CDOs it had underwritten.

Wachovia furthered its concealment, at all times until October 19, 2007, by carrying these

(undisclosed) CDO holdings at par value, despite the fact that their value had been materially and

evidently impaired no later than February 2007.  Wachovia first revealed the existence of these

CDOs simultaneously with their writedown on October 19, 2007.  Wachovia's October 19, 2007

disclosures of writedowns indicated that Wachovia held some amount of these instruments, but

Wachovia did not disclose what that amount actually was.

297.     Wachovia's CDO-related disclosures were still misleading on October 19, 2007 and

continued to be so through July 21, 2008, because, throughout, Wachovia continued to overstate the

value of its CDOs.  Directly observable indicators of those CDOs' value – most directly, indexes

tracking the market prices of CDOs and of the assets collateralizing the CDOs – had long indicated,

essentially, that there was none.  Wachovia turned a blind eye to those indicators and only

acknowledged in July 2008 the truth that such directly observable indicators had long stated.

Wachovia's series of writedowns between October 19, 2007 and July 22, 2008 belatedly conceded:

(1) what had been evident by February 2007 – that the value of these instruments was materially

impaired; and (2) what was evident by October 2007 – that the value of these instruments had almost

entirely disappeared.  By July 2008, Wachovia had written down the value of this $2.1 billion of

retained CDOs by $1.69 billion, or 79.7%. But that degree of value deterioration had in fact existed

since October 2007, and much of it had existed since February 2007.

298. The risks of such subprime CDOs had been well and widely understood no later than February 2007. That their value was materially impaired was likewise recognized by the market no later than February 2007, and the degree of impairment only became more severe thereafter. By October 2007, the impairment was near-total, and subsequent declines in value were minor as most of the value had already evaporated. The only matter that was *not* known was that Wachovia had any exposure to such decreasingly valuable instruments.

299. Lastly, as Wachovia first revealed on January 22, 2008, it had in fact retained a *further* $4.2 billion of the $10.1 billion of subprime CDOs it had underwritten. With respect to this further $4.2 billion of CDO exposures, Wachovia represented that it had entered into hedging agreements that transferred the risks of these exposures to Wachovia's counterparties. These counterparties were: (1) monoline insurers (the "Monolines"),[19] and specifically Ambac Financial Group, Inc. ("Ambac") and MBIA, Inc. ("MBIA"), in the amount of $2.2 billion; (2) AIG, in the amount of $1.1 billion; and (3) a "large European bank" in the amount of $945 million.

300. Wachovia's representations that $2.2 billion of CDO exposure risks had been hedged and transferred to the Monolines were materially false, and further concealed and misled as to Wachovia's true exposure to its own CDOs. It had long been known that the Monolines did not have the resources to make good on their "guarantees," because they themselves were swamped by CDO exposures far greater than Wachovia's. *See, e.g.*, Pershing Square Capital, *Who's Holding the Bag?*, May 2007. Indeed, Wachovia itself was well aware that the Monolines were failing and were inadequately capitalized: one of the Monolines that was first to capsize under the weight of CDO

---

[19] Monoline insurers (the "Monolines") guarantee the timely repayment of bond principal and interest when an issuer defaults. They are so named because they provide services to only one industry.

116

guarantees was Wachovia's own subsidiary BluePoint Re Ltd. ("BluePoint"), which Wachovia had created and initially capitalized with $300 million. During the third and fourth quarters of 2007, Wachovia wrote down the entirety of its investment in BluePoint, and thereafter refused to provide any further funding to enable BluePoint to make good on its guarantees, leading to BluePoint's collapse into bankruptcy.

301.    Therefore, Wachovia's hedging with the Monolines created only the *appearance* that $2.2 billion of CDO exposure risks had been hedged/transferred, when in substance they had not. Wachovia, belatedly, so recognized, and during 2008 recognized $411 million in further losses from its CDO exposures purportedly hedged with the Monolines.

A.    What CDOs Are

302.    CDOs are a class of asset-backed securities. Essentially, a CDO invests in a group of assets and then issues securities "collateralized" by those assets. Here, the assets backing the CDO securities were yet another class of asset-backed securities: subprime residential mortgage-backed securities (subprime RMBS).

303.    The securities issued in CDO and subprime RMBS securitizations are a set of several *unequal* classes ("tranches") representing differently-prioritized rights to the underlying assets. This tranching is the key to understanding what CDOs are and what their risks are, and is explained below. Because subprime CDOs invest in already-tranched securities (subprime RMBS), the explanation begins with subprime RMBS.

304.    In a subprime RMBS securitization, the securitized/underwriter assembles a pool of assets – namely, subprime mortgages – that will serve to collateralize the securities to be issued. The typical subprime RMBS was based on 3,000-4,000 mortgages having an aggregate value of

117

approximately $1 billion. The underwriter then evaluates those mortgage assets to calculate their "expected loss." Based on this expected loss, the underwriter then structures the securitization into a set of discrete tranches, each of which bears a discrete degree of remove from that expected loss sufficient to merit a given credit rating. The farther removed from loss, the higher the credit rating; the more proximate to loss, the lower the credit rating.

305.    The cash flow generated by the entire underlying asset pool (*i.e.*, the monthly mortgage payments on all the mortgages, and any prepayments of principal) flows like a waterfall (the actual metaphor used in the industry) over this tranching structure, starting at the top and working its way down. The entire cash flow first goes to paying off the interest on the triple-A tranche, then the double A tranches, then the single-A tranches, etc. As mortgages become delinquent and/or default, they stop making payments. The shortfall is first felt by the most junior tranche, even as the more senior tranches continue to receive full payment.

306.    As the underlying mortgages default and suffer principal losses, those losses result in principal writedowns that accrue to the lowest tranches, starting with the unrated "equity" tranche. As losses mount, they continue to rise to each rated tranche in turn.

307.    The real world results of this structuring process, for 2006 subprime RMBS securitizations and for 2006 Alt-A RMBS securitizations, are displayed graphically on the pages that follow. The charts show, in scale, the average tranching structure for subprime and Alt-A mortgage securitizations during 2006:

118

# Subprime RMBS:
## Average Structure and Tranche Sizes



**AS UNDERLYING MORTGAGE POOL LOSSES MOUNT, THEY CLIMB UP THE TRANCHES**

1  The lowest tranches -- equity and BB -- amount to 4.5% of the entire securitization.
Principal losses experienced by the underlying mortgages will accrue here first.
The BB/Equity tranches are written down by the amount of those losses.

2  If principal losses exceed the size of the equity/BB tranches (4.5%), then losses begin
to accrue against the more senior tranches above.

3  Next above equity are a series of thin BBB tranches (BBB+, BBB and BBB-). Each is
about 1% to 1.5% of the entire securitization; in total, 4.3% of the entire securization.
Each is successively written down as underlying mortgage losses mount.  If losses
rise above 8.8% (the 4.5% of equity/BB tranches and the 4.3% of BBB tranches), all
of the BBB tranches are worthless.

4  The process continues, except, at each successive level, the tranches are "thicker".
The A tranches account for 5.4% of the securitization.
The AA tranches account for 6.6% of the securitization.
The AAA tranches account for 79% of the securitization.

# Alt-A RMBS:
## Average Structure and Tranche Sizes



**AS UNDERLYING MORTGAGE POOL LOSSES MOUNT, THEY CLIMB UP THE TRANCHES**

**Because Alt-A mortgages have less risk than subprime mortgages, there is less subordination and the subordinate tranches are thinner**

1   The lowest tranches -- equity and BB -- amount to 1.8% of the entire securitization. Principal losses experienced by the underlying mortgages will accrue here first. The BB/Equity tranches are written down by the amount of those losses.

2   If principal losses exceed the size of the equity/BB tranches (1.8%), then losses begin to accrue against the more senior tranches above.

3   Next above equity are a series of thin BBB tranches (BBB+, BBB and BBB-). Each is about 0.4% of the entire securitization; the three total 1.2% of the entire securization. Each is successively written down as underlying mortgage losses mount. If losses rise above 3% (the 1.8% of equity/BB tranches and the 1.2% of BBB tranches), all of the BBB tranches are worthless.

4   The process continues, except, at each successive level, the tranches are "thicker". The A tranches account for 1.7% of the securitization. The AA tranches account for 2.5% of the securitization. The AAA tranches account for 93% of the securitization.

308.    The charts demonstrate two consequential matters: (1) the relative lack of protection,

especially for the BBB tranches, from loss; and (2) the dramatic "thin-ness" of the more junior

tranches, especially at the BBB and single-A levels. These were consequential because it was exactly

these tranches that constituted the lion's share of the assets collateralizing the CDOs that Wachovia

retained. As the charts demonstrate, underlying asset losses (*i.e.*, nonprime mortgage losses) did not

have to rise very much at all in order to render these RMBS tranches worthless. Thus, relatively

small loss increases at the underlying asset level would cause losses to climb into rated RMBS

tranches but leap throughout CDOs, because CDOs were primarily collateralized by these lower,

thinner RMBS tranches.

(a)    **Relative Lack of Protection from Underlying Asset Losses**. On average,

subprime RMBS securitizations provided the BBB tranches with subordinate tranches totaling only

4.5% of the entire securitization. Should underlying asset losses exceed that 4.5% of "first loss"

protection, the BBB tranches would start suffering principal losses – first the BBB-, then the BBB,

then the BBB+. And as these tranches were themselves quite thin (as next detailed), they did not

provide all that much protection for the more senior tranches above them, especially the single-A

rated tranches next in line for losses. Because Alt-A mortgages were purportedly safer than

subprime, expected losses from Alt-A mortgages were lesser, and thus less subordination was

required in Alt-A securitizations. Alt-A BBB tranches were therefore even closer to the bottom,

protected by a "first loss" tranche totaling only 1.8% of the entire securitization. Should underlying

asset losses exceed that 1.8% of "first loss" protection, the BBB tranches would start suffering

principal losses.

(b)     **Tranche Thin-ness**. As the above charts illustrate, nonprime BBB tranches

and single-A tranches represent a very thin, very specific slice of subprime risk: they begin to be

liable for aggregate losses suffered by the underlying pool of subprime mortgages when such losses

exceed approximately "X"%, and they are rendered worthless if such losses rise to X+1%. The very

thinness of these tranches gives them an evident *ab initio* risk/return profile. A thin tranche speedily

loses its value: a small deterioration in overall asset performance suffices to swing a thin tranche

from 100% return of principal to 100% loss. Experts refer to this risk profile as "cliff risk:"

everything is fine for a while, but then value "falls off a cliff." Such thin tranches are, effectively,

an "all or nothing" proposition. There is very little chance that they will suffer a partial loss: they will

provide a 100% principal return (having been protected by tranches below it) or a 100% principal

loss (having been engulfed by poor asset performance). Thus, the risk of these tranches has been

termed "digital:" 1 or 0.

309.    Thus, triple-B subprime or Alt-A RMBS tranches – as was clear from the outset –

constitute a very precise, very thin, and very close-to-the-bottom slice of nonprime risk. Mortgage

performance deterioration that may seem relatively slight when considered in light of the entire

mortgage pool (e.g., losses increasing by only 1% or 2%) are sufficient to substantially impair the

value of these instruments – or entirely destroy them.

310.    CDOs are in essence little different from the RMBS securitizations described above.

Just like RMBS, CDOs: (1) invested in a set of assets, and (2) issued a further round of tranched

securities backed by those assets. Although any assets serve to collateralize CDOs, the CDOs at issue

here are specifically CDOs collateralized by asset-backed securities (known as "ABS CDOs" or

"structured finance CDOs"). ABS CDOs came, prior to and during the Class Period, to be

122

collateralized primarily by the junior tranches of subprime RMBS and Alt-A RMBS. They are thus referred to herein as subprime CDOs.

311.    The subprime CDOs at issue here were of two primary types, Mezzanine CDOs and High Grade CDOs.

312.    **Mezzanine CDOs** invested in "mezzanine"-level assets – meaning, primarily, thin, close-to-loss BBB-rated tranches discussed above (referred to as "mezzanine" because such tranches are neither the most senior nor the most junior). These CDOs' extreme asset concentration in nonprime RMBS BBB tranches meant, *ab initio*, that a relatively small rise in underlying mortgage pool losses – sufficient to wipe out the thin, close-to-the-bottom BBB- and BBB tranches – would simultaneously destroy most of the collateral value of a Mezzanine CDO. All the CDO's junior tranches, including the junior triple-A tranche, would be rendered worthless, and even the top-most tranche, the super senior, materially impaired.

313.    In Wachovia's Mezzanine CDO, junior tranches accounted for 37.8% of the securitization, and the super senior for 62.2%. Thus, the Mezzanine CDO super senior tranche was protected from the first 38% of underlying asset losses. Yet the "super senior" tranche of Mezzanine CDO did not connote a "super" remote risk, but rather – and merely – the last 62% of losses to be suffered by the thin, close to the bottom BBB RMBS tranches.

314.    **High Grade CDOs** invested in slightly higher-rated assets than did Mezzanine CDOs: the average credit rating of the assets held by High Grade CDOs was between single-A and double-AA. Typically, High Grade CDO assets included a mix of single-A and double-A RMBS tranches, as well as some more highly-rated and some more low-rated tranches. Additionally and very importantly, High Grade CDOs often included in their asset base some single- A, double-AA