Part  (7) Pages 150-175

(stockholders) for the use of enterprise resources entrusted to it. "To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general." (FASCON 1 ¶ 50);

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASCON 2 ¶¶ 58-59);

(f)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASCON 2 ¶ 79);

(g)     The principle that financial reporting should be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent (FASCON 2 ¶ 81); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2 ¶¶ 95, 97).

364.     Each of the improper accounting practices, misrepresentations and omissions engaged in by the Defendants, and discussed further herein, standing alone, was a material breach of GAAP and SEC rules.

**B.      Omission of Required Disclosures regarding Significant Concentrations of Credit Risk, Current Vulnerability due to Certain Concentrations and Certain Significant Estimates**

365.     The Company's relevant financial statements, in violation of GAAP and SEC rules, omitted required disclosures regarding significant concentrations of credit risk, current vulnerability due to certain concentrations and certain significant estimates.

*GAAP Requires Disclosures regarding Significant Concentrations of Credit Risk*

366.     In addition to the fundamental principles of financial reporting established by the FASCONs above, GAAP requires certain disclosures to prevent financial statements from being

false and misleading. FAS No. 107, *Disclosures about Fair Value of Financial Instruments* ("FAS 107"), requires disclosure of significant concentrations of credit risk arising from all financial instruments. Credit risk can arise from group concentrations in which "a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions." For each such significant concentration, FAS 107 requires disclosure of (a) the characteristic that identifies the concentration, (b) the related maximum amount of loss due to credit risk, (c) the Company's related policies regarding collateral, and (d) the Company's related policies regarding master netting arrangements to mitigated credit risk. (FAS 107 ¶ 15A).

367.    FSP SOP No. 94-6-1, *Terms of Loan Products That May Give Rise to a Concentration of Credit Risk* ("FSP SOP 94-6-1"), indicates loan products with certain features may increase the exposure of the originator, holder, investor, guarantor, or servicer to risk of nonpayment or realization, and thereby, create a concentration of credit risk which requires the FAS 107 disclosures described above by the reporting entity. Regarding such features, SOP 94-6-1 provides the following, in relevant part:

Examples of features that may increase credit risk include, **but are not limited to:**

(a)    Terms that permit principal payment deferral **or payments smaller than interest accruals (negative amortization);**

(b)    A **high loan-to-value ratio;**

(c)    Multiple loans on the same collateral that when combined result in a high loan-to-value ratio;

(d)    **Option adjustable-rate mortgages (option ARMs)** or similar products that may expose the borrower to future increases in repayments in excess of increases that

151

result solely from increases in the market interest rate (for example, once negative amortization results in the loan reaching a maximum principal accrual limit);

(e) An **initial interest rate** that is below the market interest rate for the initial period of the loan term and **that may increase significantly** when that period ends; and

(f) **Interest-only loans.**

(FSP SOP 94-6-1 ¶ 2).

368. Under FAS 107 and FSP SOP 94-6-1, further examples that create group concentrations of credit risk include loans to nonprime (*i.e.,* subprime and Alt-A) borrowers, second mortgages/home equity loans (*i.e.,* multiple loans on the same collateral), loans in second lien positions or not secured by collateral, loans heavily concentrated in certain geographic areas and loans subject to ineffective, and potentially fraudulent, underwriting practices, as well as certain investments dependent upon cash flows from significant group concentrations.

*GAAP Requires Disclosures regarding Current Vulnerabilities due to Certain Concentrations*

369. Regarding loan products, FSP SOP 94-6-1 also refers to the requirements of SOP No. 94-6, *Disclosure of Certain Significant Risks and Uncertainties* ("SOP 94-6"), which requires disclosure of current vulnerabilities due to certain concentrations. (FSP SOP 94-6-1 ¶¶ 9-11). Such certain concentrations are not limited to concentrations of credit risk as the disclosures discussed above were. Specifically, FSP SOP 94-6-1 points to the requirement of SOP 94-6 to disclose concentrations when such a concentration (a) exists as of the date the financial statements and (b) makes the enterprise vulnerable to the risk of a near-term severe impact, and there is at least a reasonable possibility that the events that could cause the severe impact will occur in the near term. (SOP 94-6 ¶ 21). Examples of such concentrations include concentrations in the volume of business

152

transacted with a particular customer, concentrations in revenue from particular products or concentrations in a particular market or geographic area. (SOP 94-6 ¶ 22). Disclosure of concentrations meeting such criteria should include "information that is adequate to inform users of the general nature of the risk associated with the concentration." (SOP 94-6 ¶ 24).

*Required Disclosures regarding the Loan Portfolio were Omitted*

370. The Company's loan portfolio exposed the Company to significant concentrations of credit risk and current vulnerabilities due to certain concentrations. As alleged and discussed in greater detail elsewhere herein, during the Class Period, the Company accumulated/held a significant loan portfolio which, in significant parts, was comprised of loans with negative amortization features, option ARMs, variable interest rates, interest-only payment options, high LTV ratios, low documentation/stated income; loans to nonprime (*i.e.*, subprime and Alt-A) borrowers; second mortgages/home equity loans (*i.e.*, multiple loans on the same collateral); loans in second lien positions or not secured by collateral; loans based on inappropriate collateral appraisals; loans heavily concentrated in certain geographic areas; and loans subject to ineffective, and potentially fraudulent underwriting practices.

371. Prior to the merger with Golden West, the Company's loan portfolio already included loans which exhibited certain of the characteristics discussed above. For example, as of March 31, 2006 the Company's loan portfolio, with total loans in excess of $290 billion, was comprised of 55 percent commercial loans and 45 percent consumer loans. Of the commercial loans, 23 percent were not secured by collateral. Of the consumer loans, 26 percent were second lien, 31 percent had an LTV of greater than 80 percent, 10 percent had an LTV of greater than 90 percent and 46 percent had variable rates. The Company's 2006 annual financial statements were the first financial statements

153

to include the financial position and results of the operations of Golden West (beginning October 1, 2006). Those financial statements disclosed the following regarding the nature/terms of loans in its loan portfolio acquired in the merger of Golden West:

> In connection with the Company's merger with Golden West, the Company acquired a portfolio of Option Adjustable Rate Mortgage Loans ("Option ARMs"). The majority of the Company's Option ARMs have **an interest rate that changes monthly based on movements in certain indices.** Interest rate changes and available options relating to monthly payments of principal and interest are subject to contractual limitations based on the Company's lending policies. **Negative amortization occurs, under an available option subject to certain limits,** when the payment amount is less than the interest due on the loan. Borrowers may repay the deferred interest in whole or in part at any time. The amount of deferred interest related to all Option ARMs was $1.6 billion at December 31, 2006.
>
> At December 31, 2006, **Option ARMs represented 47 percent of the Company's consumer loans and 28 percent of the Company's total loans.** Properties securing the Company's Option **ARMs are concentrated primarily in California (60 percent) and Florida (8 percent).** No other state concentration is more than 5 percent of total Option ARMs.

Wachovia Corp. 2006 Annual Report, as incorporated in its 2006 Form 10-K.

372.   Subsequent disclosures have indicated that, by September 30, 2008, at least 85 percent of the Pick-A-Pay (*i.e.*, Option ARM) loan portfolio were originated under a low documentation/stated income program. No additional disclosure regarding the nature/terms (relevant to the allegations herein) of the loans in the Company's loan portfolio was provided in the 2006 annual financial statements. The 2007 annual financial statements included only a substantially similar and inadequate disclosure regarding the nature/terms (relevant to the allegations herein) of the loans in the Company's loan portfolio. Even worse, the relevant interim financial statements

154

omitted any disclosure whatsoever regarding the nature/terms of the loans in the Company's loan portfolio.

373.  Thus, the Company's relevant financial statements, in violation of GAAP and SEC rules, omitted the disclosures required by FAS 107 and FSP 94-6-1 regarding significant concentrations of credit risk created by its loan portfolio. The Company's relevant financial statements did disclose that its loan portfolio included loans with negative amortization features, option ARMs, variable interest rates and loans heavily concentrated in certain geographic areas. Such disclosures, however, did not include adequate information for each significant concentration regarding (a) the characteristic that identifies the concentration, (b) the related maximum amount of loss due to credit risk, (c) the Company's related policies regarding collateral, and (d) the Company's related policies regarding master netting arrangements to mitigated credit risk, as required by FAS 107 and FSP SOP 94-6-1. Additionally, and also in violation of GAAP and SEC rules, the Company's relevant financial statements omitted disclosure of "information that is adequate to inform users of the general nature of the risk associated with the concentration" for concentrations in volume of business with particular customers, concentrations in revenue from certain products, and concentrations in certain markets or geographic areas although the criteria for disclosure under SOP 94-6 was met.

*Concentrations in the Loan Portfolio Incurred Significant Losses*

374.  For 2007, the Company reported a provision for credit losses, of $2.3 billion, an increase of $1.9 billion compared to 2006. The Company reported a related increase to the allowance for credit losses of $1.2 billion from December 31, 2006. For the first quarter of 2008, the Company reported a provision for credit losses of $2.8 billion, an increase of $2.6 billion

155

compared to the first quarter of 2007. The Company reported a related increase to the allowance for credit losses of $2.1 billion from December 31, 2007, including an increase of $1.1 billion related to the Pick-A-Pay loan portfolio. For the second quarter of 2008, the Company eventually reported a provision for credit losses of $5.6 billion, an increase of $5.4 billion compared to the second quarter of 2007. The Company reported a related increase to the allowance for credit losses of $4.2 billion from March 31, 2008, including an increase of $3.3 billion related to the Pick-A-Pay loan portfolio. For the third quarter of 2008, the Company eventually reported a provision for credit losses of $6.6 billion, an increase of $6.2 billion compared to the third quarter of 2007. The Company reported a related increase to the allowance for credit losses of $4.6 billion from June 30, 2008, including an increase of $3.4 billion related to the Pick-A-Pay loan portfolio.

*Required Disclosures regarding Certain Investments were Omitted*

375.    During the Class Period, the Company accumulated/held a substantial investment portfolio which, in significant parts, was comprised of the relevant structured investments. The relevant structured investments exposed the Company to significant concentrations of credit risk. The values of such investments are dependent upon the present value of the expected cash flows from the investments. The expected cash flows of the investments are highly dependent upon the cash flows underlying the investments. As the underlying cash flows of the relevant structured investments are from "a number of counterparties [which] are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions" (*e.g.*, nonprime borrowers, the residential mortgage market, leveraged borrowers, monoline financial guarantors, and/or the subprime mortgage market), such investments exposed the Company to group concentrations of

156

credit risk. The complex nature, and related "opaqueness," of certain of the Company's structured investments, further enhanced such credit risk.

376.    Although previously undisclosed, the Company reported in its Form 10-Q for the quarterly period ended September 30, 2007, **but not in its related financial statements**, that, as of September 30, 2007, the Company had $3.84 billion of subprime-related ABS CDO and RMBS exposures.  Additionally, the Company reported in its Form 10-K for the annual period ended December 31, 2007 that, as of September 30, 2007 the Company also had $10.5 billion of CMBS, $11.1 billion of leveraged finance exposures, and the subprime-related ABS CDO and RMBS exposures were being offset by $2.2 billion of monoline-related exposures, which, aside from the amount of CMBS held in the Company's available-for-sale investment portfolio reported in the relevant financial statements, were also previously undisclosed.

377.    Thus, the Company's relevant financial statements, in violation of GAAP and SEC rules, omitted the disclosures required by FAS 107 and FSP 94-6-1 regarding significant concentrations of credit risk created by its investment portfolio. The Company's relevant financial statements did disclose limited information regarding the MBS and other ABS held in its trading and available for sale portfolios, including CMBS. Such disclosures, however, did not include adequate information for each significant concentration regarding (a) the characteristic that identifies the concentration, (b) the related maximum amount of loss due to credit risk, (c) the Company's related policies regarding collateral, and (d) the Company's related policies regarding master netting arrangements to mitigated credit risk, as required by FAS 107 and FSP SOP 94-6-1.

*Concentrations in the Investment Portfolio Incurred Significant Losses*

378.    For the second half of 2007, the Company reported losses related to its relevant structured investments, of $2.9 billion. For the first quarter of 2008, the Company reported losses related to its relevant structured investments of $1.5 billion. For the second quarter of 2008, the Company has eventually reported losses related to its relevant structured investments of $600 million. For the third quarter of 2008, the Company has eventually reported additional related losses of $1.0 billion.

*GAAP Requires Disclosures regarding Certain Significant Estimates*

379.    In addition to disclosures of current vulnerability due to certain concentrations discussed above, SOP 94-6 requires disclosures regarding certain significant estimates. SOP 94-6 ¶¶ 13-14, provides, in relevant part:

> Disclosure regarding an estimate should be made when known information available prior to issuance of the financial statements indicates that both of the following criteria are met:
>
> a.    It is at least **reasonably possible** that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements **will change in the near term due to one or more future confirming events**.
>
> b.    The effect of the change would be **material** to the financial statements.
>
> The disclosure should indicate **the nature of the uncertainty and include an indication that it is at least reasonably possible that a change in the estimate will occur in the near term** . . . . If the estimate involves a loss contingency covered by FASB Statement No. 5, the disclosure also should include an estimate of the possible loss or range of loss, or state that such an estimate cannot be made. Disclosure of the factors that cause the estimate to be sensitive to change is encouraged but not required.

380.    The term "reasonably possible" is defined as "more than remote but less than likely." (SOP 94-6 ¶ 13). FAS No. 5, *Accounting for Contingencies* ("FAS 5"), defines a loss contingency as "an existing condition, situation, or set of circumstances involving uncertainty as to possible . . . loss . . .to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur." (FAS 5 ¶ 1).

*Required Disclosures regarding Certain Significant Estimates were Omitted*

381.    As alleged and discussed in greater detail elsewhere herein, the Company had knowledge of its own conduct (*e.g.*, ineffective, and potentially fraudulent, underwriting practices and inadequate risk management) and the related quality of its loans and investments, as well as the prevailing economic conditions. Accordingly, the Company also knew that a related potential near-term, material adverse impact on its significant estimates was reasonably possible. In particular, it was reasonably possible that the values reported for its provision and allowance for credit losses, and the relevant structured investments would be impacted. The Company's relevant financial statements, however, did not include the disclosures required by SOP 94-6 for such significant estimates in violation of GAAP and SEC rules.

*Certain Significant Estimates were Materially Adversely Impacted in the Near-Term*

382.    For 2007, the Company reported a provision for credit losses of $2.3 billion, an increase of $1.9 billion compared to 2006. The Company reported a related increase to the allowance for credit losses of $1.2 billion from December 31, 2006. For the first quarter of 2008, the Company reported a provision for credit losses of $2.8 billion, an increase of $2.6 billion compared to the first quarter of 2007. The Company reported a related increase to the allowance for credit losses of $2.1 billion from December 31, 2007, including an increase of $1.1 billion related

159

to the Pick-A-Pay loan portfolio. For the second quarter of 2008, the Company eventually reported a provision for credit losses of $5.6 billion, an increase of $5.4 billion compared to the second quarter of 2007. The Company reported a related increase to the allowance for credit losses of $4.2 billion from March 31, 2008, including an increase of $3.3 billion related to the Pick-A-Pay loan portfolio. For the third quarter of 2008, the Company eventually reported a provision for credit losses of $6.6 billion, an increase of $6.2 billion compared to the third quarter of 2007. The Company reported a related increase to the allowance for credit losses of $4.6 billion from June 30, 2008, including an increase of $3.4 billion related to the Pick-A-Pay loan portfolio. For the second half of 2007, the Company reported losses related to its relevant structured investments of $2.9 billion. For the first quarter of 2008, the Company reported losses related to its relevant structured investments of $1.5 billion. For the second quarter of 2008, the Company eventually reported losses related to its relevant structured investments of $600 million. For the third quarter of 2008, the Company eventually reported additional related losses of $1.0 billion.

C.   **Overstatement of the Loan Portfolio, and related Understatement of the Provision and Allowance for Credit Losses**

383.   The Company's relevant financial statements, in violation of GAAP and SEC rules, overstated the value of the Company's loan portfolio, and understated the related allowance for loan/credit losses and the provision for credit losses.

*Relevant GAAP Requirements*

384.   The Company's loans held-for-investment (*i.e.* not held-for-sale) portfolio (herein the "loan portfolio") was reported as "Loans, net." Loans, net was, purportedly, reported in the relevant financial statements at the outstanding principal balance adjusted for charge-offs, net

160

of the allowance for loan losses, as required by GAAP, and specifically, SOP No. 01-6, *Accounting by Certain Entities (Including Entities With Trade Receivables) That Lend to or Finance the Activities of Others* ("SOP 01-6").

385.    The Company's allowance for loan losses was purportedly reported in the relevant financial statements as the estimate of all probable credit losses inherent in the loan portfolio, as required by GAAP. Specifically, FAS 5 provides guidance on accounting and reporting of loss contingencies (as previously defined herein), including credit losses. FAS 5 states that an estimated loss from a loss contingency, such as the collectibility of receivables, should be accrued (*i.e.*, increase the allowance for loan losses) by a charge to income. Such accrual should be made when, based on information available prior to the issuance of the financial statements, it is probable (defined as likely to occur) that the loss has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated. (FAS 5 ¶¶ 3, 4, 8). Specifically with respect to loss contingencies relating to the collectibility of receivables, FAS 5 states that accrual shall be made in relation to individual receivables or groups of similar types of receivables even though particular receivables that are uncollectible may not be identifiable. (FAS 5 ¶ 22).

386.    Additionally, FAS 5, as amended by FAS No. 114, *Accounting by Creditors for Impairment of a Loan* ("FAS 114"), provides that an individual loan is impaired when, based on current information and events, it is probable that a creditor will not be able to collect all amounts due according to the contractual terms of the loan agreement. All amounts due includes both the contractual interest payments and contractual principal payments. (FAS 114 ¶¶ 8, 21; FAS 5, as amended by FAS 114 ¶ 23).

387.    The AICPA Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies (the "AAG") provides that the quality of the related underwriting and review procedures should be considered in determining when credit losses should be recognized under the FAS 5 criteria. The AAG states, in relevant part, "if a faulty credit granting decision has been made or loan credit review procedures **are inadequate or overly aggressive** . . . the loss generally should be recognized **at the date of loan origination**." (AAG ¶ 9.37).

388.    Regarding management's methodology for estimating the amount of credit losses, the AAG provides certain common elements of any effective method. Those common elements include:

    a.    a detailed and regular analysis of the loan portfolio and off-balance-sheet instruments with credit risk.

    b.    procedures for timely identification of problem credits.

    c.    consistent use.

    d.    **consideration of all known relevant internal and external factors that may affect collectibility.**

    e.    consideration if all loans (whether on an individual or pool-of-loans basis) and other relevant credit exposure.

    f.    **consideration of the particular risks inherent in the different kinds of lending.**

    g.    **consideration of the current collateral fair values, where applicable.**

    h.    performance by competent and well-trained personnel.

    i.    current and reliable data are the base.

    j.    good documentation with clear explanations of the supporting analyses and rationale.

(AAG ¶ 9.05).

389.    Regarding the evaluation of loans, the AAG provides the following, in relevant part:

Loan evaluations by management (and tests of such by independent accountants to the extent they

are performed as part of the engagement) should avoid the following:

- *Collateral myopia*.  This is **the failure to see beyond collateral values to a financial weakness in the borrower. Collateral values and liquidity often tend to decline in periods during which they are most needed to protect against loan losses . . . .**

- *Inadequate collateral appraisals*. This is the failure to critically review appraisals to understand the methods employed, assumptions made, and limitations inherent in the appraisal process, including undue reliance on management appraisals. **Appraisal methods and assumptions may be inappropriate in the current circumstances. Going concern values generally are dramatically different from liquidation values.** For example, real estate appraisals made on the income approach are not usually appropriate for incomplete projects or in circumstances in which operating conditions have changed.

- Outdated or unreliable financial information. This is the reliance on old, incomplete, or inconsistent data to assess operating performance or financial capacity.  Financial information should be current and complete, particularly for borrowers sensitive to cyclical fluctuations or who demonstrate significant growth or changes in operating philosophy and markets.

- *Excessive renewals or unrealistic terms*. This is **the reliance on current or performing-as-agreed status if the transaction has been structured to obscure weaknesses.** Excessive renewals, **unrealistic terms, and interest capitalization [***i.e.*** negative amortization]** may be indications of such a structure. The purpose of a loan and performance against the original agreement should be critically reviewed.

*** * ***

- *Dependence on management representations*. This is undue reliance on management representations even though there is no supporting evidence. For example, such representations as "the guarantee is not signed but it is still good" or "the future prospects for this troubled borrower are promising" necessitate a critical review.

(AAG ¶ 9.17).

390.   In addition to those requirements provided in GAAP, the SEC provides additional guidance for registrants, such as the Company, regarding the management's methodology for the estimating credit losses in SAB 102, *Selected Loan Loss Allowance Methodology and Documentation Issues* ("SAB 102"). Specifically, SAB 102 states that "[i]t is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process" and consider the following factors:

- Levels of and trends in delinquencies and impaired loans;
- Levels of and trends in charge-offs and recoveries;
- **Trends in volume and terms of loans;**
- **Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;**
- Experience, ability, and depth of lending management and other relevant staff;
- **National and local economic trends and conditions;**
- **Industry conditions; and**
- **Effects of changes in credit concentrations.**

391.   Further regulatory guidance that specifically highlighted issues related to the allowance for loan losses on subprime lending was issued as early as 2001, collectively, by the Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision (the "Agencies"). The Agencies' *Expanded Guidance for Subprime Lending Programs*, which indicates the estimated credit losses should meet the criteria of GAAP and substantively reiterated many of the considerations listed above when estimating credit losses. Specifically, it provided that, when using historical loss experience to estimate expected credit losses, the historical loss experience "should be adjusted for changes in trends, conditions, and other relevant factors, including business volume, underwriting, risk selection, account management practices, and current economic or business conditions that may alter

164

such experience." Further, the guidance stated that "[t]he allowance should represent **a prudent, conservative estimate of losses that allows a reasonable margin for imprecision.**"

*Reported Amounts were Materially Misstated*

392.    As alleged and discussed in greater detail elsewhere herein, during the Class Period, the Company accumulated/held a significant loan portfolio which, in significant parts, was comprised of loans with negative amortization features, option ARMs, variable interest rates, interest-only payment options, high LTV ratios, low documentation/stated income; loans to nonprime (*i.e.,* subprime and Alt-A) borrowers; second mortgages/home equity loans (*i.e.,* multiple loans on the same collateral); loans in second lien positions or not secured by collateral; loans based on inappropriate collateral appraisals; loans heavily concentrated in certain geographic areas; and loans subject to ineffective, and potentially fraudulent, underwriting practices.

393.    During the relevant time-frame, the Company significantly expanded its total loan portfolio. The expansion was, in significant part, in the Company's consumer real estate loan portfolio which included the acquisition of the Golden West loan portfolio. Table #1 at Exhibit A depicts these trends, as well as the related trends in the Company's allowance for loan losses and net charge-offs.

394.    At the same time, the credit quality of the loan portfolio, as indicated by the relative amount of nonperforming assets, began to deteriorate. Nonperforming assets were comprised of non-accrual loans and foreclosed properties. Nonaccrual loans are those loans not accruing interest income, typically due to a past due status or other concerns regarding collectability. Table #2 at Exhibit A depicts this trend, as well as the related trend in the Company's allowance for loan losses.

165

395.     As indicated by the facts and conduct alleged elsewhere herein, the Company's inaccurate assertion that its loan portfolio, and related allowance for loan losses, were reported in conformity with GAAP rested on knowingly or recklessly ignoring the prevailing economic conditions and the risks inherent in its loan portfolio. The Company did not adequately consider such conditions and risks in its determination of the collectibility of the loan portfolio, including the allowance for loan losses. As shown in the tables above, even as the risks inherent in the loan portfolio increased, the Company's allowance for loan losses, and net charge-offs, remained minimal – and at times, decreased – relative to the loan portfolio. Similarly, at times during this period, the allowance for loan losses decreased relative to the amount of nonperforming assets.

396.     The Company acknowledged in the first quarter of 2008 that it was tightening underwriting guidelines and had "refined" its reserve model for the Pick-A-Pay portfolio. The new model (a) "strongly correlates forward expected losses to changes in the home prices and the resulting change in borrower behavior," (b) is "less reliant on historical delinquency trends," (c) "incorporates approximately 20 loan and/or borrower characteristics," and (d) "connects borrower equity to projected changes in home prices by geographic region." Those changes, in combination with facts and conduct alleged elsewhere herein, confirm there were material shortfalls in the previous model. In particular, the model Wachovia used for most of the Class Period relied heavily on inflated collateral values and on the unrealistic assumption that current delinquency and default rates would not rise, even as monthly payments did, and did not sufficiently consider geographic concentrations. Thus, the relevant financial statements, in violation of GAAP and SEC rules, materially understated the allowance for loan losses, and thereby, materially overstated the value of its loan portfolio, net of the allowance for loan losses.

397.    Direct write-offs (*i.e.*, charge-offs) from the loan portfolio and increases to the allowance for loan losses, which are included in the allowance for credit losses, are reported in the provision for credit losses (*i.e.*, an expense), a component of net income. Therefore, by overstating its loan portfolio (*i.e.*, avoided direct write-offs) and understating the allowance for credit losses, the relevant financial statements, in violation of GAAP and SEC rules, materially understated the amounts reported as the provision for credit losses, and thereby materially overstated net income.

398.    Thus, the Company materially misstated its results of operations, including the provision for credit losses, net income and earnings per share or EPS, and its financial position, including the loan portfolio and related allowance for loan and credit losses, because the numbers disclosed were not derived in conformity with GAAP.

*Losses incurred in the Loan Portfolio were eventually Reported*

399.    For 2007, the Company reported a provision for credit losses of $2.3 billion, an increase of $1.9 billion compared to 2006. The Company reported a related increase to the allowance for credit losses of $1.2 billion from December 31, 2006. For the first quarter of 2008, the Company has reported a provision for credit losses of $2.8 billion, an increase of $2.6 billion compared to the first quarter of 2007. The Company reported a related increase to the allowance for credit losses of $2.1 billion from December 31, 2007, including an increase of $1.1 billion related to the Pick-A-Pay loan portfolio. For the second quarter of 2008, the Company eventually reported a provision of for credit losses of $5.6 billion, an increase of $5.4 billion compared to the second quarter of 2007. The Company reported a related increase to the allowance for credit losses of $4.2 billion from March 31, 2008, including an increase of $3.3 billion related to the Pick-A-Pay loan portfolio. For the third quarter of 2008, the Company has eventually reported a provision of for

credit losses of $6.6 billion, an increase of $6.2 billion compared to the third quarter of 2007. The Company reported a related increase to the allowance for credit losses of $4.6 billion from June 30, 2008, including an increase of $3.4 billion related to the Pick-A-Pay loan portfolio.

**D.      Overstatement of the Value of Certain Investments**

400.    The Company's relevant financial statements, in violation of GAAP and SEC rules, overstated the value of the Company's relevant structured investments.

*Relevant GAAP Requirements*

401.    The Company falsely reported that it primarily reported its relevant structured investments at fair value as required by GAAP. GAAP, specifically, FAS 157, *Fair Value Measurements* ("FAS ¶ 157"), defines "fair value" as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." (FAS 157 ¶ 5).

402.    FAS 157 indicates that fair value is measured using valuation techniques that are appropriate in the circumstances and for which sufficient data are available, and segregates the inputs, or assumptions, used in the valuation techniques into two categories: observable and unobservable. (FAS 157 ¶ 18). Regarding their use in valuation models, FAS 157 provides that observable inputs are prioritized over unobservable inputs. (FAS 157 ¶¶ 22, 24, 28, 30). Further, FAS 157 provides that certain valuation model inputs may require adjustments to appropriately measure fair value. Regarding certain observable inputs, FAS 157 provides that the adjustments are based on factors specific to the asset and may include factors, such as, the condition of the asset and the volume and level of activity in the markets within which the inputs are observed. (FAS 157 ¶ 29). Regarding certain unobservable inputs, FAS ¶ 157 provides that inputs include assumptions

168

about risk and the inputs must be adjusted for risk. (FAS 157 ¶ A25). Specifically, FAS 157,

provides the following, in relevant part:

> Assumptions about risk **include the risk inherent in a particular valuation technique used to measure fair value (such as a pricing model) and/or the risk inherent in the inputs to the valuation technique** .... (FAS 157 ¶ A25).
>
> A measurement (for example, a "mark-to-model" measurement) that does not include an adjustment for risk **would not represent a fair value measurement if market participants would include one in pricing the related asset** or liability. (FAS 157 Footnote 15).

403.    The Company adopted FAS 157 for its 2008 fiscal year (*i.e.*, for the quarterly and

annual periods beginning on or after January 1, 2008).  While GAAP did not require the Company

to adopt FAS 157 until that time, a significant amount of the Company's peers/competitors elected

to early adopt FAS 157 for 2007.  As such, the Company's 2007 annual and interim financial

statements did not include the significantly expanded fair value disclosures required by FAS 157,

and thereby, contained significantly less disclosure than many of its peers/competitors.

404.    Prior to 2008 (*i.e.*, for the quarterly annual periods ending on or before December 31,

2007), FAS 107 provided guidance regarding fair value.  FAS 157 did not significantly change the

concept of fair value from FAS 107.  FAS 107 indicated quoted market prices were the best

indication of fair value. (FAS 107 ¶ 20).  In the absence of quoted market prices, the reporting entity

should develop its best estimate and those estimates were to be reflective of the risks involved. (FAS

107 ¶¶ 20-29).

*Reported Amounts were Materially Misstated*

405.    As alleged and discussed in greater detail elsewhere herein, during the Class Period,

the Company accumulated/held a significant investment portfolio which, in significant part, was

169

comprised of the relevant structured products. As indicated by the facts and conduct alleged elsewhere herein, the Company's knowingly false assertion that such investments were reported in conformity with GAAP rested on willfully ignoring the prevailing economic conditions and the risks inherent in its investment portfolio. The Company did not adequately consider such conditions and risks in its determination of the fair value of, at a minimum, its relevant structured products. Thus, the relevant financial statements, in violation of GAAP and SEC rules, materially overstated the fair value of those investments.

406.    Changes in the fair value (*i.e.*, realized and unrealized gains and losses) and other market valuation adjustments of the Company's investments discussed above primarily impact net income, and thereby shareholders' equity, during the period of the change. In instances where such investments were categorized as available-for-sale and the unrealized loss was determined by the Company to be temporary, the change in fair value directly impacts shareholders' equity, but not net income. Therefore, by overstating the value of the Company's relevant structured investments, the relevant financial statements, in violation of GAAP and SEC rules, materially overstated net income and shareholders' equity.

407.    Thus, the Company materially misstated its results of operations, including the losses on its relevant structured investments, net income, and earnings per share or EPS, and its financial position, including the investments discussed above, because the numbers disclosed were not derived in conformity with GAAP.

*Losses incurred in the Investment Portfolio were eventually Reported*

408.    For the second half of 2007, the Company reported losses related to its relevant structured investments, although inadequate as discussed below, of $2.9 billion. For the first quarter

170

of 2008, the Company reported losses related to its relevant structured investments, although inadequate as discussed below, of $1.5 billion. For the second quarter of 2008, the Company eventually reported losses related to its relevant structured investments of $600 million. For the third quarter of 2008, the Company eventually reported additional related losses of $1.0 billion.

### E.   Failure to Consolidate and Properly Disclose Certain Off-Balance Sheet Entities

409.   The Company's relevant financial statements, in violation of GAAP and SEC rules, did not present certain VIEs on a consolidated basis, nor include the required disclosures for certain unconsolidated VIEs.

*Relevant GAAP Requirements*

410.   GAAP requires enterprises (*i.e.*, the Company) to consolidate other entities when there is a controlling financial interest. Prior to 2004, ARB 51, *Consolidated Financial Statements* ("ARB 51"), provided that a controlling financial interest was indicated by a majority voting interest; however, in the wake of the Enron accounting scandal which, in part, involved the use of off-balance sheet entities, the FASB issued FIN 46(R), *Consolidation of Variable Interest Entities* ("FIN 46(R)"). FIN 46(R), in general, requires consolidation of an entity by the enterprise that assumes the majority of the risks and rewards of the entity. The enterprise that assumes the majority of the risks and rewards is deemed the "primary beneficiary."

411.   Determining if consolidation is required by the provisions of FIN 46(R) is, generally, a two-step process: (a) determining if the entity in question is a VIE, thereby potentially requiring consolidation, and (b) identifying the primary beneficiary.

*Determining if the Entity is a VIE*

171

412.    The determination of whether an entity meets the definition of a VIE should be performed when an enterprise initially becomes involved with that entity. (FIN 46(R) ¶ 6). VIEs are often created to structure securitization-type transactions (*e.g.*, collateralized debt obligations ("CDOs"), asset-backed commercial paper ("ABCP") conduits, etc.), and/or could be in form of structured lending vehicles, investment funds or money market funds.

*Identifying the Primary Beneficiary*

413.    If the entity is determined to be a VIE, an enterprise must determine if it is the primary beneficiary, and thereby required to consolidate the VIE. (FIN 46(R) ¶ 15). FIN 46(R) identifies the primary beneficiary as the holder of the "variable interest (or combination of variable interests) that **will absorb a majority of the entity's expected losses**, receive a majority of the entity's expected residual returns, or both . . . ." (FIN 46(R) ¶ 14).

414.    Variable interests are the "investments or other interests that will absorb portions of a variable interest entity's expected losses or receive portions of the entity's expected residual returns." (FIN 46(R) ¶ 6). Variable interests may come in the form of, among others, investments in equity, investments in debt, retained interests, lines of credit, liquidity facilities, guarantees, and certain derivatives.

415.    GAAP, specifically, FSP FIN 46(R)-5, *Implicit Variable Interests under FASB Interpretation No. 46* (revised December 2003) ("FSP FIN 46(R)-5"), requires that enterprises consider both implicit and explicit variable interests when identifying the primary beneficiary. (FSP FIN 46(R)-5 ¶ 6). FSP FIN 46(R)-5, generally, describes an implicit variable interest as an "implied pecuniary interest" that may absorb losses of a VIE although not contractually required to do so. (FSP FIN 46(R)-5 ¶¶ 3-4).

172

416.    The determination of whether an enterprise is the primary beneficiary, and thereby required to consolidate the VIE, should be performed when the enterprise initially becomes involved with the VIE and subsequently upon certain "reconsideration events," such as, when the enterprise, previously not considered the primary beneficiary, acquires additional variable interests. (FIN 46(R) ¶ 15). The expected losses and expected residual returns are, generally, determined by a probability weighted discounted cash flow analysis of the VIE. That analysis should consider both implicit and explicit variable interests. (FSP FIN 46(R)-5 ¶ 6).

*The Company's Failure to Consolidate VIEs*

417.    During the Class Period, the Company had significant involvement, implicit and explicit, in numerous unconsolidated VIEs including commercial paper conduits, CDOs, investment funds, money market funds, and structured lending vehicles. As early as December 31, 2006 the Company had significant variable interests in unconsolidated VIEs it administered (indicative of an implicit variable interest), including liquidity agreements with multi-seller commercial paper conduits and a structured lending vehicle, as well as, ownership interests in two investment funds that were unconsolidated VIEs. In January 2007 the Company purchased a majority interest in the investment manager of the investment funds (also indicative of an implicit variable interest).

418.    The Company's liquidity agreements are considered guarantees, and thus, were included in the guarantee footnote disclosure. The following table depicts a significant discrepancy between the Company's total exposures (*i.e.*, the maximum potential amount of future payments) under such variable interests and the amount of expected losses the Company deemed probable (*i.e.*, the carrying value).

173

| In millions of dollars at year end | 2005 | 2006 (a) | 2007 |
|---|---|---|---|
| Maximum Risk of Loss | 27,193 | 33,341 | 36,926 |
| Carrying Amount | 8 | 9 | 14 |
| Carrying Amount as a percentage of the Maximum Risk of Loss | 0.03% | 0.03% | 0.04% |

(a) The Maximum Risk of Loss was initially reported as 27,610 in the 2006 annual financial statements, however, that amount was revised to 33,341 in the 2007 annual financial statements.

419.    The Company's knowingly false assertion that it was not the primary beneficiary of certain VIEs, and thereby not required to consolidate, rested on willfully ignoring the prevailing economic conditions and the risks inherent in its variable interests (implicit and explicit). The Company knew, or should have known, that it would ultimately absorb the majority of the VIEs' expected losses, and thus it was their primary beneficiary. At a minimum, the Company was the primary beneficiary of (a) the structured lending vehicle it administered, as of the fourth quarter of 2006 and (b) an Evergreen fund it managed, by no later than the third quarter of 2007. Those VIEs' financial positions and results of operations should have been consolidated with the Company's.

420.    Thus, statements made regarding the Company's financial position, including capital ratios, and results of operations were materially false and misleading as the amounts were not derived in conformity with GAAP.

421.    The Company eventually consolidated the structured lending vehicle it administered, as of September 30, 2007. The Company eventually acknowledged its implicit variable interests in the Evergreen money market funds when, although "not required by contract," it purchased assets from those funds in the third quarter of 2007 and again in the third quarter of 2008. Those asset purchases ultimately resulted in valuation losses of $57 million in 2007 and $761 million in the first nine months of 2008. Additionally, the Company eventually consolidated an Evergreen fund it

174

provided financing to in June 2008, which subsequently resulted in $172 million in write-downs in the second and quarters of 2008.

   *The Company's Failure to Properly Disclose VIEs*

   422.   The Company's 2006 annual financial statements and 2007 interim statements, in violation of GAAP and SEC rules, did not include any such disclosure regarding liquidity facilities and derivative exposures to certain unconsolidated VIEs involved in CDO securitization transactions.   In addition to consolidation requirements, FIN 46(R) provides that with respect to unconsolidated VIEs with which an enterprise has significant variable interests, the enterprise must disclose: (a) the nature of its involvement with the VIE and when that involvement began, (b) the nature, purpose, size, and activities of the VIE, and (c) the enterprise's maximum exposure to loss as a result of its involvement with the VIE.   (FIN 46(R) ¶ 24).   Although previously undisclosed, the Company eventually acknowledged in its 2007 financial statements that those variable interests actually had a maximum exposure to losses from unconsolidated VIEs involved in CDO securitization transactions of $9.6 billion as of December 31, 2006 and $7.3 billion as of December 31, 2007.   Additionally, and also in violation of GAAP and SEC rules, the Company's relevant financial statements did not disclose the entire nature of its involvement (*e.g.*, its implicit interests were undisclosed) and when the Company became involved with certain unconsolidated VIEs with which it had significant variable interests.

   **F.       Lack of Timely Impairment of Goodwill**

   423.   The Company's relevant financial statements, in violation of GAAP and SEC rules, did not timely recognize impairment of goodwill, most notably the $14.9 billion of goodwill the Company recorded as a result of the merger with Golden West.