Part  (8) Pages 176-201

*Relevant GAAP Requirements*

424.    Goodwill is defined in FAS 142, *Goodwill and Other Intangible Assets* ("FAS 142"),

as the "excess of the cost of an acquired entity over the net of the amounts assigned to assets

acquired and liabilities assumed." (FAS 142 Appendix F).  An acquiring entity would, generally,

purchase an entity for excess of the fair value of net assets to be acquired, because of a perceived

control premium and/or anticipated synergies to be created in the acquisition. Goodwill is reflected

in the reporting entity's balance sheet as an asset.

425.    GAAP provides that the carrying value of goodwill should not be amortized to

expense; however, GAAP does require that goodwill be tested at an entity's reporting unit level for

impairment at least annually, but also between annual tests when certain conditions exist. (FAS 142

18, 26).  Specifically, FAS 142 provides that "[g]oodwill of a reporting unit shall be tested for

impairment between annual tests **if an event occurs or circumstances change that would more**

**likely than not reduce the fair value of a reporting unit below its carrying amount,**" including

significant adverse changes in legal factors or business climate and when its "more-likely-than-not"

that a reporting unit will be sold.  (FAS 142 ¶ 28).

426.    FAS 142 requires a two step process when testing goodwill for impairment. The first

step compares the fair value of the reporting unit to its carrying value, including goodwill, to identify

potential impairment. If the carrying value of the reporting unit is less than its fair value, there is no

goodwill impairment and the second step is not required. However, if its carrying value exceeds the

fair value of the reporting unit, the second step is performed to measure, if any, the impairment of

the reporting unit's goodwill. The second step compares the implied fair value of the reporting unit's

goodwill to the carrying value of the reporting unit's goodwill, and requires an impairment loss for

176

any amount where that carrying value exceeds that fair value. The implied fair value of a reporting unit's goodwill is determined by allocating the fair value of the reporting unit, as calculated in the first step, to all of the reporting unit's assets and liabilities. Any amount of the fair value of the reporting unit in excess of the net fair value of the reporting unit's assets and liabilities is the implied fair value of the reporting unit's goodwill.

*Goodwill Impairment was not Timely Recognized*

427.    Goodwill was a significant component of the Company's reported assets in the relevant financial statements. As of December 31, 2006 and December 31, 2007 the Company reported goodwill in the amount of $38.4 billion and $43.1 billion, respectively. During 2006 the Company recorded $14.9 billion of goodwill as a result of the merger with Golden West. Purportedly, the Company performed goodwill impairment tests as of December 31, 2006; December 31, 2007; March 31, 2008; June 30, 2008; and September 30, 2008. Regarding determining the fair value of its reporting units, the Company disclosed that prior to 2008 it relied upon earnings multiple (EM) and discounted cash flow (DCF) methods, in 2008 focused on the DCF method, and that as of September 30, 2008 it used the Company's fair value indicated by the terms of the merger with Wells Fargo as a basis. Further, the Company stated that, purportedly, its DCF models "utilized discount rates" that "adequately reflected the risk and uncertainty in the financial markets generally and specifically in its internally developed earnings projections." (Quarterly Financial Supplement p. 11, as filed as part of the Q3 2008 Form 10-Q). The Company did not report any goodwill impairment in the relevant financial statements. The Company did report, however untimely, goodwill impairment losses of $6.1 billion for the second quarter of 2008, and eventually, $18.8 billion for the third quarter of 2008.

428.    The Company's knowingly false assertion that goodwill was not impaired prior to the second and third quarters of 2008 rested on willfully ignoring the prevailing economic conditions and the risks inherent in its reporting units. The Company's analysis of goodwill did not adequately consider those conditions and risks in its discount rate, and further, the Company's "internally developed earnings projections" did not appropriately reflect the Company's true financial position and results of operations, specifically for those issues and the related untimely reported losses discussed herein. An analysis that appropriately reflected such factors would have provided a strong indication that (a) more likely than not, the fair value of the Company's reporting units were reduced below the carrying value of those reporting units requiring the Company to more timely perform goodwill impairment testing and (b) the implied fair value of its reporting units' goodwill exceeded the related carrying values requiring more timely goodwill impairment charges.

429.    Further, had the Company more timely recorded the losses related to the issues discussed herein, as required by GAAP, such would have resulted in a more timely decline in the Company's market capitalization, and ultimately, a more timely realization that the Company had to be rescued by another entity. When the Company eventually reported the goodwill impairment charges in the second and third quarter of 2008, it acknowledged that the primary drivers of such impairment were in fact the Company's reduced market capitalization and the terms of the Wells Fargo merger. Thus, the relevant financial statements materially overstated goodwill, and by avoiding timely impairment charges, overstated net income, in violation of GAAP.

178

G.  **Ineffective Disclosure Controls and Procedures and Internal Control over Financial Reporting**

430.  Throughout the Class Period, the Company falsely represented that it had effective disclosure controls and procedures, and internal control over financial reporting. The SEC defines "disclosure controls and procedures" as:

> controls and other procedures of an issuer that are designed to ensure **that information required to be disclosed by the issuer in the reports filed or submitted by it under the [Securities] Exchange Act is recorded, processed, summarized and reported, with the time periods specified in the Commission's rules and forms...**

SEC Final Rule Release Nos. 33-8124, 34-46427, IC-25722; File No. S7-21-02.

431.  "Internal control over financial reporting" is defined in Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with An Audit of Financial Statements* ("AS 2"), as a process "to provide reasonable assurance regarding the reliability of financial reporting **and the preparation of financial statements for external purposes in accordance with [GAAP] . . . .**" (See Securities Exchange Act Rules 13a-15(f) and 15d-15(f).2/) (AS 2 ¶ 7).

432.  Securities Exchange Act Rules 13a-15 and 15d-15 require the Company's principal executive officer and principal financial officer to quarterly and annually certify the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure controls and procedures as of the end of each fiscal quarter-end and fiscal year-end. Further, the Company is required to annually report on the effectiveness of its internal control over financial reporting. As 2 states, in relevant part:

> A company subject to the reporting requirements of the Securities Exchange Act of 1934 (an "issuer") is required to include in its

179

annual report a report of management on the company's internal control over financial reporting... The report of management is required to contain management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether the company's internal control over financial reporting is effective . . . .

(AS 2 ¶ 2).

433.    Specific to the allowance for loan losses, the Agencies and the National Credit Union Administration issued the "Interagency Policy on the Allowance for Loan and Lease Losses" on December 13, 2006 which reiterated the responsibility of financial institutions to "ensure controls are in place to consistently determine the [allowance for loan losses] in accordance with GAAP . . . ."

434.    The Company's disclosure controls and procedures, and internal control over financial reporting were not effective throughout the Class Period as the Defendants caused the Company to issue the relevant financial statements, and related Forms 10-K and 10-Q that, for the violations noted above herein, were not in conformity with GAAP and SEC rules. Further, as alleged and discussed in greater detail elsewhere herein, the Company had ineffective underwriting practices and inadequate risk management. Certain Defendants, however, falsely represented that the Company's disclosure controls and procedures were effective as of the date of each individual Securities Exchange Act report filed during the Class Period. Further, the Company falsely represented that it maintained effective internal control over financial reporting as of the date of each of the relevant annual financial statements. As such, during the Class Period, the Defendants caused the Company to mislead investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting.

180

## VI. ADDITIONAL SCIENTER ALLEGATIONS

435. As alleged herein, Defendants acted with *scienter* in that Defendants knew that public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Wachovia, their control over, and/or receipt and/or modification of Wachovia's allegedly misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Wachovia, participated in the fraudulent scheme alleged herein.

436. Because of their position with the Company, Defendants at all times had the opportunity to, and did, commit the wrongdoing alleged herein.

### A. Defendants Received Reports Detailing Significant and Widespread Problems with Wachovia's Lending

437. The Individual Defendants received various reports concerning Wachovia's lending practice and loan performance. According to CW 2, quarterly reports were complied for management's review, detailing information related to the Company's loan origination, including standards implemented and underwriting guidelines, was automated and readily available to the Individual Defendants as senior executives of the Company.

438. CW 2, a workout specialist in the loss mitigation department from 2000 through 2004 and a loan servicing specialist from November 2004 through October 2007 for HomeEq Servicing

181

Corporation in California, stated that HomeEq provided quarterly reports to Wachovia on losses and costs associated with the Company's collection efforts on their loans. The portfolio loans serviced by HomeEq "were not the best" and those serviced by CW 2 were all subprime loans, which Wachovia aggressively sold to customers.

439. Moreover, CW 2, while attempting to help borrowers avoid foreclosure, said it was not uncommon for a borrower to tell CW 2 that while the loan application showed the borrower's income as a certain amount, he or she really only made a third or half of that amount. The borrower would explain to CW 2 that he or she was told to write the higher number on the application in order to get the loan approved. This was a situation CW 2 ran into "a lot of the time."

440. CW 2 had direct knowledge of the information provided in the quarterly reports Wachovia received from attending quarterly all-employee meetings, which took place in the auditorium at the North Highlands, California location.

441. CW 3 was repeatedly instructed by managing directors to sell prospective borrowers on the Pick-A-Pay loan program by getting the borrowers to overstate their actual income. CW 3 has direct knowledge that upon receipt of Pick-A-Pay loan files in the Quick Qualifier program, the underwriters did not verify the income or DTI levels.

442. This testimony is corroborated by confidential witnesses cited in the *Bond/Notes Complaint*. BNCW2, who served as a mortgage consultant for Golden West (both before and after Wachovia acquired it) on the East Coast from April 2005 until October 2008, stated that from the "first week" of his employment, he learned that the practice at Golden West was to "package the loans [according to] whatever was needed" to obtain underwriter approval, and to "make sure the borrower got the loan." "Doing whatever was needed" included "making things up," and specifically

182

using bogus stated income figures (which were higher than what the borrower had initially represented) and providing more impressive sounding (but false) job titles that would be reported on the borrowers' loan application in order to bolster the fabricated incomes.

443.   BNCW2 gave the following example: "If someone was working as a cashier at McDonald's making $40,000 a year, and we saw from their file that they needed to make $60,000 [to be approved for the loan]," then the loan salesperson would list a $60,000 income and "we'd change their title to manager so it would look right."

444.   Similarly, if a borrower's actual annual income was $60,000 but the loan required an income of $75,000, a loan salesperson would say to the borrower, "If you made $75,000 a year, that would work," and the borrower would typically respond to this prompt by saying, "Yeah, I make $75,000." In sum, as BNCW2 reported, the sales force for Golden West/Wachovia was routinely "overstating income and qualifying [borrowers] at the wrong jobs."

445.   BNCW2 also confirmed that when a loan could not satisfy even its lax underwriting guidelines, Golden West/Wachovia's guidelines and exceptions would frequently be used to approve the loan. The most common exceptions, BNCW2 stated, were to the required minimum FICO score and maximum LTV limits, and those exceptions were made "every single day." "This is stuff I was taught from day one. One of the things we were taught to sell was our underwriting, that we could make and break our own rules."

**B.     Defendants Knew of or Recklessly Disregarded Wachovia's Lax Underwriting Guidelines**

446.   Because Wachovia's underwriting guidelines directly affected the value and credit quality of Wachovia's loans, and therefore were fundamental to Wachovia's overall financial

condition, Wachovia's senior management monitored and managed Wachovia's prime and subprime home lending underwriting guidelines and operations.

447.    In June 2006, Wachovia reported that the factors contributed to the decision to approve the merger in their Form S4 were that Golden West's financial condition and asset quality were very sound. In July 2006, Individual Defendant Thompson and Wachovia's management reviewed and discussed strategic factors related to the proposed transaction, including Golden West's consumer banking and mortgage-lending businesses, the timing of integration activities, and the credit quality and risk management assessment of Golden West.

448.    Shortly after the acquisition, Thompson stated that Wachovia had captured "a crown jewel" in the mortgage business. All the while, according to CW 2, Wachovia was receiving quarterly reports on losses and costs with the Company's collection efforts on their portfolio which consisted of subprime loans after the acquisition of Golden West.

449.    CW 3 explained that after the merger, the underwriting process at Wachovia was nothing short of fraud. As previously discussed, the vast majority of Pick-A-Pay loans were stated income/no document, or "Quick Qualifier" loans. To get the loans approved, CW 3 and other loan officers and sales managers were instructed to falsify the amount of stated income on the loan application. CW 3 recalled witnessing an incident where another loan officer was instructed to "bump up" an applicant's social security income to qualify for the stated loan/no documentation loan.

450.    Moreover, CW 4 stated that at Wachovia "it was all about the numbers." The priority was to sell Pick-A-Pay, even though Wachovia had other more conservative mortgage programs available. Additionally, after Wachovia took over the Pick-A-Pay loan program, Wachovia stopped

using World in-house appraisers and instead used outside appraisers to assess the home values for loan applications. CW 4 stated that this practice made the home valuation appraisals on Pick-A-Pay loans less reliable because outside appraisers had a reputation for assigning higher values to homes than World's in-house appraisers did.

451. Further, Wachovia, at the direction of the Individual Defendants, established a system of financial rewards of originating higher risk loans, and corresponding negative consequences for those who did not follow the system. Wachovia loan production personnel were compensated based on loan volume without any regard to loan quality, and were paid even more for originating riskier Pick-A-Pay loans. CW 3 stated that commissions earned by Wachovia's employees who sold Pick-A-Pay loans were substantially higher than those resulting from the sale of more traditional products.

452. Finally, unknown to the members of the Class, the Individual Defendants caused Wachovia's underwriting standards to significantly deteriorate during the Class Period. In fact, the Individual Defendant's created a false and misleading appearance of conservative, quality-focused underwriting at Wachovia through their public statements. According to CW 3, loan officers were instructed *not* to fully educate borrowers about the Pick-A-Pay loans and the negative amortization they could face if they chose the Pick-A-Pay mortgage.

C. **Insider Stock Sales By Thompson and Other Officer Defendants During the Class Period Were Highly Unusual and Suspicious**

453. The Class Period sales of Wachovia stock by Defendants Thompson, Wurtz, and Truslow were highly unusual, and therefore suspicious, as measured by (1) the amount and percentage of shares sold, (2) comparison with the Individual Defendants' own prior trading history

and that of other insiders, and (3) the timing of the sales. Such sales therefore provide strong evidence of scienter.

454.    To evaluate the Individual Defendants' selling activity, Lead Counsel used publicly available trading data required to be reported to the SEC. Lead Counsel analyzed the trading by insiders that occurred during the Class Period and during an approximately equal-length period immediately preceding the Class Period, the ("Control Period"). As demonstrated below, Individual Defendants' Class Period sales were extremely large and highly unusual.

455.    During the Class Period, Wachovia's insiders owned and sold the following Wachovia shares:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Thompson | 02/06/07 | 29,712 | $57.32 | 1,703,118.58 |
| Thompson | 3/30/2007 | 9,521 | $55.05 | 524,131.05 |
| Thompson | 4/18/2007 | 9,604 | $55.87 | 536,575.48 |
| Thompson | 4/19/2007 | 9,606 | $55.52 | 533,325.12 |
| Thompson | 4/20/2007 | 7,129 | $55.85 | 398,154.65 |
| Thompson | 2/20/2008 | 15,074 | $34.08 | 513,721.92 |
| Thompson | 3/31/2008 | 9,521 | $27.00 | 257,067.00 |
| Thompson | 4/18/2008 | 19,210 | $27.24 | 523,280.40 |
| Thompson | 4/22/2008 | 7,129 | $26.20 | 186,779.80 |
| **Total** | | **116,506** | | **5,176,154.00** |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Truslow | 10/18/06 | 16,980 | $55.14 | 936,277.20 |
| Truslow | 3/30/2007 | 1,429 | $55.05 | 78,666.45 |
| Truslow | 4/18/2007 | 1,552 | $55.87 | 86,710.24 |
| Truslow | 4/18/2007 | 37,334 | $55.52 | 2,072,783.68 |
| Truslow | 4/18/2007 | 1,789 | $55.87 | 99,951.43 |
| Truslow | 4/19/2007 | 1,682 | $55.52 | 93,384.64 |
| Truslow | 4/20/2007 | 1,498 | $55.85 | 83,663.30 |
| Truslow | 2/20/2008 | 1,816 | $34.08 | 61,889.28 |
| Truslow | 3/31/2008 | 1,092 | $27.00 | 29,484.00 |
| Truslow | 4/18/2008 | 2,473 | $27.24 | 67,364.52 |
| Truslow | 4/22/2008 | 1,145 | $26.20 | 29,999.00 |
| **Total** | | **68,790** | | **3,640,173.74** |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Wurtz | 10/23/06 | 23,358 | $55.95 | 1,306,880.10 |

186

| | | | | |
|---|---|---|---|---|
| Wurtz | 12/16/06 | 6,368 | $57.04 | 363,230.72 |
| Wurtz | 2/5/2007 | 422 | $56.46 | 23,824.56 |
| Wurtz | 2/5/2007 | 1,984 | $56.50 | 112,090.84 |
| Wurtz | 2/5/2007 | 28,014 | $57.30 | 1,605,143.37 |
| Wurtz | 3/30/2007 | 1,684 | $55.05 | 92,704.20 |
| Wurtz | 4/18/2007 | 582 | $55.87 | 32,516.34 |
| Wurtz | 4/19/2007 | 431 | $55.52 | 23,929.12 |
| Wurtz | 4/20/2007 | 409 | $55.85 | 22,842.65 |
| Wurtz | 2/20/2008 | 2,133 | $34.08 | 72,692.64 |
| Wurtz | 3/31/2008 | 1,287 | $27.00 | 34,749.00 |
| Wurtz | 4/18/2008 | 775 | $27.24 | 21,111.00 |
| Wurtz | 4/22/2008 | 313 | $26.20 | 8,200.60 |
| **Total** | | **67,760** | | **3,719,915.14** |

456.    Defendants' insider trading was unusual and suspicious. Defendant Thompson sold just over 61,000 shares of Wachovia common stock in the 16 months preceding the Class Period, but sold over 116,500 shares in the 14 months between February 2007 and April 2008. Defendant Wurtz sold just 8,255 shares of Wachovia common stock in the 16 months preceding the Class Period, but sold over 67,700 shares in the 18 months between October 2006 and April 2008. Defendant Truslow sold just 25,730 shares of Wachovia common stock in the 16 months preceding the Class Period, but sold almost 68,000 shares in the 18 months between October 2006 and April 2008.

**D.     Defendants Used Wachovia's Inflated Stock As Currency For Acquisitions During The Class Period**

457.    Defendants were also motivated to keep Wachovia's stock price artificially inflated during the Class Period because that stock was used by Defendants for acquisitions.

458.    Specifically, during the Class Period, Defendants were able to acquire Golden West by payment of 326 million shares of artificially inflated Wachovia common stock as currency.

187

459.    Later in the Class Period, on or about October1, 2007, Defendants once again used

Wachovia's artificially inflated shares as currency for an acquisition. This time, 72 million shares

of Wachovia's common stock were used as currency for Wachovia's acquisition of AG Edwards.

460.    In addition to the foregoing, the Defendants reaped even more benefits through the

sale of artificially inflated Wachovia stock in the form of an April 14, 2008 public offering of 145.83

million shares, priced at $24 a share. Although that price was significantly below Wachovia's Class

Period highs, subsequent corrective disclosures reveal that even this offering price was artificially

inflated.

E.    **Morgan Stanley Refused to Merge with Wachovia in September 2008 After
      Determining, Based on Non-Public Information, that Wachovia Had
      Understated its Mortgage Loss Rates**

461.    On September 17, 2008, Wachovia CEO Robert Steel contacted Morgan Stanley CEO

John Mack and proposed that the two banks explore a merger. As chronicled in the recently

published book by Roger Lowenstein, *The End of Wall Street* (2010), the contemplated pairing was

based on the logic that Morgan Stanley had a first-class investment bank but shaky funding, while

Wachovia had a large deposit base. However, given that Wachovia had approximately $120 billion

of option ARM mortgages (from its acquisition of Golden West), Mack needed an accurate estimate

of its losses before moving forward with any deal.

462.    That day, Wachovia provided Morgan Stanley with a trove of non-public data relating

to its mortgages and, according to the book, "that night, Morgan Stanley cracked open 400,000

Wachovia mortgages and calculated an estimated loss ratio of 30 percent, rather than the 12 percent

Wachovia had suggested." Morgan Stanley refused to take on losses of that scale. Thus, the merger

discussions were terminated immediately after Morgan Stanley was able to get a glimpse of

188

Wachovia's true financial condition, after conducting due diligence for no more than a day. Furthermore, the loss rate information provided to Morgan Stanley was not publicly disclosed but was at all times accessible to and known by defendants. A strong inference of *scienter* is raised by Morgan Stanley's ability to learn Wachovia's true loss rates immediately upon gaining access to Wachovia's internal data and by Morgan Stanley's refusal to merge with Wachovia after learning these facts.

**F.    Wachovia Had a Robust Risk Management Structure Through Which Defendants Received Direct Information on Wachovia's Actual Lending Practices**

463.    While concealing the fact that Wachovia had abandoned its touted "conservative" lending practices, defendants publicly professed to be "actively" and "carefully" monitoring Wachovia's loan origination activities and data. For example, on a September 10, 2007 conference call defendant Thompson stated that "[w]e constantly manage risk" and on an April 14, 2008 earnings call, defendant Truslow touted that "[o]ur intense focus on reviewing and managing the residential related portion of the portfolio continued . . . ."

464.    Wachovia also boasted that it had a corporate risk management structure that specifically charged each of the individual defendants with the duty to (i) monitor and track the relevant underwriting and risk management information and (ii) set, implement and monitor compliance with Wachovia' s lending procedures and standards. The risk management structure placed the individual defendants squarely in the nexus of the relevant information flow. In particular, the individual defendants were members of Wachovia's so-called "Senior Risk Committee" (the "SRC"). Meeting monthly throughout the Class Period, the SRC directed control committees that managed market risk, operational risk and credit risk and, along with other control

189

units, made sure that risks were properly identified, measured, monitored and managed throughout Wachovia, according to disclosures in Wachovia's 2007 10-K.

465.    By virtue of their positions on the SRC, Wachovia's loan origination practices were at all times subject to the individual defendants' centralized control. In addition, compliance officers from each business unit reported directly to defendant Truslow, who in turn reported to defendant Thompson. "This structure allows compliance risk management to consult with the business unit as policies and procedures are developed, and it enables close monitoring of daily activities," Wachovia bragged. "Our management processes, structure and policies . . , provide clear lines of sight for decision-making [and] accountability."

466.    Defendants' centralized control over Wachovia's lending activities was also reflected in defendant Truslow's claim in the Q1 2008 earnings call that "we've implemented further tightening in our underwriting criteria", and that "we're taking steps to significantly . . , tighten underwriting standards".

467.    Defendants repeatedly attributed the purported low-level of charge-offs during the Class Period to the individual defendants' supposedly successful "careful management" and monitoring of risks. For example, in Wachovia's Quarterly Report from July 30, 2007, the company claimed that "[t]he low level of net charge-offs reflects . . , our careful management of inherent credit risk. Our consumer real estate portfolio has a long record of relatively low net charge-offs, reflecting strong underwriting and credit risk management." In a July 20, 2006 earnings call, defendants similarly stated, "[w]e are being, as you would expect, very diligent in the underwriting process." And in its quarterly reports, defendants repeatedly assured that "[w]e continue to mitigate risk and

190

volatility on our balance sheet by actively monitoring and reducing potential problem loans, including their sale when prudent."

468.    Additionally, on a July 20, 2007 earnings call, Steve Cummings claimed that Wachovia had "[a] very integrated operating model, with origination and product execution and distribution and risk management working very closely together to properly balance the decisions about business that's presented to us and how we manage the risks associated with it." On a series of conference calls during the Class Period (including April 17, 2006, November 9 and 14, 2007, March 12, 2008), defendant Truslow spoke of Wachovia's "very robust portfolio monitoring set of processes that go on in the company," claimed that "[w]e undergo a process throughout every quarter where we look at the trends in the underlying portfolio and forecast out, mostly with a 12-month view, the expected loss we expect in those portfolios", touted Wachovia's "superb risk management" and said that defendants were "very pleased with the tight discipline that we had in the underwriting around loss parameters and risk return measures and guidelines and kind of steered us away from some trouble that we might otherwise have gotten into."

469.    In addition to the SRC, Wachovia at all times during the Class Period also maintained a "Credit Risk" committee which was responsible for establishing and monitoring Wachovia's "processes for approving credit risk exposures," according to Wachovia's 10-K annual reports. This committee supervised Wachovia's automated underwriting and standard approval structures for making residential real estate loans. It also specifically "tracked" a "regularly updated" "centralized database" relating to the company's credit risk exposure.

470.    Wachovia also maintained a "Credit Risk Review" unit the responsibility of which was to analyze the "adequacy of credit underwriting and servicing practices," and an "Operational

191

Risk" committee that was tasked with making sure that employees complied with the company's underwriting policies, procedures and standards.

471.    Furthermore, the Credit Risk, Credit Risk Review and Operational Risk committees each reported to the SRC, *i.e.*, to the individual defendants.

472.    These corporate structures raise a strong inference that defendants were familiar with all material aspects of the company's operations, financial condition and risk profile and thus knew or recklessly disregarded that their public statements were materially false and misleading. This inference is bolstered by the fact that defendants Thompson and Wurtz executed Sarbanes-Oxley ("SOX") certifications in connection with Wachovia's 2007 10-K specifically attesting to the fact that the company's internal controls and procedures were adequate to "ensure" that such material information "is made known to us."

**G.    Wachovia Effectively Admitted That it Never Actually Followed its Stated "Conservative" and "Prudent" Lending Practices by Implementing Them for the First Time in Late 2008**

473.    On April 11, 2008, Wachovia effectively admitted that it never actually followed its purportedly "conservative" and "prudent" lending practices and policies. On or about that day, it announced that it was significantly tightening its underwriting requirements – by adopting precisely the same practices that it previously claimed to be following:  requiring minimum credit scores and income and asset verification.

474.    As reported in an April 11, 2008 article in the Sacramento Business Journal, Wachovia for the first time began requiring "minimum FICO score from potential borrowers" and adopted a policy of verifying income and assets "before making mortgage loans that it intends to keep in its portfolio as opposed to selling to investors."

192

475.    Furthermore, as reported on April 15, 2008 by The American Banker, CEO Ken Thompson told reporters that "Wachovia is looking to make further adjustments to its mortgage model beyond its decision last week to implement a minimum credit score and requiring applicants to verify employment and assets."    Specifically, the company adopted "guidelines, which were outlined in a memo sent . . . to all of Wachovia's mortgage business employees, also requir[ing] loan officers to verify the assets and employment of all borrowers", the Press-Register (Mobile, Ala.) reported on April 12 , 2008.

476.    Wachovia's belated implementation of these lending standards for the first time in late 2008 constituted an implicit admission that it never actually followed them during the Class Period, and thus that defendants' public statements regarding those standards were false. This raises a strong inference of *scienter*.

## VII.    LOSS CAUSATION

477.    Wachovia's stock price declined materially beginning in late 2007 and continuing through the end of the Class Period and thereafter, owing to numerous incremental public disclosures by Wachovia and others, which although often misleading in themselves, did cumulatively reveal the materialization of previously undisclosed risks with respect to Golden West's and Wachovia's Pick-A-Pay loans, the lapses in Pick-A-Pay underwriting standards, and Wachovia's previously-concealed subprime CDO exposures and losses.

478.    On July 20, 2007, Wachovia announced its second quarter results, which included a dramatic increase to its loss reserves. At that time, CEO Thompson admitted – in response to an analyst's question regarding the wisdom of the Golden West acquisition – that the Company was "going through a little pain" as a result of that deal. In reaction to those statements, Wachovia's

stock price dropped over the course of the next three trading days from a closing price of $56.61 on July 19, 2007 to approximately $48.40 per share on July 25, 2007.

479.    On October 19, 2007, Wachovia announced its third quarter results, which included $1.3 billion of writedowns for bad loans on its mortgage backed securities, including subprime CDOs. Wachovia also announced that, allegedly to guard against rising Pick-A-Pay mortgage defaults and losses, it had more than doubled its loss reserve levels from the prior quarter. In the wake of this news, the Company's stock price fell over the course of the next three trading days from its October 18, 2007 closing price of $48.14 per share to $45.40 per share.

480.    In the Third Quarter 2007 10-Q, filed on November 9, 2007, the Company made the following partial but false and misleading disclosure about its loan loss reserves:

> **[D]ue to anticipated loan growth and the impact of continuing credit deterioration in our loan portfolio, we expect to increase our allowance for loan losses in the fourth quarter of 2007.** The expected credit deterioration will likely be focused in certain geographic areas that have recently experienced dramatic declines in housing values. We expect that these declines will correlate to increases in loan losses for loans originated within the last two years within these geographic areas. Accordingly, Wachovia now expects to record a loan loss provision in the fourth quarter of 2007 by an amount estimated to be between $500 million and $600 million in excess of charge-offs for the quarter. The actual provision will be determined in accordance with our policies and procedures, will depend on credit conditions and assumptions at quarter-end and may be materially greater or less than the range discussed in the preceding sentence.

481.    This partial disclosure about loan loss reserves was false and misleading because borrower credit had never been properly verified at the time of loan origination. According to CW 1, the Company failed to verify income and employment. Moreover, CW 3 stated that Wachovia extended Pick-A-Pay loans to borrowers with artificial or inflated debt-to-income.

194

482.    Defendants also disclosed on November 9, 2007, for the first time, Wachovia's previously-concealed holdings of $2.12 billion of subprime CDOs, and the necessity to take further writedowns (beyond those taken on October 19, 2007) on those instruments.

483.    On December 10, 2007, Merrill Lynch downgraded the Company's stock on the belief that Wachovia's net credit losses will rise "significantly" in 2008 because of rapidly deteriorating non-conforming mortgage exposure in California. Merrill Lynch was also concerned that "Wachovia [was] under-reserved, given its heavy residential real estate exposure in California and Florida, two states where home values are declining rapidly." As a result, Merrill Lynch stated that it expected that necessary future increases to Wachovia's loan loss reserves would restrain the Company's earnings-per-share growth by 12% in 2008. Based on this news, and on the announcement of increases to Wachovia's loss reserves, over the next two days the price of Wachovia shares fell from their closing price of $44.46 on December 10, 2008, to $40.53 on December 12, 2007.

484.    On January 22, 2008, Wachovia disclosed its financial results for the fourth quarter of 2007, which included a $970 million writedown of its subprime CDOs. Despite the size of the writedown, it was still insufficient for accurate valuation of the CDOs, whose value continued to be materially overstated. Defendants continued, however, to misrepresent the credit quality, performance and loss content of Wachovia's $120 billion Pick-A-Pay mortgage portfolio, and represented falsely that losses would be minor, that losses did not threaten Wachovia's capitalization, and that losses did not and would not affect Wachovia's ability to fund its current dividend payout. Consequently, Wachovia's share price continued to trade at artificially inflated levels reflecting Defendants' misrepresentations, rather than the realities which Defendants then concealed.

195

485.   On February 4, 2008, Merrill Lynch again addressed Wachovia, demoting the company to a "sell" rating due to the weakening of the California housing market. Over the next two trading days, the stock price fell from its February 1, 2004 closing price of $38.76 to $34.18 on February 5, 2008.

486.   On February 28, 2008, Wachovia announced that it had increased its reserves for expected loan losses, primarily from Pick-A-Pay mortgages, by more than three times the amount the company had set aside for reserves in the previous year. Many of those loans had been originated by Golden West. Thompson admitted in the annual report that "[w]ith the benefit of hindsight, it is clear that the timing was poor for this expansion into the mortgage business." Nevertheless, Thompson said that the company had "reconfirmed [its] opinion of the quality of the Golden West franchise, its underwriting and service model" and that the company "will be ready for a market with far fewer irrational participants."

487.   As reported in media accounts of Wachovia's February 28, 2008 announcement:

> **Wachovia's report also provided updates on highly watched aspects of its business, including loan quality** and exposure to distressed assets such as mortgage-based securities . . . .

> Wachovia also increased the nonperforming assets in its consumer first-lien mortgage portfolio by 9.7% from a report filed last month, to $3.23 billion at yearend, to reflect "a final review of certain modified loans."

> At year end it had about $3.3 billion of nonperforming assets in its entire consumer portfolio.

> **Many of Wachovia's issues stem from its October 2006 purchase of Golden West Financial Corp., and Oakland, Calif., thrift company that specialized in option adjustable-rate mortgages. Golden West's $120 billion mortgage portfolio accounted for 15.3% of Wachovia's assets at yearend.**

196

Paul Davis, *Wachovia Says 2 Workers Targeted In a Federal Investigation*, American Banker, Feb. 29, 2008.

488. Over the course of the last two days in February, Wachovia's stock dropped from $34.10 to $30.62 per share.

489. On March 12, 2008, CRO Truslow, announced that the housing market "appears to be worsening," and that the sentiment among business owners had become "much more cautious." In particular, Truslow stated that he was wary of what he called a "very challenging environment," observing that Wachovia saw particular weakness in the housing markets of California and Florida, where approximately 70% of Golden West's loans were made. Deutsche Bank analyst, Mike Mayo, who hosted the conference call with Truslow, commented that "[h]e now expects Wachovia to charge off 1.1 percent of its Golden West loans as of March 31, up from his previous estimate 0.65 percent, 'which reflects the worst quarterly loss rate for residential mortgages in general over the last 20 years.'" David Mildenberg, *Wachovia See Outlook for U.S. Housing Deteriorating*, Bloomberg, March 12, 2008. Wachovia's stock price dropped from $29.78 to $28.05 per share on March 12, 2008, and by March 17, 2008 had deteriorated to $25.60 per share.

490. On April 14, 2008, Wachovia announced that it had sold $7 billion worth of stock to raise capital, and reduced its dividend, despite prior assurances that it would not do so. Both developments resulted from substantially increased loss reserve provisioning for Pick-A-Pay mortgages. There had been no change in those mortgages' performance in recent months that made these developments suddenly necessary. Rather, the developments were occasioned by Wachovia's adoption of a newly-modified mortgage loss model that belatedly took into account: (1) mortgage

197

risk principles known *ab initio* (namely, that borrowers with little, no or negative equity were at increased risk of default); and (2) facts that had been apparent beginning in mid-2006 evidencing the materialization of those risks (namely, sharply declining housing prices, especially in California and Florida, that eroded and erased borrower equity, thus increasing both the risk of default and the loss severity to Wachovia upon default). Wachovia revealed, for the first time, that as of February 2008, 14% of its Pick-A-Pay loans matched or exceeded the value of the underlying collateral (*i.e.*, that 14% of its $120 billion Pick-A-Pay loan portfolio had LTV ratios of 100% or more). As a result, Wachovia reported that it had set aside $2.8 billion in reserves to cover problem loans, up from $1.5 billion in fourth quarter 2007, and that it was considering halting the origination of Pick-A-Pay loans in California. Market analysts concluded that Wachovia "'obviously didn't take a close enough look at Golden West, . . . . The lender's adjustable-rate mortgages, which let borrowers skip payments and add the unpaid interest on the principal, were 'a formula for disaster by anyone's standard.'" David Mildenberg, *Wachovia Posts Loss, Plans $7 Billion Capital Raising*, Bloomberg, Apr. 14, 2008.

491.     Though Defendants' April 14, 2008 admissions constituted partial corrective disclosures, Defendants continued to misrepresent and conceal the realities of Wachovia' Pick-A-Pay mortgages, their risks, and their losses. Defendants still represented falsely on April 14, 2008: (1) that the current average LTV ratio of Wachovia's Pick-A-Pay mortgages had risen only slightly from the LTV ratio at origination – to 78% from 71%; (2) that cumulative losses on the entire $120 billion portfolio, even under Defendants' new loss model, would not exceed 7.5%; and thus (3) that Wachovia still had sufficient capital levels to fund a reduced dividend payout of approximately 60% of the amount of Wachovia's prior dividend.   These representations were materially false and

misleading. The purportedly "current" LTV of 78% was neither accurate nor current, but rather false, understated and based on outdated data. Cumulative losses on the $120 billion Pick-A-Pay portfolio were likewise, and connectedly, far higher than the 7.5% level that Defendants publicly revealed on April 14, 2008. Three months later, on July 22, 2008, Defendants (under Wachovia's new CEO, who by then had replaced defendant Thompson), admitted: (1) that current LTV ratios were materially higher than previously stated; (2) connectedly, that cumulative Pick-A-Pay losses would be almost twice as high as stated on April 14, 2008 (*i.e.*, 12% rather 7.5%); and (3) that, consequently, Wachovia could not continue to fund even its already-reduced dividend. Defendants also revealed that Wachovia had abandoned further origination of Pick-A-Pay mortgages. Three months after that, on October 22, 2008, Wachovia, then under new management (with Defendants Thompson, Wurtz and Truslow gone), admitted that Pick-A-Pay losses would be **triple** the 7.5% level represented by Defendants on April 14, 2008 – a stunning 22% of the entire $120 billion portfolio.

492.    Wachovia also disclosed on April 14, 2008 a further $315 million of subprime CDO writedowns. Again, despite the size of the writedown, the writedown was insufficient, failed to value accurately the CDOs, and Wachovia thus continued to overstate the value of its CDO assets.

493.    Based on Defendants' April 14, 2008 disclosures, which still continued to be materially false and misleading, Wachovia shares fell from $27.81 to $25.55.

494.    On June 2, 2008, Wachovia announced that its board of directors forced Thompson to retire from the Company. He was replaced as CEO by director Lanty L. Smith. Wachovia's shares declined to from their May 30, 2008 closing price of $23.80 to $23.40 per share on June 2, 2008, and to $21.92 per share on June 3, 2008.

495.    The next day, a June 4, 2008 BusinessWeek article ascribed Thompson's ouster to

the Golden West fiasco. *See* Dean Foust, *Wachovia: Golden West Wasn't Golden*, BusinessWeek,

June 4, 2008.   The article described not only the devastation wrought by that deal, but also

Wachovia's shady (and previously undisclosed) business practices:

> Whoever Wachovia directors pick to succeed Thompson may spend
> a great deal of time mopping up the mess at Golden West.   **The
> thrift's vaunted underwriting proved inadequate** when housing
> prices began to plummet in California and Florida . . . .   Analysts
> figure Wachovia could end up incurring losses of as much as $11
> billion on Golden West and $122 billion mortgage portfolio.   "You
> would be hard pressed to find anything good out of this acquisition."
> says Terry Maltese, president of Sandler O'Neil Asset Management
> . . . .
>
> In most mergers, it's the acquirers that exert their will.   But right after
> the Wachovia bought Golden West, executives from the S&L took
> control of all mortgage lending.   **And according to former brokers,
> they began pushing Wachovia's sales force to steer applicants
> into its signature "Pick-A-Payment" loans** . . . .
>
> **Former brokers say they were given sales targets for the Pick-A-
> Payment loans and were told to downplay the fact that making
> the minimum payment would cause the loan balance to rise – a
> phenomenon known as "negative amortization."   In one training
> video reviewed by *Business Week*, brokers were instructed to
> avoid using terms like "negative amortization" in favor of
> euphemisms like "deferred interest."**   (Wachovia has said it does
> not set quotas by mortgage type) . . . .
>
> Analysts note that Golden West focused too much on appraisals an
> too little on verifying the income and assets of applicants . . . .

496.    The next day, on June 5, 2008, Goldman Sachs announced that Wachovia might be

required to cut its dividends in light of economic conditions.   Wachovia's stock price dropped from

$21.59 to $20.13 on June 6, 2008, and continued its decline on the next trading day, June 9, 2008,

closing at $18.89 per share.

497.    On July 9, 2008, Wachovia "pre-announced" financial results for the recently-ended second quarter of 2008. Wachovia warned of an expected $2.6 - $2.8 billion loss for the quarter "driven by higher provision expense, including $4.2 billion pre-tax to build loan loss reserves, $3.3 billion of which related to Wachovia's former Pick-a-Pay loan product." Wachovia also admitted that it would need to write down the value of impaired goodwill, and that such impairment charge would add to Wachovia's above-mentioned losses. On July 10, 2008, during a call with investors, Wachovia's new chairman and CEO, Lanty Smith, admitted that Wachovia had made a serious mistake when it acquired Golden West: "[t]here has been a complete recognition at the board level that Golden West was a mistake and that we have to deal with the consequences of it . . . . It should be recognized that we have come to grips with this issue." As a result of Wachovia's July 9-10, 2008 disclosures, Wachovia's stock, which had closed trading at $ 14.29 on July 8, 2008, declined materially on each of the next four trading days, falling to $9.08 per share on July 15, 2008.

498.    On July 22, 2008, Wachovia posted a net loss of $8.9 billion for the second quarter of 2008 – compared with net income of $2.3 billion the prior year – and took $6.1 billion of write-downs. Defendants admitted that the average LTV ratios of Wachovia's Pick-A-Pay loans was substantially higher than previously stated, and thus that the loss level of the $120 billion Pick-A-Pay portfolio – now pegged at 12% – was nearly twice the 7.5% level that Defendants represented on April 14, 2008. As a result of these increased losses, Wachovia slashed its dividend to just five cents a share from 37.5 cents. *See* David Mildenberg, *Wachovia Has Record $8.9 Billion Loss, Cuts Dividend*, Bloomberg News, July 22, 2008. Wachovia also revealed another round of subprime CDO writedowns that sufficed, finally, to bring Wachovia's valuations in line with market realities extant no later than October 2007.