**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE WACHOVIA EQUITY
SECURITIES LITIGATION

---

No. 08 Civ. 6171 (RJS)

**ECF Case**

---

### DECLARATION OF IRA M. PRESS IN SUPPORT OF
### PROPOSED CLASS SETTLEMENT, PLAN OF ALLOCATION,
### AND AWARD OF ATTORNEYS' FEES AND EXPENSES

IRA M. PRESS declares as follows, pursuant to 28 U.S.C. §1746:

1.      I am a member of the law firm of Kirby McInerney LLP, counsel for Court-appointed lead plaintiffs, the New York City Board of Education Retirement System, the New York City Employees' Retirement System, the New York City Police Pension Fund, the New York City Police Officers' Variable Supplements Fund, the New York City Police Superior Officers' Variable Supplements Fund, the New York City Fire Department Pension Fund, the New York City Firefighters' Variable Supplements Fund, the New York City Fire Officers' Variable Supplements Fund, the New York City Teachers' Retirement System and the New York City Teachers' Retirement System Variable Annuity Program (collectively, the "New York City Pension Funds" or "Lead Plaintiffs"), on behalf of themselves and the proposed class, and Lead Counsel[1] in the above-titled action (the "Action").

2.      I was actively involved in the prosecution of this case, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my close supervision and active participation in all material aspects of the Action since my firm's

---

[1]      Unless otherwise indicated, all capitalized terms herein have the same meaning as is ascribed in the Stipulation and Agreement of Settlement (the "Stipulation") filed with the Court on January 20, 2012 [Dkt. No. 98-1].

appointment.

3.      I respectfully submit this declaration in support of Lead Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the Settlement of this class action and the Plan of Allocation of the Net Settlement Fund (the "Plan of Allocation"). I also submit this declaration in support of Lead Counsel's motion for an award of attorneys' fees and reimbursement of Lead Counsel's expenses incurred during the prosecution of this Action. Lead Counsel undertook this Action on a contingent fee basis.

## I.      BENEFITS OF THE SETTLEMENT TO THE CLASS

4.      Pursuant to the Stipulation, the Settlement, which was preliminary approved by the Court by order entered January 27, 2012 [Dkt. No. 100], provides for the payment of $75,000,000 cash plus interest (the "Settlement Fund") to the Class in exchange for a release of the Released Claims brought against Wachovia Corporation, Wachovia Capital Markets, LLC, G. Kennedy Thompson, Donald K. Truslow and Thomas J. Wurtz (collectively, "Wachovia Defendants"), and Citigroup Global Markets Inc., UBS Securities LLC, Utendahl Capital Group LLC, Goldman Sachs & Co., Credit Suisse Securities (USA) LLC and Samuel A. Ramirez & Company, Inc. (collectively, "Underwriter Defendants", and with the Wachovia Defendants, the "Defendants").

5.      Lead Plaintiffs have entered into this Stipulation with a full and comprehensive understanding of the strengths and weaknesses of their claims, which are based on Lead Counsel's extensive investigation during the prosecution of this Action and motion practice over the course of approximately three years.  The Settlement is eminently fair considering this Court's dismissal of the Action in its entirety.  Even if Lead Plaintiffs successfully appealed the Court's dismissal order, Lead Plaintiffs and the Class still faced the risk that a jury would believe Defendants' accounts of the events at issue in this action, and specifically Defendants' arguments that their Class Period statements were not false or misleading, and in any event were not made with scienter.  Finally, the Class faced the risk that, in the event they prevailed on appeal and on the merits at trial, the Court or a jury would credit the opinion of Defendants' experts concerning

2

damages over the opinion of Lead Plaintiffs' expert. In light of this and other difficulties that the Class faced in seeking to prove its case, Lead Plaintiffs and Lead Counsel believe that this Settlement represents an excellent recovery for the Class.

6.      After the deduction of any attorneys' fees, expenses and notice and administration costs approved by the Court, together with any taxes and tax expenses that may be payable by the Settlement Fund, the Net Settlement Fund will be distributed to eligible Authorized Claimants, *i.e.*, class members who submit timely and valid Proof of Claim forms, in accordance with the Plan of Allocation. The allocation formula utilized, and described below, was designed with the assistance of a consulting damages expert, who has considerable experience in developing plans of allocation for settlements in securities class actions.

## II.   THE COURT'S PRELIMINARY APPROVAL ORDER AND LEAD PLAINTIFFS' DISSEMINATION OF PRE-HEARING NOTICES

7.      Lead Plaintiffs moved for preliminary approval of the Settlement on January 20, 2012 [Dkt. No. 97]. On January 27, 2012, the Court issued the Order Preliminarily Approving Proposed Settlement and Providing for Notice (the "Preliminary Approval Order") [Dkt. No. 100]. (Exhibit 1 attached hereto).

8.      In the Preliminary Approval Order, the Court made the following findings, determinations and directives, among others:

a.      granting preliminary approval of the Settlement as fair, reasonable and adequate to warrant dissemination of notice to the Settlement Class and a hearing on the fairness of the Settlement;

b.      scheduling a hearing (the "Settlement Hearing") for June 1, 2012 at 11:00 a.m. to consider, among other things, whether the proposed Settlement is fair, reasonable and adequate and should be approved by the Court; whether an order should be entered dismissing the Action with prejudice against all the Defendants; whether the proposed Plan of Allocation for the proceeds of the Settlement is fair and reasonable and should be approved; and whether Lead Counsel's application for an award of attorneys' fees and reimbursement of expenses should be granted;

c.      approving the form, substance and requirements for the Notice, the Summary Notice and the Proof of Claim and Release form;

3

     d.       appointing Rust Consulting, Inc. ("Rust" or the "Claims Administrator") to supervise and administer the notice procedure and Settlement, under the supervision of Lead Counsel, and directing that the notices be disseminated; and

     e.       establishing procedures and deadlines for Settlement Class Members to object to or opt-out of the Settlement, Plan of Allocation, and the attorneys' fees and reimbursement of expenses requested by Lead Counsel.

     9.      Annexed hereto as Exhibit 2 is the Affidavit of Eric J. Miller Regarding Notice and Claims Administration (the "Miller Aff.") dated April 26, 2012. The Miller Affidavit attests to, among other things, the efforts made to disseminate the Notice and Proof of Claim forms, the web-postings of the Notice and Proof of Claim forms and publication of the Summary Notice, all in compliance with the Preliminary Approval Order.

     10.     In order to assure thorough dissemination of the Notice, Rust worked diligently to notify all the potential Settlement Class Members identified by electronic data from counsel for Wachovia that set forth the names and addresses of owners of record using data from the Notice mailing and by contacting brokers/nominees who may have purchased Wachovia common stock for the benefit of others. Miller Aff. at ¶¶ 4-6. On February 28, 2012, Rust mailed Notice Packets to 194,886 potential Settlement Class Members and Nominees. *Id.* at ¶ 6.

     11.     As of April 24, 2012, Rust has disseminated a total of 1,029,572 Notice Packets to potential Settlement Class Members. *Id.* at ¶ 9 and fn.1. In addition, the Summary Notice was published in *The Wall Street Journal* and *USA Today* on March 13, 2012. *Id.* at ¶ 10. Rust also caused the Summary Notice to be transmitted over the *PR Newswire* on March 13, 2012. *Id.* The Notice and Proof of Claim were also posted on Rust's website for easy downloading by potential Settlement Class Members. *Id.* at ¶ 11. Rust also established an email address, info@wachoviaequitysettlement.com, to allow Settlement Class Members to obtain information about the Settlement, request a Notice Packet, and/or seek assistance with their claim. *Id.* at ¶ 12. As of the date of the Miller Affidavit, Rust has received 403 emails from claimants, brokers and nominees; all emails received have been responded to by Rust in a timely manner. *Id.* at ¶ 13.

Rust also established a toll-free telephone hotline with a recorded message and live operators to assist potential Settlement Class Members with questions about the Settlement. *Id.* at ¶14). Rust has received 3,515 calls. *Id.* Of these calls, 2,506 were transferred to live operators. All calls to the toll-free telephone hotline have been responded to in a timely manner. *Id.*

## III.   SUMMARY OF ALLEGATIONS AND CLAIMS

12.     This securities class action was brought alleging (i) violations of Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of persons who purchased or otherwise acquired common stock issued by Wachovia between May 8, 2006 and September 29, 2008, inclusive, and (ii) violations of Section 11 and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of a subclass of persons who acquired Wachovia common stock through any of Wachovia's (a) offerings of common stock in connection with its acquisitions of Golden West Financial Corp., and/or A.G. Edwards, Inc., and/or (b) April 14, 2008 common stock offering.

13.     On May 28, 2010, Lead Plaintiffs filed the Second Amended Class Action Complaint (the "Second Amended Equity Complaint") alleging that certain Defendants violated Section 10(b) of the Exchange Act and Section 11 of the Securities Act based on, *inter alia*, misrepresentations and omissions concerning Wachovia's: (i) purported lack of subprime loan origination; (ii) purported "conservative" and "rigorous" underwriting practices; (iii) purported reliance on in-house appraisers; (iv) methodology for declaring loans as non-performing; (v) purported commitment to maintaining Golden West's vaunted underwriting standards post-acquisition; and (vi) methodology for setting loss reserves.

14.     Defendants have denied all of Lead Plaintiffs' allegations and do not admit, as part of this Settlement, any wrongdoing.

## IV.   PROCEDURAL HISTORY OF THE ACTION

### A.     Pleadings and Case Management

15.     On July 7, 2008, a putative class action, *Lipetz v. Wachovia Corp.*, No. 08 Civ. 6171, was filed in this Court alleging claims under Sections 10(b) and 20(a) of the Exchange Act

against Wachovia and certain of its officers and directors.

16.     Several putative class members moved for appointment as lead plaintiff in the case, including the New York City Pension Funds; the Maine Public Employees Retirement System, Fjarde AP-Fonden, Public Employees Retirement System of Mississippi; and the Fulton County Employees' Retirement System.

17.     On October 9, 2008, the Court appointed the New York City Pension Funds as Lead Plaintiffs on behalf of the putative class of purchasers of Wachovia common stock, and further appointed Kirby McInerney LLP as Lead Counsel in this Action pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.* (the "PSLRA") [Dkt. No. 23].

18.     In preparation for the filing of the Amended Class Action Complaint (the "First Amended Equity Complaint"), Lead Counsel conducted an extensive investigation of the claims in this Action. This investigation included, among other things: (i) review and analysis of filings made with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases, public statements, securities analysts' reports, conference calls and announcements made by Defendants; (iii) review and analysis of news articles concerning the Company; (iv) consultations with a damages expert; (v) research regarding the applicable law with respect to the claims asserted in the Action and potential defenses; (vi) and working with investigators to locate and interview former Wachovia employees and confidential witnesses

19.     Following the aforementioned efforts, Lead Plaintiffs drafted and filed the First Amended Equity Complaint. The First Amended Equity Complaint pled claims for violations of Sections 10(b), 20(a) and 20A of the Exchange Act and Rule 10b-5 promulgated thereunder and and Sections 11 and 15 of the Securities Act.

20.     On March 19, 2009, Defendants moved to dismiss the Action. While the motions were pending, and after coordinating the actions with three additional related actions, the Court issued an order on April 15, 2010, directing plaintiffs in all actions that if they planned on seeking leave to amend their pleadings, they must seek leave by April 26, 2010. With the

Court's permission to amend, Lead Plaintiffs filed their Second Amended Class Action Complaint (the "Second Amended Equity Complaint") on May 28, 2010. The Second Amended Equity Complaint alleged the same claims as the ACC, but provided additional allegations of scienter and class period misstatements concerning Wachovia's Pick-A-Pay Portfolio and underwriting practices.

21.    On July 14, 2010, the Wachovia Defendants and the Underwriter Defendants each filed a motion to dismiss the Second Amended Equity Complaint. Defendants argued, *inter alia*, that the Second Amended Equity Complaint alleged mere mismanagement, that investor losses were the result of a financial crisis of unforeseen severity and not Wachovia Defendants' alleged fraud, that Lead Plaintiffs failed to adequately plead Wachovia's debasement of its lending practices, that Wachovia's origination of billions of dollars of option ARM loans to subprime borrowers was wholly consonant with its representations of "conservative" and "disciplined" underwriting, that Lead Plaintiffs' insider selling and other "motive" allegations were improperly pled, and that the confidential witnesses only created an "illusion of 'circumstantial evidence' of scienter." Defendants also argued that they made timely disclosures as soon as they became aware of additional information relating to (among other things) expected losses in the Pick-A-Pay portfolio and the declining value of Wachovia's CDO holdings, and that massive increases of loss reserves were due to sudden unexpected changes in the real estate market and borrower behavior. Further, both the Wachovia and the Underwriter Defendants challenged Lead Plaintiffs' Section 11 claims on the ground that they sound in fraud.

22.    On August 12, 2010, Lead Plaintiffs filed their consolidated papers in opposition to these motions, and the various Defendants filed reply briefs in support of their motions on September 15, 2010.

23.    On March 31, 2011, the Court entered its Joint Opinion and Order, *inter alia*, dismissing this Action in its entirety with prejudice. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326 (S.D.N.Y. Mar. 31, 2011) (the "Opinion"). On April 29, 2011, Lead Plaintiffs filed a timely Notice of Appeal to the United States Court of Appeals for the Second Circuit.

V.     THE SETTLEMENT

A.     Settlement Negotiations and Confirmatory Discovery

24.     The Settlement was negotiated on an informed basis and with a thorough understanding of the merits and value of the parties' claims and defenses.

25.     On June 15, 2011, during a Civil Appeal Management Program pre-argument conference in the Court of Appeals, counsel for the Wachovia Defendants and counsel for the Lead Plaintiffs engaged in a preliminary dialogue regarding the possibility of commencing settlement discussions under the auspices of an appropriately experienced and mutually agreeable mediator.

26.     On July 8, 2011, the Court of Appeals "so ordered" a stipulation entered between Lead Plaintiffs, the Wachovia Defendants and the Underwriter Defendants in which Lead Plaintiffs withdrew their appeal pursuant to Court of Appeals' Local Rule 42.1, without prejudice to reinstatement, while the parties explored the possibility of settlement.

27.     Lead Plaintiffs and the Wachovia Defendants agreed to retain Judge Daniel Weinstein (ret.) ("Judge Weinstein" or the "Mediator") to assist them in exploring a potential negotiated resolution of the claims against the Defendants, and met and exchanged certain information under the auspices of the Mediator in September 2011 (including a lengthy face-to-face mediation session held in New York City) in an effort to determine if the claims against the Defendants could be settled.  At the mediation, counsel for both sides made detailed oral presentations, addressing such issues as whether Defendants made misstatements and omissions, the materiality of any misstatements and omissions, causation, the amount of recoverable damages, and the methodology employed in calculating those damages.

28.     With the assistance of Judge Weinstein, counsel for the Wachovia Defendants and Lead Plaintiffs entered into a binding term sheet dated September 8, 2011 to settle and release all claims asserted against all Defendants for $75 million, all cash, to be paid by the Wachovia Defendants or their insurers subject to certain terms and conditions, the execution of a customary "long form" stipulation and agreement of settlement and related papers, and subject to

confirmatory discovery.

29.      Between September 2011 and January 2012, the parties actively drafted and negotiated the formal Stipulation and exhibits.

30.      When the formal agreement was finalized on January 20, 2012, the Stipulation was executed by the parties and submitted to the Court the same day for preliminary approval. *See* Dkt. Nos. 97-99.

31.      On January 27, 2012, the Court entered an Order Preliminarily Approving Proposed Settlement and Providing for Notice, which preliminarily approved the Settlement, authorized the form of Notice to be sent to potential Settlement Class Members and scheduled the Settlement Hearing to consider whether to grant final approval to the Settlement. *See* Dkt No. 100.

32.      Thereafter, Lead Counsel conducted confirmatory discovery to confirm that the Settlement is fair, reasonable, and adequate and in the best interests of the Class. This process included an interview with Robert Lechtenberg. Mr. Lechtenberg served as a loan officer with Golden West and, following Wachovia's acquisition of Golden West, served as a Vice President and Operations Manager in Underwriting Administration. Mr. Lechtenberg was knowledgeable of the Wachovia Defendants' Class Period lending practices and origination standards as well as the features of Wachovia's primary mortgage product the Pick-A-Pay loan. The interview with Mr. Lechtenberg confirmed that the Wachovia Defendants had plausible defenses to Lead Plaintiffs' allegations concerning Wachovia's Pick-A-Pay portfolio and underwriting practices. Lead Counsel also reviewed approximately 563,225 pages of internal documents produced by the Wachovia Defendants.

33.      The entire Settlement Fund of $75,000,000 (after deduction of Court-approved expenses and attorneys' fees), plus interest, will be distributed to members of the Class who timely submit valid proofs of claim. There will not be any reversion to Defendants or any of their insurers of any portion of the $75,000,000 settlement fund.

## VI.    ASSESSMENT OF STRENGTHS AND WEAKNESSES OF CLAIMS

34.    The investigation and discovery, described above, on both liability and damages issues enabled Lead Plaintiffs to thoroughly evaluate the strengths and weaknesses of the claims and the risks of continued litigation, and accordingly to enter into the Settlement on a fully informed basis.

35.    Lead Plaintiffs considered, among other things: (i) the cash benefit to Settlement Class Members under the terms of the Stipulation; (ii) the difficulties and risks involved in pleading, under the stringent standards of the PSLRA, certain of the allegations in the Amended Complaint, such as the scienter of each defendant and falsity; (iii) the risk that there will no recovery achieved absent settlement considering that the Court had dismissed the Second Amended Equity Complaint in its entirety, and therefore any future success would depend on securing a reversal on appeal; (iv) in the event Lead Plaintiffs were successful on securing a reversal on appeal and survived a subsequent motion to dismiss, the strong likelihood of a complex and risky expert-driven challenge to class certification, after extensive discovery; (v) the difficulties and risks involved in proving the complex claims, such as the materiality and falsity of each of the alleged misstatements, and whether the alleged fraud caused the proposed Class' losses; (vi) in the event that Lead Plaintiffs can establish that Defendants made any false or misleading statements, whether Lead Plaintiffs can also prove that Defendants acted with fraudulent intent in doing so; (vii) the probability that Defendants would move for summary judgment at the close of discovery, leading to a battle of the experts with respect to loss causation issues; (viii) the attendant risks of litigation, especially in a complex action such as this, including the ability to maintain class status through to judgment; (ix) the delays inherent in such litigation, including appeals; and (x) the uncertainty in the various theories of damages--even assuming that Lead Plaintiffs could establish liability on the part of Defendants.

36.    Securities class actions are, by their nature, legally and factually complex and difficult. Here, there were real risks because the Court had dismissed the Second Amended Equity Complaint in its entirety, and even if Lead Plaintiffs successfully obtained a reversal of

the dismissal order, they would still need to pursue contentions and expensive discovery proceedings, additional motion practice, a costly trial, and likely appeals. Throughout this process, Lead Plaintiffs would face numerous hurdles such as compelling challenges to loss causation, arguments that there were no actionable misrepresentations and omissions during the Class Period, and arguments that there were no recoverable damages.

37.     The central allegations in the Second Amended Equity are that Defendants misrepresented or concealed material, adverse information concerning Wachovia's: (i) purported lack of subprime loan origination; (ii) purported "conservative" and "rigorous" underwriting practices; (iii) purported commitment to maintaining Golden West's vaunted underwriting standards post-acquisition; (iv) purported reliance on in-house appraisers, which purportedly was a key factor that differentiated Wachovia's Pick-A-Pay loans from its competitors' ARM products; (v) methodology for declaring loans as non-performing; and (vi) methodology for setting loss reserves. Lead Plaintiffs also allege that because Defendants' misrepresentations concerned *their own* business practices, they give rise to a strong inference of scienter.

38.     Lead Plaintiffs and their counsel believe that during the Class Period, Defendants repeatedly misrepresented their own lending standards by originating most Pick-A-Pay loans on a stated income, low documentation basis, and made over 40% of its loans to borrowers with subprime FICO scores. Lead Counsel also believes that Wachovia outsourced appraisals to third parties contrary to its stated policy, established a compensation structure that favored Pick-A-Pay origination over more traditional loan products, and even counseled loan officers to fraudulently inflate borrower income to increase loan volumes. With respect to Lead Plaintiffs' allegations that Defendants misrepresented Wachovia's policy for charging off its delinquent Pick-A-Pay loans when they became 180 days past due, Lead Plaintiffs allege that Wachovia later revealed that, prior to the fourth quarter of 2007, it did not recognize losses on its delinquent Pick-A-Pay loans until the property's sale following foreclosure, which usually occurred several months after the 180-day threshold. Lead Plaintiffs and their counsel believe this undisclosed policy kept many already-defaulted loans from being recorded on Wachovia's books and caused an

apparently sudden spike in recognized defaults in the fourth quarter of 2007.

39.     Nevertheless, throughout the Action, including confirmatory discovery that Lead Plaintiffs received in connection with the Settlement, Defendants have proffered a host of factual and legal defenses and arguments that create risk regarding not only the ultimate outcome of the Action, but also the extent of the damages that the Class could recover even if the ultimate outcome was favorable to Lead Plaintiffs.

40.     Defendants assert that none of their Class Period statements were materially misleading.  Thus, Defendants assert that Lead Plaintiffs allege, at most, mismanagement with respect to Wachovia's business decisions to purchase Golden West (with its Pick-A-Pay portfolio) and to continue originating Pick-A-Pay loans.  Moreover, Defendants argue, *inter alia*, that investor losses were the result of a financial crisis of unforeseen severity and not Wachovia Defendants' alleged fraud, that Lead Plaintiffs failed to adequately plead Wachovia's debasement of its lending practices, and that Wachovia's origination standards were wholly consonant with its representations of "conservative" and "disciplined" underwriting. Additionally, Defendants claim the they made timely disclosures as soon as they became aware of additional information relating to (among other things) expected losses in the Pick-A-Pay portfolio and the declining value of Wachovia's CDO holdings, and that massive increases of loss reserves were due to sudden unexpected changes in the real estate market and borrower behavior.  Defendants argue that scienter cannot be inferred from Lead Plaintiffs' claim of insider sales because each of the Individual Defendants owned more Wachovia stock at the end of the Class Period than at the beginning.  Further, Defendants maintain that insofar as any statements were inaccurate, Defendants reasonably believed them to be true, and therefore plaintiffs cannot prove scienter.  While Lead Plaintiffs believe they could have proven otherwise, documents produced in confirmatory discovery and an interview conducted in the confirmatory discovery process revealed that Defendants' explanation of the relevant events was one that might have been believed by a jury.

41.     Defendants also would have proffered experts to opine that most, if not all,

12

alleged investor damages resulted from marketwide conditions or other factors unrelated to any alleged misrepresentations.

42.     Accordingly, Lead Plaintiffs faced a significant risk that, even if they successfully appealed the Court's dismissal order, a jury would accept Defendants' analysis of the damages and significantly limit any potential recovery at trial.

43.     Lead Plaintiffs also faced some risk that the Wachovia Defendants would not be able to offer a settlement amount as large if settlement was delayed. Just three years earlier (in early August 2008), Wachovia, which was then an independent entity, was the fourth largest banking corporation in the United States based on its publicly reported financial statements – and yet Wachovia's own CEO later admitted the company was on the brink of insolvency by September 2008, and that it only averted bankruptcy and receivership as a result of the extraordinary government-brokered and subsidized bailout efforts that led to its acquisition by Wells Fargo in October 2008.  Although the cause of these calamitous events (unforeseeable and unprecedented "economic tsunami" or foreseeable consequence of Wachovia's own inadequately disclosed and imprudent conduct) was the subject of vigorously contested litigation in this Action, there can be no dispute that the events of 2008 shook virtually all observers' confidence in the financial stability and liquidity of even the country's biggest banks. Moreover, in August 2011 shortly before the parties agreed to the binding Term Sheet, stock markets around the world again shuddered, with leading market indices plummeting by more than 20% – and with the biggest declines being suffered by U.S. and European banking corporations.  In light of the events of 2008 and the even more recent events, it would be plainly incorrect to conclude that there was "no risk" that the Wachovia Defendants would have been able to pay a substantially greater judgment in the future – perhaps three or four years hence – after the completion of formal discovery, trial, and resolution of the inevitable post-trial motions and appeals.

44.     During the mediation process, discussions concerning the parties' respective arguments enabled Lead Plaintiffs to carefully assess the value of the claims, in the event Lead Plaintiffs' appeal was successful, including the risks of proving falsity, scienter, loss causation

and damages. Because Lead Plaintiffs' internal analysis was based on historical data and information, the facts and circumstances underlying these issues were well-understood and vetted when the parties agreed to settle.

45. Lead Plaintiffs have prior experience as a lead plaintiff in complex federal securities class actions and are also represented by in-house counsel. Lead Plaintiffs' in-house counsel was regularly involved in the litigation, fully apprised of all significant activities in the case, and actively involved in settlement negotiations. Lead Plaintiffs and their counsel believe that the foregoing considerations support Lead Plaintiffs' view that the Settlement is fair and reasonable.

## VII. COMPARISON TO SIMILAR ACTIONS

46. The view that the Settlement is fair is also supported by a comparison to settlements in other securities class actions.

47. According to a recent study of settlements in securities class actions, "more than half of post–Reform Act cases have settled for less than $10 million." *See* Ellen M. Ryan and Laura E. Simmons, "Securities Class Action Settlements: 2011 Review and Analysis" (Cornerstone Research 2012) at 4 (attached hereto as Exhibit 3). Moreover, approximately "80 percent of post-Reform Act cases have settled for less than $25 million, and only 7 percent of cases have settled for $100 million or higher." *Id.* Moreover, 87.8% of post-PSLRA cases have settled for less than $50 million and 92.7% of post PSLRA cases have settled for less than $100 million occurring in 1996 through 2011. *Id.* at 4. Accordingly, this $75 million settlement is approximately in the top 10% of securities class action settlements occurring in 1996 through 2011. The average settlement amount of securities class actions in 2011 was $21 million with a median of $5.8 million compared to an average of $36.3 million reported in 2010 with a median of $11.3 million. *Id.* at 2. The 2011 study also shows that credit-crisis related cases have settled at a "slower rate than traditional cases" and "[o]f the more than 200 credit-crisis cases filed, approximately 30 have settled to date." *Id.* at 16. The study notes that during the 2009 to 2011 time frame, the median settlement amount of credit-crisis related cases settled for $31.3 million

and with an average settlement amount of $85.2 million. *Id.*

48.     This Settlement is also impressive given that it was a case dismissed with prejudice, and Lead Counsel is not aware of any other dismissed securities class action that settled for more than $75 million.

## VIII.   REACTION OF THE CLASS

49.     While class member objections must be received by May 12, 2012, there have been no objections received to the Settlement, the Plan of Allocation, or the amount of Lead Counsel's fee request.  The absence of substantive objections thus far is particularly persuasive given the large proportion of institutions who owned Wachovia common stock and who, accordingly, are potential Class Members.

## IX.     PLAN OF ALLOCATION

50.     Pursuant to the Preliminary Approval Order, and as explained in the Notice, all Class Members wishing to participate in the Settlement are to file a valid Proof of Claim on or before June 17, 2012.

51.     As set forth in the Notice, all Class Members who file valid Proof of Claim forms will receive a distribution of the Net Settlement Fund, after deduction of fees and expenses approved by the Court and taxes incurred on interest income earned by the Settlement Fund.  The distribution will be made in accordance with the Plan of Allocation set forth and described in detail in the Notice.  The Plan of Allocation was developed by Lead Plaintiffs' damages expert in consultation with Lead Counsel.

52.     As explained in the Notice, the Plan of Allocation apportions the recovery among Class Members who acquired Wachovia's common stock during the Class Period and were damaged thereby.

53.     The Plan of Allocation reflects an assessment, relying on Lead  Plaintiffs damages expert's finding of the damages that may have been recovered from the alleged stock drops, had liability been successfully established based on the amount of inflation that was removed by the corrective disclosure.  The Plan of Allocation distributes the recovery according to when Class

Members acquired or sold their Wachovia common stock - taking into account the statistical significance of each stock drop.

54.     Lead Plaintiffs and Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

## X.     THE FEE APPLICATION

55.     Consistent with the law in the Second Circuit, Lead Counsel requests an award of attorneys' fees and expenses from the Settlement Fund based on a percentage of the Settlement Fund recovered for the Class. Lead Counsel is making a collective application for a fee award of $3.75 million, which is 5% of the Settlement Fund (the "Fee Application"). Lead Counsel also requests a collective reimbursement of expenses incurred in connection with the prosecution of this Action in the amount of $138,089.49, plus interest. The amount of fees requested is in accordance with Lead Counsel's agreement entered into between it and Lead Plaintiffs at the outset of the Action. Below is a discussion of some of the factors that courts generally consider when evaluating fee applications by class counsel.

### A.     The Time and Labor Expended by Counsel

56.     As sole Lead Counsel, my firm:

a.     conducted an extensive investigation of the claims asserted in the complaints filed in the Action by thoroughly researching the factual foundation with respect to the claims asserted in the Action. Those efforts involved: (i) reviewing and analyzing Wachovia's public filings, including its SEC filings; (ii) reviewing and analyzing news articles, press releases, announcements, and analysts' reports by and relating to Wachovia; (iii) researching law applicable to the claims asserted in the Action and the defenses thereto; (iv) consulting with a damage expert; and (v) consulting with professional investigators and interviewing confidential witnesses;

b.     drafted the First Amended Equity Complaint and Second Amended Equity Complaint and thoroughly researched applicable law with respect to the claims asserted in the Action and potential defenses;

    c.  researched and drafted briefs opposing the Wachovia Defendants' and the Underwriter Defendants' separate motion to dismiss;

    d.  consulted with a damages expert in order to develop rigorous loss causation and class damages analyses;

    e.  filed a Notice of Appeal of the Court's March 31, 2011 Order dismissing this Action in its entirety with prejudice;

    f.  conducted confirmatory discovery which included an interview with a Wachovia representative Robert Lechtenberg and reviewed 563,225 pages of documents produced by Defendants; and

    g.  conducted numerous settlement meetings and telephone calls, prepared mediation statements and reply mediation statements, negotiated during one day of mediation in New York City before Judge Daniel Weinstein, followed by extensive arms-length negotiations facilitated by the mediator, over a period of several months, which led ultimately to the present Settlement.

  57.  My firm further worked diligently to finalize and document the Settlement through negotiations with Defendants, the motion for preliminary approval and the motion for final approval. My firm researched, retained and supervised the Court-appointed Claims Administrator in all administration proceedings to date, including effectuation of Notice to the Class, publication of the Summary Notice, establishment of the Notice website, and ongoing collection and processing of Class Members' claim forms. Finally, my firm will be appearing at the final settlement hearing and continuing to oversee the administration of the Settlement.

  58.  Lead Counsel respectfully seeks a fee award of $3,750,000, which is 5% of the Settlement Fund. Lead Counsel has expended 5,725.25 hours in the prosecution and investigation of this Action. The resulting lodestar is $2,269,147.50. Under the lodestar approach, the requested fee of 5% of the Settlement Fund, or $3,750,000 (without interest),

yields a multiple of 1.653 on the time expended by Lead Counsel.[2]

59.    Lead Counsel's credentials, as a firm that has extensive experience in plaintiffs' class action securities litigation and with a long and successful track record in such cases, are set forth in my firm's resume attached hereto as Exhibit 4.

60.    The schedule attached here as Exhibit 5 is a detailed summary indicating the amount of time spent by each attorney and professional support staff of my firm who was involved in the litigation, and the lodestar calculation based on my firm's current billing rates.[3] For personnel who are no longer employed by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by my firm.  The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm, which are available at the request of the Court.  Time expended in preparing this application for fees and reimbursement of expenses has not been included in this request.

61.    The hourly rates for the attorneys and professional support staff in my firm included in Exhibit 5 are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation. The rates are in-line with the rates of other law firms that specialize in prosecuting or defending complex securities class action.  Annexed hereto as Exhibit 7 is a table of billing rates for defense firms and securities class action plaintiffs' firms compiled by Lead Counsel from fee applications submitted by such firms in similar matters.

62.    My firm's lodestar figures are based upon the firm's billing rates, which do not include charges for expense items.

---

[2]    It should be noted that even if the Court were to approve the Settlement and Lead Counsel's request for fees, Lead Counsel's efforts for the class would not end, as it would need to continue to supervise the claims administration process over the coming months and, upon completion of such process, prepare and file a motion for distribution of the Net Settlement Fund to approved claimants.

[3]    However, the billing rates reflected in Exhibit 5 for certain senior personnel including Roger Kirby and me are actually lower than the standard customary rates, which been discounted from current billing rates pursuant to a fee schedule negotiated in advance with Lead Plaintiffs.

## B.   The Magnitude and Complexity of the Litigation

63.   Securities class actions are by their nature legally and factually complex and difficult.  This case was no exception.  It involved issues relating to banking industry, banking regulations, mortgage loans, CDOs, loan origination standards, assessment of loan quality, and movements in the American mortgage and real estate markets, in addition to inherently complex Securities Act issues regarding, inter alia, negative causation and damages.  The complexity of this case supports the requested fee award. Here, in addition to the demanding issues of law and fact associated with securities class actions generally, the case presented a multi-faceted fraud involving complex loss causation and damages issues raised by frauds that involve alleged lapses in underwriting standards (standards which themselves are complex or ambiguous) and misrepresentations regarding loan quality, its loan origination standards, methodology for charging-off delinquent loans and for setting loan loss reserves, the scope and nature of Wachovia's actual CDO exposure.

64.   Moreover, there were real risks because the Court had dismissed the Second Amended Equity Complaint in its entirety.  Even if Lead Plaintiffs proved successful on appeal, they would still face the substantial risks that they would be unable to establish the required elements of their claims, including scienter, loss causation, damages, and particularly that the alleged misstatements were materially false and misleading. Throughout this process, Lead Plaintiffs would face numerous hurdles such as compelling challenges to loss causation, arguments that there were no actionable misrepresentations and omissions during the Class Period, and arguments that there were no recoverable damages.

## C.   The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

65.   This prosecution was undertaken by Lead Counsel entirely on a contingent fee basis.  The risks assumed by Lead Counsel in bringing these claims to a successful conclusion are described above.  Those risks are also relevant to an award of attorneys' fees.  Here, the risks assumed by Lead Counsel, and the time and expenses incurred without any payment, were

extensive, and are described in detail above.

66.     From the outset, Lead Counsel understood that it was embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of this Action, and that funds were available to compensate staff and to cover the considerable out-of-pocket costs that a case such as this requires. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel has received no compensation during the course of this Action and has incurred $138,089.49 in out-of-pocket expenses in prosecuting this Action for the benefit of the Class.

67.     Lead Counsel also bore the risk that no recovery would be achieved.   As discussed herein, from the outset, this case presented some risks and uncertainties that could have prevented any recovery whatsoever. Despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.

68.     Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

69.     Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities law can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks

undertaken in prosecuting a securities class action.

70.     Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Class.  In circumstances such as these, and in consideration of Lead Counsel's hard work and the extraordinary result achieved, the requested fee of 5% of the Settlement Fund is reasonable and should be approved.

### D.     The Quality of Representation of Counsel

71.     Lead Counsel is highly experienced in prosecuting securities class action, and worked diligently and efficiently in prosecuting the Action.  Lead Counsel's experience and track record in complex securities class action litigation as set forth in my firm's resume (annexed hereto as Exhibit 4).

72.     The quality of the work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition.

73.     Here, Defendants were represented by some of the country's most prestigious law firms, which vigorously and ably defended the Action throughout.  Specifically, the Defendants in the Action were represented by the following law firms: Fried Frank Harris Shriver & Jacobson LLP, on behalf of the Wachovia Defendants; and Sidley Austin LLP, on behalf of the Underwriter Defendants.  Despite this formidable and undeniably well-financed opposition, Lead Counsel was nonetheless able to successfully negotiate the substantial recovery that is reflected in the proposed Settlement.

74.     In sum, all relevant metrics indicative of the quality of counsel here weigh in favor of the requested fee award.

### E.     Attorneys' Fee Awards in Similar Actions

75.     As described in Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses and Incorporated Memorandum of Law, the requested fees are fair and reasonable under both the percentage approach and the lodestar/multiplier methodology.  Exhibits 5 and 6 also detail the time and expenses incurred and the hourly rates of Lead Counsel in connection with the prosecution of this case for more than three years.

Altogether, Lead Counsel worked for a total of 5,725.25 hours and for a lodestar of $2,269,147.50 and seek a fee of 5% of the settlement fund or $3,750,000.

76.     Attached hereto Exhibit 8 is a chart compiled by Lead Counsel that shows the percentage fees awarded by the courts in all federal securities class actions that Lead Counsel is aware of that settled since 2008 in the $65 million to $90 million range. The 5% fee requested by Lead Counsel here is at the very low end of the range of percentage fees awarded in similar actions.

77.     The lodestar multiplier implied by the fee requested here – 1.653 times lodestar – is well within the range generally awarded in securities class action litigation. This multiplier is justified by both the extraordinary recovery achieved and by practice and precedent in this Circuit, where district courts normally award lodestar multiples of between 2 and 5 in complex contingent litigation. *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 123 (2d Cir. 2005), *cert. denied sub nom. Leonardo's Pizza by the Slice, Inc. v. Wal-Mart Stores, Inc.*, 544 U.S. 1044 (2005) (upholding a multiplier of 3.5 as reasonable on appeal); *In re MBIA, Inc., Sec. Litig.*, No. 08-cv-264, slip op. at 2 (S.D.N.Y. Dec. 20, 2011) (awarding fee representing 22% and a multiplier of roughly 2.89) (Press Decl. Ex. 9); *Cornwell v. Credit Suisse Group*, No. 08 Civ. 03758, slip op. (S.D.N.Y. July 18, 2011) (awarding 27.5% fee on $70 million settlement, representing a multiplier of 4.7) (Press Decl. Ex. 10); *In re Comverse Tech., Inc. Sec. Litig.*, No. 06 Civ 1825, 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) (awarding 2.78 times lodestar, and noting that "[w]here . . . counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar"); *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240, 2007 WL 2230177, at *17 (S.D.N.Y. July 27, 2007) (lodestar multiplier of 2.48 was "found to be reasonable by courts that have used lodestar cross checks in complex class actions"); *see also* 4 Newberg on Class Actions §14:6 (4th ed. West 2011) ("Multiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied."); *see also* Exhibit 8 hereto. Moreover, in the related *In re Wachovia Preferred Securities and Bond/Notes Litigation*, 09 Civ. 6991 (RJS), slip op. at 6

22

(S.D.N.Y. Dec. 30, 2011) ("*Wachovia Bond Action*") (Press Decl. Ex. 11) the lodestar multiplier was roughly 2.3 and the fee award represented a 12% fee. These decisions and the decisions cited in the accompanying memorandum in support of the fee application (at p. 12), show that the multiplier requested is fair.

## XI.   REIMBURSEMENT OF THE REQUESTED LITIGATION EXPENSES IS FAIR AND REASONABLE

78.     Lead Counsel seeks reimbursement of $138,089.49, plus interest, in litigation expenses reasonably and actually incurred by Lead Counsel in connection with commencing and prosecuting the claims against the Defendants.

79.     From the beginning of the case, Lead Counsel was aware that it might not recover any of its expenses, and, at the very least, would not recover anything until this Action was successfully resolved.  Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced by them to prosecute this Action.  Thus, Lead Counsel was motivated to, and did, take significant steps to minimize expenses wherever practicable without jeopardizing the vigorous and efficient prosecution of the case.

80.     As detailed in Exhibit 6 attached hereto, my firm, as Lead Counsel, has incurred a total of $138,089.49 in unreimbursed litigation expenses in connection with the prosecution of this Action.  These expenses are reflected on the books and records maintained by my firm. These books and records are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred.  My firm's expenses, as set forth in detail in Exhibit 6, identifies the specific category of expenses, *e.g.*, on-line legal research, experts' fees, mediation, investigators, telephone, and other costs actually incurred for which Lead Counsel seeks reimbursement.

81.     All of the litigation expenses incurred were necessary to the successful prosecution and resolution of the claims against the Defendants.  In addition, the Notice apprised potential Class Members that Lead Counsel would be seeking reimbursement of expenses in an

amount not to exceed $175,000, excluding notice and administration costs.

82.     In view of the complex nature of this Action, the expenses incurred were reasonable and necessary to pursue the interests of the Class.  Accordingly, Lead Counsel respectfully submits that the expenses incurred by Lead Counsel should be reimbursed in full.

## XII.   CONCLUSION

83.     In view of the significant recovery to the Class, the very substantial risks of this litigation, the substantial efforts of Lead Counsel, the quality of the work performed, the contingent nature of the fee, the complexity of the case and the standing and experience of Lead Counsel, Lead Counsel respectfully submits that the Settlement should be approved as fair, reasonable and adequate; that the Plan of Allocation should be approved as fair and reasonable; that a fee in the amount of 5% of the $75,000,000 Settlement Fund, or $3,750,000 plus interest, should be awarded to Lead Counsel; and that Lead Counsel's litigation expenses in the amount of $138,089.49, plus interest should be reimbursed in full.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 27, 2012 in New York, New York.


_____
IRA M. PRESS